RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 211414)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbyb.com, myk@lnbyb.com, kjb@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>    Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>    Debtor and Debtor in Possession.<br>_____<br><br>☒ Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐ Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br><br>Chapter 11 Cases<br><br>**OMNIBUS DECLARATION OF L. GEOFF GREULICH IN SUPPORT OF DEBTORS' EMERGENCY "FIRST DAY" MOTIONS**<br><br>DATE:    September 13, 2017<br>TIME:    2:00 p.m.<br>PLACE:    Courtroom "303"<br>            21041 Burbank Blvd.<br>            Woodland Hills, CA |

**I, L. Geoff Greulich, hereby declare as follows:**

1.      On September 1, 2017 ("Petition Date"), Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada" and with Ironclad California, the "Debtors" or "Ironclad"), each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code. Effective July 6, 2017, I became the Chief Executive Officer of Ironclad.  In that capacity, I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.      Other than owning all of the shares in Ironclad California, Ironclad Nevada has no business.  All operations of the Debtors effectively function through Ironclad California.

3.      The Debtors are a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder.  The Debtors' business is headquartered in Farmers Branch, Texas.  Ironclad Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW".  As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.  As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees who work overseas.

4.      Ironclad was founded in 1998 by Ed Jaeger.  Mr. Jaeger was inspired to build gloves that offered protection and performance without sacrificing one for the other.  From the beginning, Ironclad built gloves using materials that offered excellent fit to make them an extension of the hand and to make jobs easier for the "industrial athlete".  By 2006, Ironclad offered 35 different task-specific glove types for people wearing gloves as part of their daily jobs.

5.      In 2008, the Debtors launched the KONG (King of Oil 'N' Gas) line to address the high number of hand injuries in the O&G field.  By 2010, the KONG line was comprised of 46 different gloves.  Additionally, Ironclad expanded its presence in the retail and non-

professional markets with the launch of the EXO brand in June 2015. EXO offers lower cost gloves for automotive, DIY, and outdoor sporting applications. Ironclad offers 30 different EXO glove types.

6.      Ironclad's task-specific technical glove products are specially designed for individual user groups. Ironclad currently offers over 160 distinct types of gloves for a variety of markets, including industrial, construction, DIY, carpentry, machining, package handling, plumbing, welding, roofing, O&G, mechanics, hunting, and gardening. Products come in a multitude of colors and cater to the specific demands and requirements of the users based on ease of motion, grip, water and chemical resistance, visibility, and protection from abrasions, cuts, flames, impacts, temperature, and vibration. Since inception, Ironclad has employed an internal research and development ("R&D") department responsible for identifying and creating new products and applications, and improving and enhancing existing products. Ironclad is continually evaluating new base materials for gloves, and grip is another key area of focus for R&D. Ironclad often partners with industry-leading organizations to develop new products. Ironclad has 13 U.S. patents issued and 11 foreign patents, as well as five pending U.S. patent applications and several pending foreign patent applications. Ironclad also uses trademarks to strengthen and protect its recognizable brand names. Ironclad owns 52 registered U.S. trademarks, 39 registered international trademarks, and 13 and 43 trademarks pending in the U.S. and internationally, respectively.

7.      Ironclad currently sells through approximately 10,000 outlets for professional tradesmen as well as "Big Box", hardware, auto parts, and sporting goods retailers. The sales force is organized by 3 business segments: Industrial, Retail, and International. Glove products are currently manufactured by multiple suppliers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia.

8.      Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations have been insufficient to support their current business operations as well as their continued growth. There have been many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or

ineffective expansion and distribution of all of their product lines and development of new customers, and higher than anticipated production, manufacturing and warehousing costs.  In addition, it was discovered in early 2017 that under prior management, the Debtors had failed to provide materially complete and correct financial statements as required under their Loan Documents (defined below) to their primary secured lender for the fiscal years ended December 31, 2015 and 2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017.  As a result of this discovery, the Debtors' then chief executive officer and other officers were terminated, and I assumed the position of the Debtors' new chief executive officer effective July 6, 2017.  Prior to assuming this position, I had no prior connections or relationship with the Debtors as an insider, equity holder or otherwise.  As a Senior Advisor, Operations at Corridor Capital, LLC, where I lead operations through portfolio engagement as well as conducting due diligence, I was and remain qualified to serve as the Debtors' new chief executive officer.  Persons or parties interested in obtaining specific historical financial history of the Debtors should review the public filings made by the Debtors with the Securities and Exchange Commission.

9.      The Debtors have filed their bankruptcy cases to consummate a sale of substantially all of their assets for the most money possible.  Just prior to their bankruptcy filings, the Debtors entered into an asset sale agreement with the Debtors' current secured creditor, Radians Wareham Holdings, Inc. ("Radians") or its affiliate/designee, for a purchase price of $20 million or $15 million, subject to an overbid process.  Contemporaneously herewith, the Debtors have filed a motion seeking Court approval of their proposed overbid procedures that the Debtors negotiated with Radians prior to their bankruptcy filings.  The Debtors' entire sale process is designed to maximize the Debtors' sale price for the benefit of the Debtors' creditors and shareholders.  I believe that the Debtors have substantially less than $15 million of total debt. I therefore expect that the Debtors' asset sale to Radians or to a successful overbidder will result in all of the Debtors' creditors being paid in full and a significant distribution being made to the Debtors' shareholders.

10.    Pre-petition, the Debtors hired Craig-Hallum Capital Group, LLC as their financial advisor/investment banker to, among other things, market the Debtors' business for sale. The Debtors will be seeking to employ Craig-Hallum Capital Group, LLC to serve as the Debtors' post-petition financial advisor/investment banker to assist the Debtors to locate and negotiate with prospective overbidders and to help facilitate an auction sale process designed to obtain the highest price possible for the Debtors' assets.

11.    Briefly and as described below, Radians is the Debtors' primary secured creditor which is currently owed approximately $4 million. Radians has agreed to purchase the Debtors' assets for $20 million or $15 million as a stalking horse buyer. The Debtors have no secured debt other than their secured loans to Radians.

12.    To support the financial needs of their current and growing operations, on or about November 28, 2014, the Debtors obtained a revolving credit facility ("Revolving Loan") from Capital One, National Association, a National Banking Association ("Capital One") secured by substantially all of the Debtors' assets and property, which essentially consists of accounts receivable, inventory, equipment, intellectual property and goodwill associated with the Debtors' well-regarded brands. The Revolving Loan is evidenced by that certain Revolving Loan and Security Agreement dated November 28, 2014, as modified from time to time, the Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017 in the principal amount of $8,000,000 as amended from time to time, and related agreements and documents (collectively "Loan Documents"). Capital One recorded a UCC-1 financing statement with the California Secretary of State on December 18, 2014 (document number 14-7441632305), and a UCC-1 financing statement from the Nevada Secretary of State on December 12, 2014 (document number 2104031733-1), both of which purport to cover substantially all of the Debtors' assets and property. *See* **Exhibits A and B** attached to the Declaration of Monica Y. Kim ("Kim Declaration") filed concurrently herewith.

13.    On February 23, 2017, Capital One issued an Event of Default letter based on the Debtors' failure to meet certain of their financial covenants under the Loan Documents, however, Capital One agreed to waive its rights and remedies with respect to such defaults, and

to extend the maturity date by 90 days.  In consideration, the Debtors agreed to release all existing claims against Capital One generally relating to or arising with respect to the Loan Documents.

14.    On July 25, 2017, Capital One sold, transferred and assigned to Radians all of its rights, title and interest in and to the Loan Documents.  The assignment was made without recourse to Capital One and without representation or warranty of any kind.  The Debtors are unaware as to the consideration exchanged between Capital One and Radians for the assignment of the Revolving Loan.  Assignments of the UCC-1 financing statements previously recorded by Capital One with the California and Nevada Secretary of State were also recorded in these states.

15.    Subsequent to the assignment of the Revolving Loan, the Debtors have entered into several forbearance agreements with Radians.  On August 1, 2017, the Debtors signed a Forbearance and Modification Agreement pursuant to which Radians agreed to forbear, until 12:00 p.m. Central Time on August 7, 2017, from exercising available remedies under the Loan Documents.  In exchange, the Debtors agreed to release Radians from existing claims under the Loan Documents, and to a prepayment fee of $120,000 in the event the Debtors are able to repay the indebtedness with financing from a financial or lending institution or in connection with the acquisition of the Debtors or their assets by a third party. In the event Radians and/or its affiliates acquire the Debtors' assets, the Debtors receive a credit for the prepayment fee.

16.    On August 14, 2017, the Debtors signed a second Forbearance Agreement pursuant to which Radians agreed to forbear, until 12:00 p.m. Central Time on August 21, 2017, from exercising available remedies under the Loan Documents.  In exchange, the Debtors agreed to release Radians from existing claims under the Loan Documents.

17.    As of August 24, 2017, the balance owing on the Revolving Loan was $3,944,045.93.  I believe that the current outstanding balance owing to Radians is less than this amount as a result of further cash sweeping by Radians that occurred shortly prior to the bankruptcy filings.  Upon the expiration of the second Forbearance Agreement, Radians advised the Debtors that Radians was not willing to continue to forbear and, on or about August 24, 2017, Radians exercised certain of its default rights under the Loan Documents by sweeping the

Debtors' cash.  This cash sweep by Radians left the Debtors with no funds and no ability to continue to operate.  While the Debtors were in negotiations with a number of prospective lenders (both to replace the existing Radians' debt and to supplement the existing Radians' debt) and a number of prospective buyers and/or merger partners, the Debtors did not have the luxury of time to complete those negotiations and remain in business given that the Debtors had no access to their funds or the necessary liquidity to enable the Debtors' to continue with their very valuable business operations.

18.    Under these crises and dire circumstances, the Debtors determined in the exercise of their business judgment that the best option available to the Debtors if acceptable terms could be negotiated would be for the Debtors' to (i) enter into a stalking horse bid sale agreement with Radians (who had made clear its desire to acquire the Debtors' business), subject to overbid, (ii) obtain the consent of Radians to advance back to the Debtors certain of the pre-petition the swept funds and provide the Debtors with additional necessary pre-petition financing at very reasonable terms to enable the Debtors to maintain their pre-petition business operations pending the filing of their bankruptcy cases, and (iii) obtain the consent of Radians to make post-petition advances to the Debtors and to consent to the Debtors' use of cash collateral to enable the Debtors to maintain their post-petition business operations pending the closing of the Debtors' sale of their assets.

19.    Concurrently with these negotiations, further forbearance agreements were also negotiated and agreed upon between the Debtors and Radians.

20.    Under each of the multiple forbearance agreements between the Debtors and Radians, the Debtors also acknowledged the validity and enforceability of the Loan Documents and the security interests in all of the collateral covered by the Loan Documents.  The key Loan Documents are attached hereto as **Exhibit 1** (Revolving Loan and Security Agreement), **Exhibit 2** (Second Amended and Restated Revolving Line Credit Note), **Exhibit 3** (six modification agreements to the Revolving Loan and Security Agreement), **Exhibit 4** (agreements of assignment from Capital One to Radians), and **Exhibit 5** (forbearance agreements between Debtors and Radians).

21.     Based on the existing liens of Radians upon substantially all of the Debtors' assets and the proceeds therefrom, I am informed that all of the Debtors' post-petition revenue and income constitute the "cash collateral" of Radians.  I am further informed that Radians has consented to the Debtors' use of cash collateral pursuant to the terms of the Interim Order and/or the DIP Agreement.

22.     In addition, due to the Debtors' current financial condition, the use of the Debtors' cash collateral alone will be insufficient to meet the Debtors' immediate post-petition liquidity needs.  The Debtors require new post-petition funding to maintain their businesses and preserve the value of their assets while the Debtors pursue and expedited sale process which will allow the Debtors to sell their businesses and/or assets as a going concern to Radians or a successful overbidder.

23.     As described above, the Debtors' current and sole secured creditor, Radians, has agreed to provide the Debtors with post-petition financing in the aggregate principal amount not to exceed $1,000,000 (the "DIP Loan"), pursuant to the terms and conditions set forth in that certain *Debtor in Possession Loan and Security Agreement* ("DIP Agreement"), a true and correct copy of which is attached hereto as **Exhibit 7**.  Based on the Debtors' Initial Approved Budget, an eight (8) week cash flow forecast setting forth all projected cash receipts and cash disbursements following the Petition Date, the Debtors believe that the proposed DIP Loan will provide the Debtors with sufficient funds to maintain the Debtors' business operations and successfully consummate a sale of the Debtors' businesses and/or assets.  A true and correct copy of the Initial Approved Budget is attached hereto as **Exhibit 8**.

24.     The Debtors are unable to obtain sufficient interim and/or long-term financing from sources other than Radians on terms and subject to conditions more favorable than under the DIP Agreement.  Radians has indicated that it is willing to provide the Debtors with the proposed post-petition financing solely on the terms and conditions set forth in the DIP Agreement.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loan to be provided by Radians, combined with the consent to use cash collateral provided by Radians, represents the best

financing presently available to the Debtors.

25.    The specific terms and conditions under which Radians has agreed to provide the DIP Loan are set forth in the DIP Agreement which is attached hereto as **Exhibit 7**.

26.    The Debtors have filed its emergency Motion for the entry of an interim order ("Interim Order") in substantially the form attached hereto as **Exhibit 6** and for the entry of a final order ("Final Order") following a final hearing on the Motion, which provide for, among other things (i) authorization to obtain the DIP Loan in the aggregate amount not to exceed $1 million, (ii) authorizes the Debtors' use of cash collateral, and (iii) grants the liens and claims provided for in the DIP Agreement and requested in the Motion.  For all of the reasons set forth in the Motion, I respectfully request that the Court enter the Interim Order and the Final Order, and grant all other relief requested therein as requested.

27.    As indicated, the Debtors filed their bankruptcy cases to consummate a sale of substantially all of their assets (excluding cash and causes of action) for the most money possible.  Just prior to their bankruptcy filings, the Debtors entered into an asset purchase agreement ("APA") with Radians or its affiliate ("Purchaser") for a cash purchase price of $20 million or $15 million, subject to an overbid process.  Purchaser will be paying a cash purchase price of either $15 million or $20 million depending upon the occurrence of an event which is sensitive and is the subject of a motion the Debtors are filing under seal, which I hope will be granted by the Court.  It should be noted that I believe the total debt in these cases (both secured and unsecured combined) is or will be in the range of approximately $8-$10 million, which means that all creditors are expected to be paid in full with there being a substantial distribution to the shareholders of the parent company, which is a publicly traded company.

28.    The Debtors' business was actively marketed for sale for an extended period prior to the Debtors' bankruptcy filing by a qualified investment banker in Craig-Hallum Capital Group, LLC.  Prospective buyers had the ability to purchase assets or equity.  While a number of prospective buyers expressed and continued to express interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-bankruptcy marketing process because (i) the Debtors were out of funds, (ii) the Debtors could not continue

to operate without both access to their own cash receipts as well as receipt of additional financing, and (iii) Purchaser had exercised its secured creditor rights and was sweeping all of the Debtors' cash and was no longer willing to continue to forbear or advance additional needed financing to the Debtors absent a global resolution with the Debtors which was accomplished with the APA and the DIP financing agreement the Debtors entered into with Purchaser which is the subject of a separate emergency motion.

29.     The purchase offer provided to the Debtors by Purchaser was determined by the Board to be the best offer the Debtors had received by the Petition Date, and Purchaser was ready to proceed with its purchase and lend the Debtors sufficient funds to enable the Debtors to operate their business through an Auction to take place in late October, 2017 with a sale closing to occur shortly thereafter.  Purchaser was also willing to permit the Debtors to proceed with a robust post-bankruptcy marketing and hopeful overbid process to insure that the highest and best price is paid for the Debtors' assets.  Given the breadth of the Debtors' pre-bankruptcy marketing process and the fact that the Debtors' pre-bankruptcy investment banker (who is already very familiar with the various prospective overbidders) will be serving as the Debtors' post-bankruptcy investment banker and leading the overbid sale process, and the fact that the likely overbidders are already deep into the due diligence process, I am confident that providing prospective overbidders with approximately six weeks to decide whether to participate in the Auction is a sufficient amount of time for the Debtors to achieve the highest and best price for their assets.  Also, and very importantly, the Debtors' financial needs expand in the last two months of the year to accommodate seasonal builds and the Chinese New Year disruption of suppliers so if the Debtors are required to continue to operate their business through the end of the year or significantly beyond October 31, 2017, the Debtors may need to borrow additional funds which could result in substantially reducing the ultimate recovery for the Debtors' shareholders.  It is also not clear that any such additional financing would be available to the Debtors in any event.  It is for this reason that I believe it is very important that the Debtors' be authorized to implement their proposed sale timeline.

30.     The Debtors are requesting the Court to approve their Bid Procedures Motion on an emergency basis in order to provide prospective overbidders with the maximum amount of time possible to understand the overbid process and provide clear direction and guidelines because I believe that doing so will maximize the prospects for a successful Auction and insure that under the circumstances, the highest and best price is paid for the Purchased Assets.

31.     A copy of the APA entered into between the Debtors and Purchaser prior to the Petition Date is attached hereto as **Exhibit A**.  Section 6.5 of the APA is the section dealing with the bid procedures.  The following is a summary of the Bidding Procedures and Protections that the Debtors are requesting the Court to approve and which are what the Debtors and Purchaser agreed to in the APA prior to the Petition Date:[1]

1.  The initial bid over that submitted by Purchaser in the APA shall be in the amount of at least $20,750,000.00 if Purchaser's Aggregate Purchase Price is Twenty Million Dollars ($20,000,000.00) and shall be in the amount of at least $15,750,000 if Purchaser's Aggregate Purchase Price is Fifteen Million Dollars ($15,000,000.00).

2.  Thereafter, bidding shall be in increments of at least $250,000.00 or figures which are wholly divisible by $250,000.00.

3.  Only financially qualified parties will be eligible to participate in the Auction – with financially qualified parties to mean parties who have demonstrated that they have the financial means to consummate their purchase of the Purchased Assets without financing unless the financing to be used by them is already committed (meaning that any overbid may not contain any financing contingency).  Any party who participates in the Auction will have completed their due diligence of the Debtors and will have no due diligence contingency.

4.  In order to be eligible to participate in the Auction, prospective overbidders will be required at least three business days prior to the Auction (i.e., by 5:00

---

[1] Any defined term used herein which is not defined herein but which is defined in the APA shall have the same definition as provided in the APA.

p.m. PST on October __, 2017) to (i) deliver a redlined version of the APA to counsel for the Debtors, counsel for Purchaser and counsel for any official committee formed in the Debtors' bankruptcy cases indicating any changes the prospective overbidder is requesting to the APA, and (ii) submit a cash deposit of $2 million, which deposit will be non-refundable and forfeited by the prospective overbidder if the prospective overbidder is deemed by the Bankruptcy Court to be the winning bidder and fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order approving the Debtors' sale of the Purchased Assets to the prospective overbidder regardless of whether an appeal has been filed of such Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement.

5. Purchaser will have the right, but not the obligation, to credit bid the outstanding balances of its Pre-Bankruptcy Secured Debt and the DIP Facility towards its purchase price and any overbid that Purchaser elects to submit. Purchaser shall have the right to participate in any Auction.

6. If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, then concurrently with the closing of the Debtors' sale of the Purchased Assets to such winning bidder, Purchaser will be paid directly out of the sale proceeds (i) the full amount of the Pre-Bankruptcy Secured Debt, plus (ii) the full amount of the DIP Facility, plus (iii) the Breakup Fee.

7. If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, or if the Debtors elect to proceed with seeking confirmation of a plan of reorganization instead of proceeding with a sale of the Purchased Assets, Purchaser shall receive a break-up fee (the "Breakup-Fee") in the amount of $500,000.00.

8.  The Break-Up Fee shall be deemed to be an allowed expense of the kind specified in Section 503(b) of the Bankruptcy Code and shall be paid solely from the proceeds of an Alternative Transaction.

9.  The Debtors shall have the right to schedule the Auction so that the payment of the Breakup-Fee to Radians will not be considered in determining the highest price bid for the Assets.  However, Radians shall be authorized to match any qualified overbid and be declared the successful purchaser of the Purchased Assets giving consideration in the amount of the required Break-up Fee and Prepayment Fee as a component of its matching bid, which Break-up Fee and Prepayment Fee will not owing by the Debtors if Radians is the winning bidder.

10. The Debtors will agree to proceed with an accelerated sale process, seeking to have the sale approval hearing no later than October 30, 2017.

11. If Radians is deemed by the Bankruptcy Court to be the winning bidder at the Auction and Radians fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order (regardless of whether an appeal has been filed of the Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement), then Radians shall forfeit the Buyer Deposit to the Debtors.

12. The Debtors' sale of the Purchased Assets to Radians or a successful overbidder will be free and clear of all liens, claims and interests in accordance with section 363(f) of the Bankruptcy Code.

13. The Debtors have the right to market the Purchased Assets for overbid pending the Auction and to hire an investment banker or sales agent to assist the Debtors in this process.  However, the collateral of Radians shall not be used to fund the engagement of an investment banker or sales agent with such party only being entitled to compensation from the proceeds of the Closing.

32.     I submit that all of the bidding procedures the Debtors are seeking to have the Court approve, including the proposed break-up fee to Purchaser, satisfies all three of the following useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; and (3) to attract additional bidders.  I understand that the proposed break-up fee of $500,000 (which will be 2.5% if the purchase price ends up being $20 million and will be 3.33% if the purchase price ends up being $15 million) is well within the percentage parameters that have been approved by many other courts.  I believe that this proposed break-up fee of $500,000 is reasonable under the circumstances.  I also believe that it would not have been possible for the Debtors to obtain a stalking horse bidder with a purchase price in this range without the payment of a comparable break-up fee.

33.     For all of the reasons described above, the Debtors would not have been able to survive as an ongoing business if the Debtors were not able to stop the cash sweep implemented by Radians and obtain the additional financing that Radians has agreed to provide.  But in addition, it is critical that the Debtors consummate their sale by around the end of October, 2017 because after that their financial needs grow significantly, and the Debtors do not currently have in place anyone offering to provide the Debtors with the needed additional financing.  But even if the Debtors did have such additional financing available to them, borrowing even more money would simply result in increasing the amount of the Debtors' debt that would have to be satisfied before shareholders would receive a distribution and therefore reduce the ultimate recovery for shareholders.

34.     I believe that even if the Debtors would have been able to obtain use of their cash collateral (with or without the consent of their secured creditor) and even if the Debtors could have found someone else willing to provide the Debtors with their necessary financing, going into these bankruptcy cases with no stalking horse bidder and simply conducting an open auction ran the risk of chaos and uncertainty.  I feel very strongly that having a stalking horse bidder in place will create organization and stability for the Debtors, their employees, their suppliers and their customers as well as create a clear and organized sale structure and guidelines for prospective Overbidders to be able to complete against, which I believe is likely to enhance and

maximize the prospects for an overbid at the Auction and enhance the ultimate sale price paid for the Purchased Assets.  None of this would have been possible if not for Purchaser's stalking horse bid, and Purchaser understandably would not have been willing to serve as the stalking horse bidder without the assurance of the $500,000 break-up fee.  I believe that the under the circumstances of these cases, the $500,000 break-up fee is reasonable and appropriate and would undoubtedly have been required by any stalking horse bidder.  As noted above, Purchaser has agreed to a key provision of the overbid process which I understand is rare in today's bankruptcy auction world which is to provide the Debtors the flexibility of not counting the break-up fee in determining the highest and best price bid for the Purchased Assets so that the Debtors and their investment banker can legitimately advertise to prospective Overbidders that they will not be incurring any bidding disadvantage as a result of not serving as the stalking horse bidder.

35.    I strongly believe that proceeding with the Bidding Procedures and Protections as proposed by the Debtors herein and as agreed to between the Debtors and Purchaser (subject of course to the approval of the Court) is in the overwhelming best interests of the Debtors and their estates.

///

///

///

///

///

///

///

///

///

///

///

///

36.      Based upon all of the foregoing, on behalf of the Debtors, I request that the Court enter an order in substantially the form attached hereto as **Exhibit B**.

(1)      approving the form of APA between the Debtors and Purchaser attached hereto as **Exhibit A** to be used by (a) Purchaser as the stalking horse bidder for the Purchased Assets, and (b) any Overbidders who seek to participate in the Auction;

(2)      approving the form of Auction Notice to be provided by the Debtors to their creditors and to be provided by the Debtors' investment banker to prospective Overbidders in the form attached hereto as **Exhibit C**;

(3)      scheduling the Auction and the Sale Hearing before the Court in late October, 2017 to consider the Sale Motion and approval of the sale of the Purchased Assets to the highest bidder, which Auction and Sale Hearing the Debtors propose to hold concurrently before the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of September 2017 at Los Angeles, California.

                                                        L. GEOFF GREULICH

**EXHIBIT "1"**

## REVOLVING LOAN AND SECURITY AGREEMENT

This **REVOLVING LOAN AND SECURITY AGREEMENT** (this "Agreement") is made as of November 28, 2014, by and among **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California"), **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada", and, collectively with Ironclad California, "Borrower"), and **CAPITAL ONE, N.A.** ("Bank").

WHEREAS, Borrower has requested that Bank provide Borrower with a revolving credit facility; and

WHEREAS, Bank is willing to provide such revolving credit facility to Borrower upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises herein contained and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1
## DEFINITION OF TERMS

**1.1    Definitions.** As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report, or other Security Documents made or delivered pursuant to this Agreement, the following terms have the meanings assigned to them in this Section or in the Section or recital referred to below:

"Account" and "Account Receivable" includes accounts, accounts receivable, notes, notes receivable, rental agreements and other rights to collect rent, contract rights, drafts, acceptances, instruments, chattel paper, general intangibles, and other forms of obligation or rights to payment and receivables, whether or not yet earned by performance, including state and federal tax refunds.

"Account Debtor" means the party who is obligated on or under any Account or contract right.

"Affiliate" of a Person means any Person controlling, controlled by or under common control with, such Person.

"Agreement" means this Revolving Loan and Security Agreement, including the Schedules and Exhibits hereto, as the same may be modified, amended, renewed, extended, or restated from time to time.

"Audits" has the meaning set forth in Section 8.

"Borrowing Base" means an amount equal to up to eighty percent (80%) of the value of Borrower's Eligible Accounts, plus up to fifty percent (50%) of the value of Borrower's Eligible

Inventory, plus up to thirty-five percent (35%) of the value of Borrower's Eligible In-Transit Inventory, minus the Borrowing Base Reserve; provided, however, that the portion of the Borrowing Base attributable to the sum of Borrower's Eligible Inventory plus Borrower's Eligible In-Transit Inventory shall not exceed fifty percent (50%) of the Revolving Line Limit; provided, further, that in no event shall the Borrowing Base exceed the Revolving Line Limit.

"Borrowing Base Reserve" means, (i) initially, $500,000.00, and (ii) once Borrower's EBITDAS exceeds $1,000,000 on a trailing twelve-month basis, $0.00.

"Business Day" means any day other than a Saturday, Sunday, or day on which banks are authorized to be closed under the laws of the State of Texas.

"Change in Control" means a transfer of ownership or control of Stock in a Person equal to or greater than fifty percent (50%).

"Code" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated and rulings issued thereunder.

"Collateral" means any and all personal or intangible property of Borrower in which Bank acquired, now has, or by this Agreement or any other agreement acquires, or hereafter acquires a security interest or other rights or interests as security for the Indebtedness, including, without limitation, Borrower's obligations under this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § et seq.), as amended from time to time, and any successor statute.

"Constituent Documents" means, with respect to any Person, its partnership agreements, limited liability company agreements, articles of organization, regulations, articles or certificate of incorporation, bylaws, organizational documents, trust agreement, or such other document as may govern such Person's formation, organization, and management.

"Debt Service Coverage Ratio" means, with respect to Borrower and its subsidiaries, the ratio of (a) EBITDAS to (b) the sum of the current portion of the Indebtedness, plus interest expense, plus all Subordinated Debt payments, calculated in accordance with GAAP.

"Debtor Laws" means all applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, receivership, insolvency, reorganization, or similar laws from time to time in effect affecting the rights of creditors generally.

"Distributions" means, with respect to any Stock issued by any Person, (a) the retirement, redemption, purchase, or other acquisition for value of such Stock by such Person, (b) the declaration or payment of any dividend or distribution on or with respect to such Stock by such Person, and (c) any other payment or distribution of any kind by such Person with respect to such Stock.

"Dominion Account" has the meaning set forth in Section 9.1.

"EBITDAS" means, as of any applicable date of determination and as determined in accordance with GAAP, the net income of Borrower for the twelve (12)-month period then ended, plus (a) interest expense, tax expense, depreciation and amortization expenses, and stock option expenses for the same period, excluding (b) (i) any extraordinary gain or loss, and any interest income from Affiliates of the Borrower for the same period, and also excluding (ii) gains or losses resulting from changes of market values of any interest rate Hedge Agreement to which Borrower is a party.

"Eligible Account" means an Account of Borrower which meets each of the following requirements:

(a)    it arises from the sale of goods or from services rendered, such goods have been shipped or delivered to the Account Debtor under such Account and such services have been fully performed and have been accepted by the Account Debtor, and the Borrower's full right to payment for all sums due from such Account Debtor with respect to such Account has been earned and then be due and payable;

(b)    it is a valid and legally enforceable obligation of the Account Debtor thereunder according to its express terms, and is not subject to any offset, counterclaim, cross-claim, or other defense on the part of such Account Debtor denying liability thereunder in whole or in part;

(c)    it is not subject to any Lien, security interest or similar adverse rights or interests whatsoever other than the security interest in favor of Bank hereunder;

(d)    it is evidenced by an invoice, dated the date of shipment (in the case of goods sold or leased) or the date of performance (in the case of services rendered) and having payment terms acceptable to the Bank;

(e)    it is not owing by an Account Debtor whose obligations the Bank, acting in its sole discretion, has notified the Borrower are not deemed to constitute an Eligible Account;

(f)    it is not due from an Affiliated corporation or entity, subsidiary corporation or entity, parent corporation or entity, stockholder, officer, director or employee of Borrower or any such Affiliate, subsidiary, or parent corporation or entity; or any individual or entity Affiliated or related to any of the foregoing, whether by blood, marriage, or otherwise;

(g)    it is not due from an individual consumer;

(h)    it does not constitute retainages, progress billings, or deferred payments under a contract not fully performed;

(i)    it is not evidenced by an instrument, promissory note or chattel paper;

(j)    it does not constitute, in whole or in part, interest or finance charges on outstanding balances;

(k)    it is an Account with respect to which no return, repossession, rejection, cancellation, repudiation, or bankruptcy has occurred or has been threatened;

(l)    it is an Account with respect to which Borrower continues to be in full conformity with the representations, warranties, and covenants of Borrower made with respect thereto;

(m)    it is not subject to any sales terms, trial terms, sales-or-return terms, consignment terms, guaranteed sales performance or warranties or representations relating to minimum sales volume, C.O.D. terms, cash terms, or similar terms or conditions;

(n)    it is not owed by an Account Debtor that is not an individual residing in the United States or a corporation or partnership organized and validly existing under the laws of a state within the United States, unless payment is secured by a letter of credit acceptable to Bank;

(o)    it is not an Account subject, in whole or in part, to any "bill and hold" or similar arrangement pursuant to which the invoice is delivered prior to the actual delivery of the sold or leased goods or the performance of the services;

(p)    it is not an Account with respect to which (i) sixty (60) days or more has passed since the invoice due date, if the invoice due date is less than or equal to ninety (90) days from the date of the invoice, (ii) one hundred and fifty (150) days or more has passed since the date of the invoice, if the invoice due date is greater than ninety (90) days from the date of the invoice, or (iii) sixty (60) days or more has passed since the invoice due date, if the Account Debtor is AutoZone, Inc., Balkamp, Inc., or Pep Boys, Inc.;

(q)    it is not owed by any Account Debtor with respect to which fifty percent (50%) or more of its total Accounts owing to the Borrower remain unpaid after (i) sixty (60) days from the relevant invoice due date, if the invoice due date is less than or equal to ninety (90) days from the date of the invoice, (ii) one hundred and fifty (150) days from the relevant invoice due date, if the invoice due date is greater than ninety (90) days from the date of the invoice, or (iii) sixty (60) days from the relevant invoice due date, if the Account Debtor is AutoZone, Inc.;

(r)    it is not an Account owed by an Account Debtor whose account balance exceeds twenty-five percent (25%) of the total of Borrower's aggregate Accounts Receivable, except to the extent of such Eligible Accounts of such Account Debtor that do not exceed twenty-five percent (25%) of the total of Borrower's aggregate Accounts

Receivable, or except as expressly permitted from time to time by Bank exercising its reasonable credit judgment;

(s)   it is not an Account as to which Borrower or any other party to such Account is in default in the performance or observance of any of the terms thereof;

(t)   it is not an Account in which the Account Debtor is the United States of America or any department, agencies, or instrumentality thereof, unless Borrower assigns its rights to payment of such Account to Bank, in form and substance satisfactory to Bank, and so as to comply with all requirements of the law;

(u)   it is not an Account that Bank exercising its reasonable credit judgment, has deemed to be unacceptable;

(v)   it is not a contra Account;

(w)   it is not an "On Credit Hold" Account; and

(z)   it is not an Account that has had a net positive credit balance for more than sixty (60) days.

"Eligible In Transit Inventory" means Inventory that would otherwise constitute Eligible Inventory except for the fact that it is in transit, and that has been produced, is in transit to one of Borrower's places of business, and is fully insured against loss or damage while in transit.

"Eligible Inventory" means Inventory of Borrower meeting each of the following requirements:

(a)   it is not subject to special marketing conditions or marketability limitations judged by the Bank, in its sole discretion, to be unacceptable;

(b)   it is not Work in Progress, parts, supplies, nor does it include any Packaging and Supplies, marketing materials, promotional items, private label inventory, or inventory subject to patents, trademarks or licenses owned by a third party;

(c)   it is not materials or supplies used or to be used, or consumed or to be consumed in the normal course of business of Borrower;

(d)   it is new and unused;

(e)   it is owned by Borrower and is not subject to any lien or security interest whatsoever, other than the security interest granted to Bank hereunder;

(f)   it is held for sale in the normal and ordinary course of Borrower's business;

(g)    it is located at one of Borrower's places of business in the United States and is not in transit;

(h)    it is not of a type of inventory that is subject to any recall, class action litigation, governmental action, order, inquiry or investigation;

(i)    it is not located on any leased premises unless Bank has a signed landlord subordination agreement from the relevant landlord in form and substance acceptable to Bank;

(j)    it is not on consignment and no warehouse receipt or document of title is or has been issued in respect of such Inventory;

(k)    it is not expired, opened, discontinued, obsolete or damaged inventory; and

(l)    it is not inventory or of a class of inventory which is considered by Bank, exercising its reasonable credit judgment, to be "slow moving" or "excess inventory" based, in part, upon whether the inventory or class of inventory exceeds a one (1) year supply based on recent sales or usage based on a rolling twelve (12) months.

The value of all Eligible Inventory shall be determined on the basis of any and all factors and criteria as the Bank, in its sole discretion, and without reference to any standards of reasonableness shall deem appropriate, including, without limitation, that unless the Bank shall determine that some other basis is more appropriate, such value shall be determined on the basis of the lower of cost or market value, net of all handling charges, taxes, assessments, and interest and finance charges.

"Environmental Laws" means any Legal Requirement pertaining to air, emissions, water discharge, noise emissions, solid or liquid waste disposal, hazardous waste or materials, industrial hygiene, or other environmental, health, or safety matters or conditions on, under or about real property or any portion thereof, and similar laws of any Governmental Authority having jurisdiction over real property as such Legal Requirement may be amended or supplemented from time to time, and regulations promulgated and rulings issued pursuant to such laws.

"Equipment" means any "equipment" as such term is defined in Section 9.102(33) of the UCC, now owned or hereafter acquired by Borrower and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, leasehold improvements, vehicles and computers and other electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Event of Default" has the meaning set forth in Section 10.

"Excluded Swap Obligation" means, with respect to any guarantor of a Swap Obligation, including the grant of a security interest to secure the guaranty of such Swap Obligation, any Swap Obligation if, and to the extent that, such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations there under at the time the guaranty or grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Swap Obligation or security interest is or becomes illegal.

"GAAP" means those generally accepted accounting principles and practices, applied on a consistent basis, which are recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board and the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question.

"General Intangibles" means any "general intangibles" as such term is defined in Section 9.102(42) of the UCC, now owned or hereafter created or acquired by Borrower, and in any event shall include, without limitation, all choses in action, causes of action, corporation or other business records, deposit accounts, Intellectual Property inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, rights to royalties, blueprints, drawings, confidential information, catalogs, sales literature, video tapes, consulting agreements, employment agreements, customer lists, tax refund claims, computer programs, insurance policies, deposits with insurers, all claims under guaranties, security interests or other security held by or granted to Borrower to secure payment of any of the Accounts by an Account Debtor, all rights to indemnification and all other intangible property of every kind and nature (other than Accounts).

"Governmental Authority" means, with respect to any Person, any government (or any political subdivision or jurisdiction thereof), court, bureau, agency, or other governmental authority having jurisdiction over such Person or any of its business, operations, or properties.

"Governmental Authorization" means any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"Guaranty" of any Person means any contract or understanding of such Person pursuant to which such Person guarantees, or in effect guarantees, any Liabilities of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, including agreements to insure the holder of the Liabilities of the Primary Obligor against loss in respect thereof.

"Hazardous Material" means any hazardous, toxic, or dangerous waste, substance, or material defined as such in or for the purpose of any Environmental Law.

"Hedge Agreement" means (a) any agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, credit derivative transaction, forward rate agreement, commodity swap, commodity option, forward commodity contract, equity or equity index swap or option, forward bond or forward bond price or forward bond index transaction, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, cap agreement, floor agreement, collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, spot contract, or any other similar agreement (including any option to enter into any of the foregoing), whether or not such agreement is governed by or subject to any master agreement, (b) any and all agreements of any kind, and any and all related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement, or (c) any combination of the foregoing.

"Indebtedness" means all present and future indebtedness, obligations, and Liabilities and all renewals and extensions thereof, or any part thereof, now or hereafter owed to Bank by Borrower and its Affiliates, whether arising pursuant to any of the Security Documents, or otherwise, and all renewals and extensions thereof, together with all interest accruing thereon and reasonable costs, expenses, and attorneys' fees incurred in the enforcement or collection thereof.

"Intellectual Property" means all trademarks, tradenames, trade-dress, operating manuals, software, copyrights, patents and applications owned, licensed or used by Borrower or its subsidiaries.

"Inventory" means any "inventory" as such term is defined in Section 9.102(48) of the UCC, wherever located, now owned or hereafter acquired by Borrower and, in any event, shall include, without limitation, all and related merchandise and other personal property now owned or hereafter acquired by Borrower that are held for sale or lease, or are furnished or to be furnished under a contract of service or are raw materials, work in process, or materials or supplies used or to be used, or consumed or to be consumed, in Borrower's business, and all shipping and packaging materials relating to any of the foregoing.

"Investment" in any Person means any investment, whether by means of Stock purchase, loan, advance, extension of credit, capital contribution, or otherwise, in or to such Person, the Guaranty of any Liabilities of such Person, or the subordination of any claim against such Person to other Liabilities of such Person.

"Legal Requirement" means any federal, state, local, municipal, foreign, international, multi-national, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty as in effect on the date in question.

"Liabilities" means (without duplication), with respect to any Person, all indebtedness, obligations, and liabilities of such Person, including, without limitation, (a) all "liabilities" which would be reflected on a balance sheet of such Person, (b) all obligations of such Person in respect of any guaranty, letter of credit, or bankers' acceptance, (c) all obligations of such Person in

respect of any capital lease, (d) all obligations, indebtedness, and liabilities secured by any lien or any security interest on any property or assets of such Person, and (e) any obligation to redeem or repurchase any of such Person's Stock.

"Lien" means any lien, mortgage, security interest, tax lien, pledge, encumbrance, conditional sale or title retention arrangement, or any other interest in property designed to secure the repayment of Liabilities, whether arising by agreement or under any statute or law, or otherwise.

"Loan Account" means a record maintained by Bank setting forth all borrowings, charges, expenses, payments, credits and debits of Borrower.

"Lockbox" has the meaning set forth in Section 9.1.

"Lockbox Agreement" has the meaning set forth in Section 9.1.

"Material Adverse Effect" means any material adverse changes in, or effect upon, (a) the validity, performance, or enforceability of any Security Documents, (b) the financial condition or business operations of Borrower and Guarantors, taken as a whole, or (c) the ability of Borrower to fulfill its obligations under the Security Documents.

"Maturity Date" means November 30, 2016.

"Maximum Rate" means the highest non-usurious rate of interest (if any) permitted from day to day by applicable law.

"Overadvance" has the meaning set forth in Section 2.4.

"Overline" has the meaning set forth in Section 2.4.

"Packaging and Supplies" means boxes, labels, cartons pallets, etc., which are not Inventory, but are listed or tracked within Borrower's inventory system.

"Person" means an individual, corporation, joint venture, general or limited partnership, limited liability company, trust, unincorporated organization, or government, or any agency or political subdivision thereof.

"Permitted Liens" means (a) Liens imposed by mandatory provisions of law such as for materialmen's, mechanic's, warehousemen's, and other Liens of a similar nature arising in the ordinary course of Borrower's business, securing a Liability not yet due and liens of Landlord's arising pursuant to the terms of real property leases for which a Landlord's Waiver has been obtained, (b) Liens for taxes imposed upon a Person or upon such Person's income, profits, or property, if the same are not yet due and payable or if the same are being contested in good faith and as to which adequate reserves are maintained in accordance with GAAP, (c) good faith deposits in connection with leases, real estate bids or contracts (other than contracts involving the borrowing of money), pledges or deposits to secure (or in lieu of) surety, stay, appeal, or

customs bonds and deposits to secure the payment of taxes, assessments, customs, duties, or other similar charges, (d) encumbrances consisting of zoning restrictions, easements, or other restrictions on the use of real property, (e) purchase money security interests that Bank has consented to in writing, (f) Liens held by Bank, (g) the interests of lessors under operating leases which are subordinate to Bank, (h) Liens set forth on <u>Schedule 7.5</u> hereto.

"<u>Potential Default</u>" means the occurrence of any event which in and of itself would be an Event of Default with passage of time or giving of notice or both.

"<u>Proceeds</u>" means all forms of payment received by or due to Borrower from the collection of Accounts or sale, lease, exchange, collection, or other disposition of inventory or other property constituting Collateral hereunder and any and all claims against any third party for loss or damage to any Collateral, including insurance claims, and further, without limiting the generality of the foregoing, Proceeds shall include all Accounts, checks, cash, money orders, drafts, chattel paper, instruments, notes, or other documents evidencing payment obligations to Borrower for sale or exchange of Collateral.

"<u>Properties</u>" means all of a Person's property of every kind and character, personal, intangible and mixed.

"<u>Qualified ECP Guarantor</u>" means at any time, a corporation, partnership, proprietorship, organization, trust or other entity with total assets exceeding $10,000,000.00.

"<u>Revolving Line</u>" means a line of credit in favor of Borrower in the maximum amount of the Revolving Line Limit.

"<u>Revolving Line Limit</u>" means Six Million and No/100 Dollars ($6,000,000.00), except as provided in <u>Section 2.6</u>.

"<u>Revolving Loan</u>" means the revolving credit facility made or to be made hereunder to Borrower by Bank pursuant to <u>Section 2.1</u>.

"<u>Revolving Note</u>" means the Revolving Line of Credit Note, dated the date hereof, evidencing the Revolving Loan executed by Borrower and delivered to the Bank pursuant to the terms of this Agreement in the maximum principal amount of $6,000,000.00, together with any renewals, extensions, or modifications thereof.

"<u>Security Documents</u>" means this Agreement, the Revolving Note, any Specified Hedge Agreement, the closing documents set forth on <u>Exhibit "C"</u> attached hereto, and any agreements, documents (and with respect to this Agreement, and such other agreements and documents, any renewals, extensions, amendments, or supplements thereto), or certificates at any time executed or delivered pursuant to the terms of this Agreement.

"<u>Specified Hedge Agreement</u>" means any Hedge Agreement entered into by the Borrower and Bank related to interest rates under this Agreement.

"Stock" means all shares, options, warrants, general or limited partnership interests, membership interests, or other ownership interests (regardless of how designated) of or in a corporation, partnership, limited liability company, trust, or other entity, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"Subordinated Debt" means all Liabilities of Borrower to its subordinated creditors that are expressly and validly subordinated to the Indebtedness pursuant to documents in form and substance acceptable to Bank.

"Subsidiary" means, with respect to any Person, any corporation, association, partnership, joint venture, limited liability company or other business entity of which such Person or any Subsidiary of such Person, directly or indirectly, either: (a) in respect of a corporation or limited liability company, owns or controls more than fifty percent (50%) of the outstanding stock or other ownership interests, having ordinary voting power to elect a majority of the board of directors or similar managing body, irrespective of whether or not a class or classes shall or might have voting power by reason of the happening of any contingency; or (b) in respect of an association, partnership, joint venture, or other business entity, is entitled to share in more than fifty percent (50%) of the profits and losses, however determined.

"Swap Obligation" means any Specified Hedge Agreement that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, as amended from time to time.

"Tangible Net Worth" means, with respect to any Person, net worth plus all Subordinated Debt, *less* (i) any and all loans and other advances to Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (ii) notes, notes receivable, accounts, accounts receivable, inter-company receivable, and other amounts owing from Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (iii) treasury stock, good will, trademarks, trade names, patents, and deferred charges; and (iv) any and all other intangible assets, calculated in accordance with GAAP.

"UCC" means the Texas Business and Commerce Code, as amended, or, if applicable, the Uniform Commercial Code, as adopted by any state whose laws govern any aspect of the obligations of the parties hereunder.

"Work in Progress" means further process is required to consider the item a finished good. Work in Progress items are "in between" the raw material and finished goods state.

**1.2    Accounting Terms.** As used in this Agreement, and in the Revolving Note, and in any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.1, and accounting terms partly defined in Section 1.1 to the extent not defined, has, as of any date, the respective meanings given to them under GAAP and all references to balance sheets or other financial statements means such statements, prepared in accordance with GAAP as of such date.

**1.3   Rules of Construction.** When used in this Agreement: (a) "or" is not exclusive; (b) a reference to a law includes any amendment or modification to such law; (c) a reference to a Person includes its permitted successors and permitted assigns; (d) except as provided otherwise, all references to the singular shall include the plural and vice versa; (e) except as provided in this Agreement, a reference to an agreement, instrument or document shall include such agreement, instrument, or document as the same may be amended, modified or supplemented from time to time in accordance with its terms and as permitted by the Security Documents; (f) all references to Sections, Schedules, or Exhibits shall be to Sections, Schedules, or Exhibits of this Agreement, unless otherwise indicated; (g) all Exhibits to this Agreement shall be incorporated into this Agreement; (h) the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation;" and (i) except as otherwise provided herein, in the computation of time from a specified date to a later specified date, the word "from" means "from and including" and words "to" and "until" each mean "to but excluding."

## SECTION 2
## THE REVOLVING LINE

**2.1   Revolving Loan.** Subject to the terms and conditions of this Agreement, and so long as no Potential Default or Event of Default has occurred and is continuing:

(a)   From the date hereof until the Maturity Date, or such future date to which the Maturity Date may be extended, the Bank agrees to extend to Borrower a revolving credit line in the amount of the Borrowing Base; provided, however, that in no event shall the aggregate sum of all advances made by the Bank to Borrower under the Revolving Loan exceed the Revolving Line Limit. Within such limits, the Borrower may borrow, repay, and reborrow hereunder, from the date of this Agreement until the Maturity Date.

(b)   Each request by a Borrower for an advance under the Revolving Loan shall be received by a duly authorized representative of Bank not later than 11:00 a.m. Texas time, on the date of the requested advance, which shall be on a Business Day. Further, each such request for advance shall be in writing and shall specify: (i) the amount of the requested advance; and (ii) the proposed date of the advance (which shall be a Business Day). Bank, at its option, may accept telephonic requests for advances, provided that such acceptance shall not constitute a waiver of the Bank's right to delivery of a written notice in connection with subsequent advances and further provided that all such telephonic requests are immediately confirmed by the Borrower in writing, whether by facsimile or otherwise. Bank shall make such advances available to the Borrower by depositing the same, in immediately available funds, in an account of Borrower maintained with Bank, or by such other means as is acceptable to Bank and Borrower. A responsible officer of Borrower may call Bank before delivering a request for advance to receive an indication of the interest rates then in effect, but the indicated rates do not bind Bank or affect the interest rate that is actually in effect when Borrower delivers its Notice of Borrowing.

**2.2** **Conditions to Each Advance.** The obligation of the Bank to make any advance after the date of this Agreement under the Revolving Loan is subject to the full and complete satisfaction of each of the following conditions precedent as of the date of each advance:

(a) The representations and warranties set forth in <u>Section 5</u> of this Agreement are true and correct as of the date of the making of such advance to the same extent as if the representation or warranty had been made on the date of each advance;

(b) No Event of Default has occurred and is continuing, or will result from, the making of such advance; and

(c) Bank has received such additional approvals or documents as Bank may reasonably request.

**2.3** **Borrower's Loan Account.** All borrowings under the Revolving Loan will be evidenced by the Revolving Note and by entering such advances as debits to Borrower's Loan Account. Bank also will record in Borrower's Loan Account other charges, expenses, and items properly chargeable to Borrower hereunder, all payments made by such Borrower on account of its indebtedness hereunder, and other appropriate debits and credits. The debit balance of Borrower's Loan Account will reflect the amount of Borrower's indebtedness under the Revolving Loan from time to time hereunder. Notwithstanding the foregoing, no failure by Bank to properly reflect any advance actually made or any such charge, expense, or item actually incurred in Borrower's Loan Account will relieve Borrower from its true and correct obligations with respect thereto. At least once each month, Bank will render a statement of account for Borrower's Loan Account. Each such statement will be considered correct and be conclusively binding upon Borrower except to the extent that Bank receives a written notice of Borrower's exceptions within thirty (30) days after such statement has been mailed by ordinary mail to Borrower. Terms and conditions with respect repayment of the Revolving Loan are set forth in the Revolving Note.

**2.4** **Excess Advances.** In the event the unpaid principal amount of the outstanding balance of Borrower's Loan Account for the Revolving Loan ever exceeds the amount of the Revolving Line Limit, Borrower agrees to pay the excess amount (an "<u>Overline</u>") immediately upon demand by Bank. In the event the unpaid principal amount of the outstanding balance of Borrower's Loan Account for the Revolving Loan ever exceeds the Borrowing Base, Borrower agrees to pay the excess amount (an "<u>Overadvance</u>") immediately upon demand by Bank. Overlines and Overadvances will bear interest at the rate stated in the Revolving Note. If not sooner paid, interest on Overlines and Overadvances will be paid on the last day of each month, until the Revolving Loan Maturity Date. Upon request of Bank, Borrower will execute a promissory note, payable to the order of Bank, to represent the amount of any Overline and any Overadvance; however, Borrower acknowledges and agrees that the records of Bank and this Agreement will constitute conclusive evidence of any Overline or Overadvance and the obligation of Borrower to repay any Overline and Overadvance, with interest. All Overlines and Overadvances for which Bank has not demanded payment earlier, and all unpaid and accrued interest on Overlines and Overadvances not due and payable earlier, will be due and payable on

the Revolving Loan Maturity Date. Borrower acknowledges and agrees that Bank is not obligated to fund any advance that would create an Overline or an Overadvance.

**2.5    Following Maturity.** In the event that the availability of advances under the Revolving Line expires by the terms of this Agreement, or by the terms of any agreement extending the expiration date of this Agreement, Bank may, in its sole discretion, make requested advances; however, it is expressly acknowledged and agreed that, in such event, Bank has the right, in its sole discretion, to decline to make any requested advance and may require payment in full of Borrower's Loan Account with respect to the Revolving Loan, and the making of any such advances will not be construed as a waiver of such right by Bank.

**2.6    Increase in Revolving Line Limit.** Borrower may, at any time prior to the Maturity Date, request in writing that the Revolving Line Limit be increased, subject to the following terms and conditions:

(a)    No Potential Default or Event of Default exists on the effective date of such increase after giving effect to such increase;

(b)    Borrower will deliver, with its written request for an increase, a current Borrowing Base Certificate, which will contain a borrowing base calculation sufficient to justify, in Bank's sole discretion, such increase;

(c)    After giving effect to such increase, the Revolving Line Limit will not exceed Eight Million and No/100 Dollars ($8,000,000.00);

(d)    Borrower may request only one increase in the Revolving Line Limit during the term of this Agreement;

(e)    Borrower will deliver to Bank on or before the effective date of such increase the following documents in form and substance satisfactory to Bank: (1) resolutions of the governing body of Borrower, certified by the Secretary or an Assistant Secretary (or other custodian of records) of such Person, which authorize the increase in the Revolving Line Limit; (2) a certificate, dated as of the effective date of such increase certifying that no Potential Default or Event of Default has occurred and is continuing, and certifying that the representations and warranties made by Borrower herein and in the Security Documents are true and complete in all material respects with the same force and effect as if made on and as of such date (except to the extent any such representation or warranty expressly relates only to any earlier and/or specified date); and (3) such other agreements, instruments and information (including supplements or modifications to this Agreement and/or the Security Documents) executed by Borrower as Bank deems necessary in order to document the increase to the Revolving Line Limit and to protect, preserve and continue the perfection and priority of the liens, security interests, rights and remedies of Bank hereunder and under the Security Documents in light of such increase;

(f)    Borrower will execute and deliver to Bank a replacement Revolving Note reflecting the new amount of the Revolving Line Limit after giving effect to the increase (and the prior Revolving Note will be deemed to be cancelled); and

(g)    On the effective date of such increase, Borrower will pay all costs and expenses incurred by Bank in connection with the negotiations regarding, and the preparation, negotiation, execution and delivery of all agreements and instruments executed and delivered by Bank or Borrower in connection with such increase (including all fees for any supplemental or additional public filings of any Security Documents necessary to protect, preserve and continue the perfection and priority of the liens, security interests, rights and remedies of Bank  hereunder and under the Security Documents in light of such increase).

**2.7    Purpose.**  All funds borrowed under the Revolving Line will be used to provide additional working capital, for general corporate purposes, and for the acquisition of equipment.

**2.8    Fees.**

(a)    Borrower will pay to Bank an unused line fee at the rate of one quarter of one percent (0.25%) per annum on the average daily Unused Revolving Loan Amount from the date of this Agreement to and including the Maturity Date, due and payable quarterly in arrears on the first day of the month of each quarter and on the Maturity Date.  For the purposes of this Section, "Unused Revolving Loan Amount" means the Revolving Line Limit reduced by the aggregate sum of all outstanding advances made by Bank to Borrower under the Revolving Line.

(b)    Borrower acknowledges that the fees payable hereunder are bona fide fees and are intended as reasonable compensation to Bank for agreeing to make funds available to Borrower as described herein and for no other purposes.

**2.9    Advance Not a Waiver.**  No advance shall constitute a waiver of any of the conditions of Bank's obligations hereunder, nor, in the event Borrower is unable to satisfy any such condition, shall any advance have the effect of precluding Bank from thereafter declaring Event of Default.

## SECTION 3
## COLLATERAL AND GUARANTIES

**3.1    Grant of Security Interest.**  As security for the payment and performance of all Indebtedness, Bank has and is hereby granted a continuing lien on, a security interest in and a right of set-off against the following Collateral:

(a)    all Accounts of Borrower, whether now or hereafter existing, created, arising or acquired;

(b)    all Inventory of Borrower, whether now or hereafter existing, created, arising or acquired;

(c)    all Equipment of Borrower, whether now or hereafter existing, created, arising or acquired;

(d)    all General Intangibles of Borrower, whether now or hereafter existing, created, arising, or acquired, including, without limitation, the Intellectual Property;

(e)    without limitation to the foregoing, all contract rights, chattel paper, documents, documents of title, warehouse receipts, bills of lading, notes, and notes receivable instruments of Borrower, whether now or hereafter existing, created, arising, or acquired;

(f)    without limitation to the foregoing, all goods, instruments, notes, notes receivable, documents, documents of title, warehouse receipts, bills of lading, certificates of title, policies and certificates of insurance, securities, chattel paper, deposits, cash and other property now or hereafter owned by Borrower or in which it now or hereafter has an interest, which are now or may hereafter be in the possession of or deposited with Bank, or which are otherwise assigned to Bank, or as to which Bank may now or hereafter control possession by documents of title or otherwise;

(g)    all books and records now owned and hereafter acquired relating to any other Collateral and all files, correspondence, computer programs, tapes, disks and related data processing software owned by Borrower or in which Borrower has an interest that contains information concerning or relating to any of the other Collateral or any item thereof; and

(h)    all Proceeds and products of all of the foregoing, including, without limitation, insurance proceeds.

No submission by Borrower to Bank of any schedule or other particular identification of Collateral will be necessary to vest in Bank a security interest in each and every item of Collateral now existing or hereafter acquired, but rather, such security interest will vest in Bank immediately upon the creation or acquisition of any item of Collateral, without the necessity for any other or further action by Borrower or Bank.

**3.2    Applicable UCC.**  To the extent applicable, the UCC in effect in the State of Texas governs the security interests provided for herein.

**3.3    Perfection and Protection of Liens.**  Borrower hereby irrevocably authorizes Bank to file (and will upon Bank's request execute and deliver to Bank) any financing statements, continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by Borrower in form and substance reasonably satisfactory to Bank, for the purpose of perfecting, confirming, or protecting Bank's Liens and other rights in the Collateral.

## SECTION 4
## CONDITIONS PRECEDENT

The obligation of Bank to make the first advance under the Revolving Loan is subject to the conditions precedent that, on or before the date of such advance or funding, (a) Borrower has paid to Bank (i) all fees to be received by Bank pursuant to this Agreement or any other Security Document, and (ii) an amount equal to the estimated fees and out-of-pocket expenses of Bank's counsel incurred in connection with the preparation, execution, and delivery of the Security Documents and the consummation of the transactions contemplated thereby; (b) Bank has received duly executed copies of (i) a current Borrowing Base Certificate, (ii) a current customer address list, including the names, addresses and telephone numbers of all Account Debtors, and (iii) each of the documents and items listed on Exhibit "C", each dated as of the date of the Revolving Loan, if applicable, and each in form and substance satisfactory to Bank, in its sole discretion; (c) no Event of Default exists; (d) no change that would cause a Material Adverse Effect has occurred since the date of the financial statements referenced in Section 5.7; and (e) the representations and warranties contained in each of the Security Documents will be true and correct in all material respects as though made on the date of the Revolving Loan.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES

To induce Bank to make the Loan hereunder, Borrower represents and warrants to Bank that:

**5.1    Organization and Good Standing.** Borrower is duly organized and in good standing under the laws of the state of its organization, or formation, as the case may be, is duly qualified and in good standing in all states in which it is doing business, has the power and authority to own its properties and assets and to transact the business in which it is engaged in each jurisdiction in which it operates, and is or will be qualified in those states where qualification is required.

**5.2    Authorization and Power.** Borrower has full power and authority to execute, deliver, and perform the Security Documents to be executed by it, all of which has been duly authorized by all proper and necessary action.

**5.3    No Conflicts or Consents.** Neither the execution and delivery of the Security Documents, nor the consummation of any of the transactions therein contemplated, nor compliance with the terms and provisions thereof, will contravene or conflict with any Legal Requirement to which Borrower is subject, any Governmental Authorization applicable to Borrower, any indenture, loan agreement, mortgage, deed of trust, or other material agreement or instrument binding on Borrower, or any Constituent Document of Borrower. No consent, approval, authorization, or order of any court, Governmental Authority, shareholder, director, partner, member, or third party is required in connection with the execution, delivery, or performance by Borrower of any of the Security Documents, except for consents, approvals, authorizations and orders which have been obtained and delivered to Bank.

**5.4    Enforceable Obligations.** The Security Documents have been duly executed and delivered by Borrower and are the legal and binding obligations of Borrower, enforceable in accordance with their respective terms, except as limited by Debtor Laws and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.5    Ownership of Collateral.** Except for (a) the security interests granted hereby or by any other document executed in favor of Bank, and (b) Permitted Liens, Borrower is and, as to Accounts, Inventory, and other Collateral arising or to be acquired after the date hereof, will be, the sole and exclusive owner of the Accounts, Inventory, and each and every other item of Collateral, free from any Lien, and Borrower will defend its Accounts, Inventory, and each and every other item of Collateral and all Proceeds and products thereof against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Bank.

**5.6    Offices.** Set forth on Schedule 5.6 is a list of each location of Borrower at which Inventory and other tangible Collateral is located, records of Borrower pertaining to Accounts are kept and of Borrower's chief executive office.

**5.7    Financial Condition.** Borrower has delivered to Bank copies of the financial statements of the Borrower, as of September 30, 2014; such financial statements are true and correct, fairly represent the financial condition of each such Person as of such date and have been prepared in accordance with GAAP; as of the date hereof, there are no obligations or Liabilities (including contingent and indirect Liabilities) of such Person which are material and are not reflected in such financial statements which are otherwise required to be disclosed in accordance with GAAP; and no Material Adverse Effect has occurred since the date of such financial statements.

**5.8    No Default.** No event has occurred and is continuing which constitutes a Potential Default or an Event of Default.

**5.9    No Litigation.** There are no actions, suits or legal, equitable, arbitration or administrative proceedings pending, or to the knowledge of Borrower threatened, against Borrower that could reasonably be expected to, if adversely determined, result in liability in excess of $100,000.00 or otherwise have a Material Adverse Effect, except as described in Schedule 5.9.

**5.10    Use of Proceeds; Margin Stock.** The proceeds of the Revolving Loan will be used by Borrower solely for the purposes specified in Section 2.9. None of such proceeds will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulations T, U, or X of the Board of Governors of the Federal Reserve System or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulations. If requested by Bank, then Borrower will furnish to Bank a statement in conformity with the requirements of the Federal Reserve Form U-1 referred to in said Regulation U to the foregoing effect. No part of the proceeds of the Revolving Loan will be used for any purpose which violates, or is inconsistent with, the provisions of Regulation X.

**5.11    Taxes.** All tax returns required to be filed by Borrower in any jurisdiction have been filed and all taxes shown to be due on such tax returns (including mortgage recording taxes), assessments, fees, and other governmental charges upon Borrower or upon any of its properties, income, or franchises have been paid except for taxes being contested in good faith by appropriate proceedings diligently prosecuted and as to which adequate reserves have been established in accordance with GAAP. To the best of Borrower's knowledge, there is no proposed tax assessment against Borrower and all tax Liabilities of Borrower are adequately provided for. No income tax Liability of Borrower has been asserted by the Internal Revenue Service for taxes in excess of those already paid.

**5.12    Compliance with Law.**

(a)    (i) Borrower is in compliance with its Constituent Documents, and with all Legal Requirements which are applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets; and (ii) Borrower has not received any notice or other communication from any Governmental Authority or other Person of any event or circumstance that could constitute a violation of, or failure to comply with, any material Legal Requirement.

(b)    (i) Borrower is in compliance with all of the terms and requirements of each Governmental Authorization held by it; (ii) Borrower has not received any notice or other communication from any Governmental Authority or other Person of any event or circumstance that could constitute a violation of, or failure to comply with, any term or requirement of any Governmental Authorization, or of any actual or potential revocation, withdrawal, cancellation, or termination of, or material modification to, any Governmental Authorization; and (iii) all applications required to have been filed for the renewal of any required Governmental Authorizations have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities.

**5.13    Subsidiaries and Affiliates.** Borrower has no subsidiaries or Affiliates other than set forth in Schedule 5.13.

**5.14    Sufficiency of Capital.** Borrower is, and after consummation of this Agreement and, after giving effect to all Liabilities incurred in connection herewith, will be solvent.

**5.15    Operation of Business.** Borrower possesses all material licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, necessary to conduct its business substantially as now conducted and as presently proposed to be conducted, and Borrower is not in violation of any valid rights of others with respect to any of the foregoing.

**5.16    Disclosure.** No statement, certificate, information, report, representation, or warranty made by Borrower in this Agreement or in any other Security Document or furnished to Bank in connection with this Agreement or any of the transactions contemplated hereby contains any untrue statement of a material fact. There is no fact known to Borrower that has a Material

Adverse Effect, or which might in the future reasonably be expected to have a Material Adverse Effect, on the business condition (financial or otherwise), operations, prospects, or properties of Borrower that has not been disclosed in writing to Bank.

### 5.17   Environmental Matters.

(a)   Borrower and all of its respective properties, assets, and operations are in full compliance with all Environmental Laws except where the failure to be in compliance would reasonably be expected not to have a Material Adverse Effect. Borrower is not aware of, nor has Borrower received notice of, any past, present, or future conditions, events, activities, practices, or incidents which may interfere with or prevent the compliance or continued compliance of Borrower with all Environmental Laws;

(b)   Borrower has obtained all permits, licenses, and authorizations that are required under applicable Environmental Laws, and all such permits are in good standing and Borrower is in compliance with all of the terms and conditions of such permits, except where the failure to be in compliance would reasonably be expected not to have a Material Adverse Effect;

(c)   No Hazardous Materials exist on, about, or within or have been used, generated, stored, transported, disposed of on, or released from any of the properties or assets of Borrower. The use which Borrower makes and intends to make of its properties and assets will not result in the use, generation, storage, transportation, accumulation, disposal, or release of any Hazardous Material on, in, or from any of its properties or assets;

(d)   To the knowledge of Borrower, neither Borrower nor any of its respective currently or previously owned or leased properties or operations is subject to any outstanding or threatened order from or agreement with any Governmental Authority or other Person or subject to any judicial or docketed administrative proceeding with respect to (i) failure to comply with Environmental Laws, (ii) remedial action, or (iii) any Liabilities under any Environmental Law arising from a release or threatened release;

(e)   There are to Borrower's knowledge no conditions or circumstances associated with the currently or previously owned or leased properties or operations of Borrower that could reasonably be expected to give rise to any Liabilities under any Environmental Laws;

(f)   Borrower is not a treatment, storage, or disposal facility requiring a permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., regulations thereunder or any comparable provision of state law. Borrower is in compliance with all applicable financial responsibility requirements of all Environmental Laws;

(g)   Borrower has not filed or failed to file any notice required under applicable Environmental Law reporting a release; and

(h)   No Lien arising under any Environmental Law has attached to any property or revenues of Borrower.

**5.18   Intellectual Property.**   All material Intellectual Property owned or used by Borrower is listed, together with application or registration numbers, where applicable, in Schedule 5.18.   Borrower owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license could not reasonably be expected to have a Material Adverse Effect. Each Person identified on Schedule 5.18 will maintain the patenting and registration of all Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, or other appropriate Governmental Authority, except with respect to such Intellectual Property such Person determines in its sole but reasonable commercial judgment the patenting or registration need not be maintained.

**5.19   Survival of Representations and Warranties.**   All representations and warranties by Borrower herein will survive delivery of the Revolving Note and the making of the Revolving Loan.

## SECTION 6
## AFFIRMATIVE COVENANTS

Until payment in full of the Indebtedness, Borrower agrees that, unless Bank otherwise consents in writing:

**6.1   Financial Statements, Reports and Documents.** Borrower will deliver to Bank each of the following:

(a)   As soon as available, and in any event within one hundred twenty (120) days following the end of Borrower's fiscal year, an audited financial statement for Borrower, prepared by an independent certified public accountant acceptable to Bank, showing the financial condition of Borrower and its subsidiaries on a consolidated basis, at the close of such fiscal year and the results of its operations during such fiscal year, which financial statements will be materially complete and correct, prepared in accordance with GAAP, and will include, without limitation, an operating statement, an income statement, a balance sheet, a reconciliation of equity amounts, a source and application of funds report, an annual budget and such other matters as Bank may reasonably request;

(b)   As soon as available, and in any event within forty-five (45) days following the end of each calendar quarter, internally prepared financial statements for Borrower and its subsidiaries on a consolidated basis, signed by a duly authorized representative, and showing the results of its operations during such calendar quarter, which statements will include, without limitation, an income statement, a balance sheet, and such other matters as Bank may reasonably request;

(c)    As soon as available and in any event within forty-five (45) days from the end of each calendar quarter, a Compliance Certificate for Borrower in the form attached to this Agreement as <u>Exhibit "A"</u> for the fiscal year or calendar month having then ended, as applicable, together with supporting financial statements and reports;

(d)    As soon as available, and in any event within twenty (20) days from the end of each calendar month, a Borrowing Base Certificate prepared by Borrower and signed by a duly authorized representative in form acceptable to Bank, which will contain such supporting information as Bank requests, including, without limitation, an Inventory schedule and a perpetual Inventory listing;

(e)    As soon as available, and in any event within twenty (20) days after the filing thereof, and in any event by October 15 of each year, a copy of the federal income tax returns of Borrower and its subsidiaries and all requests for extensions to the filing thereof;

(f)    As soon as available, and in any event within thirty (30) days following the end of each calendar month, reports including, (i) agings of the Accounts Receivables aged by invoice due date, (ii) Accounts Receivable of Borrower, with foreign accounts and country of origin noted, and a reconciliation report fully reconciled to the general ledger for Accounts Receivable, (iii) detailed Inventory listings segregated by gloves, apparel and promotional items and a reconciliation report fully reconciled to the general ledger as of the last day of the immediately preceding calendar month, (iv) agings of the Accounts payable as of the last day of the immediately preceding calendar month fully reconciled to the general ledger, (v) a general ledger trial balance listing, (vi) a slow-moving Inventory report; (vii) a list of customer deposits and a customer deposit reclassification report; (viii) a rebates report; (ix) schedules of in transit inventory, inventory located outside of the United States, and private label inventory; and (x) a reconciliation report of the Accounts Receivable, Accounts payable and Inventory sub-ledger report totals that are not in direct agreement with the general ledger balances, all in form and substance acceptable to Bank, as of the last day of the immediately preceding calendar month, and the period of time which has elapsed with respect to such Accounts Receivable since the invoice date with respect thereto;

(g)    As soon as available, and in any event within twenty (20) days following the end of Borrower's fiscal year, a complete listing of customers and customer addresses; and

(h)    Such other documents, instruments, data, or information of any type reasonably requested by Bank with respect to the customer list, accounts receivable, collections, remittances, Inventory and any other Collateral.

**6.2    Insurance.** Borrower will (a) have and maintain at all times general liability insurance and workers' compensation insurance and, with respect to Collateral, equipment, real estate and other substantial assets of Borrower and all facets of Borrower's business, comprehensive and catastrophic insurance, including, without limitation, insurance against risks

of fire, theft, windstorm, and hail, so-called multi-peril extended hazard coverage, and insurance against other risks customarily insured against by companies engaged in similar business to that of Borrower, containing such terms, and in such form and amount, and for such periods, and written by such companies as may be reasonably satisfactory to Bank; (b) furnish to Bank, upon request, a statement of the insurance coverage; (c) obtain other or additional insurance promptly, upon the reasonable request of Bank, to the extent that such insurance may be available and is customary in Borrower's line of business and geographic region; and (d) cause Bank, P.O. Box 17200, Shreveport, Louisiana 71148, to be named as (i) an additional insured on all of Borrower's liability insurance policies, and (ii) loss payee as to all property constituting Collateral hereunder, pursuant to a mortgagee or loss payable endorsement in form acceptable to Bank. All insurance proceeds, payments and other amounts paid to or received by Bank under or in connection with any and all such policies may be retained by Bank in whole or part as additional Collateral for the Indebtedness and/or, at Bank's option, be applied in whole or part to the payment of such of the Indebtedness as will then be due, and/or, at Bank's option, be held (in a remittance or other special account in which Borrower has no interest) for application to Indebtedness not yet due and be applied to such Indebtedness as and when the same will come due, in such order as Bank may determine in its sole discretion. All insurance policies will provide for a minimum of thirty (30) days' written cancellation notice to Bank and, at Bank's request, all such policies will be delivered to and held by Bank. In the event of failure to provide and maintain insurance required by this Agreement, Bank may, at its option, provide such insurance and charge the costs and expenses incurred to Borrower's Loan Account. Bank is hereby made attorney-in-fact for Borrower to (i) obtain, adjust and settle, in its sole discretion, such insurance, and (ii) endorse any drafts or checks issued in connection with such insurance.

**6.3    Payment of Taxes and Other Liabilities.** Borrower will pay and discharge (a) all taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any property belonging to it, before delinquent, (b) all lawful claims (including claims for labor, materials and supplies), which, if unpaid, might give rise to a Lien upon any of its property, excluding Permitted Liens, and (c) all of its other Liabilities, except as prohibited under the Security Documents; provided, however, that Borrower will not be required to pay any such tax, assessment, charge, or levy if and so long as the amount, applicability or validity thereof is being contested in good faith by appropriate proceedings and appropriate accruals and cash reserves therefor have been established in accordance with GAAP.

**6.4    Depository Accounts.** Borrower shall establish and maintain with Bank its operating and depository accounts, including treasury management ("Depository Accounts"), and Bank, at Bank's option, may make all advances hereunder into Borrower's Depository Accounts, and Borrower expressly agrees that Bank may, at Bank's option, debit against any such Depository Accounts any and all sums, amounts, charges, and payments due under or in connection with the Loan.

**6.5    Operations and Properties.** Borrower will keep and maintain the Equipment and all other tangible Collateral in good operating condition, ordinary wear and tear excepted, and Borrower will provide all maintenance, service and repairs necessary for such purposes. Borrower shall (a) act prudently and in accordance with customary industry standards in managing and operating its assets and properties, and (b) keep in good working order and

condition, ordinary wear and tear excepted, all of its assets and properties which are necessary to the conduct of its business.

**6.6    Maintenance of Existence and Rights; Conduct of Business.** Borrower and its subsidiaries shall preserve and maintain its corporate existence and all of its rights, privileges, and franchises necessary or desirable in the normal conduct of its business, and conduct its business in an orderly and efficient manner consistent with good business practices and in accordance with all Legal Requirements of any Governmental Authority.

**6.7    Notice of Default; Other Notices.** Borrower shall furnish to Bank, immediately upon becoming aware of the existence of any condition or event which constitutes a Potential Default or an Event of Default, written notice specifying the nature and period of existence thereof and the action which Borrower or any Affiliate is taking or proposes to take with respect thereto. Borrower shall promptly notify Bank of (a) any material adverse change in Borrower's or any of its Affiliates' financial condition or business, (b) any default under any material agreement, contract, or other instrument to which Borrower or any of its Affiliates is a party or by which any of Borrower's or any of its Affiliates' properties are bound, or any acceleration of the maturity of any Liabilities owing by Borrower or any of its Affiliates, (c) the occurrence of any fact or circumstance which would reasonably be expected to cause a Material Adverse Effect against or affecting Borrower or any of its Affiliates, or any of their respective properties, and (d) the commencement of, and any material determination in, any litigation with any third party or any proceeding before any Governmental Authority affecting Borrower or any of its Affiliates.

**6.8    Compliance with Law.** Borrower and its subsidiaries shall comply with all applicable Legal Requirements of any Governmental Authority, a breach of which could have a Material Adverse Effect.

**6.9    Authorizations and Approvals.** Borrower shall promptly obtain, from time to time at its own expense, all Governmental Authorizations as may be required to enable it to comply with its obligations hereunder and under the other Security Documents.

**6.10    Further Assurances.** Borrower shall make, execute, and deliver or file or cause the same to be done, all such notices, additional agreements, mortgages, assignments, financing statements, or other assurances, and take any and all such other action, as Bank may, from time to time, deem reasonably necessary or proper in connection with any of the Security Documents.

**6.11    Indemnity by Borrower.** Borrower shall indemnify, defend, and hold harmless Bank and its directors, officers, agents, attorneys, and employees (individually, an "Indemnitee" and collectively, the "Indemnitees") from and against any and all loss, liability, obligation, damage, penalty, judgment, claim, deficiency, and expense (including interest, penalties, attorneys' fees, and amounts paid in settlement) to which the Indemnitees may become subject arising out of this Agreement and the other Security Documents, other than those which arise by reason of the gross negligence or willful misconduct of Bank, **BUT SPECIFICALLY INCLUDING ANY LOSS, LIABILITY, OBLIGATION, DAMAGE, PENALTY, JUDGMENT, CLAIM, DEFICIENCY, OR EXPENSE ARISING OUT OF THE SOLE OR**

**CONCURRENT NEGLIGENCE OF BANK.** Borrower shall also indemnify, protect, and hold each Indemnitee harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, proceedings, costs, expenses (including without limitation all reasonable attorneys' fees and legal expenses whether or not suit is brought), and disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against such Indemnitee, with respect to or as a direct or indirect result of the violation by Borrower of any Environmental Law; or with respect to or as a direct or indirect result of Borrower's use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or presence of a Hazardous Material on, under, from, or about real property. The provisions of and undertakings and indemnifications set forth in this Section 6.11 shall survive (a) the satisfaction and payment of the Indebtedness and termination of this Agreement, and (b) the release of any Liens held by Bank on real property or the extinguishment of such Liens by foreclosure or action in lieu thereof.

    **6.12    Keepwell.** Borrower and each Guarantor hereby absolutely, unconditionally and irrevocably undertakes that if it is a Qualified ECP Guarantor at the time the guaranty by a Guarantor or other third party that is not then an "eligible contract participant" under the Commodity Exchange Act (each, a "Specified Party"), or the grant of a security interest to Bank by any such Specified Party, in either case, becomes effective with respect to any Hedge Agreement, to provide such funds or other support to such Specified Party that is a corporation, partnership, proprietorship, organization, trust or other entity as may be needed by such Specified Party from time to time to honor all of its obligations in respect of such Hedge Agreement. Borrower and each Guarantor intends this Section 6.12 to constitute, and this Section 6.12 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Party for all purposes of the Commodity Exchange Act.

### SECTION 7
### NEGATIVE COVENANTS

    Until payment in full of the Indebtedness, Borrower agrees that (unless Bank otherwise consents in writing):

    **7.1    Change of Location.** Borrower will not change (or permit to be changed) any office or location, or move any of the Collateral, except in the ordinary course of business, without (i) at least thirty (30) days prior written notice to Bank, and (ii) prior to making any such change, executing and delivering to Bank any additional financing statements or other documents that Bank may request.

    **7.2    Disposition of Assets.** Borrower will not sell, transfer, lease, otherwise dispose of, or permit to be sold, transferred, or leased any of the Accounts, Inventory, Equipment and the other Collateral or any interest therein (or any of the Proceeds thereof, whether money, checks, money orders, drafts, notes, instruments, documents, chattel paper, Accounts, returns, or repossessions) or of any other property of Borrower, except for the sale of Inventory in the ordinary course of business and except for obsolete equipment.

**7.3    Limitations on Liabilities.** Borrower will not incur, create, issue, assume, guarantee, endorse or permit to exist any Liabilities except:

(a)    Indebtedness to Bank provided for in this Agreement;

(b)    other indebtedness not to exceed $250,000.00 (plus normal trade debt); and

(c)    any Subordinated Debt to which Bank consents in writing, including without limitation, the Subordinated Debt set forth on Schedule 7.3(b) attached hereto.

**7.4    Subordinated Debt.** Borrower will not make any payment upon any outstanding Subordinated Debt, except as expressly permitted under the terms of a written subordination agreement executed by Bank and the holder of the Subordinated Debt. Notwithstanding the forgoing, Borrower shall not be entitled to make any payment of Subordinated Debt if a Potential Default or an Event of Default is in existence and is continuing or if the making of any such payment would cause a Potential Default or an Event of Default to exist.

**7.5    Negative Pledge.** Borrower will not create, incur, permit, or suffer to exist any Lien upon their Properties, now owned or hereafter acquired, except for Permitted Liens.

**7.6    Restrictions on Distributions.** Borrower will not directly or indirectly declare or make, or incur any Liability to make, any Distributions.

**7.7    Limitation on Investments.** Borrower will not have or make any Investments in any Person.

**7.8    Management.** Borrower will not change its present management without prior notice to Bank.

**7.9    Issuance of Stock.** Borrower will not issue, sell, or otherwise dispose of, any of its Stock, or rights, warrants, or options to purchase or acquire any of its Stock, except that Borrower may issue options to employees and consultants under its existing stock option plan, as the same may be amended from time to time, and may issue stock in private placements under Section 4(2) of the Securities Act of 1933 and the regulations thereunder.

**7.10    Liquidation, Mergers, Consolidations and Dispositions of Substantial Assets.** Borrower will not dissolve or liquidate, or become a party to any merger or consolidation, other than a merger of its subsidiaries into Borrower or acquire by purchase, lease, or otherwise all or substantially all of the Property or Stock of any Person, or sell, transfer, lease, or otherwise dispose of all or any substantial part of its Properties or business, without the prior consent of Bank.

**7.11    Constituent Documents.** Borrower will not (a) violate the provisions of its Constituent Documents, or (b) modify, repeal, replace, or amend any provision of its Constituent Documents except for non-substantive changes or changes made to comply with applicable laws.

**7.12    Accounting Practices.**    Borrower will not materially change accounting practices, methods or standards or the reporting format for any information furnished Bank under the terms and provisions of this Agreement, which accounting practices shall conform with GAAP throughout the term of this Agreement.

**7.13    Prepayment of Debt.**    Borrower will not prepay any Liabilities except the Indebtedness.

**7.14    Nature of Business.**    Borrower will not engage in any business other than the business in which it is engaged as of the date hereof.

**7.15    Financial Covenants.**    Borrower, on a consolidated basis, will not, as of the last day of each calendar quarter, have:

(a)    a Debt Service Coverage Ratio of less than 1.50 to 1.0, calculated on a trailing twelve (12) months basis; and

(b)    a Tangible Net Worth of less than $8,278,000.00, to be increased annually as of the last day of each calendar year, beginning December 31, 2015, by an amount equal to fifty percent (50%) of Borrower's positive net income, if any, for such calendar year, with no regard to losses.

**7.16    Future Subsidiaries.**    With respect to each Person that becomes a domestic Subsidiary of Borrower (directly or indirectly) subsequent to the Effective Date, Borrower will cause such new Subsidiary to execute and deliver to Bank, within thirty (30) days after the date such Person becomes a Subsidiary of Borrower:

(a)    a Guaranty, in form and substance acceptable to Bank, pursuant to which such Subsidiary will guarantee in full the payment of the Indebtedness; and

(b)    a Security Agreement, in form and substance acceptable to Bank, pursuant to which such Subsidiary will grant Bank a valid first priority perfected Lien over its Collateral (as defined herein).

## SECTION 8
## FIELD AUDITS

Borrower shall, as reasonably requested by Bank thereafter (but not more than two times in any twelve-month period unless there is a continuing Event of Default), allow Bank, by or through any of its officers, agents, employees, attorneys, or accountants (i) to examine, copy, or make extracts from Borrower's books, records and documents in the possession of Borrower; (ii) to analyze financial statements; (iii) to arrange for verification of Accounts and other Collateral under reasonable procedures, directly with Account Debtors or by other methods; and (iv) visit each of Borrower's places of business (all the foregoing collectively referred to as "Audits"). Borrower shall  maintain complete and accurate books and records of its transactions

in accordance with good accounting practices. Audits by Bank may be at any time during normal business hours. Borrower shall pay Bank reasonable Audit fees and expenses to compensate Bank for its costs associated with Bank's Audits.

## SECTION 9
## COLLECTION OF ACCOUNTS

**9.1    Lockbox.**

(a)    Borrower will, at the request of Bank, execute a Wholesale Lockbox Service Addendum Agreement ("Lockbox Agreement") in form and substance acceptable to Bank and such other documentation as Bank may reasonably require to establish and maintain the lockbox ("Lockbox") and the remittances account and all other cash management services of Bank and its affiliates provided in connection with this Agreement.

(b)    Upon the occurrence of an Event of Default:

(i)    Borrower will (a) maintain in full force and effect, and comply in all respects with the Lockbox Agreement; (ii) direct all of its Account Debtors to make remittance to the Lockbox; and (iii) deposit directly into the remittances account all Proceeds received by Borrower from Account Debtors and otherwise. Funds received in any Lockbox will be transferred daily by Bank to the applicable Demand Deposit Dominion Account in the name of Borrower (the "Dominion Account") and thereafter credited by Bank first to the Borrower's Loan Account and any other unpaid Indebtedness in such manner as Bank desires. Bank will not be required to credit Borrower's Loan Account with the amount of any check or other instrument constituting provisional payment until the Bank has received final payment thereof at its office in cash or solvent credits accepted by the Bank.

(ii)    Borrower will notify the Bank of such collections as are received directly by Borrower and will hold the proceeds received from such collections in trust for the Bank without commingling the same with other funds of the Borrower and will turn the same over to the Bank immediately upon receipt in the identical form received. Proceeds so transmitted to the Bank may be handled and administered in and through the remittances account.

(iii)    Bank may apply against the outstanding balance of Borrower's Loan Account from time to time any collections on and Proceeds from Accounts Receivable forwarded to Bank and/or in Bank's possession (including, without limitation, any such collections and Proceeds in any Lockbox, remittances account or any operating or other account maintained or to be maintained by or for Borrower at Bank).

(iv)    Borrower will, at the request of the Bank, notify the Account Debtors of the security interest of the Bank in any Account and will instruct

Account Debtors to remit payments directly to Bank, and the Bank may itself, at any time, so notify Account Debtors.

(c)    Borrower acknowledges Bank's right of offset and the security interest in Borrower's accounts including the Dominion Account granted to Bank hereunder. Upon the occurrence of an Event of Default, Borrower will relinquish its control of the Dominion Account and in addition to all other rights and remedies available to Bank, Bank will immediately have sole dominion and control over the Lockbox and the Dominion Account.

**9.2    Collection of Accounts by Borrower.**  Borrower agrees that no court action or other legal proceeding or garnishment, attachment, repossession of property, or any other attempt to repossess any merchandise covered by an Account will be attempted by the Borrower except by or under the direction of competent legal counsel. BORROWER HEREBY AGREES TO INDEMNIFY AND HOLD THE BANK HARMLESS FOR ANY LOSS OR LIABILITY OF ANY KIND OR CHARACTER WHICH MAY BE ASSERTED AGAINST THE BANK BY VIRTUE OF ANY SUIT FILED, PROCESS ISSUED, OR ANY REPOSSESSION OR ATTEMPTED REPOSSESSION DONE OR ATTEMPTED BY BORROWER OR BY VIRTUE OF ANY OTHER ENDEAVORS WHICH BORROWER MAY MAKE TO COLLECT ANY ACCOUNTS OR REPOSSESS ANY SUCH MERCHANDISE.

**SECTION 10**
**EVENTS OF DEFAULT**

An "Event of Default" will exist if any one or more of the following events occurs and is continuing:

(a)    Borrower fails to pay within five days of the date when due the Indebtedness or any part thereof; or

(b)    any representation or warranty made under this Agreement, or any of the other Security Documents, proves to be untrue or inaccurate in any material respect as of the date on which such representation or warranty is made or deemed to have been made; or

(c)    Borrower fails to perform any of the covenants or agreements of Borrower contained herein or in any of the other Security Documents and such failure continues for 30 days of the date when such performance was required; or

(d)    Borrower fails to maintain any insurance required hereunder or pay any premium on (i) any insurance policy assigned to Bank, or (ii) any insurance covering any Collateral; or

(e)    INTENTIONALLY DELETED; or

(f)    any of the Security Documents ceases to be a legal, valid, and binding agreement enforceable against the Person executing the same in accordance with its terms, is terminated, becomes or is declared ineffective or inoperative or ceases to provide the respective liens, rights, remedies, powers, or privileges intended to be provided thereby; or any Person denies that such Person has any further Liability or obligation under any of the Security Documents; or

(g)    Borrower (i) applies for or consents to the appointment of a receiver, trustee, custodian, intervenor, or liquidator of itself or of all or a substantial part of its assets, (ii) files a voluntary petition in bankruptcy, admits in writing that it is unable to pay its debts as they become due, or generally not pay its debts as they become due, (iii) makes a general assignment for the benefit of creditors, (iv) files a petition or answer seeking reorganization of an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws, (v) files an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization, or insolvency proceeding, or (vi) takes corporate action for the purpose of effecting any of the foregoing; or

(h)    an involuntary proceeding is commenced against Borrower seeking bankruptcy or reorganization of Borrower or the appointment of a receiver, custodian, trustee, liquidator, or other similar official of Borrower, or all or substantially all of Borrower's assets, and such proceeding shall not have been dismissed within sixty (60) days of the filing thereof; or an order, order for relief, judgment, or decree is entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of Borrower, or appointing a receiver, custodian, trustee, liquidator, or other similar official of Borrower, or of all or substantially all of Borrower's assets; or

(i)    any final judgment(s) for the payment of money not paid or fully covered by insurance in excess of the sum of $100,000.00 in the aggregate is rendered against Borrower and such judgment(s) is not satisfied or discharged at least ten (10) days prior to the date on which any of Borrower's assets could be lawfully sold to satisfy such judgment; or

(j)    a Change in Control of Borrower occurs.

## SECTION 11
## REMEDIES

**11.1    Remedies Upon Event of Default.**    If any Event of Default occurs and is continuing, then Bank may, without notice, exercise any one or more of the following rights and remedies, and any other remedies provided in any of the Security Documents, as Bank in its sole discretion may deem necessary or appropriate: (a) declare the Indebtedness or any part thereof to be forthwith due and payable, whereupon the same will become due and payable without presentment, demand, protest, notice of default, notice of acceleration or of intention to accelerate, or other notice of any kind, all of which Borrower hereby expressly waives, anything

contained herein to the contrary notwithstanding, (b) reduce any claim to judgment, or (c) without notice of default or demand, pursue and enforce any of Bank's rights and remedies under the Security Documents, or otherwise provided under or pursuant to any applicable law or agreement; provided, however, if any Event of Default specified in Sections 10(g) or (h) shall occur, then the Indebtedness will become due and payable concurrently therewith, and Bank's obligation to lend will immediately terminate hereunder, without any further action by Bank and without presentment, demand, protest, notice of default, notice of acceleration or of intention to accelerate, or other notice of any kind, all of which Borrower hereby expressly waives.

**11.2   Remedies**.  Upon the occurrence and continuation of any one or more of the above Events of Default and at any time thereafter:

(a)     Bank has, in addition to all other rights and remedies, the remedies of a secured party under the UCC, including, without limitation, the right to take possession of the Collateral, and for that purpose Bank may, so far as Borrower can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom or take possession of same and store same on such premises pending disposition under the terms of this Agreement or applicable law.

(b)     Bank may require Borrower to assemble the Collateral and make it available to Bank at a place designated by Bank which is reasonably convenient to both parties.  Unless the Collateral is perishable or threatens to decline speedily in value or is to a type customarily sold on a recognized market, Bank shall give to Borrower at least ten (10) days' written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made, which time period shall be deemed for all purposes to be commercially reasonable.

(c)     Bank may, at any time in its discretion, transfer any securities or other property constituting Collateral into its own name or that of its nominee, and receive the income thereon and hold the same as security for the Indebtedness or apply it on principal or interest due on Indebtedness.

(d)     Insofar as Collateral shall consist of Accounts, insurance policies, instruments, chattel paper, choses in action, or the like, Bank may demand, collect, receipt for, settle, compromise, adjust, sue for, release, extend the time of payment, make allowances and adjustments, foreclose, or realize upon Collateral as Bank may determine, whether or not Indebtedness or Collateral are then due, and for the purpose of realizing Bank's rights therein, Bank may receive, open, and dispose of mail addressed to Borrower and endorse notes, checks, drafts, money orders, documents of title, or other evidences of payment, shipment, or storage or any form of Collateral on behalf of and in the name of Borrower.

**11.3   Rights Not Exclusive**.  No right, power, or remedy conferred in this Agreement, the Revolving Note, or any other agreement executed in connection herewith or any other document or agreement to which Borrower and Bank are parties, or now or hereafter existing at law, in equity, or admiralty, by statute or otherwise, shall be exclusive, and each such right,

power, or remedy, shall, to the full extent permitted by law, be cumulative and in addition to every other such right, power, or remedy. Bank may resort to any security given by this Agreement or to any other security now existing or hereafter given to secure the payment of Borrower's Indebtedness, in whole or in part, and in such portions and in such order as may seem best to Bank in its sole discretion, and any such action shall not in any way be considered as a waiver of any of the rights, benefits, or security interests evidenced by this Agreement. Bank may, at all times, proceed directly against Borrower to enforce payment of Borrower's Indebtedness and shall not be required first to enforce its rights in the Collateral or any other security granted to it. Bank shall not be required to take any action of any kind to preserve, collect, or protect Borrower's rights in the Collateral or any other security granted to it.

**11.4    Sales of Collateral**. The sale by Bank of less than the whole of the Collateral shall not exhaust the rights of Bank hereunder, and Bank is specifically empowered to make successive sales hereunder until the whole of the Collateral shall be sold. If the Proceeds of any sale of less than the whole of the Collateral shall be less than the aggregate of the Indebtedness, this Agreement and the security interests created hereby shall remain in full force and effect as to the unsold portion of the Collateral just as though no sale had been made; provided however, that Borrower shall never have any right to require sale of less than the whole of the Collateral but Bank has the right, at its sole election, to sell less than the whole of the Collateral.

**11.5    Performance by Bank**. If Borrower fails to perform any covenant, duty, or agreement contained in any of the Security Documents, then Bank may perform or attempt to perform such covenant, duty, or agreement on behalf of Borrower. In such event, Borrower shall, at the request of Bank, promptly pay any amount expended by Bank in such performance or attempted performance to Bank at its principal office in Dallas, Texas together with interest thereon at the Maximum Rate from the date of such expenditure until paid. Notwithstanding the foregoing, it is expressly understood that Bank shall not assume any Liability or responsibility for the performance of any duties of Borrower hereunder or under any of the Security Documents and none of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Bank the right or power to exercise control over the management and affairs of Borrower.

**11.6    Administrative Fees**. Upon the violation by Borrower of any material representation, warranty or covenant set forth in this Agreement or in any of the Security Documents, Borrower agrees to pay to Bank, upon demand, an administrative fee in an amount determined by Bank from time to time to cover the extra labor and expense involved in addressing and monitoring any such violation; provided however, that should such administrative fee constitute interest under any applicable law, such fee shall not, together with other interest to be paid, charged, contracted for, received, reserved against, or taken on the Indebtedness arising under any of the Security Documents, exceed the Maximum Rate. Borrower acknowledges that any fee due under this Section is a bona fide administrative fee and is intended as reasonable compensation to Bank for labor and expense as described above and for no other purpose. No demand for or acceptance of an administrative fee under this Section by Bank shall be construed as a waiver by Bank of any right or remedy of Bank or of any obligation of Borrower under this Agreement or any of the Security Documents. Bank shall not be deemed to have waived any of its rights or remedies unless such waiver be in writing and signed by Bank.

## SECTION 12
## DEPOSITS

Bank, any participant, and any other holder of all or any part of the Indebtedness are hereby given a continuing lien as additional security for all Indebtedness hereunder upon any and all moneys, securities, and other property of Borrower, and the Proceeds thereof, now or hereafter held or received by or in transit to Bank, such participant, or such holder from or for Borrower, whether for safekeeping, custody, pledge, transmission, collection, or otherwise, and also upon any and all deposit balances (general or special) and credits of Borrower with, and any and all claims of Borrower against Bank, such participant, or such holder at any time existing. Upon the occurrence and continuation of an Event of Default, such participant, or such holder may apply or set off the same against the Indebtedness and indebtedness hereby secured, without notice and without liability. Borrower agrees that any other person or entity purchasing participation from Bank in the Indebtedness may exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such person or entity was the direct creditor of Borrower in the amount of such participation.

## SECTION 13
## MISCELLANEOUS

**13.1    Accounting Reports.** All financial reports or projections furnished by any Person to Bank pursuant to this Agreement shall be prepared in such form and such detail as shall be reasonably satisfactory to Bank, shall be prepared on the same basis as those prepared by such Person in prior years, and, where applicable, shall be the same financial reports and projections as those furnished to such Person's officers and directors.

**13.2    Waiver.** No failure to exercise, and no delay in exercising, on the part of Bank, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Bank under the Security Documents shall be in addition to all other rights provided by law. No modification or waiver of any provision of any Security Document, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar, or other instances without such notice or demand.

**13.3    Payment of Expenses.** Borrower agrees to pay Bank on demand all reasonable costs and expenses of Bank, incurred in connection with the preservation and enforcement of Bank's rights under the Security Documents, and all reasonable costs and expenses of Bank (including without limitation the reasonable fees and expenses of Bank's counsel) in connection with the negotiation, preparation, execution, delivery, and administration of the Security Documents. Following notice, Bank may, at its option, debit Borrower's Loan Account or any Depository Account to pay such expenses. Borrower agrees to pay interest on amounts which Borrower fails or refuses to pay, at the Maximum Rate from the date of such expenditure until paid.

**13.4    Notices.** Any communications required or permitted to be given by any of the Security Documents must be (a) in writing and personally delivered or mailed by prepaid certified or registered mail, or (b) made by electronic or facsimile transmission delivered or transmitted, to the party to whom such notice of communication is directed, to the address of such party shown opposite its name on the signature pages hereof. Any such communication shall be deemed to have been given (whether actually received or not) on the day it is personally delivered or three (3) days after deposit if sent by certified or registered mail or, if transmitted by electronic or facsimile transmission, on the day that such communication is transmitted as aforesaid subject to telephone confirmation of receipt, provided that if such notice is delivered or deemed to have been delivered on a day that is not a Business Day or after 5:00 p.m. Central Time, such notice shall be deemed to have been delivered on the following Business Day. Any party may change its address for purposes of this Agreement by giving notice of such change to the other parties pursuant to this Section.

**13.5    Governing Law.** This Agreement has been prepared, is being executed and delivered, and is intended to be performed in the State of Texas and the substantive laws of such state and the applicable federal laws of the United States of America shall govern the validity, construction, enforcement, and interpretation of this Agreement and all of the other Security Documents.

**13.6    Choice of Forum; Consent to Service of Process and Jurisdiction.** Any suit, action, or proceeding against Borrower with respect to this Agreement, the Revolving Note, or other Security Documents, or any judgment entered by any court in respect thereof, may be brought in the courts of the State of Texas, County of Dallas, or in the United States courts located in the State of Texas as Bank in its sole discretion may elect, and Borrower hereby irrevocably submits to the nonexclusive jurisdiction of such courts for the purpose of any such suit, action, or proceeding. Borrower hereby irrevocably consents to the service of process in any suit, action, or proceeding in said court by the mailing thereof by Bank by registered or certified mail, postage prepaid, to Borrower's address shown opposite its name on the signature pages hereof. Nothing herein or in any of the other Security Documents shall affect the right of Bank to serve process in any other manner permitted by law or shall limit the right of Bank to bring any action or proceeding against Borrower or with respect to any of its property in courts in other jurisdiction. Borrower hereby irrevocably waives any objections which it may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement, the Revolving Note, or any other Security Documents brought in the courts located in the State of Texas, County of Dallas, and hereby further irrevocably waives any claim that any such suit, action, or proceeding brought in any such court has been brought in any inconvenient forum. Any action or proceeding by Borrower against Bank shall be brought only in a court located in Dallas County, Texas.

**13.7    Invalid Provisions.** Any provision of any Security Document held by a court of competent jurisdiction to be illegal, invalid or unenforceable shall not invalidate the remaining provisions of such Security Document which shall remain in full force and the effect thereof shall be confined to the provision held invalid or illegal.

**13.8    Maximum Interest Rate.** Regardless of any provision contained in any of the Security Documents, Bank shall never be entitled to receive, collect, or apply as interest (whether termed interest herein or deemed to be interest by operation of law or judicial determination) on the Revolving Note any amount in excess of interest calculated at the Maximum Rate, and, in the event that Bank ever receives, collects, or applies as interest any such excess, then the amount which would be excessive interest shall be deemed to be a partial prepayment of principal and treated hereunder as such; and, if the principal amount of the Indebtedness is paid in full, then any remaining excess shall forthwith be paid to Borrower. In determining whether or not the interest paid or payable under any specific contingency exceeds interest calculated at the Maximum Rate, Borrower and Bank shall, to the maximum extent permitted under applicable law: (a) characterize any non-principal payment as an expense, fee, or premium rather than as interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread, in equal parts, the total amount of interest throughout the entire contemplated term of the Revolving Note; provided that, if the Revolving Note is paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds interest calculated at the Maximum Rate, then Bank shall refund to Borrower the amount of such excess or credit the amount of such excess against the principal amount of the Revolving Note and, in such event, Bank shall not be subject to any penalties provided by any laws for contracting for, charging, taking, reserving, or receiving interest in excess of interest calculated at the Maximum Rate.

**13.9    Non-Liability of Bank.** The relationship between Borrower and Bank is, and shall at all times remain, solely that of borrower and Bank, and Bank has no fiduciary or other special relationship with Borrower.

**13.10    Successors and Assigns.** The Security Documents shall be binding upon and inure to the benefit of Borrower and Bank and their respective successors, assigns, and legal representatives; provided, however, that Borrower may not, without the prior written consent of Bank, assign any rights, powers, duties, or obligations thereunder. Bank reserves the right to sell all or a portion of its interest in the Revolving Loan and Bank has the right to disclose any information in its possession regarding Borrower or any assets pledged to Bank in connection herewith to any potential transferee of the Loan or any part thereof.

**13.11    Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Agreement.

**13.12    Survival.** All representations and warranties made by Borrower herein shall survive delivery of the Revolving Note and the making of the Revolving Loan.

**13.13    Participations.** Bank has the right to enter into participation agreements with other banks with respect to the Revolving Note, and grant participations ratably in the other loan documents, but such participation shall not affect the rights and duties of Bank hereunder vis-à-vis Borrower. Each actual or proposed participant shall be entitled to receive all information received by Bank regarding the creditworthiness of Borrower, including, without limitation, information required to be disclosed to a participant pursuant to Banking Circular 181 (Rev.,

August 2, 1984), issued by the Comptroller of the Currency (whether the actual or proposed participant is subject to the circular or not).

**13.14 No Third Party Beneficiary.** The parties do not intend the benefits of this Agreement to inure to any third party, nor shall any Security Document or any course of conduct by any party hereto be construed to make or render Bank or any of its officers, directors, agents, or employees liable (a) to any materialman, supplier, contractor, subcontractor, purchaser, or lessee of any property owned by Borrower, or (b) for debts or claims accruing to any such Persons against Borrower.

**13.15 Multiple Counterparts.** This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.

**13.16 Cross Pledge and Cross Default.** Borrower hereby acknowledges, confirms and ratifies that all Collateral and /or continuing guaranties being granted or pledged to Bank or in which Bank was granted a security interest to secure any one of or all of Borrower's other obligations to Bank also secures the Indebtedness. Borrower further acknowledges and agrees that any Event of Default under any other note or loan agreement, by Borrower in favor of Bank shall constitute an Event of Default under the Security Documents and any Event of Default hereunder shall constitute an Event of Default under any loan agreement or note by Borrower in favor of Bank.

**13.17 USA Patriot Act.** Bank hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"); it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Bank to identify Borrower in accordance with the Patriot Act, and Borrower hereby agrees to take any action necessary to enable Bank to comply with the requirements of the Patriot Act.

**13.18 Entirety.** THIS AGREEMENT, THE NOTE, AND THE OTHER SECURITY DOCUMENTS REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. THE PROVISIONS OF THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS TO WHICH BORROWER IS A PARTY MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE PARTIES HERETO.

**13.19 Waiver of Jury Trial.** BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE

ADVICE OF COMPETENT COUNSEL, WAIVE, RELINQUISH AND FOREVER FORGO THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS AGREEMENT OR ANY CONDUCT, ACT OR OMISSION OF LENDER, BORROWER OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTACT, TORT OR OTHERWISE.

**13.20  Errors and Omissions.**  If requested by Bank, Borrower shall fully cooperate in the correction of any Security Document so that all Security Documents accurately describe the Loan.  In the event that Borrower fails to comply with Bank's requests within thirty (30) days, Borrower agrees to pay all costs and expenses incurred by or on behalf of Bank (including attorneys' fees) in connection with any such correction.

*Signature Pages Follow*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day
and year first above written.

Address for Notice:

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**BORROWER:**

**IRONCLAD PERFORMANCE WEAR
CORPORATION**, a California corporation

By: _____
    William M. Aisenberg, Executive Vice
    President & CFO

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**IRONCLAD PERFORMANCE WEAR
CORPORATION**, a Nevada corporation

By: _____
    William M. Aisenberg, Executive Vice
    President & CFO

Address for Notice:

600 North Pearl Street
Suite 2500
Dallas, Texas 75201
Attn:  Rick Rodman
E-mail:  rick.rodman@capitalone.com

**BANK:**

**CAPITAL ONE, N.A.**

By: _____
    Rick Rodman, Senior Vice President

## EXHIBITS

Exhibit "A" – Compliance Certificate
Exhibit "B" – Borrowing Base Report
Exhibit "C" – Closing Documents

## SCHEDULES

Schedule 5.6 – Offices
Schedule 5.9 – Litigation
Schedule 5.13 – Subsidiaries and Affiliates
Schedule 5.18 – Intellectual Property
Schedule 7.3(b) – Subordinated Debt
Schedule 7.5 – Liens

EXHIBIT "A"

Compliance Certificate

**COMPLIANCE CERTIFICATE**

FOR THE QUARTER ENDED _____ (THE "**SUBJECT PERIOD**")

*BANK*:                  **CAPITAL ONE, N.A.**

*BORROWER*:           **IRONCLAD PERFORMANCE WEAR CORPORATION**, a
California corporation and **IRONCLAD PERFORMANCE
WEAR CORPORATION**, a Nevada corporation

    This certificate is delivered under the Loan and Security Agreement (the "Agreement") dated as November 28, 2014, between Borrower, Bank and the guarantors named therein. Capitalized terms when used in this certificate shall, unless otherwise indicated, have the meanings set forth in the Agreement. I certify to Bank that, on the date of this certificate, (a) the Financial Statements of Borrower attached to this certificate were prepared in accordance with GAAP, and present fairly the financial condition and results of operations of Borrower as of the end of and for the Subject Period, (b) no Potential Default or Event of Default currently exists or has occurred which has not been cured or waived by Bank, and (c) the status of compliance by Borrower with certain covenants of the Agreement at the end of the Subject Period is set forth below:

In Compliance as of<br>End of Subject Period?<br>(Please Indicate)

1.    Financial Statements and Reports

| | | | |
|---|---|---|---|
| (a) | Provide audited annual financial statements of Borrower within 120 days after the last day of each fiscal year. | Yes | No |
| (b) | Provide annual budget (to include CapEx schedule) of Borrower within 120 days after the last day of each fiscal year. | Yes | No |
| (c) | Provide quarterly financial statements of Borrower within 45 days after the last day of each fiscal quarter. | Yes | No |
| (d) | Provide a Compliance Certificate within 45 days after the last day of each fiscal quarter | Yes | No |
| (e) | Provide a Borrowing Base Certificate within 30 days after the last day of each month. | Yes | No |
| (f) | Provide such reports required in accordance with 6.1(f) | Yes | No |
| (g) | Provide customer listing and customer addresses within 20 days after the last day of each fiscal year. | Yes | No |

2.    <u>Financial Covenants</u>

(a)    Minimum Debt Service Coverage Ratio, calculated as of the last day of the calendar quarter in accordance with <u>Section 7.15(a)</u> of the Agreement.

This calculation is for the preceding twelve month period:

| | | |
|---|---|---|
| (a) | EBITDAS | $ |
| (b) | Interest Expense | $ |
| (c) | Principal Payments of Debt | $ |
| (d) | Lease Payments | $ |
| (e) | Distributions | $ |
| (f) | [(b) + (c) + (d) + (e)] | $ |
| (g) | Debt Service Coverage Ratio [(a) / (f)] | $ |

Line (g) must be equal to or greater than 1.50 to 1.0.

(b)    Tangible Net Worth*, calculated as of the last day of the calendar quarter in accordance with <u>Section 7.15(b)</u> of the Agreement.                    $

[Total Assets – Intangibles – Total Liabilities + Subordinated Debt]

Date: _____ ___, 201__

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation

By:_____

_____, _____

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

By:_____

_____, _____

*"<u>Tangible Net Worth</u>" means, with respect to any Person, net worth plus all Subordinated Debt, *less* (i) any and all loans and other advances to Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (ii) notes, notes receivable, accounts, accounts receivable, inter-company receivable, and other amounts owing from Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (iii) treasury stock, good will, trademarks, trade names, patents, and deferred charges; and (iv) any and all other intangible assets, calculated in accordance with GAAP.

# EXHIBIT "B"

### Borrowing Base Certificate

[see attached]

## EXHIBIT "C"

### Closing Documents

1.  Revolving Line of Credit Note in the original principal amount of $6,000,000.00, executed by Borrower;

2.  Revolving Loan and Security Agreement, executed by Borrower;

3   Notice of Final Agreement;

4.  Resolutions and Consents for Borrower;

5.  UCC-1 Financing Statement;

6.  Articles of Incorporation and Bylaws of Borrower;

7.  Certificate of Existence and Good Standing issued by applicable governmental authorities;

8.  UCC search;

9.  Post-Closing Letter; and

10. Landlord's Waivers.

## SCHEDULE 5.6

<u>Offices</u>

1.    1920 Hutton Court, Suite 300
      Farmers Branch, Texas 75234 (executive office)

2.    29010 Commerce Center Drive
      Valencia, California, 91355 (location of inventory, pursuant to agreement to provide
      warehousing, assembly, packaging and fulfillment services with AMS Fulfillment, Inc.)

## SCHEDULE 5.9

Litigation

NONE

## SCHEDULE 5.13

<u>Subsidiaries and Affiliates</u>

NONE

## SCHEDULE 5.18

### Intellectual Property

[TO BE PROVIDED WITHIN 30 DAYS OF CLOSING BY BORROWER]

## SCHEDULE 7.3(b)

Subordinated Debt

NONE

## SCHEDULE 7.5

Liens

NONE

# EXHIBIT "2"

<u>**SECOND AMENDED AND RESTATED**</u>
<u>**REVOLVING LINE OF CREDIT NOTE**</u>

$8,000,000.00                     Dallas, Texas                     April 11, 2017

      **FOR VALUE RECEIVED**, the undersigned, **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("<u>Ironclad California</u>"), and **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("<u>Ironclad Nevada</u>", and, collectively with Ironclad California, "<u>Borrower</u>"), whose address for purposes of notice is 1920 Hutton Court, Suite 300, Farmers Branch, Texas 75234, hereby promises, to pay to the order of **CAPITAL ONE, NATIONAL ASSOCIATION** ("<u>Bank</u>"), at its office at 600 North Pearl Street, Suite 2500, Dallas, Texas 75201, or such other place as Holder may direct, in lawful money of the United States of America, with interest as calculated herein below, the initial maximum principal amount of EIGHT MILLION AND NO/100 DOLLARS ($8,000,000.00) or, if less than such principal amount, the aggregate principal amount advanced by the Holder from time to time to the Borrower pursuant to the Loan Agreement. Payment of principal and interest shall be in accordance with the following provisions:

    1.    <u>Definitions</u>.

        "<u>Applicable Rate</u>" means a fluctuating per annum rate equal to the following:

        a.    Four and one-half percentage points (4.50%) in excess of the LIBOR Base Rate beginning on the date hereof; then

        b.    Six and one-half percentage points (6.50%) in excess of the LIBOR Base Rate beginning on June 30, 2017; then

        c.    Eight and one-half percentage points (8.50%) in excess of the LIBOR Base Rate beginning on September 30, 2017; then

        d.    Ten and one-half percentage points (10.50%) in excess of the LIBOR Base Rate beginning on December 31, 2017; then

        e.    Twelve and one-half percentage points (12.50%) in excess of the LIBOR Base Rate beginning on March 31, 2018.

        "<u>Business Day</u>" means a day (other than Saturday or Sunday) when Bank is open for conducting all of its customary commercial banking activities.

        "<u>Default Rate</u>" means the lesser of the Maximum Rate or eighteen percent (18%) per annum.

        "<u>Hedge Agreement</u>" means (a) any agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, credit



derivative transaction, forward rate agreement, commodity swap, commodity option, forward commodity contract, equity or equity index swap or option, forward bond or forward bond price or forward bond index transaction, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, cap agreement, floor agreement, collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, spot contract, or any other similar agreement (including any option to enter into any of the foregoing), whether or not such agreement is governed by or subject to any master agreement, (b) any and all agreements of any kind, and any and all related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement, or (c) any combination of the foregoing.

"Holder" means Bank and any subsequent holder of this Revolving Note.

"Indebtedness" has the meaning set forth in the Loan Agreement.

"Index Rate" means at any time the variable rate of interest published in The Wall Street Journal's "Money Rates" table as the prime rate. If multiple prime rates are quoted in the table, then the highest prime rate will be the Index Rate. In the event the prime rate is no longer published in the "Money Rates" table, the Holder will choose a substitute index rate which is based upon comparable information. The "prime rate" is a rate set by banks based upon various factors, including such banks' costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.

"Interest Period" shall mean (i) the period beginning on (and including) the date hereof and ending on (but excluding) April 30, 2017, and (ii) thereafter, the period beginning on (and including) the last day of the previous Interest Period and ending on (but excluding) the 1st day of the subsequent calendar month. Notwithstanding the foregoing, (i) if any Interest Period is scheduled to end on a day that is not a Business Day, then the Interest Period will end on (but exclude) the next succeeding Business Day; and (ii) any Interest Period scheduled to end after the Maturity Date shall end on the Maturity Date.

"LIBOR" means, with respect to each Interest Period, the rate for a Reset Date will be the rate for deposits in U.S. Dollars for a period of one month which appears on the Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on the day that is two London Banking Days preceding that Reset Date. If such rate does not appear on the Reuters Screen LIBOR01 Page, the rate for that Reset Date will be determined as if the parties had specified "USD-LIBOR-Reference Banks" as the applicable rate.

"London Banking Day" shall mean any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England.



"Loan Agreement" means that certain Revolving Loan and Security Agreement, dated November 28, 2014, executed by Borrower and Bank in connection with the Prior Revolving Notes and this Revolving Note, as may hereafter be modified from time to time. All capitalized terms not defined herein shall have the meaning attributed to them in the Loan Agreement.

"Maturity Date" means April 17, 2018.

"Maximum Rate" means, with respect to Holder, the maximum nonusurious interest rate, if any, that at any time, or from time to time, may be contracted for, taken, reserved, charged, or received on the indebtedness evidenced by this Revolving Note, under the laws which are presently in effect of the United States and the State of Texas applicable to such Holder and to such indebtedness or, to the extent permitted by law, under such applicable laws of the United States and the State of Texas which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow. To the extent that Chapter 303 of the Texas Finance Code (the "Code"), is relevant to any Holder for the purposes of determining the Maximum Rate, Holder and each such holder may elect to determine such applicable legal rate under the Code pursuant to the "interest rate ceiling," from time to time in effect, as referred to in Chapter 303 of the Code provided, however, that to the extent permitted by applicable law, Holder may, in accordance with the Code, from time to time elect the "weekly ceiling," "monthly ceiling," "quarterly ceiling" or the "annualized ceiling" as those terms are defined therein, and renew any such election without notice to Borrower.

"Prior Revolving Notes" means (a) that certain Revolving Line of Credit Note, dated November 28, 2014, executed by Borrower and payable to the order of Bank, in the maximum principal amount of $6,000,000.00, and (b) that certain Amended and Restated Revolving Line of Credit Note, dated June 15, 2015, executed by Borrower and payable to the order of Bank, in the maximum principal amount of $8,000,000.00.

"Reference Banks" means major banks in the London interbank market selected by the Bank.

"Reset Date" shall mean the first day of an Interest Period.

"Revolving Loan" means the revolving line of credit loan from Bank to Borrower, in the amount of the Revolving Note.

"Revolving Note" means this Second Amended and Restated Revolving Line of Credit Note.

"Security Documents" means the Prior Revolving Notes, this Revolving Note, the Loan Agreement, the Hedge Agreement (if applicable) and any and all other documents or instruments referenced in the Loan Agreement or otherwise executed by Borrower or third parties in connection with the Revolving Loan.



"USD-LIBOR-Reference Banks" shall mean that the rate for a Reset Date will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on the day that is two (2) London Banking Days preceding that Reset Date to prime banks in the London interbank market for a period of one month commencing on that Reset Date and in an amount equal to the principal amount of the Revolving Note. The Bank will request the principal London office of each of the Reference Banks to provide a quotation of its rate. If at least two (2) such quotations are provided, the rate for that Reset Date will be the arithmetic mean of the quotations. If fewer than two quotations are provided as requested, the rate for that Reset Date will be the arithmetic mean of the rates quoted by major banks in New York City, selected by the Bank, at approximately 11:00 a.m., New York City time, on that Reset Date for loans in U.S. Dollars to leading European banks for a period of one month commencing on that Reset Date and in an amount equal to the principal amount of the Revolving Note.

2.    <u>Payment</u>. This Revolving Note is due and payable as follows:

(a)    Borrower shall pay to Bank, commencing on May 1, 2017, and continuing on the first (1st) day of each month thereafter, monthly payments of accrued and unpaid interest on the unpaid principal balance of the Revolving Note, computed at the Applicable Rate.

(b)    All outstanding principal and accrued and unpaid interest on this Revolving Note and all other amounts due with respect to the Revolving Note under the Security Documents shall be due and payable on the Maturity Date.

3.    <u>Other Payment Terms</u>.

(a)    Should any payment become due and payable on any day other than a Business Day for Bank, the date of such payment shall be extended to the next succeeding Business Day, and, in the case of a payment of principal or past due interest or any installment of either thereof, interest shall accrue and be payable thereon for the period of such extension at the applicable interest rate or rates specified herein. Each payment by Borrower on account of the principal of or interest on this Revolving Note or of any fee or other amount payable to Bank shall be made not later than 11 :00 a.m. (Dallas, Texas time) on the applicable due date (or if such day is not a Business Day, the next succeeding Business Day). Any payment made after 11:00 a.m. (Dallas, Texas time) shall be credited on the next succeeding Business Day. All payments shall be made to Bank at Bank's office, in U.S. Dollars, in immediately available funds and shall be made without any setoff, counterclaim or deduction whatsoever.

(b)    All payments of principal and interest that are past due shall, at the option of Bank, bear interest at a per annum interest rate equal to the Default Rate. Borrower agrees to pay interest on all amounts due under the Security Documents which Borrower

<u>SECOND AMENDED AND RESTATED REVOLVING LINE OF CREDIT NOTE – PAGE 4</u>
886887.2



fails or refuses to pay, following the applicable notice and cure period, if any, at the Default Rate from the date due until paid.

(c)      Except for purposes of computing the Maximum Rate, interest shall be calculated on the basis of a 360-day year applied to the actual number of days upon which principal is outstanding by multiplying the principal amount outstanding hereunder by the applicable interest rate, multiplying the product thereof by the actual number of days elapsed, and dividing the product so obtained by three hundred sixty (360).

(d)      In lieu of the interest on past due installments provided for in this Revolving Note, Bank may collect a late charge not to exceed five cents ($.05) for each dollar ($1.00) of each payment of interest, principal and, if applicable, any other payment due under any of the Security Documents which is more than ten (10) days in arrears, but in no event to exceed Five Hundred and No/100 Dollars ($500.00) in the aggregate, to cover the extra expense involved in handling delinquent accounts; provided however, that should such late charge constitute interest under any applicable law, such late charge shall not, together with other interest to be paid, charged, contracted for, received, or reserved against, or taken on the indebtedness evidenced by this Revolving Note, or indebtedness arising under any of the Security Documents exceed the Maximum Rate.

(e)      In the event that the Holder is advised by the Reference Banks that deposits in dollars in the applicable principal amount are not being offered in the London Interbank market for any Interest Period, *or* the Holder determines that the Applicable Rate will not adequately reflect the cost to Holder of obtaining funds in dollars in the London Interbank market in an amount substantially equal to the outstanding principal in dollars, *or* the period of time remaining prior to the Maturity Date is less than thirty (30) days, *then and in that event*, the Holder shall give written notice thereof to Borrower whereupon the applicable interest rate shall be converted into a floating rate equal to the Index Rate on the last day of the then current Interest Period.

4.      Security Documents. The indebtedness evidenced hereby is secured by the Security Documents. This Revolving Note is included in the indebtedness referred to in the Security Documents and is entitled to the benefits of those documents, but neither this reference to those documents nor any provisions thereof shall affect or impair the absolute and unconditional obligation of the Borrower to pay the principal of and interest on this Revolving Note when due.

5.      Events of Default. The occurrence of an "Event of Default" under the Loan Agreement shall constitute an Event of Default under this Revolving Note. If any Event of Default shall occur, then so long as such Event of Default is in existence and has been neither waived by Bank nor cured the Holder may, with or without notice to the Borrower, declare this Revolving Note to be forthwith due and payable, both as to principal and interest, without presentment, demand, protest, or other notice of any kinds, all of which are hereby expressly waived, anything contained herein or in any of the Security Documents or in any other instrument executed in connection with or securing



this Revolving Note to the contrary notwithstanding. Reference is made to the Security Documents for a statement of the terms and conditions under which the line of credit represented by this Revolving Note is being made available to Borrower and of additional terms and conditions under which this Revolving Note may be accelerated.

6.      Security Documents-Reduction of Commitment. Reference is additionally made to the Security Documents for a statement of the terms and conditions under which the line of credit represented by this Revolving Note may be reduced. Specifically, Borrower acknowledges and agrees that effective beginning on October 1, 2017, the Bank's maximum commitment under Section 2.1 of the Loan Agreement (defined as the Revolving Line Limit) shall be permanently reduced from $8,000,000.00 to $5,000,000.00.

7.      Waivers. Borrower, accommodation party, surety, endorser or other person or entity liable for the payment or collection of this Revolving Note expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate, notice of acceleration, all other notices, bringing of suit and diligence in taking any action to collect amounts called for hereunder or enforcing any security or guaranty, and agree to any substitution, exchange or release of any security, with or without consideration, now or hereafter given for this Revolving Note or the release of any party primarily or secondarily liable hereon. Borrower, accommodation party, surety, endorser or any other person or entity liable for the payment or collection of this Revolving Note further agrees that it will not be necessary for the owner or Holder hereof, in order to enforce payment of this Revolving Note, to first institute or exhaust its remedies against any maker or other party liable hereon or to enforce its rights against any security or guaranty for this Revolving Note, and hereby consents to the renewal and extension from time to time of this Revolving Note, and any other indulgence with respect hereto without notice of any such renewal, extension or indulgence, and without limit as to the number of such renewals, extensions or indulgences or the period or periods thereof.

8.      Attorneys' Fees and Costs. Borrower agrees to pay reasonable attorneys' fees and costs incurred by the Holder in collecting or attempting to collect this Revolving Note, whether by suit or otherwise.

9.      Limitations on Interest.

        (a)      It is the intention of the Bank and the Borrower to conform strictly to any applicable usury laws. Accordingly, if the transactions contemplated hereby would be usurious under any applicable law, then, in that event, notwithstanding anything to the contrary in this Revolving Note, the Security Documents or any other agreement entered into in connection with or as security for or guaranteeing the Loan Agreement or this Revolving Note, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received by the Bank under this Revolving Note, the Security Documents or under any



other agreement entered into in connection with or as security for or guaranteeing the Loan Agreement or this Revolving Note shall under no circumstances exceed the Maximum Rate, and any excess shall be canceled automatically and, if theretofore paid, shall, at the option of the Bank, be credited by the Bank on the principal amount of any indebtedness owed to the Bank by the Borrower or refunded by the Bank to the Borrower; and (ii) in the event that the maturity of this Revolving Note is accelerated or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Bank may never include more than the Maximum Rate, and excess interest, if any, provided for in this Revolving Note, the Security Documents or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall, at the option of the Bank, be credited by the Bank on the principal amount of any indebtedness owed to the Bank by the Borrower or refunded by the Bank to the Borrower.

(b)     Notwithstanding anything herein to the contrary, in no event will interest payable to the Bank exceed the Maximum Rate (after taking into account all charges payable to the Bank which constitute interest under such applicable law), but if any amount referred to in this Revolving Note which would be payable to the Bank but for the applicability of usury or other laws limiting the consideration payable to the Bank is not paid to the Bank as a result of the applicability of such laws, then interest on the outstanding principal balance of this Revolving Note payable to the Bank shall, to the extent permitted by the law, accrue at the Maximum Rate (after taking into account all charges payable to the Bank which constitute interest under applicable law) until the total amount received by the Bank equals the amount it would have received had no such laws been applicable.

10.    <u>Applicable Law; Venue</u>. This Revolving Note shall be governed by, and construed in accordance with, the laws of the State of Texas (except that Chapter 346 of the Texas Finance Code, which regulates certain revolving credit loan accounts and revolving tri-party accounts, shall not apply to this Revolving Note or any transaction contemplated hereby); subject, however, to the effect of applicable federal law. Venue for any action brought to enforce or interpret any term or condition set forth in this Revolving Note or the other Security Documents shall be brought exclusively in Dallas County, Texas.

11.    <u>WAIVER OF JURY TRIAL</u>. BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS REVOLVING NOTE OR ANY CONDUCT, ACT OR OMISSION OF BANK OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER

<u>SECOND AMENDED AND RESTATED REVOLVING LINE OF CREDIT NOTE – PAGE 7</u>
886887.2



PERSONS AFFILIATED WITH BANK OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTACT, TORT OR OTHERWISE.

12.    <u>Assigns</u>. As used herein, the terms "Borrower," "Bank" and "Holder" shall be deemed to include their respective successors, legal representatives and assigns, whether by voluntary action of the parties or by operation of law.

13.    <u>Amendment and Restatement of Prior Revolving Notes</u>. This Revolving Note amends, restates, and modifies, but does not extinguish or terminate, the obligations evidenced by the Prior Revolving Notes. The indebtedness evidenced by the Prior Revolving Notes will continue to be evidenced by this Revolving Note; no advances have been made or are being made by Bank to satisfy the indebtedness outstanding under the Prior Revolving Notes on the date hereof, and this Revolving Note is not a novation of the indebtedness evidenced by the Prior Revolving Notes. Any accrued and outstanding interest on the Prior Revolving Notes will continue to be evidenced by this Revolving Note. All of the liens and security interests securing the Prior Revolving Notes shall continue in full force and effect, and are hereby renewed and extended, and not in any manner waived or extinguished, as security for the indebtedness evidenced by this Revolving Note.

14.    <u>Entire Agreement</u>. The Security Documents constitute the entire understanding and agreement between Borrower and Bank with respect to the transactions arising in connection with the Indebtedness and supersede all prior written or oral understandings and agreements between Borrower and Bank with respect to the matters addressed in the Security Documents. Borrower and Bank hereby acknowledge that, except as incorporated in writing in the Security Documents, there are not, and were not, and no persons are or were authorized by Bank to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Security Documents.

THE WRITTEN SECURITY DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*Signature Page Follows*



**IN WITNESS WHEREOF**, Borrower has caused this Revolving Note to be duly executed and delivered as of effective the date above written.

**BORROWER**:

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation

By:
Name:    William M. Aisenberg
Its:      Executive Vice President & CFO

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

By:
Name:    William M. Aisenberg
Its:      Executive Vice President & CFO

# EXHIBIT "3"

**Execution Copy**

## FIRST MODIFICATION AGREEMENT

This **FIRST MODIFICATION AGREEMENT** (this "Modification"), dated as of June 15, 2015, is entered into by and among **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California"), **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada", and, collectively with Ironclad California, "Borrower"), and **CAPITAL ONE, N.A.** ("Bank").

WHEREAS, Bank provided Borrower with a revolving credit facility (the "Loan"), pursuant to that certain Revolving Loan and Security Agreement, dated November 28, 2014, between Borrower and Bank (as further amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement");

WHEREAS, Section 2.6 of the Loan Agreement provides that, subject to certain terms and conditions, Borrower may request an increase in the Revolving Line Limit;

WHEREAS, Borrower has requested that Bank agree to (i) an increase in the Revolving Line Limit and (ii) modify certain of the terms and provisions of the Loan Agreement and other related documents executed by Borrower or third parties pertaining to, evidencing or securing the Loans (collectively, the "Security Documents"); and

WHEREAS, Bank has agreed to the foregoing, but only to the extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Bank hereby agree as follows:

1. _Definitions_. All capitalized terms used and not defined herein shall have the meanings given them in the Loan Agreement and the rules of construction set forth in Section 1.1 of the Loan Agreement shall apply to this Modification.

2. _Modification of Security Documents_. The Security Documents shall be modified as follows:

   a. The definition of "Revolving Line Limit" in Section 1.1 of the Loan Agreement shall be deleted in its entirety and replaced with the following:

   "Revolving Line Limit" means Eight Million and No/100 Dollars ($8,000,000.00).

b.     The definition of "Revolving Note" in Section 1.1 of the Loan Agreement shall be deleted in its entirety and replaced with the following:

"Revolving Note" means the Amended and Restated Revolving Line of Credit Note, dated June 15, 2015, evidencing the Revolving Loan in the maximum principal amount of $8,000,000.00, executed by Borrower and delivered to the Bank pursuant to the terms of this Agreement together with any renewals, extensions, or modifications thereof.

c.     Section 2.6 of the Loan Agreement shall be deleted in its entirety and replaced with the following:

## "2.6    INTENTIONALLY DELETED."

3.     Fees and Expenses. Borrower agrees that Borrower is liable for all reasonable fees, costs and expenses (including attorneys' fees) incurred by Bank in connection with the documentation, preparation, interpretation and negotiation of this Modification and any further modification or supplement to this Modification or to the Security Documents, the consummation and administration of the transactions contemplated hereby and thereby and the enforcement, preservation, protection or defense of any of Bank's rights and remedies hereunder and under the Security Documents. All such fees, costs and expenses are referred to herein as "Expenses".

4.     Conditions. Bank's undertakings hereunder are subject to the satisfaction or waiver of the following conditions ("Effectiveness Conditions"):

a.     Borrower's execution and delivery of this Modification;

b.     Borrower's execution and delivery of the Amended and Restated Revolving Line of Credit Note;

c.     Borrower's payment of all Expenses incurred by Bank through the date hereof.

5.     Acknowledgment by Borrower. Except as otherwise specified herein, the terms and provisions hereof shall in no manner impair, limit, restrict or otherwise affect the obligations of Borrower to Bank, as evidenced by the Security Documents. Borrower hereby acknowledges, agrees and represents that (a) Borrower is indebted to Bank pursuant to the terms of the Security Documents as modified hereby; (b) the liens, security interests and collateral assignments created and evidenced by the Security Documents are, respectively, valid and subsisting liens, security interests and collateral assignments of the respective dignity and priority recited in the Security Documents; (c) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Security Documents, and the other obligations created or evidenced by the Security Documents; (d) Borrower has no claims, offsets, defenses or counterclaims arising from any of Bank's acts or omissions with respect to the Collateral, the

Security Documents or Bank's performance under the Security Documents or with respect to the Collateral; (e) the representations and warranties contained in the Security Documents are true and correct in all material respects as of the date hereof (except for such representations and warranties which expressly relate to an earlier date); and (f) Bank is not in default and to Borrower's knowledge, no event has occurred which, with the passage of time, giving of notice, or both, would constitute a default by Bank of Bank's obligations under the terms and provisions of the Security Documents.

6.     <u>No Waiver of Remedies</u>.  Except as may be expressly set forth herein, nothing contained in this Modification shall prejudice, act as, or be deemed to be a waiver of any right or remedy available to Bank by reason of the occurrence or existence of any fact, circumstance or event constituting a Default or an Event of Default under the Note or the other Security Documents.

7.     <u>Effectiveness of the Security Documents</u>.  All Security Documents are hereby amended and modified in a manner consistent with the modifications, terms and provisions contained herein.  Except as expressly modified by the terms and provisions hereof, each of the terms and provisions of the Security Documents are hereby ratified and shall remain in full force and effect; provided, however, that any reference in any of the Security Documents to the Loan, the amount constituting the Loan, terms which are modified hereby, or to any of the other Security Documents, shall be deemed, from and after the date hereof, to refer to the Loan, the amount constituting the Loan, terms and to such other Security Documents, as modified hereby.

8.     **GOVERNING LAW; VENUE; SERVICE OF PROCESS.  THE TERMS AND PROVISIONS HEREOF SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  THIS AGREEMENT HAS BEEN ENTERED INTO IN DALLAS COUNTY, TEXAS, AND IT SHALL BE PERFORMABLE FOR ALL PURPOSES IN DALLAS COUNTY, TEXAS.  ANY ACTION OR PROCEEDING AGAINST BORROWER UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE SECURITY DOCUMENTS MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN DALLAS COUNTY, TEXAS.   BORROWER HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURTS, AND (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR THAT ANY SUCH COURT IS AN INCONVENIENT FORUM.  BORROWER AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT ITS ADDRESS SPECIFIED OR DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 10.12 OF THE LOAN AGREEMENT. NOTHING HEREIN OR IN ANY OF THE OTHER SECURITY DOCUMENTS SHALL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR WITH RESPECT TO ANY OF ITS PROPERTY IN COURTS IN OTHER JURISDICTIONS.  ANY ACTION OR**

**PROCEEDING BY BORROWER AGAINST BANK SHALL BE BROUGHT ONLY IN A COURT LOCATED IN DALLAS COUNTY, TEXAS.**

9.     Severability.  Any provision of this Modification held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Modification and the effect thereof shall be confined to the provision held to be invalid or illegal.

10.     Counterparts.  To facilitate execution, this Modification may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument.

**11.     NOTICE OF FINAL AGREEMENT.  THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO OR THERETO.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO OR THERETO. THE PROVISIONS OF THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE RESPECTIVE PARTIES TO SUCH DOCUMENTS.**

**12.     WAIVER OF JURY TRIAL.  THE PARTIES HERETO IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.**

13.     Release.  Borrower hereby releases and forever discharges Bank from any and all claims, demands, liabilities, losses or causes of action, known or unknown, fixed or contingent, Borrower may have directly against Bank, as of 12:00 midnight, Dallas, Texas time, on the date of this Modification, that is a part of, concerns or in any manner relates to this Modification or the Security Documents, including but not limited to, claims for tortious interference with contractual relations, breach of contract, usury, breach of fiduciary duty, bad faith, negligence, negligent misrepresentation, defamation, business disparagement, promissory estoppel, or similar causes of action, except for, any and all actions, suits, proceedings brought by Borrower, to recover damages they incurred in any action, suit or proceeding brought by a third party against them.

*Signature Page Follows*

IN WITNESS WHEREOF, the undersigned have executed this Modification as of the day and year first above written.

Address for Notice:

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**BORROWER:**

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation

By: _____
William M. Aisenberg, Executive Vice President & CFO

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

By: _____
William M. Aisenberg, Executive Vice President & CFO

Address for Notice:

600 North Pearl Street
Suite 2500
Dallas, Texas 75201
Attn:  Rick Rodman
E-mail:  rick.rodman@capitalone.com

**BANK:**

**CAPITAL ONE, N.A.**

By: _____
Rick Rodman, Senior Vice President

Execution Copy

## SECOND MODIFICATION AGREEMENT

     This **SECOND MODIFICATION AGREEMENT** (this "Modification"), dated as of March 16, 2016, is entered into by and among **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California"), **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada", and, collectively with Ironclad California, "Borrower"), and **CAPITAL ONE, N.A.** ("Bank").

     WHEREAS, Bank provided Borrower with a revolving credit facility (the "Loan"), pursuant to that certain Revolving Loan and Security Agreement, dated November 28, 2014, between Borrower and Bank, as modified by that certain First Modification Agreement, dated June 15, 2015 (as further amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement");

     WHEREAS, Borrower has requested that Bank agree to temporarily modify certain of the terms and provisions of the Loan Agreement and other related documents executed by Borrower or third parties pertaining to, evidencing or securing the Loans (collectively, the "Security Documents"); and

     WHEREAS, Bank has agreed to the foregoing, but only to the extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

     NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Bank hereby agree as follows:

     1.    Definitions.   All capitalized terms used and not defined herein shall have the meanings given them in the Loan Agreement and the rules of construction set forth in Section 1.1 of the Loan Agreement shall apply to this Modification.

     2.    Temporary Modification of Security Documents.

       a.    Bank agrees to permit Borrower, for each of the periods ending March 31, 2016, June 30, 2016, September 30, 2016 and December 31, 2016, for the 12 month period then ended, to add to Borrower's calculation of EBITDAS, up to $325,000.00 in legal expenses incurred in connection with Borrower's existing litigation with ORR Safety Corporation.

       b.    Notwithstanding that the definition of "Eligible Account" in Section 1.1 of the Loan Agreement currently excludes from the Borrowing Base all Accounts with respect to which 150 days or more has passed since the date of the invoice, Bank agrees to permit certain Accounts invoiced by Borrower in December, 2015 and January, 2016 to Action Specialties, LLC, and Pace Distributing, with respect to which 150 days or

more has passed since the date of the invoice, to be included in the definition of Eligible Accounts, in an amount not to exceed $300,000.00, so long as 180 days or more has not passed since the date of the invoice.

3.    Fees and Expenses. Borrower agrees that Borrower is liable for all reasonable fees, costs and expenses (including attorneys' fees) incurred by Bank in connection with the documentation, preparation, interpretation and negotiation of this Modification and any further modification or supplement to this Modification or to the Security Documents, the consummation and administration of the transactions contemplated hereby and thereby and the enforcement, preservation, protection or defense of any of Bank's rights and remedies hereunder and under the Security Documents. All such fees, costs and expenses are referred to herein as "Expenses".

4.    Conditions. Bank's undertakings hereunder are subject to the satisfaction or waiver of the following conditions ("Effectiveness Conditions"):

a.    Borrower's execution and delivery of this Modification;

b.    Borrower's payment of all Expenses incurred by Bank through the date hereof.

5.    Acknowledgment by Borrower.  Except as otherwise specified herein, the terms and provisions hereof shall in no manner impair, limit, restrict or otherwise affect the obligations of Borrower to Bank, as evidenced by the Security Documents. Borrower hereby acknowledges, agrees and represents that (a) Borrower is indebted to Bank pursuant to the terms of the Security Documents as modified hereby; (b) the liens, security interests and collateral assignments created and evidenced by the Security Documents are, respectively, valid and subsisting liens, security interests and collateral assignments of the respective dignity and priority recited in the Security Documents; (c) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Security Documents, and the other obligations created or evidenced by the Security Documents; (d) Borrower has no claims, offsets, defenses or counterclaims arising from any of Bank's acts or omissions with respect to the Collateral, the Security Documents or Bank's performance under the Security Documents or with respect to the Collateral; (e) the representations and warranties contained in the Security Documents are true and correct in all material respects as of the date hereof (except for such representations and warranties which expressly relate to an earlier date); and (f) Bank is not in default and to Borrower's knowledge, no event has occurred which, with the passage of time, giving of notice, or both, would constitute a default by Bank of Bank's obligations under the terms and provisions of the Security Documents.

6.    No Waiver of Remedies.  Except as may be expressly set forth herein, nothing contained in this Modification shall prejudice, act as, or be deemed to be a waiver of any right or remedy available to Bank by reason of the occurrence or existence of any fact, circumstance or event constituting a Default or an Event of Default under the Note or the other Security Documents.

7.    Effectiveness of the Security Documents.  All Security Documents are hereby amended and modified in a manner consistent with the modifications, terms and provisions contained herein.  Except as expressly modified by the terms and provisions hereof, each of the terms and provisions of the Security Documents are hereby ratified and shall remain in full force and effect; provided, however, that any reference in any of the Security Documents to the Loan, the amount constituting the Loan, terms which are modified hereby, or to any of the other Security Documents, shall be deemed, from and after the date hereof, to refer to the Loan, the amount constituting the Loan, terms and to such other Security Documents, as modified hereby.

8.    **GOVERNING LAW; VENUE; SERVICE OF PROCESS**.  **THE TERMS AND PROVISIONS HEREOF SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  THIS AGREEMENT HAS BEEN ENTERED INTO IN DALLAS COUNTY, TEXAS, AND IT SHALL BE PERFORMABLE FOR ALL PURPOSES IN DALLAS COUNTY, TEXAS. ANY ACTION OR PROCEEDING AGAINST BORROWER UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE SECURITY DOCUMENTS MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN DALLAS COUNTY, TEXAS.  BORROWER HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURTS, AND (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR THAT ANY SUCH COURT IS AN INCONVENIENT FORUM.  BORROWER AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT ITS ADDRESS SPECIFIED OR DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 10.12 OF THE LOAN AGREEMENT. NOTHING HEREIN OR IN ANY OF THE OTHER SECURITY DOCUMENTS SHALL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR WITH RESPECT TO ANY OF ITS PROPERTY IN COURTS IN OTHER JURISDICTIONS. ANY ACTION OR PROCEEDING BY BORROWER AGAINST BANK SHALL BE BROUGHT ONLY IN A COURT LOCATED IN DALLAS COUNTY, TEXAS.**

9.    Severability.  Any provision of this Modification held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Modification and the effect thereof shall be confined to the provision held to be invalid or illegal.

10.    Counterparts.  To facilitate execution, this Modification may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.

11.    **NOTICE OF FINAL AGREEMENT**.  **THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT**

SECOND MODIFICATION AGREEMENT – Page 3
2574277

AMONG THE PARTIES HERETO AND THERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO OR THERETO.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO OR THERETO.  THE PROVISIONS OF THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE RESPECTIVE PARTIES TO SUCH DOCUMENTS.

     12.   **WAIVER OF JURY TRIAL**.  THE PARTIES HERETO IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

     13.   <u>Release</u>.  Borrower hereby releases and forever discharges Bank from any and all claims, demands, liabilities, losses or causes of action, known or unknown, fixed or contingent, Borrower may have directly against Bank, as of 12:00 midnight, Dallas, Texas time, on the date of this Modification, that is a part of, concerns or in any manner relates to this Modification or the Security Documents, including but not limited to, claims for tortious interference with contractual relations, breach of contract, usury, breach of fiduciary duty, bad faith, negligence, negligent misrepresentation, defamation, business disparagement, promissory estoppel, or similar causes of action, except for, any and all actions, suits, proceedings brought by Borrower, to recover damages they incurred in any action, suit or proceeding brought by a third party against them.

*Signature Page Follows*

IN WITNESS WHEREOF, the undersigned have executed this Modification as of the day and year first above written.

Address for Notice:

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**BORROWER:**

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation

By: _____
     William M. Aisenberg, Executive Vice
     President & CFO

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

By: _____
     William M. Aisenberg, Executive Vice
     President & CFO

Address for Notice:

600 North Pearl Street
Suite 2500
Dallas, Texas 75201
Attn:  Rick Rodman
E-mail:  rick.rodman@capitalone.com

**BANK:**

**CAPITAL ONE, N.A.**

By: _____
     René Kiehn, Senior Vice President
     (For Rick Rodman, Senior Vice President)

**SECOND MODIFICATION AGREEMENT** – Page 5
2574277

## WAIVER AND THIRD MODIFICATION AGREEMENT

This **WAIVER AND THIRD MODIFICATION AGREEMENT** (this "Modification"), dated as of November 28, 2016, is entered into by and among **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California"), **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada", and, collectively with Ironclad California, "Borrower"), and **CAPITAL ONE, N.A.** ("Bank").

WHEREAS, Bank provided Borrower with a revolving credit facility (the "Loan"), pursuant to that certain Revolving Loan and Security Agreement, dated November 28, 2014, between Borrower and Bank, as modified by that certain First Modification Agreement, dated June 15, 2015, and that certain Second Modification Agreement, dated March 16, 2016 (as further amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement");

WHEREAS, Borrower has requested that Bank waive compliance by Borrower with certain provisions of the Loan Agreement, extend the maturity date of the Indebtedness, and modify certain of the terms and provisions of the Loan Agreement and other related documents executed by Borrower or third parties pertaining to, evidencing or securing the Loans (collectively, the "Security Documents"); and

WHEREAS, Bank has agreed to the foregoing, but only to the extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Bank hereby agree as follows:

1.    _Definitions._   All capitalized terms used and not defined herein shall have the meanings given them in the Loan Agreement and the rules of construction set forth in Section 1.1 of the Loan Agreement shall apply to this Modification.

2.    _Waivers._   Borrower delivered to Bank a compliance certificate certifying that an Event of Default (as defined in the Loan Agreement) has occurred and is continuing (the "Certificate of Default"), as more specifically set forth therein (the "Existing Default") and requested that Bank waive the exercise of its rights and remedies with respect thereto. Specifically, Borrower has failed to satisfy the minimum Debt Service Coverage Ratio covenant set forth in Section 7.15(a) of the Loan Agreement. As set forth in the Certificate of Default, Borrower has failed to comply with the aforementioned financial covenant as of the calendar quarter ended September 30, 2016. Upon Lender's due consideration of the foregoing facts and Borrower's representations in regard thereto, Lender hereby waives the Existing Default.



3.    Modification of Security Documents. The Security Documents shall be modified as follows:

a.    The definitions of "Maturity Date" in Section 1.1 of the Loan Agreement and Section 1 of the Revolving Note shall be deleted in their entirety and replaced with the following:

"Maturity Date" means February 28, 2017.

b.    Exhibit A to the Loan Agreement shall be deleted in its entirety and replaced with Exhibit A to this Modification.

c.    The definition of "Applicable Rate" in Section 1 of the Revolving Note shall be deleted in its entirety and replaced with the following:

"Applicable Rate" means a fluctuating per annum rate equal to 3.50% in excess of the LIBOR Base Rate.

d.    The definition of "LIBOR" in Section 1 of the Revolving Note shall be deleted in its entirety and replaced with the following:

"LIBOR" means, with respect to each Interest Period, the rate for a Reset Date will be the rate for deposits in U.S. Dollars for a period of one month which appears on the Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on the day that is two London Banking Days preceding that Reset Date. If such rate does not appear on the Reuters Screen LIBOR01 Page, the rate for that Reset Date will be determined as if the parties had specified "USD-LIBOR-Reference Banks" as the applicable rate. Notwithstanding the foregoing, in the event LIBOR is ever determined to be a negative number, LIBOR shall be deemed to be 0.00%.

4.    Fees and Expenses. Borrower agrees that Borrower is liable for all reasonable fees, costs and expenses (including attorneys' fees) incurred by Bank in connection with the documentation, preparation, interpretation and negotiation of this Modification and any further modification or supplement to this Modification or to the Security Documents, the consummation and administration of the transactions contemplated hereby and thereby and the enforcement, preservation, protection or defense of any of Bank's rights and remedies hereunder and under the Security Documents. All such fees, costs and expenses are referred to herein as "Expenses".

5.    Conditions. Bank's undertakings hereunder are subject to the satisfaction or waiver of the following conditions:

a.    Borrower's execution and delivery of this Modification;

b.    Borrower's payment of all Expenses incurred by Bank through the date hereof.

WAIVER AND THIRD MODIFICATION AGREEMENT – Page 2
2964973



6.    <u>Acknowledgment by Borrower</u>. Except as otherwise specified herein, the terms and provisions hereof shall in no manner impair, limit, restrict or otherwise affect the obligations of Borrower to Bank, as evidenced by the Security Documents. Borrower hereby acknowledges, agrees and represents that (a) Borrower is indebted to Bank pursuant to the terms of the Security Documents as modified hereby; (b) the liens, security interests and collateral assignments created and evidenced by the Security Documents are, respectively, valid and subsisting liens, security interests and collateral assignments of the respective dignity and priority recited in the Security Documents; (c) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Security Documents, and the other obligations created or evidenced by the Security Documents; (d) Borrower has no claims, offsets, defenses or counterclaims arising from any of Bank's acts or omissions with respect to the Collateral, the Security Documents or Bank's performance under the Security Documents or with respect to the Collateral; (e) the representations and warranties contained in the Security Documents are true and correct in all material respects as of the date hereof (except for such representations and warranties which expressly relate to an earlier date); and (f) Bank is not in default and to Borrower's knowledge, no event has occurred which, with the passage of time, giving of notice, or both, would constitute a default by Bank of Bank's obligations under the terms and provisions of the Security Documents.

7.    <u>No Waiver of Remedies</u>. Except as may be expressly set forth herein, nothing contained in this Modification shall prejudice, act as, or be deemed to be a waiver of any right or remedy available to Bank by reason of the occurrence or existence of any fact, circumstance or event constituting a Default or an Event of Default under the Note or the other Security Documents.

8.    <u>Effectiveness of the Security Documents</u>. All Security Documents are hereby amended and modified in a manner consistent with the modifications, terms and provisions contained herein. Except as expressly modified by the terms and provisions hereof, each of the terms and provisions of the Security Documents are hereby ratified and shall remain in full force and effect; provided, however, that any reference in any of the Security Documents to the Loan, the amount constituting the Loan, terms which are modified hereby, or to any of the other Security Documents, shall be deemed, from and after the date hereof, to refer to the Loan, the amount constituting the Loan, terms and to such other Security Documents, as modified hereby.

9.    <u>GOVERNING LAW; VENUE; SERVICE OF PROCESS</u>. THE TERMS AND PROVISIONS HEREOF SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS AGREEMENT HAS BEEN ENTERED INTO IN DALLAS COUNTY, TEXAS, AND IT SHALL BE PERFORMABLE FOR ALL PURPOSES IN DALLAS COUNTY, TEXAS. ANY ACTION OR PROCEEDING AGAINST BORROWER UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE SECURITY DOCUMENTS MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN DALLAS COUNTY, TEXAS.    BORROWER HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH

<u>WAIVER AND THIRD MODIFICATION AGREEMENT</u> – Page 3
2964973



COURTS, AND (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. BORROWER AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT ITS ADDRESS SPECIFIED OR DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF THE LOAN AGREEMENT. NOTHING HEREIN OR IN ANY OF THE OTHER SECURITY DOCUMENTS SHALL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR WITH RESPECT TO ANY OF ITS PROPERTY IN COURTS IN OTHER JURISDICTIONS. ANY ACTION OR PROCEEDING BY BORROWER AGAINST BANK SHALL BE BROUGHT ONLY IN A COURT LOCATED IN DALLAS COUNTY, TEXAS.

10.    Severability.  Any provision of this Modification held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Modification and the effect thereof shall be confined to the provision held to be invalid or illegal.

11.    Counterparts.  To facilitate execution, this Modification may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.

12.    NOTICE OF FINAL AGREEMENT.  THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO OR THERETO.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO OR THERETO.  THE PROVISIONS OF THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE RESPECTIVE PARTIES TO SUCH DOCUMENTS.

13.    WAIVER OF JURY TRIAL.  THE PARTIES HERETO IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

14.    Release.  Borrower hereby releases and forever discharges Bank from any and all claims, demands, liabilities, losses or causes of action, known or unknown, fixed or contingent, Borrower may have directly against Bank, as of 12:00 midnight, Dallas, Texas time, on the date



of this Modification, that is a part of, concerns or in any manner relates to this Modification or the Security Documents, including but not limited to, claims for tortious interference with contractual relations, breach of contract, usury, breach of fiduciary duty, bad faith, negligence, negligent misrepresentation, defamation, business disparagement, promissory estoppel, or similar causes of action, except for, any and all actions, suits, proceedings brought by Borrower, to recover damages they incurred in any action, suit or proceeding brought by a third party against them.

*Signature Page Follows*

IN WITNESS WHEREOF, the undersigned have executed this Modification as of the day and year first above written.

Address for Notice:

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

BORROWER:

IRONCLAD PERFORMANCE WEAR
CORPORATION, a California corporation

By: _____
William M. Aisenberg, Executive Vice
President & CFO

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

IRONCLAD PERFORMANCE WEAR
CORPORATION, a Nevada corporation

By: _____
William M. Aisenberg, Executive Vice
President & CFO

Address for Notice:

600 North Pearl Street
Suite 2500
Dallas, Texas 75201
Attn:  Rick Rodman
E-mail:  rick.rodman@capitalone.com

BANK:

CAPITAL ONE, N.A.

By: _____
Rick Rodman, Senior Vice President

EXHIBIT "A"

Compliance Certificate

## COMPLIANCE CERTIFICATE

FOR THE QUARTER ENDED _____ (THE "SUBJECT PERIOD")

*BANK*:            CAPITAL ONE, N.A.

*BORROWER*:        IRONCLAD PERFORMANCE WEAR CORPORATION, a
                   Nevada corporation

This certificate is delivered under the Loan and Security Agreement (the "Agreement") dated as November 28, 2014, between Borrower, Bank and the guarantors named therein. Capitalized terms when used in this certificate shall, unless otherwise indicated, have the meanings set forth in the Agreement. I certify to Bank that, on the date of this certificate, (a) the Financial Statements of Borrower attached to this certificate were prepared in accordance with GAAP, and present fairly the financial condition and results of operations of Borrower as of the end of and for the Subject Period, (b) no Potential Default or Event of Default currently exists or has occurred which has not been cured or waived by Bank, and (c) the status of compliance by Borrower with certain covenants of the Agreement at the end of the Subject Period is set forth below:

|  |  | In Compliance as of End of Subject Period? (Please Indicate) | |
|---|---|---|---|
| 1. | Financial Statements and Reports | | |
| (a) | Provide audited annual financial statements of Borrower within 120 days after the last day of each fiscal year. | Yes | No |
| (b) | Provide annual budget (to include CapEx schedule) of Borrower within 120 days after the last day of each fiscal year. | Yes | No |
| (c) | Provide quarterly financial statements of Borrower within 45 days after the last day of each fiscal quarter. | Yes | No |
| (d) | Provide a Compliance Certificate within 45 days after the last day of each fiscal quarter | Yes | No |
| (e) | Provide a Borrowing Base Certificate within 30 days after the last day of each month. | Yes | No |
| (f) | Provide such reports required in accordance with 6.1(f) | Yes | No |
| (g) | Provide customer listing and customer addresses within 20 days after the last day of each fiscal year. | Yes | No |

EXHIBIT "A" TO WAIVER AND THIRD MODIFICATION AGREEMENT – Page 1

2.  Financial Covenants

(a)  Minimum Debt Service Coverage Ratio, calculated as of the last day of the calendar quarter in accordance with Section 7.15(a) of the Agreement.

This calculation is for the preceding twelve month period:

|  |  |  |  |
|---|---|---|---|
| (a) | EBITDAS | $ | _____ |
| (b) | Interest Expense | $ | _____ |
| (c) | Principal Payments of Debt | $ | _____ |
| (d) | Distributions | $ | _____ |
| (e) | [(b) + (c) + (d)] | $ | _____ |
| (f) | Debt Service Coverage Ratio [(a) / (e)] | $ | _____ |

Line (g) must be equal to or greater than 1.50 to 1.0.

(b)  Tangible Net Worth*, calculated as of the last day of the calendar quarter in accordance with Section 7.15(b) of the Agreement.                    $ _____

Date: _____, 201__


                    IRONCLAD PERFORMANCE WEAR
                    CORPORATION, a Nevada corporation


                    By: _____
                        _____, _____


        *"Tangible Net Worth" means, with respect to any Person, net worth plus all Subordinated Debt, *less* (i) any and all loans and other advances to Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (ii) notes, notes receivable, accounts, accounts receivable, inter-company receivable, and other amounts owing from Affiliates, subsidiaries, parent, employees, officers, stockholders, directors, or other related entities; (iii) treasury stock, good will, trademarks, trade names, patents, and deferred charges; and (iv) any and all other intangible assets, calculated in accordance with GAAP.

## WAIVER AND FOURTH MODIFICATION AGREEMENT

This **WAIVER AND FOURTH MODIFICATION AGREEMENT** (this "Modification"), dated as of February 23, 2017, is entered into by and among **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California"), **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada", and, collectively with Ironclad California, "Borrower"), and **CAPITAL ONE, N.A.** ("Bank").

WHEREAS, Bank provided Borrower with a revolving credit facility (the "Loan"), pursuant to that certain Revolving Loan and Security Agreement, dated November 28, 2014, between Borrower and Bank, as modified by that certain First Modification Agreement, dated June 15, 2015, that certain Second Modification Agreement, dated March 16, 2016, and that certain Waiver and Third Modification Agreement, dated November 28, 2016 (as further amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement");

WHEREAS, Borrower has requested that Bank waive compliance by Borrower with certain provisions of the Loan Agreement, extend the maturity date of the Indebtedness, and modify certain of the terms and provisions of the Loan Agreement and other related documents executed by Borrower or third parties pertaining to, evidencing or securing the Loans (collectively, the "Security Documents"); and

WHEREAS, Bank has agreed to the foregoing, but only to the extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Bank hereby agree as follows:

1.    Definitions.    All capitalized terms used and not defined herein shall have the meanings given them in the Loan Agreement and the rules of construction set forth in Section 1.1 of the Loan Agreement shall apply to this Modification.

2.    Waivers.    Borrower delivered to Bank a compliance certificate certifying that an Event of Default (as defined in the Loan Agreement) has occurred and is continuing (the "Certificate of Default"), as more specifically set forth therein (the "Existing Default") and requested that Bank waive the exercise of its rights and remedies with respect thereto. Specifically, Borrower has failed to satisfy the minimum Debt Service Coverage Ratio covenant set forth in Section 7.15(a) of the Loan Agreement.   As set forth in the Certificate of Default, Borrower has failed to comply with the aforementioned financial covenant as of the calendar quarter ended December 31, 2016.   Upon Lender's due consideration of the foregoing facts and Borrower's representations in regard thereto, Lender hereby waives the Existing Default.



3.    <u>Modification of Security Documents</u>. The Security Documents shall be modified as follows:

a.    The definitions of "<u>Maturity Date</u>" in <u>Section 1.1</u> of the Loan Agreement and <u>Section 1</u> of the Revolving Note shall be deleted in their entirety and replaced with the following:

"<u>Maturity Date</u>" means May 31, 2017.

4.    <u>Fees and Expenses</u>. Borrower agrees that Borrower is liable for all reasonable fees, costs and expenses (including attorneys' fees) incurred by Bank in connection with the documentation, preparation, interpretation and negotiation of this Modification and any further modification or supplement to this Modification or to the Security Documents, the consummation and administration of the transactions contemplated hereby and thereby and the enforcement, preservation, protection or defense of any of Bank's rights and remedies hereunder and under the Security Documents. All such fees, costs and expenses are referred to herein as "<u>Expenses</u>".

5.    <u>Conditions</u>. Bank's undertakings hereunder are subject to the satisfaction or waiver of the following conditions:

a.    Borrower's execution and delivery of this Modification;

b.    Borrower's payment of all Expenses incurred by Bank through the date hereof.

6.    <u>Acknowledgment by Borrower</u>.  Except as otherwise specified herein, the terms and provisions hereof shall in no manner impair, limit, restrict or otherwise affect the obligations of Borrower to Bank, as evidenced by the Security Documents.  Borrower hereby acknowledges, agrees and represents that (a) Borrower is indebted to Bank pursuant to the terms of the Security Documents as modified hereby; (b) the liens, security interests and collateral assignments created and evidenced by the Security Documents are, respectively, valid and subsisting liens, security interests and collateral assignments of the respective dignity and priority recited in the Security Documents; (c) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Security Documents, and the other obligations created or evidenced by the Security Documents; (d) Borrower has no claims, offsets, defenses or counterclaims arising from any of Bank's acts or omissions with respect to the Collateral, the Security Documents or Bank's performance under the Security Documents or with respect to the Collateral; (e) the representations and warranties contained in the Security Documents are true and correct in all material respects as of the date hereof (except for such representations and warranties which expressly relate to an earlier date); and (f) Bank is not in default and to Borrower's knowledge, no event has occurred which, with the passage of time, giving of notice, or both, would constitute a default by Bank of Bank's obligations under the terms and provisions of the Security Documents.

7.    <u>No Waiver of Remedies</u>.  Except as may be expressly set forth herein, nothing contained in this Modification shall prejudice, act as, or be deemed to be a waiver of any right or

<u>**WAIVER AND FOURTH MODIFICATION AGREEMENT**</u> – **Page 2**



remedy available to Bank by reason of the occurrence or existence of any fact, circumstance or event constituting a Default or an Event of Default under the Note or the other Security Documents.

8.    <u>Effectiveness of the Security Documents</u>.    All Security Documents are hereby amended and modified in a manner consistent with the modifications, terms and provisions contained herein.    Except as expressly modified by the terms and provisions hereof, each of the terms and provisions of the Security Documents are hereby ratified and shall remain in full force and effect; provided, however, that any reference in any of the Security Documents to the Loan, the amount constituting the Loan, terms which are modified hereby, or to any of the other Security Documents, shall be deemed, from and after the date hereof, to refer to the Loan, the amount constituting the Loan, terms and to such other Security Documents, as modified hereby.

9.    <u>GOVERNING LAW; VENUE; SERVICE OF PROCESS</u>.    **THE TERMS AND PROVISIONS HEREOF SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.    THIS AGREEMENT HAS BEEN ENTERED INTO IN DALLAS COUNTY, TEXAS, AND IT SHALL BE PERFORMABLE FOR ALL PURPOSES IN DALLAS COUNTY, TEXAS. ANY ACTION OR PROCEEDING AGAINST BORROWER UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE SECURITY DOCUMENTS MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN DALLAS COUNTY, TEXAS.    BORROWER HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURTS, AND (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR THAT ANY SUCH COURT IS AN INCONVENIENT FORUM.    BORROWER AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT ITS ADDRESS SPECIFIED OR DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF THE LOAN AGREEMENT. NOTHING HEREIN OR IN ANY OF THE OTHER SECURITY DOCUMENTS SHALL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR WITH RESPECT TO ANY OF ITS PROPERTY IN COURTS IN OTHER JURISDICTIONS. ANY ACTION OR PROCEEDING BY BORROWER AGAINST BANK SHALL BE BROUGHT ONLY IN A COURT LOCATED IN DALLAS COUNTY, TEXAS.**

10.    <u>Severability</u>.    Any provision of this Modification held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Modification and the effect thereof shall be confined to the provision held to be invalid or illegal.

11.    <u>Counterparts</u>.    To facilitate execution, this Modification may be executed in as many counterparts as may be convenient or required.    It shall not be necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of

<u>**WAIVER AND FOURTH MODIFICATION AGREEMENT**</u> – Page 3



all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument.

**12.    NOTICE OF FINAL AGREEMENT. THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO OR THERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO OR THERETO. THE PROVISIONS OF THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE RESPECTIVE PARTIES TO SUCH DOCUMENTS.**

**13.    WAIVER OF JURY TRIAL. THE PARTIES HERETO IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.**

14.    <u>Release</u>. Borrower hereby releases and forever discharges Bank from any and all claims, demands, liabilities, losses or causes of action, known or unknown, fixed or contingent, Borrower may have directly against Bank, as of 12:00 midnight, Dallas, Texas time, on the date of this Modification, that is a part of, concerns or in any manner relates to this Modification or the Security Documents, including but not limited to, claims for tortious interference with contractual relations, breach of contract, usury, breach of fiduciary duty, bad faith, negligence, negligent misrepresentation, defamation, business disparagement, promissory estoppel, or similar causes of action, except for, any and all actions, suits, proceedings brought by Borrower, to recover damages they incurred in any action, suit or proceeding brought by a third party against them.

*Signature Page Follows*

IN WITNESS WHEREOF, the undersigned have executed this Modification as of the day and year first above written.

Address for Notice:

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**BORROWER:**

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation

By: _____
    William M. Aisenberg, Executive Vice
    President & CFO

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn:  William M. Aisenberg
E-mail: Bill.Aisenberg@ironclad.com

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

By: _____
    William M. Aisenberg, Executive Vice
    President & CFO

Address for Notice:

600 North Pearl Street
Suite 2500
Dallas, Texas 75201
Attn:  Rick Rodman
E-mail:  rick.rodman@capitalone.com

**BANK:**

**CAPITAL ONE, N.A.**

By: _____
    Rick Rodman, Senior Vice President

## LIMITED WAIVER AND FIFTH MODIFICATION AGREEMENT

This **LIMITED WAIVER AND FIFTH MODIFICATION AGREEMENT** (this "Modification"), dated as of April 11, 2017, is entered into by and among **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California"), **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada" individually, collectively, and interchangeably with Ironclad California, the "Borrower"), and **CAPITAL ONE, NATIONAL ASSOCIATION** ("Bank").

**WHEREAS**, Bank provided Borrower with a revolving credit facility (the "Revolving Loan"), pursuant to that certain Revolving Loan and Security Agreement dated November 28, 2014, between Borrower and Bank, as modified by that certain First Modification Agreement dated June 15, 2015, that certain Second Modification Agreement dated March 16, 2016, that certain Third Modification Agreement dated November 28, 2016, and that certain Waiver and Fourth Modification Agreement dated February 23, 2017 (as may be further amended, amended and restated, supplemented or otherwise modified from time to time, collectively the "Loan Agreement");

**WHEREAS**, Borrower has requested that Bank waive compliance by Borrower with certain provisions of the Loan Agreement, temporarily modify certain of the terms and provisions of the Loan Agreement, extend the maturity date of the Indebtedness, and permanently modify certain other terms and provisions of the Loan Agreement and other related documents executed by Borrower or third parties pertaining to, evidencing or securing the Revolving Loan (collectively, the "Security Documents"); and

**WHEREAS**, Bank has agreed to the foregoing, but only to the limited extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Bank hereby agree as follows:

1.      Definitions. All capitalized terms used and not defined herein shall have the meanings given them in the Loan Agreement and the rules of construction set forth in Section 1.3 of the Loan Agreement shall apply to this Modification.

2.      Limited Waiver. Borrower has informed Bank that certain Events of Default are projected to occur under the Security Documents as more specifically set forth in the attached Schedule 1 (the "Existing Defaults") and has requested that Bank prospectively waive the exercise of its rights and remedies with respect thereto. Bank hereby waives the only Existing Defaults on the following conditions, which the Borrower agrees to and understands: (i) the waiver set forth herein shall only be effective (subject to the terms of this Modification) from the

date of this Modification; (ii) this is a one-time waiver and Bank has no obligation to waive any future Defaults or Events of Default; (iii) this waiver relates to the Existing Defaults only and does not waive any Default or Event of Default that may exist or hereafter occur with respect to any default not included in the Existing Defaults; and (iv) this waiver does not constitute an amendment or modification of the Security Documents (except to the extent explicitly provided for herein).

     3.    <u>Modifications of Loan Agreement</u>. The Loan Agreement shall be modified as follows:

     a.    The definition of "<u>Modification</u>" is added to Section 1.1 of the Loan Agreement:

    "<u>Modification</u>" means that certain Limited Waiver and Fifth Modification Agreement dated as of April 11, 2017 executed by and between Borrower and Lender.

     b.    The definition of "<u>Maturity Date</u>" in Section 1.1 of the Loan Agreement and <u>Section 1</u> of the Revolving Note shall be deleted in their entirety and replaced with the following:

    "<u>Maturity Date</u>" means April 17, 2018.

     c.    The definition of "<u>Margined Accounts</u>" is added to Section 1.1 of the Loan Agreement:

    "<u>Margined Accounts</u>" shall mean up to seventy-five percent (75%) of the value of Borrower's Eligible Accounts.

     d.    The definition of "<u>Margined Inventory</u>" is added to Section 1.1 of the Loan Agreement:

    "<u>Margined Inventory</u>" shall mean up to fifty percent (50%) of the value of Borrower's Eligible Inventory, plus up to thirty-five percent (35%) of the value of Borrower's Eligible In-Transit Inventory.

     e.    Upon the effectiveness of this Modification, the definition of "<u>Borrowing Base</u>" in Section 1.1 of the Loan Agreement shall be deleted in its entirety and replaced with the following, which shall control until October 1, 2017:

"Borrowing Base" means an amount equal to the Margined Accounts, plus the Margined Inventory, minus the Borrowing Base Reserve; provided, however, that the amount of the Margined Inventory shall not at any time exceed fifty percent (50%) of the Revolving Line Limit, provided, further, that in no event shall the Borrowing Base exceed the Revolving Line Limit.

f.     Effective beginning on October 1, 2017, the definition of "Borrowing Base" in Section 1.1 of the Loan Agreement shall be deleted in its entirety and replaced with the following, which shall control on and after October 1, 2017:

"Borrowing Base" means an amount equal to the Margined Accounts, plus the Margined Inventory, minus the Borrowing Base Reserve; provided, however, that the amount of the Margined Inventory shall not at any time exceed the amount of the Margined Accounts, provided, further, that in no event shall the Borrowing Base exceed the Revolving Line Limit.

g.     Effective beginning on October 1, 2017, the definition of "Borrowing Base Reserve" in Section 1.1 of the Loan Agreement shall be deleted in its entirety and replaced with the following, which shall control on and after October 1, 2017:

"Borrowing Base Reserve" means Two Million and No/100 Dollars ($2,000,000.00).

h.     Effective beginning on October 1, 2017, the definition of "Revolving Line Limit" in Section 1.1 of the Loan Agreement shall be deleted in its entirety and replaced with the following, which shall control on and after October 1, 2017:

"Revolving Line Limit" means Five Million and No/100 Dollars ($5,000,000.00).

i.     The definition of "Eligible Inventory" is amended to add subsection (m) as follows:

"(m)   it is not inventory purchased from or manufactured by Vibram, or made with parts purchased from or manufactured by Vibram, or labeled, coded, or marketed as Vibram inventory."

j.     The definition of "Revolving Note" in Section 1.1 of the Loan Agreement shall be deleted in its entirety and replaced with the following:



"Revolving Note" means the "Second Amended and Restated Revolving Line of Credit Note," dated April 11, 2017, evidencing the Revolving Loan in the initial maximum amount of $8,000,000.00, executed by Borrower and delivered to the Bank pursuant to the terms of this Agreement together with any renewals, extensions and modifications thereof.

     k.    Effective beginning on December 31, 2017, Section 7.15(a) of the Loan Agreement shall be deleted in its entirety and replaced with the following, which shall control on and after December 31, 2017:

"a Debt Service Coverage Ratio of less than 2.00 to 1.00, calculated on a trailing twelve (12) months basis; and"

    4.    Second Amended and Restated Revolving Line of Credit Note. Contemporaneously with the execution of this Modification, and to evidence the interest rate increases under the Revolving Loan and the extension of the Maturity Date, the Borrower shall execute the "Second Amended and Restated Revolving Line of Credit Note" attached hereto as Exhibit "A."

    5.    Temporary Modifications and Waivers of Loan Agreement.

    a.    Bank agrees to temporarily waive Borrower's compliance with the Debt Service Coverage ratio requirements of Section 7.15(a) of the Loan Agreement for the periods ending March 31, 2017, June 30, 2017 and September 30, 2017. Borrower's compliance with the Debt Service Coverage ratio requirements of Section 7.15(a) of the Loan Agreement (as amended by this Modification) shall resume in the fourth calendar quarter of 2017 and continue quarterly thereafter.

    b.    For the sole purpose of calculating and measuring Borrower's EBITDAS (as outlined below), Bank agrees to allow Borrower to add back $599,132.00 to its net income for the fourth quarter of 2016 (December 31, 2016) to account for the $88,869.00 in unreimbursed litigation expenses and $510,263.00 in bad debt expenses.

    c.    Borrower, on a consolidated trailing twelve (12) month basis, will achieve the following minimum EBITDAS on the following dates, as determined by Bank in its sole discretion:

    (i)    on March 31, 2017, Borrower shall achieve a minimum EBITDAS of equal to or greater than < $250,000.00> (negative);

    (ii)    on June 30, 2017, Borrower shall achieve a minimum EBITDAS of equal to or greater than $0.00; and

EXECUTION (April 11, 2017)
Ironclad Performance Wear Corporation, *et al*
Limited Waiver And Fifth Modification Agreement
Page 4

(iii)    on September 30, 2017, Borrower shall achieve a minimum EBITDAS of equal to or greater than $643,373.00.

d.    Borrower agrees that Bank shall engage the services of an independent third party appraiser, acceptable to the Bank in its sole discretion, to conduct an appraisal and accounting of Borrower's Inventory, which appraisal shall be ordered immediately. Pursuant to Section 8 of the Loan Agreement, Borrower shall be liable for and shall, at the request of the Bank, immediately pay and reimburse any of the Bank's costs and/or expenses associated with this appraisal of the Borrowers' Inventory.

6.    <u>Reduction of Commitment</u>. Effective beginning on October 1, 2017, the Bank's maximum commitment under Section 2.1 of the Loan Agreement (defined as the Revolving Line Limit) shall be permanently reduced from $8,000,000.00 to $5,000,000.00.

7.    <u>Fees and Expenses.</u>

a.    Borrower agrees that it is liable to Bank for all reasonable fees, costs and expenses (including attorneys' fees) incurred by Bank in connection with the documentation, preparation, interpretation and negotiation of this Modification and any further modification or supplement to this Modification or to the Security Documents, the consummation and administration of the transactions contemplated hereby and thereby and the enforcement, preservation, protection or defense of any of Bank's rights and remedies hereunder and under the Security Documents. All such fees, costs and expenses are referred to herein as "<u>Expenses</u>." Upon the execution of this Modification, Borrower shall immediately pay and reimburse any of the Bank's reasonable fees, costs and expenses (including attorneys' fees) incurred by Bank in connection with this Modification.

b.    Borrower further agrees that in consideration of Bank entering into this Modification, that Borrower shall pay to Bank upon the execution of this Modification, a modification fee in the amount equal to 50 bps in the Revolving Line Limit of $8,000,000.00, or $40,000.00, with such fee being fully earned and non-refundable upon Bank's execution of this Modification (the "<u>Modification Fee</u>").

8.    <u>Conditions Precedent</u>. Bank's undertakings hereunder and the effectiveness of this Modification are subject to the satisfaction of the following conditions:

a.    Borrower's execution and delivery of this Modification;

b.    Borrower's execution and delivery of the Second Amended and Restated Revolving Line of Credit Note;

c.    Borrower's payment of all Fees and Expenses incurred by Bank through the date hereof, and indefeasible payment of the Modification Fee.

EXECUTION (April 11, 2017)
Ironclad Performance Wear Corporation, *et al*
Limited Waiver And Fifth Modification Agreement
Page 5



9.    <u>Acknowledgment by Borrower</u>. Except as otherwise specified herein, the terms and provisions hereof shall in no manner impair, limit, restrict or otherwise affect the obligations of Borrower to Bank, as evidenced by the Security Documents. Borrower hereby acknowledges, agrees and represents that (a) Borrower is indebted to Bank pursuant to the terms of the Security Documents as modified hereby; (b) the liens, security interests and collateral assignments created and evidenced by the Security Documents are, respectively, valid and subsisting liens, security interests and collateral assignments of the respective dignity and priority recited in the Security Documents; (c) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Security Documents, and the other obligations created or evidenced by the Security Documents; (d) Borrower has no claims, offsets, defenses or counterclaims arising from any of Bank's acts or omissions with respect to the Collateral, the Security Documents or Bank's performance under the Security Documents or with respect to the Collateral; (e) the representations and warranties contained in the Security Documents are true and correct in all material respects as of the date hereof (except for such representations and warranties which expressly relate to an earlier date); and (f) Bank is not in default and to Borrower's knowledge, no event has occurred which, with the passage of time, giving of notice, or both, would constitute a default by Bank of Bank's obligations under the terms and provisions of the Security Documents.

10.    <u>Effect of Waiver</u>. Except as expressly set forth herein, the waiver granted in this Modification shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of Bank under any of the Security Documents, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in any of the Security Documents, all of which are ratified and affirmed in all respects and shall continue in full force and effect.  Except as expressly set forth herein, nothing herein shall be deemed to entitle Borrower to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the any of the Security Documents in similar or different circumstances.

11.    <u>Effectiveness of the Security Documents</u>. All Security Documents are hereby amended and modified in a manner consistent with the modifications, terms and provisions contained herein. Except as expressly modified by the terms and provisions hereof, each of the terms and provisions of the Security Documents are hereby ratified and shall remain in full force and effect; provided, however, that any reference in any of the Security Documents to the Revolving Loan, the amount constituting the Revolving Loan, terms which are modified hereby, or to any of the other Security Documents, shall be deemed, from and after the date hereof, to refer to the Revolving Loan, the amount constituting the Revolving Loan, terms and to such other Security Documents, as modified hereby.

12.    <u>GOVERNING LAW; VENUE; SERVICE OF PROCESS</u>. THE TERMS AND PROVISIONS HEREOF SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS AGREEMENT HAS BEEN ENTERED INTO IN DALLAS COUNTY,



TEXAS, AND IT SHALL BE PERFORMABLE FOR ALL PURPOSES IN DALLAS COUNTY, TEXAS. ANY ACTION OR PROCEEDING AGAINST BORROWER UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE SECURITY DOCUMENTS MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN DALLAS COUNTY, TEXAS. BORROWER HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURTS, AND (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. BORROWER AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT ITS ADDRESS SPECIFIED OR DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF THE LOAN AGREEMENT. NOTHING HEREIN OR IN ANY OF THE OTHER SECURITY DOCUMENTS SHALL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR WITH RESPECT TO ANY OF ITS PROPERTY IN COURTS IN OTHER JURISDICTIONS. ANY ACTION OR PROCEEDING BY BORROWER AGAINST BANK SHALL BE BROUGHT ONLY IN A COURT LOCATED IN DALLAS COUNTY, TEXAS.

13.     Severability. Any provision of this Modification held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Modification and the effect thereof shall be confined to the provision held to be invalid or illegal.

14.     Counterparts. To facilitate execution, this Modification may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument.

15.     WAIVER OF JURY TRIAL. THE PARTIES HERETO IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

16.     Release. Borrower hereby releases and forever discharges Bank from any and all claims, demands, liabilities, losses or causes of action, known or unknown, fixed or contingent, Borrower may have directly against Bank, as of 12:00 midnight, Dallas, Texas time, on the date of the execution of this Modification, that is a part of, concerns or in any manner relates to this Modification or the Security Documents, including but not limited to, claims for tortious interference with contractual relations, breach of contract, usury, breach of fiduciary duty, bad faith, negligence, negligent misrepresentation, defamation, business disparagement, promissory estoppel, or similar causes of action, except for, any and all actions, suits, proceedings brought by Borrower, to recover damages they incurred in any action, suit or proceeding brought by a third party against them.

EXECUTION (April 11, 2017)
Ironclad Performance Wear Corporation, *et al*
Limited Waiver And Fifth Modification Agreement
Page 7

17.    <u>Entire Agreement</u>. This Modification and the other Security Documents constitute the entire understanding and agreement between Borrower and Bank with respect to the transactions arising in connection with the Indebtedness and supersede all prior written or oral understandings and agreements between Borrower and Bank with respect to the matters addressed in the Security Documents.    Borrower hereby acknowledges that, except as incorporated in writing in this Modification and the Security Documents, there are not, and were not, and no persons are or were authorized by Bank to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Security Documents.

THE WRITTEN SECURITY DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

THE PROVISIONS OF THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE RESPECTIVE PARTIES TO SUCH DOCUMENTS.

*Signature Page Follows*



**IN WITNESS WHEREOF**, the undersigned have executed this Modification as of the day and year first above written.

Address for Notice:

**BORROWER**:

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn: William M. Aisenberg
E-mail: bill.aisenberg@ironclad.com

By: _____
William M. Aisenberg
Executive Vice President & CFO

Address for Notice:

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn: William M. Aisenberg
E-mail: bill.aisenberg@ironclad.com

By: _____
William M. Aisenberg
Executive Vice President & CFO

Address for Notice:

**BANK**:

**CAPITAL ONE, NATIONAL ASSOCIATION**

201 St Charles Avenue
23rd Floor
New Orleans, LA 70123
Attn: Robert Johnson
E-mail: robert.johnson@capitalone.com

By: _____
Robert Johnson
Senior Vice President

## SCHEDULE 1
## EXISTING DEFAULTS

As of March 31, 2017, Borrower's Minimum Debt Service Coverage Ratio is anticipated to be negative which is less than the Minimum Debt Service Coverage Ratio of 1.50 to 1.00 ratio required by Section 7.15(a) of the Loan Agreement.



**EXHIBIT A**
**Second Amended and Restated Revolving Line of Credit Note**

### SECOND AMENDED AND RESTATED
### REVOLVING LINE OF CREDIT NOTE

$8,000,000.00                          Dallas, Texas                          April 11, 2017

**FOR VALUE RECEIVED**, the undersigned, **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California"), and **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada", and, collectively with Ironclad California, "Borrower"), whose address for purposes of notice is 1920 Hutton Court, Suite 300, Farmers Branch, Texas 75234, hereby promises, to pay to the order of **CAPITAL ONE, NATIONAL ASSOCIATION** ("Bank"), at its office at 600 North Pearl Street, Suite 2500, Dallas, Texas 75201, or such other place as Holder may direct, in lawful money of the United States of America, with interest as calculated herein below, the initial maximum principal amount of EIGHT MILLION AND NO/100 DOLLARS ($8,000,000.00) or, if less than such principal amount, the aggregate principal amount advanced by the Holder from time to time to the Borrower pursuant to the Loan Agreement. Payment of principal and interest shall be in accordance with the following provisions:

1.    <u>Definitions</u>.

   "<u>Applicable Rate</u>" means a fluctuating per annum rate equal to the following:

     a.    Four and one-half percentage points (4.50%) in excess of the LIBOR Base Rate beginning on the date hereof; then

     b.    Six and one-half percentage points (6.50%) in excess of the LIBOR Base Rate beginning on June 30, 2017; then

     c.    Eight and one-half percentage points (8.50%) in excess of the LIBOR Base Rate beginning on September 30, 2017; then

     d.    Ten and one-half percentage points (10.50%) in excess of the LIBOR Base Rate beginning on December 31, 2017; then

     e.    Twelve and one-half percentage points (12.50%) in excess of the LIBOR Base Rate beginning on March 31, 2018.

   "<u>Business Day</u>" means a day (other than Saturday or Sunday) when Bank is open for conducting all of its customary commercial banking activities.

   "<u>Default Rate</u>" means the lesser of the Maximum Rate or eighteen percent (18%) per annum.

   "<u>Hedge Agreement</u>" means (a) any agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, credit



derivative transaction, forward rate agreement, commodity swap, commodity option, forward commodity contract, equity or equity index swap or option, forward bond or forward bond price or forward bond index transaction, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, cap agreement, floor agreement, collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, spot contract, or any other similar agreement (including any option to enter into any of the foregoing), whether or not such agreement is governed by or subject to any master agreement, (b) any and all agreements of any kind, and any and all related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement, or (c) any combination of the foregoing.

"Holder" means Bank and any subsequent holder of this Revolving Note.

"Indebtedness" has the meaning set forth in the Loan Agreement.

"Index Rate" means at any time the variable rate of interest published in The Wall Street Journal's "Money Rates" table as the prime rate. If multiple prime rates are quoted in the table, then the highest prime rate will be the Index Rate. In the event the prime rate is no longer published in the "Money Rates" table, the Holder will choose a substitute index rate which is based upon comparable information. The "prime rate" is a rate set by banks based upon various factors, including such banks' costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.

"Interest Period" shall mean (i) the period beginning on (and including) the date hereof and ending on (but excluding) April 30, 2017, and (ii) thereafter, the period beginning on (and including) the last day of the previous Interest Period and ending on (but excluding) the 1st day of the subsequent calendar month. Notwithstanding the foregoing, (i) if any Interest Period is scheduled to end on a day that is not a Business Day, then the Interest Period will end on (but exclude) the next succeeding Business Day; and (ii) any Interest Period scheduled to end after the Maturity Date shall end on the Maturity Date.

"LIBOR" means, with respect to each Interest Period, the rate for a Reset Date will be the rate for deposits in U.S. Dollars for a period of one month which appears on the Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on the day that is two London Banking Days preceding that Reset Date. If such rate does not appear on the Reuters Screen LIBOR01 Page, the rate for that Reset Date will be determined as if the parties had specified "USD-LIBOR-Reference Banks" as the applicable rate.

"London Banking Day" shall mean any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England.



"<u>Loan Agreement</u>" means that certain Revolving Loan and Security Agreement, dated November 28, 2014, executed by Borrower and Bank in connection with the Prior Revolving Notes and this Revolving Note, as may hereafter be modified from time to time. All capitalized terms not defined herein shall have the meaning attributed to them in the Loan Agreement.

"<u>Maturity Date</u>" means April 17, 2018.

"<u>Maximum Rate</u>" means, with respect to Holder, the maximum nonusurious interest rate, if any, that at any time, or from time to time, may be contracted for, taken, reserved, charged, or received on the indebtedness evidenced by this Revolving Note, under the laws which are presently in effect of the United States and the State of Texas applicable to such Holder and to such indebtedness or, to the extent permitted by law, under such applicable laws of the United States and the State of Texas which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow. To the extent that Chapter 303 of the Texas Finance Code (the "Code"), is relevant to any Holder for the purposes of determining the Maximum Rate, Holder and each such holder may elect to determine such applicable legal rate under the Code pursuant to the "interest rate ceiling," from time to time in effect, as referred to in Chapter 303 of the Code provided, however, that to the extent permitted by applicable law, Holder may, in accordance with the Code, from time to time elect the "weekly ceiling," "monthly ceiling," "quarterly ceiling" or the "annualized ceiling" as those terms are defined therein, and renew any such election without notice to Borrower.

"<u>Prior Revolving Notes</u>" means (a) that certain Revolving Line of Credit Note, dated November 28, 2014, executed by Borrower and payable to the order of Bank, in the maximum principal amount of $6,000,000.00, and (b) that certain Amended and Restated Revolving Line of Credit Note, dated June 15, 2015, executed by Borrower and payable to the order of Bank, in the maximum principal amount of $8,000,000.00.

"<u>Reference Banks</u>" means major banks in the London interbank market selected by the Bank.

"<u>Reset Date</u>" shall mean the first day of an Interest Period.

"<u>Revolving Loan</u>" means the revolving line of credit loan from Bank to Borrower, in the amount of the Revolving Note.

"<u>Revolving Note</u>" means this Second Amended and Restated Revolving Line of Credit Note.

"<u>Security Documents</u>" means the Prior Revolving Notes, this Revolving Note, the Loan Agreement, the Hedge Agreement (if applicable) and any and all other documents or instruments referenced in the Loan Agreement or otherwise executed by Borrower or third parties in connection with the Revolving Loan.



"USD-LIBOR-Reference Banks" shall mean that the rate for a Reset Date will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on the day that is two (2) London Banking Days preceding that Reset Date to prime banks in the London interbank market for a period of one month commencing on that Reset Date and in an amount equal to the principal amount of the Revolving Note. The Bank will request the principal London office of each of the Reference Banks to provide a quotation of its rate. If at least two (2) such quotations are provided, the rate for that Reset Date will be the arithmetic mean of the quotations. If fewer than two quotations are provided as requested, the rate for that Reset Date will be the arithmetic mean of the rates quoted by major banks in New York City, selected by the Bank, at approximately 11:00 a.m., New York City time, on that Reset Date for loans in U.S. Dollars to leading European banks for a period of one month commencing on that Reset Date and in an amount equal to the principal amount of the Revolving Note.

2.  <u>Payment</u>. This Revolving Note is due and payable as follows:

(a)  Borrower shall pay to Bank, commencing on May 1, 2017, and continuing on the first (1st) day of each month thereafter, monthly payments of accrued and unpaid interest on the unpaid principal balance of the Revolving Note, computed at the Applicable Rate.

(b)  All outstanding principal and accrued and unpaid interest on this Revolving Note and all other amounts due with respect to the Revolving Note under the Security Documents shall be due and payable on the Maturity Date.

3.  <u>Other Payment Terms</u>.

(a)  Should any payment become due and payable on any day other than a Business Day for Bank, the date of such payment shall be extended to the next succeeding Business Day, and, in the case of a payment of principal or past due interest or any installment of either thereof, interest shall accrue and be payable thereon for the period of such extension at the applicable interest rate or rates specified herein. Each payment by Borrower on account of the principal of or interest on this Revolving Note or of any fee or other amount payable to Bank shall be made not later than 11 :00 a.m. (Dallas, Texas time) on the applicable due date (or if such day is not a Business Day, the next succeeding Business Day). Any payment made after 11:00 a.m. (Dallas, Texas time) shall be credited on the next succeeding Business Day. All payments shall be made to Bank at Bank's office, in U.S. Dollars, in immediately available funds and shall be made without any setoff, counterclaim or deduction whatsoever.

(b)  All payments of principal and interest that are past due shall, at the option of Bank, bear interest at a per annum interest rate equal to the Default Rate. Borrower agrees to pay interest on all amounts due under the Security Documents which Borrower



fails or refuses to pay, following the applicable notice and cure period, if any, at the Default Rate from the date due until paid.

(c)    Except for purposes of computing the Maximum Rate, interest shall be calculated on the basis of a 360-day year applied to the actual number of days upon which principal is outstanding by multiplying the principal amount outstanding hereunder by the applicable interest rate, multiplying the product thereof by the actual number of days elapsed, and dividing the product so obtained by three hundred sixty (360).

(d)    In lieu of the interest on past due installments provided for in this Revolving Note, Bank may collect a late charge not to exceed five cents ($.05) for each dollar ($1.00) of each payment of interest, principal and, if applicable, any other payment due under any of the Security Documents which is more than ten (10) days in arrears, but in no event to exceed Five Hundred and No/100 Dollars ($500.00) in the aggregate, to cover the extra expense involved in handling delinquent accounts; provided however, that should such late charge constitute interest under any applicable law, such late charge shall not, together with other interest to be paid, charged, contracted for, received, or reserved against, or taken on the indebtedness evidenced by this Revolving Note, or indebtedness arising under any of the Security Documents exceed the Maximum Rate.

(e)    In the event that the Holder is advised by the Reference Banks that deposits in dollars in the applicable principal amount are not being offered in the London Interbank market for any Interest Period, *or* the Holder determines that the Applicable Rate will not adequately reflect the cost to Holder of obtaining funds in dollars in the London Interbank market in an amount substantially equal to the outstanding principal in dollars, *or* the period of time remaining prior to the Maturity Date is less than thirty (30) days, *then and in that event*, the Holder shall give written notice thereof to Borrower whereupon the applicable interest rate shall be converted into a floating rate equal to the Index Rate on the last day of the then current Interest Period.

4.    <u>Security Documents</u>. The indebtedness evidenced hereby is secured by the Security Documents. This Revolving Note is included in the indebtedness referred to in the Security Documents and is entitled to the benefits of those documents, but neither this reference to those documents nor any provisions thereof shall affect or impair the absolute and unconditional obligation of the Borrower to pay the principal of and interest on this Revolving Note when due.

5.    <u>Events of Default</u>. The occurrence of an "Event of Default" under the Loan Agreement shall constitute an Event of Default under this Revolving Note. If any Event of Default shall occur, then so long as such Event of Default is in existence and has been neither waived by Bank nor cured the Holder may, with or without notice to the Borrower, declare this Revolving Note to be forthwith due and payable, both as to principal and interest, without presentment, demand, protest, or other notice of any kinds, all of which are hereby expressly waived, anything contained herein or in any of the Security Documents or in any other instrument executed in connection with or securing

<u>SECOND AMENDED AND RESTATED REVOLVING LINE OF CREDIT NOTE – PAGE 5</u>
886887.2



this Revolving Note to the contrary notwithstanding. Reference is made to the Security Documents for a statement of the terms and conditions under which the line of credit represented by this Revolving Note is being made available to Borrower and of additional terms and conditions under which this Revolving Note may be accelerated.

6.      Security Documents-Reduction of Commitment. Reference is additionally made to the Security Documents for a statement of the terms and conditions under which the line of credit represented by this Revolving Note may be reduced. Specifically, Borrower acknowledges and agrees that effective beginning on October 1, 2017, the Bank's maximum commitment under Section 2.1 of the Loan Agreement (defined as the Revolving Line Limit) shall be permanently reduced from $8,000,000.00 to $5,000,000.00.

7.      Waivers. Borrower, accommodation party, surety, endorser or other person or entity liable for the payment or collection of this Revolving Note expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate, notice of acceleration, all other notices, bringing of suit and diligence in taking any action to collect amounts called for hereunder or enforcing any security or guaranty, and agree to any substitution, exchange or release of any security, with or without consideration, now or hereafter given for this Revolving Note or the release of any party primarily or secondarily liable hereon. Borrower, accommodation party, surety, endorser or any other person or entity liable for the payment or collection of this Revolving Note further agrees that it will not be necessary for the owner or Holder hereof, in order to enforce payment of this Revolving Note, to first institute or exhaust its remedies against any maker or other party liable hereon or to enforce its rights against any security or guaranty for this Revolving Note, and hereby consents to the renewal and extension from time to time of this Revolving Note, and any other indulgence with respect hereto without notice of any such renewal, extension or indulgence, and without limit as to the number of such renewals, extensions or indulgences or the period or periods thereof.

8.      Attorneys' Fees and Costs. Borrower agrees to pay reasonable attorneys' fees and costs incurred by the Holder in collecting or attempting to collect this Revolving Note, whether by suit or otherwise.

9.      Limitations on Interest.

        (a)      It is the intention of the Bank and the Borrower to conform strictly to any applicable usury laws. Accordingly, if the transactions contemplated hereby would be usurious under any applicable law, then, in that event, notwithstanding anything to the contrary in this Revolving Note, the Security Documents or any other agreement entered into in connection with or as security for or guaranteeing the Loan Agreement or this Revolving Note, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received by the Bank under this Revolving Note, the Security Documents or under any

SECOND AMENDED AND RESTATED REVOLVING LINE OF CREDIT NOTE – PAGE 6
886887.2



other agreement entered into in connection with or as security for or guaranteeing the Loan Agreement or this Revolving Note shall under no circumstances exceed the Maximum Rate, and any excess shall be canceled automatically and, if theretofore paid, shall, at the option of the Bank, be credited by the Bank on the principal amount of any indebtedness owed to the Bank by the Borrower or refunded by the Bank to the Borrower; and (ii) in the event that the maturity of this Revolving Note is accelerated or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Bank may never include more than the Maximum Rate, and excess interest, if any, provided for in this Revolving Note, the Security Documents or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall, at the option of the Bank, be credited by the Bank on the principal amount of any indebtedness owed to the Bank by the Borrower or refunded by the Bank to the Borrower.

(b)      Notwithstanding anything herein to the contrary, in no event will interest payable to the Bank exceed the Maximum Rate (after taking into account all charges payable to the Bank which constitute interest under such applicable law), but if any amount referred to in this Revolving Note which would be payable to the Bank but for the applicability of usury or other laws limiting the consideration payable to the Bank is not paid to the Bank as a result of the applicability of such laws, then interest on the outstanding principal balance of this Revolving Note payable to the Bank shall, to the extent permitted by the law, accrue at the Maximum Rate (after taking into account all charges payable to the Bank which constitute interest under applicable law) until the total amount received by the Bank equals the amount it would have received had no such laws been applicable.

10.    <u>Applicable Law; Venue</u>. This Revolving Note shall be governed by, and construed in accordance with, the laws of the State of Texas (except that Chapter 346 of the Texas Finance Code, which regulates certain revolving credit loan accounts and revolving tri-party accounts, shall not apply to this Revolving Note or any transaction contemplated hereby); subject, however, to the effect of applicable federal law. Venue for any action brought to enforce or interpret any term or condition set forth in this Revolving Note or the other Security Documents shall be brought exclusively in Dallas County, Texas.

11.    <u>WAIVER OF JURY TRIAL</u>. BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS REVOLVING NOTE OR ANY CONDUCT, ACT OR OMISSION OF BANK OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER



PERSONS AFFILIATED WITH BANK OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTACT, TORT OR OTHERWISE.

12.     Assigns. As used herein, the terms "Borrower," "Bank" and "Holder" shall be deemed to include their respective successors, legal representatives and assigns, whether by voluntary action of the parties or by operation of law.

13.     Amendment and Restatement of Prior Revolving Notes. This Revolving Note amends, restates, and modifies, but does not extinguish or terminate, the obligations evidenced by the Prior Revolving Notes. The indebtedness evidenced by the Prior Revolving Notes will continue to be evidenced by this Revolving Note; no advances have been made or are being made by Bank to satisfy the indebtedness outstanding under the Prior Revolving Notes on the date hereof, and this Revolving Note is not a novation of the indebtedness evidenced by the Prior Revolving Notes. Any accrued and outstanding interest on the Prior Revolving Notes will continue to be evidenced by this Revolving Note. All of the liens and security interests securing the Prior Revolving Notes shall continue in full force and effect, and are hereby renewed and extended, and not in any manner waived or extinguished, as security for the indebtedness evidenced by this Revolving Note.

14.     Entire Agreement. The Security Documents constitute the entire understanding and agreement between Borrower and Bank with respect to the transactions arising in connection with the Indebtedness and supersede all prior written or oral understandings and agreements between Borrower and Bank with respect to the matters addressed in the Security Documents. Borrower and Bank hereby acknowledge that, except as incorporated in writing in the Security Documents, there are not, and were not, and no persons are or were authorized by Bank to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Security Documents.

THE WRITTEN SECURITY DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*Signature Page Follows*



**IN WITNESS WHEREOF**, Borrower has caused this Revolving Note to be duly executed and delivered as of effective the date above written.

**BORROWER**:

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation

By: _____
Name:   William M. Aisenberg
Its:      Executive Vice President & CFO

**IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation

By: _____
Name:   William M. Aisenberg
Its:      Executive Vice President & CFO

## SIXTH MODIFICATION AGREEMENT

This **SIXTH MODIFICATION AGREEMENT** (this "Sixth Modification"), dated as of May 10, 2017, is entered into by and among **IRONCLAD PERFORMANCE WEAR CORPORATION,** a California corporation ("Ironclad California"), **IRONCLAD PERFORMANCE WEAR CORPORATION,** a Nevada corporation ("Ironclad Nevada" individually, collectively, and interchangeably with Ironclad California, the "Borrower"), and **CAPITAL ONE, NATIONAL ASSOCIATION** ("Bank").

**WHEREAS,** Bank provided Borrower with a revolving credit facility (the "Revolving Loan"), pursuant to that certain Revolving Loan and Security Agreement dated November 28, 2014, between Borrower and Bank, as modified by that certain First Modification Agreement dated June 15, 2015, that certain Second Modification Agreement dated March 16, 2016, that certain Third Modification Agreement dated November 28, 2016, that certain Waiver and Fourth Modification Agreement dated February 23, 2017, and that certain Limited Waiver and Fifth Modification Agreement dated April 11, 2017 (as may be further amended, amended and restated, supplemented or otherwise modified from time to time, collectively the "Loan Agreement");

**WHEREAS,** Borrower has requested that the Bank extend the maturity date of the Indebtedness and modify certain other terms and provisions of the Loan Agreement and other related documents executed by Borrower or third parties pertaining to, evidencing or securing the Revolving Loan (collectively, the "Security Documents"); and

**WHEREAS,** Bank has agreed to the foregoing, but only to the limited extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

**NOW, THEREFORE,** for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Bank hereby agree as follows:

1.    Definitions. All capitalized terms used and not defined herein shall have the meanings given them in the Loan Agreement and the rules of construction set forth in Section 1.3 of the Loan Agreement shall apply to this Sixth Modification.

2.    Modifications of Loan Agreement. The Loan Agreement shall be modified as follows:

     a.    The definition of "Sixth Modification" is added to Section 1.1 of the Loan Agreement:

"Sixth Modification" means that certain Sixth Modification Agreement dated as of May 10, 2017 executed by and between Borrower and Lender.

b.      The definition of "Maturity Date" in Section 1.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"Maturity Date" means July 17, 2018.

3.      Modification of Revolving Note. The definition of "Maturity Date" in Section 1 of the Revolving Note is hereby deleted in its entirety and replaced with the following:

"Maturity Date" means July 17, 2018.

4.      Fees and Expenses.

a.      Borrower agrees that it is liable to Bank for all reasonable fees, costs and expenses (including attorneys' fees) incurred by Bank in connection with the documentation, preparation, interpretation and negotiation of this Sixth Modification and any further modification or supplement to this Sixth Modification or to the Security Documents, the consummation and administration of the transactions contemplated hereby and thereby and the enforcement, preservation, protection or defense of any of Bank's rights and remedies hereunder and under the Security Documents. All such fees, costs and expenses are referred to herein as "Expenses." Upon the execution of this Sixth Modification, Borrower shall immediately pay and reimburse any of the Bank's reasonable fees, costs and expenses (including attorneys' fees) incurred by Bank in connection with this Sixth Modification.

5.      Conditions Precedent. Bank's undertakings hereunder and the effectiveness of this Sixth Modification are subject to the satisfaction of the following conditions:

a.      Borrower's execution and delivery of this Sixth Modification;

b.      Borrower's payment of all Expenses incurred by Bank through the date hereof.

6.      Acknowledgment by Borrower. Except as otherwise specified herein, the terms and provisions hereof shall in no manner impair, limit, restrict or otherwise affect the obligations of Borrower to Bank, as evidenced by the Security Documents. Borrower hereby acknowledges, agrees and represents that (a) Borrower is indebted to Bank pursuant to the terms of the Security Documents as modified hereby; (b) the liens, security interests and collateral assignments created and evidenced by the Security Documents are, respectively, valid and subsisting liens, security interests and collateral assignments of the respective dignity and priority recited in the Security Documents; (c) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Security Documents, and the other obligations created or evidenced by the

Security Documents; (d) Borrower has no claims, offsets, defenses or counterclaims arising from any of Bank's acts or omissions with respect to the Collateral, the Security Documents or Bank's performance under the Security Documents or with respect to the Collateral; (e) the representations and warranties contained in the Security Documents are true and correct in all material respects as of the date hereof (except for such representations and warranties which expressly relate to an earlier date); and (f) Bank is not in default and to Borrower's knowledge, no event has occurred which, with the passage of time, giving of notice, or both, would constitute a default by Bank of Bank's obligations under the terms and provisions of the Security Documents.

7. Effect of Sixth Modification. All Security Documents are hereby amended and modified in a manner consistent with the modifications, terms and provisions contained herein. Except as expressly set forth herein, this Sixth Modification shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of Bank under any of the Security Documents, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in any of the Security Documents, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Except as expressly set forth herein, nothing herein shall be deemed to entitle Borrower to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the any of the Security Documents in similar or different circumstances.

8. GOVERNING LAW; VENUE; SERVICE OF PROCESS. THE TERMS AND PROVISIONS HEREOF SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS AGREEMENT HAS BEEN ENTERED INTO IN DALLAS COUNTY, TEXAS, AND IT SHALL BE PERFORMABLE FOR ALL PURPOSES IN DALLAS COUNTY, TEXAS. ANY ACTION OR PROCEEDING AGAINST BORROWER UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE SECURITY DOCUMENTS MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN DALLAS COUNTY, TEXAS. BORROWER HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURTS, AND (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. BORROWER AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT ITS ADDRESS SPECIFIED OR DETERMINED IN ACCORDANCE WITH THE PROVISIONS OF THE LOAN AGREEMENT. NOTHING HEREIN OR IN ANY OF THE OTHER SECURITY DOCUMENTS SHALL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR WITH RESPECT TO ANY OF ITS PROPERTY IN COURTS IN OTHER



JURISDICTIONS. ANY ACTION OR PROCEEDING BY BORROWER AGAINST BANK SHALL BE BROUGHT ONLY IN A COURT LOCATED IN DALLAS COUNTY, TEXAS.

9.     Severability. Any provision of this Sixth Modification held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Sixth Modification and the effect thereof shall be confined to the provision held to be invalid or illegal.

10.    Counterparts. To facilitate execution, this Sixth Modification may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument.

11.     WAIVER OF JURY TRIAL. THE PARTIES HERETO IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

12.    Release. Borrower hereby releases and forever discharges Bank from any and all claims, demands, liabilities, losses or causes of action, known or unknown, fixed or contingent, Borrower may have directly against Bank, as of 12:00 midnight, Dallas, Texas time, on the date of the execution of this Sixth Modification, that is a part of, concerns or in any manner relates to this Sixth Modification or the Security Documents, including but not limited to, claims for tortious interference with contractual relations, breach of contract, usury, breach of fiduciary duty, bad faith, negligence, negligent misrepresentation, defamation, business disparagement, promissory estoppel, or similar causes of action, except for, any and all actions, suits, proceedings brought by Borrower, to recover damages they incurred in any action, suit or proceeding brought by a third party against them.

13.    Entire Agreement. This Sixth Modification and the other Security Documents constitute the entire understanding and agreement between Borrower and Bank with respect to the transactions arising in connection with the Indebtedness and supersede all prior written or oral understandings and agreements between Borrower and Bank with respect to the matters addressed in the Security Documents. Borrower hereby acknowledges that, except as incorporated in writing in this Sixth Modification and the Security Documents, there are not, and were not, and no persons are or were authorized by Bank to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Security Documents.

THE WRITTEN SECURITY DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.



THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

THE PROVISIONS OF THIS SIXTH MODIFICATION AND THE OTHER SECURITY DOCUMENTS MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE RESPECTIVE PARTIES TO SUCH DOCUMENTS.

***Signature Page Follows***



**IN WITNESS WHEREOF,** the undersigned have executed this Sixth Modification as of the day and year first above written.

**BORROWER:**

Address for Notice:

**IRONCLAD PERFORMANCE WEAR CORPORATION,** a California corporation

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn: William M. Aisenberg
E-mail: bill.aisenberg@ironclad.com

By: _____
William M. Aisenberg
Executive Vice President & CFO

Address for Notice:

**IRONCLAD PERFORMANCE WEAR CORPORATION,** a Nevada corporation

1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn: William M. Aisenberg
E-mail: bill.aisenberg@ironclad.com

By: _____
William M. Aisenberg
Executive Vice President & CFO

Address for Notice:

**BANK:**

**CAPITAL ONE, NATIONAL ASSOCIATION**

201 St Charles Avenue
23rd Floor
New Orleans, LA 70123
Attn: Robert Johnson
E-mail: robert.johnson@capitalone.com

By: _____
Robert Johnson
Senior Vice President

**EXHIBIT "4"**

<u>GENERAL ASSIGNMENT AND ASSUMPTION OF LOAN DOCUMENTS</u>

THIS GENERAL ASSIGNMENT AND ASSUMPTION OF LOAN DOCUMENTS (this "**Assignment**"), is made as of July 25, 2017 by CAPITAL ONE, NATIONAL ASSOCIATION, a national banking association ("**Assignor**"), to and accepted by RADIANS WAREHAM HOLDING, INC. ("**Assignee**");

FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, Assignor, hereby sells, transfers, and assigns to <u>Assignee</u>, (i) all of Assignor's rights, title, and interests in, to and under the Loan Documents listed on *Schedule A* attached hereto and made a part hereof, (ii) the rights and obligations of Assignor evidenced therein, and (iii) all of Assignor's rights to repayment of all obligations evidenced therein, and (iv) all of Assignor's rights in and to the Collateral.

Assignee hereby accepts the foregoing assignment and assumes all of the duties and obligations of Assignor under the Loan Documents from and after the date hereof, to the same effect as if Assignee had been the named lender under the Loan Documents.

**This Assignment of Loan Documents is made WITHOUT RECOURSE TO ASSIGNOR AND WITHOUT REPRESENTATION OR WARRANTY BY ASSIGNOR OF ANY KIND, EXPRESS OR IMPLIED, including, without limitation, any representation or warranty as to the collectability or enforceability of any of the Loan Documents (except only as expressly set forth in that certain Loan Purchase Agreement between Assignor, as Seller, and Assignee, as Buyer, dated as of July 25, 2017 (the "Agreement").**

Capitalized terms used but not defined in this Assignment have the meanings given to them in the Agreement.

[The remainder of this page is intentionally left blank.]

Executed under seal this _25_ day of _JULY_ , 2017.

ASSIGNOR

CAPITAL ONE, NATIONAL ASSOCIATION

By: _____

Name: _R.B. Diffenderfft_

Title: _Senior Vice President_

State of _MARYLAND_        )
County of _BALTIMORE_ , ss.    )

_JULY 25_ , 2017

Then    personally    appeared    the    above    named    _R.B. DIFFENDERFFER_ ,
_SENIOR VICE PRESIDENT_    of Capital One, National Association ("Assignor"), and
acknowledged the foregoing instrument to be his/her free act and deed and the free act and deed
of Assignor, before me.

Notary Public
My commission expires:

_Dawn Michele Berger_

DAWN MICHELE BERGER
NOTARY PUBLIC
BALTIMORE COUNTY
MARYLAND
MY COMMISSION EXPIRES MARCH 25, 2020

ASSIGNEE

RADIANS WAREHAM HOLDING, INC.

By: _____

Name: _____Mike S Tutor_____

Title: _____President_____

State of _Tennessee_ )
County of _Shelby_ , ss. )
_7/25_ , 2017

Then personally appeared the above named _Mike Tutor_ , _____ of RADIANS WAREHAM HOLDING, INC. ("Assignee"), and acknowledged the foregoing instrument to be his/her free act and deed and the free act and deed of Assignee, before me.

ANGELA G. YORK
STATE OF
TENNESSEE
NOTARY
PUBLIC
SHELBY COUNTY
MY COMMISSION EXPIRES 9-4-2019

Notary Public _____

My commission expires: _9·4-19_

**Schedule A**
**Loan Documents**

1.  Revolving Loan and Security Agreement dated November 28, 2014, executed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as borrowers, in favor of Capital One, National Association, as lender, as modified by the First Modification Agreement dated June 15, 2015, the Second Modification Agreement dated March 16, 2016, the Third Modification Agreement dated November 28, 2016, the Waiver and Fourth Modification Agreement dated February 23, 2017, the Limited Waiver and Fifth Modification Agreement dated April 11, 2017, and the Sixth Modification Agreement dated May 10, 2017.

2.  Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017, in the principal amount of $8,000,000.00.

3.  Lost Note Affidavit from Capital One, National Association dated July 25, 2017.

4.  UCC-1 Financing Statement filed by Capital One, National Association with the California Secretary of State on December 18, 2014, under Document No. 14-7441632305 affecting the Collateral more particularly described on Exhibit A attached thereto.

5.  UCC-1 Financing Statement filed by Capital One, National Association with the Nevada Secretary of State on December 12, 2014, under Document No. 2014031733-1 affecting the Collateral more particularly described on Exhibit A attached thereto.

6.  Warehouse Waiver and Consent dated March 31, 2015, executed by Advantage Media Services, Inc. in favor of Capital One, National Association.

7.  Landlord Waiver and Consent dated April 2, 2015, executed by Erwin & Essie Appel Trust in favor of Capital One, National Association.

8.  Wholesale Lockbox Service Addendum Agreement dated November 18, 2014, with accompanying Lockbox Services addendum.

9.  Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement dated March 7, 2015 with accompanying exhibits referenced therein.

10. Secretary's Certificate dated June 15, 2015 from Ironclad Performance Wear Corporation, a California corporation to Capital One, N.A.

11. Secretary's Certificate dated June 15, 2015 from Ironclad Performance Wear Corporation, a Nevada corporation to Capital One, N.A.

12. Agreement and Plan of Merger by and among Europa Trade Agency Ltd., Ironclad Merger Corporation and Ironclad Performance Wear Corporation.

<u>ASSIGNMENT AND ASSUMPTION OF ASSIGNMENT AGREEMENT FOR PROCEEDS
OF CREDIT APPROVED RECEIVABLES PURCHASE AGREEMENT LOAN
DOCUMENTS</u>

THIS ASSIGNMENT AND ASSUMPTION OF ASSIGNMENT AGREEMENT FOR PROCEEDS OF CREDIT APPROVED RECEIVABLES PURCHASE AGREEMENT LOAN DOCUMENTS (this "**Assignment**"), is made as of July 25, 2017 by CAPITAL ONE, NATIONAL ASSOCIATION, a national banking association ("**Assignor**"), to and accepted by RADIANS WAREHAM HOLDING, INC. ("**Assignee**");

FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, Assignor, hereby sells, transfers, and assigns to <u>Assignee</u>, (i) all of Assignor's rights, title, and interests in, to and under the Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement attached hereto and made a part hereof, (ii) the rights and obligations of Assignor evidenced therein, and (iii) all of Assignor's rights to repayment of all obligations evidenced therein, and (iv) all of Assignor's rights in and to the collateral referenced therein.

Assignee hereby accepts the foregoing assignment and assumes all of the duties and obligations of Assignor under the Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement from and after the date hereof, to the same effect as if Assignee had been the named lender under the Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement.

**This Assignment is made WITHOUT RECOURSE TO ASSIGNOR AND WITHOUT REPRESENTATION OR WARRANTY BY ASSIGNOR OF ANY KIND, EXPRESS OR IMPLIED; including, without limitation, any representation or warranty as to the collectability or enforceability of the Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement (except only as expressly set forth in that certain Loan Purchase Agreement between Assignor, as Seller, and Assignee, as Buyer, dated as of July 25, 2017 (the "Agreement").**

Capitalized terms used but not defined in this Assignment have the meanings given to them in the Agreement.

[The remainder of this page is intentionally left blank.]

Executed under seal this _25_ day of _JULY_ , 2017.

ASSIGNOR

CAPITAL ONE, NATIONAL ASSOCIATION

By: _____
Name: _R.B. Diffenderfer_
Title: _Senior Vice President_

State of _MARYLAND_              )
County of _BALTIMORE_ , ss.     )                    _JULY 25_ , 2017

    Then personally appeared the above named _R. B. DIFFENDERFFER_ , _SENIOR VICE PRESIDENT_ of Capital One, National Association ("Assignor"), and acknowledged the foregoing instrument to be his/her free act and deed and the free act and deed of Assignor, before me.

Notary Public
My commission expires:

_Dawn Michele Berger_

DAWN MICHELE BERGER
NOTARY PUBLIC
BALTIMORE COUNTY
MARYLAND
MY COMMISSION EXPIRES MARCH 25, 2020

ASSIGNEE

RADIANS WAREHAM HOLDING, INC.

By: _____

Name: _____Mike S Tutor_____

Title: _____President_____

State of _Tennessee_____ )

County of _Shelby_____, ss. )                    _7/25_, 2017

Then personally appeared the above named _Mike Tutor_____,
_____ of RADIANS WAREHAM HOLDING, INC. ("Assignee"), and
acknowledged the foregoing instrument to be his/her free act and deed and the free act and deed
of Assignee, before me.

Notary Public _____
My commission expires: _9·4·19_

# EXHIBIT "5"

## FORBEARANCE AND MODIFICATION AGREEMENT

THIS **FORBEARANCE AND MODIFICATION AGREEMENT** ("Agreement") is made and entered into as of the 1ˢᵗ day of August, 2017 (the "Effective Date"), by and among **RADIANS WAREHAM HOLDING, INC.,** a Nevada corporation (the "Lender" or "Radians"), and **IRONCLAD PERFORMANCE WEAR CORPORATION,** a California corporation ("Ironclad California") and **IRONCLAD PERFORMANCE WEAR CORPORATION,** a Nevada corporation ("Ironclad Nevada" individually, collectively, and interchangeably with Ironclad California, the "Borrowers") The Borrowers, together with Radians are collectively referred to as the "Parties".

### RECITALS

A. On or about November 28, 2014, Capital One, National Association, a National Banking Association, provided Borrowers with a revolving credit facility (the "Revolving Loan"). Pursuant to that certain General Assignment and Assumption of Loan Documents and that certain Assignment and Assumption of Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement with Capital One, National Association, Radians is the owner and holder of the Loan Documents (as defined below) relating to the Revolving Loan.

B. The Revolving Loan is evidenced by the following described documentation:

    i.    That certain Revolving Loan and Security Agreement dated November 28, 2014, executed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as borrowers, in favor of Capital One, National Association, as lender, as modified by the First Modification Agreement dated June 15, 2015, the Second Modification Agreement dated March 16, 2016, the Third Modification Agreement dated November 28, 2016, the Waiver and Fourth Modification Agreement dated February 23, 2017, the Limited Waiver and Fifth Modification Agreement dated April 11, 2017, and the Sixth Modification Agreement dated May 10, 2017 ("the Loan Agreement").

    ii.    That certain Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017, in the principal amount of $8,000,000.00 (the "Note").

    iii.    That certain UCC-1 Financing Statement filed by Capital One, National Association with the California Secretary of State on December 18, 2014, under Document No. 14-7441632305 affecting the Collateral (as defined in the Loan Agreement) more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No. 62925880003.

    iv.    That certain UCC-1 Financing Statement filed by Capital One, National Association with the Nevada Secretary of State on December 12, 2014, under Document No. 2014031733-1 affecting the Collateral more particularly described

on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No.2017020461-7.

v.    That certain Warehouse Waiver and Consent dated March 31, 2015, executed by Advantage Media Services, Inc. in favor of Capital One, National Association.

vi.   That certain Landlord Waiver and Consent dated April 2, 2015, executed by Erwin & Essie Appel Trust in favor of Capital One, National Association.

vii.  That certain Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement dated March 7, 2015 with accompanying exhibits referenced therein.

viii. That certain General Assignment and Assumption of Loan Documents.

ix.   That certain Assignment and Assumption of Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement.

C. The Note and the Loan Agreement, together with all documents evidencing, or referring, or relating to the Revolving Loan are hereinafter collectively referred to as the "Loan Documents".

D. The balance owing on the Note as of July 26, 2017, is an amount of $3,688,195.22 (the "Obligations"). Interest continues to accrue on the Obligations from and after July 26, 2017, as provided in the Note.

E. By letter of July 26, 2017 (the "July 26 Letter"), Borrowers were notified by Radians of the occurrence of Events of Default (as defined in the Loan Agreement) under the terms of the Loan Documents and as a result thereof acceleration and demand for immediate payment of the Obligations

F. By letter of August 1, 2017, as inducement to enter into this Agreement, Radians notified Borrowers that without waiving the occurrence of Events of Default, the July 26 Letter was rescinded as of July 26, 2017.

G. As a result of the occurrence of Events of Default, Lender has certain rights and remedies under the Loan Documents. Borrowers have requested that Lender forbear in the exercise of its remedies under the Loan Documents for a period of time specified herein to satisfy the Obligations in full and for Lender to advance additional funds under the Note.

H. Lender is willing to forbear from the exercise of its rights and remedies under the Loan Documents as a result of the occurrence of Events of Default and to advance additional funds under the Note, but only on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing recitals, the covenants

4816-2429-2172 v3
2921440-000019 08/02/2017

herein set forth and confirmed, the mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are herein acknowledged, Borrowers and Lender agree as of the Effective Date as follows:

1. **Acknowledgement of Recitals**. Borrowers and Lender acknowledge and agree that the foregoing "Recitals" are true, correct, and complete.

2. **Acknowledgement of Obligations by Borrowers**. Borrowers acknowledge and agree that Borrowers are indebted to Lender for repayment of the Obligations, including all accrued interest accrued thereon. Borrowers further acknowledge that they are responsible for all fees, expenses and charges as allowed under the Loan Documents. Borrowers hereby reaffirm and ratify the terms of the Loan Documents, as amended herein, and acknowledge that they are enforceable in accordance with their terms.

3. **Acknowledgement of Security Interests**. Borrowers acknowledge the validity and enforceability of the security interests in the Collateral granted in favor of Lender under the Loan Documents executed by Borrowers.

4. **Acknowledgement of Events of Default**. Borrowers acknowledge that in accordance with Sections 10(b) and (c) of the Loan Agreement, Events of Default have occurred for failure to provide materially complete and correct financial statements provided in accordance with the Loan Agreement for fiscal years ended December 31, 2016, and 2015, and the fiscal quarters as of and for the periods ended March 31, 2017, and March 31, June 30 and September 30, 2016.

5. **Acknowledgment of Termination of Requirement to Make Further Advances Under the Note**. Borrowers acknowledge that in accordance with Section 2.2 of the Loan Agreement, as Events of Default have occurred and are continuing, Radians is not required to make further advances under the Loan.

6. **Acknowledgement of Lack of Defenses**. Borrowers acknowledge that as of the Effective Date each has no defense, counterclaim, offset, cross complaint, claim or demand of any kind or nature whatsoever (collectively, the "Borrower Claims") that can be asserted to reduce or eliminate all or any part of its liability to repay any of the Obligations to Lender or seek affirmative relief for damages of any kind or nature from Lender, which Borrower Claims arise out of or are related to the Loan Documents or, more generally, Borrowers' relationship with Lender. To the extent that any such Borrower Claims exist as of the Effective Date, Borrowers acknowledge and agree that they have been fully, forever and irrevocably released pursuant to Paragraph 14 hereto.

7. **Modification of Second Amended and Restated Revolving Line of Credit Note and Loan Agreement**. The Second Amended and Restated Revolving Line of Credit Note and the Loan Agreement are hereby modified by adding the following provision:

Prepayment Fee. In the event the Revolving Loan is repaid in conjunction with financing obtained by Borrowers from a financial or lending institution or other source, or in connection with the acquisition of any or both Borrowers, or any assets of either or both

Borrowers, by a third party other than Radians and/or its affiliates, then as a component necessary to satisfy the Revolving Loan, Borrowers shall pay to Radians a prepayment fee of One Hundred and Twenty Thousand ($120,000.00) Dollars (the "Prepayment Fee"). To the extent the Revolving Loan is repaid and thereafter Radians and/or its affiliates are a party to a transaction under which the Borrowers, or the assets of Borrowers, are acquired by Radians and/or its affiliates, Borrowers shall receive a credit for the Prepayment Fee paid to Radians.

8. **Forbearance**.

(a)    Lender will forbear from exercising any remedies available to it under the Loan Documents from the Effective Date through and including the Forbearance Termination Date, as further defined below (the "Forbearance Period"), and will not seek collection of the Obligations from Borrowers, except as set forth herein, initiate or join in filing any involuntary bankruptcy petition with respect to Borrowers under the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") or otherwise file or participate in any involuntary insolvency, reorganization, moratorium, receivership, or other similar proceedings initiated against Borrowers under the laws of the United States other than in response to protect its interest as a secured creditor; provided, however, that the Forbearance Period shall terminate and Lender shall be permitted to enforce or exercise any remedies available to it under the Loan Documents if: (i) Borrowers materially breach, default, or fail to perform any obligation or agreement contained in this Agreement; (ii) any case or other proceeding is instituted by or against the Borrowers under any state or federal law relating to the bankruptcy of debtors, including without limitation, the Bankruptcy Code; (iii) any Event of Default other than any existing Event of Default occurs under any of the Loan Documents as modified by this Agreement and all of the other documents executed in connection herewith; (iv) Borrowers fail to meet any deadline established under this Agreement for providing required payment, confirmation or documentation; or (v) any of the acknowledgments, warranties or representations of the Borrowers set forth herein shall be untrue or inaccurate in any material respect as of the date made. Each of the foregoing events is hereinafter referred to as a "Terminable Event."

(b)    Subject to the termination set forth in Paragraph 8(a), and unless otherwise agreed to in writing by Lender, the Forbearance Period will terminate at 12:00 o'clock Noon Central Time on August 7, 2017 (the "Forbearance Termination Date").

9. **Actions Authorized Upon a Terminable Event or the Occurrence of the Forbearance Termination Date**.    Upon the occurrence of a Terminable Event or the Forbearance Termination Date, Lender may exercise any and all rights and remedies available to Lender provided in the Loan Documents or this Agreement.

10. **Advance Under the Note**. Upon compliance with the Conditions Precedent and execution of this Agreement, Radians shall advance an additional sum of $250,000.00 under the Note to Borrowers which shall become a component of the Obligations.

11. **Adequate Consideration**. Borrowers each hereby acknowledge and agree that Lender's agreed forbearance, advancement of additional funds under the Note, and extended time for

repayment of the Obligations constitutes full and adequate consideration for the execution and delivery by Borrowers of this Agreement. Borrowers materially benefit by the forbearance, modification, and agreements of Lender contained in this Agreement. Borrower stipulates that it has the authority and authorization to execute this Agreement.

12. **Liens Unaffected**. Nothing in this Agreement shall adversely affect, invalidate, discharge, release, or impair any security or the Collateral (including, without limitation, the liens and security interests granted in the Loan Documents held by the Lender or the indebtedness secured thereby or the priority of the security interests of such security, which priority of the security interests shall remain unaffected and unimpaired).

13. **Conditions Precedent**. As conditions precedent to Lender's obligation to forbear hereunder and to make the additional advance under the Note, Borrower agree as follows:

(a)   To comply with the provisions and conditions of this Agreement;

(b)   Borrowers shall execute this Agreement;

(c)   Borrowers shall provide to Lender any and all existing documents reasonably requested by Lender relating to the operation of Borrowers' business; and

(d)   Borrowers shall continue to use the Lockbox as required under the Loan Agreement and shall execute and immediately forward to Lender, the Deposit Account Control Agreement ("DACA") attached hereto as Exhibit A.   To the extent that upon submission to Capital One, National Association ("Bank") additional edits to the DACA are required by the Bank, the parties agree to negotiate in good faith to enter into a revised DACA (the "Revised DACA") acceptable to all parties.   Upon agreement, Borrowers and Bank will promptly execute the Revised DACA and immediately thereafter forward it to Lender.

14. **Release of Lender**.

(a)   Except with respect to Lender's obligations set forth in this Agreement, in consideration of the agreements of Lender contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrowers, and each of their respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender, and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Lender and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which such Borrowers or any of their respective heirs, successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for,

upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with any of the Loan Documents or transactions thereunder or related thereto.

(b)   Borrowers understand, acknowledge and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)   Borrowers agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(d)   Upon full payment and satisfaction of the Obligations, Borrowers shall thereupon automatically be fully, finally and forever released and discharged from any further claim, liability, or obligation in connection with the Revolving Loan and this Agreement, and Lender shall return and mark the Note as "Paid in Full" and release any and all security with respect to the Obligations. This Paragraph 14 shall survive termination of this Agreement.

15. **Remedies Cumulative; No Waiver**.  The execution, delivery and performance of this Agreement by Lender and the acceptance by Lender of the performance of Borrowers hereunder (a) shall not constitute a waiver or release by Lender of any Event of Default that may now or hereafter exist, (b) shall not constitute a novation of any of the Loan Documents, as amended, and, (c) except as expressly provided in this Agreement, shall be without prejudice to, and is not a waiver or release of, Lender's rights at any time in the future to exercise any and all rights conferred upon Lender by any of the Loan Documents or otherwise at law or in equity, including but not limited to the right to institute collection proceedings against Borrowers and/or to exercise any right against any other person or entity not a party to this Agreement.

16. **Cooperation Upon Default**. Upon the expiration of the Forbearance Period including any mutually agreed upon extensions thereof without Borrowers having made a lump sum payment to Lender in order to satisfy in full the Obligations due and owing to Lender or the occurrence of a Terminable Event, Borrowers also shall, if requested by Lender, assist Lender in the orderly liquidation of the Collateral securing the Obligations (the "Turnover of Assets"). In implementing the Turnover of Assets, Borrowers agree as follows:

(a)   Borrowers will cooperate with Lender in the consensual and orderly liquidation of the Collateral securing any of the Obligations.

(b)   Borrowers acknowledge that they have received commercially reasonable, timely, and accurate notice of an Event of Default, and Borrowers agree that such notice satisfies all requirements of notice under the Loan Documents and applicable law.

17. **Representations and Warranties**. To induce Lender to enter into this Agreement and as partial consideration for the terms and conditions contained herein, Borrowers represent and

warrant, each and all of which shall survive the execution and delivery of this Agreement and all of the other documents executed in connection herewith, that all corporate actions required to be taken by Borrowers for the authorization, execution, delivery and performance of this Agreement and any other documents contemplated hereby have been taken. This Agreement is, and any documents executed pursuant hereto will be legal, valid, and binding obligations of the party or parties thereto, enforceable against each such party in accordance with their respective terms, subject only to bankruptcy, insolvency, reorganization, moratorium and other laws or equitable principles affecting creditors' rights generally.

18. **Counsel.** Borrowers acknowledge that they have read and understand this Agreement, that they have had the ability to consult with an attorney of their own choosing before signing this Agreement, have been afforded an opportunity to deliberate as to whether to enter into this Agreement, that they understand the terms and effects of this Agreement, and that they execute this Agreement voluntarily.

19. **Construction.** This Agreement shall be liberally construed in order to effectuate the rights, benefits, and remedies of each party, as expressed herein, and neither the express language herein nor any principles of interpretation shall be impaired or adversely affected by the language of any prior discussion, form or draft of this Agreement. This Agreement has been the subject of negotiations by the parties, and this Agreement shall not be construed against any party merely because of such party's involvement in its initial preparation and negotiation. Except as modified by this Agreement, the Loan Documents shall remain in full force and effect.

20. **Governing Law.** This Agreement is governed by the laws of the State of Texas. The Parties agree that the Choice of Forum; Consent to Service of Process and Jurisdiction provisions set forth in Section 13.6 of the Loan Agreement shall apply to this Agreement.

21. **Counterparts. Facsimile.** This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in one or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Facsimile or pdf transmission of any signed original document or retransmission of any signed facsimile or pdf transmission will be deemed the same as delivery of an original. At the request of any party, the other parties will confirm facsimile or pdf transmission by signing a duplicate original document.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement to be effective as of the Effective Date.

BORROWER:

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

By: _____
     L. Geoffrey Greulich, CEO

BORROWER:

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

By: _____
     L. Geoffrey Greulich, CEO

**RADIANS WAREHAM HOLDING, INC., a Nevada corporation**

By: _____
     Ruth Tutor, CFO

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the Effective Date.

BORROWER:

IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation

By: _____
L. Geoffrey Greulich, CEO

BORROWER:

IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation

By: _____
L. Geoffrey Greulich, CEO

RADIANS WAREHAM HOLDING, INC., a Nevada corporation

By: _____
Ruth Tutor, CFO

STATE OF TEXAS
COUNTY OF Dallas

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **L. Geoffrey Greulich**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **IRONCLAD PERFORMANCE WEAR CORPORATION**, the within named bargainor, a California corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

WITNESS my hand and seal at office, on this the 2nd day of August, 2017

Notary Public

My Commission Expires:

May 17, 2020

STACY METZLER
Notary Public, State of Texas
Comm. Expires 05-17-2020
Notary ID 130663860

STATE OF TEXAS
COUNTY OF Dallas

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **L. Geoffrey Greulich**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **IRONCLAD PERFORMANCE WEAR CORPORATION**, the within named bargainor, a Nevada corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

WITNESS my hand and seal at office, on this the 2nd day of August, 2017.

Notary Public

My Commission Expires:

May 17, 2020

STACY METZLER
Notary Public, State of Texas
Comm. Expires 05-17-2020
Notary ID 130663860

4816-2429-2172 v3
2921440-000019 08/02/2017

STATE OF TENNESSEE
COUNTY OF SHELBY

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **Ruth Tutor**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the _____CFO_____ of **RADIANS WAREHAM HOLDING, INC.,** the within named bargainor, a Nevada corporation, and that she as such_____CFO_____, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such_____CFO_____.

WITNESS my hand and seal at office, on this the 2nd day of August, 2017.

_____
Notary Public

My Commission Expires:

_9·4·19_

4816-2429-2172 v3
2921440-000019 08/02/2017

## FORBEARANCE AGREEMENT

THIS **FORBEARANCE AGREEMENT** ("Agreement") is made and entered into as of the 14th day of August, 2017 (the "Effective Date"), by and among **RADIANS WAREHAM HOLDING, INC.**, a Nevada corporation (the "Lender" or "Radians"), and **IRONCLAD PERFORMANCE WEAR CORPORATION**, a California corporation ("Ironclad California") and **IRONCLAD PERFORMANCE WEAR CORPORATION**, a Nevada corporation ("Ironclad Nevada" individually, collectively, and interchangeably with Ironclad California, the "Borrowers") The Borrowers, together with Radians are collectively referred to as the "Parties".

## RECITALS

A. On or about November 28, 2014, Capital One, National Association, a National Banking Association, provided Borrowers with a revolving credit facility (the "Revolving Loan"). Pursuant to that certain General Assignment and Assumption of Loan Documents and that certain Assignment and Assumption of Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement with Capital One, National Association, Radians is the owner and holder of the Loan Documents (as defined below) relating to the Revolving Loan.

B. The Revolving Loan is evidenced by the following described documentation:

    i.    That certain Revolving Loan and Security Agreement dated November 28, 2014, executed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as borrowers, in favor of Capital One, National Association, as lender, as modified by the First Modification Agreement dated June 15, 2015, the Second Modification Agreement dated March 16, 2016, the Third Modification Agreement dated November 28, 2016, the Waiver and Fourth Modification Agreement dated February 23, 2017, the Limited Waiver and Fifth Modification Agreement dated April 11, 2017, the Sixth Modification Agreement dated May 10, 2017, and that certain Forbearance and Modification Agreement dated August 1, 2017 ("the Loan Agreement").

    ii.    That certain Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017, in the principal amount of $8,000,000.00 as amended by the Forbearance and Modification Agreement dated August 1, 2017 (the "Note").

    iii.    That certain UCC-1 Financing Statement filed by Capital One, National Association with the California Secretary of State on December 18, 2014, under Document No. 14-7441632305 affecting the Collateral (as defined in the Loan Agreement) more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No. 62925880003.

    iv.    That certain UCC-1 Financing Statement filed by Capital One, National Association with the Nevada Secretary of State on December 12, 2014, under

Document No. 2014031733-1 affecting the Collateral more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No.2017020461-7.

v.      That certain Warehouse Waiver and Consent dated March 31, 2015, executed by Advantage Media Services, Inc. in favor of Capital One, National Association.

vi.     That certain Landlord Waiver and Consent dated April 2, 2015, executed by Erwin & Essie Appel Trust in favor of Capital One, National Association.

vii.    That certain Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement dated March 7, 2015 with accompanying exhibits referenced therein.

viii.   That certain General Assignment and Assumption of Loan Documents.

ix.     That certain Assignment and Assumption of Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement.

C.  The Note and the Loan Agreement, together with all documents evidencing, or referring, or relating to the Revolving Loan are hereinafter collectively referred to as the "Loan Documents".

D.  The balance owing on the Note as of August 14, 2017, is an amount of $3,977,268.09 (the "Obligations"). Interest continues to accrue on the Obligations from and after August 14, 2017, as provided in the Note.

E.  By letter of July 26, 2017 (the "July 26 Letter"), Borrowers were notified by Radians of the occurrence of Events of Default (as defined in the Loan Agreement) under the terms of the Loan Documents and as a result thereof acceleration and demand for immediate payment of the Obligations.

F.  By letter of August 1, 2017, Radians notified Borrowers that without waiving the occurrence of Events of Default, the July 26 Letter was rescinded as of July 26, 2017.

G.  Effective as of August 1, 2017, Borrowers and Radians entered that certain Forbearance and Modification Agreement providing for a Forbearance Period to allow Borrowers a period of time to satisfy the Obligations in full, during which time period Radians agreed not to seek collection of the Obligations, except on the occurrence of a Terminable Event as defined in the Forbearance and Modification Agreement.   The Forbearance and Modification Agreement further provided for modification of the Second Amended and Restated Revolving Line of Credit Note and Loan Agreement as provided therein.

H.  Under the terms of the Forbearance and Modification Agreement, the Forbearance Period expired on the Forbearance Termination Date of August 7, 2017, as Borrowers had failed to satisfy the Obligations on or before the Forbearance Termination Date.

I.  The Forbearance and Modification Agreement further provided that upon the occurrence of the Forbearance Termination Date, Radians may exercise any and all rights and remedies available to Lender provided in the Loan Documents or the Forbearance and Modification Agreement.

J.  By letter of August 9, 2017 (the "August 9 Letter"), Borrowers were notified by Radians of the occurrence of Events of Default (as defined in the Loan Agreement) under the terms of the Loan Documents and as a result thereof acceleration and demand for immediate payment of the Obligations.

K.  By letter of August 15, 2017, Radians notified Borrowers that without waiving the occurrence of Events of Default, the August 9 Letter was rescinded as of August 9, 2017.

L.  As a result of the occurrence of Events of Default, Lender has certain rights and remedies under the Loan Documents. Borrowers have requested that Lender further forbear in the exercise of its remedies under the Loan Documents for a period of time specified herein to satisfy the Obligations in full.

M.  Lender is willing to further forbear from the exercise of its rights and remedies under the Loan Documents as a result of the occurrence of Events of Default, but only on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing recitals, the covenants herein set forth and confirmed, the mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are herein acknowledged, Borrowers and Lender agree as of the Effective Date as follows:

1.  **Acknowledgement of Recitals**.  Borrowers and Lender acknowledge and agree that the foregoing "Recitals" are true, correct, and complete.

2.  **Acknowledgement of Obligations by Borrowers**. Borrowers acknowledge and agree that Borrowers are indebted to Lender for repayment of the Obligations, including all accrued interest accrued thereon. Borrowers further acknowledge that they are responsible for all fees, expenses and charges as allowed under the Loan Documents. Borrowers hereby reaffirm and ratify the terms of the Loan Documents, as amended herein, and acknowledge that they are enforceable in accordance with their terms.

3.  **Acknowledgement of Security Interests**. Borrowers acknowledge the validity and enforceability of the security interests in the Collateral granted in favor of Lender under the Loan Documents executed by Borrowers.

4.  **Acknowledgement of Events of Default**. Borrowers have previously acknowledged in the Forbearance and Modification Agreement that in accordance with Sections 10(b) and (c) of the Loan Agreement, Events of Default have occurred for failure to provide materially complete

and correct financial statements provided in accordance with the Loan Agreement for fiscal years ended December 31, 2016, and 2015, and the fiscal quarters as of and for the periods ended March 31, 2017, and March 31, June 30 and September 30, 2016.

5. **Acknowledgment of Termination of Requirement to Make Further Advances Under the Note**. Borrowers acknowledge that in accordance with Section 2.2 of the Loan Agreement, as Events of Default have occurred and are continuing, Radians is not required to make further advances under the Loan.

6. **Acknowledgement of Lack of Defenses**. Borrowers acknowledge that as of the Effective Date each has no defense, counterclaim, offset, cross complaint, claim or demand of any kind or nature whatsoever (collectively, the "Borrower Claims") that can be asserted to reduce or eliminate all or any part of its liability to repay any of the Obligations to Lender or seek affirmative relief for damages of any kind or nature from Lender, which Borrower Claims arise out of or are related to the Loan Documents or, more generally, Borrowers' relationship with Lender. To the extent that any such Borrower Claims exist as of the Effective Date, Borrowers acknowledge and agree that they have been fully, forever and irrevocably released pursuant to Paragraph 12 hereto.

7. **Forbearance**.

(a)    Lender will forbear from exercising any remedies available to it under the Loan Documents from the Effective Date through and including the Forbearance Termination Date, as further defined below (the "Forbearance Period"), and will not seek collection of the Obligations from Borrowers, except as set forth herein, initiate or join in filing any involuntary bankruptcy petition with respect to Borrowers under the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") or otherwise file or participate in any involuntary insolvency, reorganization, moratorium, receivership, or other similar proceedings initiated against Borrowers under the laws of the United States other than in response to protect its interest as a secured creditor; provided, however, that the Forbearance Period shall terminate and Lender shall be permitted to enforce or exercise any remedies available to it under the Loan Documents if: (i) Borrowers materially breach, default, or fail to perform any obligation or agreement contained in this Agreement; (ii) any case or other proceeding is instituted by or against the Borrowers under any state or federal law relating to the bankruptcy of debtors, including without limitation, the Bankruptcy Code; (iii) any Event of Default other than any existing Event of Default occurs under any of the Loan Documents as modified by this Agreement and all of the other documents executed in connection herewith; (iv) Borrowers fail to meet any deadline established under this Agreement for providing required payment, confirmation or documentation; or (v) any of the acknowledgments, warranties or representations of the Borrowers set forth herein shall be untrue or inaccurate in any material respect as of the date made. Each of the foregoing events is hereinafter referred to as a "Terminable Event."

(b)    Subject to the termination set forth in Paragraph 7(a), and unless otherwise agreed to in writing by Lender, the Forbearance Period will terminate at 5:00 o'clock Central Time on **August 21, 2017** (the "Forbearance Termination Date").

8. **Actions Authorized Upon a Terminable Event or the Occurrence of the Forbearance Termination Date**. Upon the occurrence of a Terminable Event or the Forbearance Termination Date, Lender may exercise any and all rights and remedies available to Lender provided in the Loan Documents or this Agreement.

9. **Adequate Consideration.** Borrowers each hereby acknowledge and agree that Lender's agreed forbearance and extended time for repayment of the Obligations constitutes full and adequate consideration for the execution and delivery by Borrowers of this Agreement. Borrowers materially benefit by the forbearance and agreements of Lender contained in this Agreement. Borrower stipulates that it has the authority and authorization to execute this Agreement.

10. **Liens Unaffected.** Nothing in this Agreement shall adversely affect, invalidate, discharge, release, or impair any security or the Collateral (including, without limitation, the liens and security interests granted in the Loan Documents held by the Lender or the indebtedness secured thereby or the priority of the security interests of such security, which priority of the security interests shall remain unaffected and unimpaired).

11. **Conditions Precedent**. As conditions precedent to Lender's obligation to forbear hereunder, Borrower agree as follows:

(a)    To comply with the provisions and conditions of this Agreement;

(b)    Borrowers shall execute this Agreement;

(c)    Borrowers shall provide to Lender any and all existing documents reasonably requested by Lender relating to the operation of Borrowers' business; and

(d)    Borrowers shall continue to use the Lockbox as required under the Loan Agreement with access to funds deposited in the Lockbox Account being governed by that certain Deposit Account Control Agreement executed among Borrowers, Radians and Capital One, National Association.

12. **Release of Lender**.

(a)    Except with respect to Lender's obligations set forth in this Agreement, in consideration of the agreements of Lender contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrowers, and each of their respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender, and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Lender and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set off,

demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which such Borrowers or any of their respective heirs, successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with any of the Loan Documents or transactions thereunder or related thereto.

(b)    Borrowers understand, acknowledge and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)    Borrowers agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(d)    Upon full payment and satisfaction of the Obligations, Borrowers shall thereupon automatically be fully, finally and forever released and discharged from any further claim, liability, or obligation in connection with the Revolving Loan and this Agreement, and Lender shall return and mark the Note as "Paid in Full" and release any and all security with respect to the Obligations. This Paragraph 12 shall survive termination of this Agreement.

13. **Remedies Cumulative; No Waiver**. The execution, delivery and performance of this Agreement by Lender and the acceptance by Lender of the performance of Borrowers hereunder (a) shall not constitute a waiver or release by Lender of any Event of Default that may now or hereafter exist, (b) shall not constitute a novation of any of the Loan Documents, as amended, and, (c) except as expressly provided in this Agreement, shall be without prejudice to, and is not a waiver or release of, Lender's rights at any time in the future to exercise any and all rights conferred upon Lender by any of the Loan Documents or otherwise at law or in equity, including but not limited to the right to institute collection proceedings against Borrowers and/or to exercise any right against any other person or entity not a party to this Agreement.

14. **Cooperation Upon Default**. Upon the expiration of the Forbearance Period including any mutually agreed upon extensions thereof without Borrowers having made a lump sum payment to Lender in order to satisfy in full the Obligations due and owing to Lender or the occurrence of a Terminable Event, Borrowers also shall, if requested by Lender, assist Lender in the orderly liquidation of the Collateral securing the Obligations (the "Turnover of Assets"). In implementing the Turnover of Assets, Borrowers agree as follows:

(a)    Borrowers will cooperate with Lender in the consensual and orderly liquidation of the Collateral securing any of the Obligations.

(b)    Borrowers acknowledge that they have received commercially reasonable, timely, and accurate notice of an Event of Default, and Borrowers agree that such notice satisfies

all requirements of notice under the Loan Documents and applicable law.

15. **Representations and Warranties**. To induce Lender to enter into this Agreement and as partial consideration for the terms and conditions contained herein, Borrowers represent and warrant, each and all of which shall survive the execution and delivery of this Agreement and all of the other documents executed in connection herewith, that all corporate actions required to be taken by Borrowers for the authorization, execution, delivery and performance of this Agreement and any other documents contemplated hereby have been taken. This Agreement is, and any documents executed pursuant hereto will be legal, valid, and binding obligations of the party or parties thereto, enforceable against each such party in accordance with their respective terms, subject only to bankruptcy, insolvency, reorganization, moratorium and other laws or equitable principles affecting creditors' rights generally.

16. **Counsel.** Borrowers acknowledge that they have read and understand this Agreement, that they have had the ability to consult with an attorney of their own choosing before signing this Agreement, have been afforded an opportunity to deliberate as to whether to enter into this Agreement, that they understand the terms and effects of this Agreement, and that they execute this Agreement voluntarily.

17. **Construction.** This Agreement shall be liberally construed in order to effectuate the rights, benefits, and remedies of each party, as expressed herein, and neither the express language herein nor any principles of interpretation shall be impaired or adversely affected by the language of any prior discussion, form or draft of this Agreement. This Agreement has been the subject of negotiations by the parties, and this Agreement shall not be construed against any party merely because of such party's involvement in its initial preparation and negotiation. Except as modified by this Agreement, the Loan Documents shall remain in full force and effect.

18. **Governing Law.** This Agreement is governed by the laws of the State of Texas. The Parties agree that the Choice of Forum; Consent to Service of Process and Jurisdiction provisions set forth in Section 13.6 of the Loan Agreement shall apply to this Agreement.

19. **Counterparts, Facsimile.** This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in one or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Facsimile or pdf transmission of any signed original document or retransmission of any signed facsimile or pdf transmission will be deemed the same as delivery of an original. At the request of any party, the other parties will confirm facsimile or pdf transmission by signing a duplicate original document.

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the Effective Date.

BORROWER:

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

By: _____
L. Geoffrey Greulich, CEO

BORROWER:

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

By: _____
L. Geoffrey Greulich, CEO

**RADIANS WAREHAM HOLDING, INC., a Nevada corporation**

By: _____
Ruth Tutor, CFO

4839-5676-7565 v2

2921440-000020 08/14/2017

STATE OF TEXAS
COUNTY OF Dallas

    Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **L. Geoffrey Greulich**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **IRONCLAD PERFORMANCE WEAR CORPORATION**, the within named bargainor, a California corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

    WITNESS my hand and seal at office, on this the 15th day of August, 2017.

Notary Public

My Commission Expires:

05-17-2020

STACY METZLER
Notary Public, State of Texas
Comm. Expires 05-17-2020
Notary ID 130663860

STATE OF TEXAS
COUNTY OF Dallas

    Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **L. Geoffrey Greulich**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **IRONCLAD PERFORMANCE WEAR CORPORATION**, the within named bargainor, a Nevada corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

    WITNESS my hand and seal at office, on this the 15th day of August, 2017.

Notary Public

My Commission Expires:

05-17-2020

STACY METZLER
Notary Public, State of Texas
Comm. Expires 05-17-2020
Notary ID 130663860

4839-5676-7565 v2

2921440-000020 08/14/2017

**IN WITNESS WHEREOF,** the Parties have executed this Agreement to be effective as of the Effective Date.

BORROWER:

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

By: _____
     L. Geoffrey Greulich, CEO

BORROWER:

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

By: _____
     L. Geoffrey Greulich, CEO

**RADIANS WAREHAM HOLDING, INC., a Nevada corporation**

By: _____
     Ruth Tutor, CFO

STATE OF TENNESSEE
COUNTY OF SHELBY

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **Ruth Tutor**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the _____CFO_____ of **RADIANS WAREHAM HOLDING, INC.**, the within named bargainor, a Nevada corporation, and that she as such_____CFO_____, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such_____CFO_____.

WITNESS my hand and seal at office, on this the 15th day of August, 2017.

_____
Notary Public

My Commission Expires:

a. 4. 19

STATE OF
TENNESSEE
NOTARY
PUBLIC
ANGELA G. YORK
SHELBY COUNTY
MY COMMISSION EXPIRES 9-4-2019

4839-5676-7565 v4
2921440-000020 08/15/2017

## SECOND FORBEARANCE AGREEMENT

THIS **SECOND FORBEARANCE AGREEMENT** ("Agreement") is made and entered into as of the 25th day of August, 2017 (the "Effective Date"), by and among **RADIANS WAREHAM HOLDING, INC.,** a Nevada corporation (the "Lender" or "Radians"), and **IRONCLAD PERFORMANCE WEAR CORPORATION,** a California corporation ("Ironclad California") and **IRONCLAD PERFORMANCE WEAR CORPORATION,** a Nevada corporation ("Ironclad Nevada" individually, collectively, and interchangeably with Ironclad California, the "Borrowers") The Borrowers, together with Radians are collectively referred to as the "Parties".

## RECITALS

A. On or about November 28, 2014, Capital One, National Association, a National Banking Association, provided Borrowers with a revolving credit facility (the "Revolving Loan"). Pursuant to that certain General Assignment and Assumption of Loan Documents and that certain Assignment and Assumption of Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement with Capital One, National Association, Radians is the owner and holder of the Loan Documents (as defined below) relating to the Revolving Loan.

B. The Revolving Loan is evidenced by the following described documentation:

    i.    That certain Revolving Loan and Security Agreement dated November 28, 2014, executed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as borrowers, in favor of Capital One, National Association, as lender, as modified by the First Modification Agreement dated June 15, 2015, the Second Modification Agreement dated March 16, 2016, the Third Modification Agreement dated November 28, 2016, the Waiver and Fourth Modification Agreement dated February 23, 2017, the Limited Waiver and Fifth Modification Agreement dated April 11, 2017, the Sixth Modification Agreement dated May 10, 2017, and that certain Forbearance and Modification Agreement dated August 1, 2017 ("the Loan Agreement").

    ii.    That certain Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017, in the principal amount of $8,000,000.00 as amended by the Forbearance and Modification Agreement dated August 1, 2017 (the "Note").

    iii.    That certain UCC-1 Financing Statement filed by Capital One, National Association with the California Secretary of State on December 18, 2014, under Document No. 14-7441632305 affecting the Collateral (as defined in the Loan Agreement) more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No. 62925880003.

iv.      That certain UCC-1 Financing Statement filed by Capital One, National Association with the Nevada Secretary of State on December 12, 2014, under Document No. 2014031733-1 affecting the Collateral more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No.2017020461-7.

v.      That certain Warehouse Waiver and Consent dated March 31, 2015, as amended by the Amended Warehouse Waiver and Consent, executed by Advantage Media Services, Inc. in favor of Capital One, National Association.

vi.      That certain Landlord Waiver and Consent dated April 2, 2015, as amended by the Amended Landlord Waiver and Consent, executed by Erwin & Essie Appel Trust in favor of Capital One, National Association.

vii.      That certain Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement dated March 7, 2015 with accompanying exhibits referenced therein.

viii.      That certain General Assignment and Assumption of Loan Documents.

ix.      That certain Assignment and Assumption of Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement.

C. The Note and the Loan Agreement, together with all documents evidencing, or referring, or relating to the Revolving Loan are hereinafter collectively referred to as the "Loan Documents".

D. The balance owing on the Note as of August 24, 2017, is an amount of $3,944,045.93 (the "Obligations"). Interest continues to accrue on the Obligations from and after August 24, 2017, as provided in the Note. The balance listed does not reflect funds received by Radians on and after August 24, 2017 under the DACA (defined below).

E. By letter of July 26, 2017 (the "July 26 Letter"), Borrowers were notified by Radians of the occurrence of Events of Default (as defined in the Loan Agreement) under the terms of the Loan Documents and as a result thereof acceleration and demand for immediate payment of the Obligations.

F. By letter of August 1, 2017, Radians notified Borrowers that without waiving the occurrence of Events of Default, the July 26 Letter was rescinded as of July 26, 2017.

G. Effective as of August 1, 2017, Borrowers and Radians entered that certain Forbearance and Modification Agreement providing for a Forbearance Period to allow Borrowers a period of time to satisfy the Obligations in full, during which time period Radians agreed not to seek collection of the Obligations, except on the occurrence of a Terminable Event as defined in the Forbearance and Modification Agreement. The Forbearance and Modification Agreement further provided for modification of the Second Amended and Restated Revolving Line of Credit Note and Loan Agreement as provided therein.

H. Under the terms of the Forbearance and Modification Agreement, the Forbearance Period expired on the Forbearance Termination Date of August 7, 2017, as Borrowers had failed to satisfy the Obligations on or before the Forbearance Termination Date.

I. The Forbearance and Modification Agreement further provided that upon the occurrence of the Forbearance Termination Date, Radians may exercise any and all rights and remedies available to Lender provided in the Loan Documents or the Forbearance and Modification Agreement.

J. By letter of August 9, 2017 (the "August 9 Letter"), Borrowers were notified by Radians of the occurrence of Events of Default (as defined in the Loan Agreement) under the terms of the Loan Documents and as a result thereof acceleration and demand for immediate payment of the Obligations.

K. By letter of August 15, 2017, Radians notified Borrowers that without waiving the occurrence of Events of Default, the August 9 Letter was rescinded as of August 9, 2017.

L. Effective as of August 14, 2017, Borrowers and Radians entered that certain Forbearance Agreement (the "Forbearance Agreement") providing for a Forbearance Period to allow Borrowers a period of time to satisfy the Obligations in full, during which time period Radians agreed not to seek collection of the Obligations, except on the occurrence of a Terminable Event as defined in the Forbearance Agreement.

M. Under the terms of the Forbearance Agreement, the Forbearance Period expired on the Forbearance Termination Date of August 21, 2017, as Borrowers had failed to satisfy the Obligations on or before the Forbearance Termination Date.

N. By letter of August 24, 2017 (the "August 24 Letter"), Borrowers were notified by Radians of the occurrence of Events of Default (as defined in the Loan Agreement) under the terms of the Loan Documents and as a result thereof acceleration and demand for immediate payment of the Obligations.

O. As a result of the occurrence of Events of Default, Lender has certain rights and remedies under the Loan Documents. Borrowers have requested that Lender further forbear in the exercise of its remedies under the Loan Documents for a period of time specified herein to satisfy the Obligations in full.

P. In connection with the execution of the Forbearance and Modification Agreement, Borrowers and Radians entered into that certain Deposit Account Control Agreement (the "DACA"). In accordance with the terms of the Loan Agreement and the DACA, Radians provided the required "Notice of Exclusive Control" to Capital One, National Association (the "Bank") on August 24, 2017, and has exercised its rights as provided in the Loan Agreement and DACA.

Q. Borrowers have notified Radians of their intent to initiate the filing of voluntary cases (the "Bankruptcy Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California on or before Friday, September 1, 2017.

R.  Upon the anticipated filing of the Bankruptcy Cases, Borrowers have requested that Radians provide to Borrowers certain debtor in possession financing ("DIP Financing") and consent to the Borrowers' use of cash collateral.  Borrowers and Radians have negotiated and executed a Letter of Intent that sets forth the terms of the DIP Financing and cash collateral consent and the terms under which Radians will serve as a stalking horse bidder for the purchase of the Borrowers' assets (excluding cash and causes of action against third parties).  A copy of the executed Letter of Intent is attached hereto as Exhibit "1".

S.  Lender is willing to further forbear from the exercise of its rights and remedies under the Loan Documents as a result of the occurrence of Events of Default, but only on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing recitals, the covenants herein set forth and confirmed, the mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are herein acknowledged, Borrowers and Lender agree as of the Effective Date as follows:

1. **Acknowledgement of Recitals**.  Borrowers and Lender acknowledge and agree that the foregoing "Recitals" are true, correct, and complete.

2. **Acknowledgement of Obligations by Borrowers**. Borrowers acknowledge and agree that Borrowers are indebted to Lender for repayment of the Obligations, including all accrued interest accrued thereon. Borrowers further acknowledge that they are responsible for all fees, expenses and charges as allowed under the Loan Documents. Borrowers hereby reaffirm and ratify the terms of the Loan Documents, as amended herein, and acknowledge that they are enforceable in accordance with their terms.

3. **Acknowledgement of Security Interests**. Borrowers acknowledge the validity and enforceability of the security interests in the Collateral granted in favor of Lender under the Loan Documents executed by Borrowers.

4. **Acknowledgement of Events of Default**. Borrowers have previously acknowledged in the Forbearance and Modification Agreement that in accordance with Sections 10(b) and (c) of the Loan Agreement, Events of Default have occurred for failure to provide materially complete and correct financial statements provided in accordance with the Loan Agreement for fiscal years ended December 31, 2016, and 2015, and the fiscal quarters as of and for the periods ended March 31, 2017, and March 31, June 30 and September 30, 2016.

5. **Acknowledgment of Termination of Requirement to Make Further Advances Under the Note**. Borrowers acknowledge that in accordance with Section 2.2 of the Loan Agreement, as Events of Default have occurred and are continuing, Radians is not required to make further advances under the Loan.

6. **Acknowledgement of Lack of Defenses**. Borrowers acknowledge that as of the Effective

Date each has no defense, counterclaim, offset, cross complaint, claim or demand of any kind or nature whatsoever (collectively, the "Borrower Claims") that can be asserted to reduce or eliminate all or any part of its liability to repay any of the Obligations to Lender or seek affirmative relief for damages of any kind or nature from Lender, which Borrower Claims arise out of or are related to the Loan Documents or, more generally, Borrowers' relationship with Lender. To the extent that any such Borrower Claims exist as of the Effective Date, Borrowers acknowledge and agree that they have been fully, forever and irrevocably released pursuant to Paragraph 14 hereto.

7. **Forbearance**.

(a)    Lender will forbear from exercising any remedies available to it under the Loan Documents (other than those rights of Radians as set forth in the Loan Agreement related to the Lockbox Account of Borrowers and more particularly set forth in the DACA) from the Effective Date through and including the Forbearance Termination Date, as further defined below (the "Forbearance Period"), and will not seek collection of the Obligations from Borrowers, except as set forth herein, initiate or join in filing any involuntary bankruptcy petition with respect to Borrowers under the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") or otherwise file or participate in any involuntary insolvency, reorganization, moratorium, receivership, or other similar proceedings initiated against Borrowers under the laws of the United States other than in response to protect its interest as a secured creditor; provided, however, that the Forbearance Period shall terminate and Lender shall be permitted to enforce or exercise any remedies available to it under the Loan Documents if: (i) Borrowers materially breach, default, or fail to perform any obligation or agreement contained in this Agreement; (ii) any case or other proceeding is instituted by or against the Borrowers under any state or federal law relating to the bankruptcy of debtors, including without limitation, the Bankruptcy Code; (iii) any Event of Default other than any existing Event of Default occurs under any of the Loan Documents as modified by this Agreement and all of the other documents executed in connection herewith; (iv) Borrowers fail to meet any deadline established under this Agreement for providing required payment, confirmation or documentation; or (v) any of the acknowledgments, warranties or representations of the Borrowers set forth herein shall be untrue or inaccurate in any material respect as of the date made. Each of the foregoing events is hereinafter referred to as a "Terminable Event."

(b)    Subject to the termination set forth in Paragraph 7(a), and unless otherwise agreed to in writing by Lender, the Forbearance Period will terminate at 5:00 p.m. Pacific Standard Time on **September 1, 2017** (the "Forbearance Termination Date").

8. **Continued Receipt of Funds Under the DACA**.    Borrowers acknowledge that in accordance with the Notice of Exclusive Control issued to the Bank on August 24, 2017, pursuant to the terms of the DACA, funds received in the Lockbox account of Borrowers shall continue to be forwarded by the Bank to Radians. Borrowers further acknowledge that pursuant to the terms of the Loan Agreement they are required to notify Radians of any collections received directly by Borrowers form the sale or disposition of any Collateral, and that Borrowers are required to hold the proceeds received from such collections in trust for Radians without commingling the same with other funds of Borrowers and further agrees to turn the same over to Radians immediately

upon receipt in the identical form received.

9. **Advance of Funds Under the Loan Agreement**. In contemplation of execution of this Agreement, Radians has advanced to Borrowers the sum of approximately $36,000.00 to cover issued and outstanding checks and credit card charges, as represented by Borrowers to have been incurred in the ordinary course of the operation of the business of Borrowers (the "Business"). Borrowers have further requested that Radians advance to Borrowers prior to Borrowers' commencement of the Bankruptcy Cases the total additional sum of $519,958.00 in accordance with the funding schedule attached hereto as Exhibit "2" (the "Pre-Bankruptcy Budget") to enable Borrowers to cover the payroll of the Business for the week ending September 1, 2017, to fund certain operating and other related expenses, including professional fees of Bankruptcy Counsel, prior to filing of the Bankruptcy Cases, and to enable Borrowers to commence their Bankruptcy Cases with a functional beginning cash balance of $100,000. Radians agrees to advance to Borrowers all of the requested funds to enable Borrowers to fund the expenses set forth in the Pre-Bankruptcy Budget in accordance with the time table contained in the Pre-Bankruptcy Budget.

10. **Actions Authorized Upon a Terminable Event or the Occurrence of the Forbearance Termination Date**. Upon the occurrence of a Terminable Event or the Forbearance Termination Date, Lender may exercise any and all rights and remedies available to Lender provided in the Loan Documents or this Agreement.

11. **Adequate Consideration.** Borrowers each hereby acknowledge and agree that Lender's agreed forbearance, advance of funds received pursuant to the DACA, and extended time for repayment of the Obligations constitutes full and adequate consideration for the execution and delivery by Borrowers of this Agreement. Borrowers materially benefit by the forbearance and agreements of Lender contained in this Agreement. Borrowers stipulate that they have the authority and authorization to execute this Agreement.

12. **Liens Unaffected.** Nothing in this Agreement shall adversely affect, invalidate, discharge, release, or impair any security or the Collateral (including, without limitation, the liens and security interests granted in the Loan Documents held by the Lender or the indebtedness secured thereby or the priority of the security interests of such security, which priority of the security interests shall remain unaffected and unimpaired).

13. **Conditions Precedent**. As conditions precedent to Lender's obligation to forbear hereunder, Borrowers agree as follows:

(a)    To comply with the provisions and conditions of this Agreement;

(b)    Borrowers shall execute this Agreement;

(c)    Borrowers shall provide to Lender any and all existing documents reasonably requested by Lender relating to the operation of Borrowers' business;

(d)    Borrowers shall continue to use the Lockbox as required under the Loan Agreement with access to funds deposited in the Lockbox Account being governed by that certain

Deposit Account Control Agreement executed among Borrowers, Radians and Capital One, National Association; and

(e)    Borrowers have executed the Letter of Intent.

14. **Release of Lender**.

(a)    Except with respect to Lender's obligations set forth in this Agreement, in consideration of the agreements of Lender contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrowers, and each of their respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably release, remise and forever discharge Lender, and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Lender and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which such Borrowers or any of their respective heirs, successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with any of the Loan Documents or transactions thereunder or related thereto.

(b)    Borrowers understand, acknowledge and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)    Borrowers agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(d)    Upon full payment and satisfaction of the Obligations, Borrowers shall thereupon automatically be fully, finally and forever released and discharged from any further claim, liability, or obligation in connection with the Revolving Loan and this Agreement, and Lender shall return and mark the Note as "Paid in Full" and release any and all security with respect to the Obligations. This Paragraph 14 shall survive termination of this Agreement.

15. **Remedies Cumulative; No Waiver**.    The execution, delivery and performance of this Agreement by Lender and the acceptance by Lender of the performance of Borrowers hereunder (a) shall not constitute a waiver or release by Lender of any Event of Default that may now or hereafter

exist, (b) shall not constitute a novation of any of the Loan Documents, as amended, and, (c) except as expressly provided in this Agreement, shall be without prejudice to, and is not a waiver or release of, Lender's rights at any time in the future to exercise any and all rights conferred upon Lender by any of the Loan Documents or otherwise at law or in equity, including but not limited to the right to institute collection proceedings against Borrowers and/or to exercise any right against any other person or entity not a party to this Agreement.

16. **Cooperation Upon Default.** Upon the expiration of the Forbearance Period including any mutually agreed upon extensions thereof without Borrowers having made a lump sum payment to Lender in order to satisfy in full the Obligations due and owing to Lender or the occurrence of a Terminable Event, Borrowers also shall, if requested by Lender, assist Lender in the orderly liquidation of the Collateral securing the Obligations (the "Turnover of Assets"). In implementing the Turnover of Assets, Borrowers agree as follows:

(a)    Borrowers will cooperate with Lender in the consensual and orderly liquidation of the Collateral securing any of the Obligations.

(b)    Borrowers acknowledge that they have received commercially reasonable, timely, and accurate notice of an Event of Default, and Borrowers agree that such notice satisfies all requirements of notice under the Loan Documents and applicable law.

17. **Representations and Warranties.** To induce Lender to enter into this Agreement and as partial consideration for the terms and conditions contained herein, Borrowers represent and warrant, each and all of which shall survive the execution and delivery of this Agreement and all of the other documents executed in connection herewith, that all corporate actions required to be taken by Borrowers for the authorization, execution, delivery and performance of this Agreement and any other documents contemplated hereby have been taken. This Agreement is, and any documents executed pursuant hereto will be, legal, valid, and binding obligations of the party or parties thereto, enforceable against each such party in accordance with their respective terms, subject only to bankruptcy, insolvency, reorganization, moratorium and other laws or equitable principles affecting creditors' rights generally.

18. **Counsel.** Borrowers acknowledge that they have read and understand this Agreement, that they have had the ability to consult with an attorney of their own choosing before signing this Agreement, have been afforded an opportunity to deliberate as to whether to enter into this Agreement, that they understand the terms and effects of this Agreement, and that they execute this Agreement voluntarily.

19. **Construction.** This Agreement shall be liberally construed in order to effectuate the rights, benefits, and remedies of each party, as expressed herein, and neither the express language herein nor any principles of interpretation shall be impaired or adversely affected by the language of any prior discussion, form or draft of this Agreement. This Agreement has been the subject of negotiations by the parties, and this Agreement shall not be construed against any party merely because of such party's involvement in its initial preparation and negotiation. Except as modified by this Agreement, the Loan Documents shall remain in full force and effect.

20. **Governing Law**. This Agreement is governed by the laws of the State of Texas.    The Parties agree that the Choice of Forum; Consent to Service of Process and Jurisdiction provisions set forth in Section 13.6 of the Loan Agreement shall apply to this Agreement.

21. **Counterparts, Facsimile**. This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in one or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Facsimile or pdf transmission of any signed original document or retransmission of any signed facsimile or pdf transmission will be deemed the same as delivery of an original. At the request of any party, the other parties will confirm facsimile or pdf transmission by signing a duplicate original document.

[Signatures on Next Page]

4823-9866-6830 v3
2921440-000020 08/29/2017

**IN WITNESS WHEREOF**, the Parties have executed this Agreement to be effective as of the Effective Date.

BORROWER:

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

By: _____
    L. Geoffrey Greulich, CEO

BORROWER:

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

By: _____
    L. Geoffrey Greulich, CEO

**RADIANS WAREHAM HOLDING, INC., a Nevada corporation**

By: _____
    Mike Tutor, CEO

STATE OF TEXAS
COUNTY OF _____

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **L. Geoffrey Greulich**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **IRONCLAD PERFORMANCE WEAR CORPORATION,** the within named bargainor, a California corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

WITNESS my hand and seal at office, on this the _____ day of August, 2017.


_____
Notary Public

My Commission Expires:


_____


STATE OF TEXAS
COUNTY OF _____

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **L. Geoffrey Greulich**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **IRONCLAD PERFORMANCE WEAR CORPORATION,** the within named bargainor, a Nevada corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

WITNESS my hand and seal at office, on this the _____ day of August, 2017.


_____
Notary Public

My Commission Expires:


_____

STATE OF TENNESSEE
COUNTY OF SHELBY

Before me, the undersigned, a Notary Public in and for the State and County aforesaid, personally appeared **Mike Tutor**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself (or herself) to be the Chief Executive Officer of **RADIANS WAREHAM HOLDING, INC.,** the within named bargainor, a Nevada corporation, and that he as such Chief Executive Officer, being duly authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such Chief Executive Officer.

WITNESS my hand and seal at office, on this the _____ day of August, 2017.

_____
Notary Public

My Commission Expires:

_____

# BAKER DONELSON
### BEARMAN, CALDWELL & BERKOWITZ, PC

2000 FIRST TENNESSEE
BUILDING
165 MADISON AVENUE
MEMPHIS, TENNESSEE 38103

PHONE:  901.526.2000
FAX:        901.577.2303

www.bakerdonelson.com

E. FRANKLIN CHILDRESS, JR.
**Direct Dial**: 901.577.2147
**Direct Fax**: 901.577.0845
**E-Mail Address**: fchildress@bakerdonelson.com

August 29, 2017

Ironclad Performance Wear Corporation
1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn: L. Geoffrey Greulich, CEO
geoffg@ironclad.com

Ironclad Performance Wear Corporation
1920 Hutton Court, Suite 300
Farmers Branch, Texas 75234
Attn: James McAlister, CFO
jimm@ironclad.com

**VIA:  EMAIL**

Re:    Letter of Intent to Purchase Substantially all of the Assets of Ironclad
       Performance Wear Corporation, a California corporation, and Ironclad
       Performance Wear Corporation, a Nevada corporation

Gentlemen

This Firm has the pleasure of representing Radians Wareham Holding, Inc., a Nevada corporation ("Radians").  This Letter of Intent  ("Letter") is submitted on behalf of Radians to provide an outline of key terms of a proposed Bankruptcy Acquisition under which Radians would purchase substantially all of the assets of Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (collectively, "Ironclad" or "Debtors") as defined below as the "Purchased Assets" under the terms of a mutually acceptable asset purchase and sale agreement (the "APA") to be negotiated and  consummated under an order entered by the United States Bankruptcy Court, including the following terms:

1)    **Bankruptcy Acquisition**:    The transaction described herein would be consummated under an order entered by the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") under sections 105(a), 363, and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") providing for the

4849-9028-4366 v3
2921440-000020 08/29/2017

ALABAMA • FLORIDA • GEORGIA • LOUISIANA • MARYLAND • MISSISSIPPI • SOUTH CAROLINA • TENNESSEE • TEXAS • VIRGINIA • WASHINGTON, D.C.

August 29, 2017
Page 2

purchase of the Purchased Assets free and clear of all liens, claims, interests and encumbrances. We anticipate that Ironclad will initiate voluntary filings under Chapter 11 of the Bankruptcy Code for the two entities and will file a motion (the "Procedures Motion") and motion for joint administration of the two cases (the "Joint Administration Motion") by no later than September 1, 2017, (i) seeking an order of the Bankruptcy Court approving bidding procedures (the "Procedures Order") under which Radians will be named as the "Stalking Horse" pursuant to the terms and conditions of the APA, (ii) scheduling a deadline for submission of competing bids and to the extent such bids are submitted, scheduling  an auction (the "Auction Date") under Section 363 of the Bankruptcy Code, and (iii) scheduling a hearing on or before October 30, 2017, to approve the sale to Radians pursuant to the terms of the APA based upon the terms and conditions outlined in this Letter and in the draft APA that will be commenced upon mutual acceptance by Ironclad and Radians, and as approved by their respective Boards of the terms of this Letter.  This Letter is subject to any and all requirements of the Bankruptcy Code and the Bankruptcy Court.

     2)     **Financing**:  This Letter is not contingent upon financing from any third party.

     3)     **Deposit**:  Upon execution of the APA, Radians shall submit to counsel for Ironclad in accordance with the terms and conditions of the APA, the sum of $1,000,000.00 to be held in escrow as the required deposit (the "Deposit").

     4)     **Bid**:  **$20,000,000.00** paid at Closing (including Credit Bid Component and the Deposit).

     5)     **Assets**:  The assets (the "Purchased Assets") to be included in the purchase by Radians:

- Accounts and Accounts Receivable.  "Accounts" and "Accounts Receivable" includes accounts, accounts receivable, notes, notes receivable, rental agreements and other rights to collect rent, contract rights, drafts, acceptances, instruments, chattel paper, general intangibles, and other forms of obligation or rights to payment and receivables, whether or not yet earned by performance, including state and federal tax refunds.

- All Equipment.  "Equipment" means any "equipment" as such term is defined in Section 9.102(33) of the UCC, owned or hereafter acquired by Ironclad and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, leasehold improvements, vehicles and computers and other electronic data-processing and other office equipment now owned or hereafter acquired by Ironclad and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

- All Inventory.  "Inventory" means any "inventory" as such term is defined in Section 9.102(48) of the UCC, wherever located, now owned or hereafter

August 29, 2017
Page 3

acquired by Ironclad and, in any event, shall include, without limitation, all and related merchandise and other personal property now owned or hereafter acquired by Ironclad that are held for sale or lease, or are furnished or to be furnished under a contract of service or are raw materials, work in process, or materials or supplies used or to be used, or consumed or to be consumed, in Ironclad's business, and all shipping and packaging materials relating to any of the foregoing.

- All Intellectual Property. "Intellectual Property" means all trademarks, tradenames, trade-dress, operating manuals, software, copyrights, all domain names (websites and web addresses) patents and applications owned, licensed or used by Borrower or its subsidiaries.

- General Intangibles. "General Intangibles" means any "general intangibles" as such term is defined in Section 9.102(42) of the UCC, now owned or hereafter created or acquired by Ironclad, and in any event shall include, without limitation, all inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, business telephone numbers, licenses, franchises, rights to royalties, blueprints, drawings, confidential information, catalogs, sales literature, video tapes, customer lists, business records for each client including purchase history, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to Ironclad to secure payment of any of the Accounts by an Account Debtor, all rights to indemnification and all other intangible property of every kind and nature, other than the Excluded Assets as described below.

- To the extent assignable, Ironclad to assume and assign to Radians that certain agreement (the "Warehouse Agreement") among Ironclad and Advantage Media Services, Inc., a Delaware corporation d/b/a AMS Fulfillment for providing certain warehousing, assembly, packaging, and fulfillment services from property commonly known as 29010 Commerce Center Drive, Valencia, California pursuant to that certain Letter of Agreement dated June 29, 2007.

- To the extent assignable, Ironclad to assume and assign to Radians such leases, executory contracts, including customer contracts, as designated by Radians (the "Designated Contracts").

- In connection with the assumption and assignment of Designated Contracts to be assumed and assigned, RADIANS will be responsible for the payment of all required "Cure Costs" and for demonstrating adequate assurance of future performance.

6)   **Excluded Assets**: The Purchased Assets shall not include any of the Debtors' causes of action against third parties or any of the Debtors' cash.

August 29, 2017
Page 4

7)      **Additional Requirements of Radians**: Radians requires compliance with the conditions for payment of the Bid submitted:

- Upon execution of the APA, Radians shall be authorized to speak with select employees of Ironclad for the purpose of negotiating employment agreements to be effective contingent upon Radians being the successful purchaser of the Purchased Assets

8)      **Bidding Procedures**:    Agreed Bidding Procedures to be incorporated into the APA including but not limited to:

o  the requirement that the initial overbid be in the amount of $20,750,000.00;

o  thereafter, bidding shall be in increments of at least $250,000.00 or figures which are wholly divisible by $250,000.00.;

o  Only financially qualified parties will be eligible to participate in the Auction Sale – with financially qualified parties to mean parties who have demonstrated that they have the financial means to consummate their purchase of the Purchased Assets without financing unless the financing to be used by them is already committed (meaning that any overbid may not contain any financing contingency).  Any party who participates in the Auction Sale will have completed their due diligence of the Debtors and will have no due diligence contingency.

o  In order to be eligible to participate in the Auction Sale, prospective overbidders will be required at least three business days prior to the Auction Sale to (i) deliver a redlined version of the APA indicating any changes the prospective overbidder is requesting to the form of APA entered into between the Debtors and Secured Creditor, and (ii) submit a cash deposit of $2 million, which deposit will be non-refundable and forfeited by the prospective overbidder if the prospective overbidder is deemed by the Bankruptcy Court to be the winning bidder and fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Bankruptcy Court order approving the Debtors' sale of the Purchased Assets to the prospective overbidder regardless of whether an appeal has been filed of the sale order provided there is no entered stay pending appeal - i.e., no final order requirement.

o  Radians will have the right, but not the obligation, to credit bid the outstanding balances of its pre-bankruptcy secured debt (which is currently in the amount of approximately $4,000,000.00) and its DIP Facility towards its purchase price and any overbid that Radians elects to submit.  Radians shall have the right to participate in any Auction Sale.

o  If any party other than Radians is deemed by the Bankruptcy Court to be the winning bidder at the Auction Sale, then concurrently with the closing of the Debtors' sale of

August 29, 2017
Page 5

the Purchased Assets to such winning bidder, Radians will be paid directly out of the sale proceeds (i) the full amount of the Pre-Bankruptcy Secured Debt, plus (ii) the full amount of the DIP Facility , plus (iii) the Breakup Fee (as defined below)

o   If Radians is not the successful purchaser of the Assets upon serving as the Stalking Horse Bid, it shall receive a Break-up fee (the "Breakup-Fee") in the amount of $500,000.

o   The Debtors shall have the right to schedule the Auction Sale so that the payment of the Breakup-Fee to Radians will not be considered in determining the highest price bid for the Assets. However, Radians shall be authorized to match any qualified overbid and be declared the successful purchaser of the Purchased Assets giving consideration in the amount of $620,000.00 for the required Break-up Fee and Prepayment Fee as a component of its matching bid ("Matching Bid"), which Break-up Fee and Prepayment Fee will not owing by the Debtors if Radians is the winning bidder.

o   Ironclad will agree to proceed with an accelerated sale process, seeking to have the sale approval hearing no later than October 30, 2017.

o   If Radians is deemed by the Bankruptcy Court to be the winning bidder at the Auction Sale and Radians fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Bankruptcy Court order approving the Debtors' sale of the Purchased Assets to Radians (regardless of whether an appeal has been filed of the sale order provided there is no entered stay pending appeal - i.e., no final order requirement), then Radians shall forfeit the Deposit to the Debtors.

o   The Debtors' sale of the Purchased Assets to Radians or a successful overbidder will be free and clear of all liens, claims and interests in accordance with section 363(f) of the Bankruptcy Code.

o   The Debtors have the right to market the Purchased Assets for overbid pending the Auction Sale and to hire an investment banker or sales agent to assist the Debtors in this process. However, the collateral of Radians shall not be used to fund the engagement of an investment banker or sales agent with such party only being entitled to compensation from the proceeds of the Auction Sale.

9)   **DIP Financing and Use of Cash Collateral**: Radians will agree to provide Debtor in Possession financing to the Debtors ("DIP Facility") in an amount not to exceed One Million Dollars (**$1,000,000.00**) (the "Indebtedness") based upon a budget as agreed between Ironclad and Radians, the terms of the DIP Facility to be included in the Debtor in Possession Loan Agreement to be negotiated. The DIP Facility will be for a term of 4 months and will bear interest at the rate of 10% per annum. The DIP Facility shall be used to supplement the Debtors' cash flow from their business operations pending the closing of the Debtors' sale of the

August 29, 2017
Page 6

Purchased Assets to Radians or a successful overbidder. The entire outstanding DIP Facility will be satisfied in full concurrently with the closing of the Debtors' sale of the Purchased Assets.

The DIP Facility is to be secured by a grant of superpriority status with respect to the Indebtedness pursuant to Section 364(c)(1) of the Bankruptcy Code and Security Interests pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) (in each case more fully described and subject to any applicable limitations set forth in the order approving the DIP Facility on an interim and final basis (the "Financing Order"). The liens granted by the DIP Facility shall be subordinate only to the Pre-Bankruptcy Secured Debt.

Subject to the submission of a post-petition operating budget and entry of an order of the Bankruptcy Court providing adequate protection to Radians as may be agreed by the parties and approved by the Bankruptcy Court (the "Cash Collateral Order"), Radians will also consent to the Debtors' use of cash collateral, which, together with the DIP Financing, will enable the Debtors to pay all of their post-bankruptcy expenses (and any pre-bankruptcy debts which Ironclad and Radians agree are appropriate to be paid ("Critical Vendor Payments") and as authorized by order of the Bankruptcy Court), including any outstanding pre-bankruptcy employee payroll and related expenses.

10)    **Asset Purchase Agreement**:    The APA will include, without limitation, provisions consistent with the following:

a.  <u>Representations and Warranties</u>. Ironclad will make the customary representations and warranties expected of an owner of assets similar to the Assets conveyed in a sale pursuant to Section 363 of the Bankruptcy Code.

b.  <u>Conditions to Closing</u>. The APA will include the following conditions to Radians' obligation to purchase the Purchased Assets, with such conditions not necessarily exhaustive of all conditions that may be required in the APA:

i.  There shall have been no material adverse change in the condition or affecting the Purchased Assets prior to closing other than changes related to the bankruptcy filings, announcement or pendency of the Bankruptcy Cases or to the conduct of the sale process contemplated by the APA and the Bid Procedures.

ii.  Entry of an order ("Approval Order") by the Bankruptcy Court authorizing the transaction which includes the findings as provided in paragraph 11 below.

iii.  Ironclad's representations and warranties contained in the APA are true and correct as of the Closing.

11)    **Approval Order**:  The Approval Order shall be entered by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, which shall contain, among other provisions reasonably requested by Radians, the following provisions (it being understood that certain of

August 29, 2017
Page 7

such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Approval Order): (i) the transfers of the Purchased Assets by Ironclad to Radians (A) are or will be legal, valid and effective transfers of the Purchased Assets, (B) vest or will vest Radians with all right, title and interest of Ironclad in and to the Purchased Assets free and clear of all "Liens" and "Claims" (as defined in Section 101(5) of the Bankruptcy Code) pursuant to Section 363(f) of the Bankruptcy Code whatsoever known or unknown fixed, liquidated, contingent or otherwise, including, but not limited to, any of Ironclad's creditors, vendors, suppliers, employees or lessors and any other person that is the holder of one of the Claims (collectively "Claimants") and that Radians shall not be liable in any way (as successor entity or otherwise) for any Claims that any of the Claimants or any other third party may have against Ironclad and the Purchased Assets and permanently enjoins and restrains the assertion and prosecution of any Claims by Claimants or any other third party against Radians and the ownership, use and operation of the Purchased Assets, other than claims on the account of Assumed Liabilities (to be defined in the APA); and (C) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the states of Nevada, Texas and California; (ii) all Persons are enjoined from taking any action against Radians to recover any claim which such Person has solely against Ironclad; (iii) the provisions of the Approval Order are nonseverable and mutually dependent; and (iv) the transactions contemplated by the APA are undertaken by Radians and Ironclad at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code.

12)    **Due Diligence**: As of the transmission of this Letter, Radians has not completed its due diligence. This Letter and the terms and conditions contained therein are expressly subject to satisfactory completion of due diligence by Radians. In that regard, Radians requests the following information be provided by Ironclad as soon as possible – recognizing that all such information provided by the Debtors to Radians as requested herein shall be subject to the NDA existing between the Debtors and Radians:

- Aged accounts receivable in Excel including foreign receivables insured schedule

- Aged accounts payable – "Payable Detail Historical Trial Balance"

- Aged inventory which ties to total inventory on hand

- Inventory in transit listing

- Open Purchase Orders detail listing by item with expected XF dates

- Contracts for top 5 customers (Grainger, POH…)

- Any license or royalty agreements extended to third parties for patents owned by Ironclad

- Any arrangements relating to proprietary rights licensed or used by Ironclad for its products

- Any pending or threatened litigation related to Ironclad products

August 29, 2017
Page 8

- Results of work on restated financials to date

- AMS Agreement and copies of any leases or contracts

13)    **Maintenance of Business**:  For the period commencing on the date hereof and expiring on the earlier of the termination of the APA as provided therein, and the Closing (the "Pre-Closing Period"), Ironclad shall, subject to the compliance by the Purchaser with its covenants contained in the APA and to applicable requirements of Law, conduct and carry on the Business in the ordinary course of business other than changes related to the filing, announcement or pendency of Ironclads' Bankruptcy Cases or the conduct of the sale process contemplated by the APA and/or the Bid Procedures Order.

These considerations are the basis for discussion and may not reflect everything noted in an eventual APA. Except for the provisions of paragraphs below concerning the confidentiality of the terms of purchase set forth in this Letter, and this paragraph, this Letter is not intended to be and does not constitute a binding or enforceable agreement, but is merely an outline for negotiation of the APA and related documents. Radians and Ironclad agree that in no event does this Letter constitute a formal or binding agreement and that the provisions hereof are not binding on either party except as provided by this paragraph and the paragraphs below.  The legal rights and obligations of Radians and Ironclad shall be only those that are set forth in the APA when and if executed and delivered by both Radians and Ironclad and as approved by their respective boards.

Ironclad agrees that the contents of this Letter are confidential and not to be disclosed to any third party without the express written permission of Radians or as ordered by the Bankruptcy Court.  Upon the approval of this Letter, until the earliest of (i) the execution of the APA, (ii) the written termination of this Letter by Radians, Ironclad, or those engaged to act on its behalf, or (iii) 5:00 p.m. Pacific Standard Time on September 1, 2017, Ironclad will not negotiate for nor make or accept any offers to purchase the Purchased Assets or any part thereof from any other person or entity.

After execution of this Letter, should Ironclad fail to proceed with the filing of the Bankruptcy Cases or execution of the APA, Ironclad agrees to reimburse Radians for its counsel fees and expenses incurred in the negotiation and documentation of the proposed transaction – recognizing that Ironclad will only have the financial ability to do so out of funding provided to the Debtors by Radians or from the closing of a sale transaction.

August 29, 2017
Page 9

Please let me know if you have any questions.  Please acknowledge your receipt of this Letter and agreement to the confidentiality and terms of exclusivity as set forth above.

Sincerely,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

E. Franklin Childress, Jr.

EFC:lmr

[Acknowledgments of Parties on Next Page]

4849-9028-4366 v3
2921440-000020 08/29/2017

August 29, 2017
Page 10


Acknowledged and Agreed:

**IRONCLAD PERFORMANCE WEAR
CORPORATION, a California corporation**

By: _____
L. Geoffrey Greulich, CEO


**IRONCLAD PERFORMANCE WEAR
CORPORATION, a Nevada corporation**

By: _____
L. Geoffrey Greulich, CEO



**RADIANS WAREHAM HOLDING,
INC., a Nevada corporation**

By: _____
Mike Tutor, CEO

**EXHIBIT "6"**

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 211414)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: RB@LNBYB.com, MYK@LNBYB.com, KJM@LNBYB.COM

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

In re:

IRONCLAD       PERFORMANCE       WEAR
CORPORATION, a California corporation,

           Debtor and Debtor in Possession.
_____

In re:

IRONCLAD       PERFORMANCE       WEAR
CORPORATION, a Nevada corporation,

           Debtor and Debtor in Possession.
_____

☒  Affects both Debtors

☐    Affects  Ironclad  Performance  Wear
Corporation, a California corporation only

☐    Affects  Ironclad  Performance  Wear
Corporation, a Nevada corporation only

Lead Case No.: 1:17-bk-12408-MB
Jointly administered with:
1:17-bk-12409-MB

Chapter 11 Cases

**INTERIM       ORDER:       (I)
AUTHORIZING THE DEBTORS TO
(A)     OBTAIN     POSTPETITION
FINANCING   PURSUANT   TO   11
U.S.C. §§ 105, 361, 362 AND 364, AND
(B) UTILIZE CASH COLLATERAL
PURSUANT TO 11 U.S.C. §§ 361, 362,
363   AND   364;   (II)   GRANTING
ADEQUATE         PROTECTION
PURSUANT TO 11 U.S.C. §§ 361, 362,
363 AND 364; (III) SCHEDULING A
FINAL HEARING PURSUANT TO
BANKRUPTCY RULES 4001(b) AND
4001(c);     AND     (IV)     GRANTING
RELATED RELIEF**

DATE:      September 13, 2017
TIME:      2:00 p.m.
PLACE:    Courtroom "303"
               21041 Burbank Blvd.
               Woodland Hills, CA

Upon consideration of the emergency motion ("Motion") brought pursuant to Local Bankruptcy Rule 2081-1, and 11 U.S.C. §§ 105(a), 361, 362, 363, and 364 by Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada", and with Ironclad California, the "Debtors" or "Ironclad"), the debtors and debtor-in-possession in the above-captioned Chapter 11 bankruptcy cases, for the entry of an interim order ("Interim Order") and for the entry of a final order ("Final Order" and with the Interim Order, the "Financing Orders") following a final hearing on the Motion, which provides for and requests, among other things:

(1)    approval of and authorization for the Debtors to execute, enter into, and perform under that certain *Debtor-In-Possession Credit Agreement and Agreement for the Use of Cash Collateral* ("DIP Agreement")[1], as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, with Radians Wareham Holding, Inc. ("Radians" or "Lender"), a true and correct copy of which is attached hereto as Exhibit 1;

(2)    authorization for the Debtors to obtain post-petition financing in the aggregate principal amount not to exceed $2,000,000 ("DIP Loan"), pursuant to the terms of the DIP Agreement, and the Financing Orders;

(3)    authorization for the Debtors' use of cash collateral, as such term is defined in 11 U.S.C. § 363(a), and the proceeds of the DIP Loan in accordance with the Debtors' nine (9) week cash flow forecast setting forth all projected cash receipts and cash disbursements following the Petition Date ("Initial Approved Budget"), a true and correct copy of which is attached hereto as Exhibit 2, and all future budgets, and in accordance with the terms and conditions set forth in the DIP Agreement and the Financing Orders, as applicable;

(4)    pursuant to sections 364(c)(1), (c)(2) and (c)(3) of the Bankruptcy Code, the grant of (i) super-priority administrative expense priority claims against the Debtors to Radians ("DIP Super-Priority Claim"), with priority over any and all administrative expenses and claims

---

[1] All capitalized terms used herein which are not otherwise defined shall have the meanings given in the DIP Agreement unless otherwise noted.

2

asserted against any Debtor or its respective bankruptcy estate; and (ii) valid, enforceable, non-avoidable, fully perfected and continuing second-priority liens on and security interests in and to all assets of the Debtors (but excluding any pre-petition avoidance causes of action under 11 U.S.C. §§ 547 and 548, collectively referred to herein as "Avoidance Actions" and claims against directors and officers including insurance claims relating thereto) which is defined as the "Collateral" under the DIP Agreement to Radians (such liens and security interests, the "DIP Liens"), which liens and security interests shall be junior only to (y) pre-petition liens and security interests of Radians, and (z) "Permitted Liens" as defined in the DIP Agreement, to secure all obligations of the Debtors under and with respect to the DIP Loan;

(5)     the grant of adequate protection to Radians on account of the Debtors' use of cash collateral as defined in 11 U.S.C. § 363(a), which adequate protection shall be in the form of (x) valid, enforceable, non-avoidable and fully perfected replacement liens on, and security interests in, the Collateral (the "Adequate Protection Liens"), to the extent of any diminution in value in Radian's interest in the Debtors' pre-petition collateral, senior in priority to all other liens; and (y) super-priority administrative expense priority claims against the Debtors with priority over any and all administrative expenses and claims asserted against any Debtors or their respective bankruptcy estate;

(6)     pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the scheduling of an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of the Interim Order, which, among other things, (i) authorizes the Debtors to obtain from Radians the DIP Loan in the aggregate principal amount not to exceed $2,000,000, on an interim basis[2], (ii) authorizes the Debtors' use of the cash collateral; and (iii) grants the liens and claims provided for in the DIP Agreement and the Interim Order;

---

[2] Under the DIP Agreement, an Initial Advance of $500,000 is to be made immediately upon the entry of this Interim Order. All other Credit Advances will be made after the entry of the Final Order.

(7)    the scheduling of a final hearing (the "Final Hearing") on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(8)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order.

Due and appropriate notice of the Motion under the circumstances and the relief requested therein having been given and an Interim Hearing on the Motion having been held before this Court on September __, 2017, at _____.m.; and upon the entire record made at the Interim Hearing; and this Court having found good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND:**

A.    Except as otherwise provided herein, this Court has jurisdiction over the Debtors' cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on its twenty largest unsecured creditors, Radians and its counsel, all other known secured creditors (if any), and the United States Trustee for the Central District of California (the "U.S. Trustee").  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

C.    The Debtors have an immediate need to obtain the DIP Loan in order to, among other things, fund the Debtors' normal business operations during the cases and the purchase of Inventory, pending the Section 363 sale of substantially all of their assets (the "Asset Sale") and to fund the administrative costs of the cases.  The Debtors' receipt of the DIP Loan is, therefore, necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates and to avoid irreparable harm to the Debtors' estates and creditors.

D.    The Debtors are unable to obtain financing from sources other than the Lender pursuant to, and for the purposes set forth in, the Loan Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code without granting the DIP Liens, the DIP Superpriority Claim, the 507(b) Claims (each as defined below), and the other adequate protection granted herein, in each case on the terms and conditions set forth in this Order and the Loan Documents.

E.    The terms of the DIP Loan pursuant to the DIP Agreement and this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

F.    The Loan Documents have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors and the Lender, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Loan, including without limitation, (i) all Credit Advances made to the Debtors as contemplated and authorized by this Order and (ii) all other obligations of the Debtors under the Loan Documents and this Order shall be deemed to have been extended by the Lender in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

G.    The Lender has committed to providing a DIP Loan necessary for the Debtors to fund their post-petition operating expenses pursuant to the Budget and to purchase additional inventory, in the aggregate amount of $2,000,000 (the "Stated Principal Amount"), and consent to the Debtors' use of Cash Collateral upon the terms and conditions set forth in the DIP Agreement.

H.    Based on the record before this Court, it appears that the terms of this Interim Financing Order, including, without limitation, the terms of the DIP Loan are fair and reasonable

5

under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

I.      The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the interim relief set forth in this Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Loan in accordance with this Order and the Loan Documents is, therefore, in the best interest of the Debtors' estates.  Good cause has been shown for the entry of this Order.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED, DETERMINED AND DECREED that:**

### **Motion Granted**

a.      The Motion is granted on the terms and conditions set forth in this Interim Financing Order, with the foregoing findings incorporated herein by reference. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled. This Interim Financing Order shall be valid and binding on all parties-in-interest and fully effective immediately upon entry.

### **Authorizations**

b.      The Debtors are hereby authorized to execute and enter into the Loan Documents. The Post-Petition Note, the other Loan Documents and this Interim Financing Order shall govern the financial and credit accommodations to be provided to the Debtors by the Lender as described herein; *provided* that in the event of a conflict between the Loan Documents and the Interim Financing Order, the Interim Financing Order shall control.

c.      The Debtors are hereby authorized to obtain the Initial Credit Advance, on an interim basis, under the DIP Agreement of up to an aggregate principal amount of $500,000.00 and to use of Cash Collateral to be used to fund the Debtors' normal business operations in accordance with the Budget and the Permitted Variance set forth herein and the Loan Documents.

d.      In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts and to execute and deliver all instruments and documents that are required by the terms of the DIP Agreement for the Debtors' performance of their obligations under the Loan Documents, including without limitation:

(i)      the execution, delivery and performance of the Loan Documents, including, without limitation, the Post-Petition Note;

(ii)      the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the Loan Documents as may be required by the DIP Agreement, in each case in such form as the Debtors and the Lender may agree; and

(iii)      the performance of all other acts required under or in connection with the Loan Documents.

e.      Upon execution and delivery of the Post-Petition Note and the other Loan Documents, such Loan Documents shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against the Debtors in accordance with their respective terms and the terms of the Interim Financing Order to the fullest extent permitted under sections 364(e) of the Bankruptcy Code and Bankruptcy Rule 4001.

**Borrowing; Use of Cash Collateral**

f.      Subject to the Budget attached hereto as <u>Exhibit 2</u> as modified from time to time with the consent of the Lender in its sole discretion, but without need for further Court order and solely in compliance therewith and subject further to the terms and conditions of this Interim Financing Order and the Loan Documents including the Permitted Variance, (a) the Lender will provide the DIP Loan in accordance with the terms of the Loan Documents, and (b) the Debtors, on behalf of their estates, are authorized to use Cash Collateral in accordance with the terms of the DIP Agreement and the Interim Financing Order.

**Interest, Fees, Costs and Expenses**

g.      The DIP Loan shall bear interest at ten percent (10%) per annum payable as provided in the Post-Petition Note. On and after the occurrence and during the continuance of an Event of Default (as set forth in Article X of the DIP Agreement and below), the interest shall

accrue at the interest rate set forth in the preceding sentence plus eight percent (8%) per annum, along with costs and expenses as provided in the Post-Petition Note. Interest shall continue to accrue under the Pre-Bankruptcy Secured Debt as provided in the Loan Agreement.

### Event of Default

h.      Unless waived or excused by the Lender, the occurrence of any one or more of the events as set forth in the Section 10.1(a)-(o) of the DIP Agreement, shall constitute an "Event of Default" under this Order.

i.      Upon the occurrence of an Event of Default, Lender shall provide written notice thereof ("Notice of Default") to the Debtors specifying with as much detail as possible the effective date of the default, and a description, nature and scope of the default. Lender's rights to declare the Credit Advances, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable shall further be subject to the provisions of Section 10.2 of the DIP Agreement which governs the Debtors' disputes regarding Events of Default.

j.      If the Event of Default is not cured within three (3) business days from the Debtors' receipt of the Notice of Default (the "Default Notice Period"), or the Debtors fail to notify Lender in writing as to the nature of any dispute with the Notice of Default and file an emergency motion with the Bankruptcy Court, the automatic stay shall terminate, and the Lender shall be permitted to exercise any remedies permitted by law, including any of the following actions:

(i)      declare all or any portion of the outstanding DIP Loan and the Pre-Bankruptcy Secured Debt due and payable, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Debtors;

(ii)      enforce all liens and security interests in the Pre-Petition Collateral and the Collateral;

(iii)      institute proceedings to enforce payment of the DIP Loan and the Pre-Bankruptcy Secured Debt;

(iv)      terminate the obligation of the Lender to make an additional Credit Advance; and

(v)     exercise any other remedies and take any other actions available to it at law, in equity, under the Post-Petition Note, the Pre-Bankruptcy Secured Debt, the Bankruptcy Code, other applicable law or pursuant to this Interim Financing Order.

*provided, however,* that the Lender shall continue to fund the Debtor's operations pursuant to the Budget (subject to the Permitted Variance) through the later of the Default Notice Period or the entry of a Final Order of the Court on the emergency motion filed by the Debtors to resolve the dispute. To the extent Debtors notify the Lender in writing as to the nature of the dispute, and also file an emergency motion with the Court to resolve the dispute, Lender shall not exercise any of its available remedies hereunder or under any applicable laws until the Court has entered a Final Order on the emergency motion.

k.     Termination of the Post-Petition Financing and Use of Cash Collateral. Except with respect to the payment of the Carve Out (as defined herein), the Lender's agreement to provide the DIP Loan in accordance with the Loan Documents and the Debtors' authorization to use Cash Collateral shall immediately and automatically terminate (except as the Lender may otherwise agree in writing in its sole discretion), upon the earliest to occur of any of the following (each, a "Termination Date"):

(i)     the Outside Date;

(ii)    the date of final indefeasible payment and satisfaction in full in cash of the DIP Loan and the Pre-Bankruptcy Secured Debt;

(iii)   the entry of an order by the Court granting a motion by the Debtor to obtain additional financing from a party other than the Lender under section 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash the DIP Loan and the Pre-Bankruptcy Secured Debt;

(iv)    the dismissal of the Debtors' chapter 11 cases or the conversion of the chapter 11 cases into a case under chapter 7 of the Bankruptcy Code;

(v)     the Interim Financing Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the Lender (which consent may be withheld in its sole discretion); or

9

(vi)    upon the termination of the automatic stay as provide in paragraph j above.

**Liens and Administrative Status to Secure the DIP Loan**

l.    Superpriority Claims. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Loan shall constitute allowed senior administrative expense claims against the Debtors (the "DIP Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, but subject at all times to the Carve Out to the extent specifically provided for herein.

m.    DIP Liens. As security for the DIP Loan, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Lender of any property, the following security interests and liens are hereby granted to the Lender (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral"), in each case subject only to the Carve Out (all such liens and security interests granted to the Lender on account of the DIP Loan pursuant to this Order, the "DIP Liens") to provide Lender with a valid second lien on all of Debtors' assets:

(i)    Liens Subordinate Only to the Liens Created Under the Pre-Bankruptcy Secured Debt and Permitted Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected subordinate lien on, and security interest in, (i) all cash or cash

10

proceeds; and (ii) all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired.

(ii) <u>Liens Senior To Certain Other Liens</u>.  Except as provided herein, the DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date other than Permitted Liens or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(iii) <u>Excluded Collateral</u>.  For purposes of the Interim Financing Order, the Collateral shall expressly exclude the claims and the proceeds of any of the estates' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>") and other estates' causes of actions including claims against the Debtors' directors and officers including insurance claims relating thereto (the "<u>Estate Actions</u>"), all of which shall be "Excluded Collateral" that is not subject to the DIP Liens, DIP Superpriority Claims or any other liens or superpriority claims.

## <u>Adequate Protection for Use of Cash Collateral Relating to the Pre-Bankruptcy Secured Debt</u>

n.      As adequate protection, effective as of the Petition Date, solely to the extent of the Adequate Protection Obligations and in each case automatically perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Lender of any Adequate Protection Collateral (as defined below), the following Liens are hereby granted to the Lender (all property identified in clause (i) below being collectively referred to as the "<u>Adequate Protection Collateral</u>"), subject only to the Carve Out (as defined herein) (all such Liens, the "<u>Adequate Protection Liens</u>"):

o.      <u>Replacement Liens Senior to Certain Existing Liens</u>. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-voidable priming lien on, and security interest in, all post-petition Cash Collateral, the Prepetition Collateral and all of the Debtors' now owned and hereafter acquired personal

property, tangible and intangible assets, and rights of any kind or nature, wherever located, including, without limitation, all prepetition and post-petition property of the Debtors' estates, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, *except that* the Adequate Protection Collateral shall not include the Excluded Collateral described in Section m(iii) above.   Subject to the Carve Out, the Adequate Protection Liens shall not be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or except as otherwise agreed to in writing by the Lender, subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise; *provided* that the Debtors shall not create, incur or suffer to exist any post-petition liens or security interests other than: (1) those granted pursuant to the Financing Order; (2) Permitted Liens; and (3) those which are junior in priority to the Liens of Radians upon the Adequate Protection Collateral.

p.      Superpriority Claims.   In order to further secure the Adequate Protection Obligations, the Lender is hereby granted an allowed superpriority administrative claim against each of the Debtors on a joint and several basis with priority over any and all administrative claims against the Debtors now existing or hereafter arising in the Bankruptcy Cases including all claims of the kinds arising under sections 503(b) and 507 (b) of the Bankruptcy Code subject only to the DIP Superpriority Claims.

### Automatic Perfection of DIP Liens and Adequate Protection Liens

q.      The Lender is authorized, but not required, to file or record financing statements, intellectual property filings, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens and the Adequate Protection Liens granted to it hereunder.   Regardless of whether the Lender shall in its sole discretion choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens or Adequate Protection Liens, such DIP Liens and

Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

r.      A certified copy of this Order may, in the discretion of the Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

s.      Debtors are authorized to execute and deliver to the Lender all such agreements, financing statements, instruments, and other documents as the Lender may reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens.

**Preservation of Rights Granted Under this Interim Financing Order**

t.      No claim or lien having a priority superior to or *pari passu* with those granted by the Interim Financing Order to the Lender shall be granted or allowed, except as to Permitted Liens and as provided under applicable non-bankruptcy law, until the occurrence of (i) the payment in full in cash or immediately available funds of all of the DIP Loan and the Pre-Bankruptcy Secured Debt.

u.      If an order dismissing the chapter 11 cases under section 1112 of the Bankruptcy Code or otherwise is entered at any time prior to the DIP Loan and the Pre-Bankruptcy Secured Debt being paid in full, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, DIP Liens and the Adequate Protection Liens granted to the Lender shall continue in full force and effect and shall maintain their priorities as provided in the Interim Financing Order until all DIP Loan and the Pre-Bankruptcy Secured Debt shall have been indefeasibly paid in cash in full (and that such Superpriority Claims and DIP Liens and Adequate Protection Liens, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

v.      If any or all of the provisions of the Interim Financing Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not

affect (i) the validity, priority or enforceability of the DIP Loan incurred prior to the actual receipt of written notice by the Lender of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of the Superpriority Claims and DIP Liens granted hereby with respect to the DIP Loan. To the extent permitted by applicable law, notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral or the DIP Loan incurred by the Debtors prior to the actual receipt of written notice by the Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of the Interim Financing Order, and Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, the Interim Financing Order and pursuant to the Loan Documents with respect to all uses of Cash Collateral and the DIP Loan.

w.      Except as expressly provided in the Interim Financing Order or in the Loan Documents, or until the DIP Loan and Pre-Bankruptcy Secured Debt are paid in full, the DIP Liens, the Adequate Protection Liens, and the Superpriority Claims, and all other rights and remedies of Lender granted by the provisions of the Interim Financing Order and the Loan Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the chapter 11 cases to a case under chapter 7, or dismissing the chapter 11 cases or (ii) the entry of an order confirming a plan of reorganization in the chapter 11 case except as otherwise set forth therein and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Loan and or the Pre-Bankruptcy Secured Debt. The terms and provisions of the Interim Financing Order and the Loan Documents shall continue in the chapter 11 cases, or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens and the Superpriority Claims and all other rights and remedies of the Lender granted by the provisions of the Interim Financing Order and the Loan Documents shall continue in full force and effect until the DIP Loan and the Pre-Bankruptcy Secured Debt are paid in full.

### Effect of Stipulations on Third Parties

x.      Each stipulation, admission and agreement contained in the Interim Financing Order, shall be binding upon the Debtors, and any successor thereto (including, without limitation, any chapter 7 trustee or any chapter 11 trustee appointed or elected for the Debtors) under all circumstances and for all purposes existing as of the date hereof.

### Binding Effect on Successors and Assigns

y.      The Loan Documents and the provisions of the Interim Financing Order, including all findings herein, shall be binding upon all parties in interest in the chapter 11 Cases, including, without limitation, the Committee, if any, the Debtors, the Lender and each of their respective successors and assigns (including any chapter 7 or any chapter 11 trustee hereafter appointed or elected for the estates of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) and shall inure to the benefit of the Lender, the Debtors, and each of their respective successors and assigns, *provided, however*, that the Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any Credit Advance (whether under the Post-Petition Note or otherwise) or permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to the Interim Financing Order or the Loan Documents, the Lender shall <u>not</u> (i) be deemed to be in control of the operations of the Debtors, or (ii) (subject to entry of a final order) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq*., as amended, or any similar federal or state statute).

### Limitation on Use of Post-Petition Financing and Collateral

z.      The Debtors shall use the DIP solely as provided in the DIP Agreement, Order and the Budget, subject to the Permitted Variance.  Notwithstanding anything herein or in any

other order of this Court to the contrary, no Credit Advances under the DIP Loan, no DIP Liens, no Collateral, no Adequate Protection Obligations, no 507(b) Claims, no Adequate Protection Liens, or the Carve Out may be used to (a) object, prosecute, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of any amount due under the Loan Documents, the Pre-Bankruptcy Secured Debt, the Adequate Protection Obligations, the DIP Liens, the Adequate Protection Obligations, or the liens or claims granted under this Order or the Loan Documents, (b) assert any claims and defenses, Avoidance Actions, or any other causes of action against the Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, (c) prevent, hinder, or otherwise delay the Lender's assertion, enforcement, or realization on the Collateral in accordance with the Loan Documents or this Order, (d) seek to modify any of the rights granted to the Lender hereunder or under the Loan Documents (including the adequate protection granted herein), in the case of each of the foregoing clauses (a) through (d), without the Lender's prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an Order of this Court or (ii) permitted under the Loan Documents.

### Credit Bid

aa.    Subject to section 363(k) of the Bankruptcy Code and entry of this Interim Financing Order, the Lender shall have the right to "credit bid" the full amount of the DIP Loan then outstanding in connection with the Asset Sale or any sale of all or any portion of the Debtors' assets, including, without limitation, a sale transaction under section 363 of the Bankruptcy Code.

### Effectiveness

bb.    This Interim Financing Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, the Interim Financing Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of the Interim Financing Order.

## Controlling Effect of Interim Financing Order

cc.    To the extent any p

dd.    rovisions in this Interim Financing Order conflict with any provisions of the Motion, or any Loan Document, the provisions of this Interim Financing Order shall control.

## Final Hearing

ee.    The Final Hearing on the Motion to consider entry of a Final Financing Order authorizing the DIP Loan and Debtors' use of Cash Collateral on a final basis shall be held on September __, 2017 at _____. (Pacific Standard Time) before this Court.

## Final Hearing Notice

ff.    Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) counsel to the Debtors, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, Attn: Ron Bender, Esq. (ii) counsel to the Lender, Baker Donelson Bearman Caldwell & Berkowitz, PC, 165 Madison Avenue, Suite 2000, Memphis, Tennessee  38103, Attn:  E. Franklin Childress, Jr, Esq, and Bryan Cave LLP, 120 Broadway, Suite 300, Santa Monica, California 90401, Attn Sharon Z. Weiss, Esq. (iii) counsel to any committee of unsecured creditors appointed in the chapter 11 cases, (iv) the Office of the U.S. Trustee for the Central District of California, and (v) parties required by Bankruptcy Rule 2002(a) and shall be filed with the Clerk of the United States Bankruptcy Court, Central District of California, in each case to allow actual receipt by the foregoing no later than _____, 2017 at 4:00 p.m., prevailing Pacific Standard time.

"IT IS SO ORDERED."

### ###

**EXHIBIT "7"**

**$2,000,000.00**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**and**

**AGREEMENT FOR THE USE OF CASH COLLATERAL**

**Dated as of September 8, 2017**

**between**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

**and**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation.**

**<u>as Borrowers</u>**

**and**

**RADIANS WAREHAM HOLDING, INC.**

**<u>as Lender</u>**

# TABLE OF CONTENTS

## Article I.
DEFINITIONS AND ACCOUNTING TERMS ........................................................................2

SECTION 1.1.    Certain Defined Terms........................................................................2
SECTION 1.2.    Computation of Time Periods; Other Definitional Provisions............7
SECTION 1.3.    Accounting Terms................................................................................7

## Article II.
AMOUNTS AND TERMS OF THE CREDIT ADVANCES........................................................7

SECTION 2.1.    The Credit Advances............................................................................7
SECTION 2.2.    Conditions to Making the Credit Advances .........................................8
SECTION 2.3.    Interest..................................................................................................8
SECTION 2.4.    Use of Proceeds....................................................................................9
SECTION 2.5.    Evidence of Debt..................................................................................9
SECTION 2.6.    Good Faith............................................................................................9

## Article III.
SECURITY FOR the loan .................................................................................................9

SECTION 3.1.    Description of Collateral for Loan .......................................................9
SECTION 3.2.    Perfection of Security Interests in the Collateral ..............................11

## Article IV.
CONDITIONS TO EFFECTIVENESS AND OF LENDING ....................................................12

SECTION 4.1.    Conditions Precedent .........................................................................12
SECTION 4.2.    Conditions Precedent to Advance ......................................................12
SECTION 4.3.    Determinations Under Section 4.1 .....................................................12

## Article V.
USE OF CASH COLLATERAL.........................................................................................12

SECTION 5.1.    Pre-Bankruptcy Secured Debt .  :........................................................12
SECTION 5.2.    Acknowledgments of Borrowers as to the Revolving Loan and the Loan
                Documents ..........................................................................................13
SECTION 5.3.    Conditions Precedent to Use of Cash Collateral ...............................13
SECTION 5.4.    Requirements for Provisions of the Financing Order with Regard to Use of
                Cash Collateral ..................................................................................14

## Article VI.
REPRESENTATIONS AND WARRANTIES.........................................................................15

SECTION 6.1.    Representations and Warranties of the Borrowers............................15

## Article VII.

i

AFFIRMATIVE COVENANTS ..................................................................................17

SECTION 7.1.    Compliance with Laws, Etc ...............................................17
SECTION 7.2.    Payment of Taxes, Etc........................................................17
SECTION 7.3.    Compliance with Environmental Laws................................17
SECTION 7.4.    Maintenance of Insurance ..................................................17
SECTION 7.5.    Preservation of Corporate Existence, Etc...........................17
SECTION 7.6.    Visitation Rights .................................................................17
SECTION 7.7.    Keeping of Books.................................................................18
SECTION 7.8.    Maintenance of Properties, Etc ..........................................18
SECTION 7.9.    Further Assurances ..............................................................18
SECTION 7.10.   Performance of Loan Documents........................................18
SECTION 7.11.   Compliance with Terms of Leaseholds and Contracts.......18
SECTION 7.12.   Performance of Material Contracts .....................................19
SECTION 7.13.   Bankruptcy Actions.............................................................19

**Article VIII.**

NEGATIVE COVENANTS .........................................................................................19

SECTION 8.1.    Liens, Etc ............................................................................19
SECTION 8.2.    Debt .....................................................................................19
SECTION 8.3.    Change in Nature of Business .............................................19
SECTION 8.4.    Mergers, Etc ........................................................................19
SECTION 8.5.    Sales, Etc. of Assets ............................................................20
SECTION 8.6.    Restricted Payments ............................................................20
SECTION 8.7.    Amendments of Constitutive Documents ............................20
SECTION 8.8.    Accounting Changes ............................................................20
SECTION 8.9.    Negative Pledge ..................................................................20
SECTION 8.10.   Amendment, Etc., of Material Contracts .............................20
SECTION 8.11.   Budget ..................................................................................20
SECTION 8.12.   Return of Collateral .............................................................21
SECTION 8.13.   Critical Vendor and Other Payments; Certain Receipts......21
SECTION 8.14.   Exercise of Remedies...........................................................21
SECTION 8.15.   Bankruptcy Related Negative Covenants.............................21

**Article IX.**

REPORTING COVENANTS ......................................................................................22
SECTION 9.1.    Default Notice .....................................................................22
SECTION 9.2.    Material Contracts ...............................................................22
SECTION 9.3.    Budget ..................................................................................22
SECTION 9.4.    Agreement Notices ..............................................................22
SECTION 9.5.    Environmental Conditions ...................................................22
SECTION 9.6.    Bankruptcy Reports..............................................................22
SECTION 9.7.    Other Information.................................................................23

ii

**Article X.**

EVENTS OF DEFAULT .................................................................................................23

SECTION 10.1.  Events of Default ...............................................................................23

**Article XI.**

MISCELLANEOUS .......................................................................................................25

SECTION 11.1.  Amendments, Etc ...............................................................................25
SECTION 11.2.  Notices, Etc ........................................................................................25
SECTION 11.3.  No Waiver; Remedies .........................................................................25
SECTION 11.4.  Binding Effect .....................................................................................25
SECTION 11.5.  Execution in Counterparts .................................................................26
SECTION 11.6.  Confidentiality ....................................................................................26
SECTION 11.7.  Release of Collateral ..........................................................................26
SECTION 11.8.  Patriot Act Notice ...............................................................................26
SECTION 11.9.  Jurisdiction, Etc ..................................................................................26
SECTION 11.10. Governing Law ...................................................................................26
SECTION 11.11. Waiver of Jury Trial ...........................................................................27
SECTION 11.12. Release ...............................................................................................27
SECTION 11.13. Financing Order .................................................................................27

SCHEDULES

Schedule 5.1(f)                    Borrower Compliance


EXHIBITS

Exhibit A                    Initial Budget

Exhibit B                    Form of Post-Petition Note

Exhibit C                    Form of Interim Financing Order

Exhibit D                    Form of Borrowing Notice

4843-7577-8126 v2
2921440-000020 09/05/2017

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT AND
## AGREEMENT FOR USE OF CASH COLLATERAL

This **DEBTOR-IN-POSSESSION CREDIT AGREEMENT** and **AGREEMENT FOR USE OF CASH COLLATERAL** dated as of September 8, 2017 is entered by and among Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (the *"Borrowers"* or "Debtors") and Radians Wareham Holding, Inc., a Nevada corporation ( the **"Lender"**).

## PRELIMINARY STATEMENTS:

WHEREAS, on September 8, 2017 (the "Petition Date"), Debtors filed a voluntary petition with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") initiating their cases (the "Bankruptcy Cases") that are pending under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in addition to the use of Cash Collateral, the Debtors require financing in an amount necessary to fund the Debtors' normal business operations during the Bankruptcy Cases pending the Section 363 sale of substantially all of their assets (the "Asset Sale");

WHEREAS, Debtors have requested that Lender provide a secured multiple draw term loan credit facility of $2,000,000.00 ("Stated Principal Amount") and Lender is willing to extend such financing to the Debtors, on the terms and subject to the conditions set forth herein;

WHEREAS, in connection with the Bankruptcy Cases, Debtors have requested that the Lender provide new financing in the aggregate amount of $2,000,000.00 in a credit facility pursuant to a secured debtor-in-possession credit agreement (together with all other transactions contemplated thereby, the "DIP Facility") and to consent to the Debtor's use of Cash Collateral;

WHEREAS, Lender is committing hereby to provide post-petition financing and consents to the Debtors' use of Cash Collateral in an amount necessary to fund their operating and business expenses as set forth in an agreed-upon budget submitted by the Debtors and acceptable to Lender, with the post-petition financing to be in an amount not more than the Stated Principal Amount pursuant to the DIP Facility and to the use of Cash Collateral upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1

# ARTICLE I.

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1.    <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Agreement**" means this debtor-in-possession credit agreement, as amended.

"**Bankruptcy Cases**" have the meaning specified in the Preliminary Statements.

"**Bankruptcy Code**" has the meaning specified in the Preliminary Statements.

"**Bankruptcy Court**" has the meaning specified in the Preliminary Statements.

"**Borrowers**" have the meaning specified in the recital of parties to this Agreement.

"**Borrowers' Accounts**" means the accounts of the Borrowers maintained with Capital One, National Association including the "Lockbox Account", the "Operating Account", and the "Disbursement Account", all of which are subject to the DACA.

"**Budget**" means, as of any date, the Initial Budget or the updated Budget(s) delivered pursuant to Section 2.1(a), as applicable, most recently delivered to and approved by the Lender on or prior to such date.

"**Capital Expenditures**" means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person or have a useful life of more than one year plus (b) the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures.  For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"**Carve Out**" has the meaning specified in the Financing Order.

"**Cash Collateral**" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest as further defined in Section 363(a) of the Bankruptcy Code.

"**Closing Date**" means the date upon which the Post-Petition Note is executed.

2

**"Code'"** means the United States Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

**"Collateral"** means all **"Collateral"** referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of Lender.

**"Collateral Documents"** means the Post-Petition Note and each of the collateral documents, instruments and agreements delivered pursuant to Section 2.2(a), and each other agreement that creates or purports to create a Lien in favor of Lender.

**"Committee"** has the meaning specified in the Financing Order.

**"Confidential Information"** means information that Borrowers furnish to Lender in a writing designated as confidential, but does not include any such information that is or becomes generally available to the public or that is or becomes available to Lender from a source other than the Borrowers.

**"Credit Advance"** has the meaning specified in Section 2.1.

**"DACA"** means that certain Deposit Account Control Agreement executed pre-petition among Capital One, National Association, Debtors, and Lender.

**"Debt"** of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services, (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Obligations of such Person in respect of Hedge Agreements, (i) all Guaranteed Debt of such Person and (j) all indebtedness and other payment Obligations referred to in clauses (a) through (i) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations.

**"Default"** means any Event of Default or any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

**"Default Interest Rate"** has the meaning set forth in Section 2.3(b).

**"DIP Facility"** has the meaning specified in the Preliminary Statements.

3

"**Environmental Action**" means any action, suit, demand, demand letter, claim, notice of noncompliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health, safety or the environment, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"**Environmental Law**" means any Federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"**Estate Professionals**" means any professional, claims agent, or other Person employed in the Bankruptcy Cases pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code.

"**Events of Default**" has the meaning specified in Section 10.1

"**Final DIP Facility Amount**" means a maximum aggregate commitment of $2,000,000.00.

"**Final Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Lender in its sole discretion, approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby on a final basis as contemplated by the Interim Order, following a hearing as required by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure or such other procedures so approved by the Bankruptcy Court that are acceptable to the Lender in its sole discretion, which shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of Lender in its sole discretion).

"**Financing Order**" means the Interim Financing Order or, when applicable, the Final Financing Order approving the DIP Facility and the use of Cash Collateral.

"**GAAP**" has the meaning specified in Section 1.3.

"**Governmental Authority**" means the government of the United States of America, but not the United States of America as creditor or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Initial Budget**" means a detailed receipts and disbursements forecast, for the 9-week period immediately following the Closing Date, of the Borrowers in form and substance satisfactory to the Lender, a copy of which is attached as Exhibit A.

4

"**Interim Financing Order**" means the order of the Bankruptcy Court entered at or immediately following the initial emergency hearing in the Bankruptcy Cases, approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted thereunder and the other transactions contemplated thereby on an interim basis, which shall be in full force and effect until the entry of the Final Order approving this Agreement, the DIP Facility, the Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby, and which shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Lender in its sole discretion), a copy of which draft order is attached as Exhibit C.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**Lender**" means Radians Wareham Holding, Inc., a Nevada corporation.

"**Lien**" means any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional.

"**Loan**" means the loan made by Lender to Borrowers pursuant to Article II hereof as evidenced by the Post-Petition Note in the amount of $2,000,000.00, a copy of which is attached as Exhibit B.

"**Loan Documents**" means (i) this Agreement and (ii) the Post-Petition Note, in each case as amended.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, financial condition, operations, performance or properties of the Borrowers, taken as a whole, (b) the rights and remedies of Lender under any Loan Document or (c) the ability of any Borrower, taken as a whole, to perform its Obligations under the Loan Documents other than changes related to the filing, announcement or pendency of Debtors' Bankruptcy Cases or to the conduct of the sale process contemplated by the Stalking Horse Agreement and/or the Bid Procedures Order.

"**Material Contract**" means any contract to which any Borrower is a party that involves aggregate annual revenue or payments in excess of $50,000 per year and/or that is a real property lease.

"**Obligations**" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured.  Without limiting the generality of the foregoing, the Obligations of Borrowers under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by Borrower under any Loan Document and (b) the obligation of Borrowers to reimburse any amount in respect of any of the foregoing that Lender, in its sole discretion, may elect to pay or advance on behalf of Borrowers.

5

**"Operating Business"** means the business as the developer, manufacturer and marketer of high-performance task-specific work gloves.

**"Outside Date"** means the date that is 120 days following the Closing Date (unless extended by one optional 30-day extension at the request of the Borrowers, and granted in the sole discretion of Lender).

**"Patriot Act"** means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

**"Permitted Liens"** means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced: (a) prepetition Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 6.02; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business that (i) are not overdue for a period of more than 30 days; (ii) individually or together with all other Permitted Liens outstanding on any date of determination do not materially adversely affect the use of the property to which they relate; (iii) are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, or (iv) as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; and (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations.

**"Person"** means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Authority.

**"Petition Date"** has the meaning specified in the Preliminary Statements.

**"Post-Petition Note"** means that certain promissory note to be executed by Borrowers evidencing the Loan in in the amount of $2,000,000.00.

**"Pre-Bankruptcy Secured Debt"** means that certain revolving credit facility (the "Revolving Loan") originally made by Capital One, National Association, a National Banking Association provided to Borrowers of which Lender is the owner and holder.

**"Requirement of Law"** means, as to any Person, any law (statutory or common), ordinance, treaty, rule, Governmental Authorization, Permit, regulation, order, policy, or other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

**"Secured Obligations"** mean the Obligations under the Loan Documents secured by the Lien created in favor of Lender pursuant to Section 3.1.

6

**"Secured Party"** means Lender.

**"Stalking Horse Agreement"** has the meaning specified in Section 10.1(o).

**"Termination Date"** means the earliest of (i) the Outside Date, (ii) the date that is 30 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or before such date, and (iii) the date of termination of this Agreement pursuant Section 10.1.

SECTION 1.2.    Computation of Time Periods; Other Definitional Provisions.  In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding." References in the Loan Documents to any agreement or contract "as amended" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.3.    Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles ("GAAP").

## ARTICLE II.

### AMOUNTS AND TERMS OF THE CREDIT ADVANCES

SECTION 2.1.    The Credit Advances.  Subject to the terms and conditions set forth in the Post-Petition Note evidencing the Loan, Lender shall make advances to Borrowers as follows (each individually a "Credit Advance" and collectively, the "Credit Advances"):

(a)    On the day of entry of the Interim Financing Order (the "Initial Advance"), in the amount of $500,000.00 to provide the funding requirements as set forth in the Budget for weeks one and two of the Budget attached hereto as Exhibit A as may be modified from time to time by the Borrowers with the consent of the Lender in its sole discretion;

(b)    Except with respect to the Initial Advance which shall be automatically funded by the Lender as provided in (a) above, an additional $500,000 of the Loan shall be funded as follows:  by noon prevailing eastern time on the business day immediately prior to a Funding Date, Borrowers shall give Lender written notice of their request for a Credit Advance and shall specify the Funding Date (which must be the next business day) and the amount of the requested Credit Advance (a "Borrowing Notice").  After the Initial Advance, Borrowers may make requests for the next Credit Advance upon entry of the Final Financing Order.  The Borrowing Notice shall include (a) a calculation of the requested Credit Advance amount including the estimated cash on hand included in the calculation and reasonable detail as to projected disbursements for the borrowing period which were not previously included in the Initial Budget, (b) an updated Budget including actuals for prior periods, and (c) a calculation of any variance from the Budget. The Borrowing Notice shall also be accompanied by a comparison of actual weekly receipts to those set forth in the Budget. The obligation of Lender to fund is subject to Section 2.2 hereof.  Lender shall make each properly authorized Credit Advance in immediately available funds by wire transfer to Borrowers' Account (or to a different debtor in possession

7

account if and as ordered by the Bankruptcy Court), as soon as practicable, but in no event later than the noon prevailing eastern time on the applicable Funding Date; and

(c)      From and after the date of entry of the Interim Financing Order, an additional $1,000,000 of the Loan shall be funded for additional purchases of Inventory (as defined in Section 3.1(h)) as follows:  by noon prevailing eastern time on the business day immediately prior to a Funding Date, Borrowers shall give Lender a Borrowing Notice which includes a calculation of the requested Credit Advance amount, and reasonable detail of the Inventory to be purchased. Lender shall make each properly authorized Credit Advance in immediately available funds by wire transfer to Borrowers' Account (or to a different debtor in possession account if and as ordered by the Bankruptcy Court), as soon as practicable, but in no event later than the noon prevailing eastern time on the applicable Funding Date.

SECTION 2.2.      Conditions to Making the Credit Advances.  Lender shall not be obligated to make any Credit Advance (including the Initial Advance hereunder), or to take, fulfill, or perform any other action hereunder, unless the following conditions are satisfied as of the date of the making of such Credit Advance, in Lender's reasonable discretion, or waived in writing by Lender in its sole discretion:

(a)      The Loan Documents shall have been executed and delivered to Lender and the same shall be in full force and effect.

(b)      The applicable Budget shall have been approved in writing by Lender.

(c)      Lender shall have received a copy of the applicable Financing Order, and such Financing Order shall have been entered by the Bankruptcy Court in form and substance acceptable to Lender in its sole discretion, and shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

(d)      No event shall have occurred and be continuing, or would result from the Credit Advance requested thereby, which, with the giving of notice or the passage of time or both, would constitute an Event of Default and no Event of Default shall be continuing.

(e)      Borrowers shall have timely delivered a Borrowing Notice related to any requested Credit Advance, other than the Initial Advance, which shall be substantially in the form set forth in Exhibit D hereof.

(f)      The aggregate principal and amount of all Credit Advances extended shall not exceed the Stated Principal Amount.

SECTION 2.3.      Interest.

(a)      The Post-Petition Note shall bear interest on the unpaid principal amount (the "Post-Petition Obligations") from the Closing Date to and including the Maturity Date at a fixed rate per annum equal to ten percent (10%), calculated on the basis of a 360-day year for the actual number of days elapsed.

8

(b)     Accrued, unpaid interest on the Post-Petition Note shall be compounded on the last day of each calendar month. After the Maturity Date and/or after the occurrence and during the continuance of an Event of Default, the Post-Petition Obligations shall bear interest at a rate equal to the interest rate set forth in subsection 2.3(a) above plus eight percent (8%) per annum, calculated on the basis of a 360-day year for the actual number of days elapsed (the "Default Interest Rate").

(c)     All accrued but unpaid interest shall be payable, in cash, upon prepayment of any portion of the Post-Petition Obligations, on the Maturity Date, or upon payment in full of the Loan.

(d)     Notwithstanding anything to the contrary set forth in this Section 2.3, if a court of competent jurisdiction determines that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.

(e)     Except as otherwise set forth herein or in the Financing Order, the Post-Petition Obligations, together with any other fees, costs or expenses due Lender under the Post-Petition Note, shall be due and payable on the earlier to occur of (i) the date of the Closing of the Asset Sale; (ii) the Outside Date (the "Maturity Date"); or (iii) upon acceleration of the Post-Petition Note pursuant to the terms hereof.

SECTION 2.4.    Use of Proceeds.  One Million Dollars ($1,000,000) of the Loan shall be available solely to provide funding in an amount necessary to fund the Debtors' normal business operations during the Bankruptcy Cases pending the Asset Sale in accordance with the Budget but subject to the Permitted Variance provided for in Section 8.11. The balance of the Loan in the amount of One Million Dollars ($1,000,000) shall be available solely to provide funding in an amount necessary to fund additional purchases of Inventory (as defined in Section 3.1(h)). Advances of the Loan shall be made in accordance with Section 2.1.

SECTION 2.5.    Evidence of Debt.  Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Credit Advance owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

SECTION 2.6.    Good Faith.  The Interim Financing Order and Final Financing Order shall contain a provision finding that the DIP Facility has been negotiated in good faith and at arm's length among Debtors and Lender.  Therefore, all extensions of credit to the Debtors of the DIP Facility made pursuant to the Interim Financing Order and Final Financing Order shall be deemed to have been made by Lender in good faith within the meaning of section 364(e) of the Bankruptcy Code.

### ARTICLE III.
SECURITY FOR THE LOAN

SECTION 3.1.    Description of Collateral for Loan.  To induce the Lender to make the DIP Facility, Borrowers hereby grant to Lender, as security for the full and prompt payment when

due (whether at stated maturity, by acceleration or otherwise) of the Post-Petition Obligations, a grant of superpriority status with respect to the Indebtedness pursuant to Section 364(c)(1) of the Bankruptcy Code and, except as set forth in Section 3.3, Liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and a continuing second priority Liens (subject only to the Pre-Bankruptcy Secured Debt and Permitted Liens) in and to all rights, claims and interests of the Debtors to all of their assets (collectively the "Collateral") whether owned, leased or otherwise possessed, to which the Debtors now have or at any time in the future may acquire any right, title or interest (capitalized terms used in clause (a) through (n) shall have the meanings provided for such term in the Uniform Commercial Code in effect on the date hereof in the State of Texas (the "UCC")), including the following:

(a)       all accounts, accounts receivable, notes, notes receivable, rental agreements and other rights to collect rent, contract rights, drafts, acceptances, instruments, chattel paper, general intangibles, and other forms of obligation or rights to payment and receivables, whether or not yet earned by performance, including state and federal tax refunds (collectively, "Accounts" or "Accounts Receivable");

(b)       all Chattel Paper;

(c)       all Deposit Accounts, including any monies or other property held therein;

(d)       all Documents;

(e)       all equipment as such term is defined in Section 9.102(33) of the UCC, owned or hereafter acquired by the Borrowers and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, leasehold improvements, vehicles and computers and other electronic data-processing and other office equipment now owned or hereafter acquired by the Borrowers and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "Equipment");

(f)       Any and all general intangibles as such term is defined in Section 9.102(42) of the UCC, now owned or hereafter created or acquired by the Borrowers, and in any event shall include, without limitation, all inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, business telephone numbers, licenses, franchises, rights to royalties, blueprints, drawings, confidential information, catalogs, sales literature, video tapes, customer lists, business records for each client including purchase history, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to the Borrowers to secure payment of any of the Accounts by an Account Debtor, all rights to indemnification and all other intangible property of every kind and nature (collectively the "General Intangibles");

(g)       all Instruments;

(h)       All inventory as such term is defined in Section 9.102(48) of the UCC, wherever located, now owned or hereafter acquired by the Borrowers and, in any event, shall include, without limitation, all and related merchandise and other personal property now owned or hereafter acquired by the Borrowers that are held for sale or lease, or are furnished or to be

10

furnished under a contract of service or are raw materials, work in process, or materials or supplies used or to be used, or consumed or to be consumed, in the Borrowers' businesses, and all shipping and packaging materials relating to any of the foregoing (collectively, the "Inventory");

(i)    All intellectual property including all trademarks, tradenames, trade-dress, operating manuals, software, copyrights, all domain names (websites and web addresses) patents and applications owned, licensed or used by any Borrower or its subsidiaries(collectively, the "Intellectual Property") ;

(j)    all books and records pertaining to the Debtors, their businesses and any property described herein;

(k)    all other goods and personal property of the Debtors, whether tangible or intangible, wherever located, including money, letters of credit and all rights of payment or performance under letters of credit;

(l)    to the extent not otherwise included, all monies and other property of any kind which is received by the Debtors in connection with any refunds with respect to taxes, assessments and other governmental charges;

(m)    all insurance claims with the exception of claims under or against the Debtors' directors' and officers' liability insurance policy; and

(n)    to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any proceeds of insurance, indemnity, warranty or guaranty payable to the Estate from time to time with respect to any of the foregoing.

SECTION 3.2.    Perfection of Security Interests in the Collateral.  The Financing Order shall provide for the perfection, maintenance, protection, and enforcement of the Lender's Lien in the Collateral without further action of Lender. Upon the request of the Lender, Borrowers shall deliver to the Lender those Loan Documents necessary or desirable to perfect the Lender's lien. Upon reasonable request of the Lender, Borrowers shall take such other reasonable steps as are deemed necessary or desirable to maintain the Post-Petition Lender's security interest in the Collateral.  To the extent required of Lender, Debtors hereby authorize the Lender to execute and file financing statements or continuation statements, and amendments thereto, on the Debtors' behalf covering the Collateral.

SECTION 3.3    Excluded Collateral.    Notwithstanding any provision herein, the "Collateral" shall not include any pre-petition avoidance causes of action of the Debtors' bankruptcy estates under 11 U.S.C. §§ 547 and 548, (collectively referred to herein as "Avoidance Actions"), and any claims against any of the Borrowers' former or current directors and officers including insurance claims under any liability insurance associated therewith.

**ARTICLE IV.**
CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 4.1.      Conditions Precedent.  In addition to the requirements set forth in Section 2.2, Section 2.1 of this Agreement shall become effective on and as of the first date (the "Closing Date") on which the following conditions precedent have been satisfied:

(a)      Resolutions of the Board of Directors of Borrowers approving the DIP Facility and each Loan Document to which the Borrowers are a party.

(b)      The Interim Financing Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of Lender in its sole discretion).

(c)      Lender shall have received the Initial Budget covering the period of the first 9 weeks after the Petition Date, in form and substance satisfactory to Lender.

SECTION 4.2.      Conditions Precedent to Credit Advances.  The obligation of Lender to make any Credit Advance (on the occasion of each Credit Advance (including the Initial Advance)) shall be subject to the further conditions precedent that on the date of such Advance:

(a)      the following statements shall be true:

(i)      the representations and warranties contained in each Loan Document are correct in all material respects on and as of such date, before and after giving effect to such Advance and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Advance, in which case as of such specific date;

(ii)      with respect to Credit Advances other than the Initial Advance, Borrowers are in compliance in all material respects with the Budget and the Permitted Variance as provided in Section 8.11 most recently delivered to and approved by Lender; and

(iii)      no Default or Event of Default has occurred and is continuing or would result from such Advance or from the application of the proceeds therefrom.

SECTION 4.3.      Determinations Under Section 4.1.  For purposes of determining compliance with the conditions specified in Section 4.1, Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder unless an officer of Lender responsible for the transactions contemplated by the Loan Documents prior to the Closing Date specifies its objection thereto to Borrowers in writing.

**ARTICLE V.**
USE OF CASH COLLATERAL

SECTION 5.1.      Pre-Bankruptcy Secured Debt .  The Revolving Loan is evidenced by the following described documentation (the "Pre-Petition Loan Documents"):

12

(a)     That certain Revolving Loan and Security Agreement dated November 28, 2014, executed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as borrowers, in favor of Capital One, National Association, as lender, as modified by the First Modification Agreement dated June 15, 2015, the Second Modification Agreement dated March 16, 2016, the Third Modification Agreement dated November 28, 2016, the Waiver and Fourth Modification Agreement dated February 23, 2017, the Limited Waiver and Fifth Modification Agreement dated April 11, 2017, the Sixth Modification Agreement dated May 10, 2017, that certain Forbearance and Modification Agreement dated August 1, 2017, that certain Forbearance Agreement dated August 14, 2017, and that certain Second Forbearance Agreement dated August 30, 2017(the "Loan Agreement").

(b)     That certain Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017, in the principal amount of $8,000,000.00 as amended by the Forbearance and Modification Agreement dated August 1, 2017 (the "Note").

(c)     That certain UCC-1 Financing Statement filed by Capital One, National Association with the California Secretary of State on December 18, 2014, under Document No. 14-7441632305 affecting the Collateral (as defined in the Loan Agreement) more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No. 62925880003.

(d)     That certain UCC-1 Financing Statement filed by Capital One, National Association with the Nevada Secretary of State on December 12, 2014, under Document No. 2014031733-1 affecting the Collateral more particularly described on Exhibit A attached thereto as assigned to Radians by UCC-3 filed under Document No.2017020461-7.

(e)     That certain Assignment Agreement for Proceeds of Credit Approved Receivables Purchase Agreement dated March 7, 2015 with accompanying exhibits referenced therein.

SECTION 5.2.     Acknowledgments of Borrowers as to the Revolving Loan and the Pre-Petition Loan Documents.

(a)     Borrowers acknowledge and agree that Borrowers are indebted to Lender for repayment of the Obligations evidenced by the Revolving Loan, including all accrued interest thereon. Borrowers further acknowledge that they are responsible for all fees, expenses and charges as allowed under the Pre-Petition Loan Documents.

(b)     Borrowers acknowledge the validity and enforceability of the security interests in the Pre-Petition Collateral granted in favor of Lender under the Pre-Petition Loan Documents executed by Borrowers.

SECTION 5.3.     Conditions Precedent to Use of Cash Collateral.  Subject to the submission and approval of the Budget and entry of an order of the Bankruptcy Court providing adequate protection to Lender as may be agreed by the parties and approved by the Bankruptcy Court in the Financing Order, Lender consents to the Debtors' use of Cash Collateral.

13

SECTION 5.4.     Requirements for Provisions of the Financing Order with Regard to Use of Cash Collateral.  Lender's consent to the use of Cash Collateral is subject to the entry of a Financing Order to be negotiated between Debtors and Lender and shall include the following provisions providing adequate protection to Lender for the use of Cash Collateral:

(a)     The Debtors continue to generate Accounts Receivable and to collect cash, income, proceeds, and profits generated from property and assets of the Debtors securing the obligations under the Pre-Petition Loan Documents (all such property and assets including the products and proceeds thereof are herein collectively referred to as the "Prepetition Collateral") subject to the Lender's valid and perfected security interests.

(b)     The Debtors desire to use such cash, income, products, proceeds and profits in their business operations which constitute Cash Collateral of the Lender under section 363(a) of the Bankruptcy Code pursuant to the Budget and the Permitted Variance provided for in Section 8.11.

(c)     The adequate protection provided to Lender for any diminution in the value of the Lender's interest in the Prepetition Collateral from and after the Petition Date for any reason whatsoever, including, without limitation, from the use of the Cash Collateral pursuant to the Interim Financing Order and Final Financing Order, the use, sale, lease or other diminution in value of the Prepetition Collateral other than the Cash Collateral, or the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such party's interest in the Prepetition Collateral in accordance with sections 361, 362, and 363 of the Bankruptcy Code. The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to protect the Lender from the diminution of its interest in the value of the Prepetition Collateral.

(d)     The Interim Financing Order and Final Financing Order shall contain a provision finding that the use of Cash Collateral has been negotiated in good faith and at arm's length among Debtors and Lender.  Therefore, the authorization allowing Debtors to use Cash Collateral shall be deemed to have been made by Lender in good faith within the meaning of section 364(e) of the Bankruptcy Code.

(e)     Lender is entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection of its interest in the Prepetition Collateral including the Cash Collateral, in an amount equal to the aggregate post-petition diminution in value of the Lender's interest in the Prepetition Collateral from and after the Petition Date for any reason whatsoever, including, without limitation, from use of Cash Collateral pursuant to the Financing Order, the use, sale, lease or other diminution in the value on the Prepetition Collateral other than the Cash Collateral, or the imposition of the automatic stay pursuant to section 362 (a) of the Bankruptcy Code (such diminution in value, the "Adequate Protection Obligations").

(f)     Adequate Protection. As adequate protection, effective as of the Petition Date, solely to the extent of the Adequate Protection Obligations and in each case automatically perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements or other

14

similar documents, or the possession or control by the Lender of any Adequate Protection Collateral (as defined below), the following Liens are hereby granted to the Lender (all property identified in clause (i) below being collectively referred to as the "Adequate Protection Collateral"), subject only to the Carve Out (as defined herein) (all such Liens, the "Adequate Protection Liens"):

(i)    Replacement Liens Senior to Certain Existing Liens. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-voidable priming lien on, and security interest in, all post-petition Cash Collateral, the Prepetition Collateral and all of the Debtors' now owned and hereafter acquired personal property, tangible and intangible assets, and rights of any kind or nature, wherever located, including, without limitation, all prepetition and post-petition property of the Debtors' estates, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, *except that* the Adequate Protection Collateral shall not include the Excluded Collateral described in Section 3.3. Subject to the Carve Out, the Adequate Protection Liens shall not be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or except as otherwise agreed to in writing by the Lender, subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise; *provided* that the Debtors shall not create, incur or suffer to exist any post-petition liens or security interests other than: (1) those granted pursuant to the Financing Order; (2) carriers', mechanics', operators', repairmen's, warehousemen's, or other similar liens arising in the ordinary course of business; (3) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation; (4) deposits to secure the payment of any post-petition statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; and (5) those which are junior in priority to the Liens of Radians upon the Adequate Protection Collateral.

(ii)    Carve Out. As used in this Agreement, "Carve Out" means the sum of all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate.

(iii)    In order to further secure the Adequate Protection Obligations, the Lender is hereby granted an allowed superpriority administrative claim against each of the Debtors on a joint and several basis with priority over any and all administrative claims against the Debtors now existing or hereafter arising in the Bankruptcy Cases including all claims of the kinds arising under sections 503(b) and 507 (b) of the Bankruptcy Code.

## ARTICLE VI.

### REPRESENTATIONS AND WARRANTIES

SECTION 6.1.    Representations and Warranties of the Borrowers. The Borrowers represent and warrant as follows:

(a)    Each Borrower (i) is duly incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) is qualified as a

15

foreign corporation or company in any other jurisdiction in which such qualification is required, and (iii) subject to the Financing Order, has all requisite corporate, limited liability company or limited partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted).

(b)    Subject to the Financing Order, the execution, delivery and performance by Borrowers of each Loan Document to which it is or is to be a party, and the consummation of the DIP Facility, are within each of Borrowers' corporate powers, have been duly authorized by all necessary corporate action, and do not (i) contravene each of Borrower's charter, bylaws or other constituent documents, or (ii) violate any law, rule, order, writ, judgment, injunction, decree, determination or award.

(c)    Other than the Financing Order, no Governmental Authorization, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by Borrowers of any Loan Document to which it is or is to be a party, or for the consummation of the DIP Facility, (ii) the grant by Borrowers of the Liens granted by each pursuant to the Collateral Documents or (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the second priority nature thereof), except for the authorizations, approvals, actions, notices and filings required to perfect security interests under the Loan Documents.

(d)    This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by Borrowers.  Subject to the entry of the Financing Order, this Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of Borrowers, enforceable against Borrowers in accordance with its terms.

(e)    To the best of Borrowers' knowledge, upon entry of the Financing Order, all filings and other actions necessary or desirable to perfect and protect the security interest in the Collateral created under the Collateral Documents have been duly made or taken and are in full force and effect, and the Collateral Documents create in favor of the Lender a valid and, together with such filings and other actions, perfected first and second priority security interest in the Collateral, securing the payment of the Secured Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken.  To the best of Borrowers' knowledge, Borrowers' rights, claims and interests in and to the Collateral are free and clear of any Lien, except for the liens and security interests created or permitted under the Loan Documents.

(f)    Priority of Borrowers' Obligations and Lender's Liens.  To the best of Borrowers' knowledge, upon entry of the Financing Order, Borrowers have granted to Lender, perfected security interests in all Collateral with the priority required by the Financing Order with respect to all Collateral.

(g)    To the best of Borrowers' knowledge, the Interim Financing Order is in full force and effect has not been reversed, stayed, modified or amended (other than with the consent of the Lenders).

16

# ARTICLE VII.

## AFFIRMATIVE COVENANTS

So long as any Credit Advance or any other Obligations of Borrowers under any Loan Document shall remain unpaid, except as excused or limited by the Bankruptcy Code or ordered or instructed by the Bankruptcy Court, the Borrowers will:

SECTION 7.1.    Compliance with Laws, Etc.  Comply in all material respects, with all applicable laws, rules, regulations and orders.

SECTION 7.2.    Payment of Taxes, Etc.  Pay and discharge, before the same shall become delinquent, (i) all material taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided, however, that Borrowers shall not be required to pay or discharge any such tax, assessment, charge or claim that (x) arose prior to the Petition Date or (y) is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until (with respect to (y)) any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

SECTION 7.3.    Compliance with Environmental Laws.  Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; and obtain and renew all Environmental Permits necessary for its operations and properties in accordance with the requirements of all Environmental Laws.

SECTION 7.4.    Maintenance of Insurance.  Maintain insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrowers operate.

SECTION 7.5.    Preservation of Corporate Existence, Etc.  Preserve and maintain its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises; provided that Borrowers shall not be required to preserve any right, permit, license, approval, privilege or franchise if the Board of Directors (or equivalent) of the Borrowers shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrowers and that the loss thereof is not disadvantageous in any material respect to the Borrowers or Lender.

SECTION 7.6.    Visitation Rights.  At any reasonable time during normal business hours, with written notice of not less than three (3) business days, and at Lender's expense, and from time to time, permit Lender, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of Borrowers, and to discuss the affairs, finances and accounts of Borrowers with their management.

4843-7577-8126 v2
2921440-000020 09/05/2017

SECTION 7.7.    <u>Keeping of Books</u>.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrowers in accordance with GAAP in effect from time to time, provided that, any record, account or entry resulting from irregular or improper books prior to the Petition Date shall not be construed to violate this covenant.

SECTION 7.8.    <u>Maintenance of Properties, Etc</u>.  Maintain and preserve all of its properties that are used or useful in the conduct of its business in its current working order and condition, ordinary wear and tear excepted.

SECTION 7.9.    <u>Further Assurances</u>.

(a)    Promptly upon request by Lender correct any material defect or error (which the Borrowers agree was a material defect or error) that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and

(b)    Promptly upon the request of Lender, but subject to the Financing Order, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as Lender may reasonably require from time to time, including, without limitation, any Intellectual Property Security Agreements, perfection certificates, insurance policy endorsements, landlord consents, collateral assignments in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Loan Document or under any other instrument executed in connection with any Loan Document to which Borrowers are or are to be a party.

SECTION 7.10.    <u>Performance of Loan Documents</u>.  Subject to the provisions of the Financing Order, perform and observe all of the terms and provisions of each Loan Document to be performed or observed by it, maintain each Loan Document in full force and effect, enforce such Loan Document in accordance with its terms, take all such action to such end as may be from time to time requested by the Lender and, upon request of Lender, make to each other party to each such Loan Document such demands and requests for information and reports or for action as Borrowers are entitled to make under such Loan Document.

SECTION 7.11.    <u>Compliance with Terms of Leaseholds</u>.  Make all payments and otherwise perform all material obligations in respect of all leases of real property to which either Borrower is a party so as to prevent any loss or forfeiture thereof or thereunder, except, in any case, where (i) the enforcement of non-compliance is stayed by the Bankruptcy Cases or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect; provided, that, the Borrowers may, but shall have no obligation to, exercise any

4843-7577-8126 v2
2921440-000020 09/05/2017

options under any leases of real property and the non-exercise of such options shall not be deemed to be a Material Adverse Effect hereunder.

SECTION 7.12.   <u>Performance of Material Contracts</u>.  Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in accordance with its terms, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by Lender and, upon request of Lender, make to each other party to each such Material Contract such demands and requests for information and reports or for action Borrowers are entitled to make under such Material Contract except, in any case, where (i) the enforcement of non-compliance is stayed by the Bankruptcy Cases, (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect, or (iii) the other party or parties to such Material Contract terminates such Material Contract.

SECTION 7.13. <u>Bankruptcy Actions.</u>  The Borrowers shall at all times use their commercially reasonable best efforts to timely comply with the requirements contained in the Financing Order.

## ARTICLE VIII.

### NEGATIVE COVENANTS

So long as any Credit Advance or any other Obligation of Borrowers under any Loan Document shall remain unpaid:

SECTION 8.1.    <u>Liens, Etc</u>.  From and after the Petition Date, the Borrowers will not create, incur, assume or suffer to exist any Lien on or with respect to any of its or their properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction, a financing statement that names Borrowers as debtor, or sign or suffer to exist any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, except the Borrowers may create or incur (i) Liens under the Collateral Documents, (ii) Permitted Liens.

SECTION 8.2.    <u>Debt</u>.  From and after the Petition Date, the Borrowers will not create, incur, assume or suffer to exist any Debt, except:

(a)    Debt under the Loan Documents; or

(b)    Debt incurred in the ordinary course of business.

SECTION 8.3.    <u>Change in Nature of Business</u>.  Borrowers will not make any material change in the nature of their businesses as carried on at the date hereof.

SECTION 8.4.    <u>Mergers, Etc</u>.  Except as authorized by an order of the Bankruptcy Court, Borrowers will not make, or permit any of its subsidiaries to merge into or consolidate with any Person or permit any Person to merge into it.

19

SECTION 8.5.    Sales, Etc. of Assets.  Except in connection with sales in the ordinary course of business, Borrowers will not sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets except as authorized by order of the Bankruptcy Court or with the consent of the Lender.

SECTION 8.6.    Restricted Payments.  Except as authorized by an order of the Bankruptcy Court, Borrowers will not declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its equity interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, equity interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such or issue or sell any equity interests or accept any capital contributions.

SECTION 8.7.    Amendments of Constitutive Documents.  Borrowers will not amend its certificate of incorporation or bylaws or other constitutive documents.

SECTION 8.8.    Accounting Changes.  Borrowers will not make or permit any change in (i) accounting policies or reporting practices, except as required or permitted by GAAP, or (ii) fiscal year.

SECTION 8.9.    Negative Pledge.  Borrowers will not enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets.

SECTION 8.10.    Amendment, Etc., of Material Contracts.  Without the prior written consent of Lender which shall be unreasonably withheld, Borrowers will not cancel or terminate any unexpired Material Contract or consent to or accept any cancellation or termination thereof, amend or otherwise modify any material provision of any Material Contract, or take any other action in connection with any Material Contract that would materially impair the value of the interest or rights of Borrowers thereunder or that would materially impair the interest or rights of Lender.  Notwithstanding any of the foregoing, the Borrowers shall have no obligation to exercise any options or receive a renewal/extension of the term under any Material Contracts, other than a supply agreement with a customer of Sellers accounting for more than 20% of Sellers' revenue and the non-exercise of such options or the non-renewal or non-extension of the term shall not be deemed to be a breach of any covenant hereunder except in regard to a supply agreement with a customer of Sellers accounting for more than 20% of Sellers' revenue.

SECTION 8.11.    Budget.  Borrowers shall not use the proceeds of any Collateral or the Credit Advances other than in accordance with the Budget, subject to an allowed cumulative variance of up to 10% per line item in the Budget at any time ("Permitted Variance").  Any unused amounts for any given week shall carry over to the following week's expenditures in the Budget. Borrowers shall not make any material change to the amounts indicated in the Budget without the prior written consent of Lender in its sole discretion.  Borrowers and the Lender may modify the Budget by agreement without further order of the Court.  In no case shall Borrowers use any proceeds of Collateral or any Credit Advance to bring any claim or suit against the Lender.

4843-7577-8126 v2
2921440-000020 09/05/2017

SECTION 8.12.   Return of Collateral.  Except as ordered or approved by the Bankruptcy Court or otherwise approved by the Lender in writing, Borrowers shall not enter into any agreement to return any of its inventory or other Collateral outside the ordinary course of business to any of its creditors for application against any pre-petition Debt, pre-petition trade payables or other pre-petition claims under section 546(h) of the Bankruptcy Code.

SECTION 8.13.   Critical Vendor and Other Payments; Certain Receipts.  Borrowers shall not make (i) any payments on account of any pre-petition creditor's claims against Borrowers, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget, or otherwise approved by Lender in writing.

SECTION 8.14.   Exercise of Remedies.  Except in the event of a dispute by the Borrowers as to whether an Event of Default has occurred and/or is continuing hereunder, Borrowers shall not obtain, or seek to obtain, any stay on the exercise of the remedies of Lender hereunder, under any Loan Document or the Financing Order.

SECTION 8.15.   Bankruptcy Related Negative Covenants.  Borrowers will not seek or consent to any of the following:

(a)      any modification, vacation or amendment to the Financing Order as to which the Lender has not consented in writing;

(b)      a priority claim or administrative expense claim or unsecured claim against Borrowers (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Carve Out;

(c)      any Lien on any Collateral (other than Permitted Liens or as may be granted by the Financing Order) having a priority equal or superior to the Lien securing the Obligations other than with respect to the Carve Out;

(d)      any order that authorizes the return of any of the Borrowers' conforming or non-defective property, which is not in the ordinary course of business and consistent with past practices, pursuant to Section 546(h) of the Bankruptcy Code without the consent of the Lender;

(e)      any order which authorizes the payment of any Debt incurred prior to the Petition Date, unless such payments are in compliance with the Budget, or otherwise approved by Lender in writing;

(f)      any order which would have the effect of impairing the nature, priority or terms of the Obligations or the Liens securing the Obligations pursuant to the terms of the Loan Documents; or

21

(g)    any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents, or the Financing Order or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents, or the Financing Order.

## ARTICLE IX.

### REPORTING COVENANTS

So long as any Credit Advance or any other Obligation of Borrowers under any Loan Document shall remain unpaid, Borrowers will furnish to Lender:

SECTION 9.1.    Default Notice.  Without waiving the requirements of Section 10.1, as soon as possible and in any event within three (3) days after Borrowers becomes aware of the occurrence of any Default, a statement of the Chief Executive Officer of Borrowers setting forth details of such Default or event, development or occurrence and the action that Borrowers have taken and proposes to take with respect thereto.

SECTION 9.2.    Material Contracts.  As soon as practicable and in any event within three (3) business days after it has knowledge thereof, notice that any Material Contracts have been materially breached or violated, amended or terminated.

SECTION 9.3.    Budget.  Not later than the close of business on the Wednesday of each week commencing with the week following the entry of the Interim Financing Order, an updated Budget on a rolling 4 week basis, in a form similar to the Initial Budget and satisfactory to the Lender, which updated Budget shall include (i) a comparison of the cash flow projections described therein to the cash flow projections provided for the immediately preceding week, and (ii) a written narrative explanation of any variance in excess of 10% on a cumulative basis of such actual results from those reflected in the previous Budget.

SECTION 9.4.    Agreement Notices.  Promptly upon receipt thereof, copies of all material notices, requests and other documents received by Borrowers under or pursuant to any Material Contract or instrument, indenture, loan or credit or similar agreement and, from time to time upon request by the Lender, such information and reports regarding the Material Contracts and such instruments, indentures and loan and credit and similar agreements as the Lender may reasonably request.

SECTION 9.5.    Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance of Borrowers with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse.

SECTION 9.6.    Bankruptcy Reports.  Promptly after the sending, receiving or filing thereof, copies of all reports, motions, affidavits, statements and other documents Borrowers send, receive or file in connection with the Bankruptcy Case, including all correspondence with the Bankruptcy Court.

4843-7577-8126 v2
2921440-000020 09/05/2017

SECTION 9.7.    Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects the Lender, may from time to time reasonably request.

# ARTICLE X.

## EVENTS OF DEFAULT

SECTION 10.1.    Events of Default.  If any of the following events (***"Events of Default"***) shall occur and be continuing, unless waived or excused by the Lender.

(a)    With the exception of any Event of Default existing as of the Petition Date, any Event of Default as set forth in the Loan Agreement (as defined in Section 5.1(a)); or

(b)    (i) Borrowers shall fail to pay any principal of any Credit Advance when the same shall become due and payable or (ii) Borrowers shall fail to pay any interest on any Credit Advance, or Borrowers shall fail to make any other payment under any Loan Document, in each case under this clause (ii) within three Business Days after the same shall become due and payable; or

(c)    any representation or warranty made by Borrowers (or any of their officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; or

(d)    Borrowers shall fail to perform or observe in any material way any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for 30 days after the date on which written notice thereof shall have been given to the Borrowers by Lender; or

(e)    except as permitted by the Loan Documents, any Collateral Document after delivery thereof and after giving effect to the Financing Order shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected second priority lien on and security interest in the Collateral purported to be covered thereby; or

(f)    Borrowers shall institute any proceeding or investigation or support the same by any other Person who may challenge the status, validity, perfection or priority of the Liens on the Collateral created by the Loan Documents, or the Financing Order securing the Obligations; or

(g)    Borrowers shall, without the consent of the Lender, file a plan of reorganization or liquidation or a disclosure statement, or any amendment to any such plan or disclosure statement, that does not provide for the payment in full in cash of the obligations under this Agreement upon, and as a condition to, consummation of such plan of reorganization or liquidation; or

(h)    the entry of an order appointing a trustee in any Bankruptcy Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); or

23

(i)      without Lender's consent, the entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; or

(j)      the entry of an order granting any other super-priority claim or Lien equal or superior in priority to the Lien securing the Obligations granted to the Lender, other than the Carve Out, without the Lender's prior written consent; or

(k)      the entry of an order staying, reversing, or vacating the Credit Advances, any Liens securing the Obligations (or the validity or first priority status thereof) or the Financing Order; or

(l)      failure of the Borrowers to file and properly serve a motion (the "Bidding Procedures Motion") by September 11, 2017, in form and substance acceptable to Lender in its sole and absolute discretion, seeking Bankruptcy Court approval of bidding procedures(the "Bidding Procedures") in connection with the sale of the Assets (defined below) in form and substance acceptable to the Lender, in its sole and absolute discretion; and have the Bankruptcy Court enter an order by September 30, 2017, in form and substance acceptable to Lender in its sole and absolute discretion approving the Bidding Procedures (the "Bidding Procedures Order"); or

(m)      failure of the Borrowers to file and properly serve a motion (the "Sale Motion") by September 11, 2017, in form and substance acceptable to Lender in its sole and absolute discretion, seeking Bankruptcy Court approval of: (A) the sale of the assets (the "Assets") described in an Asset Purchase Agreement in form and substance acceptable to the Lender in its sole and absolute discretion (the "Stalking Horse Agreement"), by and among Borrowers as seller, and Lender as purchaser (the "Purchaser"), subject to higher or otherwise better offers under the Bidding Procedures (as defined below); and (B) the scheduling of an auction for the sale of the Assets in accordance with the Bidding Procedures and a sale hearing with respect thereto (the "*Auction*" and "Sale Hearing", respectively), which Sale Motion shall include copies of the Stalking Horse Agreement, the Bidding Procedures and the Bidding Procedures Order, and (ii) by no later than the date prescribed in the Bidding Procedures Order or the order approving the Sale Motion properly serve each counterparty to a Contract (as defined in the Stalking Horse Agreement) a notice, in form and substance reasonably acceptable to the Lender, setting forth the amount necessary to satisfy any cure costs.  The Sale Motion shall be served on all parties that are required to receive notice in the Bankruptcy Cases; or

(n)      the failure of Borrowers to have the Bankruptcy Court enter an order not later than November 15, 2017 or such later date as may be agreed upon in writing by the parties hereto (the "Sale Order") approving a sale of substantially all of Borrower's assets and providing for the immediate repayment in full of the Obligations from the proceeds of such sale; or

(o)      the failure of Borrowers to obtain (i) entry of the Interim Financing Order by the Bankruptcy Court in form and substance acceptable to Lender in its sole and absolute discretion within five (5) business days of the Petition Date, and (ii) entry of the Final Financing Order within thirty (30) days of the Petition Date;

then, and in any such event, Lender shall provide written notice thereof ("Notice of Default") to

24

the Borrowers specifying with as much detail as possible the effective date of the default, and a description, nature and scope of the default. Lender's rights to declare the Credit Advances, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable shall further be subject to the provisions of Section 10.2 below.

SECTION 10.2    Disputes Regarding Events of Default. In the event the Borrowers dispute that an Event of Default has occurred or is continuing hereunder or under any of the Loan Documents, the Borrowers shall, within not later than three (3) business days following their receipt of the Notice of Default, notify the Lender in writing as to the nature of the dispute, and also an emergency motion with the Bankruptcy Court to resolve the dispute. Lender shall not exercise any of its available remedies hereunder or under any applicable laws until the Bankruptcy Court has entered a Final Order on the emergency motion.

## ARTICLE XI.

### MISCELLANEOUS

SECTION 11.1.    Amendments, Etc. (a) No amendment or waiver of any provision of this Agreement or the Post-Petition Note, nor consent to any departure by Borrowers therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that (a) no amendment, waiver or consent shall, unless in writing and signed by Lender do any of the following at any time:

        (i)    postpone any date scheduled for any payment of principal of, or interest on, the Credit Advances or reduce the amount of any principal or interest payment due hereunder; or

        (ii)    release all or substantially all of the Collateral in any transaction or series of related transactions.

SECTION 11.2.    Notices, Etc. (a) All notices and other communications provided for hereunder shall be in writing (including telecopy or electronic communication) and mailed, telecopied or delivered

SECTION 11.3.    No Waiver; Remedies. No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder or under the Post-Petition Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 11.4.    Binding Effect. This Agreement shall become effective when it shall have been approved by entry of the Interim Financing Order and subject to the provisions of the Financing Order, executed by the Borrowers and Lender and thereafter shall be binding upon and inure to the benefit of the Borrowers, and Lender and their respective successors and assigns, except that the Borrowers shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender.

4843-7577-8126 v2
2921440-000020 09/05/2017

SECTION 11.5.    Execution in Counterparts.  This Agreement may be executed in counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 11.6.    Confidentiality.  Lender shall not disclose any Confidential Information to any Person without the consent of the Borrowers, other than (a) to such Lender's officers, directors, employees, agents and advisors and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) in connection with any litigation or proceeding to which Lender may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

SECTION 11.7.    Release of Collateral.  Upon the sale, lease, transfer or other disposition of any item of Collateral of the Loan in accordance with the terms of the Loan Documents, Lender will, at the Borrowers' expense, execute and deliver to Borrowers such documents as Borrowers may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents.

SECTION 11.8.    Patriot Act Notice.  Lender  hereby notifies Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrowers, which information includes the name and address of Borrowers and other information that will allow Lender to identify Borrowers in accordance with the Patriot Act. Borrowers shall provide such information and take such actions as are reasonably requested by Lender in order to assist Lender in maintaining compliance with the Patriot Act.

SECTION 11.9.    Jurisdiction, Etc.  EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE BORROWERS, ON THE ONE HAND, AND LENDER, ON THE OTHER HAND, PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE EACH PARTY ACKNOWLEDGES THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT, SUBJECT TO ALL APPLICABLE FEDERAL AND STATE LAWS, INCLUDING, WITHOUT LIMITATION, BANKRUPTCY LAWS, NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER.

SECTION 11.10.    Governing Law.  This Agreement and the Post-Petition Note shall be governed by, and construed in accordance with, the laws of the State of Texas.

4843-7577-8126 v2
2921440-000020 09/05/2017

SECTION 11.11.  <u>Waiver of Jury Trial</u>.  Each of the Borrowers and the Lender irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Credit Advances or the actions of Lender in the negotiation, administration, performance or enforcement thereof.

SECTION 11.12.  <u>Financing Order</u>.  In the event of any inconsistency between the terms and conditions of any of the Loan Documents and the Financing Order, the provisions of the Financing Order shall govern and control.

SECTION 11.13.  <u>Release</u>.  Borrowers, hereby acknowledge and agree that, as of the date hereof: (a) Borrowers have no claim except as may be provided under this Agreement or the Stalking Horse Agreement or cause of action against Lender (or any of their directors, officers, employees, attorneys or agents); (b) Borrowers has no offset rights, counterclaims or defenses of any kind against any of their obligations, indebtedness or liabilities to Lender; and (c) Lender has heretofore properly performed and satisfied in a timely manner all of their obligations to the Borrowers. Lender wishes (and Borrowers agree) to eliminate any possibility that any past conditions, acts, omissions, events, circumstances or matters would impair or otherwise adversely affect any of the rights, interests, contracts, collateral security or remedies of Lender. Therefore, Borrowers on each of  its own behalf and on behalf of each of its respective successors and assigns, hereby waives, releases and discharges Lender and all of their directors, officers, employees, attorneys and agents, from any and all claims, demands, actions or causes of action on or before the date hereof and arising out of or in any way relating to this Agreement, the Loan Documents and any other documents, instruments, agreements, dealings or other matters connected with this Agreement, including, without limitation, all known and unknown matters, claims, transactions or things occurring on or prior to the date hereof relating to this Agreement.  The waivers, releases, and discharges contained in this paragraph shall be effective regardless of any other event that may occur or not occur prior to, or on or after the date hereof.

*[Signature page follows.]*

4843-7577-8126 v2
2921440-000020 09/05/2017

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWERS:**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

By: _____
Name: **L. Geoffrey Greulich**
Title:  **Chief Executive Officer**

and

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

By: _____
Name: **L. Geoffrey Greulich**
Title:  **Chief Executive Officer**

**LENDER:**

**RADIANS WAREHAM HOLDING, INC., a Nevada corporation**

By: _____
Name: **Mike Tutor**
Title: **Chief Executive Officer**

28

4873-1914-4783 v1

# EXHIBIT A

## INITIAL BUDGET

**Ironclad Cash Flow Projections**

| | September | October | | CH 11 Filing | Petition Period | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | September | | Week | September | | | | |
| **FORECAST SECTION** | | | | 7-Sep | 8-Sep | 09/04-09/08 | 11-Sep | 12-Sep | 13-Sep | 14-Sep | 15-Sep |
| **Cash Balance (net of float)** | $ - | $ (1,308,071) | | $ 250,000 | $ 301,512 | $ - | $ 353,025 | $ 404,537 | $ 456,050 | $ 291,893 | $ 49,477 |
| Cash Receipts | 875,711 | 888,203 | | 51,512 | 51,512 | 103,025 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 |
| LOC Funding | $ - | - | | | | - | | | | | |
| Other Receipts | | - | | | | | | | | | |
| **Total Cash In** | $ 875,711 | $ (419,868) | | 51,512 | 51,512 | 103,025 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 |
| Accounts Payables - Operating Expenses | (538,621) | (590,000) | | - | | (33,621) | - | - | - | (105,000) | (150,000) |
| Accounts Payable - Via Wire | (7,500) | (10,000) | | | | - | | | (2,500) | | |
| Payroll | (377,858) | (377,858) | | | | - | | | | (188,929) | - |
| International offices | (25,000) | (54,000) | | | | - | | | | | |
| AP other | - | - | | | | - | | | | | |
| Wires to Suppliers | (1,216,803) | (476,313) | | - | | - | - | | (213,169) | - | (328,423) |
| Postings to Bank | (18,000) | (18,000) | | | | - | | | | | |
| Legal Fees | - | - | | | | - | | | | | |
| US TRUSTEE FEE | - | (9,750) | | | | - | | | | | |
| Other disbursements | - | - | | | | - | | | | | |
| Disbursements | $ (2,183,782) | $ (1,535,921) | | - | - | (33,621) | - | - | (215,669) | (293,929) | (478,423) |
| Ending Cash Balance per Book | $ (1,308,071) | $ (1,955,789) | | 301,512 | 353,025 | 69,404 | 404,537 | 456,050 | 291,893 | 49,477 | (377,434) |
| Checks outstanding (float) | | | | | | | | | | | |
| Ending Cash Balance Per Bank | $ (1,308,071) | $ (1,955,789) | | 301,512 | 353,025 | 69,404 | 404,537 | 456,050 | 291,893 | 49,477 | (377,434) |
| | (283,620.70) | (283,620.70) | | | | | | | | | |

1

| **Minimum Cash Balance** |
| --- |
| $ (1,747,010) |
| 10/27/2017 |

54



| Week | September | | | | | Week | September | | | | | Week | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/11-09/15 | 18-Sep | 19-Sep | 20-Sep | 21-Sep | 22-Sep | 09/18-09/22 | 25-Sep | 26-Sep | 27-Sep | 28-Sep | 29-Sep | 09/25-09/29 | 2-Oct | 3-Oct |
| $ 353,025 | $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (377,434) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (654,098) | $ (1,024,450) | $ (990,155) |
| 257,562 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | 257,562 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | 257,562 | 42,295 | 42,295 |
| - | | | | | | - | | | | | | - | | |
| - | | | | | | | | | | | | - | | |
| 610,587 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | (119,872) | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | (396,535) | 42,295 | 42,295 |
| (255,000) | - | - | - | (105,000) | - | (105,000) | - | - | - | (145,000) | - | (145,000) | - | (150,000) |
| (2,500) | | | (2,500) | | | (2,500) | | | | (2,500) | | (2,500) | | |
| (188,929) | - | - | - | - | - | - | - | - | - | (188,929) | - | (188,929) | - | - |
| | | | | | | | (25,000) | | | | | (25,000) | (8,000) | (21,000) |
| (541,591) | - | - | - | - | (426,726) | (426,726) | - | - | - | - | (248,486) | (248,486) | - | - |
| | | | | | | | (18,000) | | | | | (18,000) | | |
| - | | | | | | - | | | | | | - | | |
| (988,021) | - | - | (2,500) | (105,000) | (426,726) | (534,226) | (43,000) | - | - | (336,429) | (248,486) | (627,915) | (8,000) | (171,000) |
| $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (654,098) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (1,024,450) | $ (1,024,450) | $ (990,155) | $ (1,118,860) |
| $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (654,098) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (1,024,450) | $ (1,024,450) | $ (990,155) | $ (1,118,860) |
| | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | | 1 | 1 |

| | October | | | Week | | | October | | | Week | | | October | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4-Oct | 5-Oct | 6-Oct | 10/02-10/06 | 9-Oct | 10-Oct | 11-Oct | 12-Oct | 13-Oct | 10/09-10/13 | 16-Oct | 17-Oct | 18-Oct | 19-Oct | 20-Oct |
| | $ (1,118,860) | $ (1,076,564) | $ (1,141,769) | $ (1,024,450) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,280,273) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) |
| | 42,295 | 42,295 | 42,295 | 211,477 | Holiday | 42,295 | 42,295 | 42,295 | 42,295 | 169,182 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 |
| | | | | - | | | | | | - | | | | | |
| | 42,295 | 42,295 | 42,295 | (812,974) | - | 42,295 | 42,295 | 42,295 | 42,295 | (1,111,091) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 |
| | - | (105,000) | - | (255,000) | - | (20,000) | - | (105,000) | - | (125,000) | - | - | - | (105,000) | - |
| | | (2,500) | | (2,500) | | | | (2,500) | | (2,500) | | | | (2,500) | |
| | - | - | - | (29,000) | - | - | - | (188,929) | - | (188,929) | - | - | - | - | - |
| | | | | - | | | | | | - | | | | | |
| | - | - | (180,799) | (180,799) | - | - | - | - | (193,938) | (193,938) | - | - | - | - | - |
| | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | - | | | | | | - | | | | | |
| | - | (107,500) | (180,799) | (467,299) | - | (20,000) | - | (296,429) | (193,938) | (510,368) | - | - | - | (107,500) | - |
| | $ (1,076,564) | $ (1,141,769) | $ (1,280,273) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,621,459) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) | $ (1,517,482) |
| | $ (1,076,564) | $ (1,141,769) | $ (1,280,273) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,621,459) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) | $ (1,517,482) |
| | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |

| Week | October | | | | | Week | October/November | | | | | Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/16-10/20 | 23-Oct | 24-Oct | 25-Oct | 26-Oct | 27-Oct | 10/23-10/27 | 30-Oct | 31-Oct | 1-Nov | 2-Nov | 3-Nov | 10/30-11/03 |
| $ (1,621,459) | $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,517,482) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,747,010) |
| 211,477 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | 211,477 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | 211,477 |
| - | | | | | | - | | | | | | - |
| - | | | | | | - | | | | | | - |
| (1,409,982) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | (1,306,005) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | (1,535,533) |
| (105,000) | - | - | - | (105,000) | - | (105,000) | - | - | - | (105,000) | - | (105,000) |
| (2,500) | | | | (2,500) | | (2,500) | | | (2,500) | | | (2,500) |
| - | - | - | - | (188,929) | - | (188,929) | - | - | - | - | - | - |
| - | | | (25,000) | | | (25,000) | | | (8,000) | (21,000) | | (29,000) |
| - | | | | | | - | | | | | | - |
| - | - | - | - | - | (101,575) | (101,575) | - | - | - | - | - | - |
| - | | | (18,000) | | | (18,000) | | | | | | - |
| - | - | - | - | - | - | - | - | - | - | - | - | - |
| - | | | | | | - | (9,750) | | | | | - |
| - | | | | | | - | | | | | | - |
| (107,500) | - | - | (43,000) | (296,429) | (101,575) | (441,005) | (9,750) | - | (10,500) | (126,000) | - | (136,500) |
| $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,747,010) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,681,783) | $ (1,672,033) |
| $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,747,010) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,681,783) | $ (1,672,033) |
| | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |

**EXHIBIT B**

**FORM OF POST-PETITION NOTE**

## POST-PETITION NOTE

$2,000,000.00                                                        Memphis, Tennessee
                                                                    September __, 2017

On the "Outside Date" or at such earlier time as provided herein, the undersigned, **Ironclad Performance Wear Corporation,** a California corporation, and **Ironclad Performance Wear Corporation**, a Nevada corporation ("Makers"), promise to pay to the order of **Radians Wareham Holding, Inc.**, a Nevada corporation located in Memphis, Tennessee ("Lender"), the principal sum of TWO MILLION DOLLARS ($2,000,000.00) or so much of such amount as shall have been disbursed, together with interest at the rate of ten percent (10.0%) per annum, until paid, upon the disbursed and unpaid principal balance. This Post-Petition Note ("Note") is made and issued in accordance with, subject to, and shall be governed by the terms of "*Debtor-in-Possession Credit Agreement and Agreement for the Use of Cash Collateral*" (the "DIP Agreement") entered into by and between the Makers and Lender concurrently herewith. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in that certain DIP Agreement.

The "Outside Date" means the date that is 120 days following the date on which this Note is executed, unless extended by one optional 30-day extension at the request of Makers and granted in the sole discretion of Lender.

Accrued, unpaid interest on the Post-Petition Note shall be compounded on the last day of each calendar month. After the Maturity Date and/or after the occurrence and during the continuance of an Event of Default, this Post-Petition Note shall bear interest at a rate equal to the interest rate set forth in the paragraph above plus eight percent (8%) per annum, calculated on the basis of a 360-day year for the actual number of days elapsed (the "Default Interest Rate").

In the event that the foregoing provisions should be construed by a court of competent jurisdiction not to constitute a valid, enforceable designation of a rate of interest or method of determining same, the indebtedness hereby evidenced shall bear interest at the maximum effective variable contract rate which may be charged by the Lender under applicable law from time to time in effect.

With the exception of the Initial Advance which shall be made by Lender to Makers in accordance with Section 2.1(a) of the DIP Agreement, the Makers can obtain advances against the principal (each a "Credit Advance" and collectively, the "Credit Advances") upon submission of a Borrowing Notice to Lender, until the Outside Date, but cannot reborrow disbursed amounts.

The outstanding principal balance and interest accrued thereon shall be due and payable on the earlier to occur of (i) the date of the Closing of the Asset Sale; (ii) the Outside Date; or (iii) upon acceleration of the Note pursuant to the terms hereof.

This Post-Petition Note is secured by the Collateral.

Payment of interest, and the principal hereof shall be made at the office of the Lender, 5305 Distriplex Farms, Memphis Tennessee 38141, or at such other place as the Lender may designate in writing, in lawful money of the United States of America, which shall be legal tender in payment of all debts and dues, public and private, at the time of payment.

Subject to the terms of the DIP Agreement, including Article X, upon the occurrence of an Event of Default, then, and in any such event, Lender shall provide written notice thereof ("Notice of Default") to the Borrowers specifying with as much detail as possible the effective date of the default, and a description, nature and scope of the default.  Lender's rights to declare the Credit Advances, all interest thereon and all other amounts payable under this Note and the other Loan Documents to be forthwith due and payable shall further be subject to the provisions of Section 10.2 of the DIP Agreement.

If this Note is placed in the hands of an attorney for collection, by suit or otherwise, or to protect the security for its payment, or to enforce its collection, or to represent the rights of the Lender in connection with any loan documentation executed in connection herewith, or to defend successfully against any claim, cause of action or suit brought by the Makers against the Lender, the non-prevailing party shall pay on demand all reasonable costs of collection and litigation (including court costs), together with a reasonable attorney's fee.

This Post-Petition Note shall be governed by, and construed in accordance with, the laws of the State of Texas.

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

By:_____
   Name: **L. Geoffrey Greulich**
   Title:  **Chief Executive Officer**

and

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

By:_____
   Name: **L. Geoffrey Greulich**
   Title:  **Chief Executive Officer**

2

**EXHIBIT C**

**FORM OF INTERIM FINANCING ORDER**

**TO BE ATTACHED**

**EXHIBIT D**

**FORM OF BORROWING NOTICE**

**Form of Borrowing Notice**

To: Radians Wareham Holding, Inc.

Dear Ms. Tutor:

Reference is made to the Debtor-In-Possession Credit Agreement and Agreement for Use of Cash Collateral (the "<u>DIP Facility</u>") dated as of September __, 2017 between Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, as Borrowers and Radians Wareham Holding, Inc, as Lender. Terms defined in the DIP Facility are used herein with the same meanings. This notice constitutes a Borrowing Notice for purposes of Sections 2.1(b) and 2.1(c) of the DIP Facility, and the Borrowers hereby request a Credit Advance under the DIP Facility in the amount of $_____, and in that connection the Borrowers represents and warrants and the following:

> No Event of Default has occurred and is continuing. All representations and warranties of Borrowers set forth in the Loan Documents are true and correct in all material respects as of the date of this request and will be as of the date of the requested Credit Advance.

The requested Funding Date is _____.

For Credit Advances requested under **Section 2.1(b)** of the DIP Facility, attached as Exhibit A to this Borrowing Notice please find:

    i.    a calculation of the requested Credit Advance amount including the estimated cash on hand included in the calculation and reasonable detail as to projected disbursements for the borrowing period which were not previously included in the Initial Budget;

    ii.    an updated Budget including actuals for prior periods;

    iii.    a calculation of any variance from the Budget; and

    iv.    a comparison of actual weekly receipts to those set forth in the Budget

For Credit Advances requested under **Section 2.1(c)** of the DIP Facility, attached as Exhibit A to this Borrowing Notice please find:

    i.    calculation of the requested Credit Advance amount including reasonable detail of the Inventory to be purchased.

Submitted this __ day of _____, 2017

                                   **IRONCLAD PERFORMANCE WEAR
CORPORATION, a California corporation**


By:_____
  Name: **L. Geoffrey Greulich**
  Title:  **Chief Executive Officer**

and
**IRONCLAD PERFORMANCE WEAR
CORPORATION, a Nevada corporation**


By: _____
  Name: **L. Geoffrey Greulich**
  Title: **Chief Executive Officer**

**EXHIBIT "8"**

**Ironclad Cash Flow Projections**

| | September | October | CH 11 Filing | Petition Period | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | September | | Week | September | | | | |
| FORECAST SECTION | | | 7-Sep | 8-Sep | 09/04-09/08 | 11-Sep | 12-Sep | 13-Sep | 14-Sep | 15-Sep |
| Cash Balance (net of float) | $ - | $ (1,308,071) | $ 250,000 | $ 301,512 | $ - | $ 353,025 | $ 404,537 | $ 456,050 | $ 291,893 | $ 49,477 |
| Cash Receipts | 875,711 | 888,203 | 51,512 | 51,512 | 103,025 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 |
| LOC Funding | $ - | - | | | - | | | | | |
| | | | | | | | | | | |
| Other Receipts | | - | | | - | | | | | |
| Total Cash In | $ 875,711 | $ (419,868) | 51,512 | 51,512 | 103,025 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 |
| | | | | | | | | | | |
| Accounts Payables - Operating Expenses | (538,621) | (590,000) | - | | (33,621) | - | - | - | (105,000) | (150,000) |
| Accounts Payable - Via Wire | (7,500) | (10,000) | | | - | | | (2,500) | | |
| | | | | | | | | | | |
| Payroll | (377,858) | (377,858) | | | - | | | | (188,929) | - |
| International offices | (25,000) | (54,000) | | | - | | | | | |
| AP other | - | - | | | - | | | | | |
| Wires to Suppliers | (1,216,803) | (476,313) | - | | - | - | - | (213,169) | - | (328,423) |
| Postings to Bank | (18,000) | (18,000) | | | - | | | | | |
| Legal Fees | - | - | - | | - | | | | | |
| US TRUSTEE FEE | - | (9,750) | | | - | | | | | |
| Other disbursements | - | | | | - | | | | | |
| Disbursements | $ (2,183,782) | $ (1,535,921) | - | - | (33,621) | - | - | (215,669) | (293,929) | (478,423) |
| | | | | | | | | | | |
| Ending Cash Balance per Book | $ (1,308,071) | $ (1,955,789) | 301,512 | 353,025 | 69,404 | 404,537 | 456,050 | 291,893 | 49,477 | (377,434) |
| Checks outstanding (float) | | | | | | | | | | |
| Ending Cash Balance Per Bank | $ (1,308,071) | $ (1,955,789) | 301,512 | 353,025 | 69,404 | 404,537 | 456,050 | 291,893 | 49,477 | (377,434) |
| | (283,620.70) | (283,620.70) | | | | | | | | 1 |

| Minimum Cash Balance |
|---|
| $ (1,747,010) |
| 10/27/2017 |

54



| Week | September | | | | | Week | September | | | | | Week | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/11-09/15 | 18-Sep | 19-Sep | 20-Sep | 21-Sep | 22-Sep | 09/18-09/22 | 25-Sep | 26-Sep | 27-Sep | 28-Sep | 29-Sep | 09/25-09/29 | 2-Oct | 3-Oct |
| $ 353,025 | $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (377,434) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (654,098) | $ (1,024,450) | $ (990,155) |
| 257,562 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | 257,562 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | 257,562 | 42,295 | 42,295 |
| - | | | | | | - | | | | | | - | | |
| - | | | | | | | | | | | | | | |
| 610,587 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | (119,872) | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | (396,535) | 42,295 | 42,295 |
| (255,000) | - | - | - | (105,000) | - | (105,000) | - | - | - | (145,000) | - | (145,000) | - | (150,000) |
| (2,500) | | | (2,500) | | | (2,500) | | | | (2,500) | | (2,500) | | |
| (188,929) | - | - | - | - | - | - | | | - | (188,929) | - | (188,929) | (8,000) | (21,000) |
| - | | | | | | | (25,000) | | | | | (25,000) | | |
| (541,591) | - | - | - | - | (426,726) | (426,726) | - | - | - | - | (248,486) | (248,486) | - | - |
| - | | | | | | | | (18,000) | | | | (18,000) | | |
| - | | | | | | - | | | | | | - | | |
| (988,021) | - | - | (2,500) | (105,000) | (426,726) | (534,226) | (43,000) | - | - | (336,429) | (248,486) | (627,915) | (8,000) | (171,000) |
| $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (654,098) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (1,024,450) | $ (1,024,450) | $ (990,155) | $ (1,118,860) |
| $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (654,098) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (1,024,450) | $ (1,024,450) | $ (990,155) | $ (1,118,860) |
| | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | | 1 | 1 |

| October | | | Week | October | | | | | Week | October | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-Oct | 5-Oct | 6-Oct | 10/02-10/06 | 9-Oct | 10-Oct | 11-Oct | 12-Oct | 13-Oct | 10/09-10/13 | 16-Oct | 17-Oct | 18-Oct | 19-Oct | 20-Oct |
| $ (1,118,860) | $ (1,076,564) | $ (1,141,769) | $ (1,024,450) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,280,273) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) |
| 42,295 | 42,295 | 42,295 | 211,477 | Holiday | 42,295 | 42,295 | 42,295 | 42,295 | 169,182 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 |
|  |  |  | - |  |  |  |  |  | - |  |  |  |  |  |
| 42,295 | 42,295 | 42,295 | (812,974) | - | 42,295 | 42,295 | 42,295 | 42,295 | (1,111,091) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 |
| - | (105,000) | - | (255,000) | - | (20,000) | - | (105,000) | - | (125,000) | - | - | - | (105,000) | - |
|  | (2,500) |  | (2,500) |  |  |  | (2,500) |  | (2,500) |  |  |  | (2,500) |  |
| - | - | - | (29,000) | - | - | - | (188,929) | - | (188,929) | - | - | - | - | - |
|  |  |  | - |  |  |  |  |  | - |  |  |  |  |  |
| - | - | (180,799) | (180,799) | - | - | - | - | (193,938) | (193,938) | - | - | - | - | - |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  |  |  | - |  |  |  |  |  | - |  |  |  |  |  |
| - | (107,500) | (180,799) | (467,299) | - | (20,000) | - | (296,429) | (193,938) | (510,368) | - | - | - | (107,500) | - |
| $ (1,076,564) | $ (1,141,769) | $ (1,280,273) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,621,459) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) | $ (1,517,482) |
| $ (1,076,564) | $ (1,141,769) | $ (1,280,273) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,621,459) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) | $ (1,517,482) |
| 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |

| Week | October | | | | | Week | October/November | | | | | Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/16-10/20 | 23-Oct | 24-Oct | 25-Oct | 26-Oct | 27-Oct | 10/23-10/27 | 30-Oct | 31-Oct | 1-Nov | 2-Nov | 3-Nov | 10/30-11/03 |
| $ (1,621,459) | $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,517,482) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,747,010) |
| 211,477 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | 211,477 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | 211,477 |
| - | | | | | | - | | | | | | - |
| - | | | | | | - | | | | | | - |
| (1,409,982) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | (1,306,005) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | (1,535,533) |
| (105,000) | - | - | - | (105,000) | - | (105,000) | - | - | - | (105,000) | - | (105,000) |
| (2,500) | | | | (2,500) | | (2,500) | | | (2,500) | | | (2,500) |
| - | - | - | - | (188,929) | - | (188,929) | - | - | (8,000) | (21,000) | - | (29,000) |
| - | | | (25,000) | | | (25,000) | | | | | | - |
| - | | | | | | - | | | | | | - |
| - | - | - | - | - | (101,575) | (101,575) | - | - | - | - | - | - |
| - | | | (18,000) | | | (18,000) | | | | | | - |
| - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | (9,750) | | | | | |
| - | | | | | | - | | | | | | - |
| (107,500) | - | - | (43,000) | (296,429) | (101,575) | (441,005) | (9,750) | - | (10,500) | (126,000) | - | (136,500) |
| | $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,747,010) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,681,783) | $ (1,672,033) |
| | $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,747,010) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,681,783) | $ (1,672,033) |
| | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |

# EXHIBIT "A"

# STALKING HORSE ASSET PURCHASE AGREEMENT

**dated September 8, 2017**

**by and among**

**RADIANS WAREHAM HOLDING, INC.**

**PURCHASER**

**AND**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

**and**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

**SELLERS**

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ............................................................................... 1

1.1     Previously Defined Terms ............................................................... 1
1.2     Definitions ....................................................................................... 1
1.3     Additional Defined Terms ............................................................... 6
1.4     Interpretation ................................................................................... 7

**ARTICLE II PURCHASE AND SALE, PURCHASE PRICE** ............................. 7

2.1     Purchase and Sale ........................................................................... 7
2.2     Purchase Price; Deposit ................................................................ 10
2.3     Payments at Closing ..................................................................... 10
2.4     Assumed Liabilities and Retained Liabilities .............................. 11
2.5     Transfer Taxes .............................................................................. 11
2.6     Allocation ..................................................................................... 11

**ARTICLE III CLOSING AND CLOSING DATE DELIVERIES** .................... 11

3.1     Closing ......................................................................................... 11
3.2     Closing Deliveries by Sellers ....................................................... 12
3.3     Closing Deliveries by Purchaser .................................................. 12
3.4     Cooperation .................................................................................. 13

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS** ...... 13

4.1     Due Incorporation ........................................................................ 13
4.2     Noncontravention ......................................................................... 14
4.3     Brokers ......................................................................................... 14
4.4     Title to Purchased Assets ............................................................. 14
4.5     Condition of Assets ...................................................................... 14
4.6     NO OTHER REPRESENTATIONS ............................................ 14

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER** ..... 15

5.1     Organization; Authorization ......................................................... 15
5.2     Noncontravention ......................................................................... 15
5.3     No Brokers .................................................................................... 15
5.4     Financing Ability .......................................................................... 15

**ARTICLE VI  BANKRUPTCY MATTERS** ..................................................... 15

6.1     Competing Bid ............................................................................. 15
6.2     Cooperation in Bankruptcy Court Matters ................................... 16
6.3     Sale Order ..................................................................................... 16
6.4     Back-up Bidder ............................................................................ 17
6.5     Bid Procedures Order and Break-up Fee ...................................... 18

**ARTICLE VII EMPLOYEE MATTERS** ........................................................ 20

-ii-

7.1    Employees to be Hired by Purchaser ............................................................ 20
7.2    Authorization to Communicate with Certain Employees............................. 21

**ARTICLE VIII COVENANTS**........................................................................ 21

A.    Pre-Closing Covenants. .............................................................................. 21
8.1    Maintenance of Business............................................................................. 21
8.2    Sellers Pre-Closing Covenants ................................................................... 22
8.3    Commercially Reasonable Efforts to Close ............................................... 22
8.4    Exclusivity.................................................................................................. 23
B.    Certain other Covenants and Agreements. ................................................ 23
8.5    Use of Name ............................................................................................... 23
8.6    Tax Matters ................................................................................................. 23

**ARTICLE IX CONDITIONS TO CLOSING APPLICABLE TO PURCHASER** ............. 24

9.1    No Termination ........................................................................................... 24
9.2    Bankruptcy Court Approval ........................................................................ 24
9.3    Bring-Down of Sellers Warranties, Representations and Covenants.......... 24
9.4    Pending Actions .......................................................................................... 25

**ARTICLE X CONDITIONS TO CLOSING APPLICABLE TO SELLER** ....................... 25

10.1    No Termination ........................................................................................... 25
10.2    Bankruptcy Court Approval ........................................................................ 25
10.3    Bring-Down of Purchaser Warranties, Representations and Covenants...... 25
10.4    Pending Actions .......................................................................................... 25
10.5    All Necessary Documents .......................................................................... 25

**ARTICLE XI TERMINATION** ...................................................................... 26

11.1    Termination ................................................................................................. 26
11.2    Breakup Fee................................................................................................. 27
11.3    Buyer Deposit.............................................................................................. 27

**ARTICLE XII MISCELLANEOUS** ................................................................ 28

12.1    Costs and Expenses .................................................................................... 28
12.2    Bankruptcy Court Approval ........................................................................ 28
12.3    Entire Agreement ........................................................................................ 28
12.4    Counterparts ................................................................................................ 28
12.5    Assignment, Successors and Assigns ........................................................ 28
12.6    Survival ....................................................................................................... 29
12.7    Severability................................................................................................. 29
12.8    Headings...................................................................................................... 29
12.9    Risk of Loss ................................................................................................ 29
12.10    Governing Law ............................................................................................ 29
12.11    Press Releases and Public Announcements ................................................ 30
12.12    U.S. Dollars ................................................................................................ 30
12.13    Notices ........................................................................................................ 31
12.14    WAIVER OF JURY TRIAL ...................................................................... 32

12.15     Waiver ................................................................................................................ 32
12.16     No Third-Party Beneficiary ................................................................................ 32
12.17     SELLERS DISCLAIMER .................................................................................. 32
12.18     PURCHASER DISCLAIMER ............................................................................ 33
12.19     Disclosures ......................................................................................................... 33
12.20     Specific Performance ......................................................................................... 33

<u>Exhibits</u>

Exhibit A – Form of Bid Procedures Order
Exhibit B – Form of Sale Order
Exhibit C – Form of DIP Credit Agreement
Exhibit D – Form of Financing Order

<u>Schedule Index</u>

Schedule 2.1(b)(vi)     -        Assumed Contracts
Schedule 4.3 -          Brokers
Schedule 7.1(a) -       Business Employees List

This Asset Purchase Agreement is made and entered into as of September 8, 2017 (this "Agreement") by and among Radians Wareham Holding, Inc., a Nevada corporation, or a Permitted Assignee as defined below ("Radians" or "Purchaser") and Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (collectively, "Ironclad" or "Sellers" or "Debtors").

RECITALS:

A.      Sellers are engaged in business as the developer, manufacturer and marketer of high-performance task-specific work gloves (the "Business");

B.      Sellers desire to sell substantially all of the assets related to the Business, and Purchaser desires to acquire substantially all of Sellers' assets related to the Business from Sellers, on the terms and subject to the conditions set forth herein;

C.      Sellers intend to commence bankruptcy cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on or after September 8, 2017 in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court");

D.      In connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, and subject to higher and better offers as contemplated by the Bid Procedures Order (as defined herein), following the entry of the Sale Order (as defined herein) and subject to the terms and conditions thereof, Sellers shall sell, transfer and assign to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined herein), and Purchaser shall assume from Sellers the Assumed Liabilities (each as defined herein), all as more specifically set forth herein and in the Sale Order; and

E.      The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to the Bid Procedures Order and the Sale Order to be entered in the Chapter 11 Cases.

NOW, THEREFORE, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     Previously Defined Terms. Each term defined in the first paragraph and Recitals shall have the meaning set forth above whenever used herein, unless otherwise expressly provided or unless the context clearly requires otherwise.

1.2     Definitions. Whenever used herein, the following terms shall have the meanings set forth below unless otherwise expressly provided or unless the context clearly requires otherwise:

"<u>Accounts Receivable</u>" - As defined in clause (i) of the definition of Purchased Assets.

"<u>Affiliate</u>" means (a) with respect to an individual, (i) the members of the immediate family (including parents, siblings and children) of the individual, (ii) the individual's spouse and (iii) any Business Entity that directly or indirectly, through one or more intermediaries is Controlled by, or is under common Control with, any of the foregoing individuals, or (b) with respect to any Person other than an individual, any other Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with or of, such Person. The term "<u>Control</u>" (including, with correlative meaning, the terms "Controlled by" and "under common Control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Bankruptcy Rules</u>" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as now in effect or hereafter amended.

"<u>Bid Procedures Motion</u>" means the motion filed by Sellers seeking entry of the Bid Procedures Order.

"<u>Bid Procedures Order</u>" means the Order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Sellers, substantially in the form attached hereto as <u>Exhibit A</u>, establishing bidding procedures for the solicitation of higher or otherwise better bids for the Purchased Assets.

"<u>Business Day</u>" means any day other than a Saturday or Sunday or other day on which banks in Los Angeles, California are authorized or required by Law to be closed.

"<u>Business Entity</u>" means any Person other than an individual or a Governmental Authority.

"<u>Cash Collateral</u>" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest as further defined in Section 363(a) of the Bankruptcy Code.

"<u>Code</u>" means the Internal Revenue Code of 1986.

"<u>Confidentiality Agreement</u>" means that certain Nondisclosure Agreement, dated August 1, 2017, by and between Sellers and Purchaser.

"<u>Contracts</u>" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, commitment, arrangement or undertaking, written or oral, or other document or instrument to which or by which such Person is a party or otherwise subject or bound or to which or by which any asset, property or right of such Person is subject or bound.

"<u>DIP Facility</u>" means a debtor-in-possession financing facility under which the Purchaser will provide financing of up to $1,000,000.00 to Sellers pursuant to a credit agreement substantially in the form attached hereto as <u>Exhibit C</u>.

"<u>Encumbrances</u>" means, with respect to any property or asset, any mortgage, lien, pledge, charge, claim, encumbrance, security interest, community or other marital property interest, equitable interest, license, option, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement or other encumbrance with respect to the use, construction, voting, transfer, receipt of income or exercise of any other attribute of ownership in respect of such property or asset.

"<u>Environmental Laws</u>" means any and all Legal Requirements relating to pollution, or to protection of human health or the environment (including ground water, land surface or subsurface strata) from pollution, including Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Materials of Environmental Concern.

"<u>Excluded Tax</u>" means any Liability of Sellers for the following Taxes (whether such Liability is direct or as a result of transferee or successor liability or pursuant to a Contract or other agreement): (i) income Taxes of Sellers; and (ii) Taxes that relate to the Purchased Assets, the Business, or any Transferred Employee for any Pre-Closing Tax Period.

"<u>GAAP</u>" means United States generally accepted accounting principles as in effect from time to time.

"<u>Governmental Authority</u>" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body, commission or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including quasi-governmental entities established to perform such functions.

"<u>IP Confidential Information</u>" means all of the following U.S., state and foreign intellectual property of any Person related to the Business: (a) inventions, discoveries, processes, designs, techniques, developments, technology and related improvements, whether or not patented or patentable; (b) proprietary computer programs and software (including source code, object code and executable code form), confidential and proprietary data, proprietary databases, and related documentation thereof, together with all translations, adaptations, modifications, derivations, combinations and derivative works thereof; (c) mask works; and (d) confidential or proprietary information (including trade secrets, know-how, drawings, specifications, designs, technical information, reports, manufacturing and production processes and techniques, operating procedures, test data and procedures, scheduling procedures, and process regimes). For the avoidance of doubt, "IP Confidential Information" excludes any data or information which is in the public domain.

"<u>IRS</u>" means the Internal Revenue Service.

"Law" means any law, statute, code, regulation, ordinance, rule or Order enacted, promulgated, entered into, agreed, imposed or enforced by any Governmental Authority.

"Legal Requirements" means with respect to any Person, all statutes, ordinances, bylaws, codes, rules, regulations, restrictions, judgments, orders, writs, injunctions, decrees, determinations or awards of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses.

"Liabilities" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

"Local Bankruptcy Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Central District of California applicable to all cases in such district governed by the Bankruptcy Code.

"Materials of Environmental Concern" means any chemicals, pollutants, contaminants, medical waste or specimens, toxic substances, chemicals, petroleum or petroleum products, including hazardous wastes under the Resource, Conservation and Recovery Act, as amended, 42 U.S.C. § 6903 et seq., hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq., asbestos, polychlorinated biphenyls and urea formaldehyde, and low-level nuclear materials, special nuclear materials or nuclear-byproduct materials, all within the meaning of the Atomic Energy Act of 1954 as amended, and any rules, regulations or policies promulgated thereunder, and all other materials regulated under Environmental Laws.

"Material Contract" means any contract to which Seller is a party (other than any contract or agreement relating to or with customers, suppliers or agents) that involves aggregate annual revenue or payments in excess of $50,000 per year and/or that is a real property lease.

"Order" means any decree, order, judgment, writ, ruling, award, injunction, stipulation, decisions, verdict, determination or consent of or by, or settlement agreement as approved by the Bankruptcy Court.

"Ordinary Course" means the ordinary course of business of Sellers, taking into account that Sellers will be operating their business under chapter 11 of the Bankruptcy Code as debtors-in-possession.

"Permitted Encumbrances" means (a) Encumbrances for Taxes not yet due and payable or being contested in good faith; (b) landlord and lessor Encumbrances existing under the terms and conditions of leases of real and personal property; (c) Encumbrances on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the Ordinary Course; and (d) any lien, claim or encumbrance of which Sellers, as debtors under the Bankruptcy Code, could not sell their property free and clear pursuant to section 363(f) of the Bankruptcy Code.

"Person" means any natural person, corporation, partnership, limited liability company, joint venture, trust, association or unincorporated entity of any kind.

- 4 -

"Post-Closing Tax Period" means any Tax period (or portion thereof) beginning after the Closing Date.

"Pre-Bankruptcy Secured Debt" means that certain revolving credit facility  (the "Revolving Loan") originally made by Capital One, National Association, a National Banking Association provided to Debtors of which Purchaser is the owner and holder.

"Pre-Closing Tax Period" means any Tax period (or portion thereof) that ends on or prior to the Closing Date.

"Prepayment Fee"  means that certain fee required to be paid under the Second Amended and Restated Revolving Line of Credit Note and the Loan Agreement, as modified, in the amount of One Hundred Twenty Thousand Dollars ($120,000.00) in the event the Revolving Loan is repaid in conjunction with financing obtained by Debtors from a financial or lending institution or other source, or in connection with the acquisition of either or both Debtors, or any assets of either or both Debtors, by a third party other than Purchaser and /or its affiliates.

"Qualified Bid" shall have the meaning ascribed to it in the Bid Procedures Order. This Agreement shall constitute a Qualified Bid.

"Qualified Bid Determination Deadline" shall have the meaning ascribed to it in the Bid Procedures Order.

"Sale Motion" means the motion filed by Sellers seeking approval of this Agreement and entry of the Sale Order.

"Sale Order" means an order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Sellers, and substantially in the form attached hereto as Exhibit B, approving this Agreement, and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby.

"Successful Bidder" means any party or parties who acquires all, substantially all, or a portion of the Purchased Assets (in a single transaction or a series of transactions) by reason of having submitted the successful bid at the Auction in a manner consistent with and authorized by the Bid Procedures Order.

"Tax Return" means any report, return (including estimated) or other information required (including any attachments or schedules required to be attached to such report, return, or other information) to be filed, with a Governmental Authority in connection with any Taxes (and any amendment thereto).

"Taxes" means all taxes, charges, fees, duties (including custom duties), levies or other assessments, including gross or net income, gross or net receipts, gross or net proceeds, capital gains, profits, gaming, capital, estimated, employment, alternative or add-on minimum, registration, natural resources, premium, ad valorem, turnover, real or personal property (tangible and intangible), sales, goods or services, use, franchise, excise, value added, stamp, unclaimed or

abandoned property, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental (including Section 59A of the Code), capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties or additions to tax attributable thereto.

"Transaction" means the sale and purchase of the Purchased Assets contemplated in this Agreement, together with any and all related transactions designed to implement, facilitate or expedite such sale and purchase of the Purchased Assets.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101-2109, or any similar applicable state or local laws.

1.3    Additional Defined Terms. For purposes of this Agreement, the following terms have the meanings specified in the indicated Section of this Agreement:

| | |
|---|---|
| Agreement | Preamble |
| Aggregate Purchase Price | 2.2 |
| Assumed Leasehold Interests | 2.1(b)(iv) |
| Assumed Liabilities | 2.7(a) |
| Auction | 6.4 |
| Bankruptcy Code | Preamble |
| Bill of Sale and Assignment Agreement | 3.2(a) |
| Business | Recitals |
| Business Employees | 7.1(a) |
| Cash Collateral Order | 6.6(d) |
| Closing | 3.1(a) |
| Competing Bid | 6.1 |
| Closing Date | 3.1(a) |
| Credit Bid | 2.2(a) |
| Designated Contracts | 2.1(b)(vi) |
| Effective Time | 3.1 |
| Financing Motion | 6.6(a) |
| Financing Order | 6.6(c) |
| Intellectual Property | 2.1(b) |
| Inventory | 2.1(b) |
| Permits | 4.16 |
| Pre-Closing Period | 8.2 |
| Purchased Assets | 2.1(b) |
| Purchase Price Allocation Schedule | 2.6 |
| Purchaser | Preamble |
| Required Closing Payment | 2.3 |
| Retained Assets | 2.1(c) |
| Sellers | Preamble |
| Specified Categories | Schedule 7.1(a) |
| Transfer Taxes | 2.7 |
| Transferred Employees | 7.1(a) |

1.4 <u>Interpretation</u>. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement, (d) all references in this Agreement to Articles, Sections and Exhibits shall mean and refer to Articles, Sections and Exhibits of this Agreement, (e) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (f) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person), (g) the term "including" shall be deemed to mean "including, without limitation" and "including, but not limited to" and (h) all references to "day" or "days" in this Agreement shall refer to calendar day(s), unless such reference is specifically to "Business Days."

**ARTICLE II**
**PURCHASE AND SALE, PURCHASE PRICE**

2.1 <u>Purchase and Sale</u>.

(a) <u>Purchase and Sale</u>. Upon the terms and subject to the conditions of this Agreement, the Bid Procedures Order, and the Sale Order, at the Closing on the Closing Date, Sellers shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall acquire from Sellers, the Purchased Assets, free and clear of any Encumbrances pursuant to Bankruptcy Code Section 363(f), other than Permitted Encumbrances, and Purchaser shall assume from Sellers the Assumed Liabilities. Notwithstanding anything herein to the contrary, the Excluded Liabilities shall not be assumed by Purchaser and the Retained Assets will be retained by Sellers and not sold, assigned, conveyed, transferred or delivered to Purchaser hereunder.

(b) <u>Purchased Assets</u>. For purposes of this Agreement, "<u>Purchased Assets</u>" means all assets, rights and properties of Sellers identified below (other than the Retained Assets), whether or not carried and reflected on the books of Sellers, wherever located:

(i) all accounts, accounts receivable, notes, notes receivable, rental agreements and other rights to collect rent, contract rights, drafts, acceptances, instruments, chattel paper, general intangibles, and other forms of obligation or rights to payment and receivables, whether or not yet earned by performance, including state and federal tax refunds (collectively, "<u>Accounts</u>" or "<u>Accounts Receivable</u>");

(ii) all equipment as such term is defined in Section 9.102(33) of the UCC, owned or hereafter acquired by Ironclad and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, leasehold improvements, vehicles and computers and other electronic data-processing and other office equipment now owned or hereafter acquired by Ironclad and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "<u>Equipment</u>");

- 7 -

(iii)    All inventory as such term is defined in Section 9.102(48) of the UCC, wherever located, now owned or hereafter acquired by Ironclad and, in any event, shall include, without limitation, all and related merchandise and other personal property now owned or hereafter acquired by Ironclad that are held for sale or lease, or are furnished or to be furnished under a contract of service or are raw materials, work in process, or materials or supplies used or to be used, or consumed or to be consumed, in Ironclad's business, and all shipping and packaging materials relating to any of the foregoing (collectively, the "Inventory");

(iv)    All intellectual property including all trademarks, tradenames, trade-dress, operating manuals, software, copyrights, all domain names (websites and web addresses) patents and applications owned, licensed or used by Sellers (collectively, the "Intellectual Property");

(v)    Any and all general intangibles as such term is defined in Section 9.102(42) of the UCC, now owned or hereafter created or acquired by Ironclad, and in any event shall include, without limitation, all inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, business telephone numbers, licenses, franchises, rights to royalties, blueprints, drawings, confidential information, catalogs, sales literature, video tapes, customer lists, business records for each client including purchase history, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to Ironclad to secure payment of any of the Accounts by an Account Debtor, all rights to indemnification and all other intangible property of every kind and nature, other than the Retained Assets as described below (collectively the "General Intangibles");

(vi)    to the extent authorized by the Bankruptcy Court, all of Sellers' right, title and interest in, to or under the Contracts of Sellers described in Schedule 2.1(b)(v) (which Schedule 2.1(b)(v) Purchaser may, subject to the approval of the Bankruptcy Court, amend at any time in Purchaser's discretion prior to one (1) business day prior to the Closing) (such assumed and assigned Contracts, the "Designated Contracts");

(vii)    to the extent authorized by the Bankruptcy Court, Sellers to assume and assign to Radians that certain agreement among Ironclad and Advantage Media Services, Inc., a Delaware corporation d/b/a AMS Fulfillment for providing certain warehousing, assembly, packaging, and fulfillment services from property commonly known as 29010 Commerce Center Drive, Valencia, California pursuant to that certain Letter of Agreement dated June 29, 2007 (the "Warehouse Agreement"); and

(viii)    to the extent authorized by the Bankruptcy Court, Sellers to assign to Radians the rights of Sellers under the non-disclosure agreements executed by potential bidders in connection with the sale of the Purchased Assets.

(c)    Retained Assets. For purposes of this Agreement, "Retained Assets" means all assets and property of Sellers, other than the Purchased Assets, including the following:

(i)      All bank accounts of Sellers and all cash and cash equivalents of Sellers as of the Closing Date;

(ii)      Sellers' corporate seal, minute books and stock record books, the general ledgers and books of original entry, all Tax Returns and other Tax records, reports, data, files and documents;

(iii)      all of Sellers' right, title and interest in choses of action, claims and causes of action or rights of recovery or set-off of every kind and character against third parties, including actions under Chapter 5 of the Bankruptcy Code;

(iv)      all insurance policies and all rights, claims, credits or causes of action thereunder or in connection therewith;

(v)      (i) all attorney-client privilege and attorney work-product protection of Sellers or associated with the Business as a result of legal counsel representing Sellers or the Business; (ii) all documents of Sellers or the Business subject to the attorney-client privilege and work-product protection described in subsection (i); and (iii) all documents maintained by Sellers in connection with the transactions contemplated by this Agreement; and

(vi)      Sellers' rights under this Agreement and the transactions contemplated hereby.

(d)      Excluded Liabilities. Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Purchased Assets shall be or become liable for or subject to, any liabilities or obligations of Sellers or the Business, including the following liabilities and obligations (collectively, "Excluded Liabilities"), which shall be and remain liabilities of Sellers:

(i)      liabilities accrued on any financial statements of Sellers;

(ii)      liabilities or obligations associated with any Retained Assets;

(iii)      liabilities or obligations associated with any and all indebtedness of Sellers for borrowed money to the extent the liability therefor is not one of the Assumed Liabilities;

(iv)      liabilities or obligations arising under any Contracts that are not Assumed Contracts;

(v)      liabilities or obligations arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions by Sellers that occurred, or arise from events that occurred, prior to the Closing Date;

(vi)      liabilities retained by Sellers pursuant to Section 7.1(b) and all other liabilities or obligations prior to the Closing to current, former or prospective employees (including any Business Employees who do not become Transferred

- 9 -

Employees) of Sellers and other individual service providers or their respective dependents or beneficiaries, other than liabilities or obligations with respect to any Transferred Employees on or after the Closing;

(vii)    liabilities of Sellers to the Internal Revenue Service or any other Governmental Authority including those relating to Sellers;

(viii)    penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any presence or release of any Materials of Environmental Concern at any location or any actual or alleged violation by Sellers of any Legal Requirement and/or Environmental Law prior to the Closing Date;

(ix)    liabilities of Sellers to any Person arising out of any act or omission under any Legal Requirement, including any Environmental Law; and

(x)    liabilities or obligations under the WARN Act, if any, arising out of or resulting from (i) layoffs or termination of employees by Seller and/or (ii) the consummation of the Transaction.

2.2    Purchase Price; Deposit.

The purchase price payable by Purchaser for the Purchased Assets shall be paid in the form of (i) a credit bid in an amount sufficient to pay in full the outstanding obligations under the DIP Facility and the Pre-Bankruptcy Secured Debt (the "Credit Bid"), plus (ii) application of the Buyer Deposit, plus (iii) cash, collectively, the "Aggregate Purchase Price", and shall be in an amount equal to Twenty Million Dollars ($20,000,000.00) or an amount equal to Fifteen Million Dollars ($15,000,000.00) as set forth in the letter agreement between the Debtors and Purchaser attached hereto as Exhibit 2.2, which letter agreement shall, subject to the approval of the Bankruptcy Court, be filed under seal with the Bankruptcy Court.  In addition to payment of the Aggregate Purchase Price, Purchaser shall assume the Assumed Liabilities at the Closing.

Upon execution of this Agreement, Purchaser shall deposit One Million Dollars ($1,000,000.00) (the "Buyer Deposit") with Levene, Neale, Bender, Yoo & Brill L.L.P. by wire transfer of immediately available funds. Levene, Neale, Bender, Yoo & Brill L.L.P. shall hold the Buyer Deposit in escrow in a segregated, non-interest-bearing account (the "Escrow Account"). An amount equal to the Buyer Deposit (the "Closing Release Amount") shall become payable, and shall be paid, to Sellers from the Escrow Account at the Closing. At the Closing, Purchaser and Sellers shall instruct Levene, Neale, Bender, Yoo & Brill L.L.P. to deliver so much of the Closing Release Amount to Sellers as is necessary for payment of the Aggregate Purchase Price by wire transfer of immediately available funds into an account designated by Sellers, pursuant to the terms of this Agreement. If this Agreement is validly terminated prior to the Closing, the Buyer Deposit shall be released and distributed to Purchaser or Sellers in accordance with the terms set forth in Section 11.3.

2.3    Payments at Closing. At the Closing, an amount equal to $15,000,000.00 or $20,000,000.00 (as required pursuant to Section 2.2 above) ("Required Closing Payment"), less the Credit Bid and the Closing Release Amount, shall be paid by Purchaser to Sellers by delivery to Sellers by bank wire transfer (in immediately available funds) to an account or

- 10 -

account designated by Sellers, which account or accounts will be designated by Sellers to Purchaser in writing at least three (3) Business Days prior to the date of the required payment. To the extent that total of the Credit Bid and the Closing Release Amount exceeds the Required Closing Payment, the excess of the Buyer Deposit shall be refunded to Purchaser.

2.4    Assumed Liabilities and Retained Liabilities.

(a)    As additional consideration for the purchase of the Purchased Assets, Purchaser shall, at the Closing, pursuant to the Sale Order, agree to perform, and in due course pay and discharge, only the following obligations and liabilities of Sellers relating to the Business (collectively, the "Assumed Liabilities"):

(i)    the obligations and liabilities arising on and after the Closing Date under or related to the Purchased Assets and Transferred Employees; and

(ii)    cure costs under Bankruptcy Code Section 365 for all Assumed Contracts.

(b)    Purchaser shall only be responsible for the Assumed Liabilities and shall not assume or pay any, and Sellers shall continue to be responsible for each, liability of Sellers whether or not relating to the Business including, but not limited to the Excluded Liabilities set forth in Section 2.1(d) (collectively, the "Retained Liabilities").

2.5    Transfer Taxes. Any and all transfer, sales, use, purchase, value added, excise, personal property, intangible stamp, registration or similar Taxes or fees imposed on, or resulting from, the transfer of any Purchased Assets (collectively "Transfer Taxes"), regardless of when payable, shall be paid by Purchaser. Purchaser shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, fees and charges, and, if required by applicable Law, Sellers will join in the execution of any such Tax Returns and other documentation.

2.6    Allocation. Within sixty (60) days of the Closing, Purchaser shall provide to Sellers, for Sellers' review, comment and consent, a schedule allocating the Aggregate Purchase Price (taking into account any Assumed Liabilities that are Liabilities for Tax purposes) among the Purchased Assets (the "Purchase Price Allocation Schedule"). The Purchase Price Allocation Schedule will be prepared in accordance with the applicable provisions of the Code. The parties hereto shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect changes in the Aggregate Purchase Price. The parties hereto agree for all Tax reporting purposes to report the transactions in accordance with the Purchase Price Allocation Schedule, as adjusted pursuant to the prior sentence, and to not take any position during the course of any audit or other proceeding inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

## ARTICLE III
## CLOSING AND CLOSING DATE DELIVERIES

3.1    Closing. The term "Closing" as used herein shall refer to the actual conveyance, transfer, assignment and delivery of the Purchased Assets to Purchaser in exchange

for the consideration delivered to Sellers pursuant to this Agreement. The Closing shall take place at the offices of Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California  or at such other place as is mutually agreed to in writing by Sellers and Purchaser, at 10:00 am local time not later than five (5) Business Days following the date on which all of the conditions set forth in <u>Articles IX</u> and <u>X</u> are satisfied (other than conditions the fulfillment of which is to occur at the Closing). The date upon which the Closing actually takes place is referred to as the "<u>Closing Date</u>". The Closing shall be deemed effective as of 12:01 a.m. (Pacific Time) on the Closing Date (the "<u>Effective Time</u>").

        3.2    <u>Closing Deliveries by Sellers</u>. At the Closing, Sellers shall deliver to Purchaser:

        (a)    a Bill of Sale and Assignment Agreement (the "<u>Bill of Sale and Assignment Agreement</u>"), executed by Sellers, and all such other bills of sale, lease assignments, trademark assignments, copyright assignments, patent assignments, employee work product assignments, and contract assignments (and any other appropriate title transfer documentation) and other documents and instruments of sale, assignment, conveyance and transfer, as Purchaser may deem necessary or desirable, which are prepared by Purchaser and delivered to Sellers for signature;

        (b)    a certificate executed by an executive officer of each of Sellers certifying as to the matters set forth in <u>Section 9.3</u>;

        (c)    a certified copy of the Sale Order;

        (d)    a certificate, duly completed and executed by each of Sellers pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that such Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

        (e)    Duly completed and executed IRS Forms W-9 establishing that Sellers are exempt from U.S. back-up withholding; and

        (f)    all documents furnished by Purchaser that are necessary to amend Sellers' name to not include "Ironclad" or any derivative thereof or any other similar name, which shall be executed by Sellers and in a form that Purchaser may file in the States of California and Nevada and in each other state in which Sellers, or either of them, are/is qualified to transact business.

        3.3    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to Sellers:

        (a)    the payments to be delivered by Purchaser pursuant to <u>Section 2.3</u>;

        (b)    a certificate of the Secretary of Purchaser certifying as to: (i) the certificate of formation of Purchaser; and (ii) the resolutions of the board of directors of Purchaser authorizing and approving the execution, delivery and performance by Purchaser of this Agreement and any agreements, instruments, certificates or other documents executed by Purchaser pursuant to this Agreement;

(c)      a certificate executed by an authorized officer of Purchaser certifying as to the matters set forth in <u>Section 10.3</u>;

(d)      the Bill of Sale and Assignment Agreement as executed by Purchaser;

(e)      a payoff letter executed by Purchaser reflecting the cancellation of the DIP Facility as a portion of the Aggregate Purchase Price and Purchaser's execution of any related documents prepared by Sellers and delivered to Purchaser necessary to effectuate a release of Purchaser's lien against the Purchased Assets, including a UCC-3 termination statement;

(f)      a payoff letter executed by Purchaser reflecting the cancellation of the Pre-Bankruptcy Secured Debt as a portion of the Aggregate Purchase Price and Purchaser's execution of any related documents prepared by Sellers and delivered to Purchaser necessary to effectuate a release of Purchaser's lien against the Purchased Assets, including a UCC-3 termination statement; and

(g)      a certificate, duly completed and executed by Purchaser pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that Purchaser is not a "foreign person" within the meaning of Section 1445 of the Code; <u>provided</u>, <u>however</u>, that if Purchaser is a disregarded entity (as described in Section 1.1445-2(b)(2)(iii) of the Treasury Regulations), such certification shall be provided by the Purchaser's owner.

3.4      <u>Cooperation</u>. Sellers and Purchaser shall, on request, on and after the Closing Date, cooperate with one another by furnishing any additional information, executing and delivering any additional documents and/or instruments and doing any and all such other things as may be reasonably required by the parties to consummate or otherwise implement the transactions contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Purchaser as of the Closing as follows:

4.1      <u>Due Incorporation</u>. Ironclad Performance Wear Corporation, a California corporation, is (i) duly organized, validly existing and in good standing under the Laws of the State of California and (ii) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect.  Ironclad Performance Wear Corporation, a Nevada corporation, is (i) duly organized, validly existing and in good standing under the Laws of the State of Nevada and (ii) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect.  Subject to entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Sellers and, if applicable, have been duly authorized by all necessary action on the part of each Seller. This Agreement has been duly executed and delivered by Sellers and, subject to entry of the Sale Order, is a legal, valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to

- 13 -

general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). Sellers have the full power and authority necessary to own, lease, operate and use the Purchased Assets.

4.2    <u>Noncontravention</u>. Subject to entry of the Sale Order, neither the execution, delivery and performance by Sellers of this Agreement nor the consummation of the transactions contemplated hereby will, after the giving of notice, or the lapse of time, or otherwise result in a breach or violation of, or default under, each of Seller's organizational documents.

4.3    <u>Brokers</u>. Except as set forth in <u>Schedule 4.3</u>, neither this Agreement nor the sale of the Purchased Assets or any other transaction contemplated by this Agreement was induced or procured through any Person acting on behalf of, or representing Sellers or any of their Affiliates as broker, finder, investment banker, financial advisor or in any similar capacity.

4.4    <u>Title to Purchased Assets</u>.

(a)    Sellers have good and marketable title to, or, in the case of property held under a lease or other contractual obligation, a valid leasehold interest in, all of the Purchased Assets, whether real or personal property and whether tangible or intangible, other than Permitted Encumbrances.

(b)    Subject to entry of the Sale Order, Purchaser will be vested with title to the Purchased Assets, free and clear of all liens and Encumbrances, other than Permitted Encumbrances, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

4.5    <u>Condition of Assets</u>. The Purchased Assets are being sold by Sellers in AS-IS condition. Neither Sellers nor any other Person makes any other express or implied representation or warranty on behalf of Sellers, including, without limitation, any representation or warranty as to the condition of the Purchased Assets.

4.6    <u>NO OTHER REPRESENTATIONS</u>.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE IV</u>, SELLERS DO NOT MAKE ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE TRANSACTIONS, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, INDEPENDENT CONTRACTORS, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE IV</u>, SELLERS (I) EXPRESSLY DISCLAIM AND NEGATE ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) AND (II) DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR

- 14 -

INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS OR ANY OF THEIR AFFILIATES).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows:

5.1     Organization; Authorization. Purchaser is (a) duly organized, validly existing and in good standing under the laws of the State of Nevada and (b) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Purchaser and have been duly authorized by all necessary action on the part of Purchaser. This Agreement has been duly executed and delivered by such party and is a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

5.2     Noncontravention. Neither the execution, delivery and performance by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby will result in a breach or violation of, or default under, Purchaser's organizational documents.

5.3     No Brokers. Purchaser has no Liability of any kind to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers could be liable.

5.4     Financing Ability. Purchaser has the financial ability to pay the Aggregate Purchase Price as of the date hereof and the Closing and to otherwise perform Purchaser's obligations under this Agreement and provide the DIP Facility. Accordingly, there are no financing conditions to the payment of the Aggregate Purchase Price or the provision of the DIP Facility.

## ARTICLE VI
## BANKRUPTCY MATTERS

6.1     Competing Bid.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) (an "Alternative Transaction") involving the direct or indirect sale, transfer or other disposition of any assets of Sellers to a purchaser or purchasers other than Purchaser (whether consummated pursuant to a sale, consensual foreclosure, liquidation, credit bid or chapter 11 plan, a "Competing Bid").

(b)    Nothing contained herein shall be construed to prohibit Sellers and their representatives or Affiliates from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Bid other than as set forth in the Bid Procedures Order.

6.2    Cooperation in Bankruptcy Court Matters.

(a)    Sellers shall pursue diligently the entry of the Bid Procedures Order and the Sale Order. Sellers shall use commercially reasonable efforts to comply with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules in connection with obtaining approval of the Bid Procedures Order.

(b)    Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bid Procedures Order. In the event the entry of the Bid Procedures Order shall be appealed, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

6.3    Sale Order.

(a)    The Sale Order shall contain, without limitation, the following provisions:

(i)    finding that notice of the hearing on the Sale Motion and the Auction was proper and sufficient under the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, that Sellers and Purchaser entered into this Agreement in good faith, the Aggregate Purchase Price and liabilities of Sellers under the Assumed Contracts constitute fair value in consideration for the Purchased Assets and determining that Purchaser is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the Purchased Assets;

(ii)    authorizing Sellers to transfer to Purchaser all of each of its respective rights, title, privileges and interests in and to the Purchased Assets, and ordering that such transfer is free and clear of any Encumbrances, with all such Encumbrances attaching to the net proceeds of sale, if any;

(iii)    authorizing Sellers to assume and sell and assign the Assumed Contracts to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code;

(iv)    finding that Purchaser is a not a successor to Sellers or their estates by reason of any theory of Law or equity, whether with respect to any liens and claims against Sellers, the Purchased Assets or otherwise and ruling that Purchaser shall not be subject to successor liabilities for products sold prior to the Closing, all as set forth in more detail in the form of Sale Order attached hereto as Exhibit C; and

(v)    Cure amounts shall otherwise be those determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code with respect to the Assumed Contracts.

- 16 -

(b)        Subject to any Competing Bid, (i) Sellers agree that each will promptly take such actions as are reasonably necessary or appropriate to obtain prompt entry of the Sale Order, (ii) Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers and are reasonably necessary or appropriate to assist Sellers in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court or live testimony for the purposes of, among other things, providing necessary assurances of future performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Aggregate Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code; and (iii) if the entry of the Sale Order shall be appealed or collaterally attacked, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal or collateral attack of the Sale Order after its entry; provided, that Purchaser shall reimburse to Sellers the costs and expenses (including professional fees and expenses) of Sellers in any such appeal. After consultation with the Purchaser, in Sellers' sole discretion, Sellers may respond to objections to the entry of the Sale Order, conduct discovery proceedings, schedule and attend hearings and oppose any actions taken by the parties objecting to, appealing, or seeking a stay of the consummation of the sale of the Purchased Assets provided by this Agreement. Sellers shall use commercially reasonable efforts to take all actions, including the defense of motions and actions filed by third parties required in the Chapter 11 Cases reasonably required to retain possession and ownership of the Purchased Assets pending the Closing; provided, however, Sellers' obligations in connection with any such efforts shall terminate upon the Closing.

6.4    Back-up Bidder. Sellers and Purchaser agree that, in the event that Purchaser is not the winning bidder at the auction undertaken pursuant to the Bid Procedures Order (the "Auction"), if and only if Purchaser submits the next highest or otherwise best bid at the Auction, as contemplated by the Bid Procedures Order and the winning bidder fails to consummate the transaction, Purchaser shall promptly consummate the transaction upon the terms and conditions as set forth herein, including the Aggregate Purchase Price, as the same may modified by Purchaser at the Auction.

- 17 -

    6.5    <u>Bid Procedures Order and Break-up Fee</u>.

(a)    Sellers shall include in the Bid Procedures Motion and seek inclusion and approval in the Bid Procedures Order of the following provisions:

(i)    The initial bid over that submitted by Purchaser in this Agreement (the "<u>Initial Overbid</u>") shall be in the amount of at least $20,750,000.00 if Purchaser's Aggregate Purchase Price is Twenty Million Dollars ($20,000,000.00) and shall be in the amount of at least $15,750,000 if Purchaser's Aggregate Purchase Price is Fifteen Million Dollars ($15,000,000.00).

(ii)    Thereafter, bidding shall be in increments of at least $250,000.00 or figures which are wholly divisible by $250,000.00.

(iii)    Only financially qualified parties will be eligible to participate in the Auction – with financially qualified parties to mean parties who have demonstrated that they have the financial means to consummate their purchase of the Purchased Assets without financing unless the financing to be used by them is already committed (meaning that any overbid may not contain any financing contingency).  Any party who participates in the Auction will have completed their due diligence of the Debtors and will have no due diligence contingency.

(iv)    In order to be eligible to participate in the Auction, prospective overbidders will be required at least three business days prior to the Auction to (i) deliver a redlined version of this Agreement indicating any changes the prospective overbidder is requesting to this Agreement, and (ii) submit a cash deposit of $2 million, which deposit will be non-refundable and forfeited by the prospective overbidder if the prospective overbidder is deemed by the Bankruptcy Court to be the winning bidder and fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order approving the Debtors' sale of the Purchased Assets to the prospective overbidder regardless of whether an appeal has been filed of such Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement.

(v)    Purchaser will have the right, but not the obligation, to credit bid the outstanding balances of its Pre-Bankruptcy Secured Debt and the DIP Facility towards its purchase price and any overbid that Purchaser elects to submit.  Purchaser shall have the right to participate in any Auction.

(vi)    If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, then concurrently with the closing of the Debtors' sale of the Purchased Assets to such winning bidder, Purchaser will be paid directly out of the sale proceeds (i) the full amount of the Pre-Bankruptcy Secured Debt, plus (ii) the full amount of the DIP Facility, plus (iii) the Breakup Fee.

(vii)    If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, or if the Debtors elect to proceed with seeking confirmation of a plan of reorganization instead of proceeding with a sale of the

- 18 -

Purchased Assets, Purchaser shall receive a break-up fee (the "Breakup-Fee") in the amount of $500,000.00.

(viii)    The Break-Up Fee shall be deemed to be an allowed expense in the Chapter 11 Cases of the kind specified in Section 503(b) of the Bankruptcy Code and shall be paid solely from the proceeds of an Alternative Transaction.

(ix)    The Debtors shall have the right to schedule the Auction so that the payment of the Breakup-Fee to Radians will not be considered in determining the highest price bid for the Assets. However, Radians shall be authorized to match any qualified overbid and be declared the successful purchaser of the Purchased Assets giving consideration in the amount of the required Break-up Fee and Prepayment Fee as a component of its matching bid ("Matching Bid"), which Break-up Fee and Prepayment Fee will not owing by the Debtors if Radians is the winning bidder.

(x)    Ironclad will agree to proceed with an accelerated sale process, seeking to have the sale approval hearing no later than October 30, 2017.

(xi)    If Radians is deemed by the Bankruptcy Court to be the winning bidder at the Auction and Radians fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order (regardless of whether an appeal has been filed of the Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement), then Radians shall forfeit the Buyer Deposit to the Debtors.

(xii)    The Debtors' sale of the Purchased Assets to Radians or a successful overbidder will be free and clear of all liens, claims and interests in accordance with section 363(f) of the Bankruptcy Code.

(xiii)    The Debtors have the right to market the Purchased Assets for overbid pending the Auction and to hire an investment banker or sales agent to assist the Debtors in this process. However, the collateral of Radians shall not be used to fund the engagement of an investment banker or sales agent with such party only being entitled to compensation from the proceeds of the Closing.

(b)    Sellers acknowledge and agree that the entry into this Agreement provides value to the Sellers' chapter 11 estates by, among other things, inducing other parties to submit higher or better offers for the Purchased Assets. Sellers and Purchaser agree that the Break-Up Fee is a material and necessary inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated in this Agreement.

6.6    DIP Facility and Use of Cash Collateral.

(a)    DIP Facility. Purchaser will provide Debtor in Possession financing to Sellers in an amount up to Two Million Dollars (**$2,000,000.00**) (the "Indebtedness") based upon a budget or budgets as agreed between Ironclad and Radians or for additional purchases of Inventory as set forth and as defined in the DIP Facility, the terms of the DIP Facility to be included in the Debtor in Possession Loan Agreement to be negotiated a copy of which is attached as Exhibit C to this Agreement. The Debtors shall file a motion with the

- 19 -

Bankruptcy Court seeking an order approving the DIP Facility (the "Financing Motion") incorporating the terms provided herein and as more particularly described in the Debtor in Possession Loan Agreement.

        (b)    Terms of the DIP Facility.    The DIP Facility will be for a term of 4 months and will bear interest at the rate of 10% per annum. Except as set forth in the DIP Facility in regards to the Debtors' possible purchase of additional Inventory, the DIP Facility shall be used to supplement the Debtors' cash flow from their business operations pending the closing of the Debtors' sale of the Purchased Assets to Purchaser or a successful overbidder. The entire outstanding DIP Facility will be satisfied in full concurrently with the closing of the Debtors' sale of the Purchased Assets.  The DIP Facility will be further subject to such terms and conditions as more particularly set forth in the Debtor in Possession Loan Agreement.

        (c)    Security for the DIP Facility. The DIP Facility is to be secured by a grant of superpriority status with respect to the Indebtedness pursuant to Section 364(c)(1) of the Bankruptcy Code and Security Interests pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) (in each case more fully described and subject to any applicable limitations set forth in the order approving the DIP Facility on an interim and final basis (the "Financing Order").  The liens granted by the DIP Facility shall be subordinate only to the Pre-Bankruptcy Secured Debt.

        (d)    Use of Cash Collateral.    Subject to the submission and approval of a post-petition operating budget and entry of an order of the Bankruptcy Court providing adequate protection to Purchaser as may be agreed by the parties and approved by the Bankruptcy Court (the "Cash Collateral Order"), Radians will also consent to the Debtors' use of cash collateral, which, together with the DIP Financing, will enable the Debtors to pay all of their post-bankruptcy operating expenses (and any pre-bankruptcy debts which Ironclad and Radians agree are appropriate to be paid ("Critical Vendor Payments") and as authorized by order of the Bankruptcy Court), including any outstanding pre-bankruptcy employee payroll and related expenses, and all fees owing to the Clerk of the Bankruptcy Court and to the United States Trustee.

## ARTICLE VII
## EMPLOYEE MATTERS

    7.1    Employees to be Hired by Purchaser.

        (a)    Prior to the Closing. Purchaser will offer to employ, effective as of the Closing Date, the employees of Sellers as of immediately prior to the Closing Date in respect of the Business as listed on Schedule 7.1(a) (which Purchaser shall deliver to Sellers no later than one (1) Business Day prior to the Qualified Bid Determination Deadline) (the "Business Employees") as determined in the sole discretion of Purchaser. All Business Employees who are offered and accept employment with Purchaser and commence such employment immediately after the Closing shall be referred to as the "Transferred Employees". Sellers shall terminate the employment of all Transferred Employees effective as of the Closing. Schedule 7.1(a) shall be filed under seal subject to the approval of the Bankruptcy Court.  Provided Purchaser is the winning bidder at the Auction, in connection with the Closing, Purchaser will make a severance

payment to each of the Debtors' employees who are not offered employment by Purchaser, other than Debtors' officers and any employee subject to an employee retention agreement, at comparable terms to their then employment with the Debtors, with each such severance payment to be consistent with the most generous current severance policy of Purchaser and/or any of its Affiliates for similarly situated employees.  Purchaser will not owe any severance payment to any of the Debtors' employees who are offered employment by Purchaser at comparable terms to their then employment with the Debtors but who do not accept their offer of employment.

(b)     Other than as set forth in the last two sentences of Section 7.1(a) above, Sellers shall be solely responsible, and Purchaser shall have no obligations whatsoever, for any salary, wages, bonuses, accrued vacations or paid time off, or other similar amounts payable to any current or former employee, independent contractor, consultant of Sellers, or any of their eligible dependents, for any period relating to service with Sellers. For the avoidance of doubt and notwithstanding anything to the contrary in this <u>Section 7.1</u>, Purchaser shall be responsible only for any Assumed Liabilities under <u>Section 2.4(a)(i)-(iv)</u>.

(c)     Nothing in this Agreement shall be deemed or construed to limit or condition the delivery by Sellers of any notices required by, or the taking of any other action Sellers deem necessary or desirable to comply with, the WARN Act, which Sellers may take at such time and in such manner as Sellers deem appropriate in their sole discretion. Purchaser shall be responsible for providing any notice required pursuant to the WARN Act with respect to any employment losses involving Transferred Employees that occur on or after the Closing Date and agrees to not, within ninety (90) days after the Closing Date, take any action that would obligate Sellers to have provided notice to any Business Employees prior to or on the Closing Date under the WARN Act.

(d)     The provisions of this <u>Section 7.1</u> shall inure solely to the benefit of the parties to this Agreement, and nothing herein, express or implied, is intended to confer upon any other Person (including any Business or Transferred Employee) any rights or remedies of any nature (including any third-party beneficiary rights under this Agreement) whatsoever.

7.2     <u>Authorization to Communicate with Certain Employees</u>. In coordination and cooperation with Sellers, upon entry of the Bid Procedures Order, Purchaser is authorized to communicate with the Business Employees for the purpose of negotiating and extending to such employees as it determines, offers of employment contingent on Purchaser being the successful purchaser of the Purchased Assets; <u>provided</u>, that this right shall terminate if Purchaser is not the winning bidder at the Auction.

**ARTICLE VIII**
**<u>COVENANTS</u>**

A.  <u>Pre-Closing Covenants</u>.

8.1     <u>Maintenance of Business</u>.  For the period commencing on the date hereof and expiring on the earlier of the termination of this Agreement in accordance with <u>Article XI</u> and the Closing (the "<u>Pre-Closing Period</u>"), Sellers shall, subject to the compliance by Purchaser with its covenants hereunder and to applicable requirements of Law, conduct and carry on the

Business in the Ordinary Course other than changes related to the filing, announcement or pendency of Sellers' Chapter 11 Cases or the conduct of the sale process contemplated by this Agreement and/or the Bid Procedures Order.

      8.2    <u>Sellers Pre-Closing Covenants</u>. Without limiting the generality of <u>Section 8.2(a)</u>, during the Pre-Closing Period, Sellers:

      (a)    shall not, without the prior written consent of Purchaser, purchase, sell, lease, mortgage, pledge or otherwise acquire or dispose of any material Purchased Assets, except for inventory, parts and supplies purchased, sold or otherwise disposed of in the Ordinary Course;

      (b)    shall not, without the prior written consent of Purchaser, waive, release or cancel in any material respect any claims against third parties or material debts owing to them, or any rights which have any material value, in each case, with respect to any Purchased Assets, other than in the Ordinary Course or related solely to Excluded Liabilities;

      (c)    shall not, without the prior written consent of Purchaser, change, amend, terminate or otherwise modify in any material respect, any material Assumed Contract to which Sellers or either of them is a party, other than in the Ordinary Course;

      (d)    shall make all payments and otherwise perform all material obligations in respect of all leases of real property to which either of the Debtors is a party so as to prevent any loss or forfeiture thereof or thereunder, except, in any case, where (i) the enforcement of non-compliance is stayed by the Chapter 11 Cases or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a material adverse effect; and

      (e)    shall, with the exception of any defaults existing as of the date of this Agreement, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it or them, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by Lender and, upon request of Lender, make to each other party to each such Material Contract such demands and requests for information and reports or for action Debtors are entitled to make under such Material Contract except, in any case, where (i) the enforcement of non-compliance is stayed by the Chapter 11 Cases or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a material adverse effect.

      8.3    <u>Commercially Reasonable Efforts to Close</u>.

      (a)    Subject to the terms and conditions hereof, each party hereto covenants and agrees to use all commercially reasonable efforts to consummate the transactions contemplated hereby within sixty (60) days of the date of this Agreement and will fully cooperate with the other parties hereto for such purpose.

      (b)    Sellers agree to immediately notify Purchaser of any event, fact or circumstance of which Sellers become aware that could reasonably be expected to result in the

failure of a condition set forth in <u>Article IX</u> or <u>X</u> to be satisfied and, if such condition is curable, to allow Purchaser a reasonable opportunity to satisfy such condition.

(c)     Purchaser agrees to immediately notify Sellers of any event, fact or circumstance of which Purchaser becomes aware that could reasonably be expected to result in the failure of a condition set forth in <u>Article IX</u> or <u>X</u> to be satisfied and, if such condition is curable, to allow Seller a reasonable opportunity to satisfy such condition.

8.4     <u>Exclusivity</u>.

(a)     During the period from the date hereof to the commencement of Sellers' Chapter 11 Cases, Sellers shall cease immediately and cause to be terminated any and all activities, discussions or negotiations with any person, entity or group conducted heretofore with respect to, or that may reasonably be expected to lead to, an Alternative Transaction, and Sellers shall not, directly or indirectly, solicit, initiate or encourage, or take any other action that facilitates any offer, inquiry or proposal concerning any Alternative Transaction.

(b)     Subject to the terms and conditions of the Bid Procedures Order, Purchaser shall have the right to bid against any Alternative Transaction bids at the Auction.

B.   <u>Certain other Covenants and Agreements</u>.

8.5     <u>Use of Name</u>. After the Closing, Sellers may not, directly or indirectly, use the name "Ironclad", "Ironclad Performance Wear" or any derivative thereof or any similar name, or trade name currently used to identify themselves. Each of Sellers shall be responsible for all filing fees required to be paid in connection with filing Sellers' change of name amendments in the States of Nevada and California, and in each other state in which it is qualified to transact business.

8.6     <u>Tax Matters</u>.

(a)     All refunds for Taxes for any Excluded Tax, Transfer Taxes, or that are attributable to the carry forward of a Tax attribute from a Pre-Closing Period shall be for the sole benefit of Sellers and to the extent that Purchaser receives a refund that is for the benefit of Sellers, Purchaser shall promptly advise Sellers of the receipt of the refund and within five (5) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Sellers. All refunds for Taxes relating to the Business, the Purchased Assets or Transferred Employees for a Post-Closing Tax Period shall be for the sole benefit of Purchaser and to the extent that Sellers receive a refund for a Tax that is for the benefit of Purchaser, Sellers shall promptly advise Purchaser of the receipt of the refund and within five (5) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Purchaser.

(b)     If any Tax (or Tax refund) relates to a period that begins before and ends after the Closing Date, the parties shall use the following conventions for determining the portion of such Tax (or Tax refund) that relate to a Pre-Closing Tax Period and the portion that relates to a Post-Closing Tax Period: (A) in the case of property Taxes and other similar Taxes imposed on

- 23 -

a periodic basis, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined by multiplying the Taxes (or Tax refund) for the entire period by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period, and the remaining amount of such Taxes (or Tax refunds) shall be attributable to the Post-Closing Tax Period; and (B) in the case of all other Taxes, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined as if a separate return was filed for the period ending as of the end of the day on the Closing Date using a "closing of the books methodology," and the remaining amount of the Taxes (or Tax refunds) for such period shall be attributable to the Post-Closing Tax Period.

(c)    Purchaser and Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such reasonably requested information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Tax Return or other filings or otherwise in connection with Tax matters, in each case relating to the Purchased Assets or the Business.

8.7    <u>Facility Lease</u>.

The Debtors and Purchaser agree to work together to attempt to negotiate an extension of the Debtors' current real property lease for the premises located at 1920 Hutton Ct #300, Farmers Branch, TX 75234, or to find an alternative location.

**ARTICLE IX**
**CONDITIONS TO CLOSING APPLICABLE TO PURCHASER**

The obligations of Purchaser hereunder (including the obligation of Purchaser to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Purchaser):

9.1    <u>No Termination</u>. Sellers shall not have terminated this Agreement pursuant to <u>Section 11.1</u>.

9.2    <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered (i) the Bid Procedures Order, (ii) the Financing Order, and (iii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date unless consented to by Purchaser.

9.3    <u>Bring-Down of Sellers Warranties, Representations and Covenants</u>. Each of the representations and warranties of Sellers contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Sellers will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Sellers at or prior to the Closing.

- 24 -

9.4     <u>Pending Actions</u>.  No proceeding by any Governmental Authority shall be pending on the Closing Date with respect to which a court of competent jurisdiction over the Debtors has entered an order that enjoins the consummation of this Agreement or any transactions contemplated hereby.

9.5     <u>Condition of Assets</u>. From the date of this Agreement through the Closing, there shall have been no material adverse change in the condition of the Purchased Assets prior to Closing other than changes related to the filing, announcement or pendency of the Chapter 11 Cases or to the conduct of the sale process contemplated by this Agreement and/or the Bid Procedures Order, with the Bankruptcy Court to be the final arbiter of whether there has been any such material adverse change if the Debtors and Purchaser are not in agreement.

9.6     <u>Validity of Due Diligence Information</u>.  The information related to the values of Accounts Receivable and Inventory provided to Purchaser by Sellers on August 31, 2017 was true and correct to the best of the knowledge, information and belief of Sellers.

**ARTICLE X**

**<u>CONDITIONS TO CLOSING APPLICABLE TO SELLERS</u>**

The obligations of Sellers hereunder (including the obligation of Sellers to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Sellers):

10.1     <u>No Termination</u>. Purchaser shall not have terminated this Agreement pursuant to <u>Section 11.1</u>.

10.2     <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered (i) the Bid Procedures Order, (ii) the Financing Order, and (iii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

10.3     <u>Bring-Down of Purchaser Warranties, Representations and Covenants</u>. Each of the representations and warranties of Purchaser contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Purchaser will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Purchaser at or prior to the Closing.

10.4     <u>Pending Actions</u>.  No proceeding by any Governmental Authority shall be pending on the Closing Date with respect to which a court of competent jurisdiction over the Debtors has entered an order that enjoins the consummation of this Agreement or any transaction contemplated hereby.

10.5     <u>All Necessary Documents</u>. All proceedings to be taken in connection with the consummation of the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to Sellers, and Sellers

- 25 -

shall have received copies of such documents as they may reasonably request in connection therewith, including those documents to be delivered pursuant to Section 3.3.

## ARTICLE XI
## TERMINATION

11.1    Termination. This Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by mutual consent of Purchaser and Sellers;

(b)    by Sellers, if:

(i)    the Closing of the transactions contemplated by this Agreement shall not have occurred on or before November 15, 2017 or such later date as may have been agreed upon in writing by the parties hereto; provided that Sellers are not in material breach of or default under this Agreement; or

(ii)    any material representation or warranty made herein for the benefit of Sellers is untrue in any material respect, or Purchaser shall have defaulted in any material respect in the performance of any obligation under this Agreement.

(c)    by Purchaser, if:

(i)    the Closing of the transactions contemplated by this Agreement shall not have occurred on or before November 15, 2017 or such later date as may have been agreed upon in writing by the parties hereto; provided that Purchaser is not in material breach of or default under this Agreement;

(ii)    any material representation or warranty made herein for the benefit of Purchaser is untrue in any material respect, or Sellers shall have defaulted in any material respect in the performance of any obligation under this Agreement;

(iii)    failure of compliance with the requirements of Sellers as conditions precedent for Purchaser to close the transaction as set forth in Article IX;

(iv)    if Sellers fail to file, on or prior to September 8, 2017, the Chapter 11 Cases, or if Sellers fail to file in the Chapter 11 Cases the Sale Motion, the Financing Motion, and the Bid Procedures Motion by September 11, 2017; provided, however, that if Sellers make any such filings after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(i);

(v)    if the Bankruptcy Court does not enter the Bid Procedures Order on or prior to September 30, 2017; provided, however, that if the Bankruptcy Court enters the Bid Procedures Order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(v);

- 26 -

(vi)    if Sellers fail to conduct the Auction in accordance with the Bid Procedures Order within the earlier of seven (7) Business Days of the Qualified Bid Determination Deadline or October 27, 2017; provided, however, that if such Auction concludes after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(vi);

(vii)    if the Bankruptcy Court does not enter the Sale Order by October 31, 2017; provided, however, that if the Bankruptcy Court enters such Sale Order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(vii);

(viii)    if, after the entry of the Bid Procedures Order, the Auction is cancelled by Sellers for reasons other than that there was no Competing Bid received by the Debtors and the Bankruptcy Court does not enter the Sale Order within three (3) Business Days after the later of (i) such cancellation date and (ii) October 31, 2017; provided, however, that if the Bankruptcy Court enters such order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(viii); or

(ix)    if, less than 50% of those Business Employees of Sellers who are provided with offers of employment by Purchaser pursuant to Section 7.2 (with compensation substantially similar to, or better than, such employees' compensation from Sellers and on other terms consistent with Purchaser's current employment practices for similarly situated employees) accept such offers of employment, contingent upon Purchaser being the successful purchaser of the Purchased Assets upon entry of the Sale Order; provided, however, that Purchaser must exercise its right to terminate this Agreement under this Section 11.1(c)(ix) on or before October 26, 2017.

(d)    automatically, if, in accordance with the Bid Procedures Order, an alternative bidder is selected by Sellers at the conclusion of the Auction as having the highest or otherwise best bid, and such alternative bidder transaction closes.

11.2    Breakup Fee. In the event that this Agreement is terminated by Sellers and Sellers pursue an Alternative Transaction, Sellers shall immediately become obligated to pay Purchaser the Break-Up Fee in accordance with the terms of this Agreement and the Bid Procedures Order, recognizing that Sellers shall pay the Break-Up Fee to Purchaser in connection with the closing or consummation of such Alternative Transaction.  In the event that this Agreement is terminated pursuant to any other provision of Section 11.1, Purchaser shall not be entitled to the Break-Up Fee.

11.3    Buyer Deposit. In the event that Purchaser terminates this Agreement pursuant to Section 11.1(a), Section 11.1(c), or Section 11.1(d), Purchaser shall be entitled to disbursement of the Buyer Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the Escrow Account. In the event of a termination of this Agreement pursuant to any provision of Section 11.1(b), Sellers shall be entitled to disbursement of the Buyer Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the Escrow Account. In the event

that this Agreement is terminated pursuant to <u>Section 11.1</u> and either Sellers or Purchaser are entitled to receive the Buyer Deposit, then Sellers or Purchaser may deliver to the Escrow Account holder, at any time following the effective date of any such termination, a letter instructing the Escrow Account holder to pay Sellers or Purchaser, as applicable, the Buyer Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Account holder shall be subject to the terms of this Agreement.

## ARTICLE XII
## <u>MISCELLANEOUS</u>

12.1 <u>Costs and Expenses</u>. Subject to Sellers' obligations under <u>Section 6.5</u> and <u>Section 6.6</u>, Purchaser will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the purchase of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein). Sellers will pay their own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the sale of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein).

12.2 <u>Bankruptcy Court Approval</u>. The Parties acknowledge that this Agreement shall not become effective until it has been approved by the Bankruptcy Court pursuant to the Bid Procedures Order and the Sale Order.

12.3 <u>Entire Agreement</u>. The Schedules and Exhibits referenced in this Agreement are incorporated into this Agreement and collectively with the Confidentiality Agreement and this Agreement contain the entire agreement between the parties hereto with respect to the transactions contemplated hereunder, and supersede all negotiations, representations, warranties, commitments, offers, contracts and writings prior to the date hereof. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

12.4 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Facsimiles or other electronic copies of signatures will be deemed to be originals.

12.5 <u>Assignment, Successors and Assigns</u>. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of Sellers and Purchaser, their respective successors, permitted assigns, and personal representatives, as the case may be.  No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties, and any assignment in contravention of the foregoing shall be null and void; *provided*, *however*, Purchaser may assign this Agreement and its rights and obligations under this Agreement, in whole or in part, without consent, to any of its Subsidiaries or Affiliates or any Person that acquires all or substantially all of the equity or assets of Purchaser ("<u>Permitted</u>

- 28 -

Assignee"). This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, including a Permitted Assignee.

12.6    <u>Survival</u>. The representations and warranties of Sellers contained in this Agreement (whether or not contained in Article IV) shall not survive, and shall terminate at, the Closing, and Sellers shall have no liability after the Closing for any breach of any representation or warranty. None of the covenants or other agreements contained in this Agreement shall survive the Closing other than those which by their terms contemplate performance after the Closing, and each surviving covenant or agreement shall survive the Closing for the period contemplated by its terms. For the avoidance of doubt, Sellers shall have no obligations under this Agreement after the earlier of (i) the Closing, (ii) the date that is three months from the date of this Agreement and (iii) the effective date of any plan confirmed in the Chapter 11 Cases.

12.7    <u>Severability</u>. If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction or as a result of future legislative action, such holding or action shall be strictly construed and shall not affect the validity or effect of any other provision hereof.

12.8    <u>Headings</u>. The captions of the various Articles and Sections of this Agreement have been inserted only for convenience of reference and shall not be deemed to modify, explain, enlarge or restrict any of the provisions of this Agreement.

12.9    <u>Risk of Loss</u>. Risk of loss (other than from post-petition operating losses incurred by the Debtors), damage or destruction to a material portion the Purchased Assets shall be upon Sellers until the Closing, and shall thereafter be upon Purchaser.

12.10    **<u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE. WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT (EXCEPT AS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY), THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY AND ANY OF THE DOCUMENTS (OR ANY PROVISION IN ANY OF THE DOCUMENTS) EXECUTED HEREUNDER OR IN CONNECTION HEREWITH. SUCH BANKRUPTCY COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND PURCHASER AND SELLERS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE CHAPTER 11 CASES SHALL HAVE CLOSED AND CANNOT BE REOPENED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE**

**JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE AND ANY APPELLATE COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE. EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. IN THE EVENT ANY SUCH ACTION, SUIT OR PROCEEDING IS COMMENCED, THE PARTIES HEREBY AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER ANY PARTY HERETO IN ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH ACTION, SUIT OR PROCEEDING UPON THE PARTY AT THE ADDRESS OF SUCH PARTY SET FORTH IN <u>SECTION 12.13</u>, UNLESS ANOTHER ADDRESS HAS BEEN DESIGNATED BY SUCH PARTY IN A NOTICE GIVEN TO THE OTHER PARTIES IN ACCORDANCE WITH THE PROVISIONS OF <u>SECTION 12.13</u>.**

      12.11  <u>Press Releases and Public Announcements</u>. No public announcement or disclosure will be made by any party with respect to the subject matter of this Agreement or the Transaction without the prior written consent of Purchaser and Sellers; <u>provided</u>, <u>however</u>, that the provisions of this <u>Section 12.11</u> will not prohibit (a) any disclosure required by any applicable Laws (in which case the disclosing party will provide the other parties with the opportunity to review in advance any such disclosure) or an Order of the Bankruptcy Court, (b) any disclosure made in connection with the enforcement of any right or remedy relating to the Transaction, and (c) any disclosure by Purchaser or Sellers to report and disclose the status of this Agreement and the transactions contemplated hereunder to their respective Affiliates and/or their respective members, creditors, shareholders or limited partners. Effective upon, and only upon, the Closing, the Confidentiality Agreement will terminate. If any such announcement or other disclosure is required by applicable Law or an Order of the Bankruptcy Court, the disclosing party required to make such announcement or disclosure shall give the other party prior notice of, and an opportunity to comment on, the proposed announcement or disclosure, which shall be reasonably satisfactory to all of the parties. The parties hereto acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Bid Procedures Order and/or the Sale Order and shall make any applicable disclosures regarding this Agreement in the Sale Motion and that Sellers may provide copies of this Agreement (including any draft versions of this Agreement) to the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court.

      12.12  <u>U.S. Dollars</u>. All amounts expressed in this Agreement and all payments required by this Agreement are in United States dollars.

12.13  <u>Notices</u>.

(a)     All notices, requests, demands and other communications under this Agreement shall be in writing and delivered in person, or sent by email or sent by reputable overnight delivery service and properly addressed as follows (with any such notice, request, demand or other communication also to be provided by email):

<u>To Purchaser</u>:

Radians Wareham Holding, Inc.
5305 Distriplex Farms
Memphis Tennessee 38141
Email:  mst@radians.com
Attention: Mike Tutor, CEO

with a **copy** to (which shall not constitute notice):

Baker Donelson
2000 First Tennessee Building
165 Madison Avenue
Memphis, Tennessee 38103
Email:  fchildress@bakerdonelson.com
Attention: E. Franklin Childress, Jr.

<u>To Seller Prior to the Closing</u>:

Ironclad Performance Wear Corporation
1920 Hutton Court, Suite 300
Farmers Branch, Texas
Email:  geoffg@ironclad.com
Attention:  L Geoffrey Greulich, CEO

with a **copy** to (which shall not constitute notice):

Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California  90067
Email:  rb@lnbyb.com
Attention: Ron Bender

and

Stubbs Alderton & Markiles, LLP
15260 Ventura Blvd., 20th Floor
Sherman Oaks, CA 91403
Email: salderton@stubbsalderton.com
Attention: Scott Alderton

(b)    Any party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

(c)    All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 12.13 if delivered personally or courier, shall be effective upon delivery; if sent by facsimile, shall be delivered upon receipt of proof of transmission.

12.14    WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT, THE SUBJECT MATTER HEREOF OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO IN CONNECTION WITH ANY SUCH AGREEMENTS, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.14 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.15    Waiver. Any party hereto may waive compliance by or extend the time of performance of any obligation or act for any other party with respect to any provision of this Agreement. No waiver of any provision or extension shall be construed as a waiver of any other provision or an extension of time for the performance of any other obligation or act hereunder. Any waiver or extension must be in writing.

12.16    No Third-Party Beneficiary. This Agreement is being entered into solely for the benefit of the parties hereto, and the parties do not intend that any employee or any other person shall be a third-party beneficiary of the covenants by either Sellers or Purchaser contained in this Agreement.

12.17    SELLERS DISCLAIMER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF SELLERS EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES) ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO PURCHASER IN CONNECTION WITH THIS AGREEMENT, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, SELLERS HAVE NOT MADE AND ARE NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED

- 32 -

REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE PURCHASED ASSETS. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE IV</u> (AS MODIFIED BY THE SCHEDULES), ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE PURCHASED ASSETS ARE HEREBY EXPRESSLY DISCLAIMED. PURCHASER REPRESENTS, WARRANTS, COVENANTS AND AGREES, THAT SELLERS ARE NOT MAKING ANY REPRESENTATION OR WARRANTY, OTHER THAN THOSE EXPRESSLY MADE BY SELLERS AS SET FORTH IN <u>ARTICLE IV</u> (AS MODIFIED BY THE SCHEDULES), AND THAT PURCHASER SHALL ACQUIRE THE PURCHASED ASSETS AND ASSUME THE ASSUMED LIABILITIES WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OTHER THAN THOSE EXPRESSLY MADE BY SELLERS AS SET FORTH IN <u>ARTICLE IV </u>(AS MODIFIED BY THE SCHEDULES).

12.18  <u>PURCHASER DISCLAIMER</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF PURCHASER EXPRESSLY SET FORTH IN <u>ARTICLE V</u> ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO SELLERS IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, PURCHASER HAS NOT MADE OR IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE V</u> HEREOF.

12.19  <u>Disclosures</u>. No reference to or disclosure of any information in the Schedules shall be construed as an admission or indication that such information is material or that such information is required to be referred to or disclosed in the Schedules nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement.

12.20  <u>Specific Performance</u>. Each of the parties acknowledges and agrees that the other parties hereto would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties hereto will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms hereof in any action instituted in any court specified in <u>Section 12.10</u> in addition to any other remedy to which he, she or it may be entitled, at law or in equity.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

PURCHASER:

RADIANS WAREHAM HOLDING, INC., a Nevada corporation

By: _____
   Name: **Mike Tutor**
   Title: **Chief Executive Officer**

SELLERS:

IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation

By: _____
   Name: **L. Geoffrey Greulich**
   Title: **Chief Executive Officer**

and
IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation

By: _____
   Name: **L. Geoffrey Greulich**
   Title: **Chief Executive Officer**

61183747_11
4826-5851-4510 v1

2921440-000020 08/30/2017
4823-5694-1390 v2
2921440-000020 09/05/2017

## EXHIBIT A

## FORM OF BID PROCEDURES ORDER

# <u>EXHIBIT B</u>

## FORM OF SALE ORDER

61183747_11
4826-5851-4510 v1

2921440-000020 08/30/2017
4823-5694-1390 v2
2921440-000020 09/05/2017

# <u>EXHIBIT C</u>

## FORM OF DEBTOR IN POSSESSION LOAN AGREEMENT

# <u>EXHIBIT D</u>

## FORM OF FINANCING ORDER

**EXHIBIT "B"**

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 211414)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br><br>☒  Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐ Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**ORDER: (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS TO USE, (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES, AND STALKING HORSE BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; AND (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER**<br><br>DATE:    September 13, 2017<br>TIME:     2:00 p.m.<br>PLACE:   Courtroom "303"<br>           21041 Burbank Blvd.<br>           Woodland Hills, CA |

1

A hearing was held on September 13, 2017, at 2:00 p.m., for the Court to consider approval of the emergency motion (the "Bid Procedures Motion") filed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (collectively, the "Debtors"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases, for the entry of an order in substantially the form attached as Exhibit "1" to the Declaration of Geoffrey Greulich (the "Greulich Declaration") filed by the Debtors in support of the Bid Procedures Motion.  Appearances were made at the hearing as set forth on the record of the Court.

The Court, having considered the Bid Procedures Motion and all of the pleadings filed by the Debtors in support of the Bid Procedures Motion, the statements, arguments and representations of the parties made at the hearing, and good cause appearing,

HEREBY ORDERS AS FOLLOWS:

1.    The form of the Asset Purchase Agreement dated September 8, 2017 (the "APA") between the Debtors and Radians Wareham Holding, Inc. ("Purchaser" or "Radians"), a true and correct copy of which is attached as Exhibit "A" to the Greulich Declaration, to be used by (a) Purchaser as the stalking horse bidder for the Purchased Assets, and (b) any prospective overbidders (each an "Overbidder" and collectively, the "Overbidders") who seek to participate in a hoped for auction sale ("Auction") of the Purchased Assets is approved, recognizing that the Court is not approving the actual sale of the Purchased Assets by way of this Order.  Any such approval of the sale of the Purchased Assets would occur only pursuant to a separate order of the Court in response to a sale motion filed by the Debtors.

2.    In the event that the Debtors receive one or more qualified overbids, an Auction shall take place before the Court on October ___, 2017, commencing at __:__ a.m.

3.      The hearing for the Court to consider approval of the Debtors' proposed sale of the Purchased Assets to Purchaser or to a successful Overbidder shall be held before the Court on October ___, 2017, commencing at __:__ a.m. following the conclusion of any Auction.

4.      In accordance with Section 6.5 of the APA, the following provisions shall apply in respect to any Auction and to any prospective Overbidder becoming qualified to participate in the Auction:

a.      The initial bid over that submitted by Purchaser in the APA shall be in the amount of at least $20,750,000.00 if Purchaser's Aggregate Purchase Price is Twenty Million Dollars ($20,000,000.00) and shall be in the amount of at least $15,750,000 if Purchaser's Aggregate Purchase Price is Fifteen Million Dollars ($15,000,000.00).

b.      Thereafter, bidding shall be in increments of at least $250,000.00 or figures which are wholly divisible by $250,000.00.

c.      Only financially qualified parties will be eligible to participate in the Auction – with financially qualified parties to mean parties who have demonstrated that they have the financial means to consummate their purchase of the Purchased Assets without financing unless the financing to be used by them is already committed (meaning that any overbid may not contain any financing contingency).  Any party who participates in the Auction will have completed their due diligence of the Debtors and will have no due diligence contingency.

d.      In order to be eligible to participate in the Auction, prospective overbidders will be required at least three business days prior to the Auction (i.e., by 5:00 p.m. PST on October __, 2017) to (i) deliver a redlined version of the APA to counsel for the Debtors, counsel for Purchaser and counsel for any official

3

committee formed in the Debtors' bankruptcy cases indicating any changes the prospective overbidder is requesting to the APA, and (ii) submit a cash deposit of $2 million, which deposit will be non-refundable and forfeited by the prospective overbidder if the prospective overbidder is deemed by the Bankruptcy Court to be the winning bidder and fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order approving the Debtors' sale of the Purchased Assets to the prospective overbidder regardless of whether an appeal has been filed of such Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement.

e.  Purchaser will have the right, but not the obligation, to credit bid the outstanding balances of its Pre-Bankruptcy Secured Debt and the DIP Facility towards its purchase price and any overbid that Purchaser elects to submit. Purchaser shall have the right to participate in any Auction.

f.  If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, then concurrently with the closing of the Debtors' sale of the Purchased Assets to such winning bidder, Purchaser will be paid directly out of the sale proceeds (i) the full amount of the Pre-Bankruptcy Secured Debt, plus (ii) the full amount of the DIP Facility, plus (iii) the Breakup Fee.

g.  If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, or if the Debtors elect to proceed with seeking confirmation of a plan of reorganization instead of proceeding with a sale of

the Purchased Assets, Purchaser shall receive a break-up fee (the "<u>Breakup-Fee</u>") in the amount of $500,000.00.

h. The Break-Up Fee shall be deemed to be an allowed expense of the kind specified in Section 503(b) of the Bankruptcy Code and shall be paid solely from the proceeds of an Alternative Transaction.

i. The Debtors shall have the right to schedule the Auction so that the payment of the Breakup-Fee to Radians will not be considered in determining the highest price bid for the Assets.   However, Radians shall be authorized to match any qualified overbid and be declared the successful purchaser of the Purchased Assets giving consideration in the amount of the required Break-up Fee and Prepayment Fee as a component of its matching bid, which Break-up Fee and Prepayment Fee will not owing by the Debtors if Radians is the winning bidder.

j. If Radians is deemed by the Bankruptcy Court to be the winning bidder at the Auction and Radians fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order (regardless of whether an appeal has been filed of the Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement), then Radians shall forfeit the Buyer Deposit to the Debtors.

k. The Debtors' sale of the Purchased Assets to Radians or a successful overbidder will be free and clear of all liens, claims and interests in accordance with section 363(f) of the Bankruptcy Code.

l. The Debtors have the right to market the Purchased Assets for overbid pending the Auction and to hire an investment banker or sales agent to assist

5

the Debtors in this process.  However, the collateral of Radians shall not be used to fund the engagement of an investment banker or sales agent with such party only being entitled to compensation from the proceeds of the Closing.

m.  If there are more than one qualified Overbidders, the Debtors shall have the right to determine the manner in which the Auction will proceed.

n.  The Court will resolve any disputes relating to the Auction.

5.      The form of notice (the "Auction Notice") to be provided by the Debtors to their creditors and to be provided by the Debtors' investment banker to prospective Overbidders in the form attached as Exhibit "C" to Greulich Declaration is approved.

###

**EXHIBIT "C"**

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 211414)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>      Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>      Debtor and Debtor in Possession.<br>_____<br><br>☒  Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐  Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**NOTICE OF PROPOSED SALE OF ASSETS, AUCTION SALE DATE AND OPPORTUNITY TO OVERBID**<br><br><br>     **[Auction Sale Date]**<br>DATE:    October __, 2017<br>TIME:    __:__ a.m.<br>PLACE:   Courtroom "303"<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA |

1

PLEASE TAKE NOTICE that on September 8, 2017, Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (collectively, the "Debtors"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that on September 8, 2017, prior to filing their Chapter 11 bankruptcy cases, the Debtors entered into an Asset Purchase Agreement (the "APA") with Radians Wareham Holding, Inc. ("Purchaser" or "Radians"), a true and correct copy of which is attached hereto as Exhibit "1," pursuant to which Purchaser has agreed to purchase substantially all of the Debtors' assets (excluding cash and causes of action) for a purchase price of $20 million or $15 million depending upon the outcome of a certain event which is the subject of a confidential side letter which has been filed with the Court under seal. A copy of the confidential side letter will be provided to any qualified prospective overbidder who signs a confidentiality agreement in a form acceptable to the Debtors.

PLEASE TAKE FURTHER NOTICE that the Debtors' proposed sale of assets to Purchaser is subject to overbid. Set forth in this Notice is important information for any prospective overbidder (each an "Overbidder" and collectively, the "Overbidders") to know in order to be eligible to participate in an auction for the sale of the Debtors' assets (the "Auction").

PLEASE TAKE FURTHER NOTICE that in the event the Debtors receive one or more qualified overbids, an Auction shall take place before the Court on October ___, 2017, commencing at __:__ a.m.

PLEASE TAKE FURTHER NOTICE that at a hearing held on September 13, 2017, at 2:00 p.m., the Court granted the Debtors' emergency bid procedures motion (the "Bid

2

Procedures Motion"). A copy of the Court order approving the Bid Procedures Motion (the "Bid Procedures Order") is attached hereto as Exhibit "2".

PLEASE TAKE FURTHER NOTICE that pursuant to the Bid Procedures Order, the form of the Asset Purchase Agreement entered into between the Debtors and Purchaser (attached hereto as Exhibit "1") is the form of Asset Purchase Agreement to be used by any prospective Overbidder. Any such approval of the sale of the Purchased Assets would occur only pursuant to a separate order of the Court in response to a sale motion filed by the Debtors.

PLEASE TAKE FURTHER NOTICE that following is important information for any prospective Overbidder:

1. The hearing for the Court to consider approval of the Debtors' proposed sale of the Purchased Assets to Purchaser or to a successful Overbidder shall be held before the Court on October ___, 2017, commencing at __:__ a.m.

2. In accordance with Section 6.5 of the APA, the following provisions shall apply in respect to any Auction and to any prospective Overbidder becoming qualified to participate in the Auction:

    a. The initial bid over that submitted by Purchaser in the APA shall be in the amount of at least $20,750,000.00 if Purchaser's Aggregate Purchase Price is Twenty Million Dollars ($20,000,000.00) and shall be in the amount of at least $15,750,000 if Purchaser's Aggregate Purchase Price is Fifteen Million Dollars ($15,000,000.00).

    b. Thereafter, bidding shall be in increments of at least $250,000.00 or figures which are wholly divisible by $250,000.00.

    c. Only financially qualified parties will be eligible to participate in the Auction – with financially qualified parties to mean parties who have demonstrated

that they have the financial means to consummate their purchase of the Purchased Assets without financing unless the financing to be used by them is already committed (meaning that any overbid may not contain any financing contingency). Any party who participates in the Auction will have completed their due diligence of the Debtors and will have no due diligence contingency.

d. In order to be eligible to participate in the Auction, prospective overbidders will be required at least three business days prior to the Auction (i.e., by 5:00 p.m. PST on October __, 2017) to (i) deliver a redlined version of the APA to counsel for the Debtors, counsel for Purchaser and counsel for any official committee formed in the Debtors' bankruptcy cases indicating any changes the prospective overbidder is requesting to the APA, and (ii) submit a cash deposit of $2 million, which deposit will be non-refundable and forfeited by the prospective overbidder if the prospective overbidder is deemed by the Bankruptcy Court to be the winning bidder and fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order approving the Debtors' sale of the Purchased Assets to the prospective overbidder regardless of whether an appeal has been filed of such Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement.

e. Purchaser will have the right, but not the obligation, to credit bid the outstanding balances of its Pre-Bankruptcy Secured Debt and the DIP Facility towards its purchase price and any overbid that Purchaser elects to submit. Purchaser shall have the right to participate in any Auction.

f.  If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, then concurrently with the closing of the Debtors' sale of the Purchased Assets to such winning bidder, Purchaser will be paid directly out of the sale proceeds (i) the full amount of the Pre-Bankruptcy Secured Debt, plus (ii) the full amount of the DIP Facility, plus (iii) the Breakup Fee.

g.  If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, or if the Debtors elect to proceed with seeking confirmation of a plan of reorganization instead of proceeding with a sale of the Purchased Assets, Purchaser  shall receive a break-up fee (the "Breakup-Fee") in the amount of $500,000.00.

h.  The Break-Up Fee shall be deemed to be an allowed expense of the kind specified in Section 503(b) of the Bankruptcy Code and shall be paid solely from the proceeds of an Alternative Transaction.

i.  The Debtors shall have the right to schedule the Auction so that the payment of the Breakup-Fee to Radians will not be considered in determining the highest price bid for the Assets.  However, Radians shall be authorized to match any qualified overbid and be declared the successful purchaser of the Purchased Assets giving consideration in the amount of the required Break-up Fee and Prepayment Fee as a component of its matching bid, which Break-up Fee and Prepayment Fee will not owing by the Debtors if Radians is the winning bidder.

j.  If Radians is deemed by the Bankruptcy Court to be the winning bidder at the Auction and Radians fails to close its purchase of the Purchased Assets within

5

14 business days following the entry of the Sale Order (regardless of whether an appeal has been filed of the Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement), then Radians shall forfeit the Buyer Deposit to the Debtors.

k.  The Debtors' sale of the Purchased Assets to Radians or a successful overbidder will be free and clear of all liens, claims and interests in accordance with section 363(f) of the Bankruptcy Code.

l.  The Debtors have the right to market the Purchased Assets for overbid pending the Auction and to hire an investment banker or sales agent to assist the Debtors in this process.  However, the collateral of Radians shall not be used to fund the engagement of an investment banker or sales agent with such party only being entitled to compensation from the proceeds of the Closing.

m.  If there are more than one qualified Overbidders, the Debtors shall have the right to determine the manner in which the Auction will proceed.

n.  The Court will resolve any disputes relating to the Auction.

Dated:  September 11, 2017

IRONCLAD PERFORAMNCE WEAR CORPORATION, *et al.*

By:___*/s/ Ron Bender*_____
　　　RON BENDER
　　　MONICA Y. KIM
　　　KRIKOR J. MESHEFEJIAN
　　　LEVENE, NEALE, BENDER,
　　　YOO & BRILL L.L.P.
　　　Proposed Attorneys for Debtors and
　　　Debtors in Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **OMNIBUS DECLARATION OF L. GEOFF GREULICH IN SUPPORT OF DEBTORS' EMERGENCY "FIRST DAY" MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 11, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **S Margaux Ross    margaux.ross@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**
- **Sharon Z. Weiss    sharon.weiss@bryancave.com, raul.morales@bryancave.com**

**2. SERVED BY UNITED STATES MAIL**: On **September 11, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 11, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☒ *Service List served by Overnight Mail attached*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 11, 2017 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**Served by Overnight Mail:**

| | | |
|---|---|---|
| Ironclad Performance Wear (8300)<br>OUST, Secured & Top 20 | United States Trustee<br>915 Wilshire Blvd., Suite 1850<br>Los Angeles, California 90017 | U. S. Securities and Exchange<br>Commission<br>Attn: Bankruptcy Counsel<br>444 South Flower Street, Suite 900<br>Los Angeles, CA 90071-9591 |
| **Secured Creditor**<br>Radians Wareham Holding, Inc.<br>Attn: Mike Tutor, CEO<br>5305 Distriplex Farms<br>Memphis, TN 38141 | **Counsel to Radians Wareham Holdings**<br>E. Franklin Childress, Jr.<br>Baker, Donelson, Bearman, Caldwell &<br>Berkowitz, PC<br>165 Madison Ave, Suite 2000<br>Memphis, Tennessee  38103 | **Counsel to Radians Wareham Holdings**<br>Sharon Z. Weiss<br>Bryan Cave<br>120 Broadway, Suite 300<br>Santa Monica, CA 90401 |

**Top 20 Unsecured Creditors:**

| | | |
|---|---|---|
| Advantage Media Services, Inc.<br>Attn: Steven Helmle<br>29010 Commerce Center Drive<br>Valencia, CA 91355 | Danny Negara<br>Mercindo Global Manufaktur<br>Jl. Raya Semarang-Bawen Km.29<br>SEemerang, Central Java<br>50661, Indonesia | Eliza Yang<br>Nantong Changbang Gloves Co.<br>Flat/RM 1602 Chit Lee Comm<br>Bldg 30-36, Shau Kei Wan Road<br>Hong Kong, China |
| Gerard<br>BDO USA, LLP<br>P. O. BOX 677973<br>Dallas, TX 75267-7973 | Kwong<br>PT JJ GLOVES INDO<br>JL Ronggowarsito, Mlese, Ceper<br>Bonded Zone, Klaten<br>Central Java, Indonesia, 57463 | Mark Robba<br>PT SPORT GLOVE INDONESIA<br>Krandon Desa Pandowoharjo<br>Sleman<br>Yogyakarta, Indonesia, 55512 |
| Daniel Gomes<br>Capital One Bank<br>P. O. BOX 1917<br>Merrifield, VA 22116-1917 | Brent Waters<br>Resources Global Professionals<br>P.O. Box 740909<br>Los Angeles, CA 90074-0909 | Skadden Arps Slate Meagher & Flom<br>LLP<br>P O Box 1764<br>White Plains, NY 10602 |
| Carol Pearson<br>FedEx<br>PO Box 7221<br>Pasadena, CA 91109-7321 | Risk Consulting Partners<br>24722 Network Place<br>Chicago, IL 60673-1247 | Robert Tejeda<br>Stubbs, Alderton & Markiles, LLP<br>15260 Ventura Blvd<br>20th Floor<br>Sherman Oaks, CA 91403 |
| Ms. Vicz Yue<br>Ka Hung Glove Inustrial Co. Ltd.<br>Fujian Quanzhou Jiacheng Leather<br>Chi Feng Road, Quanzhou City<br>Fujian, 362000, China | Shur-Sales & Marketing, Inc.<br>3830 S Windermere St.<br>Englewood, CO 80110 | John Calhoun<br>Synetra<br>1110 E. State Highway 114<br>Suite 200<br>Southlake, TX 76092 |
| Sky Lin<br>Marusan - Mimasu Tshusho Co. Ltd.<br>No 1 Queen' Road Central<br>Hong Kong<br>China | Carla Durand<br>University of Milwaukee<br>P O Box 500<br>University of Wisconsin - Milwaukee<br>Milwaukee, WI 53201 | Bradley J. S. Weiss<br>Winspeed Sports Shanghai Co., Ltd.<br>858 Mingzhu Road<br>Shanghai<br>China, 00020-1702 |
| Janice Lee<br>Woneel Midas Leathers<br>Jl Gembor Raya Desa Pasirjaya<br>Tangerang<br>Banten, Indonesia, 15135 | Liliana Dominguez<br>Yellow and Roadway<br>P. O. Box 100129<br>Pasadena, CA 91355 | 1920 Hutton Court<br>Attn: Johnny Clark<br>Inwood National Bank<br>P O Box 857413<br>Richardson, TX 75085 |