RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: RB@LNBYB.com, MYK@LNBYB.com, KJM@LNBYB.COM

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | Lead Case No.: 1:17-bk-12408-MB |
| IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation, | (Proposed to be) Jointly administered with: 1:17-bk-12409-MB |
| Debtor and Debtor in Possession. | Chapter 11 Cases |
| In re: | **DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (IV) GRANTING RELATED RELIEF;** |
| IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation, | |
| Debtor and Debtor in Possession. | |
| ☒ Affects both Debtors | |
| ☐ Affects Ironclad Performance Wear Corporation, a California corporation only | |
| ☐ Affects Ironclad Performance Wear Corporation, a Nevada corporation only | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | **[Omnibus Declaration of L. Geoff Greulich Filed in Support of Debtors' First Day Motions and Declaration of** |

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Monica Y. Kim Filed Concurrently Herewith]**

DATE:       September 13, 2017
TIME:       2:00 p.m.
PLACE:      Courtroom "303"
            21041 Burbank Blvd.
            Woodland Hills, CA

# TABLE OF CONTENTS

BACKGROUND INFORMATION ................................................................5

REQUEST TO USE CASH COLLATERAL................................................8

REQUEST TO OBTAIN PROPOSED POST-PETITION SECURED FINANCING
AND THE SALIENT TERMS THEREOF ................................................8

MEMORANDUM OF POINTS AND AUTHORITIES.................................11

I. STATEMENT OF FACTS ...................................................................11

    A. Brief Description Of The Debtors And Their Businesses...................11

    B. Events Leading To Bankruptcy And The Debtors' Chapter 11 Goals. ...........12

    C. The Debtors' Primary Assets and Secured Loans.  ...........................14

    D. The Need For Use Of Cash Collateral And Post-Petition Financing. .................17

    E. Summary Of The Salient Terms Of the Proposed DIP Loan. ...........................19
        a. DIP Loan ................................................................19
        b. Advances  ................................................................19
        c. Approved Budgets  ................................................20
        d. Inventory Purchases.  .............................................20
        e. Term and Interest on DIP Loan  ...........................20
        f. DIP Super-Priority Claim:  ....................................21
        g. DIP Liens................................................................21
        h. Acknowledgements of Pre-Petition Loans.  ..........22
        i. Events of Default and Remedies; Milestones  ........22
        j. Release ................................................................ 22

II. THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL.................. 22

    A. The Debtors Must Be Authorized To Use Cash Collateral To Operate,
       Maintain And Preserve Their Assets In Accordance With The
       Approved Budgets.................................................................22

    B. The Sole Pre-Petition Secured Party Consents To The Debtors'
       Use Of Cash Collateral And Is Adequately Protected By A
       Substantial Equity Cushion, The Continued Operation Of The
       Debtors' Businesses And Other Forms Of Adequate Protection. ....................24

III. THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN
    THE PROPOSED POST-PETITION FINANCING ........................................27

    A.  The Debtors Should Be Authorized To Obtain The Proposed Post-Petition
       Financing From Radians To Operate The Debtors' Businesses And To
       Maintain And Preserve The Value Of The Debtors' Assets. ..........................27

      1. *The Debtors Are Unable To Obtain Unsecured Credit.* ...............28

    2. *The Terms Of The Proposed Post-Petition Financing*
      *From Radians Are Fair, Reasonable and Adequate.*.....................**30**

    3. *The Proposed Financing From Radians Is Necessary*
      *And Proper* ..........................................................................**30**

**IV.  PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF**
**THE MOTION HAVE BEEN SATISFIED** ....................................................**31**

**V.  THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE** ........................**32**

**VI. CONCLUSION** ...............................................................................................**32**

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re Ames Dept. Stores*
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ....................................................27, 29, 30, 31

*In re Aqua Assoc.*
  123 B.R. 192 (Bankr. E.D.Pa. 1991) ....................................................................28

*In re Crouse Group, Inc.*
  71 B.R. 544 (Bankr. E.D.Pa. 1987) .....................................................................28

*In re Dynaco Corporation*
  162 B.R. 389 (Bankr. D.N.H. 1993) ..............................................................23, 25

*In re Immenhausen Corp.*
  164 B.R. 347 (Bankr. M.D. Fla. 1994) .................................................................25

*In re McCombs Properties VI, Ltd.*
  88 B.R. 261 (Bankr. C.D. Cal. l988)...............................................................24, 25

*In re Mellor*
  734 F.2d 1396 (9th Cir. 1984) .............................................................................24

*In re Newark Airport/Hotel Ltd. Partnership*
  156 B.R. 444 (Bankr. D.N.J. 1993) ......................................................................25

*In re O'Connor*
  808 F.2d 1393 (10th Cir. 1987) ...............................................................24, 25, 26

*In re Oak Glen R-Vee*
  8 B.R. 213 (Bankr. C.D. Cal. 1981).....................................................................23

*In re Simasko Production Co.*
  47 B.R. 444 (D. Colo.1985)..................................................................................27

*In re Snowshoe Co.*
  789 F.2d 1085 (4th Cir. 1986) .............................................................................29

*In re Stein*
  19 B.R. 458. (Bankr. E.D. Pa. 1982) ...................................................................25

*In re Triplett*
  87 B.R. 25 (Bankr. W.D.Tex. 1988).....................................................................25

*In re Tucson Industrial Partners*
    129 B.R. 614 (9th Cir. BAP 1991)...................................................................23

*Matter of Pursuit Athletic Footwear, Inc.*
    193 B.R. 713 (Bankr. D. Del. 1996) ..............................................................25

*Richmond Leasing Co. v. Capital Bank N.A.*
    762 F.2d 1303 (5th Cir. 1985) ........................................................................31

*United Savings Association v. Timbers of Inwood Forest Associates*
    108 S.Ct. 626 (1988).................................................................................24, 25

**FEDERAL STATUTES**

11 U.S.C. §§ 105(a), 361, 362, 363, and 364...........................................................3

11 U.S.C. § 363(a) ....................................................................................3, 4, 17, 23

11 U.S.C. § 363(c)(1).......................................................................................22, 23

11 U. S. C. § 363(c)(2)(A) and (B) ........................................................................23

11 U.S.C. § 363(c)(2)(B) .......................................................................................23

11 U.S.C. § 364(b), *i.e* ..........................................................................................28

11 U.S.C. § 364(b)(1)(A) .......................................................................................28

11 U.S.C. §§ 547 and 548 ...................................................................................4, 21

11 U.S.C. § 1107(a) ...............................................................................................23

Pursuant to Local Bankruptcy Rule 2081-1, and 11 U.S.C. §§ 105(a), 361, 362, 363, and 364, Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada", and with Ironclad California, the "Debtors" or "Ironclad"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases[1], hereby file this motion (the "Motion"), on an emergency basis, for the entry of an interim order ("Interim Order") in substantially the form attached as **Exhibit 6** to the Omnibus Declaration of L. Geoff Greulich filed in support of the Debtors' first day motions filed concurrently herewith ("Omnibus Declaration") [Docket No. 6], and for the entry of a final order ("Final Order" and with the Interim Order, the "Financing Orders") following a final hearing on the Motion, which provide for, among other things:

(1)     approval of and authorization for the Debtors to execute, enter into, and perform under that certain *Debtor-In-Possession Credit Agreement and Agreement for the Use of Cash Collateral* ("DIP Agreement"), as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, with Radians Wareham Holding, Inc. ("Radians"), a true and correct copy of which is attached as **Exhibit 7** to the Omnibus Declaration;

(2)     authorization for the Debtors to obtain post-petition financing in the aggregate principal amount not to exceed $2,000,000 ("DIP Loan"), pursuant to the terms of the DIP Agreement, and the Financing Orders;

(3)     authorization for the Debtors' use of cash collateral, as such term is defined in 11 U.S.C. § 363(a), and the proceeds of the DIP Loan in accordance with the Debtors' nine (9) week cash flow forecast setting forth all projected cash receipts and cash disbursements following the Petition Date ("Initial Approved Budget"), a true and correct copy of which is attached as **Exhibit 8** to the Omnibus Declaration, and all future budgets, and in accordance with the terms and conditions set forth in the DIP Agreement and the Financing Orders, as applicable;

---

[1] Concurrently herewith, the Debtors have filed a motion seeking to have their bankruptcy cases jointly administered.

(4)     pursuant to sections 364(c)(1), (c)(2) and (c)(3) of the Bankruptcy Code, the grant of (i) super-priority administrative expense priority claims against the Debtors to Radians ("DIP Super-Priority Claim"), with priority over any and all administrative expenses and claims asserted against any Debtor or its respective bankruptcy estate; and (ii) valid, enforceable, non-avoidable, fully perfected and continuing second-priority liens on and security interests in and to all assets of the Debtors (but excluding any pre-petition avoidance causes of action under 11 U.S.C. §§ 547 and 548, collectively referred to herein as "Avoidance Actions" and claims against directors and officers including insurance claims relating thereto) which is defined as the "Collateral" under the DIP Agreement to Radians (such liens and security interests, the "DIP Liens"), which liens and security interests shall be junior only to (y) pre-petition liens and security interests of Radians, and (z) "Permitted Liens" as defined in the DIP Agreement, to secure all obligations of the Debtors under and with respect to the DIP Loan;

(5)     the grant of adequate protection to Radians on account of the Debtors' use of cash collateral as defined in 11 U.S.C. § 363(a), which adequate protection shall be in the form of (x) valid, enforceable, non-avoidable and fully perfected replacement liens on, and security interests in, the Collateral (the "Adequate Protection Liens"), to the extent of any diminution in value in Radian's interest in the Debtors' pre-petition collateral, senior in priority to all other liens; and (y) super-priority administrative expense priority claims against the Debtors with priority over any and all administrative expenses and claims asserted against any Debtors or their respective bankruptcy estate;

(6)     pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the scheduling of an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of the Interim Order, which, among other things, (i) authorizes the Debtors to obtain from Radians the DIP Loan in the aggregate principal amount not to exceed $2,000,000, on an interim basis, (ii) authorizes the Debtors' use of the cash collateral; and (iii) grants the liens and claims provided for in the DIP Agreement and the Interim Order;

(7)    the scheduling of a final hearing (the "Final Hearing") on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(8)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order.

## BACKGROUND INFORMATION

On September 7, 2017 ("Petition Date"), the Debtors each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have operated their businesses and managed their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Other than owning all of the shares in Ironclad California, Ironclad Nevada has no business.  All operations of the Debtors effectively function through Ironclad California.

The Debtors are a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder.  The Debtors' business is headquartered in Farmers Branch, Texas.  Ironclad Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW".  As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.  As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees who work overseas.

The Debtors have filed their bankruptcy cases to consummate a sale of substantially all of their assets for the most money possible.  Just prior to their bankruptcy filings, the Debtors entered into an asset sale agreement with the Debtors' current and sole secured creditor, Radians or its affiliate/designee, for a purchase price of $20 million or $15 million, subject to an overbid process.  Contemporaneously herewith, the Debtors have filed a motion seeking Court approval of their proposed overbid procedures that the Debtors negotiated with Radians prior to their bankruptcy filings.  The Debtors' entire sale process is designed to maximize the Debtors' sale

price for the benefit of the Debtors' creditors and shareholders. The Debtors believe that they have substantially less than $20 million of total debt. The balance owing to Radians, the sole secured creditor of the Debtors, was $3,944,045.93 as of August 24, 2017. The Debtors therefore expect that their asset sale to Radians or to a successful overbidder will result in all of the Debtors' creditors being paid in full and a significant distribution being made to the Debtors' shareholders. Pre-petition, the Debtors hired Craig-Hallum Capital Group, LLC as their financial advisor/investment banker to, among other things, market the Debtors' business for sale. The Debtors expect to hire Craig-Hallum Capital Group, LLC to serve as the Debtors' post-petition financial advisor/investment banker to assist the Debtors to locate and negotiate with prospective overbidders and to help facilitate an auction sale process designed to obtain the highest price possible for the Debtors' assets.

As described more fully in the Memorandum of Points and Authorities annexed hereto, pre-petition, the Debtors were in default under their pre-petition loan agreements with Radians, and following multiple forbearance agreements, Radians advised the Debtors that Radians was not willing to continue to forbear and, on or about August 24, 2017, Radians exercised certain of its default rights by sweeping the Debtors' cash. This cash sweep by Radians left the Debtors with no funds and no ability to continue to operate. While the Debtors were in negotiations with a number of prospective lenders (both to replace the existing Radians' debt and to supplement the existing Radians' debt) and a number of prospective buyers and/or merger partners, the Debtors did not have the luxury of time to complete those negotiations and remain in business given that the Debtors had no access to their funds or the necessary liquidity to enable the Debtors' to continue with their very valuable business operations.

Under these crises and dire circumstances, the Debtors determined in the exercise of their business judgment that the best option available to the Debtors if acceptable terms could be negotiated would be for the Debtors' to (i) enter into a stalking horse bid sale agreement with Radians (who had made clear its desire to acquire the Debtors' business), subject to overbid, (ii) obtain the consent of Radians to advance back to the Debtors pre-petition the swept funds and provide the Debtors with additional necessary pre-petition financing at very reasonable terms to

enable the Debtors to maintain their pre-petition business operations pending the filing of their bankruptcy cases, and (iii) obtain the consent of Radians to make post-petition advances to the Debtors and to consent to the Debtors' use of cash collateral to enable the Debtors to maintain their post-petition business operations pending the closing of the Debtors' sale of their assets.

Under each of the multiple forbearance agreements between the Debtors and Radians, the Debtors have acknowledged the validity and enforceability of the parties' pre-petition loan agreements and the security interests in all of the collateral covered by such agreements.

The Debtors have no secured creditors other than Radians.  The Debtors are also unable to obtain sufficient interim and/or long-term financing from sources other than Radians on terms and subject to conditions more favorable than under the DIP Agreement, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors are also unable to obtain secured credit allowable under Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Agreement without the Debtors' (i) granting to Radians the DIP Super-Priority Claim and the DIP Liens in the Collateral, as provided in the DIP Agreement; and (ii) providing Radians the adequate protection provided for in the Interim Order for the Debtor's use of cash collateral during these cases.

Radians has indicated that it is willing to provide the Debtors with the proposed secured financing solely on the terms and conditions set forth in the DIP Agreement.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loan to be provided by Radians combined with the consent to use cash collateral provided by Radians, represents the best financing presently available to the Debtors.

Accordingly, the Debtors represent that (i) the terms and conditions of the DIP Loan are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Loan has been negotiated in good faith and at arms' length among the Debtors and Radians, and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by Radians has been extended, issued or made, as the case may be, in "good faith"

within the meaning of section 364(e) of the Bankruptcy Code.  The Debtors are requesting entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the relief sought by this Motion, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Loan and authorization for the use of cash collateral in accordance with the Interim Order and the DIP Agreement are, therefore, in the best interests of the Debtors' estates.

## REQUEST TO USE CASH COLLATERAL

The Debtors seek an order of the Court authorizing the Debtors to use their cash collateral to pay all of their projected expenses set forth in the Initial Approved Budget.  The Debtors further seek Court authority to deviate from the Initial Approved Budget, without the need for any further Court order, as permitted under the terms of the DIP Agreement (which permits the Debtors' to an allowed cumulative variance of up to 10% per line item in the Budget at any time, and allows for any unused amounts for any given week to carry over to the following week's expenditures in the Budget) ("Permitted Variance").

As adequate protection for the Debtors' use of cash collateral, the Debtors propose to provide to Radians the Adequate Protection Liens in the Collateral, which shall be senior to all liens, and super-priority status which shall have priority in payment over any and all administrative expenses and claims asserted against any Debtor or its respective bankruptcy estate.

## REQUEST TO OBTAIN PROPOSED POST-PETITION SECURED FINANCING
## AND THE SALIENT TERMS THEREOF

The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of the Debtors' business, fund the Debtors' intended sale process, and properly administer the Debtors' bankruptcy estates without immediate post-petition financing. In the absence of the proposed DIP Loan, the Debtors' business and the Debtors' estates would suffer immediate and irreparable harm, including, without limitation, an immediate cessation of the Debtors' business operations, which, in turn, would eviscerate the ability of the Debtors to pursue a transaction which provides for the sale of the Debtors' assets as part of a going-concern

business.  The preservation and maintenance of the Debtors' business is critical to the successful sale of the Debtors' assets and emergence from these Chapter 11 bankruptcy cases.  The Debtors require the DIP Loan offered by Radians to consummate a transaction which results in the sale of the Debtors' business and/or assets, for the benefit of all creditors.  The Debtors and Radians have engaged in extensive negotiations over the terms of the DIP Loan.

The Debtors' ability to maintain business relationships with their vendors, suppliers and clients, pay their employees, and otherwise finance their operations post-petition is essential to maintaining the going-concern value of the Debtors' business and preserving the value of the Debtors' assets.  However, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Loan and authorized use of cash collateral.  In the absence of the DIP Loan and the authority of this Court to use cash collateral, the Debtors' businesses and estates would suffer immediate and irreparable harm, including, without limitation, an immediate cessation of their business operations.  Based on the foregoing, it is critical and in the best interests of the Debtors' estates for the Debtors to be authorized to obtain the DIP Loan, and to use cash collateral, in accordance with the terms and conditions set forth in the DIP Agreement, and the Interim Order.

Pursuant to Bankruptcy Rule 4001, while the Court cannot conduct a final hearing on the Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtors to use cash collateral and obtain post-petition financing as is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing.  For the reasons noted above, to avoid immediate and irreparable harm to the Debtors' business and their bankruptcy estates, the Debtors must be able to use their cash collateral and obtain the DIP Loan to pay the expenses set forth in the Initial Approved Budget pending a final hearing.

The relief sought in this Motion is based upon the Motion, the annexed Memorandum of Points and Authorities, the Omnibus Declaration and the Declaration of Monica Y. Kim filed concurrently herewith, the statements, arguments and representations of counsel to be made at

the hearing(s) on the Motion, and any other evidence properly presented to the Court at or prior to the hearing(s) on the Motion.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtors have served a copy of this Motion and all supportive papers (including notice of the hearing on the Motion) upon the Office of the United States Trustee, all other known secured creditors and their counsel (if any), the 20 largest unsecured creditors of each of the Debtors and parties requesting special notice via overnight mail.

**WHEREFORE**, the Debtors respectfully request that this Court:

(1)    grant the relief requested in the Motion on an interim basis;

(2)    enter the proposed form of the Interim Order attached as **Exhibit 6** to the Omnibus Declaration filed concurrently herewith;

(3)    waive any applicable stay, including the stay provided under Bankruptcy Rule 6004, to allow the Interim Order to become immediately effective;

(4)    schedule the Final Hearing on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(5)    grant such further relief as the Court deems just and proper.

Dated:  September 11, 2017          IRONCLAD PERFORAMNCE WEAR
                                    CORPORATION, *et al.*

                                    By:___*/s/ Monica Y. Kim*_____
                                          RON BENDER
                                          MONICA Y. KIM
                                          KRIKOR J. MESHEFEJIAN
                                          LEVENE, NEALE, BENDER,
                                             YOO & BRILL L.L.P.
                                          Proposed Attorneys for Debtors and
                                          Debtors in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.    Brief Description Of The Debtors And Their Businesses.**

1.    On September 7, 2017 ("Petition Date"), Ironclad Performance Wear Corporation, a California corporation ("Ironclad California") and its parent corporation Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada"), each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, Ironclad California and Ironclad Nevada (collectively, the "Debtors" or "Ironclad") have operated their businesses and managed their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors have sought joint administration of their cases.   Other than owning all of the shares in Ironclad California, Ironclad Nevada has no business.  All operations of the Debtors effectively function through Ironclad California.

2.    The Debtors are a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder.  The Debtors' business is based out of Farmers Branch, Texas.  Ironclad Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW".  As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.  As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees who work overseas.

3.    Ironclad was founded in 1998 by Ed Jaeger.  Mr. Jaeger was inspired to build gloves that offered protection and performance without sacrificing one for the other.  From the beginning, Ironclad built gloves using materials that offered excellent fit to make them an extension of the hand and to make jobs easier for the "industrial athlete".  By 2006, Ironclad offered 35 different task-specific glove types for people wearing gloves as part of their daily jobs.

1    4.    In 2008, the Debtors launched the KONG (King of Oil 'N' Gas) line to address

the high number of hand injuries in the O&G field.  By 2010, the KONG line was comprised of

46 different gloves.  Additionally, Ironclad expanded its presence in the retail and non-

professional markets with the launch of the EXO brand in June 2015.  EXO offers lower cost

gloves for automotive, DIY, and outdoor sporting applications.  Ironclad offers 30 different EXO

glove types.

5.    Ironclad's task-specific technical glove products are specially designed for

individual user groups.  Ironclad currently offers over 160 distinct types of gloves for a variety of

markets, including industrial, construction, DIY, carpentry, machining, package handling,

plumbing, welding, roofing, O&G, mechanics, hunting, and gardening.  Products come in a

multitude of colors and cater to the specific demands and requirements of the users based on ease

of motion, grip, water and chemical resistance, visibility, and protection from abrasions, cuts,

flames, impacts, temperature, and vibration.  Since inception, Ironclad has employed an internal

research and development ("R&D") department responsible for identifying and creating new

products and applications, and improving and enhancing existing products.  Ironclad is

continually evaluating new base materials for gloves, and grip is another key area of focus for

R&D.  Ironclad often partners with industry-leading organizations to develop new products.

Ironclad has 13 U.S. patents issued and 11 foreign patents, as well as five pending U.S. patent

applications and several pending foreign patent applications.  Ironclad also uses trademarks to

strengthen and protect its recognizable brand names.  Ironclad owns 52 registered U.S.

trademarks, 39 registered international trademarks, and 13 and 43 trademarks pending in the U.S.

and internationally, respectively.

6.    Ironclad currently sells through approximately 10,000 outlets for professional

tradesmen as well as "Big Box", hardware, auto parts, and sporting goods retailers.  The sales

force is organized by 3 business segments: Industrial, Retail, and International.  Glove products

are currently manufactured by multiple suppliers operating in China, Bangladesh, Cambodia,

Vietnam and Indonesia.

**B.**    **Events Leading To Bankruptcy And The Debtors' Chapter 11 Goals.**

7. Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations have been insufficient to support their current business operations as well as their continued growth. There have been many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or ineffective expansion and distribution of all of their product lines and development of new customers, and higher than anticipated production, manufacturing and warehousing costs. In addition, it was discovered in early 2017 that under prior management, the Debtors had failed to provide materially complete and correct financial statements as required under their Loan Documents (defined below) to their primary secured lender for the fiscal years ended December 31, 2015 and 2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017. As a result of this discovery, the Debtors' then chief executive officer and other officers were terminated, and L. Geoff Greulich assumed the position of the Debtors' new chief executive officer effective July 6, 2017. Prior to assuming this position, Mr. Greulich had no prior connections or relationship with the Debtors as an insider, equity holder or otherwise. As a Senior Advisor, Operations at Corridor Capital, LLC, where he leads operations through portfolio engagement as well as conducting due diligence, Mr. Greulich was highly qualified to serve as the Debtors' new chief executive officer. Persons or parties interested in obtaining specific historical financial history of the Debtors should review the public filings made by the Debtors with the Securities and Exchange Commission.

8. The Debtors have filed their bankruptcy cases to consummate a sale of substantially all of their assets for the most money possible. Just prior to their bankruptcy filings, the Debtors entered into an asset sale agreement with the Debtors' current secured creditor, Radians Wareham Holdings, Inc. ("Radians") or its affiliate/designee, for a purchase price of $20 million or $15 million, subject to an overbid process. Contemporaneously herewith, the Debtors have filed a motion seeking Court approval of their proposed overbid procedures that the Debtors negotiated with Radians prior to their bankruptcy filings. The Debtors' entire sale process is designed to maximize the Debtors' sale price for the benefit of the Debtors' creditors and shareholders. The Debtors believe that they have substantially less than $20 million of total

debt.  The Debtors therefore expect that their asset sale to Radians or to a successful overbidder will result in all of the Debtors' creditors being paid in full and a significant distribution being made to the Debtors' shareholders.  Pre-petition, the Debtors hired Craig-Hallum Capital Group, LLC as their financial advisor/investment banker to, among other things, market the Debtors' business for sale.  The Debtors expect to hire Craig-Hallum Capital Group, LLC to serve as the Debtors' post-petition financial advisor/investment banker to assist the Debtors to locate and negotiate with prospective overbidders and to help facilitate an auction sale process designed to obtain the highest price possible for the Debtors' assets.

9.    Briefly and as described below, Radians is the Debtors' primary secured creditor which is currently owed approximately $4 million.  Radians has agreed to purchase the Debtors' assets for $20 million or $15 million as a stalking horse buyer.  The Debtors have no secured debt other than their secured loans to Radians.

**C.    The Debtors' Primary Assets and Secured Loans.**

10.    To support the financial needs of their current and growing operations, on or about November 28, 2014, the Debtors obtained a revolving credit facility ("Revolving Loan") from Capital One, National Association, a National Banking Association ("Capital One") secured by substantially all of the Debtors' assets and property, which essentially consists of accounts receivable, inventory, equipment, intellectual property and goodwill associated with the Debtors' well-regarded brands.  The Revolving Loan is evidenced by that certain Revolving Loan and Security Agreement dated November 28, 2014, as modified from time to time, the Second Amended and Restated Revolving Line of Credit Note dated April 11, 2017 in the principal amount of $8,000,000 as amended from time to time, and related agreements and documents (collectively "Loan Documents").  Capital One recorded a UCC-1 financing statement with the California Secretary of State on December 18, 2014 (document number 14-7441632305), and a UCC-1 financing statement from the Nevada Secretary of State on December 12, 2014 (document number 2104031733-1), both of which purport to cover substantially all of the Debtors' assets and property.  *See* **Exhibits A and B** attached to the Declaration of Monica Y. Kim ("Kim Declaration") filed concurrently herewith.

11.     On February 23, 2017, Capital One issued an Event of Default letter based on the Debtors' failure to meet certain of their financial covenants under the Loan Documents, however, Capital One agreed to waive its rights and remedies with respect to such defaults, and to extend the maturity date by 90 days.  In consideration, the Debtors agreed to release all existing claims against Capital One generally relating to or arising with respect to the Loan Documents.

12.     On July 25, 2017, Capital One sold, transferred and assigned to Radians all of its rights, title and interest in and to the Loan Documents.  The assignment was made without recourse to Capital One and without representation or warranty of any kind.  The Debtors are unaware as to the consideration exchanged between Capital One and Radians for the assignment of the Revolving Loan.  Assignments of the UCC-1 financing statements previously recorded by Capital One with the California and Nevada Secretary of State were also recorded in these states.

13.     Subsequent to the assignment of the Revolving Loan, the Debtors have entered into several forbearance agreements with Radians.  On August 1, 2017, the Debtors signed a Forbearance and Modification Agreement pursuant to which Radians agreed to forbear, until 12:00 p.m. Central Time on August 7, 2017, from exercising available remedies under the Loan Documents.  In exchange, the Debtors agreed to release Radians from existing claims under the Loan Documents, and to a prepayment fee of $120,000 in the event the Debtors are able to repay the indebtedness with financing from a financial or lending institution or in connection with the acquisition of the Debtors or their assets by a third party. In the event Radians and/or its affiliates acquire the Debtors' assets, the Debtors receive a credit for the prepayment fee.

14.     On August 14, 2017, the Debtors signed a second Forbearance Agreement pursuant to which Radians agreed to forbear, until 12:00 p.m. Central Time on August 21, 2017, from exercising available remedies under the Loan Documents.  In exchange, the Debtors agreed to release Radians from existing claims under the Loan Documents.

15.     As of August 24, 2017, the balance owing on the Revolving Loan was $3,944,045.93.  Upon the expiration of the second Forbearance Agreement, Radians advised the Debtors that Radians was not willing to continue to forbear and, on or about August 24, 2017,

Radians exercised certain of its default rights under the Loan Documents by sweeping the Debtors' cash.  This cash sweep by Radians left the Debtors with no funds and no ability to continue to operate.  While the Debtors were in negotiations with a number of prospective lenders (both to replace the existing Radians' debt and to supplement the existing Radians' debt) and a number of prospective buyers and/or merger partners, the Debtors did not have the luxury of time to complete those negotiations and remain in business given that the Debtors had no access to their funds or the necessary liquidity to enable the Debtors' to continue with their very valuable business operations.

16.    Under these crises and dire circumstances, the Debtors determined in the exercise of their business judgment that the best option available to the Debtors if acceptable terms could be negotiated would be for the Debtors' to (i) enter into a stalking horse bid sale agreement with Radians (who had made clear its desire to acquire the Debtors' business), subject to overbid, (ii) obtain the consent of Radians to advance back to the Debtors pre-petition the swept funds and provide the Debtors with additional necessary pre-petition financing at very reasonable terms to enable the Debtors to maintain their pre-petition business operations pending the filing of their bankruptcy cases, and (iii) obtain the consent of Radians to make post-petition advances to the Debtors and to consent to the Debtors' use of cash collateral to enable the Debtors to maintain their post-petition business operations pending the closing of the Debtors' sale of their assets.

17.    Concurrently with these negotiations, further forbearance agreements were also negotiated and agreed upon between the Debtors and Radians.

18.    Under each of the multiple forbearance agreements between the Debtors and Radians, the Debtors also acknowledged the validity and enforceability of the Loan Documents and the security interests in all of the collateral covered by the Loan Documents.  The key Loan Documents are attached as **Exhibit 1** (Revolving Loan and Security Agreement), **Exhibit 2** (Second Amended and Restated Revolving Line Credit Note), **Exhibit 3** (six modification agreements to the Revolving Loan and Security Agreement), **Exhibit 4** (agreements of assignment from Capital One to Radians), and **Exhibit 5** (forbearance agreements between

Debtors and Radians) to the Omnibus Declaration of L. Geoff Greulich ("<u>Omnibus Declaration</u>")
filed in support of the Debtors' first day motions concurrently herewith.

19.    The Debtors have no secured creditors other than Radians.  Attached as **<u>Exhibits
A and B</u>** to the Kim Declaration are copies of the certified searches of recorded UCC-1 financing
statements from the California Secretary of State (**<u>Exhibit A</u>**) and Nevada Secretary of State
(**<u>Exhibit B</u>**).  As set forth therein, the only active and valid UCC-1 financing statements existing
as of the Petition Date are as follows:

**California Secretary of State**:

UCC-1 filed by Capital One (document number 14-7441632305) recorded December 18,
2014 as to substantially all assets of Ironclad California, assigned to Radians by UCC-3
(document number 62925880003).

**Nevada Secretary of State**:

UCC-1 filed by Capital One (document number 2014031733-1) recorded December 12,
2014 as to substantially all assets of Ironclad Nevada, assigned to Radians by UCC-3 (document
number 2017020461-7).

**D.    <u>The Need For Use Of Cash Collateral And Post-Petition Financing</u>.**

20.    Based on the existing liens of Radians upon substantially all of the Debtors' assets
and the proceeds therefrom, all of the Debtors' post-petition revenue and income constitute the
"cash collateral" of Radians pursuant to 11 U.S.C. § 363(a).  Radians has consented to the
Debtors' use of cash collateral pursuant to the terms of the Financing Orders and/or the DIP
Agreement which are described below.

21.    In addition, due to the Debtors' current financial condition, the use of the Debtors'
cash collateral (as such term is defined in 11 U.S.C. § 363(a)) alone will be insufficient to meet
the Debtors' immediate post-petition liquidity needs.  The Debtors require new post-petition
funding to maintain their businesses and preserve the value of their assets while the Debtors
pursue and expedited sale process which will allow the Debtors to sell their businesses and/or
assets as a going concern to Radians or a successful overbidder.

22.     As described above, the Debtors' current and sole secured creditor, Radians, has agreed to provide the Debtors with post-petition financing in the aggregate principal amount not to exceed $2,000,000 (the "DIP Loan"), pursuant to the terms and conditions set forth in that certain *Debtor in Possession Credit Agreement and Agreement for the Use of Cash Collateral* ("DIP Agreement"), a true and correct copy of which is attached as **Exhibit 7** to the Omnibus Declaration. Based on the Debtors' Initial Approved Budget, a nine (9) week cash flow forecast setting forth all projected cash receipts and cash disbursements following the Petition Date, and all subsequent budgets, the Debtors believe that the proposed DIP Loan will provide the Debtors with sufficient funds to maintain the Debtors' business operations and successfully consummate a sale of the Debtors' businesses and/or assets. A true and correct copy of the Initial Approved Budget is attached as **Exhibit 8** to the Omnibus Declaration.

23.     The Debtors are unable to obtain sufficient interim and/or long-term financing from sources other than Radians on terms and subject to conditions more favorable than under the DIP Agreement, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable under Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Agreement without the Debtors' (i) granting to Radians the DIP Super-Priority Claim and the DIP Liens in the Collateral, as provided in the DIP Agreement; and (ii) providing Radians the adequate protection as provided in the Financing Orders.

24.     Radians has indicated that it is willing to provide the Debtors with the proposed post-petition financing solely on the terms and conditions set forth in the DIP Agreement. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loan to be provided by Radians, combined with the consent to use cash collateral provided by Radians, represents the best financing presently available to the Debtors.

25.     The Debtors also seek an order of the Court authorizing the Debtors to use their cash collateral to pay all of their projected expenses set forth in the Initial Approved Budget. The Debtors further seek Court authority to deviate from the Initial Approved Budget, without the need

for any further Court order, as permitted under the terms of the DIP Agreement (which permits the Debtors' to an allowed cumulative variance of up to 10% per line item in the Budget at any time, and allows for any unused amounts for any given week to carry over to the following week's expenditures in the Budget) ("Permitted Variance").

26.     As adequate protection for the Debtors' use of cash collateral, the Debtors propose to provide to Radians valid, enforceable, non-avoidable and fully perfected replacement liens on, and security interests ("Adequate Protection Liens") in the Collateral, which shall be senior to all liens, and super-priority status which shall have priority in payment over any and all administrative expenses and claims asserted against any Debtor or its respective bankruptcy estate.

**E.     Summary Of The Salient Terms Of the Proposed DIP Loan.**

27.     Although the DIP Agreement (attached as **Exhibit 7** to the Omnibus Declaration) sets forth in detail the terms and conditions under which Radians has agreed to provide the DIP Loan, the following is a summary of some of the principal terms of the DIP Loan[2]:

a.     **DIP Loan:**     The Debtors shall be authorized to obtain advances of the DIP Loan in an aggregate principal amount not to exceed $2,000,000 to (i) enable the Debtors to pay those expenses set forth in the Initial Approved Budget, which may be modified, supplemented and extended from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by the Debtors and approved by Radians, without subsequent notice to or order of the Court (each such additional budget, a "Proposed Budget," and together with the Initial Approved Budget, the "Approved Budgets"), and to (ii) enable the Debtors to purchase inventory which is not otherwise included in the Approved Budgets.

b.     **Advances.**     On the day of entry of the Interim Order, Radians agrees to make an "Initial Advance" of $500,000 to cover the Debtors' funding requirements for the first two weeks of the Initial Approved Budget. No further advances will be made until the entry of the Final Order. Once that occurs, Radians will make further "Credit Advances" to

---

[2] The following is a summary of certain principal terms of the DIP Loan.  To the extent this summary is inconsistent with the terms of the DIP Agreement, the terms of the DIP Agreement shall govern.

the Debtors pursuant to a "Borrowing Notice" which is to be submitted not later than noon (eastern time) on the business day immediately prior to the "Funding Date." Section 2.1(b) sets for the information that is to be included in the Borrowing Notice including a calculation of the amount requested which includes reasonable detail regarding the cash on hand and the projected disbursements for the borrowing period.

c.    **Approved Budgets:**  One Million Dollars ($1,000,000) of the DIP Loan may be used for the sole and primary purposes of paying expenses in accordance with the Initial Approved Budget, which depicts on a weekly basis cash revenue, receipts, expenses and disbursements and other information for the 9-week period following the Petition Date, and subsequent Approved Budgets, which shall be in form and substance acceptable to Radians. The Debtors shall be permitted to deviate from the Approved Budget, without the need for any further Court order, up to the permitted variance provided for in the DIP Agreement (*i.e.*, Debtors are allowed a cumulative variance of up to 10% per line item in the Budget at any time, are further allowed to apply any unused amounts for any given week to carry over to the following week's expenditures in the Budget) ("Permitted Variance").

d.    **Inventory Purchases.**  From and after the date of entry of the Interim Order, an additional $1,000,000 of the DIP Loan shall be funded for additional purchases of Inventory (as defined in the DIP Agreement) to enable the Debtors to purchase Inventory which is not otherwise included in the Approved Budgets.  The advances shall be made pursuant to a Borrowing Notice which is to be submitted not later than by noon prevailing eastern time on the business day immediately prior to a Funding Date, which includes a calculation of the requested advance amount, and reasonable detail of the Inventory to be purchased.

e.    **Term and Interest on DIP Loan:**  The DIP Loan matures on January 1, 2018, but the obligations under the DIP Loan is due and payable upon the earlier to occur of (a) date of the closing of the sale of substantially all assets to Radians, (b) January 1, 2018 maturity date, or (c) upon acceleration under the terms of the DIP Agreement.  Rate

of interest to be charged for the DIP Loan shall be ten percent (10%) per annum, calculated on the basis of a 360-day year for actual days elapsed, and interest accrued upon default is eighteen percent (18%) per annum.

f.    **DIP Super-Priority Claim:**  In accordance with Bankruptcy Code section 364(c)(1), Radians shall be granted the DIP Super-Priority Claim as security for the DIP Loan, which DIP Super-Priority Claim shall have priority over and above any and all administrative expenses and claims asserted against any Debtor or its respective bankruptcy estate, at any time existing or hereafter arising, of any kind or nature whatsoever, including, but not limited to the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113, and 1114, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

g.    **DIP Liens:**  As security for the DIP Loan, Radians shall be granted valid, enforceable, non-avoidable, fully perfected and continuing second priority liens and security interests (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code) (referred to herein as the "DIP Liens") on all of the "Collateral" (as defined the DIP Agreement) and which includes all property of the Debtors, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's estate, of any kind or nature, whatsoever, whether the property is real, personal, tangible, intangible, or mixed, whether now existing or hereafter acquired or created (but excluding any pre-petition avoidance causes of action under 11 U.S.C. §§ 547 and 548, collectively referred to herein as "Avoidance Actions" or claims against directors and officers including insurance claims relating thereto), and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, with such DIP Liens to be junior only to (y) the pre-petition liens and security interests of Radians, and (z) "Permitted Liens" as defined in the DIP Agreement, to secure all obligations of the Debtors under and with respect to the DIP Loan.

h.    **Acknowledgements of Pre-Petition Loans.**    The Debtors acknowledge that they are indebted to Radians under the pre-petition loan documents involving the Revolving Loan, and that the pre-petition liens and security interests of Radians in all of the Debtors' property and assets are valid and enforceable.

i.    **Events of Default and Remedies; Milestones:**    Article X sets forth the various Events of Default, which include the Debtors' failure to meet certain milestones relating to the sale of substantially all of their assets to Radians or a successful overbidder, including, without limitations, the deadlines by which the Debtors must file their motions for authority to sell their assets to Radians under the terms of the parties' asset purchase agreement and for approval of the proposed bidding procedures, deadlines by which the Debtors must obtain orders pertaining to such motions, and the deadline by which the Debtors must close a sale of substantially all of their assets and pay their obligations to Radians if Radians is not the successful buyer.    Article X also sets forth requirements pertaining to the giving of a Notice of Default by Radians, and the procedure by which the Debtors may dispute whether an Event of Default has occurred.

j.    **Release:**    Section 11.12 of the DIP Agreement provides for the Debtors to release all claims against Radians arising out of or in an way relating to the DIP Agreement and documents relating thereto occurring on or prior to the date of the DIP Agreement.

**II.**

**THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL**

A.    **The Debtors Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve Their Assets In Accordance With The Approved Budgets.**

The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code.  Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without

notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363.  11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A)   each entity that has an interest in such cash collateral consents; or
> (B)   the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991).  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

For the reasons discussed herein, the Debtors have no ability to maintain their business operations or to preserve the going-concern value of their assets unless the Debtors have the ability to use cash collateral to pay their projected expenses in accordance with the Approved Budgets.  The Debtors' inability to pay such expenses would cause immediate and irreparable harm to the Debtors' bankruptcy estates.  Indeed, the Debtors' inability to pay the expenses set forth in the Approved Budgets, which include payroll, utilities, and other critical operating

23

expenses, would result in the immediate shutdown of the Debtors' businesses and the decimation of the going-concern value of the Debtors' businesses and assets. The preservation and maintenance of the value of the Debtors' businesses and assets are of the utmost significance and importance to a successful sale of substantially all of the Debtors' assets and the Debtors' emergence from these Chapter 11 cases.

**B.     The Sole Pre-Petition Secured Party Consents To The Debtors' Use Of Cash Collateral And Is Adequately Protected By A Substantial Equity Cushion, The Continued Operation Of The Debtors' Businesses And Other Forms Of Adequate Protection.**

As noted above, the Debtors believe that the only party who has a valid interest in the Debtors' cash is Radians.

Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

Here, Radians has consented to the Debtors' use of cash collateral to pay the expenses set forth in the Approved Budgets in accordance with the provisions of the Financing Orders and/or DIP Agreement. Accordingly, the Debtors should be authorized to use cash collateral pursuant to section 363(c)(2) of the Bankruptcy Code.

Furthermore, the Debtors submit that the value of the Radians' interest in the Debtors' cash collateral will be adequately protected by, among other things, a substantial equity cushion and the continued operation and maintenance of the Debtors' businesses which, as evidenced by the offer made by Radians to purchase the Debtors' assets, has a value of at least $15 to $20 million while Radians is owed approximately $4 million as of the Petition Date.

Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.

*See also, McCombs,* 88 B.R. at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e.,

the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the

collateral." *McCombs*, 88 B.R. at 266.  The law is clear that the preservation of the value of a

secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a

debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988). *See also

In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982).  The *Stein* Court determined that the use of cash

collateral was necessary to the continued operations of the debtor, and that the creditor's secured

position could only be enhanced by the continued operation of the debtor's business. *See also, In

re McCombs*, *supra*, where the court determined that the debtor's use of cash collateral for

needed repairs, renovations and operating expenses eliminated the risk of diminution in the

creditor's interest in the cash collateral and such use would more likely increase cash collateral.

    As reflected in the Initial Approved Budget, the payment of the expenses necessary for

the Debtors to continue operating their businesses will adequately protect Radians because by

doing so, the Debtors will continue to generate revenue and will be able to preserve the going-

concern value of the Debtors' assets while the Debtors pursue the sale of substantially all of the

Debtors' assets to Radians (or a successful overbidder).  Other courts have determined that a

debtor's continued business operations can constitute the adequate protection of a secured

creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In

re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re

Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347,

352 (Bankr. M.D. Fla. 1994).

    Additionally, in determining adequate protection, courts have stressed the importance of

promoting a debtor's reorganization.  In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed
> to deal with cash collateral for the purpose of enhancing the prospects of
> reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the
> Debtor's efforts are not only to be encouraged, but also their efforts during the
> administration of the proceeding are to be measured in light of that quest.

Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of cash collateral is critical to the Debtors' ability to maintain their business operations and preserve the value of their assets while the Debtors pursue a sale of the Debtors' assets, for the benefit of the Debtors' creditors.  As discussed above, the Debtors will be seeking Court approval of, and will be seeking to expeditiously close, the sale of substantially all of the Debtors' assets to Radians (or a successful overbidder).  If the Debtors are not permitted to use cash collateral to maintain the Debtors' business operations and preserve the going-concern value of the Debtors' assets, the chances of successfully selling the Debtors' assets will evaporate and the Debtors will be forced to immediately liquidate their assets, which in turn will dramatically and negative impact the value of the Debtors' assets.  On the other hand, if the Debtors are authorized to use their cash collateral, the Debtors will be able to maintain their business operations and preserve the value of the Debtors' assets while the Debtors pursue the successful consummation of a sale transaction which ultimately provides the basis for a recovery to the Debtors' creditors.  Clearly, the use of cash collateral will only enhance the prospect of the Debtors' reorganization.

Moreover, Radians is adequately protected by a huge equity cushion.  Given that Radians is owed approximately $4 million while the going concern value of the Debtors' assets and business is at least $20 million as evidenced by the offer made by the Radians to purchase substantially all assets of the Debtors, Radians is protected by value that is almost 300% or higher of what it is owed.

The Debtors believe that Radians, the only creditor who has a security interest in and lien against the Debtors' assets including cash collateral, is further adequately protected by the Adequate Protection Liens in the Collateral proposed to be provided to them (to the same extent, validity and priority as their respective pre-petition liens against the Debtors' assets), which liens

shall be senior to all other liens.  Additionally, Radians, which holds a first-priority security interest and lien against all of the Debtors' assets, will be further adequately protected by a super-priority claim status against the Debtors' estates, which shall have priority in payment over any and all administrative expenses and claims asserted against any Debtor or its respective bankruptcy estate.

Since Radians has consented to the Debtors' use of cash collateral and, separately, given the adequate protection being provided to Radians for the Debtors' use of cash collateral, the Debtors submit that the requirements of section 363(c)(2) have been satisfied and that the Debtors should be authorized to use cash collateral in accordance with the terms and conditions set forth in the Financing Orders and/or DIP Agreement.

## III.

## THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE PROPOSED
## POST-PETITION FINANCING

**A.     The Debtors Should Be Authorized To Obtain The Proposed Post-Petition Financing From Radians To Operate The Debtors' Businesses And To Maintain And Preserve The Value Of The Debtors' Assets.**

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where Debtors' best business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Ames") (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Section 364(c) provides, in pertinent part, that:

> (c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

27

(1)  with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:

(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)  secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

Subject to the approval of the Court, the Debtors have agreed to grant to Radians the DIP Liens, which are fully perfected second priority liens on and security interests against the Collateral (other than Avoidance Actions and claims against directors and officers including insurance claims relating thereto), other than the pre-petition liens and security interests of Radians and Permitted Liens, to secure all obligations of the Debtors under and with respect to the DIP Loan.  As described herein, there were no other liens and security interests pre-petition other than those of Radians.  The Debtors have also agreed to provide Radians with the DIP Super-Priority Claim, which claim shall have priority in payment over any and all administrative expenses and claims asserted against any Debtor or its respective bankruptcy estate.  For all of the reasons explained herein, the Debtors believe that granting these protections to Radians are warranted, appropriate and necessary given the circumstances of these cases where Radians has agreed to provide the Debtors with critically necessary emergency financing, without which the Debtors will be forced to immediately shut down and liquidate.

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), *i.e.*, by allowing a lender only an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

The Debtors submit that all of these standards have been satisfied in these cases.

1.    ___The Debtors Are Unable To Obtain Unsecured Credit___.

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b).  *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames, supra*, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

To date, the only financing commitment that has been provided to the Debtors is the one offered by Radians.  In order to avoid a complete shutdown of the Debtors' business and liquidation of the Debtors' assets, the Debtors diligently sought additional financing before the Debtors' bankruptcy filings.  However, given the amount of the Debtors' secured debt and the Debtors' current cash flow situation, it is not realistic for any lender to be willing to provide the Debtors with unsecured financing.  Fortunately, Radians, who is also the Debtors' pre-petition senior secured lender, has offered to provide the Debtors with post-petition secured financing but solely on the terms and conditions set forth in the DIP Agreement.  Radians has presumably agreed to provide financing to the Debtors, when no other lender has expressed a willingness to do so, in the hopes of maximizing the recovery on its pre-petition secured debt.  The Debtors have little doubt that, even if there was another lender who was willing to provide the Debtors with the necessary post-petition financing (recognizing that the Debtors are not aware of any such lender at this time), such lender would require that its financing be secured by a senior priming lien against the Debtors' assets, upon terms that would very likely be less favorable than those currently offered by Radians.  The terms and conditions set forth in the DIP Agreement have been negotiated extensively, in good faith and at arms' length, by the parties.

After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loan to be provided by Radians (particularly, in conjunction with the consent to use cash collateral to be provided by Radians) represents the best financing presently available to the Debtors.

1

2

**2.      *The Terms Of The Proposed Post-Petition Financing From Radians Are Fair,
Reasonable and Adequate*.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

The Debtors submit that terms of the proposed DIP Loan from Radians are fair,
reasonable and adequate.  As noted above, the terms and conditions set forth in the DIP
Agreement were negotiated extensively, in good faith and at arms' length, by the parties.
Radians is well aware of the fact that the Debtors would have very little chance of avoiding an
immediate shutdown of the Debtors' business if not for the DIP Loan that Radians has offered.
Radians has agreed to make the DIP Loan to the Debtors in an effort to assist the Debtors in
preserving the going concern value of the Debtors' business and to facilitate the successful
consummation of the sale of the Debtors' assets to Radians (or a successful overbidder).  The
amount of financing being offered to the Debtors is for an aggregate principal amount of up to
$2,000,000 and is certainly not insignificant.  The Debtors submit that the benefits afforded to
the Debtors by the DIP Loan justify the protections being afforded to Radians under the terms of
the DIP Agreement.  The DIP Loan offers the Debtors their best and, likely, only opportunity to
maintain and preserve the going concern value of their assets while pursuing a transaction which
ultimately results in the successful sale of the Debtors' business and assets, which will benefit all
creditors and parties in interest.

18

19

20

21

22

23

24

Based on the foregoing, the Debtors represent that (i) the terms and conditions of the DIP
Loan are fair and reasonable, reflect the Debtors' exercise of prudent business judgment
consistent with their fiduciary duty and are supported by reasonably equivalent value and fair
consideration, (ii) the DIP Loan has been negotiated in good faith and at arms' length among the
Debtors and Radians, and (iii) any credit extended, loans made and other financial
accommodations extended to the Debtors by Radians have been extended, issued or made, as the
case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

25

**3.      *The Proposed Financing From Radians Is Necessary And Proper*.**

26

27

28

While in determining whether to approve such a transaction, a Court is authorized to act
in its informed discretion, *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y.
1990), the Court should give broad deference to the business decision of a Chapter 11 debtor,

1  particularly with respect to a Debtors' business judgment regarding the need for and proposed

2  use of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

3  As the Court noted in *In re Ames Dept. Stores Inc., supra*, "the court's discretion under section

4  364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor]

5  to be exercised . . ." *In re Ames Department Stores, Inc.*, 115 B.R. at 40.

6        There is little dispute that, without substantial post-petition financing, the Debtors will be

7  forced to immediately cease business operations and the Debtors will be forced into liquidation

8  mode.  There can also be no question that such a result would cause the Debtors, their estates and

9  their creditors immediate and irreparable harm.  In contrast, the DIP Loan affords the Debtors the

10  ability to maintain the Debtors' business operations and provides the Debtors with the time

11  necessary to pursue and successfully close a sale of the Debtors' assets that will ultimately

12  maximize the value of such assets.  The Debtors have therefore concluded that obtaining the DIP

13  Loan from Radians is critically important to the success of the Debtors' cases and is therefore in

14  the best interests of the Debtors' estates.

15  **IV.**

16  **PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF**

17  **THE MOTION HAVE BEEN SATISFIED**

18        Rule 4001(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") sets

19  forth the procedural requirements for obtaining authority to use cash collateral, and Bankruptcy

20  Rules 4001(c) and (d) set forth procedural requirements for obtaining post-petition credit.  The

21  Debtors submit that they have complied with these procedural requirements.  First, the Motion

22  must contain a copy of the proposed form of order granting the Motion, which has been done by

23  attaching the proposed Interim Order as **Exhibit 6** to the Omnibus Declaration concurrently filed

24  herewith.  Second, the Motion must provide a concise statement of the relief requested, which

25  was done above.  Third, the Motion is required to be served on any entity with an interest in the

26  Debtors' cash collateral, any committee appointed or the twenty largest unsecured creditors if

27  there is no committee, and on such other parties as the Court directs.  Here, the Debtors have

28  served the Motion and all supportive papers upon the Office of the United States Trustee, all

other known secured creditors and their counsel (if any), the twenty largest unsecured creditors of each of the Debtors (as no committee yet exists), the Office of the United States Trustee, and all parties who have requested special notice via overnight mail. Accordingly, the Motion complies with the procedural requirements of Bankruptcy Rules 4001 (b)-(d).

In addition, in compliance with Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2, the Debtors have filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing) which discloses whether the proposed Interim Order authorizing the DIP Loan and Debtors' use of cash collateral on an interim basis, pending a final hearing, contains certain provisions of findings of fact. Accordingly, the Motion complies with the procedural requirements of Local Bankruptcy Rule 4001-2.

## V.

## THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE

For the reasons noted in the Motion, the Debtors will suffer immediate and irreparable harm if the Debtors are not able to pay the expenses set forth in the Initial Approved Budget, pending a final hearing on the Motion. The Debtors require the terms of the DIP Agreement to become immediately effective to ensure that the Debtors will be able to use their cash collateral and obtain the proposed DIP Loan from Radians to pay such critical and immediate expenses. Based on the foregoing, the Debtors request that any applicable stay, including the stay provided under Bankruptcy Rule 6004, be waived to allow the Interim Order to become immediately effective.

## VI.

## CONCLUSION

Based upon all of the foregoing, the Debtors respectfully request that this Court:

(1)     grant the relief requested in the Motion on an interim basis;

(2)     enter the proposed form of the Interim Order attached as **Exhibit 6** to the Omnibus Declaration filed concurrently herewith;

   (3)  waive any applicable stay, including the stay provided under Bankruptcy Rule 6004, to allow the Interim Order to become immediately effective;

   (4)  schedule the Final Hearing on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

   (5)  grant such further relief as the Court deems just and proper.

Dated:  September 11, 2017    IRONCLAD PERFORAMNCE WEAR
             CORPORATION, *et al.*

             By: */s/ Monica Y. Kim*
               RON BENDER
               MONICA Y. KIM
               KRIKOR J. MESHEFEJIAN
               LEVENE, NEALE, BENDER,
                 YOO & BRILL L.L.P.
               Proposed Attorneys for Debtors and
               Debtors in Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (IV) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 11, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **S Margaux Ross    margaux.ross@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**
- **Sharon Z. Weiss    sharon.weiss@bryancave.com, raul.morales@bryancave.com**

**2.  SERVED BY UNITED STATES MAIL**: On **September 11, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 11, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☒ *Service List served by Overnight Mail attached*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 11, 2017 | Stephanie Reichert | */s/ Stephanie Reichert* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

**Served by Overnight Mail:**

Ironclad Performance Wear (8300)
OUST, Secured & Top 20

United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, California 90017

U. S. Securities and Exchange
Commission
Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

**Secured Creditor**
Radians Wareham Holding, Inc.
Attn: Mike Tutor, CEO
5305 Distriplex Farms
Memphis, TN 38141

**Counsel to Radians Wareham Holdings**
E. Franklin Childress, Jr.
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
165 Madison Ave, Suite 2000
Memphis, Tennessee  38103

**Counsel to Radians Wareham Holdings**
Sharon Z. Weiss
Bryan Cave
120 Broadway, Suite 300
Santa Monica, CA 90401

**Top 20 Unsecured Creditors:**

Advantage Media Services, Inc.
Attn: Steven Helmle
29010 Commerce Center Drive
Valencia, CA 91355

Danny Negara
Mercindo Global Manufaktur
Jl. Raya Semarang-Bawen Km.29
SEemerang, Central Java
50661, Indonesia

Eliza Yang
Nantong Changbang Gloves Co.
Flat/RM 1602 Chit Lee Comm
Bldg 30-36, Shau Kei Wan Road
Hong Kong, China

Gerard
BDO USA, LLP
P. O. BOX 677973
Dallas, TX 75267-7973

Kwong
PT JJ GLOVES INDO
JL Ronggowarsito, Mlese, Ceper
Bonded Zone, Klaten
Central Java, Indonesia, 57463

Mark Robba
PT SPORT GLOVE INDONESIA
Krandon Desa Pandowoharjo
Sleman
Yogyakarta, Indonesia, 55512

Daniel Gomes
Capital One Bank
P. O. BOX 1917
Merrifield, VA 22116-1917

Brent Waters
Resources Global Professionals
P.O. Box 740909
Los Angeles, CA 90074-0909

Skadden Arps Slate Meagher & Flom
LLP
P O Box 1764
White Plains, NY 10602

Carol Pearson
FedEx
PO Box 7221
Pasadena, CA 91109-7321

Risk Consulting Partners
24722 Network Place
Chicago, IL 60673-1247

Robert Tejeda
Stubbs, Alderton & Markiles, LLP
15260 Ventura Blvd
20th Floor
Sherman Oaks, CA 91403

Ms. Vicz Yue
Ka Hung Glove Inustrial Co. Ltd.
Fujian Quanzhou Jiacheng Leather
Chi Feng Road, Quanzhou City
Fujian, 362000, China

Shur-Sales & Marketing, Inc.
3830 S Windermere St.
Englewood, CO 80110

John Calhoun
Synetra
1110 E. State Highway 114
Suite 200
Southlake, TX 76092

Sky Lin
Marusan - Mimasu Tshusho Co. Ltd.
No 1 Queen' Road Central
Hong Kong
China

Carla Durand
University of Milwaukee
P O Box 500
University of Wisconsin - Milwaukee
Milwaukee, WI 53201

Bradley J. S. Weiss
Winspeed Sports Shanghai Co., Ltd.
858 Mingzhu Road
Shanghai
China, 00020-1702

Janice Lee
Woneel Midas Leathers
Jl Gembor Raya Desa Pasirjaya
Tangerang
Banten, Indonesia, 15135

Liliana Dominguez
Yellow and Roadway
P. O. Box 100129
Pasadena, CA 91355

1920 Hutton Court
Attn: Johnny Clark
Inwood National Bank
P O Box 857413
Richardson, TX 75085