RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 211414)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br><br>☒  Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐  Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>(Proposed to be) Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**DEBTORS' MOTION FOR AN ORDER: (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS TO USE, (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES, AND STALKING HORSE BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; AND (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Declaration of Geoffrey Greulich Filed Concurrently Herewith]**<br><br>DATE:     September 13, 2017<br>TIME:     2:00 p.m.<br>PLACE:   Courtroom "303"<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA |

# <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 7

I. STATEMENT OF FACTS ........................................................................................................ 7

    A.    Brief Description Of The Debtors And Their Businesses. ...................................... 7

    B.    Events Leading To The Filing Of The Debtors' Bankruptcies And The
        Debtors' Chapter 11 Goals .......................................................................................... 9

    C.    Summary of the Requested Bidding Procedures and Protections......................... 11

II. DISCUSSION ........................................................................................................................ 14

    A.    LAW AND RULES APPLICABLE TO THIS BID PROCEDURES
        MOTION ....................................................................................................................... 14

    B.    THE APPLICABLE REQUIREMENTS OF LBR 6004-1 HAVE BEEN
        SATISFIED ................................................................................................................... 19

III. CONCLUSION .................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re 995 Fifth Ave. Assoc., L.P.*,
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) ..................................................................16

*In re Atlanta Packaging Products, Inc.*,
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ................................................................15

*Beebe v. Pacific Realty Trust*,
    578 F.Supp. 1128 (D. Or. 1984) ......................................................................17

*Cottle v. Storer Communication Inc.*,
    849 F.2d 570 (11th Cir. 1988) ....................................................................16, 17

*In re Crowthers McCall Pattern, Inc.*,
    114 B.R. 877 (Bankr. S.D.N.Y. 1990) ........................................................16, 17

*In re CXM, Inc.*,
    307 B.R. 94 (Bankr. N.D. Ill. 2004) ................................................................17

*In re Financial News Network, Inc.*,
    126 B.R. 152 (Bankr. S.D.N.Y. 1991) ..............................................................16

*In re Integrated Resources, Inc.*,
    147 B.R. 650 (S.D.N.Y. 1992), *app. dismissed on jurisdictional grounds*, 3
    F.3d 49 (2d Cir. 1993)..........................................................................16, 17, 18

*In re Lake Burton Development, LLC*,
    No. 09-22830 (Bankr.N.D.Ga. April 1, 2010) ....................................................17

*In re S.N.A. Nut Co.*,
    186 B.R. 98 (Bankr. N.D.Ill. 1995) ..................................................................16

*Samjens Partners I v. Burlington Indus.*,
    663 F.Supp. 614 (S.D.N.Y. 1987) ....................................................................19

*In re Twenver, Inc.*,
    149 B.R. 954 (Bankr. D. Colorado 1992) ..........................................................17

*In re Women First Healthcare, Inc.*,
    332 B.R. 115 (Bankr. D. Delaware 2005) ..........................................................17

**Other State Cases**

*In re Dan River, Inc.,*
    No. 04-10990 (Banker.N.D.Ga. December 17, 2004) ...........................................................17

**Federal Statutes**

11 U.S.C. § 101 ...........................................................................................................................2
11 U.S.C. § 105(a) ..................................................................................................................2, 14
11 U.S.C. § 363(b)(1) ..............................................................................................................14
11 U.S.C. § 363(f) ....................................................................................................................14
11 U.S.C. § 503(b) ....................................................................................................................13
11 U.S.C. § 1107 ........................................................................................................................7
11 U.S.C. § 1108 ........................................................................................................................7

**Other Authorities**

Fed. R. Bankr. P.  2002 ..........................................................................................................2, 14

Fed. R. Bankr. P.  6004 ..........................................................................................................2, 14

Fed. R. Bankr. P. 6004(f) .........................................................................................................14

Fed. R. Bankr. P. 6004-1(b) ...........................................................................................2, 15, 19

Fed. R. Bankr. P. 9013-1 ...........................................................................................................2

Fed. R. Bankr. P.  9014 .............................................................................................................2

Pursuant to Sections 105(a) and 363 of the United States Code §§ 101, et seq. (the "Bankruptcy Code")[1], Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure ("FRBP"), and 6004-1(b) and 9013-1 of the Local Bankruptcy Rules ("LBR"), Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada", and with Ironclad California, the "Debtors" or "Ironclad"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases[2], hereby file this emergency motion (the "Bid Procedures Motion")[3] for the entry of an order (the "Bid Procedures Order") in substantially the form attached as **Exhibit B** to the concurrently filed Declaration of Geoffrey Greulich (the "Greulich Declaration") [Docket No. 6]:

(1)    approving the form of the Asset Purchase Agreement dated September 8, 2017 (the "APA") between the Debtors and Radians Wareham Holding, Inc. ("Purchaser"), a true and correct copy of which is attached as **Exhibit A** to the Greulich Declaration, pertaining to a sale of substantially all of the Debtors' assets (excluding cash and causes of action) (the "Purchased Assets")[4] to be used by (a) Purchaser as the stalking horse bidder for the Purchased Assets, and (b) any prospective overbidders (each an "Overbidder" and collectively, the "Overbidders") who seek to participate in a hoped for auction sale ("Auction") of the Purchased Assets;

(2)    approving the format, bidding procedures, and stalking horse bid protections (the "Bidding Procedures and Protections") relating to the proposed Auction

---

[1] Unless otherwise stated, all section references herein are to the Bankruptcy Code.

[2] Concurrently herewith, the Debtors have filed a motion seeking to have their two Chapter 11 bankruptcy cases jointly administered.

[3] LBR 6004-1(b)(1) provides that a Sale Procedures Motion may be scheduled on not less than 7 days notice to applicable parties, unless an order setting hearing on shortened notice is obtained under LBR 9075-1(b). For all of the reasons described herein, the Debtors request that the Court consider approval of this Bid Procedures Motion on less than 7 days notice.

[4] The Debtors are not seeking approval of the actual sale of the Purchased Assets pursuant to this Bid Procedures Motion. The Debtors will file a separate motion with the Court (the "Sale Motion") seeking approval of the actual sale of the Purchased Assets free and clear of liens, claims, encumbrances and interests, pursuant to Section 363, at a later date and have the Sale Motion heard on a date to be set by the Court pursuant to this Bid Procedures Motion.

described below and in the annexed Memorandum of Points and Authorities (the "<u>Memorandum</u>");

(3)    approving the form of notice (the "<u>Auction Notice</u>") to be provided by the Debtors to their creditors and to be provided by the Debtors' investment banker to prospective Overbidders in the form attached as **<u>Exhibit C</u>** to the Greulich Declaration; and

(4)    scheduling the Auction and a hearing (the "<u>Sale Hearing</u>") in late October, 2017 before the Court to consider the Sale Motion and approval of the sale of the Purchased Assets to the highest bidder, which Auction and Sale Hearing the Debtors propose to hold concurrently before the Court.

The principal terms of the APA are summarized as follows:[5]

1.    Purchaser will be paying a cash purchase price of either $15 million or $20 million depending upon the occurrence of an event which is sensitive and is the subject of a motion the Debtors are filing under seal, which the Debtors hope will be granted by the Court. It should be noted that the Debtors believe the total debt in these cases (both secured and unsecured combined) is or will be in the range of approximately $8-$10 million, which means that all creditors are expected to be paid in full with there being a substantial distribution to the shareholders of the parent company, which is a publicly traded company.

2.    Purchaser has deposited $1 million cash with Debtors' bankruptcy counsel which Purchaser will forfeit to the Debtors' estates if Purchaser elects not to proceed with its purchase of the Purchased Assets.

3.    The Debtors' proposed sale to Purchaser is subject to overbid with a minimum proposed overbid of at least $750,000 or any higher figure which is wholly divisible by $250,000.

4.    The Debtors' proposed subsequent bidding increments will be $250,000 or higher figures which are wholly divisible by $250,000.

5.    The proposed break-up fee to Purchaser is $500,000.

6.    The proposed Auction will occur (subject to the availability of the Court) in the Court in late October, 2017. The Auction is set up so that the break-up fee to be paid to Purchaser in the event of a successful overbid will not count towards determining the highest bid in order to entice prospective overbidders to participate in the Auction and not be intimidated into thinking that Purchaser has a bidding advantage at the Auction.

---

[5] This summary is for informational purposes only. Parties in interest should read the entire APA and the exhibits thereto. To the extent there are any inconsistencies between this summary and the actual terms of the APA and the exhibits thereto, the terms of the APA and the exhibits thereto shall govern in all respects.

The Debtors' business was actively marketed for sale for an extended period prior to the Debtors' bankruptcy filing by a qualified investment banker. Prospective buyers had the ability to purchase assets or equity. While a number of prospective buyers expressed and continued to express interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-bankruptcy marketing process because (i) the Debtors were out of funds, (ii) the Debtors could not continue to operate without both access to their own cash receipts as well as receipt of additional financing, and (iii) Purchaser (which is also the Debtors' secured creditor having purchased the Debtors' pre-bankruptcy secured bank debt) had exercised its secured creditor rights and was sweeping all of the Debtors' cash and was no longer willing to continue to forbear or advance additional needed financing to the Debtors absent a global resolution with the Debtors which was accomplished with the APA and the DIP financing agreement the Debtors entered into with Purchaser which is the subject of a separate emergency motion.

The purchase offer provided to the Debtors by Purchaser was the best offer the Debtors had received by the Petition Date, and Purchaser was ready to proceed with its purchase and lend the Debtors sufficient funds to enable the Debtors to operate their business through an Auction to take place in late October, 2017 with a sale closing to occur shortly thereafter. Purchaser was also willing to permit the Debtors to proceed with a robust post-bankruptcy marketing and hopeful overbid process to insure that the highest and best price is paid for the Debtors' assets. Given the breadth of the Debtors' pre-bankruptcy marketing process and the fact that the Debtors' pre-bankruptcy investment banker (who is already very familiar with the various prospective overbidders) will be serving as the Debtors' post-bankruptcy investment banker and leading the overbid sale process, and the fact that the likely overbidders are already deep into the due diligence process, the Debtors are confident that providing prospective overbidders with approximately six weeks to decide whether to participate in the Auction is a sufficient amount of time for the Debtors to achieve the highest and best price for their assets. Also, and very importantly, the Debtors' financial needs expand in the last two months of the year to accommodate seasonal builds and the Chinese New Year disruption of suppliers so if the Debtors

are required to continue to operate their business through the end of the year or significantly beyond October 31, 2017, the Debtors will need to borrow additional funds which could result in substantially reducing the ultimate recovery for the Debtors' shareholders.  It is for this reason that it is very important that the Debtors' be authorized to implement their proposed sale timeline.

The Debtors are requesting the Court to approve this Bid Procedures Motion on an emergency basis in order to provide prospective overbidders with the maximum amount of time possible to understand the overbid process and provide clear direction and guidelines because doing so will maximize the prospects for a successful Auction and insure that under the circumstances, the highest and best price is paid for the Purchased Assets.

**WHEREFORE,** the Debtors respectfully request that this Court enter a Bid Procedures Order, in substantially the form attached as **Exhibit B** to the Greulich Declaration:

(1)    approving the form of APA between the Debtors and Purchaser attached as **Exhibit A** to the Greulich Declaration to be used by (a) Purchaser as the stalking horse bidder for the Purchased Assets, and (b) any Overbidders who seek to participate in the Auction;

(2)    approving the Bidding Procedures and Protection relating to the Auction described above and in the annexed Memorandum;

(3)    approving the form of Auction Notice to be provided by the Debtors to their creditors and to be provided by the Debtors' investment banker to prospective Overbidders in the form attached as **Exhibit C** to the Greulich Declaration;

(4)    scheduling the Auction and the Sale Hearing in late October, 2017 before the Court to consider the Sale Motion and approval of the sale of the Purchased Assets to the highest bidder, which Auction and Sale Hearing the Debtors propose to hold concurrently before the Court; and

/ / /

/ / /

/ / /

(5)    granting such other and further relief as the Court deems just and proper.

Dated: September 11, 2017                    IRONCLAD PERFORAMNCE WEAR
                                            CORPORATION, *et al.*

                                            By:    */s/ Ron Bender*
                                                   RON BENDER
                                                   MONICA Y. KIM
                                                   KRIKOR J. MESHEFEJIAN
                                                   LEVENE, NEALE, BENDER,
                                                   YOO & BRILL L.L.P.
                                                   Proposed Attorneys for Debtors and
                                                   Debtors in Possession

6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.     Brief Description Of The Debtors And Their Businesses.**

On September 7, 2017 ("Petition Date"), Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and its parent corporation Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada"), each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, Ironclad California and Ironclad Nevada (collectively, the "Debtors" or "Ironclad") have operated their businesses and managed their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors have sought joint administration of their Chapter 11 cases.  Other than owning all of the shares in Ironclad California, Ironclad Nevada has no business.  All operations of the Debtors effectively function through Ironclad California.

The Debtors are a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder.  The Debtors' business is headquartered in Farmers Branch, Texas.  Ironclad Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW".  As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.  As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees who work overseas.

Ironclad was founded in 1998 by Ed Jaeger.  Mr. Jaeger was inspired to build gloves that offered protection and performance without sacrificing one for the other.  From the beginning, Ironclad built gloves using materials that offered excellent fit to make them an extension of the hand and to make jobs easier for the "industrial athlete".  By 2006, Ironclad offered 35 different task-specific glove types for people wearing gloves as part of their daily jobs.

In 2008, the Debtors launched the KONG (King of Oil 'N' Gas) line to address the high number of hand injuries in the O&G field.  By 2010, the KONG line was comprised of 46 different gloves.  Additionally, Ironclad expanded its presence in the retail and non-professional markets with the launch of the EXO brand in June 2015.  EXO offers lower cost gloves for automotive, DIY, and outdoor sporting applications.  Ironclad offers 30 different EXO glove types.

Ironclad's task-specific technical glove products are specially designed for individual user groups.  Ironclad currently offers over 160 distinct types of gloves for a variety of markets, including industrial, construction, DIY, carpentry, machining, package handling, plumbing, welding, roofing, O&G, mechanics, hunting, and gardening.  Products come in a multitude of colors and cater to the specific demands and requirements of the users based on ease of motion, grip, water and chemical resistance, visibility, and protection from abrasions, cuts, flames, impacts, temperature, and vibration.  Since inception, Ironclad has employed an internal research and development ("R&D") department responsible for identifying and creating new products and applications, and improving and enhancing existing products.  Ironclad is continually evaluating new base materials for gloves, and grip is another key area of focus for R&D.  Ironclad often partners with industry-leading organizations to develop new products.  Ironclad has 13 U.S. patents issued and 11 foreign patents, as well as five pending U.S. patent applications and several pending foreign patent applications.  Ironclad also uses trademarks to strengthen and protect its recognizable brand names.   Ironclad owns 52 registered U.S. trademarks, 39 registered international trademarks, and 13 and 43 trademarks pending in the U.S. and internationally, respectively.

Ironclad currently sells its product through approximately 10,000 outlets for professional tradesmen as well as "Big Box", hardware, auto parts, and sporting goods retailers.  The sales force is organized by 3 business segments: Industrial, Retail, and International.  Glove products are currently manufactured by multiple suppliers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia.

**B.    Events Leading To The Filing Of The Debtors' Bankruptcies And The Debtors' Chapter 11 Goals.**

Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations have been insufficient to support their current business operations as well as their continued growth.   There have been many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or ineffective expansion and distribution of all of their product lines and development of new customers, and higher than anticipated production, manufacturing and warehousing costs.   In addition, it was discovered in early 2017 that under prior management, the Debtors had failed to provide materially complete and correct financial statements as required under their Loan Documents (defined below) to their primary secured lender for the fiscal years ended December 31, 2015 and 2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017.  As a result of this discovery, the Debtors' then chief executive officer and other officers were terminated, and L. Geoffrey Greulich assumed the position of the Debtors' new chief executive officer effective July 6, 2017.   Prior to assuming this position, Mr. Greulich had no prior connections or relationship with the Debtors as an insider, equity holder or otherwise.  As a Senior Advisor, Operations at Corridor Capital, LLC where he leads operations through portfolio engagement as well as conducting due diligence, Mr. Greulich was highly qualified to serve as the Debtors' new chief executive officer.   Persons or parties interested in obtaining specific historical financial history of the Debtors should review the public filings made by the Debtors with the Securities and Exchange Commission.

The Debtors filed their bankruptcy cases to consummate a sale of substantially all of their assets (excluding cash and causes of action) for the most money possible.  Just prior to their bankruptcy filings, the Debtors entered into an asset purchase agreement ("APA") with the Debtors' current secured creditor, Radians Wareham Holdings, Inc. ("Radians") or its affiliate/designee, for a cash purchase price of $20 million or $15 million, subject to an overbid process.  Purchaser will be paying a cash purchase price of either $15 million or $20 million depending upon the occurrence of an event which is sensitive and is the subject of a motion the

Debtors are filing under seal, which the Debtors hope will be granted by the Court. It should be noted that the Debtors believe the total debt in these cases (both secured and unsecured combined) is or will be in the range of approximately $8-$10 million, which means that all creditors are expected to be paid in full with there being a substantial distribution to the shareholders of the parent company, which is a publicly traded company.

The Debtors' business was actively marketed for sale for an extended period prior to the Debtors' bankruptcy filing by a qualified investment banker. Prospective buyers had the ability to purchase assets or equity. While a number of prospective buyers expressed and continued to express interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-bankruptcy marketing process because (i) the Debtors were out of funds, (ii) the Debtors could not continue to operate without both access to their own cash receipts as well as receipt of additional financing, and (iii) Purchaser (which is also the Debtors' secured creditor having purchased the Debtors' pre-bankruptcy secured bank debt) had exercised its secured creditor rights and was sweeping all of the Debtors' cash and was no longer willing to continue to forbear or advance additional needed financing to the Debtors absent a global resolution with the Debtors which was accomplished with the APA and the DIP financing agreement the Debtors entered into with Purchaser which is the subject of a separate emergency motion.

The purchase offer provided to the Debtors by Purchaser was determined by the Board to be the best offer the Debtors had received by the Petition Date, and Purchaser was ready to proceed with its purchase and lend the Debtors sufficient funds to enable the Debtors to operate their business through an Auction to take place in late October, 2017 with a sale closing to occur shortly thereafter. Purchaser was also willing to permit the Debtors to proceed with a robust post-bankruptcy marketing and hopeful overbid process to insure that the highest and best price is paid for the Debtors' assets. Given the breadth of the Debtors' pre-bankruptcy marketing process and the fact that the Debtors' pre-bankruptcy investment banker (who is already very familiar with the various prospective overbidders) will be serving as the Debtors' post-bankruptcy investment banker and leading the overbid sale process, and the fact that the likely

overbidders are already deep into the due diligence process, the Debtors are confident that providing prospective overbidders with approximately six weeks to decide whether to participate in the Auction is a sufficient amount of time for the Debtors to achieve the highest and best price for their assets. Also, and very importantly, the Debtors' financial needs expand significantly the last two months of the year so if the Debtors are required to continue to operate their business through the end of the year or significantly beyond October 31, 2017, the Debtors may need to borrow additional money which could result in substantially reducing the ultimate recovery for the Debtors' shareholders. It is also not clear that any such additional financing would be available to the Debtors in any event. It is for this reason that it is very important that the Debtors' be authorized to implement their proposed sale timeline.

The Debtors are requesting the Court to approve this Bid Procedures Motion on an emergency basis in order to provide prospective overbidders with the maximum amount of time possible to understand the overbid process and provide clear direction and guidelines because doing so will maximize the prospects for a successful Auction and insure that under the circumstances, the highest and best price is paid for the Purchased Assets.

**C.    Summary of the Requested Bidding Procedures and Protections.**

As indicated above, a copy of the APA entered into between the Debtors and Purchaser prior to the Petition Date is attached as **Exhibit A** to the Greulich Declaration. Section 6.5 of the APA is the section dealing with the bid procedures. The following is a summary of the Bidding Procedures and Protections that the Debtors are requesting the Court to approve and which are what the Debtors and Purchaser agreed to in the APA prior to the Petition Date:[6]

1.    The initial bid over that submitted by Purchaser in the APA shall be in the amount of at least $20,750,000.00 if Purchaser's Aggregate Purchase Price is Twenty Million Dollars ($20,000,000.00) and shall be in the amount of at least $15,750,000 if Purchaser's Aggregate Purchase Price is Fifteen Million Dollars ($15,000,000.00).

---

[6] Any defined term used herein which is not defined herein but which is defined in the APA shall have the same definition as provided in the APA.

2. Thereafter, bidding shall be in increments of at least $250,000.00 or figures which are wholly divisible by $250,000.00.

3. Only financially qualified parties will be eligible to participate in the Auction – with financially qualified parties to mean parties who have demonstrated that they have the financial means to consummate their purchase of the Purchased Assets without financing unless the financing to be used by them is already committed (meaning that any overbid may not contain any financing contingency). Any party who participates in the Auction will have completed their due diligence of the Debtors and will have no due diligence contingency.

4. In order to be eligible to participate in the Auction, prospective overbidders will be required at least three business days prior to the Auction (i.e., by 5:00 p.m. PST on October __, 2017) to (i) deliver a redlined version of the APA to counsel for the Debtors, counsel for Purchaser and counsel for any official committee formed in the Debtors' bankruptcy cases indicating any changes the prospective overbidder is requesting to the APA, and (ii) submit a cash deposit of $2 million, which deposit will be non-refundable and forfeited by the prospective overbidder if the prospective overbidder is deemed by the Bankruptcy Court to be the winning bidder and fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order approving the Debtors' sale of the Purchased Assets to the prospective overbidder regardless of whether an appeal has been filed of such Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement.

5. Purchaser will have the right, but not the obligation, to credit bid the outstanding balances of its Pre-Bankruptcy Secured Debt and the DIP Facility towards its purchase price and any overbid that Purchaser elects to submit. Purchaser shall have the right to participate in any Auction.

6. If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, then concurrently with the closing of the Debtors' sale of the Purchased Assets to such winning bidder, Purchaser will be paid directly out of the sale proceeds (i) the full amount of the Pre-Bankruptcy Secured Debt, plus (ii) the full amount of the DIP Facility, plus (iii) the Breakup Fee.

7. If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, or if the Debtors elect to proceed with seeking confirmation of a plan of reorganization instead of proceeding with a sale of the Purchased Assets, Purchaser shall receive a break-up fee (the "Breakup-Fee") in the amount of $500,000.00.

8. The Break-Up Fee shall be deemed to be an allowed expense of the kind specified in Section 503(b) of the Bankruptcy Code and shall be paid solely from the proceeds of an Alternative Transaction.

9. The Debtors shall have the right to schedule the Auction so that the payment of the Breakup-Fee to Radians will not be considered in determining the highest price bid for the Assets. However, Radians shall be authorized to match any qualified overbid and be declared the successful purchaser of the Purchased Assets giving consideration in the amount of the required Break-up Fee and Prepayment Fee as a component of its matching bid, which Break-up Fee and Prepayment Fee will not owing by the Debtors if Radians is the winning bidder.

10. The Debtors will agree to proceed with an accelerated sale process, seeking to have the sale approval hearing no later than October 30, 2017.

11. If Radians is deemed by the Bankruptcy Court to be the winning bidder at the Auction and Radians fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order (regardless of whether an appeal has been filed of the Sale Order provided there is no entered stay

pending appeal - i.e., no final order requirement), then Radians shall forfeit the Buyer Deposit to the Debtors.

12. The Debtors' sale of the Purchased Assets to Radians or a successful overbidder will be free and clear of all liens, claims and interests in accordance with section 363(f) of the Bankruptcy Code.

13. The Debtors have the right to market the Purchased Assets for overbid pending the Auction and to hire an investment banker or sales agent to assist the Debtors in this process.  However, the collateral of Radians shall not be used to fund the engagement of an investment banker or sales agent with such party only being entitled to compensation from the proceeds of the Closing.

## II.

## DISCUSSION

## A.    LAW AND RULES APPLICABLE TO THIS BID PROCEDURES MOTION.

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…."  11 U.S.C. § 363(b)(1).  Section 105(a) provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  FRBP 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, FRBP 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale.  Fed. R. Bankr. P. 6004(f).  With that said, LBR 6004-1 provides, in pertinent part, as follows:

> **(b) Motion for Order Establishing Procedures for the Sale of Estate Property.**
> **…**
>     (2) Contents of Notice [of a Sale Procedure Motion]. The notice must describe the proposed bidding procedures and include

14

a copy of the proposed purchase agreement. If the purchase agreement is not available, the moving party must describe the terms of the sale proposed, when a copy of the actual agreement will be filed with the court, and from whom it may be obtained. The notice must describe the marketing efforts undertaken and the anticipated marketing plan, or explain why no marketing is required. …

(3) Service of the Notice and Motion. The moving party must serve the motion and notice of the motion and hearing by personal delivery, messenger, telephone, fax, or email to the parties to whom notice of the motion is required to be given by the FRBP or by these rules, any other party that is likely to be adversely affected by the granting of the motion, and the United States trustee. The notice of hearing must state that any response in opposition to the motion must be filed and served at least 1 day prior to the hearing, unless otherwise ordered by the court.
. . .

(6) Break-Up Fees. If a break-up fee or other form of overbid protection is requested in the Sale Procedure Motion, the request must be supported by evidence establishing:
      (A) That such a fee is likely to enhance the ultimate sale price; and
      (B) The reasonableness of the fee.

LBR 6004-1(b).

Neither the Bankruptcy Code nor the FRBP contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. Nonetheless, as one Court has stated, "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Additionally, courts have long recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*

A corollary to these principles is that the Court should not "cherry-pick" among contractual provisions, objecting to select individual portions, if the agreement as a whole is supported by an articulated business judgment. At least one bankruptcy court has expressly applied this corollary to a transaction including breakup and overbid provisions in the sale of the

debtor's business.  In *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the Court approved a transaction including provisions relating to a breakup fee and minimum overbids.  In responding to objections to other provisions of the agreement, the Court held that:

> The Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11.  *Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.*, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual provisions may be justified by the need to attract a prospective investor.).

114 B.R. at 886.

In regards to break-up fees, in general, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode ... to attract other bidders to the auction."  *In re Financial News Network, Inc.*, 126 B.R. 152, 154 n. 5 (Bankr. S.D.N.Y. 1991); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 653 (S.D.N.Y. 1992), *app. dismissed on jurisdictional grounds*, 3 F.3d 49 (2d Cir. 1993) ("[a] break-up fee, or more appropriately, a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction").  Agreements to provide breakup fees are designed to compensate the potential acquirer who serves as a catalyst or "stalking horse" which attracts more favorable offers.  *In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D.Ill. 1995); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

Outside of bankruptcy, a break-up fee is generally allowed as long as it "enhances" the bidding.  *In re S.N.A. Nut Co.*, 186 B.R. at 102.  In the bankruptcy context, a break-up fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude."  *Cottle v. Storer Communication Inc.*, 849 F.2d 570, 578 (11th Cir. 1988); *In re 995 Fifth Ave.*, 96 B.R. at 28.  Generally speaking, whether the payment of a break-up fee is appropriate is evaluated under the "business judgment rule."  *In re S.N.A. Nut Co.*, 186 B.R. at 102.  Under this rule, there is a presumption that, in making a business decision, debtor acted on an informed basis, in good faith and in the honest belief that the action taken was in the best

interest of the estate.  Therefore, bidding procedures proposed to be utilized by a debtor with respect to a proposed sale should be approved when the Court determines that such procedures are fair and do not violate any of the debtor's fiduciary duties.  *Id.*

In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions:  (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders."  *In re Integrated Resources, Inc.*, 147 B.R. at 662.  The published opinions addressing break-up fees provide for a broad range of break-up fees, typically in the range of 1-5% of the purchase price.  *See, In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D. Colorado 1992) (stating that breakup fees of 1% to 2% are found to be reasonable in the majority of cases approving such fees); *In re Integrated Resources, Inc.,* 147 B.R. 650, 662 (Bank. S.D.N.Y. 1992) (where the Court heard testimony that the average breakup fee in the industry is 3.3%); *Cottle v. Storer Communication, Inc.,* 849 F.2d 570 (11th Cir. 1988) ($18 million termination fee approved using business judgment rule where fee was 1.16% of sale price); *Samjens Partners I v. Burlington Indus.*, 663 F.Supp. 614 (S.D.N.Y. 1987) (breakup fee calculated as 2% of the value of the company was "not so onerous as to end the auction); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving $500,000 break-up fee in a $45 million sale – 1.11%); and *Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128 (D. Or. 1984)(termination fee calculated as 1% of the transaction was reasonable). Notwithstanding the foregoing, Break-up fees of over three percent have been routinely approved in the context of bankruptcy sales. *See, In re CXM, Inc.,* 307 B.R. 94, 103–04 (Bankr. N.D. Ill. 2004) (Court approved break-up fee in amount equal to the actual expenses that the stalking horse incurred  in connection with its bid to buy the Sale Assets, subject to a maximum cap of $200,000, which equaled 3% of the cash purchase price of $5,914,000); *In re Women First Healthcare, Inc.,* 332 B.R. 115, 118, (Bankr. D. Delaware 2005) (Court approved break-up fee and expense reimbursement that equaled 4.7% percent of the purchase price;  *In re Dan River, Inc.,* No. 04-10990 (Banker.N.D.Ga. December 17, 2004) (Court approved break-up fee equal to 5.3% of the cash purchase price); and *In re Lake Burton Development, LLC*, No. 09-

22830 (Bankr.N.D.Ga. April 1, 2010) (Court approved break-up fee equal to 4.75% of cash purchase price).

The Debtors submit that all of the bidding procedures the Debtors are seeking to have the Court approve, including the proposed break-up fee to Purchaser, satisfies all three of the useful functions prescribed by the *Integrated Resources* case (i.e., (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; and (3) to attract additional bidders). The proposed break-up fee of $500,000 (which will be 2.5% if the purchase price ends up being $20 million and will be 3.33% if the purchase price ends up being $15 million) is well within the percentage parameters that have been approved by many other courts. It would not have been possible for the Debtors to obtain a stalking horse bidder with a purchase price in this range without the payment of a comparable break-up fee.

For all of the reasons described above, the Debtors would not have been able to survive as an ongoing business if the Debtors were not able to stop the cash sweep implemented by their secured creditor and obtain the additional financing their secured creditor has agreed to provide. But in addition, it is critical that the Debtors consummate their sale by around the end of October, 2017 because after that their financial needs grow significantly, and the Debtors do not currently have in place anyone offering to provide the Debtors with the needed additional financing. But even if the Debtors did have such additional financing available to them, borrowing even more money would simply result in increasing the amount of the Debtors' debt that would have to be satisfied before shareholders would receive a distribution and therefore reduce the ultimate recovery for shareholders.

The Debtors believe that even if the Debtors would have been able to obtain use of their cash collateral (with or without the consent of their secured creditor) and even if the Debtors could have found someone else willing to provide the Debtors with their necessary financing, going into these bankruptcy cases with no stalking horse bidder and simply conducting an open auction ran the risk of chaos and uncertainty. The Debtors feel very strongly that having a stalking horse bidder in place will create organization and stability for the Debtors, their employees, their suppliers and their customers as well as create a clear and organized sale

structure and guidelines for prospective Overbidders to be able to complete against, which is likely to enhance and maximize the prospects for an overbid at the Auction and enhance the ultimate sale price paid for the Purchased Assets.  None of this would have been possible if not for Purchaser's stalking horse bid, and Purchaser understandably would not have been willing to serve as the stalking horse bidder without the assurance of the $500,000 break-up fee.  The Debtors believe that the under the circumstances of these cases, the $500,000 break-up fee is reasonable and appropriate and would undoubtedly have been required by any stalking horse bidder.  As noted above, Purchaser has agreed to a key provision of the overbid process which is rare in today's bankruptcy auction world which is to provide the Debtors the flexibility of not counting the break-up fee in determining the highest and best price bid for the Purchased Assets so that the Debtors and their investment banker can legitimately advertise to prospective Overbidders that they will not be incurring any bidding disadvantage as a result of not serving as the stalking horse bidder.

The Debtors strongly believe that proceeding with the Bidding Procedures and Protections as proposed by the Debtors herein and as agreed to between the Debtors and Purchaser (subject of course to the approval of the Court) is in the overwhelming best interests of the Debtors and their estates.

**B.    THE APPLICABLE REQUIREMENTS OF LBR 6004-1 HAVE BEEN SATISFIED.**

Here all of the applicable requirements of LBR 6004-1(b) pertaining to the Bid Procedures Motion and the request therein to approve the Bidding Procedures and Protections have been satisfied.  First, as required by LBR 6004-1(b)(2), the Notice of the Bid Procedures Motion describes the proposed Bidding Procedures and Protections and includes a copy of the APA.  Second, as required by LBR 6004-1(b)(2), the Notice of the Bid Procedures Motion and this Memorandum describe marketing efforts undertaken and the anticipated marketing of the Purchased Assets through the deadline for prospective Overbidders to submit bids for the Auction.  Third, as required by LBR 6004-1(b)(3), the Notice of the Bid Procedures Motion, Bid Procedures Motion, and this Memorandum were served on the twenty largest unsecured creditors

in the fastest manner possible under the circumstances.  Therefore, the Debtors submit that service of the Notice of the Bid Procedures Motion, Bid Procedures Motion, and this Memorandum by such means was adequate and appropriate.

**III.**

**CONCLUSION**

Based upon all of the foregoing, the Debtors respectfully request that this Court enter a Bid Procedures Order, in substantially the form attached as **Exhibit B** to the Greulich Declaration:

(1)    approving the form of APA between the Debtors and Purchaser attached as **Exhibit A** to the Greulich Declaration to be used by (a) Purchaser as the stalking horse bidder for the Purchased Assets, and (b) any Overbidders who seek to participate in the Auction;

(2)    approving the Bidding Procedures and Protection relating to the Auction described above and in the annexed Memorandum;

(3)    approving the form of Auction Notice to be provided by the Debtors to their creditors and to be provided by the Debtors' investment banker to prospective Overbidders in the form attached as **Exhibit C** to the Greulich Declaration;

(4)    scheduling the Auction and the Sale Hearing in late October, 2017 before the Court to consider the Sale Motion and approval of the sale of the Purchased Assets to the highest bidder, which Auction and Sale Hearing the Debtors propose to hold concurrently before the Court; and

(5)    granting such other and further relief as the Court deems just and proper.

Dated: September 11, 2017            IRONCLAD PERFORMANCE WEAR
                                     CORPORATION, *et al.*

                                     By:___*/s/ Ron Bender*_____
                                           RON BENDER
                                           LEVENE, NEALE, BENDER,
                                           YOO & BRILL L.L.P.
                                           Proposed Attorneys for Debtors and
                                           Debtors in Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DEBTORS' MOTION FOR AN ORDER: (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS TO USE, (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES, AND STALKING HORSE BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; AND (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 11, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **S Margaux Ross    margaux.ross@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**
- **Sharon Z. Weiss    sharon.weiss@bryancave.com, raul.morales@bryancave.com**

**2.  SERVED BY UNITED STATES MAIL**: On **September 11, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 11, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☒ *Service List served by Overnight Mail attached*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 11, 2017 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**

**Served by Overnight Mail:**

| | | |
|---|---|---|
| Ironclad Performance Wear (8300)<br>OUST, Secured & Top 20 | United States Trustee<br>915 Wilshire Blvd., Suite 1850<br>Los Angeles, California 90017 | U. S. Securities and Exchange<br>Commission<br>Attn: Bankruptcy Counsel<br>444 South Flower Street, Suite 900<br>Los Angeles, CA 90071-9591 |
| **Secured Creditor**<br>Radians Wareham Holding, Inc.<br>Attn: Mike Tutor, CEO<br>5305 Distriplex Farms<br>Memphis, TN 38141 | **Counsel to Radians Wareham Holdings**<br>E. Franklin Childress, Jr.<br>Baker, Donelson, Bearman, Caldwell &<br>Berkowitz, PC<br>165 Madison Ave, Suite 2000<br>Memphis, Tennessee  38103 | **Counsel to Radians Wareham Holdings**<br>Sharon Z. Weiss<br>Bryan Cave<br>120 Broadway, Suite 300<br>Santa Monica, CA 90401 |

**Top 20 Unsecured Creditors:**

| | | |
|---|---|---|
| Advantage Media Services, Inc.<br>Attn: Steven Helmle<br>29010 Commerce Center Drive<br>Valencia, CA 91355 | Danny Negara<br>Mercindo Global Manufaktur<br>Jl. Raya Semarang-Bawen Km.29<br>SEemerang, Central Java<br>50661, Indonesia | Eliza Yang<br>Nantong Changbang Gloves Co.<br>Flat/RM 1602 Chit Lee Comm<br>Bldg 30-36, Shau Kei Wan Road<br>Hong Kong, China |
| Gerard<br>BDO USA, LLP<br>P. O. BOX 677973<br>Dallas, TX 75267-7973 | Kwong<br>PT JJ GLOVES INDO<br>JL Ronggowarsito, Mlese, Ceper<br>Bonded Zone, Klaten<br>Central Java, Indonesia, 57463 | Mark Robba<br>PT SPORT GLOVE INDONESIA<br>Krandon Desa Pandowoharjo<br>Sleman<br>Yogyakarta, Indonesia, 55512 |
| Daniel Gomes<br>Capital One Bank<br>P. O. BOX 1917<br>Merrifield, VA 22116-1917 | Brent Waters<br>Resources Global Professionals<br>P.O. Box 740909<br>Los Angeles, CA 90074-0909 | Skadden Arps Slate Meagher & Flom<br>LLP<br>P O Box 1764<br>White Plains, NY 10602 |
| Carol Pearson<br>FedEx<br>PO Box 7221<br>Pasadena, CA 91109-7321 | Risk Consulting Partners<br>24722 Network Place<br>Chicago, IL 60673-1247 | Robert Tejeda<br>Stubbs, Alderton & Markiles, LLP<br>15260 Ventura Blvd<br>20th Floor<br>Sherman Oaks, CA 91403 |
| Ms. Vicz Yue<br>Ka Hung Glove Inustrial Co. Ltd.<br>Fujian Quanzhou Jiacheng Leather<br>Chi Feng Road, Quanzhou City<br>Fujian, 362000, China | Shur-Sales & Marketing, Inc.<br>3830 S Windermere St.<br>Englewood, CO 80110 | John Calhoun<br>Synetra<br>1110 E. State Highway 114<br>Suite 200<br>Southlake, TX 76092 |
| Sky Lin<br>Marusan - Mimasu Tshusho Co. Ltd.<br>No 1 Queen' Road Central<br>Hong Kong<br>China | Carla Durand<br>University of Milwaukee<br>P O Box 500<br>University of Wisconsin - Milwaukee<br>Milwaukee, WI 53201 | Bradley J. S. Weiss<br>Winspeed Sports Shanghai Co., Ltd.<br>858 Mingzhu Road<br>Shanghai<br>China, 00020-1702 |
| Janice Lee<br>Woneel Midas Leathers<br>Jl Gembor Raya Desa Pasirjaya<br>Tangerang<br>Banten, Indonesia, 15135 | Liliana Dominguez<br>Yellow and Roadway<br>P. O. Box 100129<br>Pasadena, CA 91355 | 1920 Hutton Court<br>Attn: Johnny Clark<br>Inwood National Bank<br>P O Box 857413<br>Richardson, TX 75085 |