1

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)

2

KRIKOR J. MESHEFEJIAN (SBN 255030)

3

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700

4

Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244

5

Email:  rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

6

Proposed Counsel for Chapter 11 Debtors and Debtors in Possession

7

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

8

**SAN FERNANDO VALLEY DIVISION**

9

| | |
|---|---|
| In re: | Lead Case No.: 1:17-bk-12408-MB |

10

| | Jointly administered with: |
|---|---|

11

| IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation, | 1:17-bk-12409-MB (Ironclad Performance Wear Corporation, a Nevada corporation) |

12

| Debtor and Debtor in Possession. | Chapter 11 Cases |

13

_____

In re:

14

IRONCLAD PERFORMANCE WEAR

15

CORPORATION, a Nevada corporation,

16

Debtor and Debtor in Possession.

17

_____

18

☒  Affects both Debtors

19

☐ Affects Ironclad Performance Wear

20

Corporation, a California corporation only

21

☐ Affects Ironclad Performance Wear
Corporation, a Nevada corporation only

22

23

24

25

26

27

28

**DECLARATION OF STEVE RICKMAN IN SUPPORT DEBTORS' MOTION FOR AN ORDER: (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS TO USE; (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES, AND STALKING HORSE BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; AND (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER**

Date:    September 25, 2017
Time:   2:00 p.m.
Place:   Courtroom 303
             21041 Burbank Blvd.
             Woodland Hills, CA 91367

1

### DECLARATION OF STEVE RICKMAN

I, Steve Rickman, hereby declare as follows:

1.    Except as otherwise indicated, I have personal knowledge of the facts set forth below or have gained knowledge of such matters from the Debtors' employees or their legal counsel with whom I am in contact in the ordinary course of my responsibilities and, if called to testify, would and could competently testify thereto.  Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to such terms in the "Debtors' Motion For An Order: (1) Approving Form Of Asset Purchase Agreement For Stalking Horse Bidder And For Prospective Overbidders To Use; (2) Approving Auction Sale Format, Bidding Procedures, And Stalking Horse Bid Protections; (3) Approving Form Of Notice To Be Provided To Interested Parties; And (4) Scheduling A Court Hearing To Consider Approval Of The Sale To The Highest Bidder" (the "Bid Procedures Motion") filed as Docket Number 10 on September 11, 2017, by Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada", and with Ironclad California, the "Debtors" or "Ironclad"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases.  I have reviewed the Bid Procedures Motion.

2.    I am the Managing Director of Investment Banking Mergers and Acquisitions at Craig-Hallum Capital Group LLC ("C-H").  I have over 20 years of experience advising growth companies on strategic mergers and acquisitions, private and public financings, and strategic advisory.  I have completed over 70 transactions with an aggregate deal value of more than $4 billion.  I hold an M.S. from Stanford University, and I obtained my M.B.A. from the University of Minnesota, Carlson School of Management, with Distinction.

3.    The Debtors have requested C-H to serve as their financial advisor in connection with their chapter 11 bankruptcy cases. The Debtors and C-H are currently working on preparing

2

and finalizing the Debtors' application to employ C-H as their financial advisor. I expect that application will be filed with the Bankruptcy Court within a few days.

4.       C-H has been working with the Debtors during the three-month period leading up to the Debtors' chapter 11 bankruptcy filings, and C-H has done extensive due diligence with the Debtors' management team and board of directors. Thus, C-H is uniquely positioned to act as the Debtors' financial advisor immediately without any delay on account of learning about the Debtors' situation. C-H is also very familiar with the Debtors' business and financial situation.

5.       The Debtors seek to employ C-H as their financial advisor to render, among others, the following types of professional services:

a.       identify acquirers, which in the opinion of C-H and the Debtors, are most likely to acquire the Debtors;

b.       assist the Debtors in formulating a strategy for soliciting interest from acquirers, whether approached by C-H or whether the Debtors are approached proactively, which may have an interest in acquiring the Debtors (the "Potential Acquirers"), and the development of procedures and timetable for marketing the Debtors to the Potential Acquirers;

c.       if requested, assist in the preparation of management's confidential memorandum describing the Debtors;

d.       introduce the Debtors to Potential Acquirers, and coordinate due diligence investigations of the Debtors by Potential Acquirers;

e.       along with the Debtors, evaluate proposals from interested parties regarding a Sale or Restructuring (as those terms are defined in the Engagement Letter), formulate negotiation strategies, and assist in negotiations and closing of a Sale or Restructuring; and

f.       if the Debtors pursue a stand-alone restructuring, C-H will advise and assist the Debtors in developing and seeking approval of a restructuring plan (a "Plan"), which

3

may be a plan under chapter 11 of the Bankruptcy Code; in structuring any new securities to be issued under the Plan; in providing valuation analyses with respect to the Debtors, their assets or businesses; in seeking and evaluating the terms of any exit financing; and will participate in hearings before the bankruptcy court with respect to the matters upon which C-H has provided advice, including, as relevant, providing testimony in connection therewith in coordination with the Debtors' counsel.

6.      C-H is comprised of over 100 professionals headquartered in Minneapolis with offices in Boston, Greenwich, and Philadelphia.  C-H specializes in middle-market mergers, acquisitions, financial lending restructurings, and capitalizations in myriad industries.  C-H has vast experience in serving as a financial advisor, including in the arena of manufacturing for retail sales.

7.      I will be the lead professional at C-H providing services on this engagement, and that anticipate that I will be assisted by Rick Hartfiel, Scott Ames, and Connor Oak – all of whom are professionals employed by C-H.  The firm resume for C-H and my professional biography is set forth in Exhibit "1" attached hereto.

8.      I appeared telephonically at the initial hearing on the Bid Procedures Motion held on Wednesday, September 13, 2017, and I understand that the Court has requested the Debtors to submit a declaration from me regarding my thoughts on the proposed Bid Procedures Motion.

9.      While there are a number of potentially interested buyers of the Debtors' assets who have been conducting due diligence of the Debtors with the assistance of C-H, at the time of the Debtors' bankruptcy filings on September 8, 2017, none of those Potential Acquirers were in a position to sign a definitive sale agreement with the Debtors with no further due diligence contingency in the price range that Radians Wareham Holding, Inc. ("Radians") agreed to in its Asset Purchase Agreement with the Debtors, and none of the Potential Acquirers were in a

position to provide the Debtors with a binding financing commitment either to (i) pay off the outstanding Radians debt in full and provide the Debtors with up to $2 million of additional post-bankruptcy financing (and not on the economic terms offered by Radians), or (ii) provide the Debtors with up to $2 million of additional post-bankruptcy financing secured by a lien against the Debtors' assets junior to the liens in favor of Radians (and not on the economic terms offered by Radians).

10.    As a result, given (i) the fact that Radians was in the process of sweeping all of the Debtors' cash each day and not agreeing to advance the cash back to the Debtors absent a definitive resolution, (ii) the Debtors' economic need for additional financing, and (iii) the lack of other economic options available to the Debtors at that time, I believe that entering into the Asset Purchase Agreement with Radians and agreeing to the overbid procedures set forth in the Bid Procedures Motion made economic sense for the Debtors and was the best option available to the Debtors at that time to avoid having to shut down and liquidate.

11.    I heard discussion during the initial hearing on September 13, 2017, regarding the $500,000 break-up fee proposed to be paid to Radians in the event of a successful overbid and the method by which the Debtors and Radians have agreed that any overbid process would be conducted, and I understand that the Court has requested my thoughts on these matters.

12.    I believe that the $500,000 break-up fee proposed to be paid to Radians in the event of a successful overbid is reasonable and appropriate under the circumstances of these cases and should be approved by the Court. It amounts to 2.5% of Radians' purchase price if that purchase price ends up being $20 million, and it amounts to 3.33% of Radians' purchase price if the purchase price ends up being $15 million. I understand from discussions with the Debtors' counsel that the typical range of reasonable break-up fees in the context of a stalking horse bidder

5

submitting a binding offer and making that offer available for overbid in an auction type of context is between 1%-5% of the stalking horse bidder's purchase price.

13.    I understand from discussions with the Debtors' counsel that in evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is whether the break-up fee serves any of the following three possible useful functions:  (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders.

14.    I do not believe that Radians is willing to serve as the stalking horse bidder in these cases without the $500,000 break-up fee, and I am not aware of any other buyer who is in a position at this time to sign a binding sale agreement at Radians' proposed purchase price, agree to a lower break-up fee than Radians is requiring, and provide the Debtors the necessary post-bankruptcy financing to enable the Debtors to operate their business in the ordinary course pending an auction sale to be held on October 30, 2017.

15.    I believe that all of the bidding procedures the Debtors are seeking to have the Court approve, including the proposed break-up fee to Radians, satisfies at least one of the useful functions described above (i.e., (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; and (3) to attract additional bidders) – at least functions (1) and (2) (i.e., to attract or retain a potentially successful bid; and to establish a bid standard or minimum for other bidders to follow).

16.    Given the liquidity and time constraints faced by the Debtors immediately before commencing these cases, I do not believe it would not have been possible for the Debtors to obtain a stalking horse bidder with a purchase price in the purchase price range offered by Radians without the payment of a comparable break-up fee.

17.    For all of the reasons described in the pleadings the Debtors have already filed with the Court, it is my understanding that the Debtors would not have been able to survive as an ongoing business if the Debtors were not able to stop the cash sweep implemented by Radians and obtain the additional financing that Radians has agreed to provide, including the $500,000 that I understand was advances to the Debtors by Radians to fund the Debtors' payroll on September 14, 2017. I also understand that it is important that the Debtors consummate their sale by around the middle of November, 2017 (which would be the case if the Auction date remains as currently scheduled for October 30, 2017) because after that their financial needs grow significantly, and the Debtors do not currently have in place anyone offering to provide the Debtors with the needed additional financing. But even if the Debtors did have such additional financing available to them, borrowing even more money would simply result in increasing the amount of the Debtors' debt that would have to be satisfied before shareholders would receive a distribution and therefore reduce the ultimate recovery for shareholders.

18.    Even if the Debtors would have been able to obtain use of their cash collateral (with or without the consent of Radians) and even if the Debtors could have found someone else willing to provide the Debtors with their necessary financing, I believe that going into these bankruptcy cases with no stalking horse bidder and simply conducting an open auction ran the risk of chaos and uncertainty. I believe that having a stalking horse bidder in place will create organization and stability for the Debtors, their employees, their suppliers and their customers as well as create a clear and organized sale structure and guidelines for Potential Acquirers to be able to compete against, which is likely to enhance and maximize the prospects for an overbid at the Auction and enhance the ultimate sale price paid for the Purchased Assets. I believe that none of this would have been possible if not for Radian's stalking horse bid, and I understand that Radians would not have been willing to serve as the stalking horse bidder without the assurance of the

7

proposed $500,000 break-up fee.  I also believe that any other party offering the same purchase price as Radians would have also required a comparable break-up fee.  I therefore conclude that paying Radians a $500,000 break-up fee in the event of a successful overbid is reasonable, appropriate, and in the best interests of these bankruptcy estates, and, under the circumstances of these cases, is the best option currently available to the Debtors to (1) to retain the Radians' bid; (2) to establish a bid standard or minimum for other bidders to follow; and (3) to attract additional bidders.

19.    I also believe that the overbid structure agreed to by the Debtors and Radians, by which the break-up fee to be paid to Radians in the event of a successful overbid will not be counted in determining the highest and best price bid for the Purchased Assets, is well suited to enable the Debtors to attract Potential Acquirers to participate in the Auction despite the matching bid right that Radians has been provided.

20.    Here is an example of why that is.  Let's assume that Radians' purchase price is $20 million and there is one Potential Acquirer participating in the Auction.  Under the current proposed bidding procedures, that Potential Acquirer would be required to submit a minimum initial overbid of $20,750,000.  If Radians decides to exercise its matching right, Radians would be permitted to bid the same $20,750,000 and be deemed the winning bidder unless the Potential Acquirer was willing to increase its bid by the required minimum $250,000 to $21,000,000 and that process of continuous $250,000 increases in the bid by the Potential Acquirer would continue until Radians decided it would no longer be willing to match the overbid.  But in this process, the Potential Acquirer understands that it is not at any financial bidding disadvantage to Radians as it would be if the Potential Acquirer was required to take into account the $500,000 break-up fee with each overbid as described in the following paragraph.

21.    If Radians did not have any matching right but the $500,000 break-up fee to be paid to Radians in the event of a successful overbid was required to be taken into account with each overbid, I believe that this would serve as a significant disincentive for Potential Acquirers to participate in the Auction process. Here is an example of why that is. Let's assume that Radians' purchase price is $20 million and there is one Potential Acquirer participating in the Auction, and Radians did not have any matching right but the Potential Acquirer was required to take into account the $500,000 break-up fee to Radians to determine the highest and best price bid for the Purchased Assets. Under this scenario, the Potential Acquirer would still be required to submit a minimum initial overbid of $20,750,000. Radians would then be required to submit a minimum overbid of $21,000,000 (i.e., $250,000 more than the stalking horse bid). If the Potential Acquirer wanted then to submit an additional overbid, the Potential Acquirer would be required to bid $21,750,000 (i.e., $750,000 more than Radians had bid so that after taking into account the $500,000 break-up fee to Radians the overbid was higher than the $21,000,000 bid submitted by Radians). Then if Radians wanted to submit an overbid, Radians would only be required to bid $22,000,000 (i.e., $250,000 more than the previous bid submitted by the Potential Acquirer). Then if the Potential Acquirer wanted to bid again, the Potential Acquirer would again have to bid $750,000 more (i.e., to $22,750,000), and so on. What this means is that each time Radians would bid an additional $250,000, the Potential Acquirer would be required to submit an overbid of $750,000. I believe that this would provide Radians with such a significant overbid advantage that it would serve to dissuade Potential Acquirers from participating in the Auction process.

22.    In conclusion, I believe that providing Radians with a matching right that has been proposed is better than having a bidding process where Radians' break-up fee is to be taken into

1   account with each overbid in determining the highest and best price offered for the Purchased

2   Assets.

3

4        I declare and verify under penalty of perjury that the foregoing is true and correct to the

5   best of my knowledge.

6        Executed on this 18th day of September, 2017, at Minneapolis, Minnesota.

7

8                       STEVE RICKMAN, Declarant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DECLARATION OF STEVE RICKMAN IN SUPPORT DEBTORS'MOTION FOR AN ORDER: (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS TO USE; (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES, AND STALKING HORSE BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; AND (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER**will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 18, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Monica Y Kim    myk@lnbrb.com, myk@ecf.inforuptcy.com**
- **Krikor J Meshefejian    kjm@lnbrb.com**
- **S Margaux Ross    margaux.ross@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**
- **Sharon Z. Weiss    sharon.weiss@bryancave.com, raul.morales@bryancave.com**

**2. SERVED BY UNITED STATES MAIL**: On **September 18, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 18, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 18, 2017 | Lourdes Cruz | */s/ Lourdes Cruz* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**