BROWN RUDNICK LLP
CATHRINE M. CASTALDI, #156089
ccastaldi@brownrudnick.com
2211 Michelson Drive, 7th Floor
Irvine, California  92612
Telephone:   (949) 752-7100
Facsimile:   (949) 252-1514

Proposed Attorneys for OFFICIAL COMMITTEE
OF UNSECURED CREDITORS

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>Debtor and Debtor in Possession.<br><br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>Debtor and Debtor in Possession.<br><br>☒  Affects both Debtors<br><br>☐  Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐  Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br><br>Jointly administered with: 1:17-bk-12409-MB<br><br>Chapter 11 Cases<br><br>**OPPOSITION TO DEBTORS' MOTION FOR AN ORDER: (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS TO USE, (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES, AND STALKING HORSE BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; AND (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER**<br><br>DATE:      September 25, 2017<br>TIME:      2:00 P.M.<br>CTRM:      303 |

# **TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

*In re America West Airlines, Inc.*,
    166 B.R. 908 (Bankr. D. Ariz. 1994) ............................................................8, 10

*In re Defender Drug Stores, Inc.*,
    145 B.R. 312 (B.A.P. 9th Cir. 1992) ...................................................................8

*In re Dura Auto. Sys.*,
    2007 Bankr. LEXIS 2764 (Bankr. D. Del. Aug. 15, 2007) ................................8

*In re E-Z Convenience Stores, Inc.*,
    289 B.R. 45 (Bankr. M.D.N.C. 2003) .................................................................8

*In re Encore Healthcare Assocs.*,
    312 B.R. 52 (Bankr. E.D. Pa. 2004) ...................................................................9

*G-K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Invs., L.P.)*,
    994 F.2d 774 (10 Cir. 1993) .............................................................................13

*In re Hupp Industries, Inc.*,
    140 B.R. 191 (Bankr. N.D. Ohio 1992) ...........................................................11

*In re Jon J. Peterson, Inc.*,
    411 B.R. 131 (Bankr. W.D.N.Y. 2009) ..............................................................8

*In re Mushroom Transp. Co., Inc.*,
    382 F.3d 325 (3d Cir. 2004) ...............................................................................7

*PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
    700 F.2d 935 (5th Cir. 1983), *reh'g denied*, 705 F.2d 450 (5th Cir. 1983) ................8

*In re President Casinos, Inc.*,
    314 B.R. 784 (Bankr. E.D. Mo. 2004) ...............................................................8

*In re RathGibson, Inc.*,
    2010 Bankr. LEXIS 5161 (Bankr. D. Del. Mar. 26, 2010) .................................8

*In re Wilde Horse Enterprises, Inc.*,
    136 B.R. 830 (Bankr. C.D. Cal. 1991) ...............................................................7

*In re Yellowstone Mountain Club, LLC*,
    Case No. 08-61570-11, 2009 WL 982233 (Bankr. D. Mont. Feb. 18, 2009) ............12

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re America West Airlines, Inc.*,
   166 B.R. 908 (Bankr. D. Ariz. 1994) ...................................................................8, 10

*In re Defender Drug Stores, Inc.*,
   145 B.R. 312 (B.A.P. 9th Cir. 1992) ...............................................................................8

*In re Dura Auto. Sys.*,
   2007 Bankr. LEXIS 2764 (Bankr. D. Del. Aug. 15, 2007) ............................................8

*In re E-Z Convenience Stores, Inc.*,
   289 B.R. 45 (Bankr. M.D.N.C. 2003) .............................................................................8

*In re Encore Healthcare Assocs.*,
   312 B.R. 52 (Bankr. E.D. Pa. 2004) ...............................................................................9

*G-K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Invs., L.P.)*,
   994 F.2d 774 (10 Cir. 1993) ..........................................................................................13

*In re Hupp Industries, Inc.*,
   140 B.R. 191 (Bankr. N.D. Ohio 1992) ........................................................................11

*In re Jon J. Peterson, Inc.*,
   411 B.R. 131 (Bankr. W.D.N.Y. 2009).............................................................................8

*In re Mushroom Transp. Co., Inc.*,
   382 F.3d 325 (3d Cir. 2004) ...........................................................................................7

*PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
   700 F.2d 935 (5th Cir. 1983), *reh'g denied*, 705 F.2d 450 (5th Cir. 1983) .................8

*In re President Casinos, Inc.*,
   314 B.R. 784 (Bankr. E.D. Mo. 2004) ............................................................................8

*In re RathGibson, Inc.*,
   2010 Bankr. LEXIS 5161 (Bankr. D. Del. Mar. 26, 2010) .............................................8

*In re Wilde Horse Enterprises, Inc.*,
   136 B.R. 830 (Bankr. C.D. Cal. 1991) ............................................................................7

*In re Yellowstone Mountain Club, LLC*,
   Case No. 08-61570-11, 2009 WL 982233 (Bankr. D. Mont. Feb. 18, 2009) ...............12

ii

**Federal Statutes**

*11 U.S.C.*
    *§§ 105, 361, 362, 363 and 364, and (B)* ...............................................................3

Chapter 11 of the Bankruptcy Code ........................................................ *passim*

**Other Authorities**

*United States Bankruptcy Rules 4001(B) and 4001(C)* ...........................................3

3 COLLIER ON BANKRUPTCY ¶ 363.02[7] (16th ed. 2012) ...........................................11

Monica E. White, Note, *Give Me a Break-Up Fee: In re Reliant Energy
    Channelview LP and the Third Circuit's Improper Rejection of a Bankruptcy
    Bid Protection Provision*, 48 Hous. L. Rev. 659, 660 (2011) ...................................11

The Official Committee of Unsecured Creditors (the "Committee") of Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), in the chapter 11 cases (the "Chapter 11 Cases") of Ironclad California and Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada", and together with Ironclad California, the "Debtors", "Ironclad", or the "Company") submits its limited opposition to *Debtors' Motion For An Order: (1) Approving Form Of Asset Purchase Agreement For Stalking Horse Bidder And For Prospective Overbidders To Use, (2) Approving Auction Sale Format, Bidding Procedures, And Stalking Horse Bid Protections; (3) Approving Form Of Notice To Be Provided To Interested Parties; And (4) Scheduling A Court Hearing To Consider Approval Of The Sale To The Highest Bidder*[Docket No. 10] ("Motion") filed by Debtors as follows[1]

1.    INTRODUCTION

The Committee does not object to the sale process in principle—the Committee welcomes a fair and transparent marketing effort that facilitates the long-term success of the Company, preserves jobs, maximizes value for the estates, and protects the rights of general unsecured creditors.  However, the sale process proposed by the Debtors and memorialized in the proposed Bidding Procedures and APA fails to achieve these objectives.  In addition to other problematic components detailed below, the proposed Bidding Procedures contain the following provisions that operate to chill bidding and dissuade meaningful participation in the Auction:

- The Matching and Overbid Provisions effectively allow Radians to double count the Break-Up Fee in certain bidding scenarios;

- The Break-Up Fee is excessive if the Aggregate Purchase Price is $15,000,000;

- Prospective overbidders must submit a deposit of $2,000,000 while Radians' deposit is only $1,000,000;

- Radians' credit bid rights are not subject to Bankruptcy Code Section 363(k); and

///

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Motion and the APA, as applicable.

2

1    • The accelerated Milestones are only appropriate in the context of a fair and

2    transparent marketing process.[2]

3    As discussed in greater detail below, the Committee respectfully requests that the Court

4    deny the relief requested in the Motion unless the inappropriate provisions identified herein are

5    modified or deleted.

6    2.    BACKGROUND

7    A.    The Chapter 11 Cases

8    On September 8, 2017 (the "Petition Date"), each of the Debtors filed voluntary petitions

9    for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors continue

10    to operate and manage their businesses as debtors in possession. Simultaneous with the filing of

11    these Chapter 11 Cases, and also on the Petition Date, the Debtors executed an asset purchase

12    agreement (the "APA") with Radians Wareham Holding, Inc. ("Radians" or the "Stalking Horse")

13    for substantially all of Ironclad's assets (the "Purchased Assets").

14    On the Petition Date, the Debtors filed, among other things: (i) the *Omnibus Declaration of*

15    *L. Geoff Greulich in Support of Debtors' Emergency "First Day" Motions* [Docket No. 6] (the

16    "Greulich Declaration"); (ii) the Motion; and (iii) the *Debtors' Emergency Motion for Entry of An*

17    *Interim Order: (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Pursuant to 11*

18    *U.S.C. §§ 105, 361, 362 and 364, and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 361,*

19    *362, 363 and 364; (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and*

20    *364; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C); and*

21    *(IV) Granting Related Relief* [Docket No. 7] (the "DIP Motion").

22    As described more fully in the DIP Motion, the Debtors have obtained a commitment from

23    Radians to provide DIP Financing in a principal amount of up to $2 million (the "DIP Loan" or

24    "DIP Financing"), pursuant to an agreement dated September 8, 2017 (the "DIP Loan

25    Agreement"). *See* DIP Motion at 4. The DIP Financing will be secured by a lien that is senior to

26

27    [2]    As mentioned below, the Committee does not oppose the Milestones as they relate to the proposed Bidding
Procedures. However, the Committee reserves all rights with respect to any milestones arising from or
28    related to the Debtors' proposed DIP Financing.

3

1  the Debtors' prepetition debt. *Id.* On September 13, 2017, the Court approved the DIP Motion on

2  an interim basis. *See* Docket No. 31.

3       On September 20, 2017, the United States Trustee for the Central District of California

4  (the "U.S. Trustee") appointed the Official Equity Holders Committee for Ironclad Performance

5  Wear Corp., a Nevada corporation (the "Equity Committee"). *See Notice of Appointment and*

6  *Appointment of Official Equity Holders* [Docket No. 59]. The Equity Committee includes the

7  following equity security holders: (i) Patrick W. O'Brien; (ii) Ronald Chez; and (iii) Scott Jarus.

8  On September 22, 2017, the U.S. Trustee appointed the Committee. *See Notice of Appointment of*

9  *Appointment and Official Committee of Unsecured Creditors* [Docket No. 62]. The Committee

10  includes the following entities: Resources Global Professionals, Winspeed Sports (Shanghai) Co.,

11  Ltd., and PT Sport Glove Indonesia.

12       **B.**     Debtors' Prepetition Indebtedness

13       The Debtors have yet to file their Schedules of Assets and Liabilities, Statement of

14  Financial Affairs, and other financial information typically filed upon commencing a Chapter 11

15  case.[3] Consequently, the exact amount and character of the Debtors' prepetition indebtedness is

16  unclear. Notwithstanding the absence of this information, the Greulich Declaration and the DIP

17  Motion contain limited representations describing the Debtors' prepetition indebtedness and

18  capital structure.

19       **(1)**     Ironclad's Secured Indebtedness

20       On or about November 28, 2014, the Debtors obtained a revolving credit facility

21  ("Revolving Loan") from Capital One, N.A. ("Capital One") secured by substantially all of the

22  Debtors' assets in the principal amount of $8,000,000. Greulich Declaration at ¶ 12. On July 25,

23  2017, Capital One sold, transferred and assigned to Radians all of its rights, title and interest in the

24  Loan Documents. *Id.* at ¶ 14. The Debtors are unaware what Radians paid Capital One to acquire

25  the Revolving Loan. *Id.*

26

27  _____

[3]       In accordance with the Schedules Extension Order, the Debtors have until September 29, 2017 to submit this
28  information.

4

1    Subsequent to the assignment of the Revolving Loan, Radians agreed to two one-week

2    forbearance agreements. *Id.* at ¶¶ 15–17. The first agreement was executed on August 1, 2017

3    and expired on August 7, 2017; the second agreement was executed on August 14, 2017 and

4    expired on August 21, 2017. *Id.* In exchange for the first forbearance agreement, the Debtors

5    released Radians from existing claims under the Loan Documents, and to a $120,000 fee (the

6    "Prepayment Fee") in the event the Debtors are able to repay the indebtedness with financing from

7    a financial or lending institution or in connection with the acquisition of the Debtors or their assets

8    by a third party. *Id.* at ¶ 15.

9    Following expiration of the second forbearance agreement, on August 24, 2017, Radians

10   exercised certain of its default rights under the Loan Documents by sweeping the Debtors' cash.

11   At that time, the Revolving Loan had a $3,944,045.93 balance.[4] Amidst negotiations with

12   multiple prospective lenders and buyers, the cash sweep left the Debtors unable to operate and

13   catalyzed these Chapter 11 Cases. *Id.* at ¶ 17.

14           (2)     Ironclad's Unsecured Indebtedness

15   The Debtors have not stated the amount, nature (*i.e.*, contingent v. liquidated), or category

16   (*i.e.*, trade v. litigation) of its unsecured indebtedness. Only by inference can an estimate be made

17   regarding the total amount of Ironclad's unsecured indebtedness. For instance, according to the

18   Greulich Declaration, the Debtors' CEO "believe[s] the total debt in these cases (both secured and

19   unsecured combined) is or will be in the range of approximately $8-$10 million." *Id.* at ¶ 27; *see

20   also id.* at ¶ 9 ("I believe that the Debtors have substantially less than $15 million of total debt.").

21   The Debtors offer scant information regarding their unsecured indebtedness aside from these

22   representations.

23           (3)     Ironclad's Equity

24   Debtor Ironclad Performance Wear Corp, a Nevada corporation ("Ironclad Nevada"), is

25   publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW". *Id.*

26

27

28

---

[4]    The Debtors contend that the Revolving Loan balance is less than this amount as a result of additional cash sweeps conducted by Radians shortly before the Petition Date.

5

at ¶ 3.  As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value

$0.001 per share, issued and outstanding.  *Id.*

    C.    <u>The APA</u>

    Prior to the Petition Date, and simultaneously with the negotiation of the DIP Loan

Agreement, the Debtors and Radians negotiated the APA, through which Radians will serve as the

Stalking Horse for substantially all of the Debtors' assets.  *Id.* at ¶ 18.  Pursuant to the APA,

Radians has agreed to a purchase price of either $20,000,000 or $15,000,000.  *Id.*  On the eve of

the Debtors' bankruptcy filing, Ironclad Nevada filed an 8-K that stated,

> Radians will purchase from the Debtors substantially all of their assets for (1) an
> aggregate amount of $20,000,000, subject to a reduction to $15,000,000 if certain
> conditions set forth in the Purchase Agreement are not met, and (2) the assumption
> of certain of the Debtors' liabilities at the closing of the transactions contemplated
> under the Purchase Agreement.

Ironclad Performance Wear Corp., Form 8-K, September 8, 2017 (*accessible at*

https://goo.gl/Jk3tkq).  The Greulich Declaration further provides that the final sale price will

depend "upon the occurrence of an event which is sensitive."  Greulich Declaration at ¶ 27.  The

Debtors have requested permission from the Court to keep this information confidential in the

*Debtors' Emergency Motion For Authority To File Letter Agreement Under Seal* [Docket No. 11],

which the Court will hear on October 30, 2017.

    Pursuant to the APA, the Aggregate Purchase Price consists of: (i) a credit bid of

outstanding obligations under the DIP Facility and the Pre-Bankruptcy Secured Debt (the "<u>Credit</u>

<u>Bid</u>"), (ii) application of a $1,000,000 deposit, and (iii) cash.  *See* APA § 2.2.  As additional

consideration, Radians will also assume certain post-Closing Date liabilities and cure costs related

to Assumed Contracts.  *Id.* at § 2.4(a).

    The APA further requires that the Debtors pay to the Stalking Horse a fee (the "<u>Break-Up</u>

<u>Fee</u>") in the amount of $500,000.  *See id* at § 6.5(a)(vii).  The Break-Up Fee is payable to the

Stalking Horse if any party other than Radians is deemed by the Bankruptcy Court to be the

winning bidder at the Auction, or if the Debtors elect to proceed with seeking confirmation of a

plan of reorganization instead of proceeding with a sale of the Purchased Assets.  *See id.*

6

1    D.    The Proposed Bidding Procedures

2    In connection with the APA, the Debtors also seek approval of the proposed Bidding

3    Procedures.  Among other things, the proposed Bidding Procedures set forth deadlines in

4    connection with the bidding and Auction process; the requirements that a potential overbidder

5    must satisfy to participate in the bidding and Auction process; the procedures for conducting the

6    Auction; and other matters relating to the sale of the Debtors' assets generally.  *See* Motion pp.

7    11–14.  Together, the proposed Bidding Procedures and APA impose the following sale-related

8    deadlines (the "Milestones"):

| DATE | MILESTONE |
| --- | --- |
| September 11 | File DIP Financing and Bid Procedures Motions |
| September 30 | Deadline for Entry of Bid Procedures Order |
| October 24 | Bid Deadline |
| October 27 | Auction |
| October 30 | Sale Hearing |
| October 31 | Entry of Sale Order to Stalking Horse |
| November 15 | Outside Date for Closing to Occur for Stalking Horse |
| December 6 | Outside Date for Closing to Occur for Competing Overbidder[5] |

17    Radians may terminate the APA if the Milestones are not met.  *See* APA § 11.1(c)(iv)–

18    (viii).

19    3.    ARGUMENT

20    The paramount goal in any proposed sale of property of the estate under Bankruptcy Code

21    Section 363 is to maximize the proceeds received by the estate.  *See In re Wilde Horse*

22    *Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("In any sale of estate assets, the

23    ultimate purpose is to obtain the highest price for the property sold.").  *See also In re Mushroom*

24    *Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (discussing trustee's duty to maximize value

---

[5] The proposed Bidding Procedures Order provides that a prospective overbidder must close "its purchase of the Purchased Assets within 14 business days following entry of the Sale Order…"  Proposed Bidding Procedures Order at ¶ 2(d).  The DIP Credit Agreement contains a milestone requiring the Court enter a Sale Order by November 15, 2017.  DIP Credit Agreement § 10.1(n).  December 6 is 14 business days after November 15.

7

1  of the estate); *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764, at *253–54 (Bankr. D. Del. Aug.

2  15, 2007).  To ensure this outcome, courts must safeguard the bidding and sale process and

3  approve only those procedures that will not chill bidder participation in the sale process.  *See In re*

4  *RathGibson, Inc.*, 2010 Bankr. LEXIS 5161, *5 (Bankr. D. Del. Mar. 26, 2010) (approving bid

5  procedures in part because they "are fair, reasonable and appropriate and are designed to

6  maximize the value of the Debtors' estates" and ordering that the auction be "conducted openly");

7  *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("[B]id procedures

8  should provide a vehicle to enhance the bid process and should not be a mechanism to chill

9  prospective bidders' interests.").

10      Courts will not approve bidding procedures that "undermine principles of fair play,"

11  because "unless the bidding process remains fair and equitable, competitors will refrain from the

12  type of full participation that is needed to assure bids for the highest reasonable value." *In re Jon*

13  *J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).  Indeed, courts routinely reject bid

14  procedures that are unfair, inequitable, and have a chilling effect on the bidding process.  *See,*

15  *e.g.*, *In re America West Airlines, Inc.*, 166 B.R. 908, 912–13 (Bankr. D. Ariz. 1994) (rejecting bid

16  procedures that did not induce competitive bidding); *In re E-Z Convenience Stores, Inc.*, 289 B.R.

17  45, 55 (Bankr. M.D.N.C. 2003) (denying bid procedures that were patently unfair and

18  inequitable); *President Casinos*, 314 B.R. at 786 (declining to approve bid procedures that chilled

19  bidding).

20      The proposed Bidding Procedures and APA should be denied because they include

21  provisions that discourage open bidding and, if approved, will not maximize these estates' value.

22  It is evident that the proposed Bidding Procedures and APA were drafted to aid the parochial

23  interests of one party—Radians.  However, case law is clear that the usurpation of the bankruptcy

24  process to aid the interests of one secured lender is prohibited.  *See In re Defender Drug Stores,*

25  *Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (prohibiting "convert[ing] the bankruptcy process

26  from one designed to benefit all creditors to one designed for the unwarranted benefit of the

27  postpetition lender."); *see also PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700

28  F.2d 935 (5th Cir. 1983), *reh'g denied*, 705 F.2d 450 (5th Cir. 1983) (reversing order authorizing

8

1   section 363 sale of substantially all of a debtor's assets because if sale was approved there would

2   be "little prospect or occasion for further reorganization."); *In re Encore Healthcare Assocs.*, 312

3   B.R. 52, 54–55 (Bankr. E.D. Pa. 2004) (court denied bid procedures motion finding that section

4   363 sale served no legitimate business purpose when debtor admitted that it would convert the

5   case to chapter 7 following the sale and not have adequate funds to proceed with an

6   administratively solvent estate).

7        Most concerning to the Committee is the chilling effect achieved by the Break-Up Fee and

8   Matching and Overbid provisions.  In addition, the Committee has identified multiple provisions

9   of the Bidding Procedures and APA that appear formulated to guarantee Radians' victory by

10  discouraging prospective overbidders from even participating.

11       A.    The Break-Up Fee, the Overbid Provision, and the Matching Provision Work in

12             Tandem to Grant Radians an Unwarranted Advantage That is Prejudicial to

13             Potential Overbidders

14       As currently described in the Greulich Declaration and the *Declaration of Steve Rickman*

15  *in Support of Debtors' Motion for an Order: (1) Approving Form of Asset Purchase Agreement*

16  *for Stalking Horse Bidder and for Prospective Overbidders To Use; (2) Approving Auction Sale*

17  *Format, Bidding Procedures, and Stalking Horse Bid Protections; (3) Approving Form of Notice*

18  *To be Provided to Interested Parties; and (4) Scheduling a Court Hearing to Consider Approval*

19  *of the Sale to the Highest Bidder* [Docket No. 57] (the "Rickman Declaration"), the description of

20  how the initial overbid provision (the "Overbid Provision") , the matching provision (the

21  "Matching Provision"), and the Break-Up Fee together function is confusing and challenging to

22  follow.  However, if the Committee's reading is correct, the provisions will have a significant

23  chilling effect on bidding.

24       The Overbid Provision requires that a prospective overbidder's first bid be $750,000

25  higher than the Stalking Horse's Aggregate Purchase Price. *See* APA § 6.5(a)(i).  The Matching

26  Provision provides

27  / / /

28  / / /

9

The Debtors shall have the right to schedule the Auction so that the payment of the Breakup-Fee to Radians will not be considered in determining the highest price bid for the Assets. However, Radians shall be authorized to match any qualified overbid and be declared the successful purchaser of the Purchased Assets giving consideration in the amount of the required Break-up Fee and Prepayment Fee as a component of its matching bid ("Matching Bid"), which Break-up Fee and Prepayment Fee will not owing by the Debtors if Radians is the winning bidder.

*See* APA § 6.5(a)(ix).

Together, the Matching, Overbid, and Break-Up Fee Provisions grant Radians a $1.5 million cushion in excess of the Aggregate Purchase Price. The following hypothetical illustrates how these provisions function to chill bidding while protecting Radians' bid. Assume the Aggregate Purchase Price equals $20 million. A prospective overbidder would need to submit an initial overbid of $20,750,000—$750,000 higher than the Aggregate Purchase Price—to comply with the Overbid Provision. In addition to granting an unqualified right to match the initial overbid, the Matching Provision also allows Radians to count the value of the Break-Up Fee and the Prepayment Fee—together $620,000—towards its matching bid. Thus, for only $130,000 ($750,000 - $620,000) of new money, Radians receives $750,000 of Auction currency.

But this is not even the most prejudicial feature of the Matching and Overbid Provisions. Assume the prospective overbidder desires to continue bidding. The Bidding Procedures require the next bid be $250,000 higher than the initial overbid, thus equaling $21,000,000. *See* APA §6(a)(ii). If Radians decides at this juncture to throw in the towel and cedes the Auction to the overbidder, *it is still entitled to the Break-Up Fee*. As a result, Radians benefits from the Break-Up twice: once as currency to match the initial overbid, and again in the form of a $500,000 payment. In other words, by merely committing (*i.e.*, not actually paying) $130,000, Radians can compel a competing bidder to pay $1 million more than the Aggregate Purchase Price to win the Auction and still receive $500,000 in the process.

The Bidding Procedures should be modified because the Overbid, Matching, and Break-Up Fee Provisions improperly benefit Radians and discourage competitive bidding. A "proposed break-up fee must be carefully scrutinized to insure that the [d]ebtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (citing *In re Hupp Industries, Inc.*, 140 B.R. 191,

10

1   196 (Bankr. N.D. Ohio 1992).  Moreover, the requirement that bid procedures be fair and

2   equitable mandates that bid increment limitations be reasonable.  *See, e.g., Hupp Indus.*, 140 B.R.

3   at 195 (determining that minimum bid increment bore no relation to purchase price and was

4   "arbitrary and unreasonably high"); 3 COLLIER ON BANKRUPTCY ¶ 363.02[7] (16th ed. 2012)

5   (noting that "a requirement of a disproportionate bid increment would be more likely to chill

6   bidding" than it would be to promote a fair and equitable bidding process).  Because the Matching,

7   Overbid, and Break-Up Fee Provisions fail to promote fair and equitable bidding, the Court should

8   only grant the Motion if the Debtors and Radians modify these provisions.

9         B.      The Break-Up Fee is Excessive if the Aggregate Purchase Price is $15,000,000

10         The amount of the Break-Up Fee is also excessive in the event the Aggregate Purchase

11   Price equals $15,000,000.  While the Aggregate Purchase Price is subject to a potential $5 million

12   negative adjustment (from $20,000,000 to $15,000,000), there is no related proportionate

13   reduction in the Break-Up Fee.  Thus, regardless of whether the Aggregate Purchase Price is

14   $20,000,000 or $15,000,000, the Company is required to pay $620,000—the sum of the Break-Up

15   Fee and the Prepayment Fee—if a prospective overbidder wins the Auction or if the Debtors

16   pursue confirmation of a chapter 11 plan.  Moreover, in the event of a $15,000,000 Aggregate

17   Purchase Price, the Break-Up Fee and Prepayment Fee will cost over 4% of the Aggregate

18   Purchase Price—a significantly higher figure than the 3% benchmark generally deemed acceptable

19   by courts and the market.  Radians should not be permitted to leverage its power to extract an

20   above-market break-up fee, especially when questions exist as to whether it should be entitled to

21   any break-up fee.[6]  Accordingly, the Bidding Procedures and APA should be modified to reflect a

22   reduced Break-Up Fee in the event of a $15,000,000 Aggregate Purchase Price.

23   ///

24

25   _____

[6]   A principal justification for approving a break-up fee is compensating a bidder for diligence expenses that the
26   bidder otherwise would not incur.  *See* Monica E. White, Note, *Give Me a Break-Up Fee: In re Reliant
Energy Channelview LP and the Third Circuit's Improper Rejection of a Bankruptcy Bid Protection
27   Provision*, 48 Hous. L. Rev. 659, 660 (2011).  Credit bidding parties have presumably already been
compensated for the diligence they conducted in connection with provided secured credit to the debtor that is
28   the basis for their credit bid.

1236393 v2-iManDB-000006/2432

C.     The APA and Bidding Procedures Contain Myriad Case Control Features that Must be Removed

Courts are particularly cautious of bidding procedures that, as is the case here, contemplate a sale to a Stalking Horse that is also a DIP lender. *See, e.g.*, *In re Yellowstone Mountain Club, LLC*, Case No. 08-61570-11, 2009 WL 982233, at *5 (Bankr. D. Mont. Feb. 18, 2009) (applying heightened scrutiny to—and eventually denying— a bidding procedures motion where a Stalking Horse bidder was also DIP lender and proposed bid procedures served to discourage competing bids). The reason for heightened scrutiny is clear: a Stalking Horse may exert its influence as DIP lender to install case control features into the bidding procedures that discourages other prospective bidders from participating in an auction. Unfortunately, as evidenced by multiple provisions of the proposed Bidding Procedures identified below, Radians is employing a similar strategy by leveraging its control to predetermine the Auction's outcome. To ensure an open and competitive bidding process and Auction, the Committee requests that the Bidding Procedures referenced below be deleted or revised:

- **Deposit:** Radians was only required to post a good faith deposit in the amount of $1,000,000. *See* APA § 2.2. However, the proposed Bidding Procedures require that prospective overbidders submit a cash deposit of $2,000,000—twice the amount requested of Radians. Neither the Debtors nor Rickman Declaration provide any justification for prejudicial disparity.

- **Credit Bid:** The Debtors seek to grant Radians broader credit bid rights than what the Bankruptcy Code permits. The proposed Bidding Procedures Order provides that Radians "will have the right . . . to credit bid the outstanding balances of its Pre-Bankruptcy Secured Debt and the DIP Facility[.]" APA § 6.5(a)(v); Bidding Procedures Order at ¶ 4(e). Radians' credit bid rights arise from—and are limited by—Bankruptcy Code Section 363(k). Thus, the Order must reflect that Radians' credit bid rights are subject to Bankruptcy Code Section 363(k).

- **Sale Requirement:** Radians should not receive the Break-Up Fee if the Debtors pursue confirmation of a chapter 11 plan "instead of proceeding with a sale of the Purchased Assets[.]" APA § 6.5(a)(vii); Proposed Bidding Procedures Order at ¶ 4(g). Radians will suffer no injury if the Debtors abandon the current sale trajectory to pursue confirmation of a chapter 11 plan. Indeed, strategic reasons may necessitate a sale to Radians through a chapter 11 plan instead of a Bankruptcy Code Section 363 sale, thus leaving Radians in exactly the same position.

12

- **Milestones:**  The timelines and milestones under the proposed Bidding Procedures are accelerated.  The Debtors propose a Bid Deadline of October 24th and an Auction (if necessary) on October 27th.  The Bid Deadline leaves less than four weeks for the representative advisors to scour the market for an alternative bid.  And even if an alternative bidder comes forward in this compressed timeframe, they will forfeit their $2 million deposit if they cannot close within 14 business days following entry of the Sale Order.  *See* Proposed Bidding Procedures at ¶ 2(d).  The Committee has not had a sufficient opportunity to test the assumptions put forward by the Debtor with respect to the necessity of the expedited timeline.  However, so long as the marketing process is fair and transparent, ***the Committee does not oppose the Milestones as they relate to the proposed Bidding Procedures***.  The Committee reserves all rights with respect to any milestones arising from or related to the Debtors' proposed DIP Financing.

- **Qualified Bid Determination Deadline:**  This term is not defined anywhere in the Debtors' papers, but Radians may terminate the APA if the Debtors "fail to conduct the Auction in accordance with the Bid Procedures Order within the earlier of seven (7) Business Days of the Qualified Bid Determination Deadline or October 27, 2017[.]"  APA § 11.1(c)(vi).  Although the definitional section of the Stalking Horse APA provides that "Qualified Bid Determination Deadline" has the meaning ascribed in the Bid Procedures Order, the term is undefined therein.  The meaning of this term must be clarified.

- **Discretion to Determine Qualified Bidders**:  The Bidding Procedures Order provides that "[o]nly financially qualified parties will be eligible to participate in the Auction[.]"  Proposed Bidding Procedures Order at ¶ 4(c); *see also* APA § 6.5(a)(iii).  However, it is unclear as to who is responsible for determining whether a prospective overbidder is "financially qualified."  The Bidding Procedures should clarify who is authorized to determine financial qualification.[7]

- **Committee Consultation and Notice Rights:**  The proposed Bidding Procedures and APA must be modified to provide the Committee with routine consultation and notice rights.  Specifically, Committee consultation and notice rights should be added to the Bidding Procedures (¶¶ 2(c), 2(d), 2(f), 2(j), 2(l), and 2(m)) and Bidding Procedures Order (¶¶ 2, 3, 4(c), 4(d), 4(f), 4(j), 4(l), and 4(m)).

/ / /

---

[7]    While a debtor is afforded some discretion in determining whether to accept a proposed bid, limitless discretion is inappropriate.  *See G-K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Invs., L.P.)*, 994 F.2d 774, 775 (10 Cir. 1993) (noting that the court ultimately possesses "the power to disapprove a proposed sale recommended by a…debtor-in-possession if it has an awareness that there is another proposal in hand which, from the estate's point of view, is better or more acceptable").

13

1    As stated earlier, the Committee does not intend to stand in the way of a value-

2  maximizing sale and applauds Radians' desire to maintain Ironclad as a going concern.

3  However, the APA and proposed Bid Procedures fall woefully short in observing the rigors

4  of Chapter 11.  Left unaltered, the foregoing provisions of the APA and proposed Bidding

5  Procedures will chill the bidding process and deter the submission of competing bids.

6  Thus, in order to create a fair and competitive bidding process, such provisions should be

7  eliminated or amended so that the Stalking Horse does not receive undue advantages in

8  relation to other prospective bidders.

9  4.    RESERVATION OF RIGHTS

10    The Committee reserves all of its rights with respect to the hearing to consider the

11  Motion, including without limitation further objecting to any sale of the Debtors' assets or

12  the consideration provided in connection therewith, including a sale under the APA.

13  5.    CONCLUSION

14    **WHEREFORE**, for foregoing reasons, the Committee respectfully requests that the Court

15  (i) deny the Motion (or condition approval on modifications consistent with this Objection); and

16  (ii) grant such other and further relief as is just and proper.

17

18  DATED: September 25, 2017                Respectfully submitted,

19                                           BROWN RUDNICK LLP

20                                           By:

21                                           CATHRINE M. CASTALDI
                                             Proposed Attorneys for OFFICAL COMMITTEE
22                                           OF UNSECURED CREDITORS

23

24

25

26

27

28

14

1236393 v2-iManDB-000006/2432

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
2211 Michelson Drive, Suite 700, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (specify): **OPPOSITION TO DEBTORS' MOTION FOR AN ORDER: (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS TO USE, (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES, AND STALKING HORSE BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; AND (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) September 25, 2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (date) September 25, 2017, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Ironclad Performance Wear Corporation,
a California corporation
15260 Ventura Blvd., 20th Floor
Sherman Oaks, CA 91403

Ironclad Performance Wear Corporation,
a Nevada corporation
15260 Ventura Blvd., 20th Floor
Sherman Oaks, CA 91403

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) September 25, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Martin R. Barash
U.S. Bankruptcy Court
21041 Burbank Blvd.
Woodland Hills, CA 91367

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| September 25, 2017 | JEANNIE MENDEZ | *Jeannie Mendez* |
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION (if needed):**

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF) [con't]:**

| | |
|---|---|
| Ron Bender | rb@lnbyb.com |
| Cathrine M Castaldi | ccastaldi@brownrudnick.com |
| Russell Clementson | russell.clementson@usdoj.gov |
| Aaron S Craig | acraig@kslaw.com, lperry@kslaw.com |
| Monica Y Kim | myk@lnbrb.com, myk@ecf.inforuptcy.com |
| Krikor J Meshefejian | kjm@lnbrb.com |
| S Margaux Ross | margaux.ross@usdoj.gov |
| United States Trustee (SV) | ustpregion16.wh.ecf@usdoj.gov |
| Sharon Z. Weiss | sharon.weiss@bryancave.com, raul.morales@bryancave.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION (if needed):**

**SERVED VIA EMAIL**

| | |
|---|---|
| Counsel to Radians Wareham Holdings: <br> E. Franklin Childress, Jr. <br> Baker, Donelson, Bearman, Cadwell & Berkowitz, PC <br> 165 Madison Avenue, Suite 2000 <br> Memphis, TN 38103 <br> Email: fchildress@bakerdonelson.com <br><br> CREDITORS COMMITTEE: <br><br> Resources Global Professionals <br> Attn: Brent Waters <br> 17101 Armstrong Avenue <br> Irvine, CA 92614 <br> Email: Brent.Waters@rgp.com <br><br> Winspeed Sports (Shanghai) Co., Ltd. <br> c/o Brian Mitteldorf <br> Creditors Adjustment Bureau <br> 14226 Ventura Blvd. <br> Sherman Oaks, CA 91423 <br> Email: blm@cabcollects.com <br><br> PT Sport Glove Indonesia <br> Attn: Mark Robba <br> Krandon Desa Pandowoharjo <br> Sleman Yogyakarta 55512 <br> Indonesia <br> Email: mrobba@aol.com | Proposed Counsel for Equity Holders <br><br> Samuel R. Maizel, Esq. <br> Tania Moyron, Esq. <br> Dentons LLP <br> 601 S. Figueroa Street, Suite 2500 <br> Los Angeles, CA 90017-5704 <br><br> Email: samuel.maizel@dentons.com <br> Email: tania.moyron@dentons.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* <br> 1236338 v1-000006/2432

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION (if needed):**

**SERVED VIA U.S. MAIL (con't)**

<u>Equity Holders Creditors:</u>

Patrick W. O'Brien
301 Whitmore Lane
Lake Forest, IL 60045-4707

Ronald Chez
1524 N. Astor Street
Chicago, IL 60610

Scott Jarus
938 Duncan Avenue
Manhattan Beach, CA 90266

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
1236338 v1-000006/2432

**F 9013-3.1.PROOF.SERVICE**