RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>    Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>    Debtor and Debtor in Possession.<br>_____<br><br>☒ Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐ Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**DECLARATION OF L. GEOFF GREULICH IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (2) APPROVING OF DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING OF DEBTORS' REJECTION OF THOSE UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED AND ASSIGNED; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF**<br><br>DATE:    October 30, 2017<br>TIME:    10:00 a.m.<br>PLACE:   Courtroom "303"<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA |

I, L. Geoff Greulich, hereby declare as follows:

1. I am the Chief Executive Officer of Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada" and with Ironclad California, the "Debtors" or "Ironclad"), who each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code on September 8, 2017 ("Petition Date"). I became the Debtors' Chief Executive Officer effective July 6, 2017.

2. In that capacity, I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

3. I am submitting this Declaration in support of the Debtors' motion ("Motion") seeking an order of the Court approving the Debtors' sale of substantially all of their assets to Radians Wareham Holding, Inc. ("Radians" or "Purchaser") in accordance with the terms of the Asset Purchase Agreement ("APA") attached as Exhibit "A" to my prior Declaration filed with the Court on September 11, 2017 as Docket Number 6 or to the highest or otherwise best overbidder selected at the Auction (defined below). By way of the Motion, the Debtors are also seeking the Court's approval of the Debtors' assumption and assignment to Purchaser (or the successful overbidder) of those unexpired leases and executory contracts that Purchaser (or the successful overbidder) wishes to assume (defined in the APA as the "Designated Contracts").

4. Since the Petition Date, the Debtors have operated their businesses and managed their affairs as debtors in possession. With the Court's approval, the Debtors two chapter 11 cases are being jointly administered. Other than owning all of the shares in Ironclad California, Ironclad Nevada has no business. All operations of the Debtors effectively function through Ironclad California.

5.      The Debtors are a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder. The Debtors' business is headquartered in Farmers Branch, Texas. Ironclad Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW". As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding. As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees who work overseas.

6.      Ironclad was founded in 1998 by Ed Jaeger. Mr. Jaeger was inspired to build gloves that offered protection and performance without sacrificing one for the other. From the beginning, Ironclad built gloves using materials that offered excellent fit to make them an extension of the hand and to make jobs easier for the "industrial athlete". By 2006, Ironclad offered 35 different task-specific glove types for people wearing gloves as part of their daily jobs.

7.      In 2008, the Debtors launched the KONG (King of Oil 'N' Gas) line to address the high number of hand injuries in the O&G field. By 2010, the KONG line was comprised of 46 different gloves. Additionally, Ironclad expanded its presence in the retail and non-professional markets with the launch of the EXO brand in June 2015. EXO offers lower cost gloves for automotive, DIY, and outdoor sporting applications. Ironclad offers 30 different EXO glove types.

8.      Ironclad's task-specific technical glove products are specially designed for individual user groups. Ironclad currently offers over 160 distinct types of gloves for a variety of markets, including industrial, construction, DIY, carpentry, machining, package handling,

plumbing, welding, roofing, O&G, mechanics, hunting, and gardening. Products come in a multitude of colors and cater to the specific demands and requirements of the users based on ease of motion, grip, water and chemical resistance, visibility, and protection from abrasions, cuts, flames, impacts, temperature, and vibration. Since inception, Ironclad has employed an internal research and development ("R&D") department responsible for identifying and creating new products and applications, and improving and enhancing existing products. Ironclad is continually evaluating new base materials for gloves, and grip is another key area of focus for R&D. Ironclad often partners with industry-leading organizations to develop new products. Ironclad has 13 U.S. patents issued and 11 foreign patents, as well as five pending U.S. patent applications and several pending foreign patent applications. Ironclad also uses trademarks to strengthen and protect its recognizable brand names. Ironclad owns 52 registered U.S. trademarks, 39 registered international trademarks, and 13 and 43 trademarks pending in the U.S. and internationally, respectively.

9. Ironclad currently sells its product through approximately 10,000 outlets for professional tradesmen as well as "Big Box", hardware, auto parts, and sporting goods retailers. The sales force is organized by 3 business segments: Industrial, Retail, and International. Glove products are currently manufactured by multiple suppliers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia.

10. Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations have been insufficient to support their current business operations as well as their continued growth. There have been many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or ineffective expansion and distribution of all of their product lines and development of new customers, and higher than anticipated production, manufacturing and warehousing costs. In

4

addition, it was discovered in early 2017 that under prior management, the Debtors had failed to provide materially complete and correct financial statements as required under their Loan Documents (defined below) to their primary secured lender for the fiscal years ended December 31, 2015 and 2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017.

11.  As I previously indicated, the Debtors filed their bankruptcy cases to consummate a sale of substantially all of their assets (excluding cash and causes of action) for the most money possible. Just prior to their bankruptcy filings, the Debtors entered into the APA with the Debtors' current secured creditor, Radians/Purchaser, or its affiliate/designee, for a cash purchase price of $20 million or $15 million, subject to an overbid process.  Purchaser will be paying a cash purchase price of either $15 million or $20 million depending upon the occurrence of an event which is sensitive and the letter agreement describing such event is the subject of a motion to file under seal. It should be noted that the Debtors believe the total debt in these cases (both secured and unsecured combined along with post-petition administrative claims) is or will be in the range of approximately $8-$10 million, which means that subject to the closing of the asset sale to Purchaser or a successful overbidder, all creditors are expected to be paid in full, with there being a substantial distribution to the shareholders of the parent company, which is a publicly traded company.

12.  The Debtors' business was actively marketed for sale for several months prior to the Debtors' bankruptcy filings by the highly regarded investment bank of Craig-Hallum Capital Group LLC ("C-H"). Prospective buyers had the ability to purchase assets or equity. While a number of prospective buyers expressed and continued to express interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-bankruptcy marketing process because (i) the Debtors were out of funds, (ii) the Debtors could not continue

5

to operate without both access to their own cash receipts as well as receipt of additional financing, and (iii) Purchaser (which is also the Debtors' secured creditor having purchased the Debtors' pre-bankruptcy secured bank debt) had exercised its secured creditor rights and was sweeping all of the Debtors' cash and was no longer willing to continue to forbear or advance additional needed financing to the Debtors absent a global resolution with the Debtors which was accomplished with the APA and the DIP financing agreement the Debtors entered into with Purchaser which I understand was approved by the Court on a final basis at a hearing held on October 6, 2017.

13. The purchase offer provided to the Debtors by Purchaser was determined by the Board to be the best offer the Debtors had received by the Petition Date (and I agreed with that determination by the Board), and Purchaser was ready to proceed with its purchase and lend the Debtors sufficient funds to enable the Debtors to operate their business through an Auction to take place in late October, 2017 with a sale closing to occur shortly thereafter. Purchaser was also willing to permit the Debtors to proceed with a robust post-bankruptcy marketing and hopeful overbid process to insure that the highest and best price is paid for the Purchased Assets. Given the breadth of the Debtors' pre-bankruptcy marketing process and the fact that the Debtors' pre-bankruptcy investment banker (who is already very familiar with the various prospective overbidders) will be serving as the Debtors' post-bankruptcy investment banker and leading the overbid sale process, and the fact that the likely overbidders are already deep into the due diligence process, I am confident that providing prospective overbidders with approximately six weeks post-petition to decide whether to participate in the Auction is a sufficient amount of time for the Debtors to achieve the highest and best price for the Purchased Assets. Also, and very importantly, the Debtors' financial needs expand significantly the last two months of the year so if the Debtors are required to continue to operate their business through the end of the

year or significantly beyond October 31, 2017, the Debtors may need to borrow additional money which could result in substantially reducing the ultimate recovery for the Debtors' shareholders. It is also not clear that any such additional financing would be available to the Debtors in any event. It is for this reason that it is very important that the Debtors' be authorized to implement their proposed sale timeline.

14. At a continued hearing held on September 25, 2017, the Court granted the Debtors' bid procedures motion by order entered on September 28, 2017 as Docket Number 71 (the "Bidding Procedures Order"). The Bidding Procedures Order was approved by the Debtors, Purchaser, and the Official Committee of Unsecured Creditors and Official Committee of Equity Holders that were appointed in these cases. In order to insure that the highest price possible is paid for the Purchased Assets, the Debtors' proposed sale to Purchaser is subject to overbid at an auction ("Auction") to be held on October 30, 2017. The Bidding Procedures Order explains to prospective overbidders how a prospective overbidder becomes qualified to participate in the Auction and how the Auction would proceed in the event that there is one or more qualified overbidders. In addition, C-H has established an extensive data room for prospective overbidders to obtain diligence information, and the Debtors' senior management has made themselves available to meet with prospective overbidders. To assist in the overbid process, the Debtors' counsel prepared an asset purchase agreement template for prospective overbidders to use if they want, and has delivered that template to C-H to distribute to prospective overbidders.

15. The location of the Auction will be determined after the number of qualified overbidders becomes known. The Debtors intend to seek the Court's approval of the sale of the Purchased Assets to Purchaser or a successful overbidder immediately following the completion of the Auction. If there are no qualified overbidders, the Debtors will proceed to request the Court to approve the Debtors' sale of the Purchased Assets and the Debtors' assumption and

assignment of the Designated Contracts to Purchaser at the hearing to be held on October 30, 2017. If Purchaser is the winning bidder at the Auction (or if there are no qualified overbidders), Purchaser is required to close its purchase of the Purchased Assets within five days following the entry of the sale order by the Court. If a qualified overbidder is the winning bidder at the Auction, the winning bidder is required to close its purchase of the Purchased Assets within fourteen days following the entry of the sale order by the Court. A proposed draft of the sale order (which has been approved by Purchaser) is attached as Exhibit "A" to the Motion (the "Sale Order").

16. The APA was the result of extensive pre-bankruptcy negotiations and documentation between the Debtors and Purchaser. Under the APA, Purchaser has agreed to purchase the vast majority of the Debtors' assets (defined as the "Purchased Assets" (see Section 2.1(b) of the APA)) for the cash purchase price of $20 million or $15 million (see Section 2.2 of the APA) depending upon the occurrence of an event that is described in a letter agreement that is the subject of a motion to file under seal. The Debtors' assets that are not being purchased by Purchaser are defined as the "Retained Assets" in Section 2.1(c) of the APA. The liabilities to be assumed by Purchaser (the "Assumed Liabilities") are described in Section 2.4(a) of the APA. The Closing if Purchaser is the winning bidder at the Auction or if there is no Auction is scheduled to take place within five business days following the entry of the Sale Order (see Section 3.1 of the APA). Purchaser has provided a $1 million deposit which is being held in a trust account by the Debtors' counsel (see Section 2.2 of the APA). If Purchaser is the winning bidder at the Auction (or if there is no Auction), at the Closing Purchaser will pay its cash purchase (of either $15 million or $20 million if there is no Auction or whatever the winning bid is if there is an Auction) less the $1 million deposit less the outstanding amount of Purchaser's secured debt existing at the time of the Closing (see Section 2.2 of the APA). At the time of the

Debtors' bankruptcy filings, Purchaser's outstanding secured debt was in the amount of approximately $3.5 million. The Debtors have already borrowed a total of $1.1 million post-petition from Purchaser, and the Debtors expect to borrow an additional approximately $400,000 post-petition from Purchaser. This would mean that Purchaser would be owed approximately $5 million by the time of the Closing on account of Purchaser's secured debt. Purchaser agreed to lend the Debtors a total of up to $2 million post-petition. In the event that Purchaser is not the winning bidder, the Debtors are obligated to repay their secured debt to Purchaser in full from the proceeds of the sale to the successful overbidder upon closing of the sale. Pursuant to Section 7.1 of the APA, Purchaser is required to identify one business day prior to the "Qualified Bid Determination Deadline" (which will be October 24, 2017) a list of all of the Debtors' employees who will be offered employment by Purchaser. All of the Debtors' employees who are offered and accept employment with Purchaser are defined as the "Transferred Employees". Pursuant to Section 7.1 of the APA, Purchaser (if it is the winning bidder at the Auction or if there is no Auction) has agreed to make a severance payment to each of the Debtors' employees who are not offered employment by Purchaser, other than the Debtors' officers and any employee subject to an employee retention agreement, at comparable terms to their then employment with the Debtors, with each such severance payment to be consistent with the most generous current severance policy of Purchaser and/or any of its Affiliates for similarly situated employees. Purchaser will not owe any severance payment to any of the Debtors' employees who are offered employment by Purchaser at comparable terms to their then employment with the Debtors but who do not accept their offer of employment. As indicated in Section 2.1(b)(vi) of the APA, Purchaser will have the right to designate which of the Debtors' executory contracts and unexpired leases that Purchaser wishes to assume (defined above as the "Designated Contracts"). Pursuant to Section 2.4(a)(ii) of the APA, the payment of all cure costs will be the

9

responsibility of Purchaser. Purchaser has not yet provided the Debtors with a preliminary list of the Designated Contracts. Purchaser is required to make its decision at least one business day prior to the Closing. This issue is discussed more below.

17. As indicated, in order to insure that the highest price possible is paid for the Purchased Assets, the Debtors' proposed sale to Purchaser is subject to overbid at the Auction to be held on October 30, 2017. The Debtors have retained C-H on a post-petition basis to market the Purchased Assets for overbid and to work with the Debtors to conduct the Auction in the event of one or more qualified overbidders. C-H is extremely familiar with the Debtors, the Debtors' business operations and the Purchased Assets as C-H spent months prior to the Debtors' bankruptcy filings attempting to find buyers of the Debtors' business and/or lenders to the Debtors.

18. For all of the reasons explained above, the Debtors are not able to continue to sustain their business operations without the infusion of additional financing or working capital because the Debtors are in default to Purchaser and Purchaser has made clear that it is not willing to be the Debtors' long-term lender. Prior to the Debtors' bankruptcy filings, the Debtors were not able to locate any replacement financing except under prohibitively expensive terms. As a result, the only way for the Debtors to maximize the value of their assets/business is for the Debtors to consummate an expedited sale of their assets/business. I am confident that under the circumstances, the Debtors' proposed asset sale to Purchaser (subject to overbid) is the best option available to the Debtors to maximize the value of their assets and recovery for their creditors and shareholders. Purchaser's stalking horse bid was the best pre-petition offer the Debtors received, and Purchaser has enabled the Debtors to engage in a comprehensive post-petition marketing process in an effort to locate prospective overbidders to participate in the Auction. Given the fact that a number of prospective buyers had already commenced due

diligence prior to the Debtors' bankruptcy filings, I am confident that the post-petition marketing/overbid process is sufficient to enable the Debtors to sell their business/assets for the most money possible under the circumstances.

19. The pre-petition marketing and sale process undertaken by C-H and the Debtors was designed to insure that the highest price possible was obtained for the Purchased Assets, and the offer submitted by Purchaser which is serving as the stalking horse bid was the highest and best pre-petition offer the Debtors received. The post-petition overbid marketing process that the Debtors are undertaking in accordance with the Bidding Procedures Order will insure that under the circumstances the highest and best price is paid for the Purchased Assets and that purchase price will necessarily will be equal to the current fair market value of the Purchased Assets.

20. To my knowledge, neither Purchaser nor any of Purchaser's representatives or affiliates is an "insider" of the Debtors. I am not aware of any insider who is contemplating being a potential overbidder. I am not aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Additionally, the APA was intensively negotiated at arm's length with all parties involved acting in good faith.

21. Purchaser is the only creditor that I am aware of that assert any liens against any of the Purchased Assets, and Purchaser has consented to the sale of the Purchased Assets to Purchaser (or to a successful overbidder) free and clear of its Liens. If Purchaser is the winning bidder at the Auction (or if there is no Auction), Purchaser's Liens will be satisfied in full by Purchaser's inclusion of its outstanding secured debt as part of its purchase price paid at the Closing. If a successful overbidder is the winning bidder at the Auction, then in connection with the Closing, the full outstanding secured debt of Purchaser will be paid in full at the Closing out of the sale proceeds.

22.     In addition to seeking to sell the Purchased Assets to Purchaser (or to a successful overbidder), the Debtors are also seeking to assume and assign to Purchaser (or to a successful overbidder) all of the Debtors' executory contracts and unexpired leases that Purchaser (or a successful overbidder) desires.  A schedule of all of the Debtors' known executory contracts and unexpired leases, along with the Debtors' belief as to all outstanding cure amounts owing by the Debtors to the other parties to those executory contracts and unexpired leases (the "<u>Contracts and Leases Schedule</u>"), is attached hereto as Exhibit "1".  Purchaser has not yet identified for the Debtors which of the Debtors' executory contracts and unexpired leases that Purchaser desires to have assigned to it (*i.e.*, the "<u>Designated Contracts</u>") if Purchaser is the winning bidder at the Auction (or if there is no Auction), and Purchaser is required to make that designation by one day prior to the Closing.  If someone other than Purchaser is the successful bidder at the Auction, the Debtors will now know which of their executory contracts and unexpired leases the winning bidder will desire to have assigned to it.

23.     As a result of the foregoing, the Debtors are seeking the Court's authority to assume and assign to Purchaser (or to a successful overbidder) all of the Debtors' executory contracts and unexpired leases that Purchaser (or a successful overbidder) wants to have assigned to it and to fix the required cure amount that would need to be paid to the other parties to the executory contracts and unexpired leases at the cure amounts set forth in the Contracts and Leases Schedule unless the other parties to the executory contracts and unexpired leases file a timely objection to the Motion and the Court determines that the required cure amount is different than the amount set forth in the Contracts and Leases Schedule.  I am not aware of any of the other parties to the executory contracts and unexpired leases having suffered any  actual pecuniary loss resulting from any default by the Debtors.

24. Purchaser (or any successful overbidder) will be required to file with the Court not later than one day prior to the Closing which of the Debtors' executory contracts and unexpired leases Purchaser (or any successful overbidder) has decided not to take an assignment of, in which case those executory contracts and unexpired leases will not be assumed and assigned to Purchaser (or a successful overbidder) at the Closing and, instead, will be deemed rejected effective as of the Closing.

25. For all of the reasons set forth above, I believe that selling the Purchased Assets to Purchaser (or a successful overbidder) in accordance with the timeline provided in the APA and the Bidding Procedures Order is in the best interests of the Debtors' estates, their creditors and shareholders. Closing the sale of the Purchased Assets as soon as possible will minimize the need for the Debtors to have to borrow additional funds from Purchaser for their business operations which would dilute the recovery for the Debtors' shareholders.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 9th day of October 2017 at Los Angeles, California.

_____
L. GEOFF GREULICH

# EXHIBIT "1"

| Contracting Party Name | Description of Contract | Cure Amount | Case |
|---|---|---:|---|
| Ace Hardware | Customer contract | $0.00 | CA |
| Acklands Grainger | Customer contract | $0.00 | CA |
| Advantage Media Services | Logistics and Warehousing agreement | $114,942.80 | CA |
| Amazon | Customer contract | $0.00 | CA |
| AML United Limited | Vendor contract | $0.00 | CA |
| BIC Alliance | Magazine Subscription | $5,800.00 | CA |
| Cabela's | Customer contract | $0.00 | CA |
| Dayup Global Co., Ltd. | Vendor contract | $0.00 | CA |
| Design Gallery (Pvt.) Ltd. | Vendor contract | $12,801.60 | CA |
| DESUN GARMENTS, LTD. | Vendor contract | $7,691.75 | CA |
| DNOW | Customer contract | $0.00 | CA |
| Do It Best | Customer contract | $0.00 | CA |
| DRG Strategic, LLC - Bob Goldstein | Vendor contract | $556.75 | CA |
| Duluth Trading | Customer contract | $0.00 | CA |
| Emery Waterhouse | Customer contract | $0.00 | CA |
| Essendant (USSCO) | Customer contract | $0.00 | CA |
| Glenfir | Customer contract | $0.00 | CA |
| Grainger | Customer contract | $0.00 | CA |
| Huizhou Baijia Glove Co., Ltd. | Vendor contract | $0.00 | CA |
| Ka Hung Glove Industrial Co. Ltd. | Vendor contract | $38,934.90 | CA |
| Konica Minolta | Agreement regarding printers | $1,152.31 | CA |
| MARUSAN - MIMASU TSHUSHO CO. LTD. | Vendor contract | $382,811.28 | CA |
| Menards | Customer contract | $0.00 | CA |
| MERCINDO GLOBAL MANUFAKTUR | Vendor contract | $444,674.64 | CA |
| Naayle Garments | Vendor contract | $0.00 | CA |
| NANTONG CHANGBANG GLOVES CO. | Vendor contract | $1,228,307.56 | CA |
| Orgill | Customer contract | $0.00 | CA |
| Orr Safety | Customer contract | $0.00 | CA |
| Pitney Bowes | Agreement regarding postage meter | $452.99 | CA |
| POH | Customer contract | $0.00 | CA |
| PT Adira Semesta Industry | Vendor contract | $0.00 | CA |
| PT JJ GLOVES INDO | Vendor contract | $162,917.76 | CA |
| PT SEOK HWA INDONESIA | Vendor contract | $13,174.86 | CA |

| | | | |
|---|---|---|---|
| PT SPORT GLOVE INDONESIA | Vendor contract | $144,238.66 | CA |
| PT. Eagle Glove Indonesia | Vendor contract | $0.00 | CA |
| R3 Safety aka Bunzl | Customer contract | $0.00 | CA |
| Sam's Club | Customer contract | $0.00 | CA |
| Sees Global Inc. | Vendor contract | $0.00 | CA |
| Select (Nantong) Safety Products Co | Vendor contract | $0.00 | CA |
| Shur Sales | Customer contract | $16,125.00 | CA |
| Snap-On | Customer contract | $0.00 | CA |
| Synetra | Internet Technology Service contract | $37,972.33 | CA |
| Trinet | Vendor contract | $0.00 | CA |
| True Value | Customer contract | $0.00 | CA |
| WINSPEED SPORTS SHANGHAI CO., LTD. | Vendor contract | $144,198.43 | CA |
| WONEEL MIDAS LEATHERS | Vendor contract | $785,358.50 | CA |
| Worldwide | Customer contract | $0.00 | CA |
| 1920 Hutton Court | Industrial Multi-Tenant Lease of 1920 Hutton Court | $13,257.09 | NV |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DECLARATION OF L. GEOFF GREULICH IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (2) APPROVING OF DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING OF DEBTORS' REJECTION OF THOSE UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED AND ASSIGNED; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 9, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Monica Y Kim    myk@lnbrb.com, myk@ecf.inforuptcy.com**
- **Krikor J Meshefejian    kjm@lnbrb.com**
- **S Margaux Ross    margaux.ross@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**
- **Sharon Z. Weiss    sharon.weiss@bryancave.com, raul.morales@bryancave.com**

**2. SERVED BY UNITED STATES MAIL**: On **October 9, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 9, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 9, 2017 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**

Ironclad Performance Wear (8300)
Interested Parties

| | | |
|---|---|---|
| **Counsel to Radians Wareham Holdings**<br>Sharon Z. Weiss<br>Bryan Cave<br>120 Broadway, Suite 300<br>Santa Monica, CA 90401 | **Counsel to Radians Wareham Holdings**<br>E. Franklin Childress, Jr.<br>Baker, Donelson, Bearman, Caldwell & Berkowitz, PC<br>165 Madison Ave, Suite 2000<br>Memphis, Tennessee  38103 | Skadden Arps Slate Meagher & Flom LLP<br>Attn: Annie Li, Esq.<br>300 South Grand Avenue<br>Suite 3400<br>Los Angeles, California 90071 |
| Sky Lin<br>Marusan - Mimasu Tshusho Co. Ltd.<br>Msh4726 Rm 1007 10f Ho King Ctr No 2<br>16 Fa Yuen S Mongkok HK Island Hk<br>Hong Kong<br>China | Mark Robba<br>PT SPORT GLOVE INDONESIA<br>Krandon Desa Pandowoharjo<br>Sleman<br>Yogyakarta, Indonesia, 55512 | Ronald Chez<br>1524 N. Astor Street<br>Chicago, IL 60610 |
| U. S. Securities and Exchange Commission<br>Attn: Bankruptcy Counsel<br>444 South Flower Street, Suite 900<br>Los Angeles, CA 90071-9591 | Franchise Tax Board<br>Bankruptcy Section, MS: A-340<br>P. O. Box 2952<br>Sacramento, CA 95812-2952 | State Board of Equalization<br>Account Information Group, MIC: 29<br>P.O. Box 942879<br>Sacramento, CA 94279-0029 |
| Employment Development Department<br>Bankruptcy Group MIC 92E<br>P. O. Box 826880<br>Sacramento, CA 94280-0001 | | |

Ironclad Performance Wear Corporation
File No. 8300
Contracts Service List
Service by U.S. Mail

| | | |
|---|---|---|
| Ace Hardware<br>2222 Kensington St.<br>Oak Brook, IL 60523-0000 | Acklands Grainger<br>123 Commerce Valley Dr., Suite 700<br>Thornhill, Ontario, L3T 7W, Canada | Advantage Media Services<br>29120 Commerce Center Drive #2<br>Valencia, CA 91355-0000 |
| Amazon<br>410 Terry Ave. North<br>Seattle, WA 98109-0000 | AML United Limited<br>29th Floor, Nanyang Plaza<br>57 Hung To Road, Kwun Tong,<br>Kowloon<br>Hong Kong, China, | BIC Alliance<br>P O Box 40166<br>Baton Rouge, LA 70835-0000 |
| Cabela's<br>1 Cabela Dr.<br>Sidney, NE 69160-0000 | Dayup Global Co., Ltd.<br>Phum Prey Sala, Sangkat Kakap<br>Khan Posenchey, Phnom Penh<br>855, Cambodia, | Design Gallery (Pvt.) Ltd.<br>Plot #322/B, Medical Road,<br>Helal Market, Uttarkhan, Dhaka<br>Dhaka-1230, Bangladesh, |
| DESUN GARMENTS, LTD.<br>89/1, Birulia Road, Savar, Dhaka<br>Dhaka<br>Savar-1340, Bangladesh, | DNOW<br>PO Box 40985<br>Houston, TX 77240-0000 | Do It Best<br>6502 Nelson Road<br>Fort Wayne, IN 46803-0000 |
| DRG Strategic, LLC - Bob Goldstein<br>P O BOX 191981<br>Dallas, TX 75219-0000 | Duluth Trading<br>PO Box 409170<br>Belleville, WI 53508-0000 | Emery Waterhouse<br>7 Rand Rd.<br>Portland, ME 04104-0000 |
| Essendant (USSCO)<br>1 Parkway North Blvd., Suite 100<br>Deerfield, IL 60015-0000 | Glenfir<br>General French 1948<br>Montevideo, Uruguay 11500 | Grainger<br>100 Grainger Parkway<br>Lake Forest, IL 60045-0000 |
| Huizhou Baijia Glove Co., Ltd.<br>Diakali Mouza, Manigonggjpara<br>Savar, Dhaka, 1349, Bangladesh | Ka Hung Glove Industrial Co. Ltd.<br>Fujian Quanzhou Jiacheng Leather<br>Ka Hung Holdings BldgM Chi Feng Rd<br>Quanzhou City, Fujian, 36200-0000 | Konica Minolta Business Solutions<br>100 Williams Drive<br>Ramsey NJ 07446-0000 |
| MARUSAN - MIMASU TSHUSHO CO.<br>LTD.<br>NO 1 QUEEN' ROAD CENTRAL<br>HONG KONG<br>CHINA, | Menards<br>5101 Menard Dr.<br>Eau Claire, WI 54703-0000 | MERCINDO GLOBAL MANUFAKTUR<br>JL. RAYA SEMARANG-BAWEN KM.29<br>Semerang, Central Java<br>50661, Indonesia, |
| Naayle Garments<br>CD 388/389 Sector 16B FB Ind Area<br>Karach, iSindh, Pakistan | NANTONG CHANGBANG GLOVES<br>CO.<br>Flat/RM 1602 Chit Lee Comm<br>Bldg 30-36, Shau Kei Wan Road<br>Hong Kong, China, | Orgill<br>PO Box 140<br>Memphis, TN 38101-0000 |

Orr Safety  
11601 Interchange Drive  
Louisville, KY 40229-0000

Pitney Bowes Credit Corp.  
P.O.Box   371887  
Pittsburg PA 15250-7887

POH  
12 Brennan Way  
Belmont, Western Australia 6104

PT Adira Semesta Industry  
Bihbul Raya 73, Kopo., Bandung  
West Java, 40228, Indonesia

PT JJ GLOVES INDO  
JL Ronggowarsito, Mlese, Ceper  
Bonded Zone, Klaten  
Central Java, Indonesia,  57463-0000

PT SEOK HWA INDONESIA  
Room 1218, Krantz Techno Bldg.  
5442-1 Sang Dae Won-Dong, Sung Nam  
Kyung Gi-Do, Indonesia,  00046-2819

PT SPORT GLOVE INDONESIA  
Krandon Desa Pandowoharjo  
Sleman  
Yogyakarta, Indonesia,  55512-0000

PT. Eagle Glove Indonesia  
Desa Bayen Purwomatani Kalasan  
Sleman, Yogyakarta, 55571  
Indonesia,

R3 Safety aka Bunzl  
P.O. Box 270417  
Saint Louis, MO 63141-0000

Sam's Club  
Attn: General Merchandise Manager  
2101 SE Simple Savings Drive  
Bentonville, AR 72716-0000

Sees Global Inc.  
#612 Suntec City 307-2  
Sandaewon-dong, Jungwon-gu  
Seongnam, Kyunggi, KO,  46273-6000

Select (Nantong) Safety Products Co  
No. 198 Youyi Road (W)  
Jueguang, Rudong, Jiangsu  
226400, China,

Shur Sales  
3830 Winermere Street  
Englewood, CO 80110-0000

Snap-On  
PO Box 1410  
Kenosha, WI 53141-0000

Synetra  
1110 E Highway 114, Suite 200  
Southlake, TX 76092-0000

Trinet  
1100 San Leandro Blvd., Suite 400  
San Leandro, CA 93577-0000

True Value  
8600 W. Bryn Mawr Avenue  
Chicago, IL 60631-0000

WINSPEED SPORTS SHANGHAI CO., LTD.  
858 MINGZHU ROAD  
SHANGHAI  
China,  00020-1702

WONEEL MIDAS LEATHERS  
JL GEMBOR RAYA DESA PASIRJAYA  
TANGERANG  
BANTEN, INDONESIA,  15135-0000

Worldwide  
PO Box 88607  
Seattle, WA 98138-0000

1920 Hutton Court  
Inwood National Bank  
PO Box 857413  
Richardson, TX 75085-0000