RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>    Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>    Debtor and Debtor in Possession.<br>_____<br><br>☒ Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐ Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**DEBTORS' MOTION FOR AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (2) APPROVING OF DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING OF DEBTORS' REJECTION OF THOSE UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED AND ASSIGNED; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Declaration of Geoffrey Greulich Filed Concurrently Herewith]**<br><br>DATE:    October 30, 2017<br>TIME:    10:00 a.m.<br>PLACE:    Courtroom "303"<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA |

## <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 11

I. STATEMENT OF JURISDICTION AND VENUE ................................................... 11

II. STATEMENT OF FACTS.......................................................................................... 11

    A.    Brief Description Of The Debtors And Their Businesses. .................................. 11

    B.    Events Leading To The Filing Of The Debtors' Bankruptcies And The
          Debtors' Chapter 11 Goals...................................................................... 13

    C.    The Asset Sale Process. ....................................................................... 16

    D.    The APA. .............................................................................................. 17

III. DISCUSSION AND AUTHORITIES .................................................................... 19

    A.    The Bankruptcy Court Should Authorize the Debtors to Sell the
          Purchased Assets to Purchaser (Or a Successful Overbidder) in
          Accordance with the Terms of the APA. ............................................ 19

          1.    Sound Business Purpose. ............................................................ 21

          2.    Accurate and Reasonable Notice. .............................................. 22

          3.    Fair and Reasonable Price........................................................... 23

          4.    Good Faith. .................................................................................. 24

    B.    Section 363(f) of the Bankruptcy Code Permits the Debtors' Sale of the
          Purchased Assets to Purchaser to Be Free and Clear of Any and All
          Liens (as Defined in the APA)............................................................. 26

          1.    The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C.
               Section 363(f)(2). ....................................................................... 27

          2.    The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C.
               Section 363(f)(3). ....................................................................... 28

          3.    The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C.
               Section 363(f)(5). ....................................................................... 28

i

C.      The Bankruptcy Court Should Authorize the Debtors to Assume and Assign to Purchaser (or to a Successful Overbidder) All of the Designated Contracts that Purchaser (or to a Successful Overbidder) Desires.......................................................................................... 31

E.      The Debtors Request the Court to Waive the Fourteen-Day Waiting Periods Set Forth in Bankruptcy Rules 6004(h) and 6006(d)............................. 34

IV. CONCLUSION................................................................................................ 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

In re Abbotts Dairies of Pennsylvania, Inc.,
    788 F.2d 143 (3d Cir. 1986)...............................................................20, 24, 25

In re AEG Acquisition Corp.,
    127 B.R. 34 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50 (9th Cir. B.A.P. 1993)...................33

In re Alpha Industries, Inc.,
    84 B.R. 703 (Bankr. D. Mont. 1988) ...............................................................25

In re Apex Oil Co.,
    92 B.R. 847 (Bankr. E.D. Mo. 1988) ...............................................................25

In re Atlanta Packaging Products, Inc.,
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ...............................................................24

In re Bowman,
    194 B.R. 227 (Bankr. D. Ariz. 1995)...............................................................33

In re Central Fla. Metal Fabrication, Inc.,
    190 B.R. 119 (Bankr. N.D. Fla. 1995)...............................................................32

Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal Indus., Inc.),
    63 B.R. 361 (Bankr. N.D. Ohio 1986) ...............................................................24

Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.),
    722 F.2d 1063 (2d Cir. 1983)...............................................................20, 21

In re Continental Airlines, Inc.,
    780 F.2d 1223 (5th Cir. 1986) ...............................................................21

In re Continental Country Club, Inc.,
    114 B.R. 763 (Bankr. M.D. Fla. 1990) ...............................................................32

In re Delaware and Hudson Ry. Co.,
    124 B.R. 169 (D. Del. 1991)...............................................................20, 23

In re Eliot,
    94 B.R. 343 (E.D. Pa. 1988) ...............................................................27

In re Embers 86th Street. Inc.,
    184 B.R. 892 (Bankr. S.D.N.Y. 1995) ...............................................................33

In re Filtercorp, Inc.,
  163 F.3d 570 (9th Cir. 1998) ...................................................26

In re Grand Slam U.S.A., Inc.,
  178 B.R. 460 (E.D. Mich. 1995)..........................................29, 30

In re Gucci,
  193 B.R. 411 (S.D.N.Y. 1996).................................................32

In re Gulf States Steel, Inc. of Alabama,
  285 B.R. 497 (Bankr. N.D. Ala. 2002) ...................................30

In re Healthco Int'l Inc.,
  174 B.R. 174 (Bankr. D. Mass. 1994) .................................29, 30

In re Hunt Energy Co., Inc.,
  48 B.R. 472 (Bankr. N.D. Ohio, 1985) ...................................31

In re Huntington, Ltd.,
  654 F.2d 578 (9th Cir. 1981) .................................................20

In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.,
  77 B.R. 15 (Bankr. E.D. Pa. 1987) .........................................25

In re Integrated Resources, Inc.,
  135 B.R. 746 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992) .......................24

In re Karpe,
  84 B.R. 926 (Bankr. M.D. Pa. 1988) ....................................23, 24

In re Klein Sleep Products, Inc.,
  78 F.3d 18 (2d. Cir. 1996) ......................................................32

In re M Capital Corp.,
  290 B.R. 743 (B.A.P. 9th Circuit, 2003)..................................26

In re Martin (Myers v. Martin),
  91 F.3d 389 (3d Cir. 1996)......................................................20

P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia, Dep't of
  Medical Assistance Serv. (In re P.K.R. Convalescent Centers, Inc.),
  189 B.R. 90 (Bankr. E.D. Va. 1995).......................................29

In re Perroncello,
  170 B.R. 189 (Bankr. D. Mass. 1994) ...................................30

In re Prime Motors Inns,
  124 B.R. 378 (Bankr. S.D. Fla. 1991) .....................................32

In re Qintex Entertainment, Inc.,
    950 F.2d 1492 (9th Cir. 1991) ..................................................................20

In re Rock Indus. Mach. Corp.,
    572 F.2d 1195 (7th Cir. 1978) ..................................................................25

In re Sandy Ridge Dev. Corp.,
    881 F.2d 1346 (5th Cir.1989) ...................................................................31

Scherer v. Federal National Mortgage Association (In re Terrace Chalet
    Apartments, Ltd.),
    159 B.R. 821 (Bankr. N.D. Ill. 1993) .......................................................30

In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.,
    32 B.R. 708 (N.D. Tex. 1983) ...................................................................24

In re Snyder,
    74 B.R. 872 (Bankr. E.D. Pa. 1987) .........................................................24

Titusville Country Club v. Pennbank (In re Titusville Country Club),
    128 B.R. 396 (Bankr. W.D. Pa. 1991) .......................................................21

In re Walter,
    83 B.R. 14 (9th Cir. B.A.P. 1988).................................................20, 21, 22

In re Wilde Horse Enterprises,
    136 B.R. 830 (Bankr. C.D. Cal. 1991).................................................24, 25

Willemain v. Kivitz,
    764 F.2d 1019 (4th Cir. 1985) ...................................................................24

**Federal Statutes**

11 U.S.C.
    §§ 105(a) and 365 to (a) ..............................................................................9
    § 363 ....................................................................................................21, 23
    § 363(b) ...............................................................................................*passim*
    § 363(f)(1)-(5) ...........................................................................................6
    § 363(f)(2) ...........................................................................................27, 28
    § 363(f)(3) ...........................................................................................28, 30
    § 363(f)(5) .....................................................................................29, 30, 32
    § 363(f) ................................................................................................27, 28
    § 363(m) .................................................................................................6, 26
    § 365 ..........................................................................................................9
    § 365(b)(1) ...............................................................................................33
    § 365(b)(1)(A) ..........................................................................................34
    § 365(b)(1)(B) ..........................................................................................34
    § 365(b)(2) ...............................................................................................10

§§ 365(b)(2), (e)(1) and (f)(1) ........................................................................9
§ 365(f)(1) ........................................................................33
§ 365(f)(2) ........................................................................32, 33
§ 1129(a)(3)-(b)(1) ........................................................................31
§ 1129(b)(1) ........................................................................31
§ 1129(b)(1) and (2) ........................................................................30
§ 1129(b)(2)(A) ........................................................................30, 31
§ 1129(b)(2)(A)(i)(II) ........................................................................31
§ 1129(b)(2)(A)(iii) ........................................................................31
§§ 1107 and 1108 ........................................................................12

28 U.S.C.
§§ 157 and 1334 ........................................................................11
§ 157(b) (2) (A), (M), (N) and (O) ........................................................................11
§§ 1408 and 1409 ........................................................................11

**Other Authorities**

Fed. R. Bankr. P. 6004(a)(c) ........................................................................24
Fed. R. Bankr. P. 6004(h) ........................................................................35
Fed. R. Bankr. P. 6006(d) ........................................................................35
Fed. R. Bankr. P. 6004(h) and 6006(d) ........................................................................10, 35
Fed. R. Bankr. P. 2002(a)(2), 2002(c)(1) and (d), 6004 (a), (b), (c), (e), (f) and (h),
    6006(a), (c) and (d), 9006, 9007, 9013 and 9014 ........................................................................11

Collier on Bankruptcy, ¶ 363.06 [6] (15th ed. rev. 2003) ("Collier") ........................................................................29, 30

Local Bankruptcy Rules 6004-1 and 9013-1 ........................................................................11

Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (collectively, the "Debtors"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases (collectively, the "Bankruptcy Cases"), hereby file this Motion ("Motion") seeking an order of the Court approving the Debtors' sale of substantially all of their assets to Radians Wareham Holding, Inc. ("Radians" or "Purchaser") in accordance with the terms of the Asset Purchase Agreement ("APA") attached as Exhibit "A" to the Declaration of Geoffrey Greulich filed on September 11, 2017 as Docket Number 6 (the "Original Greulich Declaration") or to the highest or otherwise best overbidder selected at the Auction (defined below).

By way of this Motion, the Debtors are also seeking the Court's approval of the Debtors' assumption and assignment to Purchaser (or the successful overbidder) of those unexpired leases and executory contracts that Purchaser (or the successful overbidder) wishes to assume (defined in the APA as the "Designated Contracts"). A schedule of all of the Debtors' known executory contracts and unexpired leases (the "Contracts and Leases Schedule"), along with the Debtors' belief as to all outstanding cure amounts owing by the Debtors to the other parties to those executory contracts and unexpired leases (the "Cure Amounts"), is attached as Exhibit "1" to the concurrently filed Declaration of Geoffrey Greulich filed on October 9, 2017 as Docket Number 94 (the "Current Greulich Declaration").

Purchaser has not yet identified for the Debtors which of the Debtors' executory contracts and unexpired leases that Purchaser desires to have assigned to it (i.e., the "Designated Contracts") if Purchaser is the winning bidder at the Auction (or if there is no Auction), and Purchaser is required to make that designation by one day prior to the sale closing (the "Closing"). If someone other than Purchaser is the successful bidder at the Auction, the Debtors will not know which of their executory contracts and unexpired leases the winning bidder will

desire to have assigned to it until the winning bidder at the Auction makes that determination which the winning bidder will also be required to make by one day prior to the Closing.

As a result, by way of this Motion, the Debtors are seeking the Court's authority to assume and assign to Purchaser (or to a successful overbidder) all of the Debtors' executory contracts and unexpired leases that Purchaser (or a successful overbidder) wants to have assigned to it and to fix the required Cure Amounts that would need to be paid to the other parties to the executory contracts and unexpired leases to enable compliance with the provisions of Section 365(b)(1)(A) of the Bankruptcy Code at the Cure Amounts set forth in the Contracts and Leases Schedule unless the other parties to the executory contracts and unexpired leases file a timely objection to this Motion and the Court determines that the required Cure Amount is different than the amount set forth in the Contracts and Leases Schedule.  By way of this Motion, the Debtors are also seeking a determination by the Court that none of the other parties to the executory contracts and unexpired leases have suffered any actual pecuniary loss resulting from any default by the Debtors so that no further payments beyond the proposed Cure Amounts are required to enable compliance with the provisions of Section 365(b)(1)(B) of the Bankruptcy Code.

The APA was the result of extensive pre-bankruptcy negotiations and documentation between the Debtors and Purchaser.  Under the APA, Purchaser has agreed to purchase the vast majority of the Debtors' assets (defined as the "Purchased Assets" (see Section 2.1(b) of the APA)) for the cash purchase price of $20 million or $15 million (see Section 2.2 of the APA) depending upon the occurrence of an event that is set forth in a letter agreement that is the subject of a motion to seal.  The Debtors' assets that are not Purchased Assets are defined as the "Retained Assets" in Section 2.1(c) of the APA.  It is possible that the event that would dictate whether Purchaser's opening bid at the Auction is $15 million or $20 million will not have been

3

determined by the time of the Auction.  All prospective overbidders are being kept apprised of this development.  Prospective overbidders are NOT required to have their overbid be subject to the same occurrence of event set forth in the letter agreement as Purchaser.  Prospective overbidders are welcome and encouraged not to make their bid subject to that occurrence of event.  If the event that would dictate whether Purchaser's opening bid at the Auction is $15 million or $20 million has not been determined by the time of the Auction, then unless Purchaser waives that contingency, the opening bid at the Auction by Purchaser will be $15 million and the minimum initial overbid will need to be at least $15,750,000.

In order to insure that the highest price possible is paid for the Purchased Assets, the Debtors' proposed sale to Purchaser is subject to overbid at an auction ("Auction") to be held on October 30, 2017.  The Debtors have retained the highly regarded investment bank of Craig-Hallum Capital Group LLC ("C-H") to market the Purchased Assets for overbid and to work with the Debtors to conduct the Auction in the event of one or more qualified overbidders.  C-H is extremely familiar with the Debtors, the Debtors' business operations and the Purchased Assets as C-H spent months prior to the Debtors' bankruptcy filings attempting to find buyers of the Debtors' business and/or lenders to the Debtors as set forth in the Current Greulich Declaration.  C-H has continued to market the Debtors' business/assets for overbid post-petition and will continue to do so through the Auction.

At a continued hearing held on September 25, 2017, the Court granted the Debtors' emergency motion to approve their proposed bidding procedures by order entered on September 28, 2017 as Docket Number 71 (the "Bidding Procedures Order").  The Bidding Procedures Order was approved by the Debtors, Purchaser, and the Official Committee of Unsecured Creditors and Official Committee of Equity Holders that were appointed in these cases.  The Bidding Procedures Order explains to prospective overbidders how a prospective overbidder

becomes qualified to participate in the Auction and how the Auction would proceed in the event that there is one or more qualified overbidders.  In addition, C-H has established an extensive data room for prospective overbidders to obtain diligence information, and the Debtors' senior management has made themselves available to meet with prospective overbidders.  To assist in the overbid process, the Debtors' counsel prepared an asset purchase agreement template for prospective overbidders to use if they want, and has delivered that template to C-H to distribute to prospective overbidders.

The location of the Auction will be determined after the number of qualified overbidders becomes known.  The Debtors intend to seek the Court's approval of the sale of the Purchased Assets to Purchaser or a successful overbidder immediately following the completion of the Auction.  If there are no qualified overbidders, the Debtors will proceed to request the Court to approve the Debtors' sale of the Purchased Assets and the Debtors' assumption and assignment of the Designated Contracts to Purchaser at the hearing to be held on October 30, 2017.  If Purchaser is the winning bidder at the Auction (or if there are no qualified overbidders), Purchaser is required to close its purchase of the Purchased Assets within five days following the date upon which all of the conditions set forth in Article IX and Article X of the APA have been satisfied, including entry of the sale order by the Court.  If a qualified overbidder is the winning bidder at the Auction, the winning bidder is required to close its purchase of the Purchased Assets within fourteen days following the entry of the sale order by the Court.  A proposed draft of the sale order (which has been approved by Purchaser) is attached hereto as Exhibit "A" (the "Sale Order").

Given the Debtors' lack of liquidity and inability to access a sufficient amount of new funding to pay off Purchaser (who is also the Debtors' current senior secured creditor having acquired the Debtors' bank debt before the bankruptcy filings and provided post-petition

financing), the Debtors have concluded that consummating a sale of the Purchased Assets for the most money possible is in the best interests of the Debtors' creditors (who are expected to be paid in full) and the Debtors' shareholders.

The Debtors urge all parties in interest and prospective overbidders to read the entire APA and all of its exhibits for a more complete description of the details of the proposed sale transaction to Purchaser, and the Debtors urge all parties in interest and prospective overbidders to read the Bidding Procedures Order to understand the details of the overbid process.  As indicated above, the Debtors' business and their assets have been marketed for sale for a relatively extended period of time by C-H, and a number of interested parties have been conducting due diligence.  The Debtors are confident that their assets will sell for the most money possible under the circumstances.  Other than being the Debtors' senior secured creditor from having purchased pre-petition the Debtors' senior secured debt from the Debtors' pre-petition lender and from having provided post-petition financing to the Debtors, Purchaser is an independent third-party buyer with no connection to the Debtors or to any insiders or affiliates of the Debtors.[1]  Purchaser has offered the highest price to date for the Purchased Assets, and the Debtors' proposed sale of the Purchased Assets to Purchaser is subject to overbid.  The Debtors do not believe that any additional time is needed for the overbid process to insure that the highest price possible is paid for the Debtors' assets, and given the vulnerability of the Debtors' business from continuing to operate in chapter 11 for an extended period of time and the fact that if the Debtors were to continue in chapter 11 well beyond the Auction date the Debtors would need additional financing which is both not currently available and would serve to reduce the ultimate recovery for the Debtors' shareholders, the Debtors believe that it is

---

[1] Purchaser is a competitor of the Debtors.

absolutely imperative that the Debtors consummate a sale of the Purchased Assets in the timeline provided in the Bidding Procedures Order.

Accordingly, for all of these reasons and the others set forth below in the annexed Memorandum of Points and Authorities and the Current Greulich Declaration, the Debtors respectfully request that the Court grant this Motion without delay to allow the Debtors to consummate their sale of the Purchased Assets to Purchaser (or to a successful overbidder) at the hearing on October 30, 2017, and immediately thereafter enter the Debtors' proposed Sale Order (subject to any changes agreed to by the Debtors and a successful overbidder in the event that someone other than Purchaser is the successful bidder at the Auction). Prior to the hearing on this Motion but after the deadline for prospective overbidders to become qualified overbidders, the Debtors will file a declaration of the principal of C-H (Steven Rickman) handling this transaction providing the Court with a status update of the sale and overbid process.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Sale Order and, among other things:

1.      find that notice of this Motion was proper, timely, adequate, appropriate and sufficient and that no other or further notice of this Motion, the hearing on this Motion, or the assumption and assignment of the Designated Contracts is or shall be required;

2.      find good, sufficient, and sound business purposes and justification and compelling circumstances for the Debtors' sale of the Purchased Assets and assumption and assignment of the Designated Contracts to Purchaser (or to a successful overbidder) prior to, and outside of, a plan of reorganization;

3.      find that the APA (or the asset purchase agreement with the successful overbidder)[2] was negotiated, proposed and entered into without collusion, in good faith, and from arm's-length bargaining positions and that Purchaser (or a successful overbidder) is acting as a good faith purchaser and is, accordingly, entitled to the protections set forth in section 363(m) of the Bankruptcy Code;

4.      find the consideration provided by Purchaser (or a successful overbidder) for the Purchased Assets: (i) to be fair and reasonable, (ii) to be the highest or otherwise best offer for the Purchased Assets that was received by the Debtors in accordance with the Bidding Procedures Order, (iii) provides a greater recovery for the Debtors' creditors and shareholders than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the circumstances of these cases, and find that prospective overbidders were provided an adequate opportunity to participate in the Auction and to submit a higher or otherwise better bid;

5.      find that one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied for selling the Purchased Assets free and clear of all "Encumbrances" (as defined in the Sale Order);

6.      find that approval of the APA and the consummation of the Debtors' sale of the Purchased Assets and the Debtors' assumption and assignment of the Designated Contracts to Purchaser (or to a successful overbidder) are in the best interests of the Debtors' estates;

7.      authorize the Debtors to sell the Purchased Assets to Purchaser (or to a successful overbidder) free and clear of all Encumbrances with all liens existing against the Purchased Assets at the time of the Closing to attach to the net sale proceeds in the same order of priority,

---

[2] References herein to "APA" shall in each case include the successful overbidder's form of asset purchase agreement which shall be submitted to the Court for approval.

and with the same validity, force and effect, as such liens had against the Purchased Assets immediately before the Closing, subject to any rights, claims and defenses of the Debtors and their bankruptcy estates;

8.    determine that (i) with the payment of the Cure Amounts (defined below), the Debtors and Purchaser (or a successful overbidder), as applicable, have cured, or have provided adequate assurance of cure, of any default existing or occurring prior to the Closing under any of the Designated Contracts, and Purchaser (or a successful overbidder) has provided adequate assurance of its future performance of and under the Designated Contracts, (ii) the provisions of Section 365(b)(1)(A) of the Bankruptcy Code at the Cure Amounts set forth in the Contracts and Leases Schedule (defined below) have been satisfied unless the other parties to the executory contracts and unexpired leases file a timely objection to this Motion and the Court determines that the required Cure Amount is different than the amount set forth in the Contracts and Leases Schedule, and (iii) none of the other parties to the executory contracts and unexpired leases have suffered any  actual pecuniary loss resulting from any default by the Debtors so that no further payments beyond the proposed Cure Amounts are required to enable compliance with the provisions of Section 365(b)(1)(B) of the Bankruptcy Code.

9.    determine that the Debtors' assumption and assignment to Purchaser, and Purchaser's assumption on the terms set forth in the APA, of the Designated Contracts is approved, and the requirements for assumption and assignment are deemed satisfied and that the Debtors are authorized in accordance with 11 U.S.C. §§ 105(a) and 365;

10.    approve (effective as of the Closing Date) the Debtors' rejection of all of the Debtors' remaining unexpired leases and executory contracts which are not assumed and assigned to Purchaser (or a successful overbidder);

11.    in the event Radians is not the winning bidder at the Auction, authorize the Debtors to repay in full all of their pre-petition and post-petition obligations to Radians from the proceeds from the sale to the successful overbidder upon the closing of that sale;

12.    waive the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

13.    grant such other and further relief as the Court deems just and proper under the circumstances of these cases.

Dated: October 9, 2017                    IRONCLAD PERFORAMNCE WEAR
                                          CORPORATION, *et al.*

                                          By:    */s/ Ron Bender*
                                                 RON BENDER
                                                 MONICA Y. KIM
                                                 KRIKOR J. MESHEFEJIAN
                                                 LEVENE, NEALE, BENDER,
                                                 YOO & BRILL L.L.P.
                                                 Proposed Attorneys for Debtors and
                                                 Debtors in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtors' bankruptcy estates and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b) (2) (A), (M), (N) and (O).  Venue of the Bankruptcy Cases is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Motion are (i) Sections 105(a) and 363(b), (f), (k), (l) and (m), 365 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (ii) Rules 2002(a)(2), 2002(c)(1) and (d), 6004 (a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006, 9007, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure, and (iii) Local Bankruptcy Rules 6004-1 and 9013-1.

### II.

### STATEMENT OF FACTS

**A.    Brief Description Of The Debtors And Their Businesses.**

On September 8, 2017 ("<u>Petition Date</u>"), Ironclad Performance Wear Corporation, a California corporation ("<u>Ironclad California</u>"), and its parent corporation Ironclad Performance Wear Corporation, a Nevada corporation ("<u>Ironclad Nevada</u>"), each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, Ironclad California and Ironclad Nevada (collectively, the "<u>Debtors</u>" or "<u>Ironclad</u>") have operated their businesses and managed their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  With the Court's approval, the Debtors two chapter 11 cases are being jointly administered.  Other than owning all of the shares in Ironclad California, Ironclad Nevada has no business.  All operations of the Debtors effectively function through Ironclad California.

The Debtors are a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder.  The Debtors' business is headquartered in Farmers Branch, Texas.  Ironclad Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW".  As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.  As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees who work overseas.

Ironclad was founded in 1998 by Ed Jaeger.  Mr. Jaeger was inspired to build gloves that offered protection and performance without sacrificing one for the other.  From the beginning, Ironclad built gloves using materials that offered excellent fit to make them an extension of the hand and to make jobs easier for the "industrial athlete".  By 2006, Ironclad offered 35 different task-specific glove types for people wearing gloves as part of their daily jobs.

In 2008, the Debtors launched the KONG (King of Oil 'N' Gas) line to address the high number of hand injuries in the O&G field.  By 2010, the KONG line was comprised of 46 different gloves.  Additionally, Ironclad expanded its presence in the retail and non-professional markets with the launch of the EXO brand in June 2015.  EXO offers lower cost gloves for automotive, DIY, and outdoor sporting applications.  Ironclad offers 30 different EXO glove types.

Ironclad's task-specific technical glove products are specially designed for individual user groups.  Ironclad currently offers over 160 distinct types of gloves for a variety of markets, including industrial, construction, DIY, carpentry, machining, package handling, plumbing, welding, roofing, O&G, mechanics, hunting, and gardening.  Products come in a multitude of

colors and cater to the specific demands and requirements of the users based on ease of motion, grip, water and chemical resistance, visibility, and protection from abrasions, cuts, flames, impacts, temperature, and vibration.  Since inception, Ironclad has employed an internal research and development ("R&D") department responsible for identifying and creating new products and applications, and improving and enhancing existing products.  Ironclad is continually evaluating new base materials for gloves, and grip is another key area of focus for R&D.  Ironclad often partners with industry-leading organizations to develop new products.  Ironclad has 13 U.S. patents issued and 11 foreign patents, as well as five pending U.S. patent applications and several pending foreign patent applications.  Ironclad also uses trademarks to strengthen and protect its recognizable brand names.   Ironclad owns 52 registered U.S. trademarks, 39 registered international trademarks, and 13 and 43 trademarks pending in the U.S. and internationally, respectively.

Ironclad currently sells its product through approximately 10,000 outlets for professional tradesmen as well as "Big Box", hardware, auto parts, and sporting goods retailers.  The sales force is organized by 3 business segments: Industrial, Retail, and International.  Glove products are currently manufactured by multiple suppliers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia.

**B.**    **Events Leading To The Filing Of The Debtors' Bankruptcies And The Debtors' Chapter 11 Goals.**

Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations have been insufficient to support their current business operations as well as their continued growth.  There have been many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or ineffective expansion and distribution of all of their product lines and development of new

customers, and higher than anticipated production, manufacturing and warehousing costs. In addition, it was discovered in early 2017 that under prior management, the Debtors had failed to provide materially complete and correct financial statements as required under their Loan Documents (defined below) to their primary secured lender for the fiscal years ended December 31, 2015 and 2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017. As a result of this discovery, the Debtors' then chief executive officer and other officers were terminated, and L. Geoffrey Greulich assumed the position of the Debtors' new chief executive officer effective July 6, 2017. Prior to assuming this position, Mr. Greulich had no prior connections or relationship with the Debtors as an insider, equity holder or otherwise. As a Senior Advisor, Operations at Corridor Capital, LLC where he leads operations through portfolio engagement as well as conducting due diligence, Mr. Greulich was highly qualified to serve as the Debtors' new chief executive officer. Persons or parties interested in obtaining specific historical financial history of the Debtors should review the public filings made by the Debtors with the Securities and Exchange Commission.

The Debtors filed their bankruptcy cases to consummate a sale of substantially all of their assets (excluding cash and causes of action) for the most money possible. Just prior to their bankruptcy filings, the Debtors entered into an asset purchase agreement ("APA") with the Debtors' current secured creditor, Radians Wareham Holdings, Inc. ("Radians" or "Purchaser") or its affiliate/designee, for a cash purchase price of $20 million or $15 million, subject to an overbid process. Purchaser will be paying a cash purchase price of either $15 million or $20 million depending upon the occurrence of an event which is sensitive and the letter agreement describing such event is the subject of a motion to file under seal. It should be noted that the Debtors believe the total debt in these cases (both secured and unsecured combined along with post-petition administrative claims) is or will be in the range of approximately $8-$10 million,

14

which means that all creditors are expected to be paid in full with there being a substantial distribution to the shareholders of the parent company, which is a publicly traded company.

The Debtors' business was actively marketed for sale for an extended period prior to the Debtors' bankruptcy filings by a qualified investment banker.  Prospective buyers had the ability to purchase assets or equity.  While a number of prospective buyers expressed and continued to express interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-bankruptcy marketing process because (i) the Debtors were out of funds, (ii) the Debtors could not continue to operate without both access to their own cash receipts as well as receipt of additional financing, and (iii) Purchaser (which is also the Debtors' secured creditor having purchased the Debtors' pre-bankruptcy secured bank debt) had exercised its secured creditor rights and was sweeping all of the Debtors' cash (although by agreement certain of the funds which were subject to the authorized sweep were re-advanced to the Debtors along with the additional advance of funds by Purchaser to enable the Debtors' continued business operations prior to the Petition Date) and was no longer willing to continue to forbear or advance additional needed financing to the Debtors absent a global resolution with the Debtors which was accomplished with the APA and the DIP financing agreement the Debtors entered into with Purchaser which is the subject of a separate emergency motion.

The purchase offer provided to the Debtors by Purchaser was determined by the Board to be the best offer the Debtors had received by the Petition Date, and Purchaser was ready to proceed with its purchase and lend the Debtors sufficient funds to enable the Debtors to operate their business through an Auction to take place in late October, 2017 with a sale closing to occur shortly thereafter.  Purchaser was also willing to permit the Debtors to proceed with a robust post-bankruptcy marketing and hopeful overbid process to insure that the highest and best price is paid for the Debtors' assets.  Given the breadth of the Debtors' pre-bankruptcy marketing

process and the fact that the Debtors' pre-bankruptcy investment banker (who is already very familiar with the various prospective overbidders) will be serving as the Debtors' post-bankruptcy investment banker and leading the overbid sale process, and the fact that the likely overbidders are already deep into the due diligence process, the Debtors are confident that providing prospective overbidders with approximately six weeks to decide whether to participate in the Auction is a sufficient amount of time for the Debtors to achieve the highest and best price for their assets. Also, and very importantly, the Debtors' financial needs expand significantly the last two months of the year so if the Debtors are required to continue to operate their business through the end of the year or significantly beyond October 31, 2017, the Debtors may need to borrow additional money which could result in substantially reducing the ultimate recovery for the Debtors' shareholders. It is also not clear at this time that any such additional financing would be available to the Debtors in any event. It is for this reason that it is very important that the Debtors' be authorized to implement their proposed sale timeline.

**C.    The Asset Sale Process.**

At a continued hearing held on September 25, 2017, the Court granted the Debtors' bid procedures motion by order entered on September 28, 2017 as Docket Number 71 (the "Bidding Procedures Order"). The Bidding Procedures Order was approved by the Debtors, Purchaser, and the Official Committee of Unsecured Creditors and Official Committee of Equity Holders that were appointed in these cases. The Bidding Procedures Order explains to prospective overbidders how a prospective overbidder becomes qualified to participate in the Auction and how the Auction would proceed in the event that there is one or more qualified overbidders. In addition, C-H has established an extensive data room for prospective overbidders to obtain diligence information, and the Debtors' senior management has made themselves available to meet with prospective overbidders. To assist in the overbid process, the Debtors' counsel

prepared an asset purchase agreement template for prospective overbidders to use if they want, and has delivered that template to C-H to distribute to prospective overbidders.

The location of the Auction will be determined after the number of qualified overbidders becomes known.  The Debtors intend to seek the Court's approval of the sale of the Purchased Assets to Purchaser or a successful overbidder immediately following the completion of the Auction.  If there are no qualified overbidders, the Debtors will proceed to request the Court to approve the Debtors' sale of the Purchased Assets and the Debtors' assumption and assignment of the Designated Contracts to Purchaser at the hearing to be held on October 30, 2017.  If Purchaser is the winning bidder at the Auction (or if there are no qualified overbidders), Purchaser is required to close its purchase of the Purchased Assets within five days following the date upon which all of the conditions set forth in Article IX and Article X of the APA have been satisfied, including entry of the Sale Order by the Court.  If a qualified overbidder is the winning bidder at the Auction, the winning bidder is required to close its purchase of the Purchased Assets within fourteen days following the entry of the sale order by the Court.  A proposed draft of the sale order (which has been approved by Purchaser) is attached hereto as Exhibit "A" (the "Sale Order").

**D.    The APA.**

The APA was the result of extensive pre-bankruptcy negotiations and documentation between the Debtors and Purchaser.  Under the APA, Purchaser has agreed to purchase the vast majority of the Debtors' assets (defined as the "Purchased Assets" (see Section 2.1(b) of the APA)) for the cash purchase price of $20 million or $15 million (see Section 2.2 of the APA) depending upon the occurrence of an event that is described in a letter agreement that is the subject of a motion to file under seal.  The Debtors' assets that are not being purchased by Purchaser are defined as the "Retained Assets" in Section 2.1(c) of the APA.  The liabilities to be

assumed by Purchaser (the "Assumed Liabilities") are described in Section 2.4(a) of the APA.

The Closing if Purchaser is the winning bidder at the Auction or if there is no Auction is

scheduled to take place within five business days following the entry of the Sale Order (see

Section 3.1 of the APA). Purchaser has provided a $1 million deposit which is being held in a

trust account by the Debtors' counsel (see Section 2.2 of the APA). If Purchaser is the winning

bidder at the Auction (or if there is no Auction), at the Closing Purchaser will pay its cash

purchase (of either $15 million or $20 million if there is no Auction or whatever the winning bid

is if there is an Auction) less the $1 million deposit less the outstanding amount of the secured

debt owed to Purchaser at the time of the Closing (see Section 2.2 of the APA). At the time of

the Debtors' bankruptcy filings, Purchaser's outstanding secured debt was in the amount of

approximately $3.5 million. The Debtors have already borrowed a total of $1.1 million post-

petition from Purchaser, and the Debtors expect to borrow an additional approximately $400,000

post-petition from Purchaser. This would mean that Purchaser would be owed approximately $5

million by the time of the Closing on account of Purchaser's secured debt. Purchaser agreed to

lend the Debtors a total of up to $2 million post-petition. In the event that Purchaser is not the

winning bidder, the Debtors are obligated to repay their secured debt to Purchaser in full from

the proceeds of the sale to the successful overbidder upon closing of the sale. Pursuant to

Section 7.1 of the APA, Purchaser is required to identify one business day prior to the "Qualified

Bid Determination Deadline" (which will be October 24, 2017) a list of all of the Debtors'

employees who will be offered employment by Purchaser. All of the Debtors' employees who

are offered and accept employment with Purchaser are defined as the "Transferred Employees".

Pursuant to Section 7.1 of the APA, Purchaser (if it is the winning bidder at the Auction or if

there is no Auction) has agreed to make a severance payment to each of the Debtors' employees

who are not offered employment by Purchaser, other than the Debtors' officers and any

employee subject to an employee retention agreement, at comparable terms to their then employment with the Debtors, with each such severance payment to be consistent with the most generous current severance policy of Purchaser and/or any of its Affiliates for similarly situated employees.  Purchaser will not owe any severance payment to any of the Debtors' employees who are offered employment by Purchaser at comparable terms to their then employment with the Debtors but who do not accept their offer of employment.  As indicated in Section 2.1(b)(vi) of the APA, Purchaser will have the right to designate which of the Debtors' executory contracts and unexpired leases that Purchaser wishes to assume ("Designated Contracts").  Pursuant to Section 2.4(a)(ii) of the APA, the payment of all Cure Amounts will be the responsibility of Purchaser.  Purchaser has not yet provided the Debtors with a preliminary list of the Designated Contracts.  Purchaser is required to make its decision at least one business day prior to the Closing.  This issue is discussed more below.

**E.      The Final DIP and Cash Collateral Order.**

On October 6, 2017, the Court entered the *Final Order: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 And 364, And (B) Utilize Cash Collateral Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; And (III) Granting Related Relief* (the "DIP Order"). Nothing in this Motion or any order thereon shall be construed to impair or limit these rights granted to the Official Committee of Equity Holders and the Official Committee of Unsecured Creditors in the DIP Order.

**III.**

**DISCUSSION AND AUTHORITIES**

**A.      The Bankruptcy Court Should Authorize the Debtors to Sell the Purchased Assets to Purchaser (Or a Successful Overbidder) in Accordance with the Terms of the APA.**

19

Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some articulated business justification."  See, e.g., In re Martin (Myers v. Martin), 91 F.3d 389, 395 (3d Cir. 1996) citing In re Schipper (Fulton State Bank v. Schipper), 933 F.2d 513, 515 (7th Cir. 1991); Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision).

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale.  In re Huntington, Ltd., 654 F.2d 578 (9th Cir. 1981); In re Walter, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988).  The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing.  In re Qintex Entertainment, Inc., 950 F.2d 1492 (9th Cir. 1991).

In determining whether a sale satisfies the business judgment standard, courts have held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith.  Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); see also, In re Walter, 83 B.R. at 19-20.

The Debtors submit that their proposed sale of the Purchased Assets to Purchaser (or a successful overbidder) clearly comports with each of these four criteria, is consistent with the

terms of the APA, and demonstrates that the Debtors' business judgment to proceed with the proposed sale of the Purchased Assets to Purchaser (or a successful overbidder) in accordance with the terms of the APA is sound.

### 1.    <u>Sound Business Purpose</u>.

There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy court may order such disposition under Section 363(b).  <u>In re Lionel Corp.</u>, 722 F.2d at 1070.  The Ninth Circuit Bankruptcy Appellate Panel in <u>Walter v. Sunwest Bank</u> (<u>In re Walter</u>), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).  In <u>Walter</u>, the Bankruptcy Appellate Panel, adopting the reasoning of the Fifth Circuit in <u>In re Continental Airlines, Inc.</u>, 780 F.2d 1223 (5th Cir. 1986) and the Second Circuit in <u>In re Lionel Corp.</u>, <u>supra</u>, articulated the standard to be applied under Section 363(b) as follows:

> Whether the proffered business justification is sufficient depends on the case.  As the Second Circuit held in <u>Lionel</u>, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the Debtor, creditors and equity holders, alike.  He might, for example, look to such relevant facts as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.  This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

<u>In Re Walter</u>, 83 B.R. at 19-20, *citing* <u>In re Continental Air Lines, Inc.</u>, 780 F.2d 1223, 1226 (5th Cir. 1986).

The facts pertaining to the Debtors' proposed sale of the Purchased Assets to Purchaser

(or a successful overbidder) clearly substantiate the Debtors' business decision that such contemplated sale serves the best interests of the Debtors' estates, their creditors and shareholders and merits the approval of the Court.

For all of the reasons explained above, the Debtors are not able to continue to sustain their business operations without the infusion of additional financing or working capital because the Debtors are in default to Purchaser and Purchaser has made clear that it is not willing to be the Debtors' long-term lender.   Prior to the Debtors' bankruptcy filings, the Debtors were not able to locate any replacement financing except under prohibitively expensive terms.  As a result, the only way for the Debtors to maximize the value of their assets/business is for the Debtors to consummate an expedited sale of their assets/business.  The Debtors engaged in a comprehensive pre-petition marketing process over a period of several months using a highly regarded investment bank in C-H.  The Debtors are confident that their proposed asset sale to Purchaser (subject to overbid) is the best option available to the Debtors to maximize the value of their assets and recovery for their creditors and shareholders.  Purchaser's stalking horse bid was the best pre-petition offer the Debtors received, and Purchaser has enabled the Debtors to engage in a comprehensive post-petition marketing process in an effort to locate prospective overbidders to participate in the Auction.  Given the fact that a number of prospective buyers had already commenced due diligence prior to the Debtors' bankruptcy filings, the Debtors are confident that the post-petition marketing/overbid process is sufficient to enable the Debtors to sell their business/assets for the most money possible under the circumstances.  The Debtors therefore submit that their proposed asset sale is justified by sound business purposes, satisfying the first requirement for a sale under Section 363(b) of the Bankruptcy Code.

      **2.**       <u>**Accurate and Reasonable Notice**</u>.

In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four

pieces of information must be presented to the creditors.  The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate."  In re Delaware & Hudson Railway Co., 124 B.R. 169, 180 (D. Del. 1991).  A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections.  In re Karpe, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988).  The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections.  Id.

In accordance with the Court's instructions, on September 15, 2017, the Debtors served by federal express a notice of the status and developments of these cases and the impending sale process on all known creditors and shareholders.  That notice was filed as Docket Number 44.  As explained above, the Bidding Procedures Order was entered by the Court and has been provided to all known prospective overbidders by C-H.  In connection with this Motion, the Debtors will serve a notice of the sale on all known creditors and shareholders.

The Debtors submit that the foregoing satisfies the requirements of the APA and of Bankruptcy Rules 6004(a) and (c), which provide as follows:

> "(a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k) ...
> (c) ... A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold.  The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession..."

Fed. R. Bankr. P. 6004(a)(c).

### 3.    Fair and Reasonable Price.

In order to be approved under Section 363(b) of the Bankruptcy Code, the purchase price must be fair and reasonable.  Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal

Indus., Inc.), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986).  Several courts have held that "fair

value" is given for property in a bankruptcy sale when at least 75% of the appraised value of

such property is paid.  See In re Karpe, 84 B.R. at 933; In re Abbotts Dairies of Pennsylvania,

Inc., 788 F.2d 143, 149 (3d Cir. 1986); Willemain v. Kivitz, 764 F.2d 1019 (4th Cir. 1985); In re

Snyder, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); In re The Seychelles, Partnership and Genius

Corp. v. Banyan Corp., 32 B.R. 708 (N.D. Tex. 1983).  However, the Debtors also realize that

"[their] main responsibility, and the primary concern of the bankruptcy court, is the

maximization of the value of the asset sold."  In re Integrated Resources, Inc., 135 B.R. 746, 750

(Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992).  "It is a well-established principle

of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to

such sales is to obtain the highest price or greatest overall benefit possible for the estate."  In re

Atlanta Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); see also In re Wilde

Horse Enterprises, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("In any sale of estate assets, the

ultimate purpose is to obtain the highest price for the property sold").

The pre-petition marketing and sale process undertaken by C-H and the Debtors was

designed to insure that the highest price possible was obtained for the Purchased Assets, and the

offer submitted by Purchaser which is serving as the stalking horse bid was the highest and best

pre-petition offer the Debtors received.  The post-petition overbid marketing process that the

Debtors are undertaking in accordance with the Bidding Procedures Order will insure that under

the circumstances the highest and best price is paid for the Purchased Assets and that purchase

price will necessarily will be equal to the current fair market value of the Purchased Assets.

### 4.    Good Faith.

When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is

required to make a finding with respect to the "good faith" of Purchaser.  In re Abbotts Dairies,

788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith. Id. at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction.  In re Wilde Horse Enterprises, 136 B.R. at 842.  With respect to the debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction." See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).  With respect to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders."  In re Abbotts Dairies, 788 F.2d at 147, In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978); In re Wilde Horse Enterprises, Inc., 136 B.R. at 842; In re Alpha Industries, Inc., 84 B.R. 703, 706 (Bankr. D. Mont. 1988).  In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings."  In re Apex Oil Co., 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), citing In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983). See also In re M Capital Corp., 290 B.R. 743 (B.A.P. 9th Circuit, 2003).

In In re Filtercorp, Inc., 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

> A good faith buyer "is one who buys 'in good faith' and 'for value.'" [citations omitted.]  [L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" [citations omitted.]

Filtercorp, 163 F.3d at 577.

The Ninth Circuit made clear in <u>Filtercorp</u> that this standard for determining good faith is applicable even when the buyer is an insider.

Neither Purchaser nor any of Purchaser's representatives or affiliates is an "insider" of the Debtors. The Debtors are not aware of any insider who is contemplating being a potential overbidder. The Debtors are not aware of any fraud, collusion or attempt to take unfair advantage of other bidders. Additionally, the APA was intensively negotiated at arm's length with all parties involved acting in good faith. Based on the foregoing, and a declaration to be submitted by Purchaser describing its good-faith conduct throughout the sale process, the Debtors submit that the Court should find that Purchaser (or a successful overbidder) constitutes a good faith purchaser entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

**B.**     **<u>Section 363(f) of the Bankruptcy Code Permits the Debtors' Sale of the Purchased Assets to Purchaser to Be Free and Clear of Any and All Liens (as Defined in the APA)</u>.**

Section 363(f) of the Bankruptcy Code provides, in relevant part, as follows:

> The trustee may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if—
>> (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; ...
>> (2) such entity consents;
>> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>> (4) Such interest is in bona fide dispute; or
>> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) of the Bankruptcy Code was drafted in the disjunctive. Thus, a debtor

need only meet the provisions of one of the five subsections of section 363(f) in order for a sale of property to be free and clear of all liens, claims and interests (defined collectively as "Encumbrances" in the Sale Order).  The Debtors submit that one or more of the tests of Bankruptcy Code section 363(f) are clearly satisfied with respect to the Debtors' proposed sale of the Purchased Assets to Purchaser free and clear of all Liens.

1.     **The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(2).**

Section 363(f)(2) of the Bankruptcy Code authorizes a sale to be free and clear of an interest if the interest holder consents to the sale.  However, the "consent" of an entity asserting an interest in the property sought to be sold, as referenced in section 363(f)(2) of the Bankruptcy Code, can be implied if such entity fails to make a timely objection to the sale after receiving notice of the sale.  In re Eliot, 94 B.R. 343, 345 (E.D. Pa. 1988).

Purchaser is the only creditor the Debtors are aware of that assert any liens against any of the Purchased Assets, and Purchaser has consented to the sale of the Purchased Assets to Purchaser (or to a successful overbidder) free and clear of its Liens.  If Purchaser is the winning bidder at the Auction (or if there is no Auction), Purchaser's Liens will be satisfied in full by Purchaser's inclusion of its outstanding secured debt as part of its purchase price paid at the Closing.  If a successful overbidder is the winning bidder at the Auction, then in connection with the Closing, the full outstanding secured debt of Purchaser will be paid in full at the Closing out of the sale proceeds.  In the event that there any other Lien holders, the Debtors request that the Bankruptcy Court approve the sale of the Purchased Assets to Purchaser (or to a successful overbidder) free and clear of all Liens of those parties who do not file a timely objection to the sale, by deeming all such parties to have consented to the sale pursuant to section 363(f)(2) of the Bankruptcy Code.

In addition to all of the foregoing, the Debtors submits that they have also satisfied at least one of the other possible conditions of section 363(f) for a free and clear sale to enable the Debtors to deliver the Purchased Assets to Purchaser (or to a successful overbidder) free and clear of all Liens.

### 2.    <u>The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(3).</u>

Section 363(f)(3) of the Bankruptcy Code authorizes a sale to be free and clear of an interest if such interest is a lien and the price at which the property to be sold is greater than the aggregative value of all lens against the property.  Here, since Purchaser is the only known secured creditor, and the purchase price to be paid by Purchaser (or a successful overbidder) is more than Radians is owed, the Debtors submit that the Court can approve the Debtors' proposed sale of the Purchased Assets free and clear of all Liens pursuant to the provisions of Section 363(f)(3) of the Bankruptcy Code.

### 3.    <u>The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(5).</u>

Section 363(f)(5) of the bankruptcy code permits a sale of property free and clear of liens and interests if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f)(5).

Pursuant to 11 U.S.C. §363(f)(5), a trustee may sell property free and clear of any interest if the holder of that interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f)(5); <u>P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia, Dep't of Medical Assistance Serv. (In re P.K.R. Convalescent Centers, Inc.)</u>, 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing sale of nursing home assets under section 363(f)(5) over objection of the Department of Medical Assistance Service where its

interest was reducible to a claim and subject to a hypothetical money satisfaction).

Section 363(f)(5) has generally been interpreted to mean that if, under applicable law, the holder of the lien or interest could be compelled to accept payment in exchange for its interest, the trustee (or debtor-in-possession) may take advantage of that right by replacing the holder's lien or interest with a payment or other adequate protection. Collier on Bankruptcy, ¶ 363.06 [6] (15th ed. rev. 2003) ("Collier").   Applicable nonbankruptcy law may recognize a monetary satisfaction when the lien holder is to be paid in full out of the proceeds of the sale or otherwise. Id.  Thus, for example, a sale free of a first mortgage might be approved when the proceeds are sufficient to pay in full the first mortgage and the second mortgagee has consented to the sale.

However, section 363(f)(5) does not require full payment to the lien or interest holder if the trustee can demonstrate the existence of another legal or equitable proceeding by which the holder may be compelled to accept less than full satisfaction of the secured debt.  In re Grand Slam U.S.A., Inc., 178 B.R. 460, 461-62 (E.D. Mich. 1995) (holding that the "money satisfaction" language in section 363(f)(5) does not require full payment to the lien holder); In re Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994) (construing "money satisfaction of such interest" to mean a payment constituting less than full payment of the underlying debt because any lien can always be discharged by full payment of the underlying debt pursuant to section 363(f)(3)); Scherer v. Federal National Mortgage Association (In re Terrace Chalet Apartments, Ltd.), 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993).

Courts have held that chapter 11 cramdown is a typical "legal proceeding" by which an entity may be compelled to accept less than full money satisfaction and which will permit the sale of creditor's collateral free and clear of interest under section 363(f)(5).  In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002)(holding that the liens or interests identified in the sale motion could be compelled to accept a money satisfaction in a

cram down plan of reorganization in a chapter 11 case); Scherer v. Federal National Mortgage Association (In re Terrace Chalet Apartments, LTD.), 159 B.R. at 829 (finding that section 1129(b)(2) cram down is such a provision); In re Perroncello, 170 B.R. 189 (Bankr. D. Mass. 1994); Collier ¶ 363.06[6][a]. Thus, the trustee can sell property free and clear of a creditor's lien it if demonstrates it can cram down the creditor's interest pursuant to § 1129(b)(2).

Likewise, the holder of a tax lien that would be subordinated under section 724 can be compelled to accept less than full payment. In re Grand Slam U.S.A., Inc., 178 B.R. at 461-62 (holding that § 724(b)(2) is applicable for purposes of § 363(f)(5) because it creates a mechanism by which lien creditors are compelled to receive less than full payment of their interest); In re Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994)(concluding that a trustee may sell property pursuant to section 363(f)(5) free of the county's tax lien lien); Collier, ¶ 363.06[6][a].

In addition to the legal arguments set forth above, the ability of a debtor to "cram-down" a secured creditor under 11 U.S.C. Sec. 1129(b)(1) and (2) also constitutes a "legal proceeding" pursuant to which a secured creditor could be compelled to accept a money satisfaction. See, In re Grand Slam, U.S.A. Inc., 178 B.R. 460, 462 (E.D. Mich. 1995); 11 U.S.C. Sec.1129(b)(2)(A).

Section 1129(b)(2)(A) allows cram-down of a secured creditor, provided that it receives "the indubitable equivalent" of its claim. A debtor can cram down a secured creditor if it demonstrates (1) the debtor is not unfairly discriminating against the secured creditor, 11 U.S.C. § 1129(b)(1); (2) it is acting in good faith, 11 U.S.C. § 1129(a)(3)-(b)(1); and (3) the secured creditor is receiving the actual value of its claim. 11 U.S.C. § 1129(b)(2)(A)(i)(II), 11 U.S.C. § 1129(b)(2)(A)(iii), see also In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir.1989) (holding that "indubitable equivalent" of a secured creditor's interest is the actual value of the claim).

In <u>In re Hunt Energy Co., Inc.</u>, 48 B.R. 472, 485 (Bankr. N.D. Ohio, 1985), the court found that a lien which attaches to the proceeds of a sale would necessarily be reduced by subsequent valuation at a hearing under section 506(a) to meet the "indubitable equivalence" requirements of section 1129(b)(2)(A).  Once section 1129(b)(2)(A) is satisfied, the lienholder would be compelled through the cram-down process to accept such money satisfaction as dictated by the cram-down provisions.  <u>Id</u>.

All of the above requirements for cram down are met in these cases.  The sale of the Purchased Assets to Purchaser (or to a successful overbidder) was negotiated and is being conducted in good faith.  While the Debtors do not believe that there are any secured creditors with valid liens against the Purchased Assets other than Purchaser, if there are any, they are being treated fairly and in accordance with their respective lien priorities, so there is no unfair discrimination present in the proposed sale.  Finally, any such secured creditors will receive the actual value of their secured claim as measured by section 506(a).

Based upon all of the foregoing, all creditors of the Debtors, including all secured creditors of the Debtors, could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interest.  The Debtors' proposed sale of the Purchased Assets to Purchaser (or to a successful overbidder) should therefore be free and clear of all Liens pursuant to section 363(f)(5) of the Bankruptcy Code.

**C.** **The Bankruptcy Court Should Authorize the Debtors to Assume and Assign to Purchaser (or to a Successful Overbidder) All of the Designated Contracts that Purchaser (or to a Successful Overbidder) Desires.**

Barring exceptions not herein relevant, sections 365(a) and 1107(a) authorizes a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the debtor."  A debtor in possession may assume or reject executory contracts

for the benefit of the estate.  In re Klein Sleep Products, Inc., 78 F.3d 18, 25 (2d. Cir. 1996); In re Central Fla. Metal Fabrication, Inc., 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996).  In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the estate to assume it.  In re Continental Country Club, Inc., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); see also In re Gucci, 193 B.R. at 415. The business judgment standard requires that the court follow the business judgment of the debtor unless that judgment is the product of bad faith, whim, or caprice.  In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), citing Lubrizol Enterprises v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with section 365(b)(1), and provides adequate assurance of future performance by the assignee.  Pursuant to section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease.  11 U.S.C. § 365(b)(1); see also In re Bowman, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995); In re AEG Acquisition Corp., 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50 (9th Cir. B.A.P. 1993).  Pursuant to section 365(f)(1) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease pursuant to section 365(f)(2) of the Bankruptcy Code notwithstanding any provision in such executory contract or unexpired lease that prohibits, restricts or conditions the assignment of such executory contract or unexpired lease.

The assumption and assignment of executory contracts furthers the goals of Chapter 11 of

promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred.  In re Embers 86th Street. Inc., 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

By this Motion, the Debtors are seeking to assume and assign to Purchaser (or to a successful overbidder) all of the Debtors' executory contracts and unexpired leases that Purchaser (or a successful overbidder) desires.  A schedule of all of the Debtors' known executory contracts and unexpired leases (the "Contracts and Leases Schedule"), along with the Debtors' belief as to all outstanding cure amounts owing by the Debtors to the other parties to those executory contracts and unexpired leases (the "Cure Amounts"), is attached as Exhibit "1" to the Current Greulich Declaration.  Purchaser has not yet identified for the Debtors which of the Debtors' executory contracts and unexpired leases that Purchaser desires to have assigned to it (i.e., the "Designated Contracts") if Purchaser is the winning bidder at the Auction (or if there is no Auction), and Purchaser is required to make that designation by one day prior to the Closing.  If someone other than Purchaser is the successful bidder at the Auction, the Debtors will not know which of their executory contracts and unexpired leases the winning bidder will desire to have assigned to it until the winning bidder at the Auction makes that determination which the winning bidder will also be required to make by one day prior to the Closing.

As a result of the foregoing, by way of this Motion, the Debtors are seeking the Court's authority to assume and assign to Purchaser (or to a successful overbidder) all of the Debtors' executory contracts and unexpired leases that Purchaser (or a successful overbidder) wants to have assigned to it and to fix the required Cure Amounts that would need to be paid to the other parties to the executory contracts and unexpired leases to enable compliance with the provisions of Section 365(b)(1)(A) of the Bankruptcy Code at the Cure Amounts set forth in the Contracts

and Leases Schedule unless the other parties to the executory contracts and unexpired leases file

a timely objection to this Motion and the Court determines that the required Cure Amount is

different than the amount set forth in the Contracts and Leases Schedule.  The Debtors submit

that none of the other parties to the executory contracts and unexpired leases have suffered any

actual pecuniary loss resulting from any default by the Debtors so that no further payments

beyond the proposed Cure Amounts are required to enable compliance with the provisions of

Section 365(b)(1)(B) of the Bankruptcy Code.  The Debtors therefore submit that any party that

fails to file a timely objection to this Motion should be deemed to have consented to the Debtors'

proposed Cure Amounts and pecuniary loss amounts and be forever barred from challenging the

Debtors' proposed Cure Amounts and pecuniary loss amounts.

Purchaser (or any successful overbidder) will be required to file with the Court not later

than one day prior to the Closing which of the Debtors' executory contracts and unexpired leases

Purchaser (or any successful overbidder) has decided not to take an assignment of, in which case

those executory contracts and unexpired leases will not be assumed and assigned to Purchaser (or

a successful overbidder) at the Closing and, instead, will be deemed rejected effective as of the

Closing.

**E.**     **The Debtors Request the Court to Waive the Fourteen-Day Waiting Periods Set**
         **Forth in Bankruptcy Rules 6004(h) and 6006(d).**

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use,

sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court

order, unless the Court orders otherwise.  Bankruptcy Rule 6006(d) has a similar provision with

respect to an order approving of a debtor's assumption and assignment of unexpired leases and

executory contracts.

For all of the reasons set forth above, the Debtors believe that selling the Purchased Assets to Purchaser (or a successful overbidder) in accordance with the timeline provided in the APA and the Bidding Procedures Order is in the best interests of the Debtors' estates, their creditors and shareholders.  Closing the sale of the Purchased Assets as soon as possible will minimize the need for the Debtors to have to borrow additional funds from Purchaser for their business operations which would dilute the recovery for the Debtors' shareholders.  In order to facilitate the most expeditious Closing possible, the Debtors request that the Sale Order be effective immediately upon entry by providing that the fourteen-day waiting periods of Bankruptcy Rule 6004(h) and 6006(d) are waived.

## IV.

## CONCLUSION

Based upon all of the foregoing, the Debtors respectfully requests that the Court enter the Sale Order and grant all of the other relief requested above in this Motion.

Dated:  October 9, 2017

IRONCLAD PERFORAMNCE WEAR CORPORATION, *et al.*

By:___ */s/ Ron Bender*_____
RON BENDER
MONICA Y. KIM
KRIKOR J. MESHEFEJIAN
LEVENE, NEALE, BENDER,
YOO & BRILL L.L.P.
Proposed Attorneys for Debtors and Debtors in Possession

# EXHIBIT "A"

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 211414)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>      Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>      Debtor and Debtor in Possession.<br>_____<br><br>☒  Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐ Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (2) APPROVING THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING THE DEBTORS' REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF**<br><br>DATE:     October 30, 2017<br>TIME:     10:00 a.m.<br>PLACE:   Courtroom "303"<br>            21041 Burbank Blvd.<br>            Woodland Hills, CA |

A hearing was held on October 30, 2017 (the "Sale Hearing"), for the Court to consider approval of the motion (the "Motion") filed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned Chapter 11 bankruptcy cases (collectively, the "Bankruptcy Cases"), seeking an order of the Court ("Sale Order") approving the Debtors' sale of substantially all of their assets to Radians Wareham Holding, Inc. ("Purchaser" or "Radians") in accordance with the terms of the APA ("APA") attached as Exhibit "A" to the Declaration of Geoffrey Greulich filed on September 11, 2017 as Docket Number 6 (the "Greulich Declaration") or to the highest or otherwise best overbidder selected at the Auction (defined below) free and clear of all Encumbrances (defined below). By way of the Motion, the Debtors also requested the Court's approval of the Debtors' assumption and assignment to Purchaser (or the successful overbidder) of those unexpired leases and executory contracts that Purchaser (or the successful overbidder) wishes to have assigned to it (defined in the APA as the "Designated Contracts") and to reject the balance of such unexpired leases and executory contracts effective as of the sale closing (the "Closing"). All capitalized terms which are not defined in this Sale Order but which are defined in the APA or the Motion shall be deemed to have the same definitions as set forth in the APA or the Motion. Appearances were made at the Sale Hearing as set forth on the record of the Court.

At a continued hearing held on September 25, 2017, the Court granted the Debtors' bid procedures motion by order entered on September 28, 2017 as Docket Number 71 (the "Bidding Procedures Order"). The Bidding Procedures Order was approved by the Debtors, Purchaser, the Official Committee of Unsecured Creditors (the "OCUC") and the Official Committee of Equity Holders (the "OCEH") that were appointed in these cases. The Bidding Procedures Order explained to prospective overbidders how a prospective overbidder could become qualified to

participate in the Auction and how the Auction would proceed in the event that there was one or more qualified overbidders.

In accordance with the Bidding Procedures Order, the Debtors conducted an Auction on October 30, 2017. _____ was the winning bidder at the Auction with a purchase price of $_____. The Debtors, in consultation with the OCUC  and the OCEH, determined that the $_____ bid submitted by _____ at the Auction (the "Winning Bid") was the highest and best bid submitted at the Action and should be approved by the Court.

The Court, having considered the Motion and all pleadings filed by the Debtors in support of the Motion and all pleadings filed in response to the Motion; the statements, arguments and representations of the parties made at the Sale Hearing; and the entire record of these cases; and the Court, having determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and their shareholders, and that the legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein; and all objections to the Motion, if any, having been withdrawn or overruled; and after due deliberation and sufficient good cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**[1]

A.    Jurisdiction and Venue.  The Bankruptcy Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtors' bankruptcy estates and is accordingly a core proceeding pursuant to 28 U.S.C. §

---

[1] The findings of fact and conclusions of law set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

157(b) (2) (A), (M), (N) and (O).   Venue of these cases is proper in this District and in the

Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    <u>Statutory Predicates</u>.   The statutory predicates for the relief requested in the

Motion are (i) Sections 105(a) and 363(b), (f), (k), (l) and (m), 365 of Title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), (ii) Rules 2002(a)(2), 2002(c)(1) and (d), 6004 (a), (b),

(c), (e), (f) and (h), 6006(a), (c) and (d), 9006, 9007, 9013 and 9014 of the Federal Rules of

Bankruptcy Procedure, and (iii) Local Bankruptcy Local Rules 6004-1 and 9013-1.

C.    <u>Notice</u>. The Debtors have provided good and sufficient notice with respect to the

following: (i) the Motion and the relief sought therein, including the entry of this Sale Order and the

transfer and sale of the Purchased Assets, (ii) the Auction and the Sale Hearing, (iii) the selection of

the Winning Bid, and (iv) the assumption and assignment of the Designated Contracts and proposed

cure amounts owing under such Designated Contracts ("<u>Cure Amounts</u>"); and no further notice of

the Motion, the relief requested therein or the Sale Hearing is required.  A reasonable opportunity to

object and to be heard regarding the relief provided herein has been afforded to parties-in-interest.

D.    <u>Compliance with the Auction Procedures</u>. The Auction process implemented by the

Debtors was conducted in accordance with the Bidding Procedures Order and were fair, proper, and

reasonably calculated to result in the best value received for the Purchased Assets. The Auction

process afforded a full, fair, and reasonable opportunity for any party-in-interest to become a

qualified bidder and to participate in the Auction.  As demonstrated by (i) the testimony and/or other

evidence proffered and adduced at the Sale Hearing and (ii) the representations of counsel made on

the record at the Sale Hearing, the Debtors have conducted the Auction process in good faith, without

collusion and in accordance with the Bidding Procedures Order.

E.    <u>Highest or Otherwise Best Bid</u>.  The Winning Bid constitutes the highest or otherwise

best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estates than

would be provided by any other available alternative. The Debtors' determination that the Winning Bid constitutes the highest or otherwise best offer for the Purchased Assets constitutes a reasonable, valid and sound exercise of the Debtors' business judgment, and is in the best interests of the Debtors, their estates, their creditors and their shareholders.   The consideration to be paid by Purchaser for the Purchased Assets is fair and reasonable, is the highest or otherwise best offer therefor, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws of the United States.

F.    Arm's Length Transaction.  The APA and other documents and instruments (the "Transaction Documents") related to and connected with this transaction (the "Transaction") and the consummation thereof were negotiated and entered into by the Debtors and Purchaser without collusion, in good faith and through an arm's length bargaining process.  Neither Purchaser nor any of its affiliates or representatives is an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  None of the Debtors, Purchaser, or their respective representatives engaged in any conduct that would cause or permit the APA, any of the other Transaction Documents or the Transaction to be avoided under section 363(n) of the Bankruptcy Code, or have acted in any improper or collusive manner.  The terms and conditions of the APA and the other Transaction Documents, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and are not avoidable and shall not be avoided, and no damages may be assessed against Purchaser or any other party, as set forth in section 363(n) of the Bankruptcy Code.

G.    Good Faith Purchaser.  Purchaser has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) Purchaser, in proposing and proceeding with the Transaction in accordance with the APA, recognized that the Debtors were free to deal with other interested parties; (ii) Purchaser agreed to provisions in the APA that would enable the Debtors

to accept a higher and better offer; (iii) Purchaser complied with all of the provisions in the Auction and the Bidding Procedures Order applicable to Purchaser; (iv) all payments to be made by Purchaser and other agreements entered into or to be entered into between Purchaser and the Debtors in connection with the Transaction have been disclosed; (v) the negotiation and execution of the APA and related Transaction Documents were conducted in good faith and constituted an arm's length transaction; and (vi) the APA was not entered into, and the Transaction being consummated pursuant to and in accordance with the APA is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors.  Purchaser is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction or Purchaser's status as a "good faith" purchaser.

H.    Justification for Relief. Good and sufficient reasons for approval of the APA and the other Transaction Documents and the Transaction have been articulated to the Bankruptcy Court in the Motion and at the Sale Hearing, and the relief requested in the Motion and set forth in this Sale Order is in the best interests of the Debtors, their estates, their creditors and their shareholders.  The Debtors have demonstrated through the Motion and other evidence submitted at the Sale Hearing both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the transfer and sale of the Purchased Assets as provided in the APA outside the ordinary course of business, and before, and outside of, a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, their creditors and their shareholders.

I.    Free and Clear. In accordance with sections 363(b) and 363(f) of the Bankruptcy Code, the consummation of the Transaction pursuant to the Transaction Documents will be a legal,

valid, and effective transfer and sale of the Purchased Assets and will vest in Purchaser, through the

consummation of the Transaction, all of the Debtors' right, title, and interest in and to the Purchased

Assets, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature

whatsoever (collectively, "Encumbrances").  The Debtors have demonstrated that one or more of the

standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  All holders

of Encumbrances in the Purchased Assets are adequately protected by having their respective

Encumbrances attach to the net sale proceeds attributable to the Purchased Assets to the extent any

such Encumbrances existed as of the Petition Date and subject to the terms of such Encumbrances

with the same validity, force and effect, and in the same order of priority, which such Encumbrances

had against the Purchased Assets as of the Petition Date, subject to any rights, claims and defenses

the Debtors or their estates may possess with respect thereto.

J.      Prompt Consummation. The Debtors have demonstrated good and sufficient cause to

waive the stay requirement under Bankruptcy Rules 6004(h) and 6006(d).  Time is of the essence in

consummating the Transaction, and it is in the best interests of the Debtors and their estates to

consummate the Transaction within the timeline set forth in the Motion and the APA.

K.      Assumption of Executory Contracts and Unexpired Leases.  The Debtors have

demonstrated that it is an exercise of their sound business judgment to assume and assign the

Designated Contracts to Purchaser in connection with the consummation of the Transaction, and the

assumption and assignment of the Designated Contracts is in the best interests of the Debtors and

their estates.

L.      Cure/Adequate Assurance.  Purchaser has cured, or has provided adequate assurance

of cure upon Closing, of any default existing prior to the Closing under any of the Designated

Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts set forth in

the Contracts and Leases Schedule.  Purchaser has provided or will provide adequate assurance of

7

future performance of and under the Designated Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C). Pursuant to 11 U.S.C. § 365(f), the Designated Contracts to be assumed by the Debtors and assigned to Purchaser under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, Purchaser notwithstanding any provision in such Designated Contracts prohibiting their assignment or transfer. The Debtors have demonstrated that no other parties to any of the Designated Contracts has incurred any actual pecuniary loss resulting from a default prior to the Closing under any of the Designated Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B). Pursuant to 11 U.S.C. § 365(f), the Designated Contracts to be assumed by the Debtors and assigned to Purchaser at the Closing shall be assigned and transferred to, and remain in full force and effect for the benefit of, Purchaser notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

M.    Rejection of Executory Contracts and Unexpired Leases. The Debtors have demonstrated that it is an exercise of their sound business judgment to reject all of their executory contracts and unexpired leases which are not part of the Designated Contracts effective as of the Closing.

N.    Legal and Factual Bases. The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    The relief requested in the Motion is GRANTED and APPROVED in all respects to the extent provided herein.

2.    All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein and in the Bidding

Procedures Order, and all reservation of rights included in such objections, are overruled on the merits with prejudice.

3.       Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Transaction, including the transfer and sale of the Purchased Assets to Purchaser on the terms set forth in the APA, is approved in all respects, and the Debtors are authorized and directed to consummate the Transaction in accordance with the APA, including, without limitation, by executing all of the Transaction Documents and taking all actions necessary and appropriate to effectuate and consummate the Transaction (including the transfer and sale of the Purchased Assets) in consideration of the Purchase Price upon the terms set forth in the APA, including, without limitation, assuming and assigning to Purchaser the Designated Contracts.

4.       As of the Closing, (i) the Transaction set forth in the APA shall effect a legal, valid, enforceable and effective transfer and sale of the Purchased Assets to Purchaser free and clear of all Encumbrances, as further set forth in the APA and this Sale Order; and (ii) the APA, and the other Transaction Documents, and the Transaction, shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors, any successor thereto including a trustee or estate representative appointed in the Bankruptcy Cases, and all other persons and entities.

5.       Subject to the fulfillment of the terms and conditions of the APA, this Sale Order shall, as of the Closing, be considered and constitute for all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets and/or a bill of sale transferring all of the Debtors' rights, title and interest in and to the Purchased Assets to Purchaser.  Consistent with, but not in limitation of the foregoing, each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept all documents and instruments necessary and

appropriate to consummate the transactions contemplated by the APA and approved in this Sale Order.

6.      Any person or entity that is currently, or on the Closing Date may be, in possession of some or all of the Purchased Assets is hereby directed to surrender possession of such Purchased Assets either to (a) the Debtors before the Closing or (b) to Purchaser or its designee upon the Closing.

7.      The transfer of the Purchased Assets pursuant to the Transaction Documents is a legal, valid, and effective transfer and shall, in accordance with sections 105(a) and 363(f) of the Bankruptcy Code, and upon consummation of the Transaction, including, without limitation, payment of the Purchase Price to the Debtors, vest Purchaser with all right, title, and interest in the Purchased Assets, free and clear of all Encumbrances.

8.      Following the Closing, no holder of any Encumbrance against the Debtors or the Purchased Assets shall interfere with Purchaser's respective rights in, title to or use and enjoyment of the Purchased Assets.  All valid and perfected Encumbrances in the Purchased Assets shall attach to the net Purchase Price proceeds attributable to the Purchased Assets immediately upon receipt of such Purchase Price proceeds by the Debtors in the order of priority, and with the same validity, force and effect, which such Encumbrances had against such Purchased Assets as of the filing of the Bankruptcy Cases, subject to any rights, claims and defenses the Debtors and their estates may possess with respect thereto.

9.      Purchaser shall not be deemed, as a result of any action taken in connection with, or as a result of the Transaction (including the transfer and sale of the Purchased Assets), to: (i) be a successor, continuation or alter ego (or other such similarly situated party) to the Debtors or their estates by reason of any theory of law or equity, including, without limitation, any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability; or (ii) have, de facto or

otherwise, merged with or into the Debtors; or (iii) be a mere continuation, alter ego, or substantial

continuation of the Debtors.  Other than the Assumed Liabilities, Purchaser is not assuming any of the

Debtors' debts.

10.    This Sale Order (i) shall be effective as a determination that, on Closing, all

Encumbrances existing against the Purchased Assets before the Closing have been unconditionally

released, discharged and terminated, and that the transfers and conveyances described herein have

been effected, and (ii) shall be binding upon and shall govern the acts of all persons and entities.  If

any person or entity that has filed financing statements or other documents or agreements evidencing

any Encumbrances against the Purchased Assets shall not have delivered to the Debtors before the

Closing, in proper form for filing and executed by the appropriate parties, termination statements,

instruments of satisfaction, releases of all Encumbrances which the person or entity has with respect to

the Purchased Assets, then Purchaser and/or the Debtors are hereby authorized to execute and file

such statements, instruments, releases and other documents on behalf of the person or entity with

respect to such Purchased Assets.

11.    The Closing, either by allowance of the outstanding amount of the secured debt owed

to Purchaser existing at the time of the Closing as a credit bid, or by payment of such amount if there

is a successful overbidder, shall constitute a complete satisfaction of all outstanding indebtedness

owing by the Debtors to Purchaser.  Following the Closing, Purchaser shall no longer have any

allowed claim against the Debtors or their bankruptcy estates, and all funds that are part of the

Debtors' bankruptcy estates shall be free and clear of any lien or claim of Purchaser.

12.    Upon the Closing, the Debtors are authorized and directed to assume, assign and/or

transfer each of the Designated Contracts to Purchaser.  In connection with the Closing, Purchaser

shall pay to all non-Debtor parties to the Designated Contracts the cure amounts set forth in the

Contracts and Leases Schedule for all of the Designated Contracts (the "Cure Amounts"), and Purchaser's payment of such Cure Amounts are deemed the necessary and sufficient amounts to "cure" all "defaults" with respect to the Designated Contracts under section 365(b) of the Bankruptcy Code.  The payment of the applicable Cure Amounts (if any) to any third-party counterparty (a "Counterparty") to each of the Designated Contracts shall (i) effect a cure of all defaults existing thereunder, and (ii) compensate such Counterparty for any actual pecuniary loss resulting from any such default.  Purchaser shall then have assumed the Designated Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Designated Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts, neither the Debtors nor Purchaser shall have any further liabilities to any Counterparty other than Purchaser's obligations under the Designated Contracts that accrue and become due and payable on or after the Closing Date. In addition, adequate assurance of future performance has been demonstrated by or on behalf of Purchaser with respect to the Designated Contracts within the meaning of sections 365(b)(1)(c), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

13.    Each non-Debtor party to a Designated Contract hereby is forever barred, estopped, and permanently enjoined from (i) raising or asserting against the Debtors or Purchaser, or the property of any of them, any assignment fee, acceleration, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Designated Contracts, existing as of the date of the Sale Hearing, or arising by reason of the consummation of the Transaction contemplated by the APA, including, without limitation, the Transaction and the assumption and assignment of the Designated Contracts, including any asserted breach relating to or arising out of the change-in-control provisions in such Designated Contracts, or any purported written or oral modification to the Designated Contracts and (ii) asserting against Purchaser any claim, counterclaim, breach, or

condition asserted or assertable against the Debtors existing as of the Closing or arising by reason of

the transfer of the Purchased Assets, except for the Assumed Liabilities.

14.     Any provisions in any Designated Contracts that prohibit or condition the assignment

of such Designated Contract or allow the Counterparty to such Designated Contract to terminate,

recapture, impose any penalty, condition on renewal or extension or modify any term or condition

upon the assignment of such Designated Contract, constitute unenforceable anti-assignment

provisions that are void and of no force and effect with respect to the Debtors' assumption and

assignment of such Designated Contract in accordance with the APA.

15.     The terms and provisions of this Sale Order, as well as the rights granted under the

Transaction Documents, shall continue in full force and effect and are binding upon any successor,

reorganized Debtors, or chapter 7 or chapter 11 trustee applicable to the Debtors, notwithstanding any

such conversion, dismissal or order entry.  Nothing contained in any chapter 11 plan confirmed in the

Bankruptcy Cases or in any order confirming such a plan, nor any order dismissing the Bankruptcy

Cases or converting the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, shall

conflict with or derogate from the provisions of the APA, any documents or instruments executed in

connection therewith, or the terms of this Sale Order.  The provisions of this Sale Order and any

actions taken pursuant hereto shall survive any conversion or dismissal of the Bankruptcy Case and

the entry of any other order that may be entered in the Bankruptcy Case, including any order (i)

confirming any plan of reorganization; (ii) converting the Bankruptcy Case from chapter 11 to

chapter 7; (iii) appointing a trustee or examiner in the Bankruptcy Case; or (iv) dismissing the

Bankruptcy Case.

16.     The Transaction contemplated by the APA and other Transaction Documents are

undertaken without collusion and in "good faith," as that term is defined in section 363(m) of the

Bankruptcy Code.  Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein by this Sale Order to consummate the Transaction shall not affect the validity of the sale of the Purchased Assets to Purchaser.

17.    The failure to specifically include any particular provision of the APA or the other Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Bankruptcy Court that the Transaction, the APA and the other Transaction Documents be authorized and approved in their entirety.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

18.    Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, if applicable, or any other Local Bankruptcy Rule or otherwise, this Sale Order shall not be stayed for 14-days after the entry hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h) and 6006(d).  Time is of the essence in approving the Transaction (including the transfer and the sale of the Purchased Assets).

19.    The automatic stay pursuant to section 362 is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Bankruptcy Court, to (i) allow Purchaser to deliver any notice provided for in the APA and Transaction Documents and (ii) allow Purchaser to take any and all actions permitted under the APA and Transaction Documents in accordance with the terms and conditions thereof.

20.    Unless otherwise provided in this Sale Order, to the extent any inconsistency exists between the provisions of the APA and this Sale Order, the provisions contained in this Sale Order shall govern.

21.    The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe, and enforce the provisions of the APA and this Sale Order in all respects, and further, including, without limitation, to (i) hear and determine all disputes between the Debtors and/or Purchaser, as the case may be, and any other non-Debtor party to, among other things, the Designated Contracts concerning, among other things, assignment thereof by the Debtors to Purchaser and any dispute between Purchaser and the Debtors as to their respective obligations with respect to any asset, liability, or claim arising hereunder; (ii) compel delivery of the Purchased Assets to Purchaser free and clear of Encumbrances; (iii) compel the delivery of the Purchase Price or performance of other obligations owed to the Debtors; (iv) interpret, implement, and enforce the provisions of this Sale Order; and (v) protect Purchaser against (A) claims made related to any of the Excluded Liabilities, (B) any claims of successor or vicarious liability (or similar claims or theories) related to the Purchased Assets or the Designated Contracts, or (C) any Encumbrances asserted on or against Purchaser or the Purchased Assets.

22.    Nothing in this Sale Order shall be construed to impair or limit in any way the rights of the OCEH and the OCUC granted in the *Final Order: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 And 364, And (B) Utilize Cash Collateral Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; And (III) Granting Related Relief.*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DEBTORS' MOTION FOR AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (2) APPROVING OF DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING OF DEBTORS' REJECTION OF THOSE UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED AND ASSIGNED; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 9, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Monica Y Kim    myk@lnbrb.com, myk@ecf.inforuptcy.com**
- **Krikor J Meshefejian    kjm@lnbrb.com**
- **S Margaux Ross    margaux.ross@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**
- **Sharon Z. Weiss    sharon.weiss@bryancave.com, raul.morales@bryancave.com**

**2.  SERVED BY UNITED STATES MAIL**: On **October 9, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 9, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 9, 2017 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Ironclad Performance Wear (8300)
Interested Parties

**Counsel to Radians Wareham Holdings**
Sharon Z. Weiss
Bryan Cave
120 Broadway, Suite 300
Santa Monica, CA 90401

Sky Lin
Marusan - Mimasu Tshusho Co. Ltd.
Msh4726 Rm 1007 10f Ho King Ctr No 2
16 Fa Yuen S Mongkok HK Island Hk
Hong Kong
China

U. S. Securities and Exchange Commission
Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

State Board of Equalization
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA 94279-0029

**Counsel to Radians Wareham Holdings**
E. Franklin Childress, Jr.
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
165 Madison Ave, Suite 2000
Memphis, Tennessee  38103

Mark Robba
PT SPORT GLOVE INDONESIA
Krandon Desa Pandowoharjo
Sleman
Yogyakarta, Indonesia, 55512

Franchise Tax Board
Bankruptcy Section, MS: A-340
P. O. Box 2952
Sacramento, CA 95812-2952

State Board of Equalization
Special Operations Bankruptcy Team
MIC: 74
P.O. Box 942879
Sacramento, CA 94279-0029

Skadden Arps Slate Meagher & Flom LLP
Attn: Annie Li, Esq.
300 South Grand Avenue
Suite 3400
Los Angeles, California 90071

Ronald Chez
1524 N. Astor Street
Chicago, IL 60610

Employment Development Department
Bankruptcy Group MIC 92E
P. O. Box 826880
Sacramento, CA 94280-0001

Ironclad Performance Wear Corporation
File No. 8300
Contracts Service List
Service by U.S. Mail

Ace Hardware
2222 Kensington St.
Oak Brook, IL 60523-0000

Acklands Grainger
123 Commerce Valley Dr., Suite 700
Thornhill, Ontario, L3T 7W, Canada

Advantage Media Services
29120 Commerce Center Drive #2
Valencia, CA 91355-0000

Amazon
410 Terry Ave. North
Seattle, WA 98109-0000

AML United Limited
29th Floor, Nanyang Plaza
57 Hung To Road, Kwun Tong, Kowloon
Hong Kong, China,

BIC Alliance
P O Box 40166
Baton Rouge, LA 70835-0000

Cabela's
1 Cabela Dr.
Sidney, NE 69160-0000

Dayup Global Co., Ltd.
Phum Prey Sala, Sangkat Kakap
Khan Posenchey, Phnom Penh
855, Cambodia,

Design Gallery (Pvt.) Ltd.
Plot #322/B, Medical Road,
Helal Market, Uttarkhan, Dhaka
Dhaka-1230, Bangladesh,

DESUN GARMENTS, LTD.
89/1, Birulia Road, Savar, Dhaka
Dhaka
Savar-1340, Bangladesh,

DNOW
PO Box 40985
Houston, TX 77240-0000

Do It Best
6502 Nelson Road
Fort Wayne, IN 46803-0000

DRG Strategic, LLC - Bob Goldstein
P O BOX 191981
Dallas, TX 75219-0000

Duluth Trading
PO Box 409170
Belleville, WI 53508-0000

Emery Waterhouse
7 Rand Rd.
Portland, ME 04104-0000

Essendant (USSCO)
1 Parkway North Blvd., Suite 100
Deerfield, IL 60015-0000

Glenfir
General French 1948
Montevideo, Uruguay 11500

Grainger
100 Grainger Parkway
Lake Forest, IL 60045-0000

Huizhou Baijia Glove Co., Ltd.
Diakali Mouza, Manigonggjpara
Savar, Dhaka, 1349, Bangladesh

Ka Hung Glove Industrial Co. Ltd.
Fujian Quanzhou Jiacheng Leather
Ka Hung Holdings BldgM Chi Feng Rd
Quanzhou City, Fujian,  36200-0000

Konica Minolta Business Solutions
100 Williams Drive
Ramsey NJ 07446-0000

MARUSAN - MIMASU TSHUSHO CO.
LTD.
NO 1 QUEEN' ROAD CENTRAL
HONG KONG
CHINA,

Menards
5101 Menard Dr.
Eau Claire, WI 54703-0000

MERCINDO GLOBAL MANUFAKTUR
JL. RAYA SEMARANG-BAWEN KM.29
Semerang, Central Java
50661, Indonesia,

Naayle Garments
CD 388/389 Sector 16B FB Ind Area
Karach, iSindh, Pakistan

NANTONG CHANGBANG GLOVES
CO.
Flat/RM 1602 Chit Lee Comm
Bldg 30-36, Shau Kei Wan Road
Hong Kong, China,

Orgill
PO Box 140
Memphis, TN 38101-0000

Orr Safety
11601 Interchange Drive
Louisville, KY 40229-0000

Pitney Bowes Credit Corp.
P.O.Box  371887
Pittsburg PA 15250-7887

POH
12 Brennan Way
Belmont, Western Australia 6104


PT Adira Semesta Industry
Bihbul Raya 73, Kopo., Bandung
West Java, 40228, Indonesia

PT JJ GLOVES INDO
JL Ronggowarsito, Mlese, Ceper
Bonded Zone, Klaten
Central Java, Indonesia,  57463-0000

PT SEOK HWA INDONESIA
Room 1218, Krantz Techno Bldg.
5442-1 Sang Dae Won-Dong, Sung
Nam
Kyung Gi-Do, Indonesia,  00046-2819


PT SPORT GLOVE INDONESIA
Krandon Desa Pandowoharjo
Sleman
Yogyakarta, Indonesia,  55512-0000

PT. Eagle Glove Indonesia
Desa Bayen Purwomatani Kalasan
Sleman, Yogyakarta, 55571
Indonesia,

R3 Safety aka Bunzl
P.O. Box 270417
Saint Louis, MO 63141-0000


Sam's Club
Attn: General Merchandise Manager
2101 SE Simple Savings Drive
Bentonville, AR 72716-0000

Sees Global Inc.
#612 Suntec City 307-2
Sandaewon-dong, Jungwon-gu
Seongnam, Kyunggi, KO,  46273-6000

Select (Nantong) Safety Products Co
No. 198 Youyi Road (W)
Jueguang, Rudong, Jiangsu
226400, China,


Shur Sales
3830 Winermere Street
Englewood, CO 80110-0000

Snap-On
PO Box 1410
Kenosha, WI 53141-0000

Synetra
1110 E Highway 114, Suite 200
Southlake, TX 76092-0000


Trinet
1100 San Leandro Blvd., Suite 400
San Leandro, CA 93577-0000

True Value
8600 W. Bryn Mawr Avenue
Chicago, IL 60631-0000

WINSPEED SPORTS SHANGHAI CO.,
LTD.
858 MINGZHU ROAD
SHANGHAI
China,  00020-1702


WONEEL MIDAS LEATHERS
JL GEMBOR RAYA DESA PASIRJAYA
TANGERANG
BANTEN, INDONESIA,  15135-0000

Worldwide
PO Box 88607
Seattle, WA 98138-0000

1920 Hutton Court
Inwood National Bank
PO Box 857413
Richardson, TX 75085-0000