RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br>☒  Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐  Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**DEBTORS' STATUS REPORT DATED OCTOBER 16, 2017; DECLARATION OF L. GEOFF GREULICH IN SUPPORT THEREOF**<br><br>DATE:    October 30, 2017<br>TIME:     10:00 a.m.<br>PLACE:   Courtroom "303"<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA |

Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (collectively, the "Debtors"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases (collectively, the "Bankruptcy Cases"), hereby file this Status Report Dated October 16, 2017, pursuant to the Court's *Order Setting Scheduling And Case Management Conference* [Docket No. 73].

**A.    Brief Description Of The Debtors' Business And Their Operations.**

On September 8, 2017 ("Petition Date"), Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and its parent corporation Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada"), each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, Ironclad California and Ironclad Nevada (collectively, the "Debtors" or "Ironclad") have operated their businesses and managed their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  With the Court's approval, the Debtors two chapter 11 cases are being jointly administered.  Other than owning all of the shares in Ironclad California, Ironclad Nevada has no business.  All operations of the Debtors effectively function through Ironclad California.

The Debtors are a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder.  The Debtors' business is headquartered in Farmers Branch, Texas.  Ironclad Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW".  As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.  As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees who work overseas.

Ironclad was founded in 1998 by Ed Jaeger.  Mr. Jaeger was inspired to build gloves that offered protection and performance without sacrificing one for the other.  From the beginning, Ironclad built gloves using materials that offered excellent fit to make them an extension of the

2

hand and to make jobs easier for the "industrial athlete". By 2006, Ironclad offered 35 different task-specific glove types for people wearing gloves as part of their daily jobs.

In 2008, the Debtors launched the KONG (King of Oil 'N' Gas) line to address the high number of hand injuries in the O&G field. By 2010, the KONG line was comprised of 46 different gloves. Additionally, Ironclad expanded its presence in the retail and non-professional markets with the launch of the EXO brand in June 2015. EXO offers lower cost gloves for automotive, DIY, and outdoor sporting applications. Ironclad offers 30 different EXO glove types.

Ironclad's task-specific technical glove products are specially designed for individual user groups. Ironclad currently offers over 160 distinct types of gloves for a variety of markets, including industrial, construction, DIY, carpentry, machining, package handling, plumbing, welding, roofing, O&G, mechanics, hunting, and gardening. Products come in a multitude of colors and cater to the specific demands and requirements of the users based on ease of motion, grip, water and chemical resistance, visibility, and protection from abrasions, cuts, flames, impacts, temperature, and vibration. Since inception, Ironclad has employed an internal research and development ("R&D") department responsible for identifying and creating new products and applications, and improving and enhancing existing products. Ironclad is continually evaluating new base materials for gloves, and grip is another key area of focus for R&D. Ironclad often partners with industry-leading organizations to develop new products. Ironclad has 13 U.S. patents issued and 11 foreign patents, as well as five pending U.S. patent applications and several pending foreign patent applications. Ironclad also uses trademarks to strengthen and protect its recognizable brand names. Ironclad owns 52 registered U.S. trademarks, 39 registered international trademarks, and 13 and 43 trademarks pending in the U.S. and internationally, respectively.

Ironclad currently sells its product through approximately 10,000 outlets for professional tradesmen as well as "Big Box", hardware, auto parts, and sporting goods retailers. The sales force is organized by 3 business segments: Industrial, Retail, and International. Glove products

are currently manufactured by multiple suppliers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia.

**B.      The Debtors' Bankruptcy Cases.**

      1.      Events Leading To The Bankruptcy Filings, Principal Business, Financial And Legal Problems, And The Debtors' Efforts To Address These Problems.

Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations have been insufficient to support their current business operations as well as their continued growth.  There have been many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or ineffective expansion and distribution of all of their product lines and development of new customers, and higher than anticipated production, manufacturing and warehousing costs.  In addition, it was discovered in early 2017 that under prior management, the Debtors had failed to provide materially complete and correct financial statements as required under their Loan Documents (defined below) to their primary secured lender for the fiscal years ended December 31, 2015 and 2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017.  As a result of this discovery, the Debtors' then chief executive officer and other officers were terminated, and L. Geoffrey Greulich assumed the position of the Debtors' new chief executive officer effective July 6, 2017.  Prior to assuming this position, Mr. Greulich had no prior connections or relationship with the Debtors as an insider, equity holder or otherwise.  As a Senior Advisor, Operations at Corridor Capital, LLC where he leads operations through portfolio engagement as well as conducting due diligence, Mr. Greulich was highly qualified to serve as the Debtors' new chief executive officer.  Persons or parties interested in obtaining specific historical financial history of the Debtors should review the public filings made by the Debtors with the Securities and Exchange Commission.

      2.      The Proposed Sale Of The Debtors' Assets.

The Debtors filed their bankruptcy cases to consummate a sale of substantially all of their assets (excluding cash and causes of action) for the most money possible.  Just prior to their bankruptcy filings, the Debtors entered into an asset purchase agreement ("APA") with the

Debtors' current secured creditor, Radians Wareham Holdings, Inc. ("Radians" or "Purchaser") or its affiliate/designee, for a cash purchase price of $20 million or $15 million, subject to an overbid process. Purchaser will be paying a cash purchase price of either $15 million or $20 million depending upon the occurrence of an event which is sensitive and the letter agreement describing such event is the subject of a motion to file under seal.

The Debtors' business was actively marketed for sale for an extended period prior to the Debtors' bankruptcy filings by a qualified investment banker. Prospective buyers had the ability to purchase assets or equity. While a number of prospective buyers expressed and continued to express interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-bankruptcy marketing process because (i) the Debtors were out of funds, (ii) the Debtors could not continue to operate without both access to their own cash receipts as well as receipt of additional financing, and (iii) Purchaser (which is also the Debtors' secured creditor having purchased the Debtors' pre-bankruptcy secured bank debt) had exercised its secured creditor rights and was sweeping all of the Debtors' cash (although by agreement certain of the funds which were subject to the authorized sweep were re-advanced to the Debtors along with the additional advance of funds by Purchaser to enable the Debtors' continued business operations prior to the Petition Date) and was no longer willing to continue to forbear or advance additional needed financing to the Debtors absent a global resolution with the Debtors which was accomplished with the APA and the DIP financing agreement the Debtors entered into with Purchaser which is the subject of a separate emergency motion.

The purchase offer provided to the Debtors by Purchaser was determined by the Board to be the best offer the Debtors had received by the Petition Date, and Purchaser was ready to proceed with its purchase and lend the Debtors sufficient funds to enable the Debtors to operate their business through an Auction to take place in late October, 2017 with a sale closing to occur shortly thereafter. Purchaser was also willing to permit the Debtors to proceed with a robust post-bankruptcy marketing and hopeful overbid process to insure that the highest and best price is paid for the Debtors' assets. Given the breadth of the Debtors' pre-bankruptcy marketing process and the fact that the Debtors' pre-bankruptcy investment banker (who is already very

familiar with the various prospective overbidders) will be serving as the Debtors' post-bankruptcy investment banker and leading the overbid sale process, and the fact that the likely overbidders are already deep into the due diligence process, the Debtors are confident that providing prospective overbidders with approximately six weeks to decide whether to participate in the Auction is a sufficient amount of time for the Debtors to achieve the highest and best price for their assets.  Also, and very importantly, the Debtors' financial needs expand significantly the last two months of the year so if the Debtors are required to continue to operate their business through the end of the year or significantly beyond October 31, 2017, the Debtors may need to borrow additional money which could result in substantially reducing the ultimate recovery for the Debtors' shareholders.  It is also not clear at this time that any such additional financing would be available to the Debtors in any event.  It is for this reason that it is very important that the Debtors' be authorized to implement their proposed sale timeline, which consists of the receipt of overbids by October 25, 2017, and a sale auction and sale hearing on October 30, 2017.

        3.     The Debtors' Estimate Regarding Timing For Confirmation of A Plan.

The timing for confirmation of a plan in these cases will depend upon the outcome of the Debtors' proposed sale, as well as the Debtors discussions with the Official Committee of Equity Security Holders and Official Committee of Unsecured Creditors.  The Debtors are currently well within their exclusivity period for proposing a plan in these cases, but their primary focus to date has been to take all of the steps necessary to ensure an appropriate sale process, and the Debtors anticipate that the next 30-60 days will be dedicated to attempting to obtain Court approval of a sale of their assets for the highest price possible, and successfully closing a sale. The Debtors anticipate requiring at least the entirety of their exclusivity period for proposing a plan in order to propose a plan, and possibly an extension of that exclusivity period.

        4.     Whether The Debtors Are Considered A "Health Care Business".

The Debtors are not a "health care business" as defined in 11 U.S.C. § 101(27A).

        5.     Whether The Debtors Are Designated As Small Businesses.

The Debtors have not been designated as small businesses and do not intend to designate themselves as small businesses.

      6.    <u>Whether These Cases Are Single Asset Real Estate Cases</u>.

These cases are not single asset real estate cases.

      7.    <u>The Debtors' Compliance With Their Duties</u>.

Since the bankruptcy filings, the Debtors and their staff have worked around the clock to ensure that the Debtors' are in compliance with their duties and obligations. The Debtors have submitted a substantial amount of information to the United States Trustee, and believe that they are in substantial compliance with respect to submissions of information to the United States Trustee. The United States Trustee has requested follow-up information that the Debtors are in the process of gathering and submitted, and anticipate that all follow-up requests will have been fully addressed by the time of the status conference. The Debtors are also in the process of preparing their September 2017 monthly operating reports. The Debtors timely filed their Schedules of Assets and Liabilities, Statement of Financial Affairs, and other required documents, on September 29, 2017. The Debtors also attended their respective initial debtor interviews, and anticipate that, by the time of the Status Conference, will have attended and completed their respective meetings of creditors under 11 U.S.C. § 341(a).

      8.    <u>Parties Claiming An Interest In The Debtors' Cash Collateral</u>.

Radians claims an interest in the Debtors' cash collateral. The Debtors have obtained Court approval, on a final basis, of a cash collateral stipulation with, and debtor-in-possession financing from, Radians.

**C.**     **<u>The Identity Of All Professionals Retained Or To Be Retained By The Estates, And Information Regarding Employment</u>.**

The Debtors have filed and served the following employment applications of professionals:

      1.    On September 22, 2017, the Debtors filed an application to employ Levene, Neale, Bender, Yoo & Brill L.L.P. ("<u>LNBYB</u>") as their general bankruptcy counsel. LNBYB estimates that monthly fees and expenses will vary, depending upon the amount of work that will

be required to successfully close a sale of the Debtors' assets, and subsequently formulate a mechanism to exit chapter 11.

2.      On September 29, 2017, the Debtors filed an application to employ Craig Hallum Capital Group LLC ("CH") as the Debtors' financial advisor, to assist the Debtors in connection with the marketing and sale of the Debtors' assets.  CH is proposed to be compensated with a "Sale or Restructuring Fee" in the amount of $275,000 plus 2.5% of the "Aggregate Transaction Value (defined in CH's employment application) in excess of $20 million up to $22.5 million, plus 4.5% of the Aggregate Transaction value in excess of $22.5 million.

3.      On October 6, 2017, the Debtors filed an application to employ Stubbs Alderton & Markiles, LLP ("SAM") as the Debtors' special corporate and securities counsel, special trademark, and special litigation counsel.

4.      The Debtors may also file an application to employ an accountant and special counsel.

**D.      The Debtors' Current Operations And Operating Budget.**

On October 6, 2017, the Court entered that certain *Final Order: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 and 364, And (B) Utilize Cash Collateral Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; and (III) Granting Related Relief* (the "Final Cash Collateral/DIP Order").    Pursuant to the Final Cash Collateral/DIP Order, the Debtors are authorized to use cash collateral and the proceeds of the DIP Loan (as defined in the Final Cash Collateral/DIP Order) in accordance with the Debtors' nine week cash flow forecast setting forth all projected cash receipts and cash disbursements following the Petition Date, a true and correct copy of which is attached as Exhibit 1 hereto.

**E.      Proposed Deadlines For Filing Claims, Objections To Disputed Claims.**

The Debtors have obtained a deadline for filing proofs of claim – October 21, 2017.  The Debtors do not believe it is appropriate to establish a deadline to file claim objections prior to first allowing the claim filing deadline to expire and providing sufficient time to review the filed claims in these cases.

**F.    Issues Related To Assumption, Assignment and Rejection Of Unexpired Leases And Executory Contracts.**

The Debtors' unexpired leases and executor contracts are listed in the Debtors' Schedules of Assets and Liabilities (*see* Schedule G).  The Debtors believe that any buyer of the Debtors' assets will want to review all of the Debtors' contracts and leases and determine whether to obtain an assignment of such contracts and leases.

**G.    Whether The Debtors Anticipate The Sale Of Any Estate Assets By Motion Or In Connection With A Plan.**

On October 9, 2017, the Debtors filed their motion for an order authorizing the sale of substantially all of their assets.  A hearing on the motion is scheduled for October 30, 2017.

**H.    A Proposed Deadline For The Filing Of A Disclosure Statement And Plan.**

The Debtors believe that it is premature to set a deadline for filing a disclosure statement and a plan at this time, while the Debtors are in the initial stages of their exclusivity periods for filing a plan and disclosure statement, and before the Debtors have closed a sale of their assets.

Dated:  October 16, 2017            IRONCLAD PERFORAMNCE WEAR
                                    CORPORATION, *et al.*

                                    By:    */s/ Krikor Meshefejian*
                                           RON BENDER
                                           MONICA Y. KIM
                                           KRIKOR J. MESHEFEJIAN
                                           LEVENE, NEALE, BENDER,
                                           YOO & BRILL L.L.P.
                                           Proposed Attorneys for Debtors and
                                           Debtors in Possession

### DECLARATION OF L. GEOFF GREULICH

I, L. Geoff Greulich, hereby declare as follows:

1.      I am the Chief Executive Officer of Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada" and with Ironclad California, the "Debtors" or "Ironclad"), who each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code on September 8, 2017 ("Petition Date").  I became the Debtors' Chief Executive Officer effective July 6, 2017.

2.      In that capacity, I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

3.      On September 8, 2017 ("Petition Date"), Ironclad Performance Wear Corporation, a California corporation ("Ironclad California"), and its parent corporation Ironclad Performance Wear Corporation, a Nevada corporation ("Ironclad Nevada"), each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, Ironclad California and Ironclad Nevada (collectively, the "Debtors" or "Ironclad") have operated their businesses and managed their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  With the Court's approval, the Debtors two chapter 11 cases are being jointly administered.  Other than owning all of the shares in Ironclad California, Ironclad Nevada has no business.  All operations of the Debtors effectively function through Ironclad California.

4.      The Debtors are a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder.  The Debtors' business is headquartered in Farmers Branch, Texas.  Ironclad Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW".  As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.  As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees who work overseas.

5.      Ironclad was founded in 1998 by Ed Jaeger.  Mr. Jaeger was inspired to build gloves that offered protection and performance without sacrificing one for the other.  From the beginning, Ironclad built gloves using materials that offered excellent fit to make them an extension of the hand and to make jobs easier for the "industrial athlete".  By 2006, Ironclad offered 35 different task-specific glove types for people wearing gloves as part of their daily jobs.

6.      In 2008, the Debtors launched the KONG (King of Oil 'N' Gas) line to address the high number of hand injuries in the O&G field.  By 2010, the KONG line was comprised of 46 different gloves.  Additionally, Ironclad expanded its presence in the retail and non-professional markets with the launch of the EXO brand in June 2015.  EXO offers lower cost gloves for automotive, DIY, and outdoor sporting applications.  Ironclad offers 30 different EXO glove types.

7.      Ironclad's task-specific technical glove products are specially designed for individual user groups.  Ironclad currently offers over 160 distinct types of gloves for a variety of markets, including industrial, construction, DIY, carpentry, machining, package handling, plumbing, welding, roofing, O&G, mechanics, hunting, and gardening.  Products come in a multitude of colors and cater to the specific demands and requirements of the users based on ease of motion, grip, water and chemical resistance, visibility, and protection from abrasions, cuts, flames, impacts, temperature, and vibration.  Since inception, Ironclad has employed an internal research and development ("R&D") department responsible for identifying and creating new products and applications, and improving and enhancing existing products.  Ironclad is continually evaluating new base materials for gloves, and grip is another key area of focus for R&D.  Ironclad often partners with industry-leading organizations to develop new products.  Ironclad has 13 U.S. patents issued and 11 foreign patents, as well as five pending U.S. patent applications and several pending foreign patent applications.  Ironclad also uses trademarks to strengthen and protect its recognizable brand names.  Ironclad owns 52 registered U.S. trademarks, 39 registered international trademarks, and 13 and 43 trademarks pending in the U.S. and internationally, respectively.

8.      Ironclad currently sells its product through approximately 10,000 outlets for professional tradesmen as well as "Big Box", hardware, auto parts, and sporting goods retailers. The sales force is organized by 3 business segments: Industrial, Retail, and International.  Glove products are currently manufactured by multiple suppliers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia.

9.      Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations have been insufficient to support their current business operations as well as their continued growth.  There have been many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or ineffective expansion and distribution of all of their product lines and development of new customers, and higher than anticipated production, manufacturing and warehousing costs.  In addition, it was discovered in early 2017 that under prior management, the Debtors had failed to provide materially complete and correct financial statements as required under their Loan Documents (defined below) to their primary secured lender for the fiscal years ended December 31, 2015 and 2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017.  As a result of this discovery, the Debtors' then chief executive officer and other officers were terminated, and I assumed the position of the Debtors' new chief executive officer effective July 6, 2017.  Prior to assuming this position, I had no prior connections or relationship with the Debtors as an insider, equity holder or otherwise.  Persons or parties interested in obtaining specific historical financial history of the Debtors should review the public filings made by the Debtors with the Securities and Exchange Commission.

10.      The Debtors filed their bankruptcy cases to consummate a sale of substantially all of their assets (excluding cash and causes of action) for the most money possible.  Just prior to their bankruptcy filings, the Debtors entered into an asset purchase agreement ("APA") with the Debtors' current secured creditor, Radians Wareham Holdings, Inc. ("Radians" or "Purchaser") or its affiliate/designee, for a cash purchase price of $20 million or $15 million, subject to an overbid process.  Purchaser will be paying a cash purchase price of either $15 million or $20

million depending upon the occurrence of an event which is sensitive and the letter agreement describing such event is the subject of a motion to file under seal.

11.     The Debtors' business was actively marketed for sale for an extended period prior to the Debtors' bankruptcy filings by a qualified investment banker.  Prospective buyers had the ability to purchase assets or equity.   While a number of prospective buyers expressed and continued to express interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-bankruptcy marketing process because (i) the Debtors were out of funds, (ii) the Debtors could not continue to operate without both access to their own cash receipts as well as receipt of additional financing, and (iii) Purchaser (which is also the Debtors' secured creditor having purchased the Debtors' pre-bankruptcy secured bank debt) had exercised its secured creditor rights and was sweeping all of the Debtors' cash (although by agreement certain of the funds which were subject to the authorized sweep were re-advanced to the Debtors along with the additional advance of funds by Purchaser to enable the Debtors' continued business operations prior to the Petition Date) and was no longer willing to continue to forbear or advance additional needed financing to the Debtors absent a global resolution with the Debtors which was accomplished with the APA and the DIP financing agreement the Debtors entered into with Purchaser which is the subject of a separate emergency motion.

12.     The purchase offer provided to the Debtors by Purchaser was determined by the Board to be the best offer the Debtors had received by the Petition Date, and Purchaser was ready to proceed with its purchase and lend the Debtors sufficient funds to enable the Debtors to operate their business through an Auction to take place in late October, 2017 with a sale closing to occur shortly thereafter.  Purchaser was also willing to permit the Debtors to proceed with a robust post-bankruptcy marketing and hopeful overbid process to insure that the highest and best price is paid for the Debtors' assets.  Given the breadth of the Debtors' pre-bankruptcy marketing process and the fact that the Debtors' pre-bankruptcy investment banker (who is already very familiar with the various prospective overbidders) will be serving as the Debtors' post-bankruptcy investment banker and leading the overbid sale process, and the fact that the likely overbidders are already deep into the due diligence process, the Debtors are confident that

providing prospective overbidders with approximately six weeks to decide whether to participate in the Auction is a sufficient amount of time for the Debtors to achieve the highest and best price for their assets. Also, and very importantly, the Debtors' financial needs expand significantly the last two months of the year so if the Debtors are required to continue to operate their business through the end of the year or significantly beyond October 31, 2017, the Debtors may need to borrow additional money which could result in substantially reducing the ultimate recovery for the Debtors' shareholders. It is also not clear at this time that any such additional financing would be available to the Debtors in any event. It is for this reason that it is very important that the Debtors' be authorized to implement their proposed sale timeline, which consists of the receipt of overbids by October 25, 2017, and a sale auction and sale hearing on October 30, 2017.

13.     Since the bankruptcy filings, the Debtors and their staff have worked around the clock to ensure that the Debtors' are in compliance with their duties and obligations. The Debtors have submitted a substantial amount of information to the United States Trustee, and believe that they are in substantial compliance with respect to submissions of information to the United States Trustee. The United States Trustee has requested follow-up information that the Debtors are in the process of gathering and submitted, and anticipate that all follow-up requests will have been fully addressed by the time of the status conference. The Debtors are also in the process of preparing their September 2017 monthly operating reports. The Debtors timely filed their Schedules of Assets and Liabilities, Statement of Financial Affairs, and other required documents, on September 29, 2017. The Debtors also attended their respective initial debtor interviews, and anticipate that, by the time of the Status Conference, will have attended and completed their respective meetings of creditors under 11 U.S.C. § 341(a)

14.     The Debtors have filed and served the following employment applications of professionals:

a.  On September 22, 2017, the Debtors filed an application to employ Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB") as their general bankruptcy counsel.

b. On September 29, 2017, the Debtors filed an application to employ Craig Hallum Capital Group LLC ("CH") as the Debtors' financial advisor, to assist the Debtors in connection with the marketing and sale of the Debtors' assets. CH is proposed to be compensated with a "Sale or Restructuring Fee" in the amount of $275,000 plus 2.5% of the "Aggregate Transaction Value (defined in CH's employment application) in excess of $20 million up to $22.5 million, plus 4.5% of the Aggregate Transaction value in excess of $22.5 million.

c. On October 6, 2017, the Debtors filed an application to employ Stubbs Alderton & Markiles, LLP ("SAM") as the Debtors' special corporate and securities counsel, special trademark, and special litigation counsel.

d. The Debtors may also file an application to employ an accountant and special counsel.

15.    On October 6, 2017, the Court entered that certain *Final Order: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 and 364, And (B) Utilize Cash Collateral Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; and (III) Granting Related Relief* (the "Final Cash Collateral/DIP Order").  Pursuant to the Final Cash Collateral/DIP Order, the Debtors are authorized to use cash collateral and the proceeds of the DIP Loan (as defined in the Final Cash Collateral/DIP Order) in accordance with the Debtors' none week cash flow forecast setting forth all projected cash receipts and cash disbursements following the Petition Date, a true and correct copy of which is attached as Exhibit 1 hereto.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 13th day of October 2017 at Los Angeles, California.

L. GEOFF GREULICH

# EXHIBIT "1"

**Ironclad Cash Flow Projections**

| FORECAST SECTION | September | October | | CH 11 Filing | Petition Period | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | September | | Week | | September | | | |
| | | | | 7-Sep | 8-Sep | 09/04-09/08 | 11-Sep | 12-Sep | 13-Sep | 14-Sep | 15-Sep |
| **Cash Balance (net of float)** | $ - | $ (1,308,071) | | $ 250,000 | $ 301,512 | $ - | $ 353,025 | $ 404,537 | $ 456,050 | $ 291,893 | $ 49,477 |
| Cash Receipts | 875,711 | 888,203 | | 51,512 | 51,512 | 103,025 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 |
| LOC Funding | $ - | - | | | | - | | | | | |
| Other Receipts | | - | | | | | | | | | |
| **Total Cash In** | $ 875,711 | $ (419,868) | | 51,512 | 51,512 | 103,025 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 |
| Accounts Payables - Operating Expenses | (538,621) | (590,000) | | - | (33,621) | - | - | - | (105,000) | (150,000) | |
| Accounts Payable - Via Wire | (7,500) | (10,000) | | - | | | (2,500) | | | | |
| Payroll | (377,858) | (377,858) | | - | | | | (188,929) | - | | |
| International offices | (25,000) | (54,000) | | - | | | | | | | |
| AP other | - | - | | - | | | | | | | |
| Wires to Suppliers | (1,216,803) | (476,313) | | - | - | - | (213,169) | - | (328,423) | | |
| Postings to Bank | (18,000) | (18,000) | | - | | | | | | | |
| Legal Fees | - | - | | - | | | | | | | |
| US TRUSTEE FEE | - | (9,750) | | - | | | | | | | |
| Other disbursements | | - | | - | | | | | | | |
| Disbursements | $ (2,183,782) | $ (1,535,921) | | - | - | (33,621) | - | - | (215,669) | (293,929) | (478,423) |
| Ending Cash Balance per Book | $ (1,308,071) | $ (1,955,789) | | 301,512 | 353,025 | 69,404 | 404,537 | 456,050 | 291,893 | 49,477 | (377,434) |
| Checks outstanding (float) | | | | | | | | | | | |
| Ending Cash Balance Per Bank | $ (1,308,071) | $ (1,955,789) | | 301,512 | 353,025 | 69,404 | 404,537 | 456,050 | 291,893 | 49,477 | (377,434) |
| | (283,620.70) | (283,620.70) | | | | | | | | | 1 |

**Minimum Cash Balance**

$ (1,747,010)

10/27/2017        54



| Week | September | | | | | Week | September | | | | | Week | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/11-09/15 | 18-Sep | 19-Sep | 20-Sep | 21-Sep | 22-Sep | 09/18-09/22 | 25-Sep | 26-Sep | 27-Sep | 28-Sep | 29-Sep | 09/25-09/29 | 2-Oct | 3-Oct |
| $ 353,025 | $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (377,434) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (654,098) | $ (1,024,450) | $ (990,155) |
| 257,562 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | 257,562 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | 257,562 | 42,295 | 42,295 |
| - | | | | | | | | | | | | - | | |
| - | | | | | | | | | | | | | | |
| 610,587 | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | (119,872) | 51,512 | 51,512 | 51,512 | 51,512 | 51,512 | (396,535) | 42,295 | 42,295 |
| (255,000) | - | - | - | (105,000) | - | (105,000) | - | - | - | (145,000) | - | (145,000) | - | (150,000) |
| (2,500) | | | (2,500) | | | (2,500) | | | | (2,500) | | (2,500) | | |
| (188,929) | - | - | - | - | - | - | | | - | (188,929) | - | (188,929) | | |
| - | | | | | | | (25,000) | | | | | (25,000) | (8,000) | (21,000) |
| (541,591) | - | - | - | - | (426,726) | (426,726) | - | - | - | - | (248,486) | (248,486) | - | - |
| - | | | | | | | (18,000) | | | | | (18,000) | | |
| - | | | | | | | | | | | | - | | |
| - | | | | | | | | | | | | - | | |
| (988,021) | - | - | (2,500) | (105,000) | (426,726) | (534,226) | (43,000) | - | - | (336,429) | (248,486) | (627,915) | (8,000) | (171,000) |
| $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (654,098) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (1,024,450) | $ (1,024,450) | $ (990,155) | $ (1,118,860) |
| $ (377,434) | $ (325,921) | $ (274,409) | $ (225,396) | $ (278,884) | $ (654,098) | $ (654,098) | $ (645,585) | $ (594,073) | $ (542,560) | $ (827,477) | $ (1,024,450) | $ (1,024,450) | $ (990,155) | $ (1,118,860) |
| | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | | 1 | 1 |

| October | | | Week | October | | | | | Week | October | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-Oct | 5-Oct | 6-Oct | 10/02-10/06 | 9-Oct | 10-Oct | 11-Oct | 12-Oct | 13-Oct | 10/09-10/13 | 16-Oct | 17-Oct | 18-Oct | 19-Oct | 20-Oct |
| $ (1,118,860) | $ (1,076,564) | $ (1,141,769) | $ (1,024,450) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,280,273) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) |
| 42,295 | 42,295 | 42,295 | 211,477 | Holiday | 42,295 | 42,295 | 42,295 | 42,295 | 169,182 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 |
| | | | - | | | | | | - | | | | | |
| 42,295 | 42,295 | 42,295 | (812,974) | - | 42,295 | 42,295 | 42,295 | 42,295 | (1,111,091) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 |
| - | (105,000) | - | (255,000) | - | (20,000) | - | (105,000) | - | (125,000) | - | - | - | (105,000) | - |
| | (2,500) | | (2,500) | | | | (2,500) | | (2,500) | | | | (2,500) | |
| | | | (29,000) | | | | | | | | | | | |
| | | | - | | | | | | - | | | | | |
| - | - | - | - | - | - | - | (188,929) | - | (188,929) | - | - | - | - | - |
| | | (180,799) | (180,799) | | | | | (193,938) | (193,938) | | | | | |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | - | | | | | | - | | | | | |
| - | (107,500) | (180,799) | (467,299) | - | (20,000) | - | (296,429) | (193,938) | (510,368) | - | - | - | (107,500) | - |
| $ (1,076,564) | $ (1,141,769) | $ (1,280,273) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,621,459) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) | $ (1,517,482) |
| $ (1,076,564) | $ (1,141,769) | $ (1,280,273) | $ (1,280,273) | $ (1,280,273) | $ (1,257,977) | $ (1,215,682) | $ (1,469,816) | $ (1,621,459) | $ (1,621,459) | $ (1,579,163) | $ (1,536,868) | $ (1,494,573) | $ (1,559,777) | $ (1,517,482) |
| 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |

| Week | October | | | | | Week | October/November | | | | | Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/16-10/20 | 23-Oct | 24-Oct | 25-Oct | 26-Oct | 27-Oct | 10/23-10/27 | 30-Oct | 31-Oct | 1-Nov | 2-Nov | 3-Nov | 10/30-11/03 |
| $ (1,621,459) | $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,517,482) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,747,010) |
| 211,477 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | 211,477 | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | 211,477 |
| - | | | | | | - | | | | | | - |
| - | | | | | | - | | | | | | - |
| (1,409,982) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | (1,306,005) | 42,295 | 42,295 | 42,295 | 42,295 | 42,295 | (1,535,533) |
| (105,000) | - | - | - | (105,000) | - | (105,000) | - | - | - | (105,000) | - | (105,000) |
| (2,500) | | | | (2,500) | | (2,500) | | | (2,500) | | | (2,500) |
| - | - | - | - | (188,929) | - | (188,929) | - | - | (8,000) | (21,000) | - | (29,000) |
| - | | | (25,000) | | | (25,000) | | | | | | - |
| - | | | | | | - | | | | | | - |
| - | - | - | - | - | (101,575) | (101,575) | - | - | - | - | - | - |
| - | - | - | (18,000) | - | - | (18,000) | - | - | - | - | - | - |
| - | | | | | | - | (9,750) | | | | | - |
| - | | | | | | - | | | | | | - |
| (107,500) | - | - | (43,000) | (296,429) | (101,575) | (441,005) | (9,750) | - | (10,500) | (126,000) | - | (136,500) |
| $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,747,010) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,681,783) | $ (1,672,033) |
| $ (1,517,482) | $ (1,475,186) | $ (1,432,891) | $ (1,433,596) | $ (1,687,729) | $ (1,747,010) | $ (1,747,010) | $ (1,714,464) | $ (1,672,169) | $ (1,640,373) | $ (1,724,078) | $ (1,681,783) | $ (1,672,033) |
| | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DEBTORS' STATUS REPORT DATED OCTOBER 16, 2017; DECLARATION OF L. GEOFF GREULICH IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 16, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Cathrine M Castaldi    ccastaldi@brownrudnick.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **Aaron S Craig    acraig@kslaw.com, lperry@kslaw.com**
- **Monica Y Kim    myk@lnbrb.com, myk@ecf.inforuptcy.com**
- **Krikor J Meshefejian    kjm@lnbrb.com**
- **Tania M Moyron    tania.moyron@dentons.com, chris.omeara@dentons.com**
- **S Margaux Ross    margaux.ross@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**
- **Sharon Z. Weiss    sharon.weiss@bryancave.com, raul.morales@bryancave.com**

**2.  SERVED BY UNITED STATES MAIL**: On **October 16, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 16, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 16, 2017 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                     **F 9013-3.1.PROOF.SERVICE**

Ironclad Performance Wear (8300)
OUST, Secured, Committees

United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, California 90017

**Secured Creditor**
Radians Wareham Holding, Inc.
Attn: Mike Tutor, CEO
5305 Distriplex Farms
Memphis, TN 38141

**Counsel to Radians Wareham Holdings**
E. Franklin Childress, Jr.
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
165 Madison Ave, Suite 2000
Memphis, TN  38103

**Counsel to Radians Wareham Holdings**
Sharon Z. Weiss
Bryan Cave
120 Broadway, Suite 300
Santa Monica, CA 90401

**Creditors Committee:**

*Committee Counsel*
Brown Rudnick LLP
Attn: Cathrine M Castaldi
2211 Michelson Dr 7th Fl
Irvine, CA 92612

Resources Global Professionals
c/o Brent Waters
17101 Armstrong Ave
Irvine, CA 92614

Winspeed Sports (Shanghai) Co., LTD
c/o Brian Mitteldorf
Creditors Adjustment Bureau
14226 Ventura Blvd.
Sherman Oaks, CA 91423

PT Sport Glove Indonesia
c/o Mark C. Robba
Kranoon Desa Pandowoharjo
Sleman Yogyakarta 55512
Indonesia

**Equity Committee:**

*Equity Committee Counsel*
Dentons US LLP
Attn: Samuel Maizel & Tania Moyron
601 South Figueroa St., Suite 2500
Los Angeles, CA 90017-5704

Patrick W O'Brien
301 Whitmore Lane
Lake Forrest, IL 60045-4707

Ronald Chez
1524 N. Astor Street
Chicago, IL 60610

Scott Jarus
938 Duncan Avenue
Manhattan Beach, CA 90266

**Interested Parties:**

Advantage Media Services
29010 Commerce Center Drive
Valencia, CA 91355