Shiva Delrahim Beck (SBN 228841)
GARDERE WYNNE SEWELL LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas  75201
(214) 999-3000
(214) 999-4667 (fax)
Email: sbeck@gardere.com

Attorneys for William M. Aisenberg and Jeffrey Cordes

**UNITED STATES BANKRUPTCY COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>Ironclad Performance Wear Corporation, a California corporation,<br><br>　　　Debtor and Debtor in Possession.<br><br>In re:<br><br>Ironclad Performance Wear Corporation, a Nevada corporation,<br><br>　　　Debtor and Debtor in Possession.<br><br>[X]　Affects both Debtors<br><br>[ ]　Affects Ironclad Performance Wear Corporation a California corporation only<br><br>[ ]　Affects Ironclad Performance Wear Corporation a Nevada corporation only | Lead Case No. 1:17-bk-12408-MB<br><br>Jointly administered with: 1:17-bk-12409-MB<br><br>(Ironclad Performance Wear Corporation, a Nevada corporation)<br><br>Chapter 11 Cases<br><br>**DECLARATION OF JEFFREY CORDES IN SUPPORT OF LIMITED OBJECTION OF JEFFREY CORDES AND WILLIAM M. AISENBERG TO THE DEBTORS' SALE MOTION**<br><br>Hearing Date:<br>October 30, 2017<br>Time: 10:00 a.m.<br>Ctrm: 303<br>　　21041 Burbank Blvd.<br>　　Woodland Hills, CA 91367 |

I, Jeffrey Cordes, hereby state and declare as follows:

　　　1.　　My name is Jeffrey Cordes.  I am over the age of eighteen (18) years.  I am of sound mind, capable of making this Declaration and fully competent to testify to the matters

stated in this Declaration.   I have personal knowledge of each matter stated in this Declaration, and they are true and correct to the best of my knowledge.   Each matter stated herein is based on my own personal knowledge and on my review of relevant documents.   I make this Declaration in support of the *Limited Objection of Motion of Jeffrey Cordes and William M. Aisenberg to the Debtors' Sale Motion*, which is being filed contemporaneously herewith.

2.      Prior to their respective bankruptcy filings, I served as the President and Chief Executive Officer of Ironclad Performance Wear Corp., a California corporation, and Ironclad Performance Wear Corp., a Nevada corporation, the debtors and debtors-in-possession (collectively, the "**Debtors**") in the above referenced chapter 11 cases (the "**Chapter 11 Cases**").   The Chapter 11 Cases were initiated on September 8, 2017 (the "**Petition Date**").

3.      Prior to the Petition Date, (i) Debtors incurred obligations to me, which are mature and remain unpaid and (ii) I initiated an action against the Debtors that is currently pending before the American Arbitration Association, Reference No. 1220057366 (the "**AAA Proceeding**") in connection with the Debtors' breaches of certain employment agreements and related documents among the Debtors and me.   Additionally, I incurred, and expect to incur, legal expenses that are recoverable as an insured under Directors and Officers indemnity coverage purchased by Debtors for their benefit and the benefit of me.

4.      On October 3, 2017, I timely filed my proof of claim with the Bankruptcy Court at Claim No. 8-1 (the "**Claim**").[1]

5.      The Claim arises pursuant to three interrelated documents that define the terms of my former employment with the Debtors.   These include: (a) that certain *Employment Letter Agreement* dated February 3, 2014 between the Debtors and me (the "**Cordes Agreement**")[2]; (b) that certain *Employee Proprietary Information and Inventions Agreement* (the "**Cordes PIIA**")[3] dated February 3, 2014; and (c) an amendment to certain terms of the

---

[1] A true and correct copy of the proof of Claim is attached hereto as **Exhibit A**.

[2] A true and correct copy of the Cordes Agreement is attached hereto as **Exhibit B**.

[3] A true and correct copy of the Cordes PIIA is attached hereto as **Exhibit C**.

1    Cordes Agreement and Cordes PIIA dated January 1, 2017 (the "**Cordes Amendment**").[4] [5]

2    6.    On or around July 4, 2017, I resigned from my positions with the Debtors.

3    Pursuant to the Cordes Agreement and the Cordes Amendment, upon my termination with the

4    Debtors, I became entitled to an <u>unconditional</u> right to six months of severance pay, in the

5    total aggregate amount of not less than $150,000.00 (the "**Cordes Severance Pay**").  Prior to

6    the Petition Date, I was advised that the Debtors did not intend to pay the Cordes Severance

7    Pay.  I hold a breach of contract claim against the Debtors in connection with the Debtors'

8    failure to pay the Cordes Severance Pay and I am entitled to damages resulting from the

9    Debtors' breaches.  The only obligation remaining under the Cordes Employment Agreement

10    is for the Debtors to pay the Cordes Severance Pay and related fees or costs associated

11    therewith.

12    7.    On or about September 7, 2017, I submitted a demand for arbitration pursuant

13    to JAMS Rule 5(a)(ii), initiating the AAA Proceeding.

14    8.    As of the Petition Date, the Debtors held a professional liability insurance

15    policy through QBE Insurance Corporation, policy number QPL019727, covering the period

16    of May 11, 2017 through June 1, 2018 (the "**Policy**").[6]  I am an insured person under the

17    Policy.  Pursuant to the Policy, I am authorized to pursue coverage with respect to legal

18    expenses incurred as a result of any investigation conducted by the Debtors of me, and any

19    breach of duty claims pursued by the Debtors or its shareholders against me.

20    9.    On October 9, 2017, the Debtors filed the Debtors' *Motion for an Order* (the

21    "**Sale Order**"*): (1) Approving Sale of Substantially All of the Debtors' Assets Free and Clear*

22    *of All Encumbrances; (2) Approving of Debtors' Assumption and Assignment of Certain*

23    *Unexpired Leases and Executory Contracts and Determining Cure Amounts and Approving*

24    *of Debtors' Rejection of Those Unexpired Leases and Executory Contracts Which Are Not*

25    *Assumed and Assigned; (3) Waiving the 14-Day Stay Periods Set Forth in Bankruptcy Rules*

---

26    [4] A true and correct copy of the Cordes Amendment is attached hereto as **Exhibit D**.

27    [5] Collectively, the Cordes Agreement, the Cordes PIIA, and the Cordes Amendment are referred to as the "**Cordes Employment Agreement**."

28    [6] A true and correct copy of the Policy is attached hereto as **Exhibit E**.

6004(h) and 6006(d); and (4) Granting Related Relief; Memorandum of Points and Authorities [Docket No. 95] (the "**Sale Motion**").

10.     On October 9, 2017, Debtors filed their *Notice of Hearing on Debtors' Motion for an Order: (1) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances; (2) Approving of Debtors' Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and Determining Cure Amounts and Approving of Debtors' Rejection of Those Unexpired Leases and Executory Contracts Which Are Not Assumed and Assigned; (3) Waiving the 14-Day Stay Periods Set Forth in Bankruptcy Rules 6004(h) and 6006(d); and (4) Granting Related Relief; Memorandum of Points and Authorities* [Docket No. 96] (the "**Sale Hearing Notice**").    The Sale Hearing Notice establishes Monday, October 16, 2017 as the deadline to file or otherwise submit an objection to the Sale Motion.  I did not receive the Sale Hearing Notice until Friday, October 13, 2017, only one business day prior to the October 16 objection deadline.  I filed the Objection as soon as reasonably practicable after having received the Sale Hearing Notice.

By my limited Objection, I request that the Sale Order include language providing (i) that the Debtors' proposed sale, if approved, shall not affect my rights to pursue claims against the Debtors under the Cordes Employment Agreement; (ii) that the Debtors' proposed sale, if approved, shall not affect my rights as an insured party under the Policy to pursue any insurance proceeds to which I may be, or in the future may become, entitled; (iii) that the Debtors are prohibited from terminating or otherwise allowing the Policy to lapse; (iv) that the Cordes Employment Agreement (a) is not an "executory contract," as that term is used in the Bankruptcy Code, (b) is not among those Designated Contracts being assumed by the Debtors and Assigned to the Purchaser, and (c) is not rejected by the Debtors; and (v) that any language in the Sale Order establishing that a party to an executory contract has not incurred any pecuniary loss is inapplicable to the Cordes Employment Agreement.

*[Signature Page Follows]*

1   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

2   correct to the best of my knowledge and belief.

3

4   Executed this 20th day of October 2017 in _____.

5

6   _____

7   Jeffrey Cordes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>Exhibit A</u>**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Fill in this information to identify the case:**

Debtor 1 **Ironclad Performance Wear Corporation**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Central District of California

Case number **17-12408** MB



## Official Form 410

# Proof of Claim

4/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

---

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

**Jeffrey Cordes**
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

**Gardere Wynne Sewell, LLP c/o Alan J. Perkins**
Name

**2021 McKinney Avenue, Suite 1600**
Number       Street

**Dallas**          **TX**       **75201**
City          State       ZIP Code

Contact phone **214.999.4683**

Contact email **aperkins@gardere.com**

Where should payments to the creditor be sent? (if different)

**Jeffrey Cordes**
Name

**1570 Bent Creek Drive**
Number       Street

**Southlake**       **TX**       **76092**
City          State       ZIP Code

Contact phone

Contact email **jeff.cordes@jvcventures.com**

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — —

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
          MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____166,906.75   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attachment.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                 $_____

Amount of the claim that is secured:   $_____

Amount of the claim that is unsecured:  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $_____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☑ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $____12,850.00 |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  09 26 2017
          MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Jeffrey Cordes | | |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | |
|---|---|

| Company | |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 1570 Bent Creek Drive | | |
|---|---|---|---|
| | Number      Street | | |
| | Southlake | TX | 76092 |
| | City | State | ZIP Code |

| Contact phone | _____ | Email | jeff.cordes@jvcventures.com |
|---|---|---|---|

*Ironclad Performance Wear Corporation*
**Case No. 17-12408**
**United States Bankruptcy Court for the Central District of California**
**San Fernando Valley Division**

## EXHIBIT A TO PROOF OF CLAIM

1.      <u>Claimant</u>: Jeffrey Cordes is an individual with an address located at 1570 Bent

Creek Drive, Southlake, Texas 76092. This proof of claim (the "**Claim**") is filed pursuant to 11

U.S.C. §§ 105(a) and 501 and Federal Rules of Bankruptcy Procedure 3002 and 3003.

2.      <u>Debtor</u>: Upon information and belief, debtor Ironclad Performance Wear

Corporation (the "**Debtor**") maintains offices at 15260 Ventura Blvd., 20th Floor, Sherman Oaks,

California 91403. The Debtor's "**Chapter 11 Case**" is currently pending before the United

States Bankruptcy Court for the Central District of California, San Fernando Valley Division,

under case number 17-12408.

3.      <u>Indebtedness</u>: As of the date of the entry of the Order for Relief in this Chapter 11

Case, September 8, 2017 (the "**Petition Date**"), the outstanding indebtedness owing from the

Debtor to Mr. Cordes was not less than **$166,906.75** (the "**Indebtedness**"), excluding attorneys'

fees and expenses accrued after the Petition Date.

4.      <u>Basis for Claim</u>:   Prior to the Petition Date, Mr. Cordes served as the Debtor's

President and Chief Executive Officer. The Indebtedness arises pursuant to three interrelated

documents that define the terms of Mr. Cordes's former employment with the Debtor. These

include: (a) that certain *Employment Letter Agreement* dated February 3, 2014 between the

Debtor and Mr. Cordes (the "**Agreement**"); (b) that certain *Employee Proprietary Information*

*and Inventions Agreement* (the "**PIIA**") dated February 3, 2014; and (c) an amendment to certain

terms of the Agreement and PIIA dated January 1, 2017 (the "**Amendment**").[1]   On or around

July 4, 2017, Mr. Cordes resigned from his positions with the Debtor.   Pursuant to the

---

[1] The Debtor is in possession of the documentation referenced herein evidencing Mr. Cordes's Claim. Copies of any such documentation may be made available upon request to Mr. Cordes's counsel at the contact information provided below.

**PAGE 1 OF 5**

**EXHIBIT A TO JEFFREY CORDES'S PROOF OF CLAIM**

*Ironclad Performance Wear Corporation*
**Case No. 17-12408**
**United States Bankruptcy Court for the Central District of California**
**San Fernando Valley Division**

Agreement and the Amendment, upon his termination with the Debtor, Mr. Cordes became entitled to an <u>unconditional</u> right to six months of severance pay, in the total aggregate amount of not less than $150,000.00 (the "**Severance Pay**"). Prior to the Petition Date, after being advised that the Debtor did not intend to pay the Severance Pay, Mr. Cordes engaged the counsel identified below to represent him in connection with the Debtor's breaches for failure to pay same. On or about September 7, 2017, Mr. Cordes submitted a demand for arbitration pursuant to JAMS Rule 5(a)(ii). Section 21 of the PIIA contains the arbitration clause pursuant to which Mr. Cordes filed his arbitration demand. Attachment C to the PIIA requires the Debtor to bear the cost of the arbitrator's fees and other costs unique to arbitration. Prior to the Petition Date, Mr. Cordes incurred $16,906.75 in attorneys' fees in connection with the Debtor's breach of the Agreement and the Amendment. Mr. Cordes holds a breach of contract claim against the Debtor in connection with the Debtor's failure to pay the Severance Pay and is entitled to damages resulting from the Debtor's breaches. Accordingly, the total Indebtedness owing from the Debtor is not less than $166,906.75. Mr. Cordes reserves the right to amend this Claim as additional damages resulting from the Debtor's breach of the Agreement and the Amendment discovered.

5.     <u>Priority Claim.</u> Of the total Indebtedness, Mr. Cordes is entitled to a priority claim of not less than $12,850.00. Pursuant to 11 U.S.C. § 507(a)(4)(A), allowed unsecured claims earned within 180 days before the date of the filing of the Debtor's petition for "wages, salaries, or commissions, including ... severance ... earned by an individual," are entitled to an allowed priority claim, subject to a statutory cap of $12,850.00. Mr. Cordes became entitled to $150,000.00 in severance pay on July 4, 2017, which is within 180 days prior to the Petition Date. Accordingly, Mr. Cordes's priority claim totals $12,850.00.

**PAGE 2 OF 5**

EXHIBIT A TO JEFFREY CORDES'S PROOF OF CLAIM

*Ironclad Performance Wear Corporation*
**Case No. 17-12408**
**United States Bankruptcy Court for the Central District of California**
**San Fernando Valley Division**

6.    <u>Post-Petition Claims</u>. The Debtor is indebted to Mr. Cordes for all costs and expenses incurred by Mr. Cordes from and after the Petition Date in connection with the claims herein asserted (including, without limitation, interest, legal fees, and expenses) and for post-petition interest on all claims of Mr. Cordes.

7.    <u>Reservation of Administrative Expense Priority</u>: The Indebtedness detailed in this Proof of Claim and Proof of Claim Exhibit represents the Debtor's pre-Petition Date financial obligations due and owing to Mr. Cordes as of the Petition Date. Mr. Cordes may be entitled to a post-petition administrative expense priority claim on amounts incurred by the Debtor on and after the Petition Date ("**Administrative Claim**"). Mr. Cordes intends to file the appropriate papers and comply with the appropriate procedures for allowance and collection of its Administrative Claim in due course and timing of the Debtor's Chapter 11 Case, including, without limitation, amendment of this Proof of Claim, if required.

8.    <u>Other Rights</u>: The Claim described in this Exhibit A is legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever. No portion of the Claim or any funds previously paid to Mr. Cordes are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Mr. Cordes expressly reserves the right in the future to assert any and all claims that he may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which he may be entitled. Mr. Cordes additionally claims the benefit of (a) all adequate-protection security interests, liens, mortgages, and other rights and protections granted to him or received by him from and after the Petition Date by operation of law, orders of this Court, or otherwise; (b) all

**PAGE 3 OF 5**

<span style="font-variant: small-caps">Exhibit A to Jeffrey Cordes's Proof of Claim</span>

*Ironclad Performance Wear Corporation*
**Case No. 17-12408**
**United States Bankruptcy Court for the Central District of California**
**San Fernando Valley Division**

renewals, extensions, ratifications, supplements, amendments, corrections, and other prior or

subsequent documentation evidencing or relating to the claims of Mr. Cordes; and (c) any other

filed or recorded documents. The filing of this proof of claim is not to be construed as an election

of remedies. Mr. Cordes further reserves the rights (a) to amend, modify or supplement this proof

of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the

purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued

or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of

Mr. Cordes set forth herein; (b) to file additional proofs of claim; and (c) against third parties.

9.    <u>Notices</u>: All notices to Mr. Cordes are to be sent to:

> Jeffrey Cordes
> 1570 Bent Creek Drive
> Southlake, Texas 76092
>
> with copies to:
> Alan J. Perkins
> Gardere Wynne Sewell LLP
> 2021 McKinney Avenue, Suite 1600
> Dallas, TX 75201

10.    <u>Payments</u>:  All payments and distributions to Mr. Cordes with respect to this

proof of claim are to be made as follows:

> Jeffrey Cordes
> 1570 Bent Creek Drive
> Southlake, Texas 76092
> Re: *Ironclad Performance Wear Corporation*

11.    <u>Miscellaneous</u>:  This proof of claim is filed under compulsion of the bar date

established in this Chapter 11 Case solely out of an abundance of caution to protect Mr. Cordes

from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this

proof of claim shall not be construed as an admission by Mr. Cordes as to the amounts due and

**PAGE 4 OF 5**

**EXHIBIT A TO JEFFREY CORDES'S PROOF OF CLAIM**

*Ironclad Performance Wear Corporation*
**Case No. 17-12408**
**United States Bankruptcy Court for the Central District of California**
**San Fernando Valley Division**

owing outside of this bankruptcy proceeding. The filing of this proof of claim is **not**: (a) a waiver or release of Mr. Cordes's rights or remedies against any person, entity or property; (b) a consent by Mr. Cordes to the jurisdiction of this Court with respect to the subject matter of the claim or any objection or other proceeding commenced in this Chapter 11 Case against or otherwise involving Mr. Cordes; (c) a consent by Mr. Cordes to entry of final judgment by this Court in any core proceeding commenced in this Chapter 11 Case, consistent with the United States Supreme Court's holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (d) a waiver of the right to move to withdraw the reference or otherwise challenge the jurisdiction of this Court; (e) a waiver of the right to a jury trial; (f) an election of a remedy which waives or otherwise affects any other remedy; or (g) a waiver of the right to assert a different or enhanced classification of priority for its Claim in respect of the other claims asserted in this Chapter 11 Case.

EXHIBIT A TO JEFFREY CORDES'S PROOF OF CLAIM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Exhibit B</u>**

*Ironclad Performance Wear*
*2201 Park Place, Suite 101*
*El Segundo, California 90245*

February 3, 2014

Jeff Cordes
1570 Bent Creek Drive
Southlake, Texas 76092

Dear Jeff:

Ironclad Performance Wear Corp. (the "***Company***") is pleased to offer you employment on the following terms:

1. **Position**.  You will serve in a full-time capacity as Chief Executive Officer of the Company, and so long as you serve in that capacity, will have a position on the Board of Directors of the Company (the "***Board***").  You will report directly to the Board.  Your primary duties will be those normally and customarily vested in the office of Chief Executive Officer of a corporation, subject to the supervision, direction and control of the Board.  By signing this letter agreement, you represent and warrant to the Company you are under no contractual commitments inconsistent with your obligations to the Company.

2. **Salary and Bonus**.  You will be paid a salary at the annual rate of $300,000, payable in semi-monthly installments in accordance with the Company's standard payroll practices for salaried employees.  Your pay will be reviewed annually by the Board. Your pay will be subject to adjustment pursuant to the Company's employee compensation policies in effect from time to time. You will also have the opportunity to earn an incentive bonus of $125,000 (with upside potential with over-achievement of the corporate objectives) based upon the Company's achieving its stated revenue and Operating Income (Operating Income is defined as Earnings before interest, tax, depreciation, amortization, and stock option expense) targets, and upon you and or the Company achieving certain stated corporate objectives. The actual bonus plan will be completed with your input within 30 days of the commencement date of your employment. Your earned bonus will be paid based upon the results of 2014, with 50% paid in cash on or before the end of Q1 2015 and 50% paid in restricted stock. The restricted stock will be granted, if the bonus is earned, at the end of Q1 2015, and 50% of such grant (the "***Unvested Portion***") shall be subject to a risk of forfeiture until such time as the Board reasonably determines that the 2015 performance will surpass the 2014 performance for revenue and Operating Income, and upon such determination, the Unvested Portion shall become fully vested. If the Board has not made the determination that 2015 performance for revenue and Operating Income will surpass the same for 2014 on or before December 31, 2015, the Unvested Portion shall become forfeited. You will be responsible for making your own determination as to whether you will make an 83(b) election with respect to the Unvested Portion and pay income tax on the Unvested Portion at the fair market value thereof on the date of grant, or wait until the Unvested Portion becomes fully vested, and pay income tax on the Unvested Portion at the fair market value thereof on the date of vesting.

Jeff Cordes
February 3, 2014
Page 2

3. **Stock Options.**    Subject to the approval of the Company's Board of Directors or its Compensation Committee, you will be granted an option to purchase 2,700,000 shares of the Company's Common Stock. The exercise price per share will be equal to the fair market value per share on the last trading date prior to your first day of employment, which will be the date the option is actually granted. The option will be subject to the terms and conditions applicable to options granted under the Company's Stock Incentive Plan, as described in that Plan and the applicable stock option agreement. You will vest in 25% of the option shares after 12 months of continuous service, and the balance will vest in monthly installments over the next 36 months of service, as described in the applicable stock option agreement. In the event there is a sale of the Company to an unaffiliated third party buyer (provided that a "going private" transaction or private equity investment or purchase of equity interests in the Company shall not be considered a "sale" even if it might constitute a "change in control"), during the term of your employment, your unvested stock options shall be vested immediately prior to such sale. In the event there is a "going private" transaction or private equity investment or purchase of equity interests in the Company that is not considered a "sale," during the term of your employment, **and** if your employment with the Company is terminated by the Company for any reason other than "cause" (as defined below) within 6 months thereafter, your unvested stock options shall be vested immediately upon such termination.

4. **Employment Benefits.**   During your employment, you shall be eligible to participate in all operative employee benefit and welfare plans of the Company then in effect from time to time and in respect of which all executive officers of the Company generally are entitled to participate, including, to the extent then in effect, group life, medical, disability and other insurance plans, all on the same basis applicable to employees of the Company who are senior executive officers. You shall also be entitled to vacation benefits commensurate with that provided to senior executive officers, and reimbursement of all business expenses in accordance with the Company's policies on expense reimbursement. We understand that you will be commuting to California from your home in Texas. The Company agrees to pay the reasonable costs of your commute and lodging in California, pursuant to arrangements to be determined between you and the Company.

5. **Proprietary Information and Inventions.** Like all Company employees, you will be required, as a condition to your employment with the Company, to sign the Company's standard Employee Proprietary Information and Inventions Agreement, a copy of which is attached hereto as Exhibit A.

6. **Period of Employment.** Your employment with the Company will be "at will," meaning that either you or the Company will be entitled to terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. Notwithstanding the foregoing, in the event your employment is terminated by the Company other than for "cause" (as defined below) (A) within six (6) months of a sale of the Company to an unaffiliated third party buyer or any "going private" transaction or private equity investment or purchase of equity interests in the Company that

Jeff Cordes
February 3, 2014
Page 3

results in a change in the beneficial ownership of securities of the Company of more than fifty percent (50%) of the total combined voting power of all outstanding securities of the Company, the Company shall continue to pay your then-current base salary for a period of twelve (12) months following the effective date of such termination, and (B) at any other time during the term of your employment, the Company shall continue to pay your then-current base salary for a period of six (6) months following the effective date of such termination. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company. For purposes of this letter agreement, "cause" means (i) a material breach of any provision of any written agreement between you and the Company after notice to you of the particular details thereof and a period of 30 days thereafter within which to cure such breach and your failure to cure such breach within such 30 day period; (ii) conviction of, or a plea of nolo contendere for, any felony criminal offense or any offense involving dishonesty or moral turpitude; (iii) engaging in dishonest or fraudulent activities which are injurious to Company; (iv) refusal to follow any lawful directives of the Board; (v) gross negligence or incompetence or willful misconduct which is injurious to Company; or (vi) breach of fiduciary duty to the Company which involves a material personal profit.

7. **Outside Activities**. While you render services to the Company, you will not engage in any other gainful employment, business or activity without the written consent of the Board. While you render services to the Company, you also will not assist any person or organization in competing with the Company, in preparing to compete with the Company or in hiring any employees of the Company.

8. **Withholding Taxes**. All forms of compensation referred to in this letter are subject to reduction to reflect applicable withholding and payroll taxes.

9. **Entire Agreement**. This letter and the Exhibit attached hereto contain all of the terms of your employment with the Company and supersede any prior understandings or agreements, whether oral or written, between you and the Company.

10. **Amendment and Governing Law**. This letter agreement may not be amended or modified except by an express written agreement signed by you and a duly authorized officer of the Company. THE TERMS OF THIS LETTER AGREEMENT AND THE RESOLUTION OF ANY DISPUTES WILL BE GOVERNED BY CALIFORNIA LAW, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

Pursuant to Ironclad's policy for hiring executive officers, this offer is contingent upon the satisfactory results of a background check, and your passing a drug screening test. Also, as required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States.

Jeff Cordes
February 3, 2014
Page 4

We hope that you find the foregoing terms acceptable. You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter and the enclosed Proprietary Information and Inventions Agreement and returning them to the Company.

This offer, if not accepted, will expire at the close of business on February 9, 2014.

If you have any questions, please call me at office (303) 228-8760 or cell (720) 470-5411.

Very truly yours,

**IRONCLAD PERFORMANCE WEAR CORP.**

By: _____
     Vane Clayton, Director

I have read and accept this employment offer:

_____
Signature of Jeff Cordes

Dated: 2/9 ___, 2014

## IRONCLAD PERFORMANCE WEAR CORPORATION
## INDEMNIFICATION AGREEMENT

This Indemnification Agreement (*"Agreement"*) is effective as of February 11, 2014, by and between Ironclad Performance Wear Corporation, a Nevada corporation (the *"Company"*), and Jeff Cordes (*"Indemnitee"*).

WHEREAS, the Company and Indemnitee recognize the increasing difficulty in obtaining liability insurance for its officers and directors, the significant increases in the cost of such insurance and the general reductions in the coverage of such insurance; and

WHEREAS, the Company and Indemnitee further recognize the substantial increase in corporate litigation, subjecting officers and directors to expensive litigation risks at the same time as the availability and coverage of liability insurance has been severely limited; and

WHEREAS, Indemnitee does not regard the current protection available as adequate under the present circumstances, and the Indemnitee and other officers and directors of the Company may not be willing to continue to serve in such capacities without additional protection; and

WHEREAS, the Company desires to attract and retain the services of highly qualified individuals, such as Indemnitee, to serve the Company and, in part, in order to induce Indemnitee to continue to provide services to the Company, wishes to provide for the indemnification and advancing of expenses to Indemnitee to the maximum extent permitted by law.

NOW, THEREFORE, in consideration for Indemnitee's agreement to continue to serve the company, the Company and Indemnitee hereby agree as follows:

1.      **Indemnification.**

(a)      **Indemnification of Expenses.** The Company shall indemnify Indemnitee to the fullest extent permitted by law if Indemnitee was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, or any hearing, inquiry or investigation that Indemnitee in good faith believes might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism, whether civil, criminal, administrative, investigative or other, including any proceeding by or in the right of the Company or any subsidiary of the Company (hereinafter a *"Claim"*) by reason of (or arising in part out of) any event or occurrence, arising or occurring at any time before or after the date of this Agreement, related to the fact that Indemnitee is or was a director, officer, employee or agent of the Company, or any subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, or by reason of any action or inaction on the part of Indemnitee while serving in such capacity (hereinafter an *"Indemnifiable Event"*) against any and all expenses (including attorneys' fees, disbursements of and retainers, accounting and witness fees, travel and deposition costs, and all other costs, expenses and obligations incurred in connection with investigating, defending, being a witness in or participating in (including an appeal), or preparing to defend, be a witness in or participate in, any such action, suit, proceeding, alternative dispute resolution mechanism, hearing, inquiry or investigation),

judgments, fines, penalties and amounts paid in settlement (if such settlement is approved in advance by the Company, which approval shall not be unreasonably withheld) of such Claim and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement (collectively hereinafter, "*Expenses*"), including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses.

(b)    **Reviewing Party.**  Notwithstanding the foregoing, (i) the obligation of the Company under Section 1(a) shall be subject to the condition that the Reviewing Party (as defined in Section 10(e) hereof) shall not have determined (in a written opinion in any case in which the Independent Legal Counsel referred to in Section 1(c) hereof is involved) that Indemnitee would not be permitted to be indemnified under applicable law, and (ii) the obligation of the Company to make an advance payment of Expenses to Indemnitee pursuant to Section 2(a) (an "*Expense Advance*") shall be subject to the condition that, if, when and to the extent that the Reviewing Party shall have determined that Indemnitee would not be permitted to be so indemnified under applicable law, the Company shall be entitled to be reimbursed by Indemnitee (who hereby agrees to reimburse the Company) for all such amounts theretofore paid; provided, however, that if Indemnitee has commenced or thereafter commences legal proceedings in a court of competent jurisdiction to secure a determination that Indemnitee should be indemnified under applicable law, any determination made by the Reviewing Party that Indemnitee would not be permitted to be indemnified under applicable law shall not be binding and Indemnitee shall not be required to reimburse the Company for any Expense Advance until a final judicial determination is made with respect thereto (as to which all rights of appeal therefrom have been exhausted or lapsed). Indemnitee's obligation to reimburse the Company for any Expense Advance shall be unsecured and no interest shall be charged thereon. If there has not been a Change in Control (as defined in Section 10(c) hereof), the Reviewing Party shall be selected by the Board of Directors, and if there has been such a Change in Control (other than a Change in Control which has been approved by a majority of the Company's Board of Directors who were directors immediately prior to such Change in Control), the Reviewing Party shall be the Independent Legal Counsel referred to in Section 1(c) hereof. If there has been no determination by the Reviewing Party or if the Reviewing Party determines that Indemnitee substantively would not be permitted to be indemnified in whole or in part under applicable law, Indemnitee shall have the right to commence litigation seeking an initial determination by the court or challenging any such determination by the Reviewing Party or any aspect thereof, including the legal or factual bases therefor, and the Company hereby consents to service of process and to appear in any such proceeding. Any determination by the Reviewing Party otherwise shall be conclusive and binding on the Company and Indemnitee.

(c)    **Change in Control.**  The Company agrees that if there is a Change in Control of the Company (other than a Change in Control which has been approved by a majority of the Company's Board of Directors who were directors immediately prior to such Change in Control) then with respect to all matters thereafter arising concerning the rights of Indemnitee to payments of Expenses and Expense Advances under this Agreement or any other agreement or under the Company's Articles of Incorporation or Bylaws as now or hereafter in effect, Independent Legal Counsel (as defined in Section 10(d) hereof) shall be selected by Indemnitee and approved by the Company (which approval shall not be unreasonably withheld).  Such counsel, among other things, shall render its written opinion to the Company and Indemnitee as to whether and to what extent Indemnitee would be permitted to be indemnified under applicable law

2

and the Company agrees to abide by such opinion. The Company agrees to pay the reasonable fees of the Independent Legal Counsel referred to above and to indemnify fully such counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(d)    **Mandatory Payment of Expenses.** Notwithstanding any other provision of this Agreement other than <u>Section 9</u> hereof, to the extent that Indemnitee has been successful on the merits or otherwise, including, without limitation, the dismissal of an action without prejudice, in defense of any action, suit, proceeding, inquiry or investigation referred to in <u>Section 1(a)</u> hereof or in the defense of any claim, issue or matter therein, Indemnitee shall be indemnified against all Expenses incurred by Indemnitee in connection therewith.

2.    **Expenses; Indemnification Procedures.**

(a)    **Advancement of Expenses.** The Company shall advance all Expenses incurred by Indemnitee in connection with the investigation, defense, settlement or appeal of any Claim referenced in <u>Sections 1(a)</u> hereof. Indemnitee hereby undertakes to repay such amounts advanced only if, and to the extent that, it shall ultimately be determined that Indemnitee is not entitled to be indemnified by the Company as authorized hereby. The advances to be made hereunder shall be paid by the Company to Indemnitee within thirty (30) days following delivery of a written request therefor by Indemnitee to the Company.

(b)    **Notice/Cooperation by Indemnitee.** Indemnitee shall, as a condition precedent to Indemnitee's right to be indemnified under this Agreement, give the Company notice in writing as soon as practicable of any Claim made against Indemnitee for which indemnification will or could be sought under this Agreement. Notice to the Company shall be directed to the Chief Executive Officer of the Company at the address shown on the signature page of this Agreement (or such other address as the Company shall designate in writing to Indemnitee). In addition, Indemnitee shall give the Company, at the Company's expense, such information and cooperation as it may reasonably require and as shall be within Indemnitee's power.

(c)    **Procedure.** Any indemnification and advances of Expenses provided for in this Agreement shall be made no later than thirty (30) days after receipt of the written request of Indemnitee. If a claim under this Agreement is not paid in full by the Company within thirty (30) days after a written request for payment therefor has first been received by the Company, Indemnitee may, but need not, at any time thereafter bring an action against the Company to recover the unpaid amount of the claim and, subject to <u>Section 13</u> of this Agreement, Indemnitee shall also be entitled to be paid for the expenses (including attorneys' fees) of bringing such action. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in connection with any action, suit or proceeding in advance of its final disposition) that Indemnitee has not met the standards of conduct which make it permissible under applicable law for the Company to indemnify Indemnitee, but the burden of proving such defense shall be on the Company and Indemnitee shall be entitled to receive interim payments of Expenses pursuant to <u>Section 2(a)</u> unless and until such defense is finally adjudicated by court order or judgment from which no further right of appeal exists. It is the intention of the parties that if the Company contests Indemnitee's right to indemnification under this Agreement or applicable law, the question of Indemnitee's right to indemnification shall be for the court to decide, and neither

3

the failure of the Reviewing Party to have made a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct required by this Agreement or by applicable law, nor an actual determination by the Reviewing Party that Indemnitee has not met such applicable standard of conduct, shall create a presumption that Indemnitee has not met the applicable standard of conduct.

(d)    **Notice to Insurers.**  If, at the time of the receipt by the Company, of a notice of a Claim pursuant to <u>Section 2(b)</u> hereof, the Company has liability insurance in effect which may cover such claim, the Company shall give prompt notice of the commencement of such Claim to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such action, suit, proceeding, inquiry or investigation in accordance with the terms of such policies.

(e)    **Selection of Counsel.**  In the event the Company shall be obligated hereunder to pay the Expenses of any Claim, the Company, if appropriate, shall be entitled to assume the defense of such Claim with counsel approved by Indemnitee, upon the delivery to Indemnitee of written notice of its election so to do; *provided, however,* that (i) the Company shall have no right to assume the defense of any Claim which seeks, in whole or in part, any remedy other than monetary damages (e.g., injunction, specific performance, criminal sanctions) or which could, if Indemnitee were not to prevail therein, materially damage Indemnitee's personal or business reputation, and (ii) the Company shall have no right to assume the defense of any Claim unless the Company first agrees fully and unconditionally, in writing, that the Company is obligated to indemnify Indemnitee in full with respect thereto, and waives any and all defenses, counterclaims or set-offs which might otherwise be asserted in limitation or mitigation of such indemnification obligation. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee under this Agreement for any fees of counsel subsequently incurred by Indemnitee with respect to the same Claim; provided that, (i) Indemnitee shall have the right to employ Indemnitee's counsel in any such Claim at Indemnitee's expense and (ii) if (A) the employment of counsel by Indemnitee has been previously authorized by the Company, (B) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Company and Indemnitee in the conduct of any such defense, or (C) the Company shall not, in fact, have retained or continued to retain such counsel to defend such Claim, then the reasonable fees and expenses of Indemnitee's counsel shall be at the expense of the Company.

3.    **Additional Indemnification Rights; Nonexclusivity.**

(a)    **Scope.**  Notwithstanding any other provision of this Agreement, the Company hereby agrees to indemnify the Indemnitee to the fullest extent permitted by law, notwithstanding that such indemnification is not specifically authorized by the other provisions of this Agreement, the Company's Articles of Incorporation, the Company's Bylaws or by statute. In the event of any change after the date of this Agreement in any applicable law, statute or rule which expands the right of a Nevada corporation to indemnify a member of its Board of Directors or an officer, such changes shall be, ipso facto, within the purview of an Indemnitee's rights, and the Company's obligations, under this Agreement. In the event of any change in any applicable law, statute or rule which narrows the right of a Nevada corporation to indemnify a member of its

4

Board of Directors or an officer, such changes, to the extent not otherwise required by such law, statute or rule to be applied to this Agreement, shall have no effect on this Agreement or the parties' rights and obligations hereunder.

(b)     **Nonexclusivity**. The indemnification provided by this Agreement shall not be deemed exclusive of any rights to which an Indemnitee may be entitled under the Company's Articles of Incorporation, the Company's Bylaws, any agreement, any vote of stockholders or disinterested Directors, the Nevada Revised Statutes, or otherwise, both as to action in Indemnitee's official capacity and as to action in another capacity while holding such office. The indemnification provided under this Agreement shall continue as to Indemnitee for any action taken or not taken while serving in an indemnified capacity even though Indemnitee may have ceased to serve in such capacity at the time of any action, suit or other covered proceeding.

4.     **No Duplication of Payments**. The Company shall not be liable under this Agreement to make any payment in connection with any Claim made against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, Articles of Incorporation, Bylaw or otherwise) of the amounts otherwise indemnifiable hereunder.

5.     **Partial Indemnification**. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of Expenses incurred by him in connection with any Claim, but not, however, for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion of such Expenses to which Indemnitee is entitled.

6.     **Mutual Acknowledgment**. Both the Company and Indemnitee acknowledge that in certain instances, Federal law or applicable public policy may override Nevada law and prohibit the Company from indemnifying its directors and officers under this Agreement or otherwise. For example, the Company and Indemnitee acknowledge that the Securities and Exchange Commission has taken the position that indemnification is not permissible for liabilities arising under certain federal securities laws, and federal legislation prohibits indemnification for certain ERISA violations. Indemnitee understands and acknowledges that the Company has undertaken or may be required in the future to undertake with the Securities and Exchange Commission to submit the question of indemnification to a court in certain circumstances for a determination of the Company's right under public policy to indemnify Indemnitee. The Company agrees to assert vigorously, in any such action pertaining to the Company's right to indemnify Indemnitee, the position that the Company has the full and unfettered right to so indemnify Indemnitee, and further agrees that Indemnitee may, at any time and in Indemnitee's sole discretion, assume control of the Company's defense of such right (including without limitation selection of counsel and determination of strategy), with such defense nonetheless being conducted at the Company's expense.

7.     **Officers and Director Liability**. The Company will obtain and maintain a policy or policies of insurance with reputable insurance companies providing the officers and directors of the Company with coverage for losses from wrongful acts, or to ensure the Company's performance of its indemnification obligations under this Agreement. In all policies of director and officer liability insurance, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are accorded to the most favorably insured of

5

the Company's directors, if the Indemnitee is a director; or of the Company's officers, if the Indemnitee is not a director of the Company but is an officer; or of the Company's key employees, if Indemnitee is not an officer or director but is a key employee. Notwithstanding the foregoing, the Company shall have no obligation to obtain or maintain such insurance if the Company determines in good faith that such insurance is not reasonably available, the premium costs for such insurance are disproportionate to the amount of coverage provided, the coverage provided by such insurance is limited by exclusions so as to provide an insufficient benefit, or Indemnitee is covered by a similar insurance maintained by a subsidiary or parent of the Company.

8.    **Exceptions.**  Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement:

(a)    **Excluded Action or Omissions.**  To indemnify Indemnitee for acts, omissions or transactions from which Indemnitee may not be relieved of liability under applicable law;

(b)    **Claims Initiated by Indemnitee.**  To indemnify or advance expenses to Indemnitee with respect to Claims initiated or brought voluntarily by Indemnitee and not by way of defense, except (i) with respect to actions or proceedings brought to establish or enforce a right to indemnification under this Agreement or any other agreement or insurance policy or under the Company's Articles of Incorporation or Bylaws now or hereafter in effect relating to Claims for Indemnifiable Events, (ii) in specific cases if the Board of Directors has approved the initiation or bringing of such Claim, or (iii) as otherwise required under Section 78.7502 of the Nevada Revised Statutes, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advance expense payment or insurance recovery, as the case may be;

(c)    **Lack of Good Faith.**  To indemnify Indemnitee for any expenses incurred by the Indemnitee with respect to any proceeding instituted by Indemnitee to enforce or interpret this Agreement, if a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous;

(d)    **Insured Claims.**  To indemnify Indemnitee for expenses or liabilities of any type whatsoever (including, but not limited to, judgments, fines, ERISA excise taxes or penalties, and amounts paid in settlement) which have been paid directly to Indemnitee by an insurance carrier under a policy of officers' and directors' liability insurance maintained by the Company or any parent or subsidiary of the Company;

(e)    **Claims Under Section 16(b).**  To indemnify Indemnitee for expenses or the payment of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 16(b) of the Securities Exchange Act of 1934, as amended, or any similar successor statute;

(f)    **Failure to Settle Proceeding.**  In the event that Indemnitee Fails to Pursue a Recommended Settlement of a Qualifying Claim, to indemnify Indemnitee (i) for amounts paid or payable in settlement of such Qualifying Claim in excess of the amount of such Recommended Settlement thereof, or (ii) for any Expenses directly related to such Qualifying Claim incurred by Indemnitee following the date upon which Indemnitee Fails To Pursue such Recommended

6

Settlement. For purposes of this clause, "*Qualifying Claim*" shall mean any claim the defense of which may be assumed by the Company under Section 2(e) above (i.e., any claim that (A) is not described in the first clause (i) of said Section 2(e) and (B) with respect to which the Company has acknowledged its unconditional duty to indemnify as described in first clause (ii) of said Section 2(e)), "*Recommended Settlement*" shall mean a reasonable written settlement proposal, in full and final executable form in all material respects, and "*Fails To Pursue*" shall mean either (i) Indemnitee's failure to communicate a Recommended Settlement to the principal adverse party in the subject matter within 30 days after Indemnitee' receipt thereof from the Company, or (ii) Indemnitee's failure to agree to any Recommended Settlement that has been accepted by all adverse parties in the subject matter within 30 days after receipt thereof, *provided* the Company has (A) irrevocably deposited all funds necessary to satisfy all of Indemnitee's obligations under such Recommended Settlement in an account subject to Indemnitee's or a third party's control and (B) irrevocably taken all actions and given all instructions necessary or appropriate to permit such funds to be applied in satisfaction of such obligations of Indemnitee; or

      (g)    **Breach of Employment Agreement.** To indemnify Indemnitee for any breach by Indemnitee of any employment agreement between Indemnitee and the Company or any of its subsidiaries.

      9.    **Period of Limitation.** No legal action shall be brought and no cause of action shall be asserted by or in the right of the Company against Indemnitee, Indemnitee's estate, spouse, heirs, executors or personal or legal representatives after the expiration of two years from the date of accrual of such cause of action, and any claim or cause of action of the Company shall be extinguished and deemed released unless asserted by the timely filing of a legal action within such two-year period; provided, that if any shorter period of limitations is otherwise applicable to any such cause of action, such shorter period shall govern.

      10.    **Construction of Certain Phrases.**

      (a)    For purposes of this Agreement, references to the "*Company*" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its officers and directors, so that if Indemnitee is or was an officer or director of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, Indemnitee shall stand in the same position under the provisions of this Agreement with respect to the resulting or surviving corporation as Indemnitee would have with respect to such constituent corporation if its separate existence had continued.

      (b)    For purposes of this Agreement, references to "*other enterprises*" shall include employee benefit plans; references to "*fines*" shall include any excise taxes assessed on Indemnitee with respect to an employee benefit plan; and references to "*serving at the request of the Company*" shall include any service as an officer or director of the Company which imposes duties on, or involves services by, such officer or director with respect to an employee benefit plan, its participants or its beneficiaries and if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit

plan, Indemnitee shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement.

(c)        For purposes of this Agreement a "*Change in Control*" shall be deemed to have occurred if (i) any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the company in substantially the same proportions as their ownership of stock of the Company, (A) who is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing 10% or more of the combined voting power of the Company's then outstanding Voting Securities, increases his beneficial ownership of such securities by 5% or more over the percentage so owned by such person, or (B) becomes the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing more than 20% of the total voting power represented by the Company's then outstanding Voting Securities, (ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors of the Company and any new director whose election by the Board of Directors or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination or election was previously so approved, cease for any reason to constitute a majority thereof, or (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation other than a merger or consolidation which would result in the Voting Securities of the company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into Voting Securities of the surviving entity) at least 80% of the total voting power represented by the Voting Securities of the company or such surviving entity outstanding immediately after such merger or consolidation, or the stockholders of the company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of (in one transaction or a series of transactions) all of substantially all of the Company's assets.

(d)        For purposes of this Agreement, "*Independent Legal Counsel*" shall mean an attorney or firm of attorneys, selected in accordance with the provisions of Section 1(c) hereof, who shall not have otherwise performed services for the Company or Indemnitee within the last three years (other than with respect to matters concerning the rights of Indemnitee under this Agreement, or of other indemnitees under similar indemnity agreements).

(e)        For purposes of this Agreement, a "*Reviewing Party*" shall mean any appropriate person or body consisting of a member or members of the Company's Board of Directors or any other person or body appointed by the Board of Directors who is not a party to the particular claim for which Indemnitee is seeking indemnification, or Independent Legal Counsel.

(f)        For purposes of this Agreement, "*Voting Securities*" shall mean any securities of the Company that vote generally in the election of directors.

11.        **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall constitute an original.

8

12.    **Binding Effect; Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the company, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all, or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform the Company's obligations under this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place. This Agreement shall continue in effect regardless of whether Indemnitee continues to serve as a director or officer of the Company or of any other enterprise at the Company's request.

13.    **Attorneys' Fees.** In the event that any action is instituted by Indemnitee under this Agreement or under any liability insurance policies maintained by the Company to enforce or interpret any of the terms hereof or thereof, Indemnitee shall be entitled to be paid all Expenses incurred by Indemnitee with respect to such action, regardless of whether Indemnitee is ultimately successful in such action, and shall be entitled to the advancement of Expenses with respect to such action, unless as a part of such action a court of competent jurisdiction over such action determines that each of the material assertions made by Indemnitee as a basis for such action were not made in good faith or were frivolous. In the event of an action instituted by or in the name of the Company under this Agreement to enforce or interpret any of the terms of this Agreement, Indemnitee shall be entitled to be paid all Expenses incurred by Indemnitee in defense of such action (including costs and expenses incurred with respect to Indemnitee's counterclaims and crossclaims made in such action), and shall be entitled to the advancement of Expenses with respect to such action, unless as a part of such action a court having jurisdiction over such action determines that each of Indemnitee's material defenses to such action were made in bad faith or were frivolous.

14.    **Notice.** All, notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) if delivered by hand and signed for by the party addressed, on the date of such delivery, or (ii) if mailed by domestic certified or registered mail with postage prepaid, on the third business day after the date postmarked. Addresses for notice to either party are as shown on the signature page of this Agreement, or as subsequently modified by written notice.

15.    **Severability.** The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law. Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable, that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

9

16.   **Choice of Law**.  This Agreement shall be governed by and its provisions construed and enforced in accordance with the laws of the State of Nevada without regard to the conflict of laws principles thereof.

17.   **Subrogation**.  In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all documents required and shall do all acts that are necessary to secure such rights and to enable the Company effectively to bring suit to enforce such rights.

18.   **Amendments and Termination**.  No amendment, modification, termination or cancellation of this Agreement shall be effective unless it is in writing signed by both the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

19.   **Integration and Entire Agreement**.  This Agreement sets forth the entire understanding between the parties hereto and supersedes and merges all previous written and oral negotiations, commitments, understandings and agreements relating to the subject matter hereof between the parties hereto.

20.   **No Construction as Employment Agreement**.  Nothing contained in this Agreement shall be construed as giving Indemnitee any right to be retained in the employ of the Company or any of its subsidiaries.

*[Signature Page Follows]*

10

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

IRONCLAD PERFORMANCE WEAR CORPORATION
a Nevada corporation, as the Company

By: _____
Name: Vane Clayton
Title: Director

Notice Address:

Ironclad Performance Wear Corporation
2201 Park Place, Suite 101
El Segundo, CA 90245
Attn:   EVP of Finance

AGREED TO AND ACCEPTED:

INDEMNITEE:

_____
(Signature)

Jeff Cordes, CEO Ironclad

Notice Address:

1570 BENT CREEK DR
SOUTHLAKE TX 76092

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Exhibit C</u>**

## EMPLOYEE
## PROPRIETARY INFORMATION
## AND INVENTIONS AGREEMENT

This EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT (the "*Agreement*") is entered into between me and Ironclad Performance Wear Corp. (the "*Company*"). In consideration of my employment or continuing employment with the Company, I agree as follows:

1.    **Definitions.**

    **1.1.**    "*Company Materials*" means any and all of the Company's equipment, devices and other property and documents and other media that contain or embody information relating to the Company and all manifestations of Proprietary Information.

    **1.2.**    "*Inventions*" means any and all inventions and improvements (whether or not patentable), works of authorship, derivative works, trade secrets, technology, computer programs or software, algorithms, formulas, compositions, ideas, designs, processes, techniques, know-how and data made, conceived, reduced to practice or developed by me (in whole or in part, either alone or jointly with others).

    **1.3.**    "*Proprietary Information*" means any and all information, knowledge and data obtained from the Company (whether conveyed visually, orally or in writing) concerning the Company's actual or anticipated business, research, developments, products, services or finances including, without limitation, algorithms, trade secrets, computer programs and software, source code, data structures, databases, scripts, application programming interfaces, protocols, drawings, designs, mask works, formulas, technology, ideas, know-how, products, features and modes of operation, services, customer and supplier lists and compilations containing customer or supplier information, contacts at or knowledge of clients or prospective clients, finances, processes, schematics, specifications, techniques, compositions, inventions and improvements (whether or not patentable), patent applications, discoveries, works of authorship, derivative works, technical, business, financial, customer and product related plans, analyses, compilations, studies, forecasts and strategies, the salaries, terms of compensation, skill levels, duties and other terms of employment of other employees, the terms and existence of third party agreements, negotiations with third parties, and information which is received in confidence by or for the Company from any third party subject to a duty on the Company's part to maintain the confidentiality of such information.

    **1.4.**    "*Rights*" means any and all patent rights, copyright rights, trademark rights, trade secret rights, mask work rights, *sui generis* database rights, industrial design rights and all other intellectual property, industrial property and proprietary rights recognized anywhere in the world, now or in the future.

2.    **Proprietary Information.** All Proprietary Information and all Rights in connection therewith are the sole property of the Company and its successors and assigns. I hereby irrevocably assign to the Company, and its successors and assigns, any and all Rights I may have or acquire in Proprietary Information and all Rights therein. At all times, both during and after my employment with the Company, I will keep in strict confidence and trust and will not use, disclose or publish any Proprietary Information without the prior written consent of an officer of the Company, except as may be necessary and appropriate in the ordinary course of performing the duties of my employment. In addition, I will obtain the Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at the Company and/or incorporates any Proprietary Information. The foregoing restrictions shall not apply to any information that (i) is or becomes publicly known through lawful means; (ii) was rightfully in my possession or part of my general knowledge prior to my employment by the Company as specifically identified in <u>Attachment A</u> hereto; or (iii) is disclosed to me without confidentiality obligations or restrictions on use or disclosure by a third party who rightfully possesses the information (without confidentiality obligations or restrictions on use or disclosure) and who did not receive such information, directly or indirectly, from the Company. By signing this Agreement, I acknowledge understanding that the identities, goals, needs and strategic plans of individuals and entities currently or prospectively served by the Company ("*Clients*"), and the terms on which such Clients do business or seek to do business with the Company, (all of the foregoing, "*Client Information*") has independent economic value to the Company and is not readily ascertainable from public sources. I further understand that the Company has expended considerable time and effort to develop, compile and protect the secrecy of Client Information, and has expressly identified Client Information to me as a valuable trade secret of the Company.

3.    **Company Materials.** All Company Materials are the sole property of the Company. I will not remove any Company Materials from the business premises of the Company or deliver any Company Materials to any third party, except as may be necessary and appropriate in the ordinary course of performing the duties of my employment. I acknowledge that the Company's information technology systems (including, without limitation, computer networks,

email systems, telephone systems and voicemail systems) and all devices (whether owned by me or the Company) that access or otherwise communicate with the Company's information technology systems including, without limitation, computers, cell phones and tablets, contain Proprietary Information and I agree not to use the Company's information technology systems for any improper purpose, which includes, without limitation, working on behalf of any person or entity other than the Company during working hours or otherwise. I further agree that upon the termination of my employment by me or by the Company for any reason, or for no reason, or during my employment if so requested by the Company, I will immediately return to the Company all Company Materials, apparatus, equipment and other physical property, or any reproduction of such property, excepting only (i) my personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copy of this Agreement. I further agree that any property situated on the premises of the Company and owned by the Company, including discs, flash drives and other storage media, filing cabinets or other work areas, is subject to inspection by the personnel of the Company at any time with or without notice.

4.    **Intellectual Property.**

    **4.1.**    I agree that all Inventions during my employment and all Rights therein shall be the sole property of the Company and its successors and assigns. Subject to Section 4.2 below, I hereby irrevocably assign and agree to assign in the future (when any such Invention or Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company, and its successors and assigns, without further consideration, all of my right, title and interest in and to any and all Inventions and Rights during the period of my employment with the Company to the maximum extent permitted by Section 2870 of the California Labor Code, a copy of which is provided in Attachment B hereto. No assignment in this Agreement shall extend to Inventions, the assignment of which is prohibited by California Labor Code Section 2870.

    **4.2.**    I acknowledge and agree that each original work of authorship which is made by me (in whole or in part, either alone or jointly with others) within the scope of my employment and which is protectable by copyright (collectively, "*Work*") is a "work made for hire" as defined in the United States Copyright Act (17 U.S.C., Section 101).

    **4.3.**    If any Invention assigned hereunder or any Work is based on, or incorporated in, or is an improvement or derivative of, or cannot be reasonably made, used, modified, maintained, supported, reproduced and sold or distributed without using or violating technology or rights owned or licensed by me and not assigned hereunder, I hereby grant the Company and its successors and assigns a perpetual, irrevocable, worldwide, fully paid-up, royalty-free, non-exclusive and sublicensable right and license to make, use, sell, offer for sale, copy, adapt, distribute, display, publicly perform, exploit and exercise all such technology and rights in support of the Company's exercise or exploitation of any Work or assigned Invention (including modifications, improvements and derivatives thereof) or any Rights.

    **4.4.**    I agree to perform, during and after my employment, all acts deemed necessary or desirable by the Company to permit and assist it, at the Company's expense, in evidencing, perfecting, applying for, prosecuting, obtaining, maintaining, defending and enforcing in any and all countries all Rights relating to any Work or in any Invention assigned to the Company hereunder and the assignment thereof. Such acts may include, without limitation, execution and delivery of documents and assistance or cooperation in legal proceedings (including appearance as a witness). I also agree to assign all my right, title and interest in and to any particular Invention to a third party including, without limitation, the United States Government, as directed by the Company. Should the Company be unable to secure my signature on any document necessary to evidence, perfect, apply for, prosecute, obtain, maintain, defend or enforce any Rights relating to any Work or assigned Invention, whether due to my mental or physical incapacity or any other cause, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorneys-in-fact, with full power of substitution, to act for and in my behalf and instead of me, to execute, verify and file any documents and to do all other lawfully permitted acts to further the above purposes with the same legal force and effect as if executed by me and I acknowledge that the foregoing power is coupled with an interest. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Rights assigned hereunder.

    **4.5.**    Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "*Moral Rights*"). To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such waiver and consent. I agree to confirm any such waivers and consents from time to time

as requested by the Company.

    **4.6.**    I will promptly disclose in writing, to my immediate supervisor or to any persons designated by the Company, all Inventions conceived, reduced to practice, used, sold, exploited or developed by me (in whole or in part, either alone or jointly with others) during the term of my employment. In addition, to the extent I would not be in breach of my confidentiality obligations to a future employer, I will promptly disclose in writing to the Company all Inventions conceived, reduced to practice, used, sold, exploited or developed by me (in whole or in part, either alone or jointly with others) during the six (6) months after termination of my employment (***"Presumed Inventions"***). Such disclosures shall be received by the Company in confidence (to the extent they are not assigned in Section 4.1 above) and do not extend such assignment. I will not disclose Inventions covered by Section 4.1 to any third party, unless I am requested in writing by the Company to do so. Because of the difficulty of establishing when any Presumed Invention is first conceived or developed by me, or whether it results from access to Proprietary Information or the Company's equipment, facilities, and/or data, I agree that all Presumed Inventions and all Rights associated therewith shall be presumed to be Inventions subject to assignment under Section 4.1. I can rebut this presumption, if I prove that a Presumed Invention is not an Invention subject to assignment under Section 4.1.

**5.**    **Prior Inventions.** Attachment A contains a complete list of all Inventions prior to the commencement of my employment with the Company to which I claim ownership as of the date of this Agreement and that I desire to specifically clarify are excluded from this Agreement, and I acknowledge and agree that such list is complete. If disclosure of any such Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Invention in Attachment A, but I am only to disclose a name for each such Invention, a listing of the party(ies) to whom it belongs and the fact that disclosure as to such Invention has not been made for that reason. If no such list of Inventions is attached to this Agreement, I represent that I have no such Inventions at the time of signing this Agreement.

**6.**    **Non-Solicitation of Employees.** During my employment with the Company and for two (2) years thereafter, I will not, without the express prior written approval from the Company's Chief Executive Officer, directly or indirectly, (i) solicit or encourage any individual, who was employed or engaged by the Company (including any consultant of the Company) on the date of my termination of employment or any time during the six (6) months prior to the termination of my employment, to leave or terminate his or her employment or consultancy with the Company, (ii) assist any other person or entity in so encouraging or soliciting any such individual or (iii) recruit or assist in recruiting any such individual for employment or consultancy by any person or entity other than the Company.

**7.**    **Non-Solicitation of Customers and Vendors.** At no time during or after my employment with the Company will I engage, without the express prior written approval from the Company's Chief Executive Officer, directly or indirectly, in any of the following conduct: (i) make use of any trade secret or other Proprietary Information to divert or attempt to divert any business from the Company, or to solicit or attempt to solicit any business, on my own behalf or on behalf of any person or entity other than the Company; (ii) induce or attempt to induce, on my own behalf or on behalf of any person or entity other than the Company, any customer, client, licensee or other third party to sever or breach any existing contractual relationship with the Company; or (iii) induce or attempt to induce, on my own behalf or on behalf of any person or entity other than the Company, any customer, client, licensee or other third party to sever or abandon any non-contractual or prospective business relationship with Company.

**8.**    **Non-Competition During Employment.** I agree that, at all times during my employment with the Company, I will not engage, directly or indirectly, in any employment, business, or activity that is in any way competitive with the business or reasonably anticipated business of the Company or would otherwise conflict with my employment by the Company, and I will not assist any third party in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company.

**9.**    **No Conflict with Obligation to Third Parties.** I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment with the Company. I have not entered into, and I agree I will not enter into, any agreement, either written or oral, in conflict with my obligations under this Agreement or in conflict with my employment with the Company.

**10.**    **Prior Actions and Knowledge.** I represent and warrant that, from the time of my first contact or communication with the Company, I have held in strict confidence all Proprietary Information and have not (i) disclosed any Proprietary Information or delivered any Company Materials to anyone outside of the Company, or (ii) used, copied, published, or summarized any Proprietary Information or removed any Company Materials from the business premises of the Company, except to the extent necessary to carry out my responsibilities as an employee of the Company.

11.    **Former Employer Information.** I acknowledge that the Company does not wish to receive any confidential information, proprietary information or trade secrets of my former or concurrent employers and I agree that I will not, during my employment with the Company, improperly use or disclose any confidential information, proprietary information or trade secrets of any of my former or concurrent employers. I agree that I will not bring onto the premises of, or transmit to, the Company any unpublished document or other property belonging to any of my former or concurrent employers unless consented to in writing by them.

12.    **Not an Employment Agreement.** I agree that this Agreement is not an employment contract and does not confer upon me any right to employment or continuing employment by the Company. If I am an at-will employee of the Company, this Agreement in no way modifies that status.

13.    **Other Employee Obligations.** I agree that this Agreement does not purport to set forth all of the terms and conditions of my employment, and that as an employee of the Company I have obligations to the Company which are not set forth in this Agreement.

14.    **Survival.** All of the provisions of this Agreement shall continue in effect after any termination of my employment with the Company.

15.    **Controlling Law.** This Agreement shall be governed by the laws of the State of California without regard to conflicts of laws principles. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any lawsuit filed there against me by Company arising from or related to this Agreement.

16.    **Severability.** If any provision of this Agreement is held to be illegal or unenforceable, such illegal or unenforceable provision shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms. If any of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law.

17.    **Successors and Assigns.** This Agreement shall be effective as of the first day of my employment with the Company or the first day on which the Company disclosed, or discloses, any Proprietary Information to me, whichever occurs first. This Agreement shall be binding upon me, my heirs, executors, assigns, administrators and other legal representatives and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

18.    **Authorization to Notify New Employers.** I hereby authorize the Company to notify any of my actual or prospective future employers about my rights and obligations under this Agreement.

19.    **Attorneys' Fees.** The prevailing party in any legal action arising from or relating to this Agreement shall be entitled to recover his, her or its costs incurred in prosecuting and/or defending against such action, including reasonable attorneys' fees.

20.    **Equitable Relief.** I acknowledge and agree that because of the unique nature of Proprietary Information and Inventions, the provisions set forth in this Agreement are necessary and reasonable to protect the interests of the Company, and that any breach or threatened breach of any provision of this Agreement by me, or at my direction, would cause great and irreparable harm to the Company for which there would be no adequate remedy at law. Therefore, in addition to any other rights and remedies the Company may have, I agree that the Company, without the necessity of proving actual damages, shall be entitled to temporary and permanent injunctive relief, specific performance and other equitable relief to prevent me from breaching or continuing to breach this Agreement. I further agree that the Company shall be entitled to such relief without posting a bond or making any undertaking. Any such requirement of a bond or undertaking is hereby waived by me, and I acknowledge that in the absence of such a waiver, a bond or undertaking might otherwise be required by the Court.

21.    **Arbitration.** I agree that any controversy, claim or dispute arising out of or in any way relating to this Agreement, the breach thereof, my employment by the Company or the ending of such employment, shall be settled by final and binding arbitration in accordance with the Mutual Agreement to Arbitrate, a copy of which is attached as Attachment C hereto, which I agree to execute concurrent with my execution of this Agreement.

22.    **Modification; Entire Agreement.** This Agreement can only be modified by a subsequent written agreement or subsequent written amendment to this Agreement executed, in either case, by an officer of the Company. The terms of this Agreement (including all Attachments, which are incorporated herein by this reference) are the sole and final expression of my agreement with respect to its subject matter and may not be contradicted by evidence of any prior or contemporaneous agreement.

*[Signature Page Follows]*

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.   I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL  THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

Dated: Feb 18 , 2014

Employee Signature

JEFF CORDES
Name (type or print)

ACCEPTED AND AGREED:

IRONCLAD PERFORMANCE WEAR CORP.

By _____

Name: _____

Title: _____

## ATTACHMENT A

1.      The following is a complete list of Inventions relevant to the subject matter of my employment with Ironclad Performance Wear Corp. (the "*Company*") that have been made, conceived, reduced to practice or developed by me (in whole or in part, either alone or jointly with others) prior to my employment by the Company that I desire to clarify are not subject to the Company's Employee Proprietary Information and Inventions Agreement.

☑  No Inventions            _____ (*initials*)

☐  See below:

_____

_____

☐  Additional sheets attached

2.      Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the party(ies) identified below:

|      | Invention/Improvement | Party(ies) | Relationship |
|------|----------------------|------------|--------------|
| 1.   |                      |            |              |
| 2.   |                      |            |              |
| 3.   |                      |            |              |

☐  Additional sheets attached.

_____
Employee Signature

JEFF CORDES
Name (type or print)

## ATTACHMENT B

Section 2870. Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

## ATTACHMENT C

## MUTUAL AGREEMENT TO ARBITRATE

This MUTUAL AGREEMENT TO ARBITRATE (the *"Arbitration Agreement"*) is entered into between Ironclad Performance Wear Corp. (*"Company"*) and the undersigned employee, as of the date set forth below. The words "you" and "your" in this Arbitration Agreement refer to the undersigned employee and anyone acting on the employee's behalf including, without limitation, the employee's family, heirs, agents and assigns.

You and the Company are executing this Arbitration Agreement to obtain the benefit of a speedy, impartial and cost-effective dispute resolution procedure. For the right to resolve your claims by arbitration rather than through the courts, you agree with the Company as follows:

1.        **Agreement to Arbitrate.** Except as otherwise expressly provided in this Arbitration Agreement, you and the Company agree to settle by final and binding arbitration the following claims and controversies (*"Arbitrable Claims"*), arising out of or relating to your employment by the Company, which the Company may have against you or you may have against the Company or any of its affiliates, or against any past or present owner, associate, employee, consultant or agent of the Company or any of its affiliates, in their capacity as such: (a) any claim involving conduct alleged to be in violation of any local, state or federal statute or common law (including, but not limited to, any claim of unlawful discrimination, harassment or retaliation); and (b) any claim arising out of or relating to the ending of your employment with the Company.

2.        **Arbitration Procedures.** Arbitration shall be filed with JAMS, Inc. (*"JAMS"*), and heard by one arbitrator (the *"Arbitrator"*) in Los Angeles County, California. The arbitration shall be conducted in accordance with the JAMS Employment Arbitration Rules and Procedures (the *"Rules"*) in effect at the time the claim is made. The Rules can be found at www.jamsadr.com/rules-employment-arbitration/. California Code of Civil Procedure Section 1283.05, which provides for certain discovery rights, shall apply to any arbitration. The Arbitrator shall apply, as applicable, federal or California substantive law and law of remedies. The Arbitrator's remedial authority shall be no greater than that available under each statutory or common law theory asserted. The Arbitrator shall issue a written opinion that includes the factual and legal basis for any decision and award. A judgment upon any award rendered by the Arbitrator may be entered in any court having jurisdiction. You, the Company, legal counsel and the Arbitrator shall treat all arbitration proceedings, including any decision, award and opinion in support thereof, as confidential, and the Arbitrator shall issue such orders as are reasonably necessary to maintain such confidentiality. The Company shall bear the cost of the Arbitrator's fees and other costs unique to arbitration in compliance with applicable law.

3.        **Claims Not Covered By This Arbitration Agreement.** This Arbitration Agreement does not apply to or cover the following claims: (a) claims by you for workers' compensation benefits; (b) claims by you for unemployment compensation benefits; (c) claims brought in a court of competent jurisdiction by either you or the Company to compel arbitration under this Arbitration Agreement, to enforce an arbitration award or to obtain preliminary injunctive and/or other equitable relief in support of claims to be prosecuted in an arbitration by either party; (d) claims based upon a pension or benefit plan that contains an arbitration or other dispute resolution procedure, in which case the provisions of such plan shall apply; and (e) any other claim not identified as an "Arbitrable Claim" in Section 1 above.

4.        **Survival of Provisions.** This Arbitration Agreement shall continue in effect after your employment relationship with the Company ends and shall apply to any claim whether it arises or is asserted before, during or after the ending of your employment relationship with the Company. You and the Company agree that this Arbitration Agreement can be modified or revoked only by a writing, signed by both you and the Company, which specifically states that you and the Company both intend to modify or revoke this Arbitration Agreement.

5.        **Severability.** The Arbitrator shall have sole and exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement including, but not limited to, any claim that all or any part of this Agreement is invalid, voidable or unenforceable. If the Arbitrator finds that any one or more provisions of this Agreement is, for any reason, invalid, voidable or unenforceable, in whole or in part, with respect to any claim or class of claims, the Arbitrator's finding shall in no way affect any other provision of this Agreement or the validity or enforcement of the remainder of this Agreement, and any provision thus affected shall itself be modified only to the extent necessary to bring the provision within the applicable requirements of the law.

6.    **Sole and Entire Agreement.**   You and the Company acknowledge that this Arbitration Agreement constitutes the complete agreement of the parties on the subject matter contained herein, and supersedes any prior or contemporaneous oral or written agreement or understanding on the subject matter contained herein.

IRONCLAD PERFORMANCE WEAR CORP.

By_____

Name: **Vane Clayton**

Title: **Director**

Date: **Feb 11, 2014**

**EMPLOYEE'S ACCEPTANCE**

I acknowledge that I have carefully read and understand the foregoing Arbitration Agreement and that I agree to be bound by and comply with all its terms.  I acknowledge that I have entered into this Arbitration Agreement voluntarily and that I am not relying on any representation, oral or written, as to the effect, enforceability or meaning of this Arbitration Agreement; except as specifically set forth in this Arbitration Agreement.  I UNDERSTAND AND ACKNOWLEDGE THAT BY SIGNING THIS ARBITRATION AGREEMENT, THE COMPANY AND I ARE GIVING UP THE RIGHT TO A JURY TRIAL AND TO A TRIAL IN A COURT OF LAW WITH RESPECT TO ANY ARBITRABLE CLAIM EITHER OF US MAY HAVE AGAINST THE OTHER.  I ALSO UNDERSTAND AND ACKNOWLEDGE THAT BY SIGNING THIS ARBITRATION AGREEMENT, THE COMPANY AND I EACH EXPRESSLY WAIVE THE RIGHT TO PURSUE ANY ARBITRABLE CLAIM AGAINST THE OTHER THROUGH ANY CLASS ACTION OR OTHER REPRESENTATIVE ACTION.

**Jeff Cordes**                                    2/18/14
Employee Name                Employee Signature                  Date

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Exhibit D</u>**

## FIRST AMENDMENT TO EMPLOYMENT LETTER AGREEMENT AND EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

This First Amendment to Employment Letter Agreement and Employee Proprietary Information and Inventions Agreement (this "*Amendment*") is dated January 1, 2017, and amends that certain letter agreement (the "*Employment Agreement*") dated February 3, 2014, between Ironclad Performance Wear Corporation (the "*Company*") and Jeff Cordes (the "*Executive*"), and that certain Employee Proprietary Information and Inventions Agreement dated February 3, 2014, between the Company and Executive (the "*PIIA*"). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Employment Agreement or the PIIA, as applicable.

WHEREAS, the parties desire to amend the Employment Agreement to revise the severance provisions thereunder as set forth herein;

WHEREAS, the parties desire to amend the PIIA to change the controlling law and to provide for an extended non-compete covenant as set forth herein;

WHEREAS, pursuant to Section 10 of the Employment Agreement the Employment Agreement may not be amended or modified except by an express written agreement signed by Executive and a duly authorized officer of the Company; and

WHEREAS, pursuant to Section 22 of the PIIA, the PIIA may only be modified by a subsequent written agreement or subsequent written amendment to the PIIA executed by an officer of the Company.

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Section 6 of the Employment Agreement is hereby amended in its entirety to read as follows:

"6.    **Period of Employment.** Your employment with the Company will be "at will," meaning that either you or the Company will be entitled to terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer.

Notwithstanding the foregoing, in the event your employment is terminated:

(A)    Within 9 months following the Sale of the Company (as defined below) (i) by the Company other than for Cause (as defined below) or (ii) by you for Good Reason (as defined below), the Company shall (1) pay in a lump sum payment 2 times your then-current base salary, such payment to be made within 20 days following the termination date, and (2) to the extent you are eligible and elect continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*") under

a health, dental, or vision plan sponsored by the Company, within the time period prescribed pursuant to COBRA, reimburse you, as and when due to the COBRA carrier, for the COBRA premiums for such coverage (at the coverage levels in effect immediately prior to your termination of employment) until the earliest to occur of (a) a period of twenty-four (24) months following the effective date of such termination, (b) the date upon which you become eligible for coverage under a health, dental, or vision insurance plan of a subsequent employer and (c) the date you cease to be eligible for COBRA coverage; or

(B)     At any other time during the term of your employment, the Company shall continue to pay your then-current base salary for a period of six (6) months following the effective date of such termination.

This is the full and complete agreement between you and the Company on this term.

Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company.

It is intended that the provisions of this letter agreement comply with Section 409A of the Internal Revenue Code and the regulations and guidance promulgated thereunder (collectively, "*Code Section 409A*"), and all provisions of this letter agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties under Code Section 409A. Notwithstanding the foregoing, Company shall have no liability with regard to any failure to comply with Code Section 409A so long as it has acted in good faith with regard to compliance therewith.

For purposes of this letter agreement, "*Cause*" means (i) a material breach of any provision of any written agreement between you and the Company after notice to you of the particular details thereof and a period of 30 days thereafter within which to cure such breach and your failure to cure such breach within such 30-day period; (ii) conviction of, or a plea of nolo contendere for, any felony criminal offense or any offense involving dishonesty or moral turpitude; (iii) engaging in dishonest or fraudulent activities which are injurious to Company; (iv) refusal to follow any lawful directives of the Board; (v) gross negligence or incompetence or willful misconduct which is injurious to the Company; or (vi) breach of fiduciary duty to the Company which involves a material personal profit.

For purposes of this letter agreement, "*Sale of the Company*" shall be defined as any sale of the Company to an unaffiliated third party buyer or any "going private" transaction or private equity investment or purchase of equity interests in the Company that results in a change in the beneficial ownership of securities of the Company of more than fifty percent (50%) of the total combined voting power of all outstanding securities of the Company.

4843-8160-7997, v. 5

For purposes of this letter agreement, *"Good Reason"* shall be defined as (i) a change in your reporting structure or change in your responsibilities or obligations that is materially inconsistent with your then existing responsibilities and obligations, without your prior written consent; (ii) any reduction in the base salary, unless such reduction is agreed to by you in writing; (iii) without limiting the generality of the forgoing, any material breach by the Company of this letter agreement; or (iv) the relocation by the Company of its principal Corporate office from within 40 miles of Dallas, Texas."

2.    Section 10 of the Employment Agreement is hereby amended in its entirety to read as follows:

"10.    **Amendment and Governing Law.** This letter agreement may not be amended or modified except by an express written agreement signed by you and a duly authorized officer of the Company. THE TERMS OF THIS LETTER AGREEMENT AND THE RESOLUTION OF ANY DISPUTES WILL BE GOVERNED BY TEXAS LAW, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES."

3.    Section 8 of the PIIA is hereby amended in its entirety to read as follows:

"8.    **Non-Competition.** I agree that at all times during my employment with the Company, and for all periods after my employment with the Company in connection with or during which I receive severance compensation from the Company (which for purposes of clarity shall be 24 months in connection with severance compensation provided under Section 6(A) and 6 months in connection with severance compensation provided under Section 6(B)), I will not engage, directly or indirectly, in any employment, business, or activity that is in any way competitive with the business or reasonably anticipated business of the Company or would otherwise conflict with my employment by the Company, and I will not assist any third party in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company."

4.    Section 15 of the PIIA is hereby amended in its entirety to read as follows:

"15.    **Controlling Law.** This Agreement shall be governed by the laws of the State of Texas without regard to conflicts of laws principles. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Texas for any lawsuit filed there against me by the Company arising from or related to this Agreement."

5.    Except as expressly modified herein, all terms and conditions of the Employment Agreement and the PIIA are hereby ratified, confirmed and approved and shall remain in full force and effect. In the event of any conflict or inconsistency between this Amendment and the Employment Agreement, or this Amendment and the PIIA, this Amendment shall govern.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

**COMPANY:**                                          **EXECUTIVE:**

**Ironclad Performance Wear Corporation**

By: _____            _____
Name:                                                   Jeff Cordes
Title:

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

**COMPANY:**                                                      **EXECUTIVE:**

**Ironclad Performance Wear Corporation**

By:_____                        _____
Name:                                                                 Jeff Cordes
Title:

**<u>Exhibit E</u>**

# QBE® Insurance Corporation

A Stock Company



## *The Solution* for Public Company D&O

---

**Home Office:**

c/o CT Corporation System
116 Pine Street, Suite 320
Harrisburg, Pennsylvania  17101

**Administrative Office:**

Wall Street Plaza
 88 Pine Street
New York, New York  10005
 1-877-772-6771

QBE and the links logo are registered service marks of QBE Insurance Group Limited.

QBPD-3000 (05-14)                                                                 **Page 1 of 2**

**This policy consists of:** Declarations
One or more coverage parts.
A coverage part consists of:
— One or more coverage forms
— Applicable forms and endorsements

**QBE Insurance Corporation**

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Robert V. James                                    Jose Ramon Gonzalez, Jr.
President                                           Secretary

POLICY NUMBER: QPL0109727

QBPD-3002 (05-14)



*The Solution* for Public Company D&O
Declarations

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office:  c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

**THIS POLICY PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  PLEASE READ THIS POLICY CAREFULLY.**

| | | |
|---|---|---|
| **Item 1**: | Parent Company: | Ironclad Performance Wear Corporation |
| | Mailing Address: | 1920 Hutton Court, Suite 300<br>Farmers Branch, Texas 75234 |
| **Item 2**: | Policy Period | From: May 11, 2017 To: June 1, 2018<br>At 12:01 A.M. Standard Time at the mailing address stated in Item 1 |
| **Item 3**: | A.  Limit of Liability: | $5,000,000 in the aggregate |
| | B.  Securityholder Derivative Demand Investigation Limit: $500,000 | |

**Item 4**:    Retentions:

|   |   |   |
|---|---|---|
| A. | Insuring Clause B – Claims other than Securities Claims: | $100,000 per Claim |
| B. | Insuring Clauses B and C – Securities Claims only: | $250,000 per Claim |
| C. | Insuring Clauses B and C – Merger Objection Claim: | $500,000 per Claim |

**Item 5**:    A. Notice to Insurer of a Claim or circumstance:         B. All Other Notices to Insurer:

| | |
|---|---|
| QBE Insurance Corporation<br>Attn: The Claims Manager<br>Wall Street Plaza<br>88 Pine Street, 18th Floor<br>New York, New York 10005<br>Telephone: (877) 772-6771<br>Email: professional.liability.claims@us.qbe.com | QBE Insurance Corporation<br>Attn: Underwriting<br>Wall Street Plaza<br>88 Pine Street, 18th Floor<br>New York, New York 10005<br>Telephone: (877) 772-6771<br>Email: MLPLadmin@us.qbe.com |

**Item 6**:    Pending or Prior Proceedings Date: May 11, 2006

**Item 7**:    Extended Reporting Period
Premium:  150% of annual premium
Length:    One Year

**Item 8**:    Premium: $38,088

In witness whereof, the Insurer has caused this Policy to be executed, but it shall not be valid unless also signed by a duly authorized representative of the Insurer.

**QBPD-3002 (05-14)**                                                                                   **Page 1 of 1**

QBE and the links logo are registered service marks of QBE Insurance Group Limited.

**QBE**

*The Solution* for Public Company D&O

In consideration of the payment of the premium, the Insurer and the **Insureds** agree as follows:

## I.   INSURING CLAUSES

A.   Side A - Non-Indemnifiable Loss Coverage for Insured Persons

The Insurer shall pay, on behalf of an **Insured Person**, **Loss** on account of a **Claim** first made during the **Policy Period** to the extent that such **Loss** has not been paid or indemnified by any **Company**.

B.   Side B - Corporate Reimbursement Coverage for Indemnification of Insured Persons

The Insurer shall pay, on behalf of a **Company**, **Loss** on account of a **Claim** first made during the **Policy Period** to the extent the **Company** pays or indemnifies an **Insured Person** for such **Loss**.

C.   Side C - Entity Coverages

The Insurer shall pay, on behalf of a **Company**, **Loss** on account of a **Securities Claim**, and **Defense Costs** on account of a **Securityholder Derivative Demand Investigation**, first made during the **Policy Period**.

## II.   EXCLUSIONS

No coverage shall be provided under this Policy for **Loss** on account of that portion of a **Claim**:

A.   Conduct - based upon, arising out of or resulting from any deliberate fraud, deliberate criminal act or deliberate violation of any statute or regulation, or any illegal profit or remuneration, by an **Insured**, established by a final, non-appealable adjudication adverse to such **Insured** in any underlying action;

With respect to Exclusion A: 1. the Insurer shall not utilize a declaratory action or proceeding brought by or against the Insurer to establish such final, non-appealable adjudication; and 2. no conduct or knowledge of any **Insured** shall be imputed to any other **Insured Person**, and only the conduct or knowledge of any past, present or future chief executive officer or chief financial officer of a **Company** shall be imputed to such **Company** and its **Subsidiaries**;

Exclusions B - F below shall not apply to any **Claim** under Insuring Clause A;

B.   Bodily Injury/Property Damage - for bodily injury, violation of a right of privacy, mental anguish, emotional distress, humiliation, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof, whether or not it is damaged or destroyed, provided that this exclusion shall not apply to: 1. a violation of a right of privacy, mental anguish, emotional distress or humiliation for which a claimant seeks compensation in an employment-related claim; or 2. a **Securities Claim**;

C.   Entity v. Insured - brought by, or on behalf of: 1. a **Company** against another **Company**; or 2. a **Company** or **Outside Entity** against an **Insured Person**, provided that this exclusion shall not apply to a **Claim** brought: (a) outside the United States of America, Canada or their territories or possessions; (b) while the **Parent Company** or **Outside Entity** is in **Financial Impairment**; (c) as a securityholder derivative action; or (d) while an **Insured Person** is no longer serving in his capacity as such;

D.   ERISA - for any violation of the responsibilities, obligations or duties imposed by **ERISA** or for any functions identified in ERISA Section 3(21)(A) as not being the functions of a fiduciary and commonly referred to as "settlor" functions;

E.   Pending or Prior Proceedings - based upon, arising out of or resulting from any action, proceeding, or **Claim** described in paragraphs 1(a) and 2 of the definition of **Claim**, pending against an **Insured** on or before the Pending or Prior Proceedings Date stated in Item 6 of the Declarations; and

F.   Prior Notice - based upon, arising out of or resulting from any claim reported, or any circumstance reported and accepted, under the insurance policy (including any policies of which such policy is a renewal policy) replaced by this Policy;

Exclusions E and F above shall not apply where this Policy is a renewal of a policy issued by the Insurer to the **Parent Company**.

## III.   RETENTION

The applicable Retentions are stated in Item 4 of the Declarations. No retention shall apply to any **Claim** under Insuring Clause A or to any **Securityholder Derivative Demand Investigation**. If different parts of a single **Claim** are subject to different Retentions, then the total amount of **Loss** applied to the applicable Retentions shall not exceed the largest applicable Retention.

QBPD-1000 (05-14)                                                                                                    Page 1 of 9

## IV.   LIMIT OF LIABILITY

A. The Limit of Liability, stated in Item 3A of the Declarations, represents the maximum amount payable under this Policy during the **Policy Period** for all **Loss**.

B. The Securityholder Derivative Demand Investigation Limit, stated in Item 3B of the Declarations, represents the maximum amount payable under this Policy during the **Policy Period** for **Defense Costs** on account of all **Securityholder Derivative Demand Investigations**, which amount shall be part of, and not in addition to the Limit of Liability stated in Item 3A of such Declarations.

C. **Defense Costs**, including those incurred on account of a **Securityholder Derivative Demand Investigation**, are part of and not in addition to the Limit of Liability.

D. The Limit of Liability shall be the limit of liability available during any applicable Extended Reporting Period.

## V.   ADVANCEMENT

A. If a **Company** fails to respond to an **Insured Person's** request for indemnification within 60 days of the **Insured Person's** request to the **Company** for such indemnification, then upon the reporting of the **Claim**, the Insurer shall advance **Defense Costs** and any other incurred **Loss** until such time that the **Company** accepts the **Insured's** request for indemnification or the Limit of Liability stated in Item 3A of the Declarations has been exhausted, whichever occurs first. In any other **Claim**, the Insurer shall advance **Defense Costs** on a current basis, but no later than 60 days after receipt of the legal bills and any supporting documentation.

B. If it is determined by a final adjudication that any advanced **Defense Costs** are not covered under this Policy, the **Insureds**, severally according to their respective interests, shall repay such uncovered **Defense Costs** to the Insurer, provided that nothing in this paragraph B shall limit the final non-appealable adjudication requirement in Exclusion A. Conduct.

## VI.   REPORTING

A. Notice of any **Claim** described in paragraphs 1(a) and 2 of the definition of **Claim** is considered timely when reported to the Insurer as soon as practicable after the **Parent Company's** Risk Manager or General Counsel first becomes aware of such **Claim**. However, the Insurer shall not assert that notice of a **Claim** is untimely unless the Insurer is materially prejudiced by the untimely notice, as determined by a final adjudication rendered only after the Insurer has exhausted all other reasonable means of determining whether it has been materially prejudiced.

B. Notice of any **Claim** described in paragraph 1(b) of the definition of **Claim** or a **Securityholder Derivative Demand Investigation** is optional, but only **Loss** incurred after such **Claim** or **Securityholder Derivative Demand Investigation** is reported is eligible for coverage under this Policy.

C. Notice of any circumstance which could give rise to a **Claim** under this Policy is optional.

D. If an **Insured** elects to report any circumstance which could give rise to a **Claim** or a **Securityholder Derivative Demand Investigation**:

1. such notice shall include information regarding the nature of any **Wrongful Acts** or alleged or potential damages and the names of any actual or potential defendants; and

2. any **Claim** that may subsequently arise out of a reported circumstance and any reported **Securityholder Derivative Demand Investigation** shall be deemed to have been first made during the **Policy Period** in which such circumstance or investigation was first reported.

## VII.   DEFENSE AND SETTLEMENT

With respect to any **Claim**:

A. the **Insured** shall:

1. have the duty to defend;

2. not agree to any settlement, stipulate to any judgment, incur any **Defense Costs**, admit any liability or assume any contractual obligation, without the Insurer's prior written consent, provided that the **Insured** may settle any **Claim**, without the Insurer's prior written consent, where the amount of such settlement, including **Defense Costs**, does not exceed the applicable Retention;

3. not do anything that could prejudice the Insurer's position or its potential or actual rights of recovery; and

4. agree to provide the Insurer with all information, assistance and cooperation which the Insurer may reasonably require,

provided that the failure of any **Insured** to comply with any of the requirements in paragraphs 1 - 4 above, shall not impair the rights of any **Insured Person** under this Policy; and

B.  the Insurer:

   1.  shall have the right to effectively associate in the investigation, defense and settlement of any **Claim** reasonably likely to be covered under this Policy; and

   2.  shall not be liable for any such settlement, stipulation, incurred **Defense Costs**, admission or assumed obligation to which it has not given its prior written consent, and the Insurer shall not  unreasonably withhold such consent.

## VIII.   ALLOCATION

The Insurer and the **Insureds** shall use their best efforts to determine a fair and proper allocation between **Loss** that is covered and loss, or any other amount, that is not covered based on the relative legal and financial exposures of the covered parties to the covered matters. However, in the event the Insurer and the Insured cannot agree on an allocation percentage, nothing in this section shall preclude the Insurer from advancing **Defense Costs** in accordance with Section V. ADVANCEMENT of this Policy.

## IX.   TREATMENT OF RELATED CLAIMS

All **Related Claims** shall be deemed a single **Claim** first made during the policy period in which the earliest of such **Related Claims** was either first made or deemed to have been first made in accordance with Section VI. REPORTING.

## X.   OTHER INSURANCE

A.  With the exception of insurance written specifically as excess of the Limit of Liability of this Policy, this Policy shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for **Loss** for which this Policy also provides coverage, provided that any payment by an **Insured** of a retention or deductible under any such other insurance shall reduce the applicable Retention under this Policy by the amount of such payment which would otherwise have been **Loss** under this Policy.

B.  This Policy shall also be excess of and shall not contribute with any indemnity provided, and any valid and collectible insurance maintained, by an **Outside Entity** for an **Insured Person** serving in his capacity as such for the **Outside Entity**.

C.  Any personal umbrella excess liability insurance, independent directors liability insurance or any other similar personal liability insurance available to an **Insured Person** shall be specifically excess of this Policy.

## XI.   SUBROGATION

A.  In the event of any payment of **Loss** under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery with respect to such **Loss**, and the **Insureds** shall take all reasonable actions to secure and preserve the Insurer's subrogation rights.

B.  In no event shall the Insurer exercise any subrogation right against an **Insured Person**.  In any subrogation action against a **Company**, it is agreed that each **Company** agrees to fulfill its indemnification obligations to each **Insured Person** to the fullest extent permitted by law and any contract or agreement providing an indemnification obligation exceeding any such law.

C.  If the Insurer recovers, either through subrogation or recoupment, any portion of an amount paid for **Loss** under this Policy, the Insurer shall reinstate the applicable limit of liability stated in Item 3 of the Declarations with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## XII.   EXTENDED REPORTING PERIOD

A.  If this Policy does not renew or terminates for any reason other than for non-payment of premium, the **Insureds** shall have the right to purchase an Extended Reporting Period ("ERP") for the premium and time period stated in Item 7 of the Declarations. This right shall lapse, however, unless written notice of election to purchase such ERP, together with payment of the specified premium, is received by the Insurer within 60 days after the effective date of non-renewal or termination of the Policy. In the event the **Parent Company** elects not to purchase an ERP and an **Insured Person** or group of **Insured Persons** elects to purchase such ERP, such ERP shall only apply to **Claims** against such **Insured Person** or group of **Insured Persons**.

B.  The premium for the ERP shall be deemed fully earned at the inception of the ERP.

C.  Any ERP purchased shall become part of the **Policy Period**, extending such **Policy Period** to the expiration of the time period stated in Item 7 of the Declarations, but with respect to a **Claim** described in paragraphs 1(a) and 2 of the definition of **Claim**, the **Wrongful Act** which gives rise to such **Claim** must have occurred prior to the effective date of non-renewal or termination.

QBPD-1000 (05-14)                                                                                                        Page 3 of 9

**XIII. CHANGES IN EXPOSURE**

A. New Companies and Old Companies

1. Any **Insured** of a **Subsidiary**:

   (a) acquired before or during the **Policy Period** is eligible for coverage under this Policy, but only for a **Wrongful Act**, or a request or sworn statement described in paragraph 1(b) of the definition of **Claim**, which occurs after the date of such acquisition; or

   (b) ceasing to be a **Subsidiary** before or during the **Policy Period** is eligible for coverage under this Policy, but only for a **Wrongful Act**, or a request or sworn statement described in paragraph 1(b) of the definition of **Claim**, which occurred while such entity was a **Subsidiary**.

2. If the total assets of any **Subsidiary** acquired during the **Policy Period** exceed 20% of the total assets of the **Parent Company** (as reflected in the most recent audited consolidated financial statements of the **Parent Company** as of the date of such acquisition), the **Parent Company** shall have 90 days from the date of the acquisition to notify the Insurer of such acquisition. Following such notice to the Insurer, the **Parent Company** shall be required to provide the Insurer with any additional information the Insurer may reasonably require regarding the acquisition, and any coverage for an **Insured** of such newly acquired **Subsidiary** may be subject to additional or different terms or conditions under the Policy and the payment of additional premium. If the **Parent Company** fails to provide the foregoing 90 days notice and additional information, coverage under this Policy for any **Insured** of such newly acquired **Subsidiary** shall terminate with respect to any **Claim** first made more than 90 days after the date of the acquisition.

B. Acquisition of the **Parent Company**

In the event of a **Change in Control** of the **Parent Company** during the **Policy Period**:

1. this Policy shall remain in force until the expiration of the **Policy Period**, but only for any **Claim** for a **Wrongful Act**, or request or sworn statement described in paragraph 1(b) of the definition of **Claim**, which occurred prior to such acquisition;

2. the entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**; and

3. the **Parent Company** shall be entitled to receive a quote for up to a 6 year extension of coverage ("Run-Off Coverage") solely for **Claims** for a **Wrongful Act**, or a request or sworn statement described in paragraph 1(b) of the definition of **Claim**, which occurred prior to a **Change in Control**. Coverage offered pursuant to such quote shall be subject to additional or different terms and conditions and payment of an additional premium. Any Run-Off Coverage purchased shall replace the ERP that would be available to an **Insured** pursuant to Section XII. EXTENDED REPORTING PERIOD.

**XIV. NOTICE**

A. All notices to the Insurer under this Policy of a **Claim** or circumstances which could give rise to a **Claim** shall be given in writing to the address listed in Item 5A of the Declarations.

B. All other notices to the Insurer under this Policy shall be given in writing to the address listed in Item 5B of the Declarations.

C. Any notice under this Policy shall be effective on the date of mailing or receipt by the Insurer, whichever is earlier.

**XV. TERMINATION OF POLICY**

This Policy shall terminate at the earliest of:

A. 20 days after receipt by the **Parent Company** of written notice from the Insurer of termination for non-payment of premium;

B. expiration of the **Policy Period**; or

C. such other time as may be mutually agreed upon by the Insurer and the **Parent Company**, in which case any returned premium shall be computed on a pro rata basis.

**XVI. REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGE**

A. In issuing this Policy, the Insurer has relied upon the information and representations in the **Application** as being true and accurate, and the **Application** is the basis for, and considered incorporated into, this Policy.

B. The **Application** shall be construed as a separate request for coverage by each **Insured**, without any knowledge possessed by an **Insured** being imputed to any other **Insured Person**.

C.  If the **Application** contains any misrepresentation made with the actual intent to deceive or which, for reasons other than simple negligence or oversight, materially affect the Insurer's acceptance of the risk or the hazard assumed, the Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising out of or resulting from either of such misrepresentations:

1.  with respect to any **Insured Person** who had actual knowledge of any misrepresentation described in paragraph C above, and the Insurer can demonstrate that with such actual knowledge, such **Insured Person** reasonably believed that a **Claim** would arise from such misrepresentation;

2.  with respect to any **Company**, if the **Insured Person** described in paragraph 1 above is a past or present chief executive officer or chief financial officer of the **Parent Company**.

D.  The Insurer shall not be entitled under any circumstances to void or rescind this Policy with respect to any **Insured**.

## XVII.  PRIORITY OF PAYMENTS

In the event that **Loss** under Insuring Clause A and any other **Loss** are concurrently due under this Policy, then the **Loss** under Insuring Clause A shall be paid first. In all other instances, the Insurer may pay **Loss** as it becomes due under this Policy without regard to the potential for other future payment obligations under this Policy.

## XVIII.  EFFECT OF BANKRUPTCY

A.  Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

B.  The coverage provided by this Policy is intended first and foremost for the benefit and protection of **Insured Persons**.  In the event a liquidation or reorganization proceeding is commenced by or against a **Company** pursuant to United States bankruptcy law:

1.  the **Company** and the **Insureds** hereby agree not to oppose or object to any efforts by the Insurer, the **Company** or an **Insured** to obtain relief from any stay or injunction issued in such proceeding; and

2.  the Insurer shall first pay **Loss** on account of a **Claim** for a **Wrongful Act** occurring prior to the date such liquidation or reorganization proceeding commences, and then pay **Loss** in connection with a **Claim** for a **Wrongful Act** occurring after the date such liquidation or reorganization proceeding commences.

## XIX.  WORLDWIDE TERRITORY AND APPLICATION OF LAW

A.  This Policy shall apply anywhere in the world, and any reference to laws, however described, shall include all U.S. federal, state and local statutory laws, all amendments to and rules and regulations promulgated under any such laws, common law, and any equivalent body of law anywhere in the world, unless specifically stated to the contrary.

B.  Considering the worldwide applicability of this Policy, unless otherwise prohibited by applicable law, the Insurer shall use its best efforts to make payment under this Policy for **Loss** incurred in a jurisdiction outside the United States of America or its territories or possessions (a "foreign jurisdiction"). If the Insurer is unable to make payment of **Loss** to an **Insured Person** in a foreign jurisdiction pursuant to Insuring Clause  A of this Policy, to the extent permitted by law, the Insurer shall pay such **Loss** in an alternative jurisdiction mutually acceptable to such **Insured Person** and the **Insurer**. Similarly, if the Insurer is unable to make payment of **Loss** under Insuring Clauses B or C of this Policy to a **Company** in a foreign jurisdiction, the Insurer shall pay such **Loss** to the **Parent Company** at the address listed at Item 1 of the Declarations.

## XX.  ROLE OF THE PARENT COMPANY

The **Parent Company** shall act on behalf of each **Insured** with respect to paying premiums, receiving any return premiums, agreeing to endorsements to this Policy and the giving or receiving of any notice provided for in this Policy (except notices of a **Claim** or circumstance which could give rise to a **Claim** or notice to apply for an ERP).

## XXI.  VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If any element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the exchange rate published in The Wall Street Journal on the date the element of **Loss** is due.

## XXII.  ALTERATION, ASSIGNMENT AND HEADINGS

A.  Any change in or modification of this Policy or assignment of interest under this Policy must be agreed to in writing by the Insurer.

B.  The descriptions and headings and sub-headings of this Policy are solely for convenience, and form no part of the terms, conditions and limitations of coverage.

## XXIII. TRADE SANCTIONS

This insurance coverage does not apply to the extent that trade or economic sanctions of any country prohibit the insurer or any member of the insurer's group from providing insurance coverage.

## XXIV. GLOSSARY

A. **Application** means:

1. where provided to the Insurer, the application and any accompanying documentation submitted to the Insurer for this Policy or any documentation submitted to the Insurer in connection with the underwriting of this Policy; and

2. all publicly available documents filed by a **Company** with the Securities and Exchange Commission during the 12 months preceding this Policy's inception date.

B. **Change in Control** means:

1. the **Parent Company's** merger with, or acquisition by, another entity or the acquisition of all or substantially all of its assets by another entity, such that the **Parent Company** is not the surviving entity; or

2. when a person or entity or group of persons or entities acting in concert, acquires securities or voting rights which result in ownership or voting control by such person(s) or entity(ies) of more than 50% of the outstanding securities or voting rights representing the present right to vote for or appoint directors or **Managers** of the **Parent Company**.

C. **Claim** means:

1. with respect to Insuring Clauses A and B:

   (a) an investigation, evidenced by any written document, including a subpoena, target letter or search warrant, against an **Insured Person** for a **Wrongful Act**; and

   (b) any request to interview, depose or otherwise meet with, or a sworn statement obtained from, an **Insured Person** or any request for an **Insured Person** to produce documents or information in connection with:

      (i) an **Insured Person** acting in his capacity as such;

      (ii) a **Company's** business activities;

      (iii) an **Insured** responding to or cooperating with an inquiry or investigation by an **Investigative Body**; or

      (iv) a **Company** or its legal counsel investigating a securityholder derivative demand or any alleged violation of law,

      provided that any such request or sworn statement included in this paragraph shall not include any request by an **Investigative Body** that is part of any routine or regularly scheduled **Investigative Body** oversight, compliance, audit, inspection or examination; and

2. with respect to Insuring Clauses A, B and C:

   (a) a written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation, waiving or tolling of a statute of limitations or **Extradition**;

   (b) a civil or criminal proceeding, evidenced by: (i) the service of a complaint or similar pleading in a civil proceeding; or (ii) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

   (c) an administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

   against an **Insured** for a **Wrongful Act**, including any appeal therefrom, provided that with respect to any administrative or regulatory proceeding against a **Company**, such proceeding is also made and continuously maintained against an **Insured Person**.

The time when a **Claim** shall be deemed first made for the purposes of this Policy shall be: (i) with respect to any **Claim** described in paragraphs 1(a) and 2 above, the date on which the **Claim** is first made against, served upon or received by the **Insured** or the applicable notice or order is filed or entered; and (ii) with respect to any

**Claim** described in paragraph 1(b) above, the date on which notice of such **Claim** is provided to the Insurer in accordance with the Reporting and Notice provisions in this Policy.

D. **Company** means the **Parent Company** and any **Subsidiary**, any foundation, political action committee or charitable trust controlled or sponsored by the **Parent Company** or any **Subsidiary**, and the **Parent Company** or any **Subsidiary** in its capacity as a debtor in possession under United States bankruptcy law.

E. **Defense Costs** means that part of **Loss** consisting of:

1. reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**): incurred in: (a) investigating, defending, opposing or appealing any **Claim**; or (b) any **Securityholder Derivative Demand Investigation** and;

2. the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

F. **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985 and the Health Insurance Portability and Accountability Act of 1996).

G. **Extradition** means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country for trial or otherwise to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

H. **Financial Impairment** means the status of a **Company** resulting from: 1. the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate such **Company**; or 2. such **Company** becoming a debtor in possession under United States bankruptcy law.

I. **Insured** means any **Company** or **Insured Person**.

J. **Insured Person** means:

1. any natural person who was, now is or shall become:

(a) a duly elected or appointed director, officer, **Manager**, trustee, regent, governor, risk manager, comptroller or in-house general counsel of any **Company** organized in the United States of America, or in a functionally equivalent or comparable role to any of the foregoing;

(b) a holder of a functionally equivalent position or comparable role to those described in paragraph (a) above in a **Company** that is organized in a jurisdiction other than the United States of America;

(c) a shadow director pursuant to the United Kingdom Companies Act or any equivalent statute;

(d) any full or part-time employee of a **Company**, but only with respect to a **Claim**: (i) brought by a securityholder of a **Company** in his capacity as such; or (ii) that is also brought and maintained against an **Insured Person** included in paragraphs (a), (b) or (c) above; or

(e) a holder of an equivalent position to those included in paragraph (a) or (b) above in an **Outside Entity**, while serving at the specific request or direction of the **Company**;

2. the estate, heirs, legal representatives or assigns of any **Insured Person** included in paragraph 1(a) above, if such **Insured Person** is deceased, legally incompetent, insolvent or bankrupt; or

3. the lawful spouse or domestic partner of any **Insured Person** included in paragraph 1(a) above solely by reason of such spouse's or domestic partner's: (i) status as such; or (ii) ownership interest in property which a claimant seeks as recovery for an alleged **Wrongful Act** of an **Insured Person** included in paragraph 1(a) above,

provided that no coverage shall apply with respect to loss arising from an act, error or omission by an estate, heirs, legal representatives, assigns, spouse or domestic partner included in paragraphs 2 or 3 above.

K. **Investigative Body** means any federal, state, local or provincial law enforcement or governmental regulatory authority worldwide or the enforcement unit of any securities exchange or similar self-regulatory organization.

L. **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorney fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense

involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. **Defense Costs**;

5. solely with respect to Insuring Clause A, taxes imposed by law upon an **Insured Person** in his capacity as such in connection with any bankruptcy, receivership, conservatorship or liquidation of a **Company**, to the extent such taxes are insurable by law;

6. punitive, exemplary or multiplied damages, fines or penalties, if and to the extent that any such damages, fines or penalties are insurable under the law of the jurisdiction most favorable to the insurability of such damages, fines or penalties; and

7. reasonable fees, costs and expenses (including the premium or origination fee for a loan or bond), incurred with the Insurer's consent, to facilitate the return of amounts required to be repaid by an **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Act of 2010 or other similar laws requiring the return of incentive based compensation, provided that no coverage shall be provided for the return of any actual compensation or remuneration required by any such laws.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds**, to the **Company**, or to the **Claim** giving rise to such damages, fines or penalties, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the **Insured**) that such damages, fines or penalties are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Policy is construed, provided that the Insurer shall not assert that any **Loss** attributable to violations of Sections 11, 12, or 15 of the Securities Act of 1933 is uninsurable;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) amount that represents or is substantially equivalent to an increase in consideration paid (or proposed to be paid) by a **Company** in connection with its purchase of any securities or assets;

(d) tax, other than taxes described in paragraph (5) above; or

(e) cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

M. **Manager** means any natural person, who was, now is, or shall become, a manager, member of the Board of Managers or equivalent executive of a **Company** that is a limited liability company.

N. **Merger Objection Claim** means a **Securities Claim** for a **Wrongful Act** based upon, arising out of or resulting from a **Change in Control**.

O. **Outside Entity** means:

1. any non-profit corporation, community chest, fund or foundation; or

2. any other entity specifically added as an **Outside Entity** by endorsement to this Policy,

that is not a **Company**.

P. **Parent Company** means the entity named in Item 1 of the Declarations.

Q. **Policy Period** means the period of time stated in Item 2 of the Declarations (subject to any termination in accordance with Section XV. TERMINATION OF POLICY) and the ERP, if applicable.

R. **Pollutants** means any solid, liquid, gaseous or thermal irritants or contaminants, including smoke, soot, vapor, fumes, acids, chemicals, alkalis, asbestos, asbestos products or waste. Waste includes materials to be reconditioned, recycled or reclaimed.

S. **Related Claims** means all **Claims** based upon, arising out of or resulting from the same or related, or having a common nexus of, facts, circumstances or **Wrongful Acts**.

T. **Securities Claim** means a **Claim** whether brought pursuant to any United States securities laws or common law:

1. in connection with any interest in, purchase, sale or offer to purchase or sell securities of a **Company**; or

2. brought by a securityholder in his capacity as such, whether directly, derivatively or by class action.

U.  **Securityholder Derivative Demand Investigation** means an investigation by a **Company** to determine whether it is in the best interest of such **Company** to prosecute the claims alleged in a securityholder derivative demand or lawsuit. Where a **Securityholder Derivative Demand Investigation** is initiated because of a lawsuit rather than a demand, any coverage provided for **Defense Costs** on account of such **Securityholder Derivative Demand Investigation** shall in no way limit the coverage otherwise afforded under this Policy to an **Insured** for **Loss** on account of a **Securities Claim**.

V.  **Subsidiary** means:

1.  any entity while more than 50% of the outstanding securities or other equity ownership, representing the present right to vote for election of, or to appoint, directors, **Managers**, or the foreign equivalent of any such directors or **Managers** of such entity, are owned or controlled by the **Parent Company** directly or indirectly through one or more **Subsidiaries**; or

2.  any entity while the **Parent Company** has the right, pursuant to either written contract or the bylaws, charter, operating agreement or similar documents of a **Company**, to elect or appoint a majority of the Board of Directors of a corporation or **Managers**.

W.  **Wrongful Act** means:

1.  any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by: (a) an **Insured Person** in his capacity as such; or (b) by a **Company**; or

2.  any other matter claimed against an **Insured Person** solely by reason of serving in his capacity as such.

# SCHEDULE OF ENDORSEMENTS

QBPD-3000 QBE Policy Jacket
QBPD-5043 Texas Amendatory Endorsement
QBGS-0258 Texas Important Notice
QBPD-2027 State Amendatory Inconsistency Endorsement
QBPD-2013 Insurer Rating Downgrade Endorsement
QBPD-2009 De Facto Director Endorsement
QBPD-2008 Amend Changes in Exposure to 25%
QBPD-2046 Renewal / Rate Stabilization Endorsement
QBPD-2029 Amend BI/PD – UK Corporate Manslaughter carve-back
QBPD-2047 Amend Conduct Exclusion to include Personal Profit & Financial Advantage
QBPD-2052 Amend E v I Exclusion to include Carveback for Sox 404 and Dodd Frank 954
QBPD-2053 Amend Definition of Loss to Include FCPA
QBPD-6000 Cap on Losses from Certified Acts of Terrorism (TRIA)
QBGS-103 OFAC Notice to Policyholders


To be attached to and form part of the Policy Number listed above.

POLICY NUMBER: QP 20 09722
Endorsement Effective Date: May 11, 2010

Case 1:17-cv-02009-MB    Doc 131-2    Filed 10/20/17    Entered 10/20/17 16:09:24    Desc
Declaration of Jeffrey Cordes    Page 61 of 73

QBPD-5043 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## TEXAS AMENDATORY ENDORSEMENT

It is hereby agreed that:

**I.**  Section **IV. LIMIT OF LIABILITY**, paragraph D. is replaced by the following:

   D.  The Limit of Liability shall be the limit of liability available during any Automatic Extended Reporting Period and any applicable Extended Reporting Period.

**II.**  Section **XII. EXTENDED REPORTING PERIOD** is amended by the addition of the following:

If this Policy does not renew or terminates for any reason other than for non-payment of premium, then the **Parent Company** and the **Insureds** shall have the right to a thirty (30) day extension of coverage provided by this Policy following the effective date of cancellation or non-renewal, but only for **Wrongful Acts** taking place before the effective date of cancellation or non-renewal.  This 30-day period is called the "Automatic Extended Reporting Period" in this Policy.

**III.**  Section **XV. TERMINATION OF POLICY** is amended by the addition of the following:

The notice shall state the reason for cancellation.

**IV.**  Section **XXIV. GLOSSARY**, paragraph Q. is replaced by the following:

   Q.  **Policy Period** means the period of time set forth in Item 2 of the Declarations (subject to any termination in accordance with Section XV. TERMINATION OF POLICY), the Automatic Extended Reporting Period, and the Extended Reporting Period, if applicable.

**V.**  This Policy is amended by the addition of the following:

**NON-RENEWAL**

If the Insurer decides not to renew this Policy, the Insurer will deliver or mail written notice of non-renewal to the **Parent Company** at the address set forth in the Declarations at least sixty (60) days before the expiration date of this Policy.  The notice shall state the reason for non-renewal.  If notice of non-renewal is delivered or mailed later than the 60th day before the expiration date, the Policy's coverage shall remain in effect until the 61st day after the date on which the notice is delivered or mailed.  Earned premium for any period of coverage that extends beyond the expiration date shall be computed pro rata based on the Policy's current rate.  If this Policy is so extended, such period of extended coverage shall be part of and not in addition to the **Policy Period**.  The Insurer shall not refuse to renew this Policy based solely on the fact that the **Insured** is an elected official.

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER: QPL0408721

Case 1:17-bk-12408-MB    Doc 131-2    Filed 10/20/17    Entered 10/20/17 16:09:24    Desc
Declaration of Jeffrey Cordes    Page 62 of 73

QBGS-0258 (12-13)



# TEXAS - IMPORTANT NOTICE
# NOTICE OF TOLL FREE NUMBERS

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may contact your agent **Risk Consulting Partners** at:

**(314) 678-1200**

You may call QBE North America's toll-free telephone number for information or to make a complaint at:

**1-(877) 772-6771**

You may also write to **QBE North America** at:

QBE North America

Wall Street Plaza

88 Pine Street, 16th Floor

New York, NY 10005

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may write the Texas Department of Insurance:

P. O. Box 149104

Austin, TX 78714-9104

Fax: (512) 475-1771

Web: http://www.tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the agent, **Risk Consulting Partners** first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Puede comunicarse con su **Risk Consulting Partners** al:

**(314) 678-1200**

Usted puede llamar al numero de telefono gratis de **QBE North America**'s para informacion o para someter una queja al:

**1-(877) 772-6771**

Usted tambien puede escribir a **QBE North America** at:

QBE North America

Wall Street Plaza

88 Pine Street, 16th Floor

New York, NY 10005

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas:

P. O. Box 149104

Austin, TX 78714-9104

Fax: (512) 475-1771

Web: http://www.tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

**DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el, **Risk Consulting Partners**, primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

POLICY NUMBER: QPL4108727
Endorsement Effective Date: May 11, 2017

Case 1:17-bk-12408-MB    Doc 131-2    Filed 10/20/17    Entered 10/20/17 16:09:24    Desc
Declaration of Jeffrey Cordes    Page 63 of 73    QBPD-2027 (05-14)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## STATE AMENDATORY INCONSISTENCY ENDORSEMENT

It is hereby agreed that in the event there is an inconsistency between a state amendatory endorsement attached to this Policy and any other term or condition of this Policy, then where permitted by law, the Insurer shall apply those terms and conditions of either the state amendatory endorsement or the Policy, whichever are more favorable to the **Insured**.

All other terms and conditions of this Policy remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## INSURER RATING DOWNGRADE ENDORSEMENT

It is hereby agreed that the **Parent Company** may cancel this Policy immediately upon written notice to the Insurer if the Insurer's financial strength rating for AM Best falls below "A-". If cancelled pursuant to such ratings downgrade, the Insurer shall retain the pro rata proportion of the premium.

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER: QP20-0972Z
Endorsement Effective Date: May 1, 2019

Case 1:17-bk-12408-MB    Doc 131-2    Filed 10/20/17    Entered 10/20/17 16:09:24    Desc
Declaration of Jeffrey Cordes    Page 65 of 73          QBPD-2009 (05-14)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**


**DE FACTO DIRECTOR ENDORSEMENT**


It is hereby agreed that Section **XXIV.  GLOSSARY**, paragraph J.1.(a) is replaced by the following:

(a)  a duly elected or appointed director (including a  de facto director), officer, **Manager**, trustee, regent, governor, risk manager, comptroller or in-house general counsel of any **Company** organized in the United States of America, or in a functionally equivalent  or comparable role to any of the foregoing;


All other terms and conditions of this Policy remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CHANGES IN EXPOSURE THRESHOLD CHANGE ENDORSEMENT**

It is hereby agreed that Section **XIII. CHANGES IN EXPOSURE**, paragraph A.2. is replaced by the following:

2.  If the total assets of any **Subsidiary** acquired during the **Policy Period** exceed 25% of the total assets of the **Parent Company** (as reflected in the most recent audited consolidated financial statements of the **Parent Company** as of the date of such acquisition), the **Parent Company** shall have 90 days from the date of the acquisition to notify the Insurer of such acquisition.  Following such notice to the Insurer, the **Parent Company** shall be required to provide the Insurer with any additional information the Insurer may reasonably require regarding the acquisition, and any coverage for an **Insured** of such newly acquired **Subsidiary** may be subject to additional or different terms conditions under the Policy and the payment of additional premium. If the **Parent Company** fails to provide the foregoing 90-day notice and additional information, coverage under this Policy for any **Insured** of such newly acquired **Subsidiary** shall terminate with respect to any **Claim** first made more than 90 days after the date of the acquisition.

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER: QP2409872B
Endorsement Effective Date: May 1, 2010

Case 1:17-bk-12408-MB    Doc 131-2    Filed 10/20/17    Entered 10/20/17 16:09:24    Desc
Declaration of Jeffrey Cordes    Page 67 of 73

QBPD-2046 (01-16)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**RENEWAL ENDORSEMENT**

In consideration of the premium charged, it is hereby agreed that:

**I.**  Upon expiration of the **Policy Period**, the Insurer shall renew this Policy unless:

    A.  during the **Policy Period**:

        1.  there is a **Change in Control** of the **Parent Company**; or

        2.  the **Parent Company** files for bankruptcy protection;

    B.  the Policy has been canceled by the **Parent Company** or the **Insurer** as permitted or required by law and in accordance with Section **XV. TERMINATION OF POLICY**; or

    C.  a notice of **Claim** or notice of circumstance has been given to the **Insurer** pursuant to Section **VI. REPORTING** of this Policy and:

        1.  the **Insurer's** Claims Department reasonably estimates that the total potential **Loss** resulting from such **Claim** and/or circumstance will be in excess of ($500,000); or

        2.  the **Claim** is or is sought to be certified as a class action (regardless of whether certification is granted); or

    D.  there has been a change in the law or an insurance regulatory action which prevents the Insurer from issuing a renewal policy at the same terms and conditions as this Policy.

**II.**  A renewal of this Policy shall have a one year policy period and shall be at the same terms and conditions as this Policy.

**III.**  The premium for the renewal of this Policy shall be 100% of the annual premium.

**IV.**  Nothing in this Endorsement shall be construed to affect any rights the Insurer has to require an additional premium or amendment of Section **XIII. CHANGES IN EXPOSURE** of the Policy.

All other terms and conditions of this Policy remain unchanged.

**POLICY NUMBER: QPL0409727**
**Endorsement Effective Date: May 11, 2010**

QBPD-2029 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## BODILY INJURY/PROPERTY DAMAGE EXCLUSION – UK CORPORATE MANSLAUGHTER CARVEBACK

It is hereby agreed that Section **II. EXCLUSIONS**, paragraph B. is amended by the addition of the following:

This exclusion shall not apply to **Defense Costs** incurred by an **Insured Person** that results solely from the investigation, adjustment, defense, or appeal of a **Claim** against a **Company** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction.

All other terms and conditions of this Policy remain unchanged.

QBPD-2029 (05-14)

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMEND CONDUCT EXCLUSION ENDORSEMENT
## (EXCLUDE ILLEGAL PERSONAL PROFIT AND FINANCIAL ADVANTAGE)

It is hereby agreed that Section **II. EXCLUSIONS**, paragraph A. is replaced by the following:

A.   Conduct - based upon, arising out of or resulting from any deliberate fraud, deliberate criminal act or deliberate violation of any statute or regulation, or any illegal personal profit, financial advantage, or remuneration, by an **Insured**, established by a final, non-appealable adjudication adverse to such **Insured** in any underlying action;

With respect to Exclusion A: 1. the Insurer shall not utilize a declaratory action or proceeding brought by or against the Insurer to establish such final, non-appealable adjudication; and 2. no conduct or knowledge of any **Insured** shall be imputed to any other **Insured Person**, and only the conduct or knowledge of any past, present or future chief executive officer or chief financial officer of a **Company** shall be imputed to such **Company** and its **Subsidiaries**;

All other terms and conditions of this Policy remain unchanged.

QBPD-2052 (01-16)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMEND ENTITY VS INSURED EXCLUSION ENDORSEMENT

It is hereby agreed that Section **II. EXCLUSIONS**, paragraph C. is amended by the addition of the following:

Exclusion (C)2 shall not apply to any **Claim** brought by a **Company** against an **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

All other terms and conditions of this Policy remain unchanged.

QBPD-2052 (01-16)                                                                Page 1 of 1

**POLICY NUMBER: QPL0109727**
**Endorsement Effective Date: May 11, 2017**                                    QBPD-2053 (01-16)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND LOSS TO INCLUDE FCPA ENDORSEMENT

It is hereby agreed that Section **XXIV. GLOSSARY,** paragraph L.6. is replaced by the following:

6.   punitive, exemplary or multiplied damages, fines or penalties, including fines or penalties assessed against an **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act 15 U.S.C. §78dd-2(g)(2)(B) or pursuant to 15 U.S.C. § 78ff(c)(2)(B), if and to the extent that any such damages, fines or penalties are insurable under the law of the jurisdiction most favorable to the insurability of such damages, fines or penalties; and

All other terms and conditions of this Policy remain unchanged.

**POLICY NUMBER: QPL0109727**
**Endorsement Effective Date: May 11, 2017**                                          QBPD-6000 (02-15)

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

It is hereby agreed that:

**I.**   This Policy is amended by the addition of the following:

If aggregate insured losses attributable to a **Certified Act of Terrorism** under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**II.**   Solely for the purposes of this endorsement, this Policy is amended by the addition of the following:

**Certified Act of Terrorism** means an act that is certified by the Secretary of Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act,, to be an act of terrorism.   The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

  **1.**   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

  **2.**   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**III.**   The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any **Loss** that is otherwise excluded under this Policy.

All other terms and conditions of this Policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc., with its permission

**QBPD-6000 (02-15)**                                                                          **Page 1 of 1**



# Notice to Policyholders
# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

**NO COVERAGE IS PROVIDED BY THIS POLICYHOLDER NOTICE NOR CAN IT BE CONSTRUED TO REPLACE ANY PROVISIONS OF YOUR POLICY. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE FOR COMPLETE INFORMATION ON THE COVERAGES YOU ARE PROVIDED.**

**THIS NOTICE PROVIDES INFORMATION CONCERNING POSSIBLE IMPACT ON YOUR INSURANCE COVERAGE DUE TO DIRECTIVES ISSUED BY OFAC.**

**PLEASE READ THIS NOTICE CAREFULLY**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- ➢ Foreign agents;
- ➢ Front organizations;
- ➢ Terrorists;
- ➢ Terrorist organizations; and
- ➢ Narcotics traffickers;

As "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Includes copyrighted material of Insurance Services Office, Inc., with its permission

**QBGS-103 (07-04)**                                                    **Page 1 of 1**