RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br><br>⊠  Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐  Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**NOTICE REGARDING PROPOSED ASSET PURCHASE AGREEMENT**<br><br>DATE:    November 3, 2017<br>TIME:     9:30 a.m.<br>PLACE:   Courtroom "303"<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA |

**PLEASE TAKE NOTICE** that, attached hereto as <u>Exhibit A</u> is the proposed form of Asset Purchase Agreement (the "<u>APA</u>") that will be attached as Exhibit "1" to the sale order ("<u>Sale Order</u>") sought to be entered by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, the debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") in the above-captioned Chapter 11 bankruptcy cases (collectively, the "<u>Bankruptcy Cases</u>"), approving the Debtors' motion (the "<u>Motion</u>") for approval of the sale of substantially all of their assets to Brighton-Best International, Inc. ("<u>BBI</u>"), the winning bidder at the Auction which occurred on October 30, 2017 at 10:00 a.m. before the Court.  The proposed Sale Order is being filed in advance of the continued hearing scheduled for November 3, 2017 at 9:30 a.m. which was set by the Court as a holding date to review any issues pertaining to the Sale Order.

On October 9, 2017, as Docket Number 97, the Debtors filed a Notice which had attached to it as Exhibit C a copy of the Stalking Horse Asset Purchase Agreement that the Debtors had entered into pre-petition with the stalking horse bidder Radians Wareham Holding, Inc.  (the "<u>Stalking Horse APA</u>") At the recent hearing held on November 1, 2017, the Court requested the Debtors to file a redlined version of the APA showing the changes that were being made to the Stalking Horse APA to accommodate the proposed asset sale to the winning bidder – BBI. Attached hereto as <u>Exhibit B</u> is that redlined version.

Dated:  November 3, 2017

IRONCLAD PERFORMANCE WEAR
CORPORATION, *et al.*

By:___*/s/ Ron Bender*_____
     RON BENDER
     MONICA Y. KIM
     KRIKOR J. MESHEFEJIAN
     LEVENE, NEALE, BENDER,
     YOO & BRILL L.L.P.
     Attorneys for Chapter 11 Debtors and
     Debtors in Possession

**EXHIBIT A**

## ASSET PURCHASE AGREEMENT

**dated October __, 2017**

**by and among**

**BRIGHTON-BEST INTERNATIONAL, INC., A CALIFORNIA CORPORATION**

**PURCHASER**

**AND**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation**

**and**

**IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation**

**SELLERS**

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ........................................................................................ 1

1.1    Previously Defined Terms ............................................................................ 1
1.2    Definitions .................................................................................................... 1
1.3    Additional Defined Terms ............................................................................ 5
1.4    Interpretation ............................................................................................... 6

**ARTICLE II PURCHASE AND SALE, PURCHASE PRICE** ................................... 6

2.1    Purchase and Sale ........................................................................................ 6
2.2    Purchase Price; Deposit ............................................................................. 10
2.3    Payments at Closing ................................................................................... 10
2.4    Assumed Liabilities .................................................................................... 10
2.5    Transfer Taxes ............................................................................................ 10
2.6    Allocation ................................................................................................... 11

**ARTICLE III CLOSING AND CLOSING DATE DELIVERIES** ........................... 11

3.1    Closing ....................................................................................................... 11
3.2    Closing Deliveries by Sellers ..................................................................... 11
3.3    Closing Deliveries by Purchaser ................................................................ 12
3.4    Cooperation ................................................................................................ 12

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS** ........... 12

4.1    Due Incorporation ...................................................................................... 13
4.2    Noncontravention ....................................................................................... 13
4.3    Brokers ....................................................................................................... 13
4.4    Title to Purchased Assets ........................................................................... 13
4.5    Condition of Assets .................................................................................... 13
4.6    NO OTHER REPRESENTATIONS ........................................................... 14

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER** ....... 14

5.1    Organization; Authorization ....................................................................... 14
5.2    Noncontravention ....................................................................................... 14
5.3    No Brokers .................................................................................................. 14
5.4    Financing Ability ....................................................................................... 15

**ARTICLE VI BANKRUPTCY MATTERS** ............................................................ 15

6.1    Cooperation in Bankruptcy Court Matters and Sale Order ........................ 15

**ARTICLE VII EMPLOYEE MATTERS** ............................................................... 16

7.1    Employees to be Hired by Purchaser ......................................................... 16
7.2    Authorization to Communicate with Certain Employees............................ 17

**ARTICLE VIII COVENANTS** ............................................................................... 17

A.    Pre-Closing Covenants. ........................................................................... 17
8.1    Maintenance of Business ........................................................................ 17
8.2    Sellers Pre-Closing Covenants .............................................................. 17
8.3    Commercially Reasonable Efforts to Close ............................................ 18
B.    Certain other Covenants and Agreements. ............................................ 18
8.4    Use of Name ........................................................................................... 18
8.5    Tax Matters ............................................................................................ 19
8.6    Facility Lease ......................................................................................... 19

**ARTICLE IX CONDITIONS TO CLOSING APPLICABLE TO PURCHASER** ............. 20

9.1    No Termination ....................................................................................... 20
9.2    Bankruptcy Court Approval .................................................................... 20
9.3    Bring-Down of Sellers Warranties, Representations and Covenants ......... 20
9.4    Pending Actions ...................................................................................... 20
9.5    Condition of Assets. ............................................................................... 20

**ARTICLE X** ...................................................................................................... 20

**CONDITIONS TO CLOSING APPLICABLE TO SELLERS** ............................................ 20

10.1    No Termination ..................................................................................... 20
10.2    Bankruptcy Court Approval .................................................................. 21
10.3    Bring-Down of Purchaser Warranties, Representations and Covenants .... 21
10.4    Pending Actions .................................................................................... 21
10.5    All Necessary Documents ..................................................................... 21

**ARTICLE XI TERMINATION** ............................................................................. 21

11.1    Termination ........................................................................................... 21
11.2    Buyer Deposit. ...................................................................................... 22

**ARTICLE XII MISCELLANEOUS** ...................................................................... 22

12.1    Costs and Expenses .............................................................................. 22
12.2    Bankruptcy Court Approval .................................................................. 22
12.3    Entire Agreement .................................................................................. 22
12.4    Counterparts .......................................................................................... 23
12.5    Assignment, Successors and Assigns .................................................... 23
12.6    Survival ................................................................................................. 23
12.7    Severability ........................................................................................... 23
12.8    Headings ................................................................................................ 23
12.9    Risk of Loss .......................................................................................... 23
12.10   **GOVERNING LAW** .......................................................................... 23
12.11   Press Releases and Public Announcements .......................................... 24
12.12   U.S. Dollars ........................................................................................... 25
12.13   Notices ................................................................................................... 25
12.14   WAIVER OF JURY TRIAL .................................................................. 26
12.15   Waiver ................................................................................................... 27
12.16   No Third-Party Beneficiary .................................................................. 27

12.17      SELLERS DISCLAIMER...................................................................................... 27
12.18      PURCHASER DISCLAIMER ............................................................................. 28
12.19      Disclosures ........................................................................................................ 28
12.20      Specific Performance ....................................................................................... 28

<u>Exhibits</u>

Exhibit A - Sale Order

<u>Schedule Index</u>

Schedule 4.3 -        Brokers
Schedule 7.1(a) -     Business Employees List

This Asset Purchase Agreement is made and entered into as of October ___, 2017 (this "Agreement") by and among Brighton-Best International, Inc., a California corporation, or a Permitted Assignee as defined below ("Purchaser") and Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (collectively, "Ironclad" or "Sellers").

RECITALS:

A.    Sellers are engaged in business as the developer, manufacturer and marketer of high-performance task-specific work gloves (the "Business");

B.    Sellers desire to sell substantially all of the assets related to the Business, and Purchaser desires to acquire substantially all of Sellers' assets related to the Business from Sellers, on the terms and subject to the conditions set forth herein;

C.    Sellers commenced bankruptcy cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on September 8, 2017 in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court");

D.    In connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, and subject to higher and better offers as contemplated by the Bid Procedures Order (as defined herein), following the entry of the Sale Order (as defined herein) and subject to the terms and conditions thereof, Sellers shall sell, transfer and assign to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined herein), and Purchaser shall assume from Sellers the Assumed Liabilities (each as defined herein), all as more specifically set forth herein and in the Sale Order; and

E.    The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to the Bid Procedures Order and the Sale Order to be entered in the Chapter 11 Cases.

NOW, THEREFORE, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    Previously Defined Terms. Each term defined in the first paragraph and Recitals shall have the meaning set forth above whenever used herein, unless otherwise expressly provided or unless the context clearly requires otherwise.

1.2    Definitions. Whenever used herein, the following terms shall have the meanings set forth below unless otherwise expressly provided or unless the context clearly requires otherwise:

"<u>Accounts Receivable</u>" - As defined in clause (i) of the definition of Purchased Assets.

"<u>Affiliate</u>" means (a) with respect to an individual, (i) the members of the immediate family (including parents, siblings and children) of the individual, (ii) the individual's spouse and (iii) any Business Entity that directly or indirectly, through one or more intermediaries is Controlled by, or is under common Control with, any of the foregoing individuals, or (b) with respect to any Person other than an individual, any other Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with or of, such Person. The term "<u>Control</u>" (including, with correlative meaning, the terms "Controlled by" and "under common Control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Bankruptcy Rules</u>" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as now in effect or hereafter amended.

"<u>Bid Procedures Motion</u>" means the motion filed by Sellers seeking entry of the Bid Procedures Order.

"<u>Bid Procedures Order</u>" means the Order of the Bankruptcy Court establishing bidding procedures for the solicitation of higher or otherwise better bids for the Purchased Assets.

"<u>Business Day</u>" means any day other than a Saturday or Sunday or other day on which banks in Los Angeles, California are authorized or required by Law to be closed.

"<u>Business Entity</u>" means any Person other than an individual or a Governmental Authority.

"<u>Code</u>" means the Internal Revenue Code of 1986.

"<u>Confidentiality Agreement</u>" means that certain Nondisclosure Agreement, dated October 16, 2017, by and between Sellers and Purchaser.

"<u>Contracts</u>" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, commitment, arrangement or undertaking, written or oral, or other document or instrument to which or by which such Person is a party or otherwise subject or bound or to which or by which any asset, property or right of such Person is subject or bound.

"<u>Encumbrances</u>" means, with respect to any property or asset, any mortgage, lien, pledge, charge, claim, encumbrance, security interest, community or other marital property interest, equitable interest, license, option, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement or other encumbrance with respect to the use, construction, voting, transfer, receipt of income or exercise of any other attribute of ownership in respect of such property or asset.

- 2 -

"Environmental Laws" means any and all Legal Requirements relating to pollution, or to protection of human health or the environment (including ground water, land surface or subsurface strata) from pollution, including Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Materials of Environmental Concern.

"Excluded Tax" means any Liability of Sellers for the following Taxes (whether such Liability is direct or as a result of transferee or successor liability or pursuant to a Contract or other agreement): (i) income Taxes of Sellers; and (ii) Taxes that relate to the Purchased Assets, the Business, or any Transferred Employee for any Pre-Closing Tax Period.

"Governmental Authority" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body, commission or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including quasi-governmental entities established to perform such functions.

"IRS" means the Internal Revenue Service.

"Law" means any law, statute, code, regulation, ordinance, rule or Order enacted, promulgated, entered into, agreed, imposed or enforced by any Governmental Authority.

"Legal Requirements" means with respect to any Person, all statutes, ordinances, bylaws, codes, rules, regulations, restrictions, judgments, orders, writs, injunctions, decrees, determinations or awards of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses.

"Liabilities" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

"Local Bankruptcy Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Central District of California applicable to all cases in such district governed by the Bankruptcy Code.

"Materials of Environmental Concern" means any chemicals, pollutants, contaminants, medical waste or specimens, toxic substances, chemicals, petroleum or petroleum products, including hazardous wastes under the Resource, Conservation and Recovery Act, as amended, 42 U.S.C. § 6903 et seq., hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq., asbestos, polychlorinated biphenyls and urea formaldehyde, and low-level nuclear materials, special nuclear materials or nuclear-byproduct materials, all within the meaning of the Atomic Energy Act of 1954 as amended, and any rules, regulations or policies promulgated thereunder, and all other materials regulated under Environmental Laws.

"Material Contract" means any contract to which Seller is a party (other than any contract or agreement relating to or with customers, suppliers or agents) that involves aggregate annual revenue or payments in excess of $50,000 per year and/or that is a real property lease.

"Order" means any decree, order, judgment, writ, ruling, award, injunction, stipulation, decisions, verdict, determination or consent of or by, or settlement agreement as approved by the Bankruptcy Court.

"Ordinary Course" means the ordinary course of business of Sellers, taking into account that Sellers will be operating their business under chapter 11 of the Bankruptcy Code as debtors-in-possession.

"Permitted Encumbrances" means (a) Encumbrances for Taxes not yet due and payable or being contested in good faith; (b) landlord and lessor Encumbrances existing under the terms and conditions of leases of real and personal property; (c) Encumbrances on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the Ordinary Course; and (d) any lien, claim or encumbrance of which Sellers, as debtors under the Bankruptcy Code, could not sell their property free and clear pursuant to section 363(f) of the Bankruptcy Code.

"Person" means any natural person, corporation, partnership, limited liability company, joint venture, trust, association or unincorporated entity of any kind.

"Post-Closing Tax Period" means any Tax period (or portion thereof) beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period (or portion thereof) that ends on or prior to the Closing Date.

"Qualified Bid" shall have the meaning ascribed to it in the Bid Procedures Order. This Agreement shall constitute a Qualified Bid.

"Qualified Bid Determination Deadline" shall have the meaning ascribed to it in the Bid Procedures Order.

"Sale Motion" means the motion filed by Sellers seeking approval of this Agreement and entry of the Sale Order.

"Sale Order" means an order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Sellers, and in the form attached hereto as Exhibit A, approving this Agreement, and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby.

"Tax Return" means any report, return (including estimated) or other information required (including any attachments or schedules required to be attached to such report, return, or other information) to be filed, with a Governmental Authority in connection with any Taxes (and any amendment thereto).

- 4 -

"Taxes" means all taxes, charges, fees, duties (including custom duties), levies or other assessments, including gross or net income, gross or net receipts, gross or net proceeds, capital gains, profits, gaming, capital, estimated, employment, alternative or add-on minimum, registration, natural resources, premium, ad valorem, turnover, real or personal property (tangible and intangible), sales, goods or services, use, franchise, excise, value added, stamp, unclaimed or abandoned property, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental (including Section 59A of the Code), capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties or additions to tax attributable thereto.

"Transaction" means the sale and purchase of the Purchased Assets contemplated in this Agreement, together with any and all related transactions designed to implement, facilitate or expedite such sale and purchase of the Purchased Assets.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101-2109, or any similar applicable state or local laws.

    1.3    Additional Defined Terms. For purposes of this Agreement, the following terms have the meanings specified in the indicated Section of this Agreement:

| | |
|---|---|
| Agreement | Preamble |
| Aggregate Purchase Price | 2.2 |
| Assumed Liabilities | 2.4(a) |
| Auction | 6.4 |
| Bankruptcy Code | Preamble |
| Bill of Sale and Assignment Agreement | 3.2(a) |
| Business | Recitals |
| Business Employees | 7.1(a) |
| Closing | 3.1 |
| Competing Bid | 6.1 |
| Closing Date | 3.1 |
| Designated Contracts | 2.1(b)(vi) |
| Effective Time | 3.1 |
| Intellectual Property | 2.1(b)(iv) |
| Inventory | 2.1(b)(iii) |
| Permits | 4.16 |
| Pre-Closing Period | 8.1 |
| Purchased Assets | 2.1(b) |
| Purchase Price Allocation Schedule | 2.6 |
| Purchaser | Preamble |
| Required Closing Payment | 2.3 |
| Retained Assets | 2.1(c) |

| Sellers | Preamble |
| Specified Categories | Schedule 7.1(a) |
| Transfer Taxes | 2.5 |
| Transferred Employees | 7.1(a) |

1.4    <u>Interpretation</u>. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement, (d) all references in this Agreement to Articles, Sections and Exhibits shall mean and refer to Articles, Sections and Exhibits of this Agreement, (e) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (f) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person), (g) the term "including" shall be deemed to mean "including, without limitation" and "including, but not limited to" and (h) all references to "day" or "days" in this Agreement shall refer to calendar day(s), unless such reference is specifically to "Business Days."

**ARTICLE II**
**PURCHASE AND SALE, PURCHASE PRICE**

2.1    <u>Purchase and Sale</u>.

(a)    <u>Purchase and Sale</u>. Upon the terms and subject to the conditions of this Agreement, the Bid Procedures Order, and the Sale Order, at the Closing on the Closing Date, Sellers shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall acquire from Sellers, the Purchased Assets, free and clear of any Encumbrances pursuant to Bankruptcy Code Section 363(f), other than Permitted Encumbrances, and Purchaser shall assume from Sellers the Assumed Liabilities. Notwithstanding anything herein to the contrary, the Excluded Liabilities shall not be assumed by Purchaser and the Retained Assets will be retained by Sellers and not sold, assigned, conveyed, transferred or delivered to Purchaser hereunder.

(b)    <u>Purchased Assets</u>. For purposes of this Agreement, "<u>Purchased Assets</u>" means all assets, rights and properties of Sellers identified below (other than, or relating to, the Retained Assets), whether or not carried and reflected on the books of Sellers, wherever located:

(i)    all accounts, accounts receivable, notes, notes receivable, rental agreements and other rights to collect rent, contract rights, drafts, acceptances, instruments, chattel paper, general intangibles, and other forms of obligation or rights to payment and receivables, whether or not yet earned by performance, including state and federal tax refunds (collectively, "<u>Accounts</u>" or "<u>Accounts Receivable</u>");

(ii)    all equipment as such term is defined in Section 9.102(33) of the UCC, owned or hereafter acquired (as used in this section, "hereafter acquired" means between the date of the Agreement and the Closing Date) by Ironclad and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures,

- 6 -

leasehold improvements, vehicles and computers and other electronic data-processing and other office equipment now owned or hereafter acquired by Ironclad and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "Equipment");

(iii)    All inventory as such term is defined in Section 9.102(48) of the UCC, wherever located, now owned or hereafter acquired by Ironclad and, in any event, shall include, without limitation, all and related merchandise and other personal property now owned or hereafter acquired by Ironclad that are held for sale or lease, or are furnished or to be furnished under a contract of service or are raw materials, work in process, or materials or supplies used or to be used, or consumed or to be consumed, in Ironclad's business, and all shipping and packaging materials relating to any of the foregoing (collectively, the "Inventory");

(iv)    All intellectual property including all trademarks, tradenames, trade-dress, operating manuals, software, copyrights, all domain names (websites and web addresses) patents and applications, inventions, improvements, discoveries, technologies, designs, trade secrets, know-how, tooling, techniques, processes, research and development, databases, art work and other work of authorship, and confidential and proprietary information (including, without limitations, trade secrets, know-how, drawings, specifications, designs, design criteria and processes, technical information, reports, manufacturing and production processes and techniques, operating procedures, test data and procedures, scheduling procedures, and process regimes)  owned, licensed or used by Sellers (collectively, the "Intellectual Property");

(v)    Any and all general intangibles as such term is defined in Section 9.102(42) of the UCC, now owned or hereafter created or acquired by Ironclad, and in any event shall include, without limitation, all inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, business telephone numbers, licenses, franchises, rights to royalties, blueprints, drawings, confidential information, catalogs, sales literature, video tapes, customer lists, business records for each client including purchase history, tax refund claims (to the extent provided for the benefit of Purchaser in Section 8.5 below), computer programs, all claims under guaranties, security interests or other security held by or granted to Ironclad to secure payment of any of the Accounts by an Account Debtor, all rights to indemnification and all other intangible property of every kind and nature, other than the Retained Assets as described below (collectively the "General Intangibles");

(vi)    to the extent authorized by the Bankruptcy Court, all of Sellers' right, title and interest in, to or under the Designated Contracts of Sellers as defined in the Sale Order;

(vii)    to the extent authorized by the Bankruptcy Court, Sellers to assume and assign to Purchaser that certain agreement among Ironclad and Advantage Media Services, Inc., a Delaware corporation d/b/a AMS Fulfillment for providing certain warehousing, assembly, packaging, and fulfillment services from property

- 7 -

commonly known as 29010 Commerce Center Drive, Valencia, California pursuant to that certain Letter of Agreement dated June 29, 2007 (the "Warehouse Agreement");

(viii)    to the extent authorized by the Bankruptcy Court, Sellers to assign to Purchaser the rights of Sellers under the non-disclosure agreements executed by bidders and potential bidders in connection with the sale of the Purchased Assets; and

(ix)    Sellers' right title and interest in choses in action, claims and causes of action  or rights of recovery or set-off relating to (A) Trademark assets, (B) Patent assets, (C) Designated Contracts pursuant to Section 1.02(b)(vi) herein above and (D) insurance recoveries related to claims for damage or loss to inventory and equipment being acquired under this Agreement.

(c)    Retained Assets. For purposes of this Agreement, "Retained Assets" means all assets and property of Sellers, other than the Purchased Assets, including the following:

(i)    All bank accounts of Sellers and all cash and cash equivalents of Sellers as of the Closing Date;

(ii)    Sellers' corporate seal, minute books and stock record books, the general ledgers and books of original entry, all Tax Returns and other Tax records, reports, data, files and documents, and with respect to Retained Assets and Excluded Liabilities only, all books and records, including electronic data related thereto and documents;

(iii)    all of Sellers' right, title and interest in choses of action, claims and causes of action or rights of recovery or set-off of every kind and character against third parties (including Sellers' officers and directors), including actions under Chapter 5 of the Bankruptcy Code, excluding Sellers' right title and interest in choses in action, claims and causes of action or rights of recovery or set-off relating to (A) Trademark assets, (B) Patent assets, (C) Designated Contracts pursuant to Section 1.02(b)(vi) herein above and (D) insurance recoveries related to claims for damage or loss to inventory and equipment being acquired under this Agreement;

(iv)    all insurance policies and all rights, claims, credits or causes of action thereunder or in connection therewith, other than those relating to inventory and equipment being acquired under this Agreement;

(v)    (i) all attorney-client privilege and attorney work-product protection of Sellers or associated with the Business as a result of legal counsel representing Sellers or the Business; (ii) all documents of Sellers or the Business subject to the attorney-client privilege and work-product protection described in subsection (i); and (iii) all documents maintained by Sellers in connection with the transactions contemplated by this Agreement;

(vi)    Sellers' rights under this Agreement and the transactions contemplated hereby;

(vii)    Tax refund claims (to the extent provided for the benefit of Sellers in Section 8.5 below); and

(viii)    The equity interest that Ironclad Performance Wear Corporation, a Nevada corporation (i.e., the public company), has in its wholly-owned subsidiary Ironclad Performance Wear Corporation, a California corporation.

(ix)    Any claims that Ironclad Performance Wear Corporation, a Nevada corporation, has against Ironclad Performance Wear Corporation, a California corporation; and any claims that Ironclad Performance Wear Corporation, a California corporation, has against Ironclad Performance Wear Corporation, a Nevada corporation.

(d)    Excluded Liabilities. Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Purchased Assets shall be or become liable for or subject to, any liabilities or obligations of Sellers or the Business, including the following liabilities and obligations (collectively, "Excluded Liabilities"), which shall be and remain liabilities of Sellers:

(i)    liabilities accrued on any financial statements of Sellers;

(ii)    liabilities or obligations associated with any Retained Assets;

(iii)    liabilities or obligations associated with any and all indebtedness of Sellers for borrowed money to the extent the liability therefor is not one of the Assumed Liabilities;

(iv)    liabilities or obligations arising under any Contracts that are not Designated Contracts;

(v)    liabilities or obligations arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions by Sellers that occurred, or arise from events that occurred, prior to the Closing Date;

(vi)    liabilities retained by Sellers pursuant to Section 7.1(b) and all other liabilities or obligations prior to the Closing to current, former or prospective employees (including any Business Employees who do not become Transferred Employees) of Sellers and other individual service providers or their respective dependents or beneficiaries, other than liabilities or obligations with respect to any Transferred Employees on or after the Closing;

(vii)    liabilities of Sellers to the Internal Revenue Service or any other Governmental Authority including those relating to Sellers;

(viii)    penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any presence or release of any Materials of Environmental Concern at any location or any actual or alleged violation by Sellers of any Legal Requirement and/or Environmental Law prior to the Closing Date;

- 9 -

(ix)    liabilities of Sellers to any Person arising out of any act or omission under any Legal Requirement, including any Environmental Law; and

(x)    liabilities or obligations under the WARN Act, if any, arising out of or resulting from (i) layoffs or termination of employees by Seller and/or (ii) the consummation of the Transaction.

2.2    Purchase Price; Deposit.

The purchase price payable by Purchaser for the Purchased Assets shall be paid in the (i) the application of the Buyer's Deposit as defined below and (ii) cash, collectively, the "Aggregate Purchase Price", and shall be in an amount equal to Twenty-Five Million Two Hundred Fifty Thousand Dollars ($25,250,000.00).  In addition to payment of the Aggregate Purchase Price, Purchaser shall assume the Assumed Liabilities at the Closing.

Purchaser previously deposited One Million Dollars ($1,000,000.00) (the "Buyer Deposit") with Levene, Neale, Bender, Yoo & Brill L.L.P. ("Escrow Agent") by wire transfer of immediately available funds.  Escrow Agent is holding the Buyer Deposit in a segregated, non-interest-bearing account (the "Trust Account"). The Buyer Deposit shall become payable, and shall be paid, to Sellers from the Trust Account at the Closing. If this Agreement is validly terminated prior to the Closing, the Buyer Deposit shall be released and distributed to Purchaser or Sellers in accordance with the terms set forth in Section 11.3.

2.3    Payments at Closing. Purchaser shall fund the payment of the Purchase Price at the Closing by (i) wire transferring into the Trust Account the additional amount of Twenty-Four Million Two Hundred Fifty Thousand Dollars ($24,250,000.00) (the "Required Closing Payment") and (ii) by transferring title to the Buyer Deposit to Sellers.

2.4    Assumed Liabilities.

(a)    As additional consideration for the purchase of the Purchased Assets, Purchaser shall, at the Closing, pursuant to the Sale Order, agree to perform, and in due course pay and discharge, only the following obligations and liabilities of Sellers relating to the Business (collectively, the "Assumed Liabilities"):

(i)    the obligations and liabilities arising on and after the Closing Date under or related to the Purchased Assets and Transferred Employees; and

(ii)    cure costs under Bankruptcy Code Section 365 for all Designated Contracts which shall be treated and paid in accordance with the Sale Order.

(b)    Purchaser shall only be responsible for the Assumed Liabilities and shall not assume or pay any, and Sellers shall continue to be responsible for each, liability of Sellers whether or not relating to the Business including, but not limited to the Excluded Liabilities set forth in Section 2.1(d).

2.5    Transfer Taxes. Any and all transfer, sales, use, purchase, value added, excise, personal property, intangible stamp, registration or similar Taxes or fees imposed on, or

- 10 -

resulting from, the transfer of any Purchased Assets (collectively "<u>Transfer Taxes</u>"), regardless of when payable, shall be paid by Purchaser. Purchaser shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, fees and charges, and, if required by applicable Law, Sellers will join in the execution of any such Tax Returns and other documentation.

2.6     <u>Allocation</u>. Within sixty (60) days of the Closing, Purchaser shall provide to Sellers, for Sellers' review, comment and consent, a schedule allocating the Aggregate Purchase Price (taking into account any Assumed Liabilities that are Liabilities for Tax purposes) among the Purchased Assets (the "<u>Purchase Price Allocation Schedule</u>"). The Purchase Price Allocation Schedule will be prepared in accordance with the applicable provisions of the Code. The parties hereto shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect changes in the Aggregate Purchase Price. The parties hereto agree for all Tax reporting purposes to report the transactions in accordance with the Purchase Price Allocation Schedule, as adjusted pursuant to the prior sentence, and to not take any position during the course of any audit or other proceeding inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

## ARTICLE III
## CLOSING AND CLOSING DATE DELIVERIES

3.1     <u>Closing</u>. The term "<u>Closing</u>" as used herein shall refer to the actual conveyance, transfer, assignment and delivery of the Purchased Assets to Purchaser in exchange for the consideration delivered to Sellers pursuant to this Agreement. The Closing shall take place at the offices of Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California  or at such other place as is mutually agreed to in writing by Sellers and Purchaser, at 10:00 am local time not later than fifteen (15) calendar days following the date on which all of the conditions set forth in <u>Articles IX</u> and <u>X</u> are satisfied (other than conditions the fulfillment of which is to occur at the Closing). The date upon which the Closing actually takes place is referred to as the "<u>Closing Date</u>". The Closing shall be deemed effective as of 12:01 a.m. (Pacific Time) on the Closing Date (the "<u>Effective Time</u>").

3.2     <u>Closing Deliveries by Sellers</u>. At the Closing, Sellers shall deliver to Purchaser:

(a)     a Bill of Sale and Assignment Agreement (the "<u>Bill of Sale and Assignment Agreement</u>"), executed by Sellers, and all such other bills of sale, lease assignments, trademark assignments, copyright assignments, patent assignments, employee work product assignments, and contract assignments (and any other appropriate title transfer documentation) and other documents and instruments of sale, assignment, conveyance and transfer related to the Purchased Assets, as Purchaser may deem necessary or desirable, which are prepared by Purchaser and delivered to Sellers for signature;

(b)     a certificate executed by an executive officer of each of Sellers certifying as to the matters set forth in <u>Section 9.3</u>;

(c)     a certified copy of the Sale Order;

- 11 -

(d)      a certificate, duly completed and executed by each of Sellers pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that such Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(e)      Duly completed and executed IRS Forms W-9 establishing that Sellers are exempt from U.S. back-up withholding; and

(f)      all documents furnished by Purchaser that are necessary to amend Sellers' name to not include "Ironclad" or any derivative thereof or any other similar name, which shall be executed by Sellers and in a form that Purchaser may file in the States of California and Nevada and in each other state in which Sellers, or either of them, are/is qualified to transact business.

3.3      <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to Sellers:

(a)      the Required Closing Payment to be delivered by Purchaser pursuant to <u>Section 2.3</u>;

(b)      a certificate of the Secretary of Purchaser certifying as to: (i) the certificate of formation of Purchaser; and (ii) the resolutions of the board of directors of Purchaser authorizing and approving the execution, delivery and performance by Purchaser of this Agreement and any agreements, instruments, certificates or other documents executed by Purchaser pursuant to this Agreement;

(c)      a certificate executed by an authorized officer of Purchaser certifying as to the matters set forth in <u>Section 10.3</u>;

(d)      the Bill of Sale and Assignment Agreement as executed by Purchaser;

(e)      a certificate, duly completed and executed by Purchaser pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that Purchaser is not a "foreign person" within the meaning of Section 1445 of the Code; <u>provided, however</u>, that if Purchaser is a disregarded entity (as described in Section 1.1445-2(b)(2)(iii) of the Treasury Regulations), such certification shall be provided by the Purchaser's owner.

3.4      <u>Cooperation</u>. Sellers and Purchaser shall, on request, on and after the Closing Date, cooperate with one another by furnishing any additional information, executing and delivering any additional documents and/or instruments and doing any and all such other things as may be reasonably required by the parties to consummate or otherwise implement the transactions contemplated by this Agreement.

**ARTICLE IV**
**<u>REPRESENTATIONS AND WARRANTIES OF SELLERS</u>**

Sellers represent and warrant to Purchaser as of the Closing as follows:

- 12 -

4.1    <u>Due Incorporation</u>. Ironclad Performance Wear Corporation, a California corporation, is (i) duly organized, validly existing and in good standing under the Laws of the State of California and (ii) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect.  Ironclad Performance Wear Corporation, a Nevada corporation, is (i) duly organized, validly existing and in good standing under the Laws of the State of Nevada and (ii) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect.  Subject to entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Sellers and, if applicable, have been duly authorized by all necessary action on the part of each Seller. This Agreement has been duly executed and delivered by Sellers and, subject to entry of the Sale Order, is a legal, valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). Sellers have the full power and authority necessary to own, lease, operate and use the Purchased Assets.

4.2    <u>Noncontravention</u>. Subject to entry of the Sale Order, neither the execution, delivery and performance by Sellers of this Agreement nor the consummation of the transactions contemplated hereby will, after the giving of notice, or the lapse of time, or otherwise result in a breach or violation of, or default under, each of Seller's organizational documents.

4.3    <u>Brokers</u>. Except as set forth in <u>Schedule 4.3</u>, neither this Agreement nor the sale of the Purchased Assets or any other transaction contemplated by this Agreement was induced or procured through any Person acting on behalf of, or representing Sellers or any of their Affiliates as broker, finder, investment banker, financial advisor or in any similar capacity.

4.4    <u>Title to Purchased Assets</u>.

(a)    Sellers have good and marketable title to, or, in the case of property held under a lease or other contractual obligation, a valid leasehold interest in, all of the Purchased Assets, whether real or personal property and whether tangible or intangible, other than Permitted Encumbrances.

(b)    Subject to entry of the Sale Order, Purchaser will be vested with title to the Purchased Assets, free and clear of all liens and Encumbrances, other than Permitted Encumbrances, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

4.5    <u>Condition of Assets</u>. The Purchased Assets are being sold by Sellers in AS-IS condition. Neither Sellers nor any other Person makes any other express or implied representation or warranty on behalf of Sellers, including, without limitation, any representation or warranty as to the condition of the Purchased Assets.

- 13 -

4.6    NO OTHER REPRESENTATIONS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV, SELLERS DO NOT MAKE ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE TRANSACTIONS, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, INDEPENDENT CONTRACTORS, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV, SELLERS (I) EXPRESSLY DISCLAIM AND NEGATE ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) AND (II) DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS OR ANY OF THEIR AFFILIATES).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows:

5.1    Organization; Authorization. Purchaser is (a) duly organized, validly existing and in good standing under the laws of the California and (b) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Purchaser and have been duly authorized by all necessary action on the part of Purchaser. This Agreement has been duly executed and delivered by such party and is a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

5.2    Noncontravention. Neither the execution, delivery and performance by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby will result in a breach or violation of, or default under, Purchaser's organizational documents.

5.3    No Brokers. Purchaser has no Liability of any kind to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers could be liable.

5.4    <u>Financing Ability</u>. Purchaser has the financial ability to pay the Aggregate Purchase Price as of the date hereof and the Closing and to otherwise perform Purchaser's obligations under this Agreement. Accordingly, there are no financing conditions to the payment of the Aggregate Purchase Price.

**ARTICLE VI**
**<u>BANKRUPTCY MATTERS</u>**

6.1    <u>Cooperation in Bankruptcy Court Matters and Sale Order</u>.

(a)    Sellers shall pursue diligently the entry of the Sale Order. Sellers shall use commercially reasonable efforts to comply with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules in connection with obtaining approval of the Sale Order.  In the event of any inconsistency between the terms of this Agreement and the terms of the Sale Order, the terms of the Sale Order shall control.

(b)    In the event the entry of the Sale Order shall be appealed, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

(c)    Sellers agree that each will promptly take such actions as are reasonably necessary or appropriate to obtain prompt entry of the Sale Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers and are reasonably necessary or appropriate to assist Sellers in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court or live testimony for the purposes of, among other things, providing necessary assurances of future performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Aggregate Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code.  If the entry of the Sale Order shall be appealed or collaterally attacked, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal or collateral attack of the Sale Order after its entry; <u>provided</u>, that Purchaser shall reimburse to Sellers the costs and expenses (including professional fees and expenses) of Sellers in any such appeal. After consultation with Purchaser, in Sellers' discretion upon consultation with the Official Committee of Equity Holders, Sellers may respond to objections to the entry of the Sale Order, conduct discovery proceedings, schedule and attend hearings and oppose any actions taken by the parties objecting to, appealing, or seeking a stay of the consummation of the sale of the Purchased Assets provided by this Agreement. Sellers shall use commercially reasonable efforts to take all actions, including the defense of motions and actions filed by third parties required in the Chapter 11 Cases reasonably required to retain possession and ownership of the Purchased Assets pending the Closing; <u>provided</u>, <u>however</u>, Sellers' obligations in connection with any such efforts shall terminate upon the Closing.

(d)    The Sale Order shall contain, without limitation, the following provisions:

- 15 -

(i)    finding that notice of the hearing on the Sale Motion and the auction undertaken pursuant to the Bid Procedures Order (the "Auction") was proper and sufficient under the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, that Sellers and Purchaser entered into this Agreement in good faith, the Aggregate Purchase Price and liabilities of Sellers under the Designated Contracts constitute fair value in consideration for the Purchased Assets and determining that Purchaser is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the Purchased Assets;

(ii)    authorizing Sellers to transfer to Purchaser all of each of its respective rights, title, privileges and interests in and to the Purchased Assets, and ordering that such transfer is free and clear of any Encumbrances, with all such Encumbrances attaching to the net proceeds of sale, if any;

(iii)    authorizing Sellers to assume and sell and assign the Designated Contracts to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code; and

(iv)    finding that Purchaser is a not a successor to Sellers or their estates by reason of any theory of Law or equity, whether with respect to any liens and claims against Sellers, the Purchased Assets or otherwise and ruling that Purchaser shall not be subject to successor liabilities for products sold prior to the Closing.

(v)    Cure amounts shall otherwise be those determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code with respect to the Designated Contracts.

## ARTICLE VII
## EMPLOYEE MATTERS

7.1    Employees to be Hired by Purchaser.

(a)    Prior to the Closing. Purchaser will offer to employ, effective as of the Closing Date, the employees of Sellers as of immediately prior to the Closing Date in respect of the Business as listed on Schedule 7.1(a) (the "Business Employees") as determined in the sole discretion of Purchaser. All Business Employees who are offered and accept employment with Purchaser and commence such employment immediately after the Closing shall be referred to as the "Transferred Employees". Sellers shall terminate the employment of all Transferred Employees effective as of the Closing. In connection with the Closing, Purchaser will make a severance payment to each of Sellers' employees who are not offered employment by Purchaser, other than Sellers' officers and any employee subject to an employee retention agreement, at comparable terms to their then employment with Sellers, with each such severance payment to be consistent with the most generous current severance policy of Purchaser and/or any of its Affiliates for similarly situated employees.  Purchaser will not owe any severance payment to any of Sellers' employees who are offered employment by Purchaser at comparable terms to their then employment with Sellers but who do not accept their offer of employment.

(b)    Other than as set forth in the last two sentences of Section 7.1(a) above, Sellers shall be solely responsible, and Purchaser shall have no obligations whatsoever, for any salary, wages, bonuses, accrued vacations or paid time off, or other similar amounts payable to any current or former employee, independent contractor, consultant of Sellers, or any of their eligible dependents, for any period relating to service with Sellers. For the avoidance of doubt and notwithstanding anything to the contrary in this Section 7.1, Purchaser shall be responsible only for any Assumed Liabilities under Section 2.4(a)(i)-(iv).

(c)    Nothing in this Agreement shall be deemed or construed to limit or condition the delivery by Sellers of any notices required by, or the taking of any other action Sellers deem necessary or desirable to comply with, the WARN Act, which Sellers may take at such time and in such manner as Sellers deem appropriate in their sole discretion. Purchaser shall be responsible for providing any notice required pursuant to the WARN Act with respect to any employment losses involving Transferred Employees that occur on or after the Closing Date and agrees to not, within ninety (90) days after the Closing Date, take any action that would obligate Sellers to have provided notice to any Business Employees prior to or on the Closing Date under the WARN Act.

(d)    The provisions of this Section 7.1 shall inure solely to the benefit of the parties to this Agreement, and nothing herein, express or implied, is intended to confer upon any other Person (including any Business or Transferred Employee) any rights or remedies of any nature (including any third-party beneficiary rights under this Agreement) whatsoever.

7.2    Authorization to Communicate with Certain Employees. In coordination and cooperation with Sellers, effective upon the conclusion of the Auction, Purchaser is authorized to communicate with the Business Employees for the purpose of negotiating and extending to such employees as it determines, offers of employment.

## ARTICLE VIII
## COVENANTS

A.  Pre-Closing Covenants.

8.1    Maintenance of Business.  For the period commencing on the date hereof and expiring on the earlier of the termination of this Agreement in accordance with Article XI and the Closing (the "Pre-Closing Period"), Sellers shall, subject to the compliance by Purchaser with its covenants hereunder and to applicable requirements of Law, conduct and carry on the Business in the Ordinary Course other than changes related to the filing, announcement or pendency of Sellers' Chapter 11 Cases or the conduct of the sale process contemplated by this Agreement and/or the Sale Order.

8.2    Sellers Pre-Closing Covenants. Without limiting the generality of Section 8.2(a), during the Pre-Closing Period, Sellers:

(a)    shall not, without the prior written consent of Purchaser, purchase, sell, lease, mortgage, pledge or otherwise acquire or dispose of any material Purchased Assets, except for inventory, parts and supplies purchased, sold or otherwise disposed of in the Ordinary Course;

- 17 -

(b)       shall not, without the prior written consent of Purchaser, waive, release or cancel in any material respect any claims against third parties or material debts owing to them, or any rights which have any material value, in each case, with respect to any Purchased Assets, other than in the Ordinary Course or related solely to Excluded Liabilities;

(c)       shall not, without the prior written consent of Purchaser, change, amend, terminate or otherwise modify in any material respect, any material Assumed Contract to which Sellers or either of them is a party, other than in the Ordinary Course;

(d)       shall make all payments and otherwise perform all material obligations in respect of all leases of real property to which either of Sellers is a party so as to prevent any loss or forfeiture thereof or thereunder, except, in any case, where (i) the enforcement of non-compliance is stayed by the Chapter 11 Cases or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a material adverse effect; and

(e)       shall, with the exception of any defaults existing as of the date of this Agreement, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it or them, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by Purchaser and, upon request of Purchaser, make to each other party to each such Material Contract such demands and requests for information and reports or for action Sellers are entitled to make under such Material Contract except, in any case, where (i) the enforcement of non-compliance is stayed by the Chapter 11 Cases or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a material adverse effect.

8.3       Commercially Reasonable Efforts to Close.

(a)       Subject to the terms and conditions hereof, each party hereto covenants and agrees to use all commercially reasonable efforts to consummate the transactions contemplated hereby in accordance with the terms of the Sale Order and will fully cooperate with the other parties hereto for such purpose.

(b)       Sellers agree to immediately notify Purchaser of any event, fact or circumstance of which Sellers become aware that could reasonably be expected to result in the failure of a condition set forth in Article IX or X to be satisfied and, if such condition is curable, to allow Purchaser a reasonable opportunity to satisfy such condition.

(c)       Purchaser agrees to immediately notify Sellers of any event, fact or circumstance of which Purchaser becomes aware that could reasonably be expected to result in the failure of a condition set forth in Article IX or X to be satisfied and, if such condition is curable, to allow Seller a reasonable opportunity to satisfy such condition.

B.       Certain other Covenants and Agreements.

8.4       Use of Name. After the Closing, Sellers may not, directly or indirectly, use the name "Ironclad", "Ironclad Performance Wear" or any derivative thereof or any similar name, or trade name currently used to identify themselves. Each of Sellers shall be responsible

- 18 -

for all filing fees required to be paid in connection with filing Sellers' change of name amendments in the States of Nevada and California, and in each other state in which it is qualified to transact business.

8.5     Tax Matters.

(a)     All refunds for Taxes for any Excluded Tax, Transfer Taxes, or that are attributable to the carry forward of a Tax attribute from a Pre-Closing Period shall be for the sole benefit of Sellers and to the extent that Purchaser receives a refund that is for the benefit of Sellers, Purchaser shall promptly advise Sellers of the receipt of the refund and within five (5) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Sellers. All refunds for Taxes relating to the Business, the Purchased Assets or Transferred Employees for a Post-Closing Tax Period shall be for the sole benefit of Purchaser and to the extent that Sellers receive a refund for a Tax that is for the benefit of Purchaser, Sellers shall promptly advise Purchaser of the receipt of the refund and within five (5) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Purchaser.

(b)     If any Tax (or Tax refund) relates to a period that begins before and ends after the Closing Date, the parties shall use the following conventions for determining the portion of such Tax (or Tax refund) that relate to a Pre-Closing Tax Period and the portion that relates to a Post-Closing Tax Period: (A) in the case of property Taxes and other similar Taxes imposed on a periodic basis, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined by multiplying the Taxes (or Tax refund) for the entire period by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period, and the remaining amount of such Taxes (or Tax refunds) shall be attributable to the Post-Closing Tax Period; and (B) in the case of all other Taxes, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined as if a separate return was filed for the period ending as of the end of the day on the Closing Date using a "closing of the books methodology," and the remaining amount of the Taxes (or Tax refunds) for such period shall be attributable to the Post-Closing Tax Period.

(c)     Purchaser and Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such reasonably requested information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Tax Return or other filings or otherwise in connection with Tax matters, in each case relating to the Purchased Assets or the Business.

8.6     Facility Lease.

The Sellers and Purchaser agree to work together to attempt to negotiate an extension of the Sellers' current real property lease for the premises located at 1920 Hutton Ct #300, Farmers Branch, TX 75234, or to find an alternative location.

## ARTICLE IX
## CONDITIONS TO CLOSING APPLICABLE TO PURCHASER

The obligations of Purchaser hereunder (including the obligation of Purchaser to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Purchaser):

9.1    No Termination. Sellers shall not have terminated this Agreement pursuant to Section 11.1.

9.2    Bankruptcy Court Approval. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date unless consented to by Purchaser.

9.3    Bring-Down of Sellers Warranties, Representations and Covenants. Each of the representations and warranties of Sellers contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Sellers will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Sellers at or prior to the Closing.

9.4    Pending Actions.  No proceeding by any Governmental Authority shall be pending on the Closing Date with respect to which a court of competent jurisdiction over Sellers has entered an order that enjoins the consummation of this Agreement or any transactions contemplated hereby.

9.5    Condition of Assets. From the date of this Agreement through the Closing, there shall have been no material adverse change in the condition of the Purchased Assets prior to Closing other than changes related to the filing, announcement or pendency of the Chapter 11 Cases or to the conduct of the sale process contemplated by this Agreement and/or the Sale Order, with the Bankruptcy Court to be the final arbiter of whether there has been any such material adverse change if Sellers and Purchaser are not in agreement.

9.6    Validity of Due Diligence Information.  The information related to the values of Accounts Receivable and Inventory provided to Purchaser by Sellers on October 16, 2017 was true and correct to the best of the knowledge, information and belief of Sellers.

## ARTICLE X

## CONDITIONS TO CLOSING APPLICABLE TO SELLERS

The obligations of Sellers hereunder (including the obligation of Sellers to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Sellers):

10.1    No Termination. Purchaser shall not have terminated this Agreement pursuant to Section 11.1.

- 20 -

10.2    <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

10.3    <u>Bring-Down of Purchaser Warranties, Representations and Covenants</u>. Each of the representations and warranties of Purchaser contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Purchaser will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Purchaser at or prior to the Closing.

10.4    <u>Pending Actions</u>.  No proceeding by any Governmental Authority shall be pending on the Closing Date with respect to which a court of competent jurisdiction over Sellers has entered an order that enjoins the consummation of this Agreement or any transaction contemplated hereby.

10.5    <u>All Necessary Documents</u>. All proceedings to be taken in connection with the consummation of the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to Sellers, and Sellers shall have received copies of such documents as they may reasonably request in connection therewith, including those documents to be delivered pursuant to <u>Section 3.3</u>.

## ARTICLE XI
## TERMINATION

11.1    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by mutual consent of Purchaser and Sellers;

(b)    by Sellers, if:

(i)    the Closing of the transactions contemplated by this Agreement shall not have occurred within fifteen (15) calendar days following the date of entry of the Sale Order due to the fault of Purchaser or such later date as may have been agreed upon in writing by the parties hereto; <u>provided</u> that Sellers are not in material breach of or default under this Agreement; or

(ii)    any material representation or warranty made herein for the benefit of Sellers is untrue in any material respect, or Purchaser shall have defaulted in any material respect in the performance of any obligation under this Agreement.

(c)    by Purchaser, if:

(i)    the Closing of the transactions contemplated by this Agreement shall not have occurred within fifteen (15) calendar days following the date of entry of the Sale Order (or such later date as may have been agreed upon in writing by the parties

- 21 -

hereto) either (x) due to the fault of Sellers, provided that Purchaser is not in material breach of or default under this Agreement, or (y) due to the entry of an Order staying, reversing, modifying or amending the Sale Order;

        (ii)     any material representation or warranty made herein for the benefit of Purchaser is untrue in any material respect, or Sellers shall have defaulted in any material respect in the performance of any obligation under this Agreement;

        (iii)    failure of compliance with the requirements of Sellers as conditions precedent for Purchaser to close the transaction as set forth in Article IX; and

        (iv)    the Bankruptcy Court does not enter the Sale Order by November 15, 2017.

        11.2   <u>Buyer Deposit</u>. In the event that Purchaser terminates this Agreement pursuant to <u>Section 11.1(a)</u> or <u>Section 11.1(c)</u>, Purchaser shall be entitled to disbursement of the Buyer Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the Trust Account. In the event of a termination of this Agreement pursuant to any provision of <u>Section 11.1(b)</u>, Sellers shall be entitled to disbursement of the Buyer Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the Trust Account. In the event that this Agreement is terminated pursuant to <u>Section 11.1</u> and either Sellers or Purchaser are entitled to receive the Buyer Deposit, then Sellers or Purchaser may deliver to the Escrow Agent, at any time following the effective date of any such termination, a letter instructing the Escrow Agent to pay Sellers or Purchaser, as applicable, the Buyer Deposit from the Trust Account and the distribution of the Buyer Deposit by the Escrow Agent shall be subject to the terms of this Agreement.

## ARTICLE XII
## MISCELLANEOUS

        12.1   <u>Costs and Expenses</u>. Purchaser will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the purchase of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein). Sellers will pay their own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the sale of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein).

        12.2   <u>Bankruptcy Court Approval</u>. The Parties acknowledge that this Agreement shall not become effective until it has been approved by the Bankruptcy Court pursuant to the Sale Order.

        12.3   <u>Entire Agreement</u>. The Schedules and Exhibits referenced in this Agreement are incorporated into this Agreement and collectively with the Sale Order, the Confidentiality Agreement and this Agreement contain the entire agreement between the parties hereto with respect to the transactions contemplated hereunder, and supersede all negotiations,

representations, warranties, commitments, offers, contracts and writings prior to the date hereof. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

       12.4   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Facsimiles or other electronic copies of signatures will be deemed to be originals.

       12.5   Assignment, Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of Sellers and Purchaser, their respective successors, permitted assigns, and personal representatives, as the case may be.  No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties, and any assignment in contravention of the foregoing shall be null and void; *provided*, *however*, Purchaser may assign this Agreement and its rights and obligations under this Agreement, in whole or in part, without consent, to any of its Subsidiaries or Affiliates or any Person that acquires all or substantially all of the equity or assets of Purchaser ("Permitted Assignee"). This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, including a Permitted Assignee.

       12.6   Survival. The representations and warranties of Sellers contained in this Agreement (whether or not contained in Article IV) shall not survive, and shall terminate at, the Closing, and Sellers shall have no liability after the Closing for any breach of any representation or warranty. None of the covenants or other agreements contained in this Agreement shall survive the Closing other than those which by their terms contemplate performance after the Closing, and each surviving covenant or agreement shall survive the Closing for the period contemplated by its terms. For the avoidance of doubt, Sellers shall have no obligations under this Agreement after the Closing except as specifically set forth herein.

       12.7   Severability. If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction or as a result of future legislative action, such holding or action shall be strictly construed and shall not affect the validity or effect of any other provision hereof; provided that the Parties will amend the Agreement to most closely implement the intent of the Agreement.

       12.8   Headings. The captions of the various Articles and Sections of this Agreement have been inserted only for convenience of reference and shall not be deemed to modify, explain, enlarge or restrict any of the provisions of this Agreement.

       12.9   Risk of Loss. Risk of loss (other than from post-petition operating losses incurred by the Sellers), damage or destruction to a material portion the Purchased Assets shall be upon Sellers until the Closing, and shall thereafter be upon Purchaser.

       **12.10   GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE. WITHOUT**

- 23 -

**LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT (EXCEPT AS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY), THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY AND ANY OF THE DOCUMENTS (OR ANY PROVISION IN ANY OF THE DOCUMENTS) EXECUTED HEREUNDER OR IN CONNECTION HEREWITH. SUCH BANKRUPTCY COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND PURCHASER AND SELLERS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE CHAPTER 11 CASES SHALL HAVE CLOSED AND CANNOT BE REOPENED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE AND ANY APPELLATE COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE. EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. IN THE EVENT ANY SUCH ACTION, SUIT OR PROCEEDING IS COMMENCED, THE PARTIES HEREBY AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER ANY PARTY HERETO IN ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH ACTION, SUIT OR PROCEEDING UPON THE PARTY AT THE ADDRESS OF SUCH PARTY SET FORTH IN <u>SECTION 12.13</u>, UNLESS ANOTHER ADDRESS HAS BEEN DESIGNATED BY SUCH PARTY IN A NOTICE GIVEN TO THE OTHER PARTIES IN ACCORDANCE WITH THE PROVISIONS OF <u>SECTION 12.13</u>.**

12.11    <u>Press Releases and Public Announcements</u>. Other than regular filings with the United States Securities and Exchange Commission, including the filing of Form 8-K's as Sellers deem appropriate, no public announcement or disclosure will be made by any party with respect to the subject matter of this Agreement or the Transaction without the prior written consent of Purchaser and Sellers; provided, however, that the provisions of this <u>Section 12.11</u> will not prohibit (a) any disclosure required by any applicable Laws (in which case the disclosing party will provide the other parties with the opportunity to review in advance any such disclosure) or an Order of the Bankruptcy Court, (b) any disclosure made in connection with the enforcement of any right or remedy relating to the Transaction, and (c) any disclosure by Purchaser or Sellers to report and disclose the status of this Agreement and the transactions

contemplated hereunder to their respective Affiliates and/or their respective members, creditors, shareholders or limited partners. Effective upon, and only upon, the Closing, the Confidentiality Agreement will terminate.  If any such announcement or other disclosure is required by applicable Law or an Order of the Bankruptcy Court, the disclosing party required to make such announcement or disclosure shall give the other party prior notice of, and an opportunity to comment on, the proposed announcement or disclosure, which shall be reasonably satisfactory to all of the parties. The parties hereto acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order, and Sellers may provide copies of this Agreement (including any draft versions of this Agreement) to the statutory committee of unsecured creditors and the Equity Committee which have been appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court.

       12.12  <u>U.S. Dollars</u>. All amounts expressed in this Agreement and all payments required by this Agreement are in United States dollars.

       12.13  <u>Notices</u>.

       (a)    All notices, requests, demands and other communications under this Agreement shall be in writing and delivered in person, or sent by email or sent by reputable overnight delivery service and properly addressed as follows (with any such notice, request, demand or other communication also to be provided by email):

    <u>To Purchaser</u>:

       Brighton-Best International, Inc.
       5855 Obispo Avenue
       Long Beach, California 90805
       Email: junxu@brightonbest.com
       Attention:  Jun Xu

    with a copy to (which shall not constitute notice):

       Kurosaki & Parker, PC
       714 West Olympic Blvd., Suite 1011
       Los Angeles, California 90015
       Email: gmk@kpzlaw.com
       Attention:  Glenn Kurosaki

       Greenberg Glusker Fields Claman & Machtinger, LLP
       1900 Avenue of the Stars, 21st Floor
       Los Angeles, California 90067
       Email: jkrieger@greenbergglusker.com
       Attention:  Jeffrey Krieger

To Seller Prior to the Closing:

>Ironclad Performance Wear Corporation
1920 Hutton Court, Suite 300
Farmers Branch, Texas
Email:  geoffg@ironclad.com
Attention:  L Geoffrey Greulich, CEO

with a copy to (which shall not constitute notice):

>Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California  90067
Email:  rb@lnbyb.com
Attention: Ron Bender

>and

>Stubbs Alderton & Markiles, LLP
15260 Ventura Blvd., 20th Floor
Sherman Oaks, CA 91403
Email: salderton@stubbsalderton.com
Attention: Scott Alderton

>and

>Dentons US LLP
601 S. Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Email:  tania.moyron@dentons.com
Attention:  Tania Moyron

(b)    Any party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

(c)    All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 12.13 if delivered personally or courier, shall be effective upon delivery; if sent by facsimile, shall be delivered upon receipt of proof of transmission.  In addition to any other form of notice provided, all notices required to be provided under this Agreement must also be provided by email at the email addresses above.

12.14   WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY

- 26 -

IRREVOCABLY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT, THE SUBJECT MATTER HEREOF OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO IN CONNECTION WITH ANY SUCH AGREEMENTS, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.14 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.15    Waiver. Any party hereto may waive compliance by or extend the time of performance of any obligation or act for any other party with respect to any provision of this Agreement. No waiver of any provision or extension shall be construed as a waiver of any other provision or an extension of time for the performance of any other obligation or act hereunder. Any waiver or extension must be in writing.

12.16    No Third-Party Beneficiary. This Agreement is being entered into solely for the benefit of the parties hereto, and the parties do not intend that any employee or any other person shall be a third-party beneficiary of the covenants by either Sellers or Purchaser contained in this Agreement.

12.17    SELLERS DISCLAIMER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF SELLERS EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES) ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO PURCHASER IN CONNECTION WITH THIS AGREEMENT, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, SELLERS HAVE NOT MADE AND ARE NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE PURCHASED ASSETS. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES), ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE PURCHASED ASSETS ARE HEREBY EXPRESSLY DISCLAIMED. PURCHASER REPRESENTS, WARRANTS, COVENANTS AND AGREES, THAT SELLERS ARE NOT MAKING ANY

REPRESENTATION OR WARRANTY, OTHER THAN THOSE EXPRESSLY MADE BY SELLERS AS SET FORTH IN <u>ARTICLE IV</u> (AS MODIFIED BY THE SCHEDULES), AND THAT PURCHASER SHALL ACQUIRE THE PURCHASED ASSETS AND ASSUME THE ASSUMED LIABILITIES WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OTHER THAN THOSE EXPRESSLY MADE BY SELLERS AS SET FORTH IN <u>ARTICLE IV</u> (AS MODIFIED BY THE SCHEDULES).

   12.18 <u>PURCHASER DISCLAIMER</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF PURCHASER EXPRESSLY SET FORTH IN <u>ARTICLE V</u> ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO SELLERS IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, PURCHASER HAS NOT MADE OR IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE V</u> HEREOF.

   12.19 <u>Disclosures</u>. No reference to or disclosure of any information in the Schedules shall be construed as an admission or indication that such information is material or that such information is required to be referred to or disclosed in the Schedules nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement.

   12.20 <u>Specific Performance</u>. Each of the parties acknowledges and agrees that the other parties hereto would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties hereto will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms hereof in any action instituted in any court specified in <u>Section 12.10</u> in addition to any other remedy to which he, she or it may be entitled, at law or in equity.

        [signature page follows]

- 28 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**PURCHASER:**

**BRIGHTON-BEST INTERNATIONAL, INC.**
a California corporation

By:_____
  Name:  Jun Xu
  Title:  President

**SELLERS:**

**IRONCLAD PERFORMANCE WEAR
CORPORATION, a California corporation**

By:_____
  Name: **L. Geoffrey Greulich**
  Title:  **Chief Executive Officer**

and

**IRONCLAD PERFORMANCE WEAR
CORPORATION, a Nevada corporation**

By:_____
  Name: **L. Geoffrey Greulich**
  Title:  **Chief Executive Officer**

## EXHIBIT A


**SALE ORDER**

**Schedule 4.3**

**BROKERS**

**[Sellers - Craig-Hallum Capital Group LLC as their financial advisor]**
**[Purchaser, None]**

### Schedule 7.1(a)

**BUSINESS EMPLOYEES LIST**

| Name | Department |
|------|-----------|
| Broussard, Ronald Roy | VP of Industrial Sales |
| Burkhard, Kerri | Customer Service - 97Y209 |
| Day, Christopher James | Sales - Industrial - Grainger |
| Dooley, Jeffrey Scott | Sales - Director - Grainger |
| Eshleman, Derek G | Prod Mgr & R&D |
| Feld, Abraham Hagen | Marketing - |
| Ferguson, Mathew Lee | Sales - Retail |
| Fowler, Michael J | VP Sales - Retail |
| Frank, Jodi L | Sales - Industrial - NE |
| Guo, Xin | Logistics - Buyer |
| Jaeger, Eric | Research Design & Development - 97Y203 |
| Laubert, Matthew Palmer | Customer Service - FB |
| Merchant, Jason Stuart | Sales - Retail |
| Metzler, Stacy Marie | G&A - A/R |
| Morris, Chartrice Holt | Logistics - |
| Nacion, Markham | Research Design & Development - 97Y203 |
| Patterson, Lisa Gonzalez | Sales - Industrial - |
| Rogus, Kenneth Paul | Sales - Industrial - |
| Thomas, William Ned | Sales - Industrial - |
| Urena, Daniel | Logistics - |
| Vonalman, Turner J | Logistics - 97Y205 |
| Warmus, Scott Jerome | Sales - Retail - 97Y217 |
| Washington, Cheryl | G&A - 97Y200 |
| Weispfenning, Daniel Walton | Research Design & Development - 97Y203 |
| Stephanie Dixon | Cust Svc - $20 per hour |
| Mike Emslie | VP International |
| Russell ?? | International Cust Svc |
| Tiko | Indonesia Country Mgr |
| River | China country Mgr |
| Other Asia - | Support staff |

**EXHIBIT B**

# ~~STALKING HORSE~~ ASSET PURCHASE AGREEMENT

### dated ~~September 8,~~October __, 2017

### by and among

### ~~RADIANS WAREHAM HOLDING, INC.~~BRIGHTON-BEST INTERNATIONAL, INC., A CALIFORNIA CORPORATION

### PURCHASER

### AND

### IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation

### and

### IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation

### SELLERS

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ..............................................................

1.1       Previously Defined Terms .............................................
        1.2        Definitions ......................................................
1.3        Additional Defined Terms .........................................
        1.4        Interpretation ..................................................

**ARTICLE II PURCHASE AND SALE, PURCHASE PRICE** ...........................................7~~6~~

        2.1        Purchase and Sale ............................................
        2.2        Purchase Price; Deposit ...................................
        2.3        Payments at Closing .......................................
        2.4        Assumed Liabilities ~~and Retained Liabilities~~ ...........................11
        2.5        Transfer Taxes ...............................................
        2.6        Allocation .....................................................

**ARTICLE III CLOSING AND CLOSING DATE DELIVERIES** ..................................~~12~~11

        3.1        Closing ........................................................
        3.2        Closing Deliveries by Sellers ...........................
        3.3        Closing Deliveries by Purchaser .......................
        3.4        Cooperation ...................................................

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS**...................~~13~~12

        4.1        Due Incorporation...........................................
        4.2        Noncontravention ...........................................
        4.3        Brokers ........................................................
        4.4        Title to Purchased Assets ................................
        4.5        Condition of Assets ........................................
        4.6        NO OTHER REPRESENTATIONS ...........................................

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER** .............~~15~~14

        5.1        Organization; Authorization.............................
        5.2        Noncontravention ...........................................
        5.3        No Brokers ....................................................
        5.4        Financing Ability ...........................................

**ARTICLE VI  BANKRUPTCY MATTERS** ..........................................................

        6.1        ~~Competing Bid~~ ....................................................
~~6.2        Cooperation in Bankruptcy Court Matters~~ ..............................
        ~~6.3~~ and Sale Order ............................................
        ~~6.4        Back-up Bidder~~...............................................
~~6.5        Bid Procedures Order and Break-up Fee~~ .................................

**ARTICLE VII EMPLOYEE MATTERS** .........................................................

7.1    Employees to be Hired by Purchaser ...........................................................
7.2    Authorization to Communicate with Certain Employees..................................~~21~~17

**ARTICLE VIII COVENANTS**

A.    Pre-Closing Covenants.
8.1    Maintenance of Business .......................................................
8.2    Sellers Pre-Closing Covenants .........................................
8.3    Commercially Reasonable Efforts to Close ..............................
~~8.4    Exclusivity~~
B.    Certain other Covenants and Agreements.........................................
~~8.5~~8.4    Use of Name...........................................................................
~~8.6~~8.5    Tax Matters.............................................................................
8.6    Facility Lease .......................................................

**ARTICLE IX CONDITIONS TO CLOSING APPLICABLE TO PURCHASER** .......... ~~24~~20

9.1    No Termination .........................................................
9.2    Bankruptcy Court Approval .........................................
9.3    Bring-Down of Sellers Warranties, Representations and Covenants...................... ~~24~~20
9.4    Pending Actions ..........................................................
9.5    Condition of Assets.....................................................

**ARTICLE X** _20

**CONDITIONS TO CLOSING APPLICABLE TO ~~SELLER~~** ............................... ~~25~~**SELLERS**

10.1    No Termination .........................................................
10.2    Bankruptcy Court Approval .......................................
10.3    Bring-Down of Purchaser Warranties, Representations and Covenants ................. ~~25~~21
10.4    Pending Actions .......................................................
10.5    All Necessary Documents .........................................

**ARTICLE XI TERMINATION** ...................................................

11.1    Termination ..............................................................
11.2    ~~Breakup Fee~~ ...............................................................
~~11.3~~    Buyer Deposit. .......................................................

**ARTICLE XII MISCELLANEOUS**

12.1    Costs and Expenses ................................................
12.2    Bankruptcy Court Approval ....................................
12.3    Entire Agreement ...................................................
12.4    Counterparts ..........................................................
12.5    Assignment, Successors and Assigns......................
12.6    Survival ................................................................
12.7    Severability...........................................................
12.8    Headings ...............................................................
12.9    Risk of Loss ..........................................................

12.10     Governing Law ................................................................29GOVERNING

12.11     Press Releases and Public Announcements ...............................

          12.12     U.S. Dollars ................................................................

                    12.13     Notices ................................................................

          12.14     WAIVER OF JURY TRIAL ................................................

                    12.15     Waiver ................................................................

          12.16     No Third-Party Beneficiary ................................................

          12.17     SELLERS DISCLAIMER ................................................

          12.18     PURCHASER DISCLAIMER ................................................

                    12.19     Disclosures ................................................................

          12.20     Specific Performance ................................................................

<u>Exhibits</u>

Exhibit A   Form of Bid Procedures OrderExhibit B - Form of Sale Order
Exhibit C - Form of DIP Credit AgreementExhibit D - Form of Financing Order

<u>Schedule Index</u>

Schedule 2.1(b)(vi)     -     Assumed Contracts
Schedule 4.3 -          Brokers
Schedule 7.1(a) -       Business Employees List

This Asset Purchase Agreement is made and entered into as of ~~September 8,~~October ___, 2017 (this "Agreement") by and among ~~Radians Wareham Holding~~Brighton-Best International, Inc., a ~~Nevada~~ California corporation, or a Permitted Assignee as defined below ("~~Radians" or "~~Purchaser") and Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation (collectively, "Ironclad" or "Sellers" ~~or "Debtors"~~).

RECITALS:

A.    Sellers are engaged in business as the developer, manufacturer and marketer of high-performance task-specific work gloves (the "Business");

B.    Sellers desire to sell substantially all of the assets related to the Business, and Purchaser desires to acquire substantially all of Sellers' assets related to the Business from Sellers, on the terms and subject to the conditions set forth herein;

C.    Sellers ~~intend to commence~~commenced bankruptcy cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on ~~or after~~ September 8, 2017 in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court");

D.    In connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, and subject to higher and better offers as contemplated by the Bid Procedures Order (as defined herein), following the entry of the Sale Order (as defined herein) and subject to the terms and conditions thereof, Sellers shall sell, transfer and assign to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined herein), and Purchaser shall assume from Sellers the Assumed Liabilities (each as defined herein), all as more specifically set forth herein and in the Sale Order; and

E.    The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to the Bid Procedures Order and the Sale Order to be entered in the Chapter 11 Cases.

NOW, THEREFORE, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    Previously Defined Terms. Each term defined in the first paragraph and Recitals shall have the meaning set forth above whenever used herein, unless otherwise expressly provided or unless the context clearly requires otherwise.

    1.2  <u>Definitions</u>. Whenever used herein, the following terms shall have the meanings set forth below unless otherwise expressly provided or unless the context clearly requires otherwise:

    "<u>Accounts Receivable</u>" - As defined in clause (i) of the definition of Purchased Assets.

    "<u>Affiliate</u>" means (a) with respect to an individual, (i) the members of the immediate family (including parents, siblings and children) of the individual, (ii) the individual's spouse and (iii) any Business Entity that directly or indirectly, through one or more intermediaries is Controlled by, or is under common Control with, any of the foregoing individuals, or (b) with respect to any Person other than an individual, any other Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with or of, such Person. The term "Control" (including, with correlative meaning, the terms "Controlled by" and "under common Control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

    "<u>Bankruptcy Rules</u>" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as now in effect or hereafter amended.

    "<u>Bid Procedures Motion</u>" means the motion filed by Sellers seeking entry of the Bid Procedures Order.

    "<u>Bid Procedures Order</u>" means the Order of the Bankruptcy Court~~, in form and substance reasonably acceptable to Purchaser and Sellers, substantially in the form attached hereto as Exhibit A,~~ establishing bidding procedures for the solicitation of higher or otherwise better bids for the Purchased Assets.

    "<u>Business Day</u>" means any day other than a Saturday or Sunday or other day on which banks in Los Angeles, California are authorized or required by Law to be closed.

    "<u>Business Entity</u>" means any Person other than an individual or a Governmental Authority.

    ~~"Cash Collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest as further defined in Section 363(a) of the Bankruptcy Code.~~

    "<u>Code</u>" means the Internal Revenue Code of 1986.

    "<u>Confidentiality Agreement</u>" means that certain Nondisclosure Agreement, dated ~~August 1,~~October 16, 2017, by and between Sellers and Purchaser.

    "<u>Contracts</u>" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, commitment, arrangement or undertaking, written or oral, or other

document or instrument to which or by which such Person is a party or otherwise subject or bound or to which or by which any asset, property or right of such Person is subject or bound.

"DIP Facility" means a debtor-in-possession financing facility under which the Purchaser will provide financing of up to $1,000,000.00 to Sellers pursuant to a credit agreement substantially in the form attached hereto as Exhibit C.

"Encumbrances" means, with respect to any property or asset, any mortgage, lien, pledge, charge, claim, encumbrance, security interest, community or other marital property interest, equitable interest, license, option, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement or other encumbrance with respect to the use, construction, voting, transfer, receipt of income or exercise of any other attribute of ownership in respect of such property or asset.

"Environmental Laws" means any and all Legal Requirements relating to pollution, or to protection of human health or the environment (including ground water, land surface or subsurface strata) from pollution, including Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Materials of Environmental Concern.

"Excluded Tax" means any Liability of Sellers for the following Taxes (whether such Liability is direct or as a result of transferee or successor liability or pursuant to a Contract or other agreement): (i) income Taxes of Sellers; and (ii) Taxes that relate to the Purchased Assets, the Business, or any Transferred Employee for any Pre-Closing Tax Period.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Authority" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body, commission or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including quasi-governmental entities established to perform such functions.

"IP Confidential Information" means all of the following U.S., state and foreign intellectual property of any Person related to the Business: (a) inventions, discoveries, processes, designs, techniques, developments, technology and related improvements, whether or not patented or patentable; (b) proprietary computer programs and software (including source code, object code and executable code form), confidential and proprietary data, proprietary databases, and related documentation thereof, together with all translations, adaptations, modifications, derivations, combinations and derivative works thereof; (c) mask works; and (d) confidential or proprietary information (including trade secrets, know-how, drawings, specifications, designs, technical information, reports, manufacturing and production processes and techniques, operating procedures, test data and procedures, scheduling procedures, and process regimes). For the avoidance of doubt, "IP Confidential Information" excludes any data or information which is in the public domain.

- 3 -

"IRS" means the Internal Revenue Service.

"Law" means any law, statute, code, regulation, ordinance, rule or Order enacted, promulgated, entered into, agreed, imposed or enforced by any Governmental Authority.

"Legal Requirements" means with respect to any Person, all statutes, ordinances, bylaws, codes, rules, regulations, restrictions, judgments, orders, writs, injunctions, decrees, determinations or awards of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses.

"Liabilities" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

"Local Bankruptcy Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Central District of California applicable to all cases in such district governed by the Bankruptcy Code.

"Materials of Environmental Concern" means any chemicals, pollutants, contaminants, medical waste or specimens, toxic substances, chemicals, petroleum or petroleum products, including hazardous wastes under the Resource, Conservation and Recovery Act, as amended, 42 U.S.C. § 6903 et seq., hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq., asbestos, polychlorinated biphenyls and urea formaldehyde, and low-level nuclear materials, special nuclear materials or nuclear-byproduct materials, all within the meaning of the Atomic Energy Act of 1954 as amended, and any rules, regulations or policies promulgated thereunder, and all other materials regulated under Environmental Laws.

"Material Contract" means any contract to which Seller is a party (other than any contract or agreement relating to or with customers, suppliers or agents) that involves aggregate annual revenue or payments in excess of $50,000 per year and/or that is a real property lease.

"Order" means any decree, order, judgment, writ, ruling, award, injunction, stipulation, decisions, verdict, determination or consent of or by, or settlement agreement as approved by the Bankruptcy Court.

"Ordinary Course" means the ordinary course of business of Sellers, taking into account that Sellers will be operating their business under chapter 11 of the Bankruptcy Code as debtors-in-possession.

"Permitted Encumbrances" means (a) Encumbrances for Taxes not yet due and payable or being contested in good faith; (b) landlord and lessor Encumbrances existing under the terms and conditions of leases of real and personal property; (c) Encumbrances on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the Ordinary Course; and (d) any lien, claim or encumbrance of which Sellers, as debtors under the Bankruptcy Code, could not sell their property free and clear pursuant to section 363(f) of the Bankruptcy Code.

- 4 -

"Person" means any natural person, corporation, partnership, limited liability company, joint venture, trust, association or unincorporated entity of any kind.

"Post-Closing Tax Period" means any Tax period (or portion thereof) beginning after the Closing Date.

~~"Pre-Bankruptcy Secured Debt" means that certain revolving credit facility (the "Revolving Loan") originally made by Capital One, National Association, a National Banking Association provided to Debtors of which Purchaser is the owner and holder.~~

"Pre-Closing Tax Period" means any Tax period (or portion thereof) that ends on or prior to the Closing Date.

~~"Prepayment Fee" means that certain fee required to be paid under the Second Amended and Restated Revolving Line of Credit Note and the Loan Agreement, as modified, in the amount of One Hundred Twenty Thousand Dollars ($120,000.00) in the event the Revolving Loan is repaid in conjunction with financing obtained by Debtors from a financial or lending institution or other source, or in connection with the acquisition of either or both Debtors, or any assets of either or both Debtors, by a third party other than Purchaser and /or its affiliates.~~

"Qualified Bid" shall have the meaning ascribed to it in the Bid Procedures Order. This Agreement shall constitute a Qualified Bid.

"Qualified Bid Determination Deadline" shall have the meaning ascribed to it in the Bid Procedures Order.

"Sale Motion" means the motion filed by Sellers seeking approval of this Agreement and entry of the Sale Order.

"Sale Order" means an order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Sellers, and ~~substantially~~ in the form attached hereto as Exhibit ~~B~~A, approving this Agreement, and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby.

~~"Successful Bidder" means any party or parties who acquires all, substantially all, or a portion of the Purchased Assets (in a single transaction or a series of transactions) by reason of having submitted the successful bid at the Auction in a manner consistent with and authorized by the Bid Procedures Order.~~

"Tax Return" means any report, return (including estimated) or other information required (including any attachments or schedules required to be attached to such report, return, or other information) to be filed, with a Governmental Authority in connection with any Taxes (and any amendment thereto).

"Taxes" means all taxes, charges, fees, duties (including custom duties), levies or other assessments, including gross or net income, gross or net receipts, gross or net proceeds, capital gains, profits, gaming, capital, estimated, employment, alternative or add-on minimum, registration, natural resources, premium, ad valorem, turnover, real or personal property (tangible and intangible), sales, goods or services, use, franchise, excise, value added, stamp, unclaimed or abandoned property, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental (including Section 59A of the Code), capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties or additions to tax attributable thereto.

"Transaction" means the sale and purchase of the Purchased Assets contemplated in this Agreement, together with any and all related transactions designed to implement, facilitate or expedite such sale and purchase of the Purchased Assets.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101-2109, or any similar applicable state or local laws.

1.3    Additional Defined Terms. For purposes of this Agreement, the following terms have the meanings specified in the indicated Section of this Agreement:

| | |
|---|---|
| Agreement | Preamble |
| Aggregate Purchase Price | 2.2 |
| Assumed Leasehold Interests | 2.1(b)(iv) |
| Assumed Liabilities | 2.72.4(a) |
| Auction | 6.4 |
| Bankruptcy Code | Preamble |
| Bill of Sale and Assignment Agreement | 3.2(a) |
| Business | Recitals |
| Business Employees | 7.1(a) |
| Cash Collateral Order | 6.6(d) |
| Closing | 3.1(a) |
| Competing Bid | 6.1 |
| Closing Date | 3.1(a) |
| Credit Bid | 2.2(a) |
| Designated Contracts | 2.1(b)(vi) |
| Effective Time | 3.1 |
| Financing Motion | 6.6(a) |
| Financing Order | 6.6(c) |
| Intellectual Property | 2.1(b)(iv) |
| Inventory | 2.1(b)(iii) |
| Permits | 4.16 |
| Pre-Closing Period | 8.28.1 |
| Purchased Assets | 2.1(b) |
| Purchase Price Allocation Schedule | 2.6 |
| Purchaser | Preamble |
| Required Closing Payment | 2.3 |
| Retained Assets | 2.1(c) |
| Sellers | Preamble |
| Specified Categories | Schedule 7.1(a) |
| Transfer Taxes | 2.72.5 |
| Transferred Employees | 7.1(a) |

1.4    Interpretation. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement, (d) all references in this Agreement to Articles, Sections and Exhibits shall mean and refer to

Articles, Sections and Exhibits of this Agreement, (e) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (f) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person), (g) the term "including" shall be deemed to mean "including, without limitation" and "including, but not limited to" and (h) all references to "day" or "days" in this Agreement shall refer to calendar day(s), unless such reference is specifically to "Business Days."

**ARTICLE II**
**PURCHASE AND SALE, PURCHASE PRICE**

2.1    <u>Purchase and Sale</u>.

(a)    <u>Purchase and Sale</u>. Upon the terms and subject to the conditions of this Agreement, the Bid Procedures Order, and the Sale Order, at the Closing on the Closing Date, Sellers shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall acquire from Sellers, the Purchased Assets, free and clear of any Encumbrances pursuant to Bankruptcy Code Section 363(f), other than Permitted Encumbrances, and Purchaser shall assume from Sellers the Assumed Liabilities. Notwithstanding anything herein to the contrary, the Excluded Liabilities shall not be assumed by Purchaser and the Retained Assets will be retained by Sellers and not sold, assigned, conveyed, transferred or delivered to Purchaser hereunder.

(b)    <u>Purchased Assets</u>. For purposes of this Agreement, "<u>Purchased Assets</u>" means all assets, rights and properties of Sellers identified below (other than, or relating to, the Retained Assets), whether or not carried and reflected on the books of Sellers, wherever located:

(i)    all accounts, accounts receivable, notes, notes receivable, rental agreements and other rights to collect rent, contract rights, drafts, acceptances, instruments, chattel paper, general intangibles, and other forms of obligation or rights to payment and receivables, whether or not yet earned by performance, including state and federal tax refunds (collectively, "<u>Accounts</u>" or "<u>Accounts Receivable</u>");

(ii)    all equipment as such term is defined in Section 9.102(33) of the UCC, owned or hereafter acquired (as used in this section, "hereafter acquired" means between the date of the Agreement and the Closing Date) by Ironclad and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, leasehold improvements, vehicles and computers and other electronic data-processing and other office equipment now owned or hereafter acquired by Ironclad and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "<u>Equipment</u>");

(iii)    All inventory as such term is defined in Section 9.102(48) of the UCC, wherever located, now owned or hereafter acquired by Ironclad and, in any event, shall include, without limitation, all and related merchandise and other personal property now owned or hereafter acquired by Ironclad that are held for sale or lease, or are

- 7 -

furnished or to be furnished under a contract of service or are raw materials, work in process, or materials or supplies used or to be used, or consumed or to be consumed, in Ironclad's business, and all shipping and packaging materials relating to any of the foregoing (collectively, the "Inventory");

(iv)    All intellectual property including all trademarks, tradenames, trade-dress, operating manuals, software, copyrights, all domain names (websites and web addresses) patents and applications, inventions, improvements, discoveries, technologies, designs, trade secrets, know-how, tooling, techniques, processes, research and development, databases, art work and other work of authorship, and confidential and proprietary information (including, without limitations, trade secrets, know-how, drawings, specifications, designs, design criteria and processes, technical information, reports, manufacturing and production processes and techniques, operating procedures, test data and procedures, scheduling procedures, and process regimes) owned, licensed or used by Sellers (collectively, the "Intellectual Property");

(v)    Any and all general intangibles as such term is defined in Section 9.102(42) of the UCC, now owned or hereafter created or acquired by Ironclad, and in any event shall include, without limitation, all inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, business telephone numbers, licenses, franchises, rights to royalties, blueprints, drawings, confidential information, catalogs, sales literature, video tapes, customer lists, business records for each client including purchase history, tax refund claims (to the extent provided for the benefit of Purchaser in Section 8.5 below), computer programs, all claims under guaranties, security interests or other security held by or granted to Ironclad to secure payment of any of the Accounts by an Account Debtor, all rights to indemnification and all other intangible property of every kind and nature, other than the Retained Assets as described below (collectively the "General Intangibles");

(vi)    to the extent authorized by the Bankruptcy Court, all of Sellers' right, title and interest in, to or under the Designated Contracts of Sellers described in Schedule 2.1(b)(v) (which Schedule 2.1(b)(v) Purchaser may, subject to the approval of the Bankruptcy Court, amend at any time in Purchaser's discretion prior to one (1) business day prior to the Closing) (such assumed and assigned Contracts, the "Designated Contracts")as defined in the Sale Order;

(vii)    to the extent authorized by the Bankruptcy Court, Sellers to assume and assign to RadiansPurchaser that certain agreement among Ironclad and Advantage Media Services, Inc., a Delaware corporation d/b/a AMS Fulfillment for providing certain warehousing, assembly, packaging, and fulfillment services from property commonly known as 29010 Commerce Center Drive, Valencia, California pursuant to that certain Letter of Agreement dated June 29, 2007 (the "Warehouse Agreement"); and

(viii)    to the extent authorized by the Bankruptcy Court, Sellers to assign to RadiansPurchaser the rights of Sellers under the non-disclosure agreements executed by bidders and potential bidders in connection with the sale of the Purchased Assets; and

- 8 -

(ix)    Sellers' right title and interest in choses in action, claims and causes of action  or rights of recovery or set-off relating to (A) Trademark assets, (B) Patent assets, (C) Designated Contracts pursuant to Section 1.02(b)(vi) herein above and (D) insurance recoveries related to claims for damage or loss to inventory and equipment being acquired under this Agreement.

(c)    Retained Assets. For purposes of this Agreement, "Retained Assets" means all assets and property of Sellers, other than the Purchased Assets, including the following:

(i)    All bank accounts of Sellers and all cash and cash equivalents of Sellers as of the Closing Date;

(ii)    Sellers' corporate seal, minute books and stock record books, the general ledgers and books of original entry, all Tax Returns and other Tax records, reports, data, files and documents, and with respect to Retained Assets and Excluded Liabilities only, all books and records, including electronic data related thereto and documents;

(iii)    all of Sellers' right, title and interest in choses of action, claims and causes of action or rights of recovery or set-off of every kind and character against third parties (including Sellers' officers and directors), including actions under Chapter 5 of the Bankruptcy Code, excluding Sellers' right title and interest in choses in action, claims and causes of action or rights of recovery or set-off relating to (A) Trademark assets, (B) Patent assets, (C) Designated Contracts pursuant to Section 1.02(b)(vi) herein above and (D) insurance recoveries related to claims for damage or loss to inventory and equipment being acquired under this Agreement;

(iv)    all insurance policies and all rights, claims, credits or causes of action thereunder or in connection therewith, other than those relating to inventory and equipment being acquired under this Agreement;

(v)    (i) all attorney-client privilege and attorney work-product protection of Sellers or associated with the Business as a result of legal counsel representing Sellers or the Business; (ii) all documents of Sellers or the Business subject to the attorney-client privilege and work-product protection described in subsection (i); and (iii) all documents maintained by Sellers in connection with the transactions contemplated by this Agreement; and

(vi)    Sellers' rights under this Agreement and the transactions contemplated hereby;

(vii)    Tax refund claims (to the extent provided for the benefit of Sellers in Section 8.5 below); and

(viii)    The equity interest that Ironclad Performance Wear Corporation, a Nevada corporation (i.e., the public company), has in its wholly-owned subsidiary Ironclad Performance Wear Corporation, a California corporation.

- 9 -

(ix) Any claims that Ironclad Performance Wear Corporation, a Nevada corporation, has against Ironclad Performance Wear Corporation, a California corporation; and any claims that Ironclad Performance Wear Corporation, a California corporation, has against Ironclad Performance Wear Corporation, a Nevada corporation.

(d)     Excluded Liabilities. Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Purchased Assets shall be or become liable for or subject to, any liabilities or obligations of Sellers or the Business, including the following liabilities and obligations (collectively, "Excluded Liabilities"), which shall be and remain liabilities of Sellers:

(i)     liabilities accrued on any financial statements of Sellers;

(ii)     liabilities or obligations associated with any Retained Assets;

(iii)     liabilities or obligations associated with any and all indebtedness of Sellers for borrowed money to the extent the liability therefor is not one of the Assumed Liabilities;

(iv)     liabilities or obligations arising under any Contracts that are not Assumed Designated Contracts;

(v)     liabilities or obligations arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions by Sellers that occurred, or arise from events that occurred, prior to the Closing Date;

(vi)     liabilities retained by Sellers pursuant to Section 7.1(b) and all other liabilities or obligations prior to the Closing to current, former or prospective employees (including any Business Employees who do not become Transferred Employees) of Sellers and other individual service providers or their respective dependents or beneficiaries, other than liabilities or obligations with respect to any Transferred Employees on or after the Closing;

(vii)     liabilities of Sellers to the Internal Revenue Service or any other Governmental Authority including those relating to Sellers;

(viii)     penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any presence or release of any Materials of Environmental Concern at any location or any actual or alleged violation by Sellers of any Legal Requirement and/or Environmental Law prior to the Closing Date;

(ix)     liabilities of Sellers to any Person arising out of any act or omission under any Legal Requirement, including any Environmental Law; and

(x)     liabilities or obligations under the WARN Act, if any, arising out of or resulting from (i) layoffs or termination of employees by Seller and/or (ii) the consummation of the Transaction.

- 10 -

2.2    Purchase Price; Deposit.

The purchase price payable by Purchaser for the Purchased Assets shall be paid in the ~~form of (i) a credit bid in an amount sufficient to pay in full the outstanding obligations under the DIP Facility and the Pre-Bankruptcy Secured Debt (the "Credit Bid"), plus (ii)~~(i) the application of the Buyer~~'s~~ Deposit~~, plus (iii~~ as defined below and (ii) cash, collectively, the "Aggregate Purchase Price", and shall be in an amount equal to Twenty-Five Million Two Hundred Fifty Thousand Dollars ($~~20,000,000.00) or an amount equal to Fifteen Million Dollars ($15,000,000.00) as set forth in the letter agreement between the Debtors and Purchaser attached hereto as Exhibit 2.2, which letter agreement shall, subject to the approval of the Bankruptcy Court, be filed under seal with the Bankruptcy Court~~25,250,000.00)).  In addition to payment of the Aggregate Purchase Price, Purchaser shall assume the Assumed Liabilities at the Closing.

~~Upon execution of this Agreement,~~ Purchaser ~~shall deposit~~previously deposited One Million Dollars ($1,000,000.00) (the "Buyer Deposit") with Levene, Neale, Bender, Yoo & Brill L.L.P. ("Escrow Agent") by wire transfer of immediately available funds. ~~Levene, Neale, Bender, Yoo & Brill L.L.P. shall hold~~ Escrow Agent is holding the Buyer Deposit ~~in escrow~~ in a segregated, non-interest-bearing account (the "~~Escrow~~Trust Account"). ~~An amount equal to the~~The Buyer Deposit ~~(the "Closing Release Amount")~~ shall become payable, and shall be paid, to Sellers from the ~~Escrow Account at the Closing. At the Closing, Purchaser and Sellers shall instruct Levene, Neale, Bender, Yoo & Brill L.L.P. to deliver so much of the Closing Release Amount to Sellers as is necessary for payment of the Aggregate Purchase Price by wire transfer of immediately available funds into an account designated by Sellers, pursuant to the terms of this Agreement~~Trust Account at the Closing. If this Agreement is validly terminated prior to the Closing, the Buyer Deposit shall be released and distributed to Purchaser or Sellers in accordance with the terms set forth in Section 11.3.

2.3    ~~Payments at Closing. At the Closing, an amount equal to $15,000,000.00 or $20,000,000.00 (as required pursuant to Section 2.2 above) ("Required Closing Payment"), less the Credit Bid and the Closing Release Amount, shall be paid by Purchaser to Sellers by delivery to Sellers by bank wire transfer (in immediately available funds) to an account or account designated by Sellers, which account or accounts will be designated by Sellers to Purchaser in writing at least three (3) Business Days prior to the date of the required payment. To the extent that total of the Credit Bid and the Closing Release Amount exceeds the Required Closing Payment, the excess of the Buyer Deposit shall be refunded to Purchaser.~~Payments at Closing. Purchaser shall fund the payment of the Purchase Price at the Closing by (i) wire transferring into the Trust Account the additional amount of Twenty-Four Million Two Hundred Fifty Thousand Dollars ($24,250,000.00) (the "Required Closing Payment") and (ii) by transferring title to the Buyer Deposit to Sellers.

2.4    Assumed ~~Liabilities and Retained~~ Liabilities.

(a)    As additional consideration for the purchase of the Purchased Assets, Purchaser shall, at the Closing, pursuant to the Sale Order, agree to perform, and in due course pay and discharge, only the following obligations and liabilities of Sellers relating to the Business (collectively, the "Assumed Liabilities"):

- 11 -

        (i)     the obligations and liabilities arising on and after the Closing Date under or related to the Purchased Assets and Transferred Employees; and

        (ii)    cure costs under Bankruptcy Code Section 365 for all ~~Assumed~~Designated Contracts which shall be treated and paid in accordance with the Sale Order.

(b)    Purchaser shall only be responsible for the Assumed Liabilities and shall not assume or pay any, and Sellers shall continue to be responsible for each, liability of Sellers whether or not relating to the Business including, but not limited to the Excluded Liabilities set forth in Section 2.1(d) ~~(collectively, the "Retained Liabilities")~~.

2.5    <u>Transfer Taxes</u>. Any and all transfer, sales, use, purchase, value added, excise, personal property, intangible stamp, registration or similar Taxes or fees imposed on, or resulting from, the transfer of any Purchased Assets (collectively "<u>Transfer Taxes</u>"), regardless of when payable, shall be paid by Purchaser. Purchaser shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, fees and charges, and, if required by applicable Law, Sellers will join in the execution of any such Tax Returns and other documentation.

2.6    <u>Allocation</u>. Within sixty (60) days of the Closing, Purchaser shall provide to Sellers, for Sellers' review, comment and consent, a schedule allocating the Aggregate Purchase Price (taking into account any Assumed Liabilities that are Liabilities for Tax purposes) among the Purchased Assets (the "<u>Purchase Price Allocation Schedule</u>"). The Purchase Price Allocation Schedule will be prepared in accordance with the applicable provisions of the Code. The parties hereto shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect changes in the Aggregate Purchase Price. The parties hereto agree for all Tax reporting purposes to report the transactions in accordance with the Purchase Price Allocation Schedule, as adjusted pursuant to the prior sentence, and to not take any position during the course of any audit or other proceeding inconsistent with such schedule unless required by a determination of the applicable Governmental Authority that is final.

## ARTICLE III
## <u>CLOSING AND CLOSING DATE DELIVERIES</u>

3.1    <u>Closing</u>. The term "<u>Closing</u>" as used herein shall refer to the actual conveyance, transfer, assignment and delivery of the Purchased Assets to Purchaser in exchange for the consideration delivered to Sellers pursuant to this Agreement. The Closing shall take place at the offices of Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California  or at such other place as is mutually agreed to in writing by Sellers and Purchaser, at 10:00 am local time not later than ~~five~~fifteen (~~5) Business Days~~15) calendar days following the date on which all of the conditions set forth in Articles IX and X are satisfied (other than conditions the fulfillment of which is to occur at the Closing). The date upon which the Closing actually takes place is referred to as the "<u>Closing Date</u>". The Closing shall be deemed effective as of 12:01 a.m. (Pacific Time) on the Closing Date (the "<u>Effective Time</u>").

- 12 -

      3.2    <u>Closing Deliveries by Sellers</u>. At the Closing, Sellers shall deliver to Purchaser:

      (a)    a Bill of Sale and Assignment Agreement (the "<u>Bill of Sale and Assignment Agreement</u>"), executed by Sellers, and all such other bills of sale, lease assignments, trademark assignments, copyright assignments, patent assignments, employee work product assignments, and contract assignments (and any other appropriate title transfer documentation) and other documents and instruments of sale, assignment, conveyance and transfer <u>related to the Purchased Assets</u>, as Purchaser may deem necessary or desirable, which are prepared by Purchaser and delivered to Sellers for signature;

      (b)    a certificate executed by an executive officer of each of Sellers certifying as to the matters set forth in <u>Section 9.3</u>;

      (c)    a certified copy of the Sale Order;

      (d)    a certificate, duly completed and executed by each of Sellers pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that such Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

      (e)    Duly completed and executed IRS Forms W-9 establishing that Sellers are exempt from U.S. back-up withholding; and

      (f)    all documents furnished by Purchaser that are necessary to amend Sellers' name to not include "Ironclad" or any derivative thereof or any other similar name, which shall be executed by Sellers and in a form that Purchaser may file in the States of California and Nevada and in each other state in which Sellers, or either of them, are/is qualified to transact business.

      3.3    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to Sellers:

      (a)    the ~~payments~~<u>Required Closing Payment</u> to be delivered by Purchaser pursuant to <u>Section 2.3</u>;

      (b)    a certificate of the Secretary of Purchaser certifying as to: (i) the certificate of formation of Purchaser; and (ii) the resolutions of the board of directors of Purchaser authorizing and approving the execution, delivery and performance by Purchaser of this Agreement and any agreements, instruments, certificates or other documents executed by Purchaser pursuant to this Agreement;

      (c)    a certificate executed by an authorized officer of Purchaser certifying as to the matters set forth in <u>Section 10.3</u>;

      (d)    the Bill of Sale and Assignment Agreement as executed by Purchaser;

      ~~(e)    a payoff letter executed by Purchaser reflecting the cancellation of the DIP Facility as a portion of the Aggregate Purchase Price and Purchaser's execution of any related~~

~~documents prepared by Sellers and delivered to Purchaser necessary to effectuate a release of Purchaser's lien against the Purchased Assets, including a UCC-3 termination statement;~~

~~(f)    a payoff letter executed by Purchaser reflecting the cancellation of the Pre-Bankruptcy Secured Debt as a portion of the Aggregate Purchase Price and Purchaser's execution of any related documents prepared by Sellers and delivered to Purchaser necessary to effectuate a release of Purchaser's lien against the Purchased Assets, including a UCC-3 termination statement; and~~

(e)    ~~(g)~~ a certificate, duly completed and executed by Purchaser pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations promulgated under the Code, certifying that Purchaser is not a "foreign person" within the meaning of Section 1445 of the Code; provided, however, that if Purchaser is a disregarded entity (as described in Section 1.1445-2(b)(2)(iii) of the Treasury Regulations), such certification shall be provided by the Purchaser's owner.

3.4    Cooperation. Sellers and Purchaser shall, on request, on and after the Closing Date, cooperate with one another by furnishing any additional information, executing and delivering any additional documents and/or instruments and doing any and all such other things as may be reasonably required by the parties to consummate or otherwise implement the transactions contemplated by this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Sellers represent and warrant to Purchaser as of the Closing as follows:

4.1    Due Incorporation. Ironclad Performance Wear Corporation, a California corporation, is (i) duly organized, validly existing and in good standing under the Laws of the State of California and (ii) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect.  Ironclad Performance Wear Corporation, a Nevada corporation, is (i) duly organized, validly existing and in good standing under the Laws of the State of Nevada and (ii) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect.  Subject to entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Sellers and, if applicable, have been duly authorized by all necessary action on the part of each Seller. This Agreement has been duly executed and delivered by Sellers and, subject to entry of the Sale Order, is a legal, valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). Sellers have the full power and authority necessary to own, lease, operate and use the Purchased Assets.

4.2    Noncontravention. Subject to entry of the Sale Order, neither the execution, delivery and performance by Sellers of this Agreement nor the consummation of the

- 14 -

transactions contemplated hereby will, after the giving of notice, or the lapse of time, or otherwise result in a breach or violation of, or default under, each of Seller's organizational documents.

4.3    Brokers. Except as set forth in Schedule 4.3, neither this Agreement nor the sale of the Purchased Assets or any other transaction contemplated by this Agreement was induced or procured through any Person acting on behalf of, or representing Sellers or any of their Affiliates as broker, finder, investment banker, financial advisor or in any similar capacity.

4.4    Title to Purchased Assets.

(a)    Sellers have good and marketable title to, or, in the case of property held under a lease or other contractual obligation, a valid leasehold interest in, all of the Purchased Assets, whether real or personal property and whether tangible or intangible, other than Permitted Encumbrances.

(b)    Subject to entry of the Sale Order, Purchaser will be vested with title to the Purchased Assets, free and clear of all liens and Encumbrances, other than Permitted Encumbrances, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

4.5    Condition of Assets. The Purchased Assets are being sold by Sellers in AS-IS condition. Neither Sellers nor any other Person makes any other express or implied representation or warranty on behalf of Sellers, including, without limitation, any representation or warranty as to the condition of the Purchased Assets.

4.6    NO OTHER REPRESENTATIONS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV, SELLERS DO NOT MAKE ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE TRANSACTIONS, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, INDEPENDENT CONTRACTORS, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV, SELLERS (I) EXPRESSLY DISCLAIM AND NEGATE ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) AND (II) DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS OR ANY OF THEIR AFFILIATES).

- 15 -

ARTICLE V
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Sellers as follows:

5.1    Organization; Authorization. Purchaser is (a) duly organized, validly existing and in good standing under the laws of the ~~State of Nevada~~California and (b) duly qualified to do business and in good standing in each jurisdiction in which failure to qualify would have a material adverse effect. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Purchaser and have been duly authorized by all necessary action on the part of Purchaser. This Agreement has been duly executed and delivered by such party and is a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

5.2    Noncontravention. Neither the execution, delivery and performance by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby will result in a breach or violation of, or default under, Purchaser's organizational documents.

5.3    No Brokers. Purchaser has no Liability of any kind to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers could be liable.

5.4    Financing Ability. Purchaser has the financial ability to pay the Aggregate Purchase Price as of the date hereof and the Closing and to otherwise perform Purchaser's obligations under this Agreement ~~and provide the DIP Facility~~. Accordingly, there are no financing conditions to the payment of the Aggregate Purchase Price ~~or the provision of the DIP Facility~~.

~~**ARTICLE VI**~~
**ARTICLE VI**
**BANKRUPTCY MATTERS**

~~6.1    Competing Bid.~~

~~(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) (an "Alternative Transaction") involving the direct or indirect sale, transfer or other disposition of any assets of Sellers to a purchaser or purchasers other than Purchaser (whether consummated pursuant to a sale, consensual foreclosure, liquidation, credit bid or chapter 11 plan, a "Competing Bid").~~

~~(b)    Nothing contained herein shall be construed to prohibit Sellers and their representatives or Affiliates from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Bid other than as set forth in the Bid Procedures Order.~~

6.1    6.2 Cooperation in Bankruptcy Court Matters and Sale Order.

(a)    Sellers shall pursue diligently the entry of the Bid Procedures Order and the Sale Order. Sellers shall use commercially reasonable efforts to comply with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules in connection with obtaining approval of the Bid Procedures Order Sale Order. In the event of any inconsistency between the terms of this Agreement and the terms of the Sale Order, the terms of the Sale Order shall control.

(b)    Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bid Procedures Order. In the event the entry of the Bid Procedures Sale Order shall be appealed, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

6.3    Sale Order.

(a)    The Sale Order shall contain, without limitation, the following provisions:

(i)    finding that notice of the hearing on the Sale Motion and the Auction was proper and sufficient under the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, that Sellers and Purchaser entered into this Agreement in good faith, the Aggregate Purchase Price and liabilities of Sellers under the Assumed Contracts constitute fair value in consideration for the Purchased Assets and determining that Purchaser is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the Purchased Assets;

(ii)    authorizing Sellers to transfer to Purchaser all of each of its respective rights, title, privileges and interests in and to the Purchased Assets, and ordering that such transfer is free and clear of any Encumbrances, with all such Encumbrances attaching to the net proceeds of sale, if any;

(iii)    authorizing Sellers to assume and sell and assign the Assumed Contracts to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code;

(iv)    finding that Purchaser is a not a successor to Sellers or their estates by reason of any theory of Law or equity, whether with respect to any liens and claims against Sellers, the Purchased Assets or otherwise and ruling that Purchaser shall not be subject to successor liabilities for products sold prior to the Closing, all as set forth in more detail in the form of Sale Order attached hereto as Exhibit C; and

(v)    Cure amounts shall otherwise be those determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code with respect to the Assumed Contracts.

(c)    (b) Subject to any Competing Bid, (i) Sellers agree that each will promptly take such actions as are reasonably necessary or appropriate to obtain prompt entry of the Sale Order, (ii) . Purchaser agrees that it will promptly take such actions as are reasonably

- 17 -

requested by Sellers and are reasonably necessary or appropriate to assist Sellers in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court or live testimony for the purposes of, among other things, providing necessary assurances of future performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Aggregate Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code; and (iii) if.  If the entry of the Sale Order shall be appealed or collaterally attacked, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal or collateral attack of the Sale Order after its entry; provided, that Purchaser shall reimburse to Sellers the costs and expenses (including professional fees and expenses) of Sellers in any such appeal. After consultation with the Purchaser, in Sellers' sole discretion upon consultation with the Official Committee of Equity Holders, Sellers may respond to objections to the entry of the Sale Order, conduct discovery proceedings, schedule and attend hearings and oppose any actions taken by the parties objecting to, appealing, or seeking a stay of the consummation of the sale of the Purchased Assets provided by this Agreement. Sellers shall use commercially reasonable efforts to take all actions, including the defense of motions and actions filed by third parties required in the Chapter 11 Cases reasonably required to retain possession and ownership of the Purchased Assets pending the Closing; provided, however, Sellers' obligations in connection with any such efforts shall terminate upon the Closing.

6.4    Back-up Bidder. Sellers and Purchaser agree that, in the event that Purchaser is not the winning bidder at the auction undertaken pursuant to the Bid Procedures Order (the "Auction"), if and only if Purchaser submits the next highest or otherwise best bid at the Auction, as contemplated by the Bid Procedures Order and the winning bidder fails to consummate the transaction, Purchaser shall promptly consummate the transaction upon the terms and conditions as set forth herein, including the Aggregate Purchase Price, as the same may modified by Purchaser at the Auction.

6.5    Bid Procedures Order and Break-up Fee.

(a)    Sellers shall include in the Bid Procedures Motion and seek inclusion and approval in the Bid Procedures Order of the following provisions:

(i)    The initial bid over that submitted by Purchaser in this Agreement (the "Initial Overbid") shall be in the amount of at least $20,750,000.00 if Purchaser's Aggregate Purchase Price is Twenty Million Dollars ($20,000,000.00) and shall be in the amount of at least $15,750,000 if Purchaser's Aggregate Purchase Price is Fifteen Million Dollars ($15,000,000.00).

(ii)    Thereafter, bidding shall be in increments of at least $250,000.00 or figures which are wholly divisible by $250,000.00.

(iii)    Only financially qualified parties will be eligible to participate in the Auction — with financially qualified parties to mean parties who have demonstrated that they have the financial means to consummate their purchase of the Purchased Assets without financing unless the financing to be used by them is already committed (meaning that any overbid may not contain any financing contingency). Any party who participates in the Auction will have completed their due diligence of the Debtors and will have no due diligence contingency.

(iv)    In order to be eligible to participate in the Auction, prospective overbidders will be required at least three business days prior to the Auction to (i) deliver a redlined version of this Agreement indicating any changes the prospective overbidder is requesting to this Agreement, and (ii) submit a cash deposit of $2 million, which deposit will be non-refundable and forfeited by the prospective overbidder if the prospective overbidder is deemed by the Bankruptcy Court to be the winning bidder and fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order approving the Debtors' sale of the Purchased Assets to the prospective overbidder regardless of whether an appeal has been filed of such Sale Order provided there is no entered stay pending appeal – i.e., no final order requirement.

(v)    Purchaser will have the right, but not the obligation, to credit bid the outstanding balances of its Pre-Bankruptcy Secured Debt and the DIP Facility towards its purchase price and any overbid that Purchaser elects to submit. Purchaser shall have the right to participate in any Auction.

(vi)    If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, then concurrently with the closing of the Debtors' sale of the Purchased Assets to such winning bidder, Purchaser will be paid directly out of the sale proceeds (i) the full amount of the Pre-Bankruptcy Secured Debt, plus (ii) the full amount of the DIP Facility, plus (iii) the Breakup Fee.

(vii)    If any party other than Purchaser is deemed by the Bankruptcy Court to be the winning bidder at the Auction, or if the Debtors elect to proceed with

- 19 -

seeking confirmation of a plan of reorganization instead of proceeding with a sale of the Purchased Assets, Purchaser shall receive a break up fee (the "Breakup Fee") in the amount of $500,000.00.

(viii)    The Break-Up Fee shall be deemed to be an allowed expense in the Chapter 11 Cases of the kind specified in Section 503(b) of the Bankruptcy Code and shall be paid solely from the proceeds of an Alternative Transaction.

(ix)    The Debtors shall have the right to schedule the Auction so that the payment of the Breakup Fee to Radians will not be considered in determining the highest price bid for the Assets.  However, Radians shall be authorized to match any qualified overbid and be declared the successful purchaser of the Purchased Assets giving consideration in the amount of the required Break up Fee and Prepayment Fee as a component of its matching bid ("Matching Bid"), which Break up Fee and Prepayment Fee will not owing by the Debtors if Radians is the winning bidder.

(x)    Ironclad will agree to proceed with an accelerated sale process, seeking to have the sale approval hearing no later than October 30, 2017.

(xi)    If Radians is deemed by the Bankruptcy Court to be the winning bidder at the Auction and Radians fails to close its purchase of the Purchased Assets within 14 business days following the entry of the Sale Order (regardless of whether an appeal has been filed of the Sale Order provided there is no entered stay pending appeal - i.e., no final order requirement), then Radians shall forfeit the Buyer Deposit to the Debtors.

(xii)    The Debtors' sale of the Purchased Assets to Radians or a successful overbidder will be free and clear of all liens, claims and interests in accordance with section 363(f) of the Bankruptcy Code.

(xiii)    The Debtors have the right to market the Purchased Assets for overbid pending the Auction and to hire an investment banker or sales agent to assist the Debtors in this process.  However, the collateral of Radians shall not be used to fund the engagement of an investment banker or sales agent with such party only being entitled to compensation from the proceeds of the Closing.

(b)    Sellers acknowledge and agree that the entry into this Agreement provides value to the Sellers' chapter 11 estates by, among other things, inducing other parties to submit higher or better offers for the Purchased Assets. Sellers and Purchaser agree that the Break Up Fee is a material and necessary inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated in this Agreement.

6.6    DIP Facility and Use of Cash Collateral.

(a)    DIP Facility.  Purchaser will provide Debtor in Possession financing to Sellers in an amount up to Two Million Dollars (**$2,000,000.00**) (the "Indebtedness") based upon a budget or budgets as agreed between Ironclad and Radians or for additional purchases of Inventory as set forth and as defined in the DIP Facility, the terms of the DIP Facility to be included in the Debtor in Possession Loan Agreement to be negotiated a copy

of which is attached as Exhibit C to this Agreement. The Debtors shall file a motion with the Bankruptcy Court seeking an order approving the DIP Facility (the "Financing Motion") incorporating the terms provided herein and as more particularly described in the Debtor in Possession Loan Agreement.

(b)     Terms of the DIP Facility.     The DIP Facility will be for a term of 4 months and will bear interest at the rate of 10% per annum. Except as set forth in the DIP Facility in regards to the Debtors' possible purchase of additional Inventory, the DIP Facility shall be used to supplement the Debtors' cash flow from their business operations pending the closing of the Debtors' sale of the Purchased Assets to Purchaser or a successful overbidder. The entire outstanding DIP Facility will be satisfied in full concurrently with the closing of the Debtors' sale of the Purchased Assets. The DIP Facility will be further subject to such terms and conditions as more particularly set forth in the Debtor in Possession Loan Agreement.

(c)     Security for the DIP Facility. The DIP Facility is to be secured by a grant of superpriority status with respect to the Indebtedness pursuant to Section 364(c)(1) of the Bankruptcy Code and Security Interests pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) (in each case more fully described and subject to any applicable limitations set forth in the order approving the DIP Facility on an interim and final basis (the "Financing Order"). The liens granted by the DIP Facility shall be subordinate only to the Pre-Bankruptcy Secured Debt.

(d)     Use of Cash Collateral.          Subject to the submission and approval of a post-petition operating budget and entry of an order of the Bankruptcy Court providing adequate protection to Purchaser as may be agreed by the parties and approved by the Bankruptcy Court (the "Cash Collateral Order"), Radians will also consent to the Debtors' use of cash collateral, which, together with the DIP Financing, will enable the Debtors to pay all of their post-bankruptcy operating expenses (and any pre-bankruptcy debts which Ironclad and Radians agree are appropriate to be paid ("Critical Vendor Payments") and as authorized by order of the Bankruptcy Court), including any outstanding pre-bankruptcy employee payroll and related expenses, and all fees owing to the Clerk of the Bankruptcy Court and to the United States Trustee. The Sale Order shall contain, without limitation, the following provisions:

(i)     finding that notice of the hearing on the Sale Motion and the auction undertaken pursuant to the Bid Procedures Order (the "Auction") was proper and sufficient under the Bankruptcy Code, the Bankruptcy Rules and Local Bankruptcy Rules, that Sellers and Purchaser entered into this Agreement in good faith, the Aggregate Purchase Price and liabilities of Sellers under the Designated Contracts constitute fair value in consideration for the Purchased Assets and determining that Purchaser is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the Purchased Assets;

(ii)     authorizing Sellers to transfer to Purchaser all of each of its respective rights, title, privileges and interests in and to the Purchased Assets, and ordering that such transfer is free and clear of any Encumbrances, with all such Encumbrances attaching to the net proceeds of sale, if any;

(iii)    authorizing Sellers to assume and sell and assign the Designated Contracts to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code; and

(iv)    finding that Purchaser is a not a successor to Sellers or their estates by reason of any theory of Law or equity, whether with respect to any liens and claims against Sellers, the Purchased Assets or otherwise and ruling that Purchaser shall not be subject to successor liabilities for products sold prior to the Closing.

(v)    Cure amounts shall otherwise be those determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code with respect to the Designated Contracts.

## ARTICLE VII
## EMPLOYEE MATTERS

7.1    <u>Employees to be Hired by Purchaser</u>.

(a)    <u>Prior to the Closing</u>. Purchaser will offer to employ, effective as of the Closing Date, the employees of Sellers as of immediately prior to the Closing Date in respect of the Business as listed on Schedule 7.1(a) (which Purchaser shall deliver to Sellers no later than one (1) Business Day prior to the Qualified Bid Determination Deadline) (the "<u>Business Employees</u>") as determined in the sole discretion of Purchaser. All Business Employees who are offered and accept employment with Purchaser and commence such employment immediately after the Closing shall be referred to as the "<u>Transferred Employees</u>". Sellers shall terminate the employment of all Transferred Employees effective as of the Closing. Schedule 7.1(a) shall be filed under seal subject to the approval of the Bankruptcy Court.  Provided Purchaser is the winning bidder at the Auction, inIn connection with the Closing, Purchaser will make a severance payment to each of the DebtorsSellers' employees who are not offered employment by Purchaser, other than DebtorsSellers' officers and any employee subject to an employee retention agreement, at comparable terms to their then employment with the DebtorsSellers, with each such severance payment to be consistent with the most generous current severance policy of Purchaser and/or any of its Affiliates for similarly situated employees.  Purchaser will not owe any severance payment to any of the DebtorsSellers' employees who are offered employment by Purchaser at comparable terms to their then employment with the DebtorsSellers but who do not accept their offer of employment.

(b)    Other than as set forth in the last two sentences of Section 7.1(a) above, Sellers shall be solely responsible, and Purchaser shall have no obligations whatsoever, for any salary, wages, bonuses, accrued vacations or paid time off, or other similar amounts payable to any current or former employee, independent contractor, consultant of Sellers, or any of their eligible dependents, for any period relating to service with Sellers. For the avoidance of doubt and notwithstanding anything to the contrary in this <u>Section 7.1</u>, Purchaser shall be responsible only for any Assumed Liabilities under <u>Section 2.4(a)(i)-(iv)</u>.

(c)    Nothing in this Agreement shall be deemed or construed to limit or condition the delivery by Sellers of any notices required by, or the taking of any other action

Sellers deem necessary or desirable to comply with, the WARN Act, which Sellers may take at such time and in such manner as Sellers deem appropriate in their sole discretion. Purchaser shall be responsible for providing any notice required pursuant to the WARN Act with respect to any employment losses involving Transferred Employees that occur on or after the Closing Date and agrees to not, within ninety (90) days after the Closing Date, take any action that would obligate Sellers to have provided notice to any Business Employees prior to or on the Closing Date under the WARN Act.

(d)      The provisions of this <u>Section 7.1</u> shall inure solely to the benefit of the parties to this Agreement, and nothing herein, express or implied, is intended to confer upon any other Person (including any Business or Transferred Employee) any rights or remedies of any nature (including any third-party beneficiary rights under this Agreement) whatsoever.

7.2      <u>Authorization to Communicate with Certain Employees</u>. In coordination and cooperation with Sellers, <u>effective</u> upon ~~entry~~<u>the conclusion</u> of the ~~Bid Procedures Order~~<u>Auction</u>, Purchaser is authorized to communicate with the Business Employees for the purpose of negotiating and extending to such employees as it determines, offers of employment ~~contingent on Purchaser being the successful purchaser of the Purchased Assets; provided, that this right shall terminate if Purchaser is not the winning bidder at the Auction~~.

**ARTICLE VIII**
**COVENANTS**

A.  <u>Pre-Closing Covenants</u>.

8.1      <u>Maintenance of Business</u>.  For the period commencing on the date hereof and expiring on the earlier of the termination of this Agreement in accordance with <u>Article XI</u> and the Closing (the "<u>Pre-Closing Period</u>"), Sellers shall, subject to the compliance by Purchaser with its covenants hereunder and to applicable requirements of Law, conduct and carry on the Business in the Ordinary Course other than changes related to the filing, announcement or pendency of Sellers' Chapter 11 Cases or the conduct of the sale process contemplated by this Agreement and/or the ~~Bid Procedures~~<u>Sale</u> Order.

8.2      <u>Sellers Pre-Closing Covenants</u>. Without limiting the generality of <u>Section 8.2(a)</u>, during the Pre-Closing Period, Sellers:

(a)      shall not, without the prior written consent of Purchaser, purchase, sell, lease, mortgage, pledge or otherwise acquire or dispose of any material Purchased Assets, except for inventory, parts and supplies purchased, sold or otherwise disposed of in the Ordinary Course;

(b)      shall not, without the prior written consent of Purchaser, waive, release or cancel in any material respect any claims against third parties or material debts owing to them, or any rights which have any material value, in each case, with respect to any Purchased Assets, other than in the Ordinary Course or related solely to Excluded Liabilities;

- 23 -

(c)       shall not, without the prior written consent of Purchaser, change, amend, terminate or otherwise modify in any material respect, any material Assumed Contract to which Sellers or either of them is a party, other than in the Ordinary Course;

(d)       shall make all payments and otherwise perform all material obligations in respect of all leases of real property to which either of ~~the Debtors~~Sellers is a party so as to prevent any loss or forfeiture thereof or thereunder, except, in any case, where (i) the enforcement of non-compliance is stayed by the Chapter 11 Cases or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a material adverse effect; and

(e)       shall, with the exception of any defaults existing as of the date of this Agreement, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it or them, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by ~~Lender~~Purchaser and, upon request of ~~Lender~~Purchaser, make to each other party to each such Material Contract such demands and requests for information and reports or for action ~~Debtors~~Sellers are entitled to make under such Material Contract except, in any case, where (i) the enforcement of non-compliance is stayed by the Chapter 11 Cases or (ii) the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a material adverse effect.

8.3      Commercially Reasonable Efforts to Close.

(a)       Subject to the terms and conditions hereof, each party hereto covenants and agrees to use all commercially reasonable efforts to consummate the transactions contemplated hereby ~~within sixty (60) days of the date of this Agreement~~in accordance with the terms of the Sale Order and will fully cooperate with the other parties hereto for such purpose.

(b)       Sellers agree to immediately notify Purchaser of any event, fact or circumstance of which Sellers become aware that could reasonably be expected to result in the failure of a condition set forth in Article IX or X to be satisfied and, if such condition is curable, to allow Purchaser a reasonable opportunity to satisfy such condition.

(c)       Purchaser agrees to immediately notify Sellers of any event, fact or circumstance of which Purchaser becomes aware that could reasonably be expected to result in the failure of a condition set forth in Article IX or X to be satisfied and, if such condition is curable, to allow Seller a reasonable opportunity to satisfy such condition.

~~8.4      Exclusivity.~~

~~(a)       During the period from the date hereof to the commencement of Sellers' Chapter 11 Cases, Sellers shall cease immediately and cause to be terminated any and all activities, discussions or negotiations with any person, entity or group conducted heretofore with respect to, or that may reasonably be expected to lead to, an Alternative Transaction, and Sellers shall not, directly or indirectly, solicit, initiate or encourage, or take any other action that facilitates any offer, inquiry or proposal concerning any Alternative Transaction.~~

- 24 -

(b)    Subject to the terms and conditions of the Bid Procedures Order, Purchaser shall have the right to bid against any Alternative Transaction bids at the Auction.

B.    Certain other Covenants and Agreements.

8.4    8.5 Use of Name. After the Closing, Sellers may not, directly or indirectly, use the name "Ironclad", "Ironclad Performance Wear" or any derivative thereof or any similar name, or trade name currently used to identify themselves. Each of Sellers shall be responsible for all filing fees required to be paid in connection with filing Sellers' change of name amendments in the States of Nevada and California, and in each other state in which it is qualified to transact business.

8.5    8.6 Tax Matters.

(a)    All refunds for Taxes for any Excluded Tax, Transfer Taxes, or that are attributable to the carry forward of a Tax attribute from a Pre-Closing Period shall be for the sole benefit of Sellers and to the extent that Purchaser receives a refund that is for the benefit of Sellers, Purchaser shall promptly advise Sellers of the receipt of the refund and within five (5) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Sellers. All refunds for Taxes relating to the Business, the Purchased Assets or Transferred Employees for a Post-Closing Tax Period shall be for the sole benefit of Purchaser and to the extent that Sellers receive a refund for a Tax that is for the benefit of Purchaser, Sellers shall promptly advise Purchaser of the receipt of the refund and within five (5) business days of the receipt of the refund shall pay such refund (net of all actual, reasonable out of pocket expenses and costs and Taxes incurred in obtaining such refund) to Purchaser.

(b)    If any Tax (or Tax refund) relates to a period that begins before and ends after the Closing Date, the parties shall use the following conventions for determining the portion of such Tax (or Tax refund) that relate to a Pre-Closing Tax Period and the portion that relates to a Post-Closing Tax Period: (A) in the case of property Taxes and other similar Taxes imposed on a periodic basis, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined by multiplying the Taxes (or Tax refund) for the entire period by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period, and the remaining amount of such Taxes (or Tax refunds) shall be attributable to the Post-Closing Tax Period; and (B) in the case of all other Taxes, the amount of Taxes (or Tax refunds) attributable to the Pre-Closing Tax Period shall be determined as if a separate return was filed for the period ending as of the end of the day on the Closing Date using a "closing of the books methodology," and the remaining amount of the Taxes (or Tax refunds) for such period shall be attributable to the Post-Closing Tax Period.

(c)    Purchaser and Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such reasonably requested information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Tax Return or other filings or otherwise in connection with Tax matters, in each case relating to the Purchased Assets or the Business.

- 25 -

8.6    8.7 Facility Lease.

The ~~Debtors~~Sellers and Purchaser agree to work together to attempt to negotiate an extension of the ~~Debtors~~Sellers' current real property lease for the premises located at 1920 Hutton Ct #300, Farmers Branch, TX 75234, or to find an alternative location.


# ARTICLE IX
## CONDITIONS TO CLOSING APPLICABLE TO PURCHASER

The obligations of Purchaser hereunder (including the obligation of Purchaser to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Purchaser):

9.1    No Termination. Sellers shall not have terminated this Agreement pursuant to Section 11.1.

9.2    Bankruptcy Court Approval. The Bankruptcy Court shall have entered ~~(i) the Bid Procedures Order, (ii) the Financing Order, and (iii)~~ the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date unless consented to by Purchaser.

9.3    Bring-Down of Sellers Warranties, Representations and Covenants. Each of the representations and warranties of Sellers contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Sellers will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Sellers at or prior to the Closing.

9.4    Pending Actions.  No proceeding by any Governmental Authority shall be pending on the Closing Date with respect to which a court of competent jurisdiction over ~~the Debtors~~ Sellers  has entered an order that enjoins the consummation of this Agreement or any transactions contemplated hereby.

9.5    Condition of Assets. From the date of this Agreement through the Closing, there shall have been no material adverse change in the condition of the Purchased Assets prior to Closing other than changes related to the filing, announcement or pendency of the Chapter 11 Cases or to the conduct of the sale process contemplated by this Agreement and/or the ~~Bid Procedures~~ Sale  Order, with the Bankruptcy Court to be the final arbiter of whether there has been any such material adverse change if ~~the Debtors~~Sellers and Purchaser are not in agreement.

9.6    Validity of Due Diligence Information.  The information related to the values of Accounts Receivable and Inventory provided to Purchaser by Sellers on ~~August 31,~~October 16, 2017 was true and correct to the best of the knowledge, information and belief of Sellers.

- 26 -

# ARTICLE X

## CONDITIONS TO CLOSING APPLICABLE TO SELLERS

The obligations of Sellers hereunder (including the obligation of Sellers to close the transactions herein contemplated) are subject to the following conditions precedent (unless waived by Sellers):

10.1    No Termination. Purchaser shall not have terminated this Agreement pursuant to Section 11.1.

10.2    Bankruptcy Court Approval. The Bankruptcy Court shall have entered (i) the Bid Procedures Order, (ii) the Financing Order, and (iii) the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

10.3    Bring-Down of Purchaser Warranties, Representations and Covenants. Each of the representations and warranties of Purchaser contained in this Agreement will be true and correct in all material respects at and as of the Closing, in each case, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time. Purchaser will have performed and complied in all material respects with all covenants contained in this Agreement that are required to be performed or complied with by Purchaser at or prior to the Closing.

10.4    Pending Actions. No proceeding by any Governmental Authority shall be pending on the Closing Date with respect to which a court of competent jurisdiction over the DebtorsSellers has entered an order that enjoins the consummation of this Agreement or any transaction contemplated hereby.

10.5    All Necessary Documents. All proceedings to be taken in connection with the consummation of the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to Sellers, and Sellers shall have received copies of such documents as they may reasonably request in connection therewith, including those documents to be delivered pursuant to Section 3.3.

# ARTICLE XI
# TERMINATION

11.1    Termination. This Agreement may be terminated at any time prior to the Closing only as follows:

(a)      by mutual consent of Purchaser and Sellers;

(b)      by Sellers, if:

(i)      the Closing of the transactions contemplated by this Agreement shall not have occurred on or before November 15, 2017within fifteen (15) calendar days following the date of entry of the Sale Order due to the fault of Purchaser or such later date as may be been agreed upon in writing by the

- 27 -

parties hereto; <u>provided</u> that Sellers are not in material breach of or default under this Agreement; or

(ii)     any material representation or warranty made herein for the benefit of Sellers is untrue in any material respect, or Purchaser shall have defaulted in any material respect in the performance of any obligation under this Agreement.

(c)     by Purchaser, if:

(i)     the Closing of the transactions contemplated by this Agreement shall not have occurred ~~on or before November 15, 2017~~ within fifteen (15) calendar days following the date of entry of the Sale Order (or such later date as may have been agreed upon in writing by the parties hereto~~;~~) either (x) due to the fault of Sellers, provided that Purchaser is not in material breach of or default under this Agreement, or (y) due to the entry of an Order staying, reversing, modifying or amending the Sale Order;

(ii)     any material representation or warranty made herein for the benefit of Purchaser is untrue in any material respect, or Sellers shall have defaulted in any material respect in the performance of any obligation under this Agreement;

(iii)     failure of compliance with the requirements of Sellers as conditions precedent for Purchaser to close the transaction as set forth in Article IX; and

~~(iv)     if Sellers fail to file, on or prior to September 8, 2017, the Chapter 11 Cases, or if Sellers fail to file in the Chapter 11 Cases the Sale Motion, the Financing Motion, and the Bid Procedures Motion by September 11, 2017; provided, however, that if Sellers make any such filings after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(iv);~~

~~(v)     if the Bankruptcy Court does not enter the Bid Procedures Order on or prior to September 30, 2017; provided, however, that if the Bankruptcy Court enters the Bid Procedures Order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(v);~~

~~(vi)     if Sellers fail to conduct the Auction in accordance with the Bid Procedures Order within the earlier of seven (7) Business Days of the Qualified Bid Determination Deadline or October 27, 2017; provided, however, that if such Auction concludes after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(vi);~~

(iv) ~~(vii)   if~~ the Bankruptcy Court does not enter the Sale Order by ~~October 31, 2017; provided, however, that if the Bankruptcy Court enters such Sale Order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(vii);~~ November 15, 2017.

~~(viii)   if, after the entry of the Bid Procedures Order, the Auction is cancelled by Sellers for reasons other than that there was no Competing Bid received by the Debtors and the Bankruptcy Court does not enter the Sale Order within three (3) Business Days after the later of (i) such cancellation date and (ii) October 31, 2017; provided,~~ however, ~~that if the Bankruptcy Court enters such order after such date, but prior to the termination of this Agreement, Purchaser shall no longer be entitled to terminate this Agreement under this Section 11.1(c)(viii); or~~

~~(ix)   if, less than 50% of those Business Employees of Sellers who are provided with offers of employment by Purchaser pursuant to Section 7.2 (with compensation substantially similar to, or better than, such employees' compensation from Sellers and on other terms consistent with Purchaser's current employment practices for similarly situated employees) accept such offers of employment, contingent upon Purchaser being the successful purchaser of the Purchased Assets upon entry of the Sale Order; provided,~~ however, ~~that Purchaser must exercise its right to terminate this Agreement under this Section 11.1(c)(ix) on or before October 26, 2017.~~

~~(d)   automatically, if, in accordance with the Bid Procedures Order, an alternative bidder is selected by Sellers at the conclusion of the Auction as having the highest or otherwise best bid, and such alternative bidder transaction closes.~~

~~11.2   Breakup Fee. In the event that this Agreement is terminated by Sellers and Sellers pursue an Alternative Transaction, Sellers shall immediately become obligated to pay Purchaser the Break-Up Fee in accordance with the terms of this Agreement and the Bid Procedures Order, recognizing that Sellers shall pay the Break-Up Fee to Purchaser in connection with the closing or consummation of such Alternative Transaction.   In the event that this Agreement is terminated pursuant to any other provision of Section 11.1, Purchaser shall not be entitled to the Break-Up Fee.~~

11.2   ~~11.3~~ Buyer Deposit. In the event that Purchaser terminates this Agreement pursuant to Section 11.1(a)~~,~~ or Section 11.1(c)~~, or Section 11.1(d)~~, Purchaser shall be entitled to disbursement of the Buyer Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the ~~Escrow~~Trust Account. In the event of a termination of this Agreement pursuant to any provision of Section 11.1(b), Sellers shall be entitled to disbursement of the Buyer Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon, if any) from the ~~Escrow~~Trust Account. In the event that this Agreement is terminated pursuant to Section 11.1 and either Sellers or Purchaser are entitled to receive the Buyer Deposit, then Sellers or Purchaser may deliver to the Escrow ~~Account holder~~Agent, at any time following the effective date of any such termination, a letter instructing the Escrow ~~Account holder~~Agent to pay Sellers or Purchaser, as applicable, the Buyer Deposit from the ~~Escrow~~Trust Account and the distribution of the Buyer Deposit by the Escrow ~~Account holder~~Agent shall be subject to the terms of this Agreement.

## ARTICLE XII
## MISCELLANEOUS

12.1    Costs and Expenses. Subject to Sellers' obligations under Section 6.5 and Section 6.6, Purchaser will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the purchase of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein). Sellers will pay their own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the sale of the Purchased Assets and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein).

12.2    Bankruptcy Court Approval. The Parties acknowledge that this Agreement shall not become effective until it has been approved by the Bankruptcy Court pursuant to the Bid Procedures Order and the Sale Order.

12.3    Entire Agreement. The Schedules and Exhibits referenced in this Agreement are incorporated into this Agreement and collectively with the Sale Order, the Confidentiality Agreement and this Agreement contain the entire agreement between the parties hereto with respect to the transactions contemplated hereunder, and supersede all negotiations, representations, warranties, commitments, offers, contracts and writings prior to the date hereof. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

12.4    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Facsimiles or other electronic copies of signatures will be deemed to be originals.

12.5    Assignment, Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of Sellers and Purchaser, their respective successors, permitted assigns, and personal representatives, as the case may be.  No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties, and any assignment in contravention of the foregoing shall be null and void; *provided*, *however*, Purchaser may assign this Agreement and its rights and obligations under this Agreement, in whole or in part, without consent, to any of its Subsidiaries or Affiliates or any Person that acquires all or substantially all of the equity or assets of Purchaser ("Permitted Assignee"). This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, including a Permitted Assignee.

12.6    Survival. The representations and warranties of Sellers contained in this Agreement (whether or not contained in Article IV) shall not survive, and shall terminate at, the Closing, and Sellers shall have no liability after the Closing for any breach of any representation or warranty. None of the covenants or other agreements contained in this Agreement shall survive the Closing other than those which by their terms contemplate performance after the Closing, and each surviving covenant or agreement shall survive the Closing for the period

- 30 -

contemplated by its terms. For the avoidance of doubt, Sellers shall have no obligations under this Agreement after the ~~earlier of (i) the Closing, (ii) the date that is three months from the date of this Agreement and (iii) the effective date of any plan confirmed in the Chapter 11 Cases.~~ Closing except as specifically set forth herein.

12.7    <u>Severability</u>. If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction or as a result of future legislative action, such holding or action shall be strictly construed and shall not affect the validity or effect of any other provision hereof~~.~~; provided that the Parties will amend the Agreement to most closely implement the intent of the Agreement.

12.8    <u>Headings</u>. The captions of the various Articles and Sections of this Agreement have been inserted only for convenience of reference and shall not be deemed to modify, explain, enlarge or restrict any of the provisions of this Agreement.

12.9    <u>Risk of Loss</u>. Risk of loss (other than from post-petition operating losses incurred by the ~~Debtors~~Sellers), damage or destruction to a material portion the Purchased Assets shall be upon Sellers until the Closing, and shall thereafter be upon Purchaser.

12.10    <u>**GOVERNING LAW**</u>. **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ~~TEXAS~~CALIFORNIA (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE. WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT (EXCEPT AS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY), THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY AND ANY OF THE DOCUMENTS (OR ANY PROVISION IN ANY OF THE DOCUMENTS) EXECUTED HEREUNDER OR IN CONNECTION HEREWITH. SUCH BANKRUPTCY COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND PURCHASER AND SELLERS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE CHAPTER 11 CASES SHALL HAVE CLOSED AND CANNOT BE REOPENED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE AND ANY APPELLATE COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE**

**MAINTENANCE OF SUCH DISPUTE. EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. IN THE EVENT ANY SUCH ACTION, SUIT OR PROCEEDING IS COMMENCED, THE PARTIES HEREBY AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER ANY PARTY HERETO IN ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH ACTION, SUIT OR PROCEEDING UPON THE PARTY AT THE ADDRESS OF SUCH PARTY SET FORTH IN <u>SECTION 12.13</u>, UNLESS ANOTHER ADDRESS HAS BEEN DESIGNATED BY SUCH PARTY IN A NOTICE GIVEN TO THE OTHER PARTIES IN ACCORDANCE WITH THE PROVISIONS OF <u>SECTION 12.13</u>.**

12.11   <u>Press Releases and Public Announcements</u>. ~~No~~Other than regular filings with the United States Securities and Exchange Commission, including the filing of Form 8-K's as Sellers deem appropriate, no public announcement or disclosure will be made by any party with respect to the subject matter of this Agreement or the Transaction without the prior written consent of Purchaser and Sellers; <u>provided</u>, <u>however</u>, that the provisions of this <u>Section 12.11</u> will not prohibit (a) any disclosure required by any applicable Laws (in which case the disclosing party will provide the other parties with the opportunity to review in advance any such disclosure) or an Order of the Bankruptcy Court, (b) any disclosure made in connection with the enforcement of any right or remedy relating to the Transaction, and (c) any disclosure by Purchaser or Sellers to report and disclose the status of this Agreement and the transactions contemplated hereunder to their respective Affiliates and/or their respective members, creditors, shareholders or limited partners. Effective upon, and only upon, the Closing, the Confidentiality Agreement will terminate.  If any such announcement or other disclosure is required by applicable Law or an Order of the Bankruptcy Court, the disclosing party required to make such announcement or disclosure shall give the other party prior notice of, and an opportunity to comment on, the proposed announcement or disclosure, which shall be reasonably satisfactory to all of the parties. The parties hereto acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the ~~Bid Procedures~~Sale Order, and~~/or the Sale Order and shall make any applicable disclosures regarding this Agreement in the Sale Motion and that~~ Sellers may provide copies of this Agreement (including any draft versions of this Agreement) to the statutory committee of unsecured creditors and the Equity Committee which have been appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court.

12.12   <u>U.S. Dollars</u>. All amounts expressed in this Agreement and all payments required by this Agreement are in United States dollars.

12.13   <u>Notices</u>.

(a)   All notices, requests, demands and other communications under this Agreement shall be in writing and delivered in person, or sent by email or sent by reputable overnight delivery service and properly addressed as follows (with any such notice, request, demand or other communication also to be provided by email):

- 32 -

<u>To Purchaser</u>:

~~Radians Wareham Holding, Inc.~~<u>Brighton-Best International, Inc.</u>
~~5305 Distriplex Farms~~
~~Memphis Tennessee 38141~~
<u>5855 Obispo Avenue</u>
<u>Long Beach, California 90805</u>
Email: ~~mst@radians.com~~<u>junxu@brightonbest.com</u>
Attention: ~~Mike Tutor, CEO~~ <u>Jun Xu</u>

with a copy to (which shall not constitute notice):

~~Baker Donelson~~
~~2000 First Tennessee Building~~
<u>Kurosaki & Parker, PC</u>
<u>714 West Olympic Blvd., Suite 1011</u>
<u>Los Angeles, California 90015</u>
<u>Email: gmk@kpzlaw.com</u>
<u>Attention:  Glenn Kurosaki</u>

<u>Greenberg Glusker Fields Claman & Machtinger, LLP</u>
~~165 Madison Avenue~~<u>1900 Avenue of the Stars, 21st Floor</u>
~~Memphis, Tennessee 38103~~
<u>Los Angeles, California 90067</u>
Email: ~~fchildress@bakerdonelson.com~~<u>jkrieger@greenbergglusker.com</u>
Attention: ~~E. Franklin Childress, Jr.~~ <u>Jeffrey Krieger</u>

<u>To Seller Prior to the Closing</u>:

Ironclad Performance Wear Corporation
1920 Hutton Court, Suite 300
Farmers Branch, Texas
Email:  geoffg@ironclad.com
Attention:  L Geoffrey Greulich, CEO

with a copy to (which shall not constitute notice):

Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California  90067
Email:  rb@lnbyb.com
Attention: Ron Bender

and

Stubbs Alderton & Markiles, LLP

- 33 -

15260 Ventura Blvd., 20th Floor
Sherman Oaks, CA 91403
Email: salderton@stubbsalderton.com
Attention: Scott Alderton

and

Dentons US LLP
601 S. Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Email:  tania.moyron@dentons.com
Attention:  Tania Moyron

(b)      Any party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

(c)      All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 12.13 if delivered personally or courier, shall be effective upon delivery; if sent by facsimile, shall be delivered upon receipt of proof of transmission.  In addition to any other form of notice provided, all notices required to be provided under this Agreement must also be provided by email at the email addresses above.

12.14   WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT, THE SUBJECT MATTER HEREOF OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO IN CONNECTION WITH ANY SUCH AGREEMENTS, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.14 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.15   Waiver. Any party hereto may waive compliance by or extend the time of performance of any obligation or act for any other party with respect to any provision of this Agreement. No waiver of any provision or extension shall be construed as a waiver of any other provision or an extension of time for the performance of any other obligation or act hereunder. Any waiver or extension must be in writing.

- 34 -

12.16  No Third-Party Beneficiary. This Agreement is being entered into solely for the benefit of the parties hereto, and the parties do not intend that any employee or any other person shall be a third-party beneficiary of the covenants by either Sellers or Purchaser contained in this Agreement.

12.17  SELLERS DISCLAIMER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF SELLERS EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES) ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO PURCHASER IN CONNECTION WITH THIS AGREEMENT, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, SELLERS HAVE NOT MADE AND ARE NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE PURCHASED ASSETS. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES), ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE PURCHASED ASSETS ARE HEREBY EXPRESSLY DISCLAIMED. PURCHASER REPRESENTS, WARRANTS, COVENANTS AND AGREES, THAT SELLERS ARE NOT MAKING ANY REPRESENTATION OR WARRANTY, OTHER THAN THOSE EXPRESSLY MADE BY SELLERS AS SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES), AND THAT PURCHASER SHALL ACQUIRE THE PURCHASED ASSETS AND ASSUME THE ASSUMED LIABILITIES WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OTHER THAN THOSE EXPRESSLY MADE BY SELLERS AS SET FORTH IN ARTICLE IV (AS MODIFIED BY THE SCHEDULES).

12.18  PURCHASER DISCLAIMER. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT: (a) THE REPRESENTATIONS AND WARRANTIES OF PURCHASER EXPRESSLY SET FORTH IN ARTICLE V ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO SELLERS IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, PURCHASER HAS NOT MADE OR IS NOT MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE V HEREOF.

12.19  Disclosures. No reference to or disclosure of any information in the Schedules shall be construed as an admission or indication that such information is material or that such information is required to be referred to or disclosed in the Schedules nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement.

12.20  Specific Performance. Each of the parties acknowledges and agrees that the other parties hereto would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties hereto will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms hereof in any action instituted in any court specified in Section 12.10 in addition to any other remedy to which he, she or it may be entitled, at law or in equity.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**PURCHASER:**

**RADIANS WAREHAM HOLDING** **BRIGHTON-BEST INTERNATIONAL**, INC.**,**
a **Nevada** California corporation

By:_____
  Name: **Mike Tutor** Jun Xu
  Title: **Chief Executive Officer** President

**SELLERS:**

**IRONCLAD PERFORMANCE WEAR
CORPORATION, a California corporation**

By:_____
  Name: **L. Geoffrey Greulich**
  Title:  **Chief Executive Officer**

and

**IRONCLAD PERFORMANCE WEAR
CORPORATION, a Nevada corporation**

By:_____
  Name: **L. Geoffrey Greulich**
  Title:  **Chief Executive Officer**

61183747_114826 5851 4510 v1

2921440 000020 08/30/20174823 5694 1390 v2

2921440 000020 09/05/2017

# EXHIBIT A

## FORM OF BID PROCEDURES ORDER

61183747_1~14826-5851-4510 v1

2921440-000020 08/30/20174823-5694-1390 v2

2921440-000020 09/05/2017

**EXHIBIT B**

**FORM OF** SALE ORDER
**EXHIBIT C**

**Schedule 4.3**

**BROKERS**

**[Sellers - Craig-Hallum Capital Group LLC as their financial advisor]**
**[Purchaser, None]**

~~FORM OF DEBTOR IN POSSESSION LOAN AGREEMENT~~
~~EXHIBIT D~~

**Schedule 7.1(a)**

~~**FORM OF FINANCING ORDER**~~
**BUSINESS EMPLOYEES LIST**

| Name | Department |
|---|---|
| Broussard, Ronald Roy | VP of Industrial Sales |
| Burkhard, Kerri | Customer Service - 97Y209 |
| Day, Christopher James | Sales - Industrial - Grainger |
| Dooley, Jeffrey Scott | Sales - Director - Grainger |
| Eshleman, Derek G | Prod Mgr & R&D |
| Feld, Abraham Hagen | Marketing - |
| Ferguson, Mathew Lee | Sales - Retail |
| Fowler, Michael J | VP Sales - Retail |
| Frank, Jodi L | Sales - Industrial - NE |
| Guo, Xin | Logistics - Buyer |
| Jaeger, Eric | Research Design & Development - 97Y203 |
| Laubert, Matthew Palmer | Customer Service - FB |
| Merchant, Jason Stuart | Sales - Retail |
| Metzler, Stacy Marie | G&A - A/R |
| Morris, Chartrice Holt | Logistics - |
| Nacion, Markham | Research Design & Development - 97Y203 |
| Patterson, Lisa Gonzalez | Sales - Industrial - |
| Rogus, Kenneth Paul | Sales - Industrial - |
| Thomas, William Ned | Sales - Industrial - |
| Urena, Daniel | Logistics - |
| Vonalman, Turner J | Logistics - 97Y205 |
| Warmus, Scott Jerome | Sales - Retail - 97Y217 |
| Washington, Cheryl | G&A - 97Y200 |
| Weispfenning, Daniel Walton | Research Design & Development - 97Y203 |
| Stephanie Dixon | Cust Svc - $20 per hour |
| Mike Emslie | VP International |
| Russell ?? | International Cust Svc |
| Tiko | Indonesia Country Mgr |
| River | China country Mgr |
| Other Asia - | Support staff |

Document comparison by Workshare Professional on Friday, November 03, 2017
7:27:46 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\kjm\Desktop\APA Signature Version Clean.docx |
| Description | APA Signature Version Clean |
| Document 2 ID | file://C:\Users\kjm\Desktop\BBI APA v4 from Debtors CLEAN.docx |
| Description | BBI APA v4 from Debtors CLEAN |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 299 |
| Deletions | 305 |
| Moved from | 12 |
| Moved to | 12 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 628 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **NOTICE REGARDING PROPOSED ASSET PURCHASE AGREEMENT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 3, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Shiva D Beck**    sbeck@gardere.com, jcharrison@gardere.com
- **Ron Bender**    rb@lnbyb.com
- **Cathrine M Castaldi**    ccastaldi@brownrudnick.com
- **Russell Clementson**    russell.clementson@usdoj.gov
- **Aaron S Craig**    acraig@kslaw.com, lperry@kslaw.com
- **Matthew A Gold**    courts@argopartners.net
- **Monica Y Kim**    myk@lnbrb.com, myk@ecf.inforuptcy.com
- **Krikor J Meshefejian**    kjm@lnbrb.com
- **Tania M Moyron**    tania.moyron@dentons.com, chris.omeara@dentons.com
- **S Margaux Ross**    margaux.ross@usdoj.gov
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov
- **Sharon Z. Weiss**    sharon.weiss@bryancave.com, raul.morales@bryancave.com

**2. SERVED BY UNITED STATES MAIL**: On **November 3, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **November 3, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

*__Served via Attorney Service__*
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 3, 2017 | Krikor J. Meshefejian | */s/ Krikor J. Meshefejian* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**