RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com

Attorneys for Chapter 11 Debtors
and Debtors in Possession

**FILED & ENTERED**

**NOV 03 2017**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Ogier        DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a California corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>IRONCLAD PERFORMANCE WEAR CORPORATION, a Nevada corporation,<br><br>     Debtor and Debtor in Possession.<br>_____<br><br>☒ Affects both Debtors<br><br>☐ Affects Ironclad Performance Wear Corporation, a California corporation only<br><br>☐ Affects Ironclad Performance Wear Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (2) APPROVING THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING THE DEBTORS' REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF**<br><br>DATE:     October 30, 2017<br>TIME:     10:00 a.m.<br>PLACE:    Courtroom "303"<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA |

A hearing was held on October 30, 2017 (the "Sale Hearing"), for the Court to consider approval of the motion (the "Motion")[1] filed by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned Chapter 11 bankruptcy cases (collectively, the "Bankruptcy Cases"), seeking an order of the Court ("Sale Order") approving the Debtors' sale of substantially all of their assets to Radians Wareham Holding, Inc. ("Radians") in accordance with the terms of the APA ("Radians APA") attached as Exhibit "A" to the Declaration of Geoffrey Greulich filed on September 11, 2017 as Docket Number 6 (the "Greulich Declaration") or to the highest or otherwise best overbidder selected at the Auction (defined below) free and clear of all Encumbrances (defined below).  By way of the Motion, the Debtors also requested the Court's approval of the Debtors' assumption and assignment to Radians (or the successful overbidder) of those unexpired leases and executory contracts that Radians (or the successful overbidder) wishes to have assigned to it and to reject the balance of such unexpired leases and executory contracts effective as of the sale closing.  All capitalized terms which are not defined in this Sale Order shall be deemed to have the same definitions as set forth in the Asset Purchase Agreement between Brighton-Best International, Inc. ("BBI") and the Debtors (the "APA").  All capitalized terms which are not defined in either this Sale Order or in the APA shall have the definitions set forth in the Motion.

At a continued hearing held on September 25, 2017, the Court granted the Debtors' bid procedures motion by order entered on September 28, 2017 as Docket Number 71 (the "Bidding Procedures Order").  The Bidding Procedures Order was approved by the Debtors, Radians, the Official Committee of Unsecured Creditors (the "OCUC") and the Official Committee of Equity Holders (the "OCEH") that were appointed in these cases.  The Bidding Procedures Order

---

[1] Concurrently with the hearing on the Motion, the Court also held a hearing on that certain *Debtors' Motion For An Order: (1) Approving Debtors' Assumption And Assignment Of Additional Executory Contracts And Determining Cure Amounts And Approving Of Debtors' Rejection Of Those Executory Contracts Which Are Not Assumed And Assigned; (2) Waiving The 14-Day Stay Period Set Forth In Bankruptcy Rule 6006(d); and (3) Granting Related Relief* [Docket No. 125] (the "Additional Contracts Motion").  References in this Sale Order to the Motion include and incorporate the Additional Contracts Motion.

explained to prospective overbidders how a prospective overbidder could become qualified to participate in the Auction and how the Auction would proceed in the event that there was one or more qualified overbidders.

In accordance with the Bidding Procedures Order, the Debtors conducted an Auction on October 30, 2017. BBI was the winning bidder at the Auction with a purchase price of Twenty-Five Million Two Hundred Fifty Thousand Dollars ($25,250,000.00) (the "Purchase Price") to be funded in the manner set forth below in this Sale Order. The Debtors, in consultation with the OCUC and the OCEH, determined that the Purchase Price bid submitted by BBI at the Auction (the "Winning Bid") was the highest and best bid submitted at the Action and should be approved by the Court.

The Court, having considered the Motion and all pleadings filed by the Debtors in support of the Motion and all pleadings filed in response to the Motion; the statements, arguments and representations of the parties made at the Sale Hearing; and the entire record of these cases; and the Court, having determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and their shareholders, and that the legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein; and all objections to the Motion, if any, having been withdrawn or overruled; and after due deliberation and sufficient good cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT:[2]**

A.    Jurisdiction and Venue. The Bankruptcy Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to the administration of the Debtors' bankruptcy estates and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b) (2) (A), (M), (N) and (O). Venue of these cases is proper in this District and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] The findings of fact and conclusions of law set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    <u>Statutory Predicates</u>.    The statutory predicates for the relief requested in the Motion are (i) Sections 105(a) and 363(b), (f), (k), (l) and (m), 365 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (ii) Rules 2002(a)(2), 2002(c)(1) and (d), 6004 (a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006, 9007, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure, and (iii) Local Bankruptcy Local Rules 6004-1 and 9013-1.

C.    <u>Notice</u>. The Debtors have provided good and sufficient notice with respect to the following: (i) the Motion and the relief sought therein, including the entry of this Sale Order and the transfer and sale of the Purchased Assets, (ii) the Auction and the Sale Hearing, (iii) the selection of the Winning Bid, and (iv) the assumption and assignment of the executory contracts and unexpired leases and proposed cure amounts owing under such executory contracts and unexpired leases ("<u>Cure Amounts</u>"); and no further notice of the Motion, the relief requested therein or the Sale Hearing is required.  A reasonable opportunity to object and to be heard regarding the relief provided herein has been afforded to parties-in-interest.

D.    <u>Compliance with the Auction Procedures</u>. The Auction process implemented by the Debtors was conducted in accordance with the Bidding Procedures Order and was fair, proper, and reasonably calculated to result in the best value received for the Purchased Assets.  The Auction process afforded a full, fair, and reasonable opportunity for any party-in-interest to become a qualified bidder and to participate in the Auction.  As demonstrated by (i) the testimony and/or other evidence proffered and adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have conducted the Auction process in good faith, without collusion and in accordance with the Bidding Procedures Order.

E.    <u>Highest or Otherwise Best Bid</u>.  The Winning Bid constitutes the highest or otherwise best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Winning Bid constitutes the highest or otherwise best offer for the Purchased Assets constitutes a reasonable, valid and sound exercise of the Debtors' business judgment, and is in the best interests of the Debtors, their estates, their creditors and their shareholders.  The consideration to be paid by BBI for the Purchased Assets is fair and reasonable, is the highest or otherwise best offer therefor, and

constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws of the United States.

F.    <u>Arm's Length Transaction</u>.  The APA and other documents and instruments (the "<u>Transaction Documents</u>") related to and connected with this transaction (the "<u>Transaction</u>") and the consummation thereof were negotiated and entered into by the Debtors and BBI without collusion, in good faith and through an arm's length bargaining process.  Neither BBI nor any of its affiliates or representatives is an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  None of the Debtors, BBI, or their respective representatives engaged in any conduct that would cause or permit the APA, any of the other Transaction Documents or the Transaction to be avoided under section 363(n) of the Bankruptcy Code, or have acted in any improper or collusive manner.  The terms and conditions of the APA and the other Transaction Documents, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and are not avoidable and shall not be avoided, and no damages may be assessed against BBI or any other party, as set forth in section 363(n) of the Bankruptcy Code.

G.    <u>Good Faith Purchaser</u>.  BBI has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) BBI, in proposing and proceeding with the Transaction in accordance with the APA, recognized that the Debtors were free to deal with other interested parties; (ii) BBI agreed to provisions in the APA that would enable the Debtors to accept a higher and better offer; (iii) BBI complied with all of the provisions in the Auction and the Bidding Procedures Order applicable to BBI; (iv) all payments to be made by BBI and other agreements entered into or to be entered into between BBI and the Debtors in connection with the Transaction have been disclosed; (v) the negotiation and execution of the APA and related Transaction Documents were conducted in good faith and constituted an arm's length transaction; and (vi) the APA was not entered into, and the Transaction being consummated pursuant to and in accordance with the APA is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors.  BBI is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or

modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction or BBI's status as a "good faith" purchaser.

H.    Justification for Relief. Good and sufficient reasons for approval of the APA and the other Transaction Documents and the Transaction have been articulated to the Bankruptcy Court in the Motion and at the Sale Hearing, and the relief requested in the Motion and set forth in this Sale Order is in the best interests of the Debtors, their estates, their creditors and their shareholders. The Debtors have demonstrated through the Motion and other evidence submitted at the Sale Hearing both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the transfer and sale of the Purchased Assets as provided in the APA outside the ordinary course of business, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, their creditors and their shareholders.

I.    Free and Clear. In accordance with sections 363(b) and 363(f) of the Bankruptcy Code, the consummation of the Transaction pursuant to the Transaction Documents will be a legal, valid, and effective transfer and sale of the Purchased Assets and will vest in BBI, through the consummation of the Transaction, all of the Debtors' right, title, and interest in and to the Purchased Assets, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (collectively, "Encumbrances"). The Debtors have demonstrated that one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. All holders of Encumbrances in the Purchased Assets are adequately protected by having their respective Encumbrances attach to the net sale proceeds attributable to the Purchased Assets to the extent any such Encumbrances existed as of the Petition Date and subject to the terms of such Encumbrances with the same validity, force and effect, and in the same order of priority, which such Encumbrances had against the Purchased Assets as of the Petition Date, subject to any rights, claims and defenses the Debtors or their estates may possess with respect thereto.

J.    Prompt Consummation. The Debtors have demonstrated good and sufficient cause to waive the stay requirement under Bankruptcy Rules 6004(h) and 6006(d). Time is of the essence in consummating the Transaction, and it is in the best interests of the Debtors and their estates to consummate the Transaction within the timeline set forth in the Motion and the APA.

K.      Assumption of Executory Contracts and Unexpired Leases.   The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign to BBI the Currently Identified  Designated Contracts (as defined and identified in paragraph 14 below) and to the extent subsequently identified by BBI pursuant to paragraph 15 below, the Subsequently Identified Designated Contracts (as defined in paragraph 15 below) (the Currently Identified Designated Contracts and the Subsequently Identified Contracts are collectively referred to herein as the "Designated Contracts") in connection with the consummation of the Transaction, and the assumption and assignment of the Designated Contracts is in the best interests of the Debtors and their estates.

L.      Cure/Adequate Assurance.   Through the payments to be made at the Closing, BBI will have cured, or will have provided adequate assurance of cure upon Closing, of any default existing prior to the Closing under any of the Designated Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts and in the manner set forth below.  BBI has provided or will provide adequate assurance of future performance of and under the Designated Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C).  Pursuant to 11 U.S.C. § 365(f), the Designated Contracts to be assumed by the Debtors and assigned to BBI under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, BBI notwithstanding any provision in such Designated Contracts prohibiting their assignment or transfer.  The Debtors have demonstrated that no other parties to any of the Designated Contracts has incurred any actual pecuniary loss resulting from a default prior to the Closing under any of the Designated Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B).  Pursuant to 11 U.S.C. § 365(f), the Designated Contracts to be assumed by the Debtors and assigned to BBI at the Closing shall be assigned and transferred to, and remain in full force and effect for the benefit of, BBI notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

M.      Rejection of Executory Contracts and Unexpired Leases.   The Debtors have demonstrated that it is an exercise of their sound business judgment to reject all of their executory contracts and unexpired leases which are not part of the Designated Contracts effective as of the Closing, subject only to that set forth in paragraphs 17 and 28 below.

N.    _Legal and Factual Bases_.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    The relief requested in the Motion is GRANTED and APPROVED in all respects to the extent provided herein.

2.    All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein and in the Bidding Procedures Order, and all reservation of rights included in such objections, are overruled on the merits with prejudice.

3.    Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Transaction, including the transfer and sale of the Purchased Assets to BBI on the terms set forth in the APA, a copy of which is attached as Exhibit "1" to Docket No 176, is approved in all respects, and the Debtors are authorized and directed to consummate the Transaction in accordance with the APA, including, without limitation, by executing all of the Transaction Documents and taking all actions necessary and appropriate to effectuate and consummate the Transaction (including the transfer and sale of the Purchased Assets) in consideration of the Purchase Price upon the terms set forth in the APA, including, without limitation, assuming and assigning to BBI the Designated Contracts.  The Debtors and BBI shall have the right to make any mutually agreeable, non-material changes to the APA which shall be in writing signed by both parties without further order of the Court and provided that the OCEH and the OCUC do not object to such changes.  Any objection by the OCEH or the OCUC to any such changes will be resolved by the Court.

4.    As of the Closing, (i) the Transaction set forth in the APA shall effect a legal, valid, enforceable and effective transfer and sale of the Purchased Assets to BBI free and clear of all Encumbrances, as further set forth in the APA and this Sale Order; and (ii) the APA, and the other Transaction Documents, and the Transaction, shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors, any successor thereto including a trustee or estate representative appointed in the Bankruptcy Cases, and all other persons and entities.

5.    Subject to the fulfillment of the terms and conditions of the APA, this Sale Order

shall, as of the Closing, be considered and constitute for all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets and/or a bill of sale transferring all of the Debtors' rights, title and interest in and to the Purchased Assets to BBI.  Consistent with, but not in limitation of the foregoing, each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and approved in this Sale Order.

6.      Any person or entity that is currently, or on the Closing Date may be, in possession of some or all of the Purchased Assets is hereby directed to surrender possession of such Purchased Assets either to (a) the Debtors before the Closing or (b) to BBI or its designee upon the Closing.

7.      The transfer of the Purchased Assets pursuant to the Transaction Documents is a legal, valid, and effective transfer and shall, in accordance with sections 105(a) and 363(f) of the Bankruptcy Code, and upon consummation of the Transaction, including, without limitation, payment of the Purchase Price to the Debtors, vest BBI with all right, title, and interest in the Purchased Assets, free and clear of all Encumbrances.

8.      Following the Closing, no holder of any Encumbrance against the Debtors or the Purchased Assets shall interfere with BBI's respective rights in, title to or use and enjoyment of the Purchased Assets.  All valid and perfected Encumbrances in the Purchased Assets shall attach to the net Purchase Price proceeds attributable to the Purchased Assets immediately upon receipt of such Purchase Price proceeds by the Debtors in the order of priority, and with the same validity, force and effect, which such Encumbrances had against such Purchased Assets as of the filing of the Bankruptcy Cases, subject to any rights, claims and defenses the Debtors and their estates may possess with respect thereto.

9.      BBI shall not be deemed, as a result of any action taken in connection with, or as a result of the Transaction (including the transfer and sale of the Purchased Assets), to: (i) be a successor, continuation or alter ego (or other such similarly situated party) to the Debtors or their estates by reason of any theory of law or equity, including, without limitation, any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability; or (ii) have, de facto or

otherwise, merged with or into the Debtors; or (iii) be a mere continuation, alter ego, or substantial continuation of the Debtors.  Other than the Assumed Liabilities, BBI is not assuming any of the Debtors' debts.

10.    This Sale Order (i) shall be effective as a determination that, on Closing, all Encumbrances existing against the Purchased Assets before the Closing have been unconditionally released, discharged and terminated, and that the transfers and conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all persons and entities.  If any person or entity that has filed financing statements or other documents or agreements evidencing any Encumbrances against the Purchased Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances which the person or entity has with respect to the Purchased Assets, then BBI and/or the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Purchased Assets.

11.    In accordance with the Bidding Procedures Order, concurrently with the Closing, the Escrow Agent shall pay to Radians out of the Purchase Price (i) the full amount of Radians' pre-bankruptcy secured debt, plus (ii) the full amount then drawn by the Debtors against the DIP Facility (collectively, the "Radians Payoff Amount"), plus (iii) the Breakup Fee of $500,000.00.  As of October 31, 2017, the Radians Payoff Amount is $4,813,780.79.  Interest accrues on the Radians Payoff Amount from and after October 31, 2017 at a daily per diem of $2,011.28 until paid.  The payment to Radians at the Closing in the amount of the Radians Payoff Amount, including accrued interest from and after October 31, 2017, and the Breakup Fee out of the Purchase Price shall constitute a complete satisfaction of all outstanding indebtedness owing by the Debtors to Radians as of date of payment, and extinguishment of the pre and post-petition liens and security interests on the Purchased Assets of the Debtors' bankruptcy estates as granted to Radians. Radians hereby authorizes BBI to file UCC termination statements with respect to all recorded liens by Radians or Radians'

predecessor from whom Radians purchased its pre-bankruptcy secured debt. Nothing in this Sale Order shall be construed to impair or limit in any way the rights of Radians granted in the *Final Order: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 And 364, And (B) Utilize Cash Collateral Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; And (III) Granting Related Relief (the "Final DIP Order"),* except that following the Closing Radians shall have no Encumbrance on or against any of the Purchased Assets (with Radians' Encumbrances to transfer to the net Purchase Price proceeds as set forth below in this paragraph 11). Radians reserves all rights and remedies as granted to it under the pre-petition Loan Documents and the DIP Agreement to assert possible claims for additional fees and expenses incurred by Radians against the Debtors' bankruptcy estates to the extent Radians is entitled to them under the Loan Documents and the DIP Agreement resulting from an action, threatened action or discovery brought against Radians with all parties reserving all rights. The OCEH and OCUC reserve any and all rights to challenge any claims asserted by Radians for additional fees and expenses. Until such time that the deadline for any claims to be asserted against Radians set forth in the Final DIP Order passes with no such claims asserted, or claims are asserted and are resolved to final order of the Court, Radians valid and perfected Encumbrances in the Purchased Assets for any additional fees and expenses as referenced above shall attach to the net Purchase Price proceeds attributable to the Purchased Assets immediately upon receipt of such Purchase Price proceeds by the Debtors in the same order of priority, and with the same validity, force and effect, which such Encumbrances had against such Purchased Assets as of the filing of the Bankruptcy Cases, subject to any rights, claims and defenses the Debtors and their estates and/or the OCEH and OCUC may possess with respect thereto.

12.     BBI shall fund the payment of the Purchase Price at the Closing by (i) wire transferring into a segregated trust account (the "Trust Account") maintained by Levene, Neale, Bender, Yoo & Brill L.L.P. ("Escrow Agent"), which shall serve as the Escrow Agent for this Transaction, the amount of Twenty-Four Million Two Hundred Fifty Thousand Dollars ($24,250,000.00) and (ii) by transferring title to the One Million Dollar ($1,000,000.00) deposit that BBI previously provided to the Escrow Agent (the "BBI Deposit") to the Debtors. The

Trust Account shall be maintained by Escrow Agent at First Republic Bank unless otherwise ordered by the Court.

13.    Concurrently with the Closing or as soon thereafter as is possible, the Escrow Agent shall pay out of the Purchase Price the following amounts to the following parties (collectively, the "Designated Cure Amounts"):

Nantong Changbang Gloves Co. - $1,228,307.56

Woneel Midas Leathers - $785,358.50

Mercindo Global Manufaktur    - $444,674.64

Marusan – Mimasu Tshusho Co. Ltd. - $382,811.28

Grainger - $180,000.00 (the "Grainger Cure Payment")

Advantage Media Services - $178,522.75

PT JJ Gloves Indo - $162,917.76

PT Sport Glove Indonesia - $144,238.66

Windspeed Sports Shanghai Co., Ltd. - $144,198.43

Ka Hung Glove Industrial Co. Ltd. - $38,934.90

Synetra - $37,972.33

AML United Limited - $28,330.56

1920 Hutton Court - $13,257.09

PT Seok HWA Indonesia - $13,174.86

Design Gallery (Pvt.) Ltd. - $12,801.60

Desun Garments, Ltd. - $7,691.75

Konica Minolta - $1,152.31

Pitney Bowes - $452.99

Notwithstanding the inclusion of the Grainger Cure Payment on the above list of Designated Cure Payments, and for the avoidance of doubt, neither the GGS Supplier Agreement nor the Grainger Supplier Agreement shall be considered Designated Contracts or Currently Identified Designated Contracts, and the Debtors are not assuming or assuming and assigning to BBI the GGS Supplier Agreement or the Grainger Supplier Agreement.

14.     To the extent that any of the contracts and/or leases, not including the GGS Supplier Agreement and the Grainger Supplier Agreement,  which give rise to the Designated Cure Amounts in paragraph 13 above (the "Currently Identified Designated Contracts") are executory contracts or unexpired leases (over which the Court is not making any such determination at this time), then in connection with the Closing, the Debtors shall be deemed to have assumed all such Currently Identified Designated Contracts (so that they are deemed part of the Designated Contracts) and to have assigned them to BBI, and BBI shall have assumed all obligations owing under all such Currently Identified Designated Contracts following the Closing.   In the event that the Court ultimately determines that any such counter-parties to the Currently Identified Designated Contracts (the "Currently Identified Designated Contract Counter-Parties") have an allowed claim against the Debtors which exceeds the Designated Cure Amounts, the difference will be paid by the Escrow Agent out of the Purchase Price and shall not be the responsibility of BBI.  The Court shall resolve any and all disputes which may arise between the Debtors, BBI and any of the Currently Identified Designated Contract Counter-Parties over whether the Currently Identified Designated Contracts are executory contracts or unexpired leases and whether any of the Currently Identified Designated Contract Counter-Parties are entitled to an allowed claim against the Debtors which exceeds the Designated Cure Amounts.

15.     All of the Currently Identified Designated Contracts, to the extent they are executory contracts or unexpired leases, shall be part of the Designated Contracts that will be assumed by the Debtors and assigned to BBI at the Closing.   In the event that BBI elects to add any other of the Debtors' executory contracts or unexpired leases to the list of Designated Contracts ("Subsequently Identified Designated Contracts"), BBI must file a notice with the Court at least three business days prior to the Closing identifying all such Subsequently Identified Designated Contracts and serving such notice by over-night mail on all counter-parties to the Subsequently Identified Designated Contracts ("Subsequently Identified Designated Contract Counter-Parties").   All Subsequently Identified Designated Contracts shall be assumed by the Debtors and assigned to BBI at the Closing, with BBI to be obligated to pay all cure amounts owing to such Subsequently Identified Designated Contract Counter-Parties (the "BBI Cure Amounts") concurrently with the Closing unless there is a

dispute over the amount of any such BBI Cure Amounts, with the Court to resolve any such disputes. The payment by BBI of such BBI Cure Amounts will be in addition to the Purchase Price.

16.    Other than the Radians Payoff Amount, the Breakup Fee, and the Designated Cure Amounts, all of which shall be paid in full by the Escrow Agent in connection with the Closing, then notwithstanding anything contained in any prior order of the Court, the Escrow Agent shall maintain the remaining balance of the Purchase Price in the Trust Account pending further order of the Court.

17.    In addition to the payment of the Purchase Price, in connection with the Closing, BBI shall wire transfer to the Escrow Agent the additional amount of Eight Hundred Twenty Thousand Dollars ($820,000.00) (the "Supplemental Payment") which Escrow Agent shall maintain in a segregated trust account separate from the Trust Account (the "Separate Trust Account") pending further order of the Court.  Except as set forth solely with respect to PIP and the PIP APA (as each is defined in paragraph 28 below), (i) the Supplier Agreement dated November 9, 2015 (the "GGS Supplier Agreement") entered into between the Debtors and Grainger Global Sourcing a division of Grainger International, Inc. ("GGS"), and (ii) that certain "Third Amendment to Terms and Conditions to Supplier Agreement By and Between Ironclad Performance Wear Corp. and W.W. Grainger, Inc. dated November 15, 2015, which amended the terms and conditions of that certain Supplier Agreement dated January 1, 2006 (the "Grainger Supplier Agreement") entered into between the Debtors and W.W. Grainger, Inc. ("Grainger") are not Designated Contracts and are not being assumed by the Debtors and are not being assigned to BBI.  The funds in the Separate Trust Account are to be used solely to pay any damage claim to the extent allowed by the Court in favor of GGS resulting from the Debtors' rejection of the GGS Supplier Agreement and/or allowed by the Court in favor of Grainger resulting from the Debtors' rejection of the Grainger Supplier Agreement after taking into account the Grainger Cure Payment (collectively, the "Final Grainger Claim").  If the Final Grainger Claim exceeds One Million Dollars ($1,000,000) (inclusive of the $180,000 Grainger Cure Payment), the Final Grainger Claim will be fully satisfied by payment to Grainger of (i) the $180,000 Grainger Cure Payment to be paid to Grainger by the Escrow Agent at the Closing, plus (ii) the $820,000 Supplemental Payment to be maintained in the Separate Trust Account to be paid to Grainger and/or GGS (as ordered by the

Court or as agreed to by the parties) by the Escrow Agent following the entry of an order of the Court allowing the Final Grainger Claim and such order becoming a final order, plus (iii) any excess to be paid by the Escrow Agent to Grainger and/or GGS (as ordered by the Court or as agreed to by the parties) from the Purchase Price following the entry of an order of the Court allowing the Final Grainger Claim and such order becoming a final order ("Excess Grainger Amount") and the entry of a further order of the Court authorizing payment of any such Excess Grainger Amount.    If the Final Grainger Claim (inclusive of the $180,000 Grainger Cure Payment) equals or is less than One Million Dollars ($1,000,000.00), (a) the Final Grainger Claim will be fully satisfied by payment to Grainger of (i) the $180,000 Grainger Cure Payment to be paid to Grainger by the Escrow Agent at the Closing, plus (ii) an amount from the $820,000 Supplemental Payment maintained in the Separate Trust Account which when added to the $180,000 Grainger Cure Payment equals the total Final Grainger Claim to be paid to Grainger and/or GGS (as ordered by the Court or as agreed to by the parties) by the Escrow Agent following the entry of an order of the Court allowing the Final Grainger Claim and such order becoming a final order; and (b) promptly after the payment above to Grainger and/or GGS (as ordered by the Court or as agreed to by the parties) has been made in satisfaction of the Final Grainger Claim, the Escrow Agent shall cause the balance in the Separate Trust Account, if any, to be paid promptly to BBI.  The Debtors and BBI shall work cooperatively and in good faith, including following the Closing, in a joint effort to minimize the Final Grainger Claim with the Court to resolve any differences between the Debtors and BBI in this regard.  The Debtors, BBI, the OCEH and the OCUC shall jointly determine the timing of the Debtors' rejection of the GGS Supplier Agreement and the Grainger Supplier Agreement, which may occur after the Closing if doing so will help to minimize the Final Grainger Claim.  Any such rejection of the GGS Supplier Agreement and the Grainger Supplier Agreement will happen only following the entry of an order of the Court approving such rejection.  The Court will resolve any differences between the Debtors and BBI over the timing of the rejection of the GGS Supplier Agreement and the Grainger Supplier Agreement.  The Debtors may not assume or assume and assign either the GGS Supplier Agreement and/or the Grainger Supplier Agreement (or assign any rights

under either the GGS Supplier Agreement and/or the Grainger Supplier Agreement) without the prior written consent of BBI, which BBI has the right to withhold in its sole and absolute discretion for any reason.

18.     Upon the Closing, the Debtors are authorized and directed to assume, assign and/or transfer each of the Designated Contracts to BBI, including the Currently Identified Designated Contracts and any Subsequently Identified Designated Contracts.  At the Closing, the Escrow Agent shall pay out of the Purchase Price to all Currently Identified Designated Contract Counter-Parties and to Grainger the Designated Cure Amounts identified in paragraph 13 above, and payment of such Designated Cure Amounts by the Escrow Agent to all such Currently Identified Designated Contract Counter-Parties are deemed the necessary and sufficient amounts to "cure" all "defaults" with respect to all such Currently Identified Designated Contracts under section 365(b) of the Bankruptcy Code.  The payment by the Escrow Agent of such Designated Cure Amounts to all such Currently Identified Designated Contract Counter-Parties shall (i) effect a cure of all defaults existing under all such Currently Identified Designated Contracts, and (ii) compensate all such Currently Identified Designated Contract Counter-Parties for any actual pecuniary loss resulting from any such default.  At the Closing, BBI shall pay (which payment(s) shall be in addition to the Purchase Price) to all Subsequently Identified Designated Contract Counter-Parties the BBI Cure Amounts, and payment of such BBI Cure Amounts by BBI to all such Subsequently Identified Designated Contract Counter-Parties are deemed the necessary and sufficient amounts to "cure" all "defaults" with respect to all such Subsequently Identified Designated Contracts under section 365(b) of the Bankruptcy Code.  The payment by BBI of such BBI Cure Amounts to all such Subsequently Identified Designated Contract Counter-Parties shall (i) effect a cure of all defaults existing under all such Subsequently Identified Designated Contracts, and (ii) compensate such Subsequently Identified Designated Contract Counter-Parties for any actual pecuniary loss resulting from any such default.  The Debtors shall then have assumed and assigned to BBI, effective as of the Closing, all of the Designated Contracts (comprised of both all Currently Identified Designated Contracts and all Subsequently Identified Designated Contracts, if any), and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of all such Designated Contracts to BBI shall not be

a default thereunder.  After the payment of the Designated Cure Amounts by the Escrow Agent to the Currently Identified Designated Contract Counter-Parties, neither the Debtors nor BBI shall have any further liabilities to any Currently Identified Designated Contract Counter-Parties other than BBI's obligations under the Currently Identified Designated Contracts that accrue and become due and payable on or after the Closing Date.  After the payment of the BBI Cure Amounts by BBI to the Subsequently Identified Designated Contract Counter-Parties, neither the Debtors nor BBI shall have any further liabilities to any Subsequently Identified Designated Contract Counter-Parties other than BBI's obligations under the Subsequently Identified Designated Contracts that accrue and become due and payable on or after the Closing Date.  In addition, adequate assurance of future performance has been demonstrated by or on behalf of BBI with respect to all of the Designated Contracts within the meaning of sections 365(b)(1)(c), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

19.    All of the Currently Identified Designated Contract Counter-Parties and all of Subsequently Identified Designated Contract Counter-Parties are forever barred, estopped, and permanently enjoined from (i) raising or asserting against the Debtors or BBI, or any of their property, any assignment fee, acceleration, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Designated Contracts, existing as of the Closing, or arising by reason of the consummation of the Transaction contemplated by the APA, including, without limitation, the Transaction and the assumption and assignment of the Designated Contracts, including any asserted breach relating to or arising out of the change-in-control provisions in such Designated Contracts, or any purported written or oral modification to the Designated Contracts and (ii) asserting against BBI any claim, counterclaim, breach, or condition asserted or assertable against the Debtors existing as of the Closing or arising by reason of the transfer of the Purchased Assets, except for the Assumed Liabilities.

20.    Any provisions in any Designated Contracts that prohibit or condition the assignment of such Designated Contract or allow the counterparty to such Designated Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Designated Contract constitute unenforceable anti-assignment provisions

that are void and of no force and effect with respect to the Debtors' assumption and assignment of

such Designated Contract to BBI in accordance with the APA.

21.    The terms and provisions of this Sale Order, as well as the rights granted under the

Transaction Documents, shall continue in full force and effect and are binding upon any successor,

reorganized Debtors, or chapter 7 or chapter 11 trustee applicable to the Debtors, notwithstanding any

such conversion, dismissal or order entry.  Nothing contained in any chapter 11 plan confirmed in the

Bankruptcy Cases or in any order confirming such a plan, nor any order dismissing the Bankruptcy

Cases or converting the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, shall

conflict with or derogate from the provisions of the APA, any documents or instruments executed in

connection therewith, or the terms of this Sale Order.  The provisions of this Sale Order and any

actions taken pursuant hereto shall survive any conversion or dismissal of the Bankruptcy Case and

the entry of any other order that may be entered in the Bankruptcy Cases, including any order (i)

confirming any plan of reorganization; (ii) converting the Bankruptcy Case from chapter 11 to

chapter 7; (iii) appointing a trustee or examiner in the Bankruptcy Case; or (iv) dismissing the

Bankruptcy Cases.

22.    The Transaction contemplated by the APA and other Transaction Documents are

undertaken without collusion and in "good faith," as that term is defined in section 363(m) of the

Bankruptcy Code.  BBI is a good faith purchaser within the meaning of section 363(m) of the

Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy

Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein by this

Sale Order to consummate the Transaction shall not affect the validity of the sale of the Purchased

Assets to BBI.

23.    The failure to specifically include any particular provision of the APA or the other

Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such

provisions, it being the intent of the Bankruptcy Court that the Transaction, the APA and the other

Transaction Documents be authorized and approved in their entirety.  Likewise, all of the provisions

of this Sale Order are non-severable and mutually dependent.

24.    Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, if applicable, or

any other Local Bankruptcy Rule or otherwise, this Sale Order shall not be stayed for 14-days after the entry hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h) and 6006(d). Time is of the essence in approving the Transaction (including the transfer and the sale of the Purchased Assets).

25.    The automatic stay pursuant to section 362 is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Bankruptcy Court, to (i) allow BBI to deliver any notice provided for in the APA and Transaction Documents and (ii) allow BBI to take any and all actions permitted under the APA and Transaction Documents in accordance with the terms and conditions thereof.

26.    Unless otherwise provided in this Sale Order, to the extent any inconsistency exists between the provisions of the APA and this Sale Order, the provisions contained in this Sale Order shall govern.

27.    The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe, and enforce the provisions of the APA and this Sale Order in all respects, and further, including, without limitation, to (i) hear and determine all disputes between the Debtors and/or BBI, as the case may be, and any other non-Debtor party to, among other things, the Designated Contracts concerning, among other things, assignment thereof by the Debtors to BBI and any dispute between BBI and the Debtors as to their respective obligations with respect to any asset, liability, or claim arising hereunder; (ii) compel delivery of the Purchased Assets to BBI free and clear of Encumbrances; (iii) compel the delivery of the Purchase Price or performance of other obligations owed to the Debtors; (iv) interpret, implement, and enforce the provisions of this Sale Order; and (v) protect BBI against (A) claims made related to any of the Excluded Liabilities, (B) any claims of successor or vicarious liability (or similar claims or theories) related to the Purchased Assets or the Designated Contracts, or (C) any Encumbrances asserted on or against BBI or the Purchased Assets.

28.    Protective Industrial Products, Inc. ("PIP") is hereby approved as the back-up bidder with a back-up bid of Twenty-Five Million Dollars ($25,000,000.00) (the "Back Up Purchase Price"). If BBI fails to close the Transaction in accordance with the terms and timing of the APA, BBI shall be deemed to have forfeited the BBI Deposit to the Debtors' bankruptcy

estates as liquidated damages, with the Court to resolve any dispute in this regard between the

Debtors and BBI.  The Escrow Agent will continue to hold the One Million Dollar deposit

provided to the Escrow Agent by PIP (the "PIP Deposit").  Only if BBI fails to close the

Transaction in accordance with the terms and timing of the APA, the sale of the Purchased

Assets to PIP pursuant to the terms of the asset purchase agreement provided to the Debtors by

PIP on Wednesday, October 25, 2017, as modified on the record at the Auction (the "PIP APA")

shall be deemed authorized and approved by this Sale Order.  The Debtors shall forthwith

provide written notice to PIP (by email to PIP and its counsel) of such failure to close by BBI

(the "Back Up Bidder Notice").  The PIP Transaction contemplated by the PIP APA and other

Transaction Documents between the Debtors and PIP are deemed by the Court to have been

undertaken without collusion and in "good faith," as that term is defined in section 363(m) of the

Bankruptcy Code.  PIP is a good faith purchaser within the meaning of section 363(m) of the

Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy

Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein by this

Sale Order to consummate the PIP Transaction shall not affect the validity of the sale of the Purchased

Assets to PIP.  Only in the event that BBI fails to close the Transaction in accordance with the

terms and timing of the APA, all findings and terms of this Sale Order that apply to BBI shall be

deemed to apply to PIP, and all findings and terms of this Sale Order that apply to the APA or to

the Transaction shall be deemed to apply to the PIP APA and the PIP Transaction respectively,

without the need for any further order of the Court, provided, however, that in such event, and

notwithstanding anything to the contrary set forth herein (i) both the GGS Supplier Agreement and

the Grainger Supplier Agreement shall be deemed to be included in the definition of Currently

Identified Designated Contracts to be assumed by the Debtors and assigned to PIP in connection with

such Closing;  (ii) paragraph 17 above and the last sentence of paragraph 13 above shall be deemed

stricken from this Sale Order and of no further force or effect; and (iii) PIP may seek entry of an

amended Sale Order specifically authorizing the PIP Transaction.  The Escrow Agent will refund the

PIP Deposit to PIP within five (5) business days following the earlier to occur of (i) the Closing

of the Transaction with BBI or (ii) the Debtors' failure to deliver a Back Up Bidder Notice on or

before November 20, 2017.  If the Debtors deliver a Back Up Bidder Notice to PIP on or before November 20, 2017, the PIP Deposit shall be applied to the Back Up Purchase Price to be paid by PIP, forfeited to the Debtors as liquidated damages, or returned to PIP, in accordance with the provisions of Articles II and XI of the PIP APA, provided, however, that the PIP APA shall be deemed modified to provide that the "Outside Closing Date" shall mean the date which is fourteen (14) business days following PIP's receipt of the Backup Bidder Notice.

29.    Nothing in this Sale Order shall be construed to impair or limit in any way the rights of the OCEH and the OCUC granted in the Final DIP Order.

30.    The Debtors (including any successor in interest) and BBI shall make reasonable efforts to retain and preserve all books, records, emails, and other documents relating to the Debtors' business prior to the filing of the Bankruptcy Cases and shall provide the Securities and Exchange Commission ("SEC") with reasonable access to all such documents during normal business hours following receipt of not less than seventy-two (72) hours prior written notice from the SEC.  No party shall destroy or otherwise abandon any such documents or records without providing the other party and the SEC at least 60 days' prior written notice of its intent to abandon or destroy such materials, and a reasonable opportunity to obtain possession thereof.

31.    In accordance with Section 8.4 of the APA, after the Closing, the Debtors are authorized to change their names.

32.    Upon the entry of this Sale Order, the Debtors are authorized and instructed to return and deliver to Radians the $1,000,000 deposit previously made by Radians under the Radians APA within one (1) business day of the entry of this Sale Order.

33.    Following the date of entry of this Sale Order, the Debtors and BBI are authorized to make immaterial changes to the APA without the need for any further of the Court provided that all such changes have been approved in writing by the Debtors, BBI, the OCEH and the OCUC.  Any other changes to this Sale Order would require a further order of the Court.

34.    All of the Debtors' executory contracts and unexpired leases which are not part of the Designated Contracts shall be deemed rejected effective as of the Closing, subject only to that set forth in paragraphs 17 and 28 above, including with respect to the GGS Supplier

1   Agreement and the Grainger Supplier Agreement.  Within seven days following the Closing, the

2   Debtors shall provide notice to all counter-parties to Designated Contracts that their Designated

3   Contract has been assumed by the Debtors and assigned to BBI and including with that notice

4   payment of any associated Cure Amount (unless with the consent of the counter-party the Cure

5   Amount is paid by wire transfer) except with respect to the Designated Cure Amounts which as

6   set forth in paragraph 13 above which shall be paid concurrently with the Closing or as soon

7   thereafter as is possible.  Within seven days following the Closing, the Debtors shall provide

8   notice to all counter-parties to all executory contracts and unexpired leases which are not

9   Designated Contracts that their executory contracts and unexpired leases have been rejected by

10  the Debtors effective as of the Closing and notifying such counter-parties that they are required

11  to file with the Court within thirty days following the date of service of the notice any rejection

12  damage claim that they wish to assert.

# # #

Date: November 3, 2017

Martin R Barash
United States Bankruptcy Judge