RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com
Attorneys for Chapter 11 Debtors and Debtors in Possession

SAMUEL R. MAIZEL (SBN 189301)
TANIA M. MOYRON (SBN 235736)
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:  (213) 623-9300; Facsimile:  (213) 623-9924
Email: samuel.maizel@dentons.com; tania.moyron@dentons.com
Attorneys for Official Committee of Equity Security Holders

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>ICPW Liquidation Corporation, a California corporation[1],<br><br>　　　　Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>ICPW Liquidation Corporation, a Nevada corporation[2],<br><br>　　　　Debtor and Debtor in Possession.<br>_____<br>☒  Affects both Debtors<br><br>☐ Affects ICPW Liquidation Corporation, a California corporation only<br><br>☐ Affects ICPW Liquidation Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**NOTICE OF FILING OF INITIAL DRAFT OF DEBTORS' AND OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS' JOINT PLAN OF LIQUIDATION DATED DECEMBER ＿＿, 2017**<br><br>Plan Confirmation Hearing:<br>Date:　　[To Be Set By Court]<br>Time:　　[To Be Set By Court]<br>Place:　　Courtroom "303"<br>　　　　　21041 Burbank Blvd.<br>　　　　　Woodland Hills, CA |

_____

[1] Formerly known as Ironclad Performance Wear Corporation, a California corporation.
[2] Formerly known as Ironclad Performance Wear Corporation, a Nevada corporation.

1

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE:**

Attached hereto as Exhibit "A" is an initial draft of a Joint Plan of Liquidation Dated December ___, 2017 (the "Draft Plan") that is being jointly proposed by ICPW Liquidation Corporation, a California corporation, formerly known as Ironclad Performance Wear Corporation, a California corporation ("ICPW California"), and ICPW Liquidation Corporation, a Nevada corporation, formerly known as Ironclad Performance Wear Corporation, a Nevada corporation ("ICPW Nevada" and collectively with ICPW California, the "Debtors") and the Official Committee of Equity Security Holders (the "OCEH"). The Debtors and the OCEH reserve all rights to modify the Draft Plan and because this is only an initial draft of the Plan, with certain blanks still left to be filled in, the Debtors and the OCEH fully expect to the modify the Draft Plan, including, but not limited to, to fill in the blanks and to take into account any facts which occur following the date of the filing of the Draft Plan.

The Debtors and the OCEH (collectively, the "Plan Proponents") believe that the Draft Plan represents the optimal outcome for these chapter 11 bankruptcy cases. Any allowed pre-petition claims in these bankruptcy estates (the "Estates") that are not paid prior to Plan confirmation will be paid in full on the Effective Date and are therefore deemed not impaired and are not required to vote on the Plan because they are conclusively presumed to have accepted the Plan, and solicitation of acceptances to the Plan from such claim holders is not required, pursuant to § 1126(f) of the Bankruptcy Code. All unsecured creditors who have or who ultimately obtain allowed general unsecured claims will be paid post-petition interest at the applicable federal rate from the date of the Debtors' bankruptcy filing through the date they are paid the full amount of their allowed general unsecured claim.

After all allowed post-bankruptcy claims have been paid in full with post-petition interest, and appropriate reserves have been made for disputed claims and to fund post-confirmation litigation and other expenses, the balance of the funds in these Estates will be distributed to the record shareholders of the Nevada corporation (the "Shareholders") - determined at the end of the day on the date of the Plan confirmation hearing at which the Court confirms the Plan (the "Plan Confirmation Hearing").

A trust (the "Trust") is being established under the Plan.  On the Effective Date, the Debtors and the trustee of the Trust (the "Trustee") will enter into a related trust agreement (the "Trust Agreement") for the benefit of the Shareholders.  An initial draft of the Trust Agreement is attached as Exhibit "2" to the Draft Plan.  The Trustee will, among other things, investigate and pursue certain claims and causes of action that belong to the Estates and are assigned to the Trust for the benefit of the Shareholders.  The Plan Proponents believe that Shareholders are not impaired under the Plan. Therefore, they are not required to vote on the Plan because they are conclusively presumed to have accepted the Plan, and solicitation of acceptances to the Plan from the Shareholders is not required, pursuant to § 1126(f) of the Bankruptcy Code.  *See In re Acequia, Inc.*, 787 F.2d 1352, 1363 (9th Cir. 1986); *In re Nickels Midway Pier, LLC*, 452 B.R. 156 (D.N.J. 2011).

Under the Plan, there will be no impaired class of creditors because the only class of creditors under the Plan is class 1 (general unsecured creditors), and the class 1 claims are not impaired by the Plan and therefore do not vote on the Plan.  Under the Plan, there will be no impaired class of Shareholders because the only class of interests under the Plan is class 2 (the Shareholders), and the class 2 Shareholders are not impaired by the Plan and therefore do not vote on the Plan.  Even if the class 2 Shareholders were impaired by the Plan and were entitled to vote on the Plan, and, as a class, did not vote to accept the Plan (despite the fact that the interests of the

class 2 Shareholders are represented by the OCEH; the OCEH is a co-proponent of the Plan; and the OCEH would recommend that all class 2 Shareholders vote to accept the Plan), the Plan Proponents believe that the Plan would nevertheless be confirmable by "cramdown" because the conditions of § 1129(b)(2)(C)(ii) will have been satisfied in that no holder of any interest that is junior to the interests of the class 2 Shareholders will receive or retain any property under the Plan on account of any such junior interest. In fact, there are no interests that are junior to the interests of the class 2 Shareholders.

As a result of all of the foregoing, the Plan Proponents believe that no purpose would be served by having a disclosure statement and disclosure statement hearing because no voting on the Plan is required. The Plan Proponents are therefore requesting the Court to permit the Plan Proponents to skip the disclosure statement stage and proceed directly with a Plan confirmation hearing. That would save the Estates a significant amount of money and time. The Plan Proponents are requesting the Court to schedule a Plan confirmation hearing at the very end of January, 2018 or early February, 2018, depending upon the Court's calendar. The Plan Proponents would like to have until December 31, 2017 to finalize the Draft Plan (and fill in the blanks) and the Trust Agreement and to effectuate service of a comprehensive notice of Plan confirmation upon all creditors and Shareholders (which service will include a copy of the actual finalized Plan itself, along with the finalized Trust Agreement, if the Court so requires).

/ / /

/ / /

/ / /

1      The Plan Proponents are requesting the opportunity to review all of the foregoing with the

2 Court at the currently scheduled status conference on December 12, 2017, at 1:30 p.m.

3 Dated: December 12, 2017                    LEVENE, NEALE, BENDER, YOO & BRILL

4                                             L.L.P.

5

6                                             By:___/s/ Ron Bender_____
                                                 RON BENDER
7                                                MONICA Y. KIM
                                                 KRIKOR J. MESHEFEJIAN
8                                                LEVENE, NEALE, BENDER, YOO
                                                 & BRILL L.L.P.
9                                                Attorneys for Chapter 11 Debtors and
                                                 Debtors in Possession
10

11                                            DENTONS US LLP

12

13                                            By:___/s/ Tania Moyron_____
                                                 SAMUEL R. MAIZEL
14                                               TANIA MOYRON
                                                 Attorneys for Official Committee of Equity
15                                               Security Holders

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com
Attorneys for Chapter 11 Debtors and Debtors in Possession

SAMUEL R. MAIZEL (SBN 189301)
TANIA M. MOYRON (SBN 235736)
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:  (213) 623-9300; Facsimile:  (213) 623-9924
Email: samuel.maizel@dentons.com; tania.moyron@dentons.com
Attorneys for Official Committee of Equity Security Holders

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>ICPW Liquidation Corporation, a California corporation[1],<br><br>       Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>ICPW Liquidation Corporation, a Nevada corporation[2],<br><br>       Debtor and Debtor in Possession.<br>_____<br>☒ Affects both Debtors<br><br>☐ Affects ICPW Liquidation Corporation, a California corporation only<br><br>☐ Affects ICPW Liquidation Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**DEBTORS' AND OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS' JOINT PLAN OF LIQUIDATION DATED DECEMBER __, 2017**<br><br>Plan Confirmation Hearing:<br>Date:      _____, 2018<br>Time:     ___:___ __.m.<br>Place:   Courtroom "303"<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA |

[1] Formerly known as Ironclad Performance Wear Corporation, a California corporation.
[2] Formerly known as Ironclad Performance Wear Corporation, a Nevada corporation.

1

## **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................... 2

    A.    Disclaimer.................................................................................................. 3

    B.    Purpose of this Plan ................................................................................. 5

    C.    Deadlines for Objecting to this Plan; Date of Plan Confirmation Hearing. ..........5

        1.    Time and Place of the Plan Confirmation Hearing. ...................................... 6

        2.    Deadline for Objecting to the Confirmation of this Plan. ........................... 6

    D.    Identity of Persons to Contact for More Information Regarding this Plan. ............6

II.    BACKGROUND ..................................................................................................... 7

    A.    Description and History of the Debtors' Business and the Debtors' Sale Process which Led to the Filing of the Debtors' Chapter 11 Cases. .......................7

    B.    Events Leading To The Filing Of The Debtors' Chapter 11 Bankruptcies And The Debtors' Chapter 11 Goals. ....................................................... 9

    C.    The Asset Sale Process. ........................................................................ 12

    D.    The Radians APA. ................................................................................. 12

    E.    The Final DIP and Cash Collateral Order. ............................................ 13

    F.    The Auction and the Sale Closing. ....................................................... 15

    G.    Significant Events Which Have Occurred During the Bankruptcy Cases. ...........19

        1.    Formation of the Official Committee of Unsecured Creditors (the "OCUC"). ............................................................................................... 19

        2.    Formation of the Official Committee of Equity Security Holders (the "OCEH"). ............................................................................................... 19

        3.    Operational Issues. ................................................................................ 20

        4.    Administrative Matters.......................................................................... 22

        5.    Employment of Professionals................................................................ 23

        6.    Executory Contracts and Unexpired Leases.......................................... 24

        7.    The OCEH's Objection to the Radians' Claims and Lawsuit Against Radians. ................................................................................................ 24

i

III.    CLAIMS SUMMARY ................................................................. 24

    A.    Secured Claims. ............................................................. 24

    B.    Administrative Claims. .................................................. 25

    C.    Pre-Petition Priority Wage Claims. ............................... 25

    D.    Pre-Petition Priority Tax Claims. .................................. 26

    E.    General Unsecured Claims. ............................................ 26

IV.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................. 29

    A.    What Creditors and Shareholders Will Receive Under this Plan. .......................... 29

    B.    Unclassified Claims. ...................................................... 29

        1.    Administrative Expenses. ...................................... 29

        2.    Priority Tax Claims. ............................................... 32

    C.    Classified Claims and Interests. ..................................... 33

        1.    Classes of Secured Claims .................................... 33

        2.    Class of Priority Unsecured Claims. ..................... 33

        3.    Class of General Unsecured Claims – Class 1. ....... 34

        4.    Class of Shareholders – Class 2 ............................ 38

V.    MEANS OF EFFECTUATING THIS PLAN AND IMPLEMENTATION OF THIS PLAN. .................. 41

    A.    Funding for this Plan. .................................................... 41

    B.    Effective Date Resignation of the Management and Board of Directors of the Debtors. ................. 41

    C.    Dissolution of the OCUC. ............................................. 42

    D.    Dissolution of the OCEH. ............................................. 42

    E.    Dissolution of the Debtors. ............................................ 42

    F.    Creation of the Trust. .................................................... 43

    G.    Appointment of Disbursing Agent. ............................... 43

    H.    Exemption from Transfer Taxes. ................................... 45

I.      Executory Contracts and Unexpired Leases..................................................... 46

J.      Changes in Rates Subject to Regulatory Commission Approval. ......................... 46

K.      Administrative Claims Bar Date. ....................................................................... 46

L.      Assignment of all Causes of Action, Including Avoidance Actions, to the Trust.. 48

M.      Objections to Claims. ........................................................................................ 49

VI.    THE TRUST ............................................................................................................ 50

A.      Transfer of Property to the Trust. ...................................................................... 50

B.      The Trust Agreement......................................................................................... 52

C.      Funding of the Trust. ......................................................................................... 52

D.      Management of the Liquidating Debtor by the Trustee and Primary
        Functions of the Trust........................................................................................ 52

E.      Operations of the Trust...................................................................................... 53

F.      Limitation of Liability of the Trustee and the Trust Board. ................................ 54

G.      Employment of Professionals By the Trustee and Payment of
        Professional Fees and Expenses By the Trustee Incurred after the
        Effective Date.................................................................................................... 55

VII.   PAYMENTS AND DISTRIBUTIONS IN GENERAL ................................................ 56

A.      Distribution Procedures & Reserve Provisions. ................................................. 56

B.      Delivery of Payments. ....................................................................................... 56

C.      Rounding. .......................................................................................................... 57

D.      Unclaimed Property........................................................................................... 57

VIII.  TAX CONSEQUENCES OF THIS PLAN ................................................................. 57

IX.    CONFIRMATION REQUIREMENTS AND PROCEDURES ...................................... 58

A.      Who May Vote to Accept/Reject this Plan......................................................... 59

B.      What Is an Allowed Claim/Interest. ................................................................... 59

C.      What Is an Impaired Claim/Interest. .................................................................. 59

D.      Who Is Not Entitled to Vote............................................................................... 60

E.     Treatment of Non-Accepting Classes..................................................60

F.     Request for Confirmation Without Any Voting on this Plan...............61

G.     Liquidation Analysis. .........................................................................61

H.     Feasibility. ...........................................................................................63

X.     RISK FACTORS REGARDING THIS PLAN ...........................................64

XI.     EFFECT OF CONFIRMATION OF THIS PLAN .....................................64

A.     Retention of Jurisdiction......................................................................64

B.     Discharge. ............................................................................................66

C.     Binding Effect of Plan. ........................................................................66

D.     Revesting of Property Free and Clear. .................................................66

E.     Exculpations and Releases. ..................................................................67

F.     Injunctions. ..........................................................................................67

G.     Modification of this Plan. .....................................................................68

H.     Post-Confirmation Status Reports. .......................................................68

I.     Post-Confirmation Conversion/Dismissal. ...........................................69

J.     Final Decrees. .......................................................................................69

XII.     MISCELLANEOUS ...................................................................................69

A.     Severability of Plan Provisions. ..........................................................69

B.     Governing Law and Headings. .............................................................70

C.     Language Interpretation........................................................................70

D.     Exhibits.................................................................................................70

E.     Notices. .................................................................................................71

F.     Computation of Time Periods. ..............................................................72

G.     Defects, Omissions and Amendments...................................................72

H.     Filing of Additional Documents............................................................72

I.     Successors and Assigns. ........................................................................72

iv

J.      Successors and Assigns. ................................................................................73

K.      Implementation.................................................................................................73

L.      Certain Actions. ...............................................................................................73

M.      Waiver of Ten (10) Day Stay. .........................................................................74

## I.  INTRODUCTION

ICPW Liquidation Corporation, a California corporation, formerly known as Ironclad Performance Wear Corporation, a California corporation ("ICPW California"), and ICPW Liquidation Corporation, a Nevada corporation, formerly known as Ironclad Performance Wear Corporation, a Nevada corporation ("ICPW Nevada" and collectively with ICPW California, the "Debtors") are the Debtors in pending chapter 11 bankruptcy cases.  The Debtors filed voluntary petitions under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on September 8, 2017 (the "Petition Date").

Chapter 11 allows the Debtors, and, under some circumstances, creditors and other parties in interest, to propose a plan of liquidation.  This document is the Joint Plan of Liquidation Dated December ___, 2017 ("Plan") that is being jointly proposed by the Debtors and the Official Committee of Equity Security Holders (the "OCEH").

The effective date of this Plan (the "Effective Date") will be the first business day which is at least fifteen days following the date of entry of the Court order confirming this Plan (the "Plan Confirmation Order") and the satisfaction or waiver by the Debtors and the OCEH of all of the following conditions to the effectiveness of this Plan: (a) there shall not be any stay in effect with respect to the Plan Confirmation Order; (b) the Plan Confirmation Order shall not be subject to any appeal or rehearing; and (c) this Plan and all documents, instruments and agreements to be executed in connection with this Plan shall have been executed and delivered by all parties to such documents, instruments and agreements.  Following the Effective Date, the Debtors will be referred to herein as the "Liquidating Debtor."

The Debtors and the OCEH (collectively, the "Plan Proponents") believe that this Plan represents the optimal outcome for these chapter 11 bankruptcy cases (the "Cases").  Any allowed pre-petition claims (the "Allowed Claims") in these bankruptcy estates (the "Estates") that are not

paid prior to Plan confirmation will be paid in full on the Effective Date and are therefore deemed not impaired and are not required to vote on this Plan because they are conclusively presumed to have accepted this Plan, and solicitation of acceptances to this Plan from such claim holders is not required, pursuant to § 1126(f) of the Bankruptcy Code.

After all allowed post-bankruptcy claims have been paid in full, and appropriate reserves have been made for disputed claims and to fund post-confirmation litigation and other expenses (as further explained below), the balance of the funds in the Estates will be distributed to the record shareholders of the Nevada corporation (the "Shareholders" - as determined at the end of the day on the date of the Plan confirmation hearing at which the Court confirms the Plan (the "Plan Confirmation Hearing").

A trust (the "Trust") is being established under this Plan.  On the Effective Date, the Debtors and the trustee of the Trust (the "Trustee") will enter into a related trust agreement (the "Trust Agreement") for the benefit of the Shareholders.  The Trustee  will, among other things, investigate and, if appropriate, pursue all claims and causes of action that belong to the Estates and are assigned to the Trust for the benefit of the Shareholders. The Plan Proponents believe that Shareholders are not impaired under this Plan. Therefore, they are not required to vote on this Plan because they are conclusively presumed to have accepted this Plan, and solicitation of acceptances to this Plan from the Shareholders is not required, pursuant to § 1126(f) of the Bankruptcy Code.  Further information about the Trust, the Trustee and the projected distribution to Shareholders is described below.

**A.    Disclaimer**.

THE INFORMATION CONTAINED IN THIS PLAN IS INCLUDED HEREIN FOR PURPOSES OF DESCRIBING TREATMENT UNDER THIS PLAN. THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN

TO DESCRIBE TREATMENT UNDER AND TERMS OF THIS PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THIS PLAN, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS PLAN.

ALL CREDITORS, SHAREHOLDERS AND PARTIES IN INTEREST ARE ADVISED AND ENCOURAGED TO READ THIS PLAN IN ITS ENTIRETY.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THIS PLAN AND THE EXHIBITS ANNEXED TO THIS PLAN. THE STATEMENTS CONTAINED IN THIS PLAN ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. ANY ESTIMATES OF CLAIMS AND INTERESTS SET FORTH IN THIS PLAN MAY VARY FROM THE AMOUNTS OF CLAIMS AND INTERESTS ULTIMATELY ALLOWED BY THE COURT.

THE FINANCIAL DATA RELIED UPON IN FORMULATING THIS PLAN IS BASED ON THE DEBTORS' BOOKS AND RECORDS WHICH, UNLESS OTHERWISE INDICATED, ARE UNAUDITED.  **THE INFORMATION AND STATEMENTS CONTAINED IN THIS PLAN, INCLUDING, WITHOUT LIMITATION, INFORMATION ABOUT THE DEBTORS, THEIR FORMER BUSINESS AND THEIR BANKRUPTCY ESTATES AND ASSETS, HAVE BEEN PROVIDED SOLELY BY THE DEBTORS, AND SUCH INFORMATION HAS NOT BEEN INDEPENDENTLY VERIFIED OR AUDITED BY ANY OTHER PARTY.**

**B.      Purpose of this Plan.**

This Plan summarizes what is in this Plan and tells you certain information relating to this Plan and the process the Court follows in determining whether or not to confirm this Plan.

## READ THIS PLAN CAREFULLY IF YOU WANT TO KNOW ABOUT:

**(1)      WHAT THE TREATMENT OF YOUR CLAIM IS (*i.e.*, what your claim will receive if this Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS;**

**(2)      THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR BANKRUPTCY CASES;**

**(3)      THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THIS PLAN;**

**(4)      THE EFFECT OF PLAN CONFIRMATION; AND**

**(5)      WHETHER THIS PLAN IS FEASIBLE.**

This Plan cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read this Plan and the Trust (for Shareholders) in their entirety.  If there are any inconsistencies between this Plan and the Trust, the Trust provisions will govern.

**C.      Deadlines for Objecting to this Plan; Date of Plan Confirmation Hearing.**

THE COURT HAS NOT YET CONFIRMED THIS PLAN.  IN OTHER WORDS, THE TERMS OF THIS PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THIS PLAN, THEN THIS PLAN WILL BE BINDING ON ALL CREDITORS AND SHAREHOLDERS IN THE CASES.

**1.    Time and Place of the Plan Confirmation Hearing.**

The Plan Confirmation Hearing will take place on _____, 2018, at __:00 a.m., before the Honorable Martin R. Barash, United States Bankruptcy Judge for the Central District of California, San Fernando Valley Division, in Courtroom 303, located at 21041 Burbank Blvd., Woodland Hills, California.

**2.    Deadline for Objecting to the Confirmation of this Plan.**

Objections to the confirmation of this Plan must, by _____, 2018, be filed with the Court and served by same day service upon counsel to the Debtors – Ron Bender, Esq. and Krikor Meshefejian, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, fax: (310) 229-1244, email: rb@lnbyb.com; kjm@lnbyb.com, and upon counsel to the OCEH – Sam R. Maizel, Esq. and Tania M. Moyron, Esq., Dentons US LLP, 601 South Figueroa Street, Suite 2500, Los Angeles, California 90017-5704, fax (213) 623-9924, email: samuel.maizel@dentons.com; tania.moyron@dentons.com.

**D.    Identity of Persons to Contact for More Information Regarding this Plan.**

Any interested party desiring further information about this Plan should contact counsel to the Debtors – Ron Bender, Esq. or Krikor Meshefejian, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, fax: (310) 229-1244, email: rb@lnbyb.com; kjm@lnbyb.com, or counsel to the OCEH – Samuel R. Maizel, Esq. or Tania M. Moyron, Esq., Dentons US LLP, 601 South Figueroa Street, Suite 2500, Los Angeles, California 90017-5704, fax (213) 623-9924, email: samuel.maizel@dentons.com; tania.moyron@dentons.com.

/ / /

/ / /

/ / /

## II.    BACKGROUND

**A.    Description and History of the Debtors' Business and the Debtors' Sale Process which Led to the Filing of the Debtors' Chapter 11 Cases.**

On the Petition Date of September 8, 2017, the Debtors each filed a Voluntary Petition under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have operated their business and managed their affairs as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. With the Court's approval, the Debtors' two chapter 11 Cases are being jointly administered. Other than owning all of the shares in the California entity, the Nevada entity had no business. All operations of the Debtors effectively functioned through the California entity.

Until the recently consummated sale of substantially all of their assets (discussed in detail below), the Debtors were a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas ("O&G"), automotive, the sporting goods, military, police, fire, and first-responder. The Debtors' business was headquartered in Farmers Branch, Texas. The Nevada entity is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW". As of April 7, 2017, Ironclad Nevada had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding. As of August 30, 2017, the Debtors had approximately 41 full time employees, with 9 of these employees working overseas. The Debtors effectively terminated all of their employees upon the closing of the Debtors' recent sale of its business and nearly all of the Debtors' former employees were hired by the buyer.

The Ironclad business was founded in 1998 by Ed Jaeger. Mr. Jaeger was inspired to build gloves that offered protection and performance without sacrificing one for the other. From

the beginning, the Debtors built gloves using materials that offered excellent fit to make them an extension of the hand and to make jobs easier for the "industrial athlete".  By 2006, the Debtors offered 35 different task-specific glove types for people wearing gloves as part of their daily jobs.

In 2008, the Debtors launched the KONG (King of Oil 'N' Gas) line to address the high number of hand injuries in the O&G field.  By 2010, the KONG line was comprised of 46 different gloves.  Additionally, the Debtors expanded their presence in the retail and non-professional markets with the launch of the EXO brand in June 2015.  EXO offered lower cost gloves for automotive, DIY, and outdoor sporting applications.  The Debtors offered 30 different EXO glove types.

The Debtors' task-specific technical glove products were specially designed for individual user groups.  The Debtors offered over 160 distinct types of gloves for a variety of markets, including industrial, construction, DIY, carpentry, machining, package handling, plumbing, welding, roofing, O&G, mechanics, hunting, and gardening.  Products came in a multitude of colors and catered to the specific demands and requirements of the users based on ease of motion, grip, water and chemical resistance, visibility, and protection from abrasions, cuts, flames, impacts, temperature, and vibration.  Since inception, the Debtors employed an internal research and development ("R&D") department responsible for identifying and creating new products and applications, and improving and enhancing existing products.  The Debtors continually evaluated new base materials for gloves, and grip was another key area of focus for R&D.  The Debtors often partnered with industry-leading organizations to develop new products.  The Debtors had 13 U.S. patents issued and 11 foreign patents, as well as five pending U.S. patent applications and several pending foreign patent applications.  The Debtors also used trademarks to strengthen and protect their recognizable brand names.  The Debtors owned 52 registered U.S. trademarks, 39

registered international trademarks, and 13 and 43 trademarks pending in the U.S. and internationally, respectively.

The Debtors sold their product through approximately 10,000 outlets for professional tradesmen as well as "Big Box", hardware, auto parts, and sporting goods retailers. The sales force was organized by 3 business segments: Industrial, Retail, and International. Glove products were manufactured by multiple suppliers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia.

**B.    Events Leading To The Filing Of The Debtors' Chapter 11 Bankruptcies And The Debtors' Chapter 11 Goals.**

Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations became insufficient beginning in mid-2013 to support their business operations as well as their continued growth. There were many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or ineffective expansion and distribution of all of their product lines and development of new customers, and higher than anticipated administrative production, manufacturing and warehousing costs. In addition, it was discovered in early-2017 that under then management, the Debtors had failed to provide materially complete and accurate financial statements as required under their loan documents to their primary secured lender for the fiscal years ended December 31, 2015 and 2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017. These same financial irregularities were also publicly filed and disclosed through the Company's SEC and other public filings. The Plan Proponents understand that an investigation of the foregoing may now underway by federal authorities. As a result of this discovery, the Debtors' then chief executive officer and other officers voluntarily resigned, and L. Geoffrey Greulich was employed as the Debtors' new chief executive officer effective July 6, 2017. Prior

to assuming this position, Mr. Greulich had no prior connection or relationship with the Debtors as an insider, equity holder or otherwise.  As a Senior Advisor, Operations at Corridor Capital, LLC, where he leads operations through portfolio engagement as well as conducting due diligence, Mr. Greulich was highly qualified to serve as the Debtors' new chief executive officer, and, as indicated below, did and is continuing to do an extraordinary job for the Debtors during their Cases.

The Debtors filed the Cases to consummate a sale of substantially all of their assets (excluding cash, causes of action and other assets) for the most money possible.  Just prior to their chapter 11 bankruptcy filings, the Debtors entered into an asset purchase agreement (the "Radians APA") with the Debtors' then pre-petition secured creditor, Radians Wareham Holdings, Inc. ("Radians"), for a cash purchase price of $20 million or $15 million, subject to an overbid process.  Radians agreed to pay a cash purchase price of either $15 million or $20 million depending upon the occurrence of an event that was sensitive and the letter agreement describing such event was the subject of a motion to file under seal.  Radians had acquired the Debtors' secured bank debt several months before the Petition Date.  The Plan Proponents believe that Radians did this with the goal of acquiring the Debtors' business – either consensually or through a hostile manner.

The Debtors' business was actively marketed for sale for a number of months prior to the Debtors' bankruptcy filings by the Debtors' financial advisor/investment banker – Craig Hallum Capital Group LLC ("C-H").  Prospective buyers were provided with the opportunity to purchase assets or equity.  While a number of prospective buyers expressed pre-petition interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-bankruptcy marketing process because (i) the Debtors were out of funds, (ii) the Debtors could not continue to operate without both access to their own cash receipts as well as receipt of

additional financing, and (iii) Radians (which as described above was also the Debtors' secured creditor having purchased the Debtors' pre-bankruptcy secured bank debt) had exercised its secured creditor rights and was sweeping all of the Debtors' cash and was no longer willing to continue to forbear or advance additional needed financing to the Debtors absent a global resolution with the Debtors which was accomplished with the Radians APA and the DIP financing agreement the Debtors entered into with Radians (discussed more below).

The purchase offer provided to the Debtors by Radians was determined by the Board to be the best offer the Debtors had received by the Petition Date, and Radians was ready to proceed with its purchase and lend the Debtors sufficient funds to enable the Debtors to operate their business through a bankruptcy auction to take place in late October, 2017, with a sale closing to occur shortly thereafter.  Consistent with the Bankruptcy Code, Radians permitted the Debtors to proceed with a robust post-bankruptcy marketing and overbid process (and corresponding auction – defined below as the "Auction") to insure that the highest and best price was paid for the Debtors' assets.  Given the breadth of the Debtors' pre-bankruptcy marketing process and the fact that C-H, the Debtors' pre-bankruptcy investment banker/financial advisor (who was already very familiar with the various likely prospective overbidders) would be serving as the Debtors' post-bankruptcy investment banker/financial advisor and leading the overbid sale process, and the fact that the likely overbidders were already deep into the due diligence process, the Debtors were confident that providing prospective overbidders with approximately six weeks to decide whether to participate in the Auction was a sufficient amount of time for the Debtors to achieve the highest and best price for their assets.  Also, and very importantly, if not for the recent closing of the Debtors' sale of their assets, the Debtors' financial needs would have expanded significantly during the last two months of the year, as have been the normal business cycle for the Company, so if the Debtors were required to continue to operate their business through the end of the year or

11

significantly beyond October 31, 2017, the Debtors borrowing needs would likely have increased significantly, and, even if the Debtors were able to obtain the necessary post-petition financing (which was not at all clear), any such additional borrowing (and the costs of such additional borrowing) would have reduced the ultimate recovery for the Debtors' Shareholders on a dollar-for-dollar basis.  It was for these reasons that it was very important that the Debtors were able to implement their proposed sale timeline.

**C.      The Asset Sale Process.**

At a continued hearing held on September 25, 2017, the Court granted the Debtors' bid procedures motion by order entered on September 28, 2017 as Docket Number 71 (the "Bidding Procedures Order").  The Bidding Procedures Order was approved by the Debtors, Radians,  the Official Committee of Unsecured Creditors (the "OCUC") and the OCEH.  Both the OCUC and the OCEH hired counsel and a financial advisor (although both the Debtors and the OCEH opposed the employment of a financial advisor to the OCUC since creditors were being paid in full).  The Bidding Procedures Order explained to prospective overbidders how a prospective overbidder becomes qualified to participate in the Auction and how the Auction would proceed in the event that there was one or more qualified overbidders.  In addition, C-H had established an extensive data room for prospective overbidders to obtain diligence information, and the Debtors' senior management had made themselves available to meet with prospective overbidders and provide management presentations.  To assist in the overbid process, the Debtors' counsel prepared an asset purchase agreement template for prospective overbidders to use if they wanted, and delivered that template to C-H to distribute to prospective overbidders.

**D.      The Radians APA.**

The Radians APA was the result of extensive pre-bankruptcy negotiations and documentation between the Debtors and Radians.  Under the Radians APA, Radians had agreed

to purchase the vast majority of the Debtors' assets for the cash purchase price of $20 million or $15 million depending upon the occurrence of an event that is described in a letter agreement that was the subject of a motion to file under seal. Radians provided the Debtors with a $1 million deposit which was held in a trust account by the Debtors' bankruptcy counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"). At the time of the Debtors' bankruptcy filings, Radians' outstanding secured debt was in the amount of approximately $3.5 million. The Debtors borrowed a total of $1.1 million post-petition from Radians in accordance with the terms of the Final DIP Order (defined below). Radians agreed to make a severance payment to each of the Debtors' employees who were not offered employment by Radians, other than the Debtors' officers and any employee subject to an employee retention agreement, at comparable terms to their then employment with the Debtors, with each such severance payment to be consistent with the most generous current severance policy of Radians for similarly situated employees. Radians was provided with the right to designate which of the Debtors' executory contracts and unexpired leases that it wished to assume with the payment of all related cure amounts to be the responsibility of Radians.

**E.      The Final DIP and Cash Collateral Order.**

On October 6, 2017, as docket number 87, the Court entered the *Final Order: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 And 364, And (B) Utilize Cash Collateral Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; And (III) Granting Related Relief* (the "Final DIP Order"). The Debtors had obtained interim use of cash collateral and DIP financing on an emergency basis pending entry of the Final DIP Order pursuant to an order entered on September 13, 2017 as docket number 31, and then further interim use pursuant to a second order entered on September 27, 2017 as docket number 70. The Final

DIP Order as well as the preceding interim cash collateral/dip financing orders were critical to the Debtors' ability to continue to operate their business post-bankruptcy and to have the necessary funding to do so. An important component to the Final DIP Order negotiated between the OCUC and the OCEH, on the one hand, and Radians, on the other hand, is the "Challenge Rights of Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders" (the "Challenge Rights"). Per the terms of the Final DIP Order, the parties agreed that on or before the date that is sixty days from the date of entry of the Final DIP Order (*i.e.*, December 5, 2017 – the "Lookback Period"), the OCUC and the OCEH have standing individually and on behalf of the Estates to object to, challenge, or seek to avoid the amount, validity, or enforceability of Radians' pre-bankruptcy secured debt (or any portion thereof) or any of the liens and security interests created under the Radians' pre-bankruptcy secured debt and to bring any other claim that they have against Radians, individually or on behalf of the Estates (separately and collectively, a "Challenge"). If no such action, objection or other Challenge is commenced by either the OCUC or the OCEH within the Lookback Period, then the Radians' pre-bankruptcy secured debt will be deemed and adjudicated finally and indefeasibly as valid and enforceable, the liens and security interests created under the Radians' pre-bankruptcy secured debt will be deemed and adjudicated finally and indefeasibly as valid, enforceable and perfected liens and security interests in that collateral, and any affirmative claim(s) or cause(s) of action of any kind against Radians with respect to the Radians' pre-bankruptcy secured debt, or otherwise, and the liens and security interests securing the Radians' pre-bankruptcy secured debt, or any payment received by Radians will be forever barred. As provided in the Final DIP Order, the Debtors have waived and released, and shall be forever barred from asserting, any right to object to, challenge or seek to avoid, the amount, validity, or enforceability of the Radians' pre-bankruptcy secured debt or the liens and security interests in the collateral securing the Radians'

pre-bankruptcy secured debt.  Except as otherwise may have been determined by the Court in the

proceedings referenced above, and subject to further order of the Court, in the event any payment

made to, or other amount or value received by Radians from or for the account of any of the

Debtors is avoided, rescinded, set aside or must otherwise be returned or repaid by Radians,

whether in the Cases or any other proceedings, the indebtedness repaid shall be allowed as a claim

in accordance with existing law. Any of Radians' claims, liens, rights, and remedies under the

Radians loan documents which survive such action shall be reinstated and fully preserved.  As

explained below, in accordance with the Sale Order, the full amount of the Radians' secured debt plus

the $500,000 Breakup Fee owing to Radians has already been paid in full.  Since it is now clear that all

allowed claims will be paid in full, it is only the Shareholders that would be affected by any recovery

obtained from Radians.  As a result, the OCEH is handling the Challenge analysis.

**F.      The Auction and the Sale Closing.**

Pursuant to the Bidding Procedures Order, the Auction was scheduled to be held before

the Court on October 30, 2017, at 10:00 a.m.  Approximately 20 prospective overbidders signed

NDA's and accessed the data room.  Many of them spent extensive time in the data room and

with C-H and the Debtors' management team.  The Debtors' management team provided multiple

management presentations to prospective overbidders.  Prior to the Auction, the Debtors filed a

declaration of Steve Rickman of C-H, who is the Managing Director of Investment Banking

Mergers and Acquisitions at C-H and who served as the lead professional at C-H providing

services on this engagement, in which Mr. Rickman declared that he believed that serious

prospective overbidders were well informed as to the overbid opportunity and the impending

Auction process, and that he was not aware of any serious prospective overbidder who did not

comply with the requirements to be eligible to participate in the Auction because they did not

have access to sufficient information or required additional time.

In order to become qualified to participate in the Auction, prospective overbidders were required to do each of the following three things: (1) deliver a $1 million deposit to a segregated trust account maintained by LNBYB which would be non-refundable if the prospective overbidder was the winning bidder at the Auction; (2) deliver a redlined version of the Radians APA showing the prospective overbidder's proposed changes to the Radians APA; and (3) be determined to be financially qualified by C-H to fund the transaction without any further financing or due diligence contingency. Two prospective overbidders satisfied all three requirements, consisting of Brighton-Best International, Inc. ("BBI") and Protective Industrial Products, Inc. ("PIP"). This sale process was an extremely fluid process as there were a number of constantly moving parts.

As a result, between Radians (as the stalking horse bidder) and BBI and PIP (as prospective overbidders), there were three qualified bidders at the Auction. The Auction was an extraordinary success. Through great efforts by Mr. Greulich and LNBYB, the Debtors were able to satisfy the condition referenced in the side letter filed under seal which required Radians to commence the Auction with an opening bid of $20 million instead of $15 million. Thus, before any overbid was even submitted, the sale price had already increased by $5 million. After very robust bidding by BBI and PIP (Radians never submitted any overbid beyond its initial $20 million opening bid), BBI was determined to be the winning bidder at the Auction with a purchase price of $25,250,000, and PIP consented to be a backup bidder with a backup purchase price of $25,000,000. The final form of the sale order and the final form of the APA with BBI were heavily negotiated and agreed to by the Debtors, BBI, the OCUC and the OCEH, and the Court entered the final form of the sale order on November 3, 2017, as docket number 177 (the "Sale Order"), after conducting two follow-up hearings on the Sale Order on November 1, 2017, and then again on November 3, 2017.

The sale to BBI closed on November 14, 2017 (the "Sale Closing").  In connection with the Sale Closing, after taking into account various deposits and pro rations, BBI wire transferred a Sale Closing payment of $25,328,919, which is in addition to the $1,000,000 deposit that BBI had provided to the Debtors in advance of the Auction (the "BBI Deposit") and is inclusive of the $820,000 "Supplemental Payment" which, pursuant to the Sale Order, is to be maintained by LNBYB (the "Escrow Agent") at First Republic Bank in a segregated trust account separate from the balance of the sale proceeds pending further order of the Court.  In connection with the Sale Closing, a payment in the amount of $180,000 was made to Grainger to compensate Grainger for what all of the parties agreed was the minimum amount owing to Grainger.  The $820,000 Supplemental Payment from BBI is to provide a source of funding of any further payment that will be owing to Grainger as a result of the Debtors' rejection of their two supplier agreements with the Grainger entities (Grainger Global Sourcing a division of Grainger International, Inc. ("GGS") and W.W. Grainger, Inc. ("Grainger")). BBI had the opportunity to take an assignment of the Debtors' supplier agreements with GGS and Grainger, but BBI decided that it did not want to do so, and the Sale Order provides for the Debtors' supplier agreements with GGS and Grainger to be rejected (with the Debtors and BBI to work together in an effort to minimize any rejection damage claim in favor of GGS and Grainger).  In the event that GGS and Grainger end up with allowed rejection damage claims in excess of the $180,000 that was paid to the Grainger entities in connection with the Sale Closing but not more than $1 million, the excess will be paid to the Grainger entities out of the $820,000 Supplemental Payment with any remaining balance to be returned to BBI.  In the event that GGS and Grainger end up with allowed rejection damage claims in excess of $1 million (which the Debtors do not believe will be the case), the entire $820,000 Supplemental Payment will be paid to the Grainger entities, and the Debtors will be liable for any amount owing to the Grainger entities in excess of $1 million.

17

After adding in the BBI Deposit and deducting the Supplemental Payment, a total of $25,511,469 of sale proceeds was deposited into the segregated trust account (the "Trust Account") maintained by the Escrow Agent.

In accordance with the Sale Order, all of the following "Designated Cure Amounts" were paid by the Escrow Agent out of the Trust Account:

Nantong Changbang Gloves Co. - $1,228,307.56

Woneel Midas Leathers - $785,358.50

Mercindo Global Manufaktur - $444,674.64

Marusan – Mimasu Tshusho Co. Ltd. - $382,811.28

Grainger - $180,000.00

Advantage Media Services - $178,522.75

PT JJ Gloves Indo - $162,917.76

PT Sport Glove Indonesia - $144,238.66

Windspeed Sports Shanghai Co., Ltd. - $152,830.45[3]

Ka Hung Glove Industrial Co. Ltd. - $38,934.90

Synetra - $37,972.33

AML United Limited - $28,330.56

1920 Hutton Court - $13,257.09

PT Seok HWA Indonesia - $13,174.86

Design Gallery (Pvt.) Ltd. - $12,801.60

Desun Garments, Ltd. - $7,691.75

Konica Minolta - $1,152.31

---

[3] This figure was $144,198.43 in the Sale Order but was increased to $152,830.45 pursuant to an order of the Court entered on November 13, 2017, as Docket Number 207.

Pitney Bowes - $452.99

Also in accordance with the Sale Order, the Escrow Agent paid out of the Trust Account to secured creditor Radians the "Radians Payoff Amount," plus the Breakup Fee of $500,000.00, which amounted to a total payment of $5,343,988.19.

After taking into account all of the foregoing (and excluding the Supplemental Payment), there is a current remaining balance in the Trust Account of $16,354,050.82 (the "Remaining Estate Funds"), which will continue to be maintained in the Trust Account by LNBYB, as Escrow Agent, pending further order of the Court and the entry of the Plan Confirmation Order. All of the Remaining Estate Funds are unencumbered.

**G.    Significant Events Which Have Occurred During the Bankruptcy Cases.**

The following is a list of many of the significant events which have occurred during the Cases beyond that set forth above:

**1.    Formation of the Official Committee of Unsecured Creditors (the "OCUC").**

The United States Trustee (the "UST") formed the OCUC at the very outset of the Cases to represent the interests of general unsecured creditors. The OCUC was composed of the following three members: Resources Global Professionals, Winspeed Sports (Shanghai) Co., Ltd. and PT Sports Glove Indonesia. As indicated above, both Windspeed Sports Shanghai Co., Ltd. and PT Sport Glove Indonesia were paid in full in connection with the Sale Closing, leaving Resources Global Professionals as the sole remaining member of the OCUC. The OCUC employed Brown Rudnick LLP as its counsel, and the OCUC employed Province, Inc. as its financial advisor.

**2.    Formation of the Official Committee of Equity Security Holders (the "OCEH").**

Also at the very outset of the Cases, the UST formed the OCEH to represent the interests of the equity holders of ICPW Nevada (i.e., the "Shareholders"). The OCEH is composed of the

following three members: Scott Jarus, Ron Chez and Patrick O'Brien. The OCEH employed Dentons US LLP as its counsel, and the OCEH employed Michael D. Schwarzmann as its financial advisor.

### 3.    Operational Issues.

#### i.    Use of Cash Collateral and Post-Petition Borrowing.

In order for the Debtors to continue to operate their business and manage the Estates through the Auction process and Sale Closing, the Debtors had to be able to use their cash and post-petition operating revenue, and the Debtors had to be able to borrow a sufficient amount of additional money to fund their projected post-petition cash flow shortfalls. As explained above, Radians was the Debtors' secured creditor at the time of the Debtors' bankruptcy filings. Concurrently with entering into the Radians APA with the Debtors' just prior to the Debtors' bankruptcy filings, Radians entered into a cash collateral/dip financing agreement with the Debtors pursuant to which Radians consented to the Debtors' use of cash collateral, and Radians agreed to lend the Debtors up to $1.5 million of post-petition financing. The Debtors ultimately borrowed only $1.1 million post-petition from Radians. The entire Radians secured debt was paid in full in connection with the Sale Closing.

#### ii.    Emergency Motion to Jointly Administer the Debtors' chapter 11 Cases.

At the commencement of the Cases, the Debtors filed emergency motions for authority to jointly administer the Cases. On September 12, 2017, the Court granted the Debtors' emergency joint administration motions pursuant to docket number 7 in the Nevada case and docket number 25 in the California case.

#### iii.    Emergency Motion to Pay the Debtors' Pre-Petition Priority Wages

**and Related Employee Expenses.**

At the commencement of the Cases, the Debtors filed an emergency motion for authority to pay the Debtors' pre-petition priority wages and related benefits in the ordinary course of business to avoid the disruption to the Debtors' business from failing to do so. The Court granted the Debtors' emergency wage motion pursuant to an ordered entered on September 13, 2017 as docket number 29.

        **iv.**        **Emergency Motion to Provide Adequate Assurance of Payment to the Debtor's Utilities.**

At the commencement of the Cases, the Debtors filed an emergency motion for an order authorizing the Debtors to provide adequate assurance of future payment to certain utility companies pursuant to § 366(c) of the Bankruptcy Code. The Court granted the Debtors' emergency utilities motion pursuant to an ordered entered on September 13, 2017 as docket number 30.

        **v.**        **Emergency Motion to Maintain Cash Management Systems.**

At the commencement of the Cases, the Debtors filed an emergency motion for authority to maintain their cash management systems, which was imperative to avoid significant disruption to the Debtors' business operations. The Court granted the Debtors' emergency cash management systems motion pursuant to an ordered entered on September 14, 2017 as docket number 36.

        **vi.**        **Pre-Petition Claims Bar Date.**

The Court established a claims bar date of October 20, 2017 as the last day for creditors to file pre-petition claims against the Debtors pursuant to an ordered entered on September 14, 2017 as docket number 37.

vii.      **Motion to Honor Pre-Petition and Post-Petition Employee Bonus Incentive Agreements.**

Both prior to the commencement of the Cases and following the commencement of the Cases, the Debtors negotiated various performance based bonus programs and targets with their key employees because their performance with the business and cooperation with the sale process were going to be crucial towards the successful consummation of the sale of the business to BBI and effectuate a smooth transaction of the business to BBI.  Pursuant to an order entered on November 17, 2017, as docket number 224, the Court authorized the Debtors to pay a total of $457,500 of employee bonuses on account of pre-bankruptcy employee bonus agreements, and the Court authorized the Debtors to pay a total of $52,500 of employee bonuses on account of post-bankruptcy employee bonus agreements for a total amount of employee bonuses of $510,000, all of which were paid in connection with the Sale Closing.

viii.      **Debtors' Name Change Following the Sale Closing.**

As part of the Debtors' sale agreement with BBI, the Debtors were required to effectuate a name change following the Sale Closing.  Pursuant to an order entered on November 15, 2017, as docket number 218, the Court authorized the Debtors to effectuate a change of their corporate name to ICPW Liquidation Corporation without further action by the Debtors' boards of directors or Shareholders.

4.      **Administrative Matters.**

The Debtors were required to address the various administrative matters attendant to the commencement of the Cases, which required an extensive amount of work by the Debtors' employees and management and their bankruptcy counsel, LNBYB.  These matters included the preparation of the Debtors' Schedules of Assets and Liabilities and Statement of Financial Affairs and the UST compliance package.  The Debtors have subsequently filed a number of amendments

to their bankruptcy schedules.  The Debtors have made every effort to comply with their duties under 11 U.S.C. §§ 521, 1106 and 1107 and all applicable UST guidelines, including the filing of the Debtors' monthly operating reports.  The Debtors attended their initial interview with the UST and the meeting of creditors required under 11 U.S.C. § 341(a).

### 5.    **Employment of Professionals.**

A total of seven professionals have been employed in the Cases.  The Debtors have employed three professionals: LNBYB as their bankruptcy counsel; Stubbs Alderton & Markiles, LLP as their special corporate and securities, special trademark, and special litigation counsel; and Craig Hallum Capital Group LLC as their financial advisor.  The OCEH has employed two professionals: Dentons US LLP as its bankruptcy counsel and Michael D. Schwarzmann as its financial advisor.  The OCUC has employed two professionals: Brown Rudnick LLP as its bankruptcy counsel and Province, Inc. as its financial advisor. The Debtors have filed an application to employ BPE&H An Accountancy Corporation as the Debtors' certified public accountant to, among other things, (i) analyze the 2015 federal and state tax returns and determine whether they need to be amended, (ii) prepare and file the Debtors' 2016 federal and state tax returns, (iii) prepare an estimate of whether any taxes are owing in 2017 resulting from the Debtors' asset sale to BBI and, if so, how much. The Trust will have the responsibility of preparing the 2017 and 2018 tax returns for the Debtors as well as any tax returns that the Trust itself may be required to file.

The OCEH will be filing an application to employ Solomon & Cramer LLP as special litigation counsel to handle certain litigation matters for the OCEH prior to the Effective Date and to handle certain litigation for the Trust after the Effective Date.

The Debtors advised parties that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") has provided post-petition legal services to the Debtors and/or the independent board of directors of the Debtors which served as Skadden's pre-petition client. As of the date of this Plan, the Debtors have not yet filed an application to employ Skadden with the Court. The Debtors believe that the post-petition fees incurred by Skadden exceed the amount of post-petition fees the Debtors authorized Skadden to incur, and the OCEH has advised the Debtors that the OCEH reserves its right to oppose any such employment application filed by the Debtors.

**6.    Executory Contracts and Unexpired Leases.**

In connection with the Sale Closing, BBI had the right to designate which executory contracts and which unexpired leases that BBI desired to take an assignment of, and all of those designated executory contracts and unexpired leases were deemed assumed by the Debtors and assigned to BBI effective as of the Sale Closing. Pursuant to the Sale Order, all of the Debtors' executory contracts and unexpired leases that were not assumed and assigned to BBI were deemed rejected as of the Sale Closing, with the exception of the two supplier agreements with GGS and Grainger whose rejection can happen only following the entry of an order of the Court approving such rejection.

**7.    The OCEH's Objection to the Radians' Claims and Lawsuit Against Radians.**

On December 5, 2017, the OCEH fled an objection to Radians' claim and a lawsuit against Radians for (1) Duress, (2) Breach of the Covenant of Good Faith and Fair Dealing, (3) Unjust Enrichment, and (4) avoidance and recovery of property transfer (the "Radians Claim Objection and Lawsuit").

### III.    CLAIMS SUMMARY

**A.    Secured Claims.**

As a result of the fact that Radians was paid in full in connection with the Sale Closing,

**B.** **Administrative Claims.**

Separate and apart from the Remaining Estate Funds, as of the date of this Plan (*i.e.*, December __, 2017), the Debtors have approximately $_____ remaining in their debtor-in-possession accounts which the Debtors use to pay their operating expenses and costs of administering the Estates. In connection with the sale to BBI, the Debtors retained all of their cash, and the Debtors' used that cash to pay their non-professional fee administrative claims, consisting primarily of trade debt to vendors who extended post-bankruptcy trade debt to the Debtors. As of the date of this Plan, the Debtors are not aware of any outstanding non-professional fee administrative claims as the Debtors believe they have already paid all such non-professional fee administrative claims in full. The Debtors therefore currently believe that the only administrative claims left to be paid in the Cases will be the final outstanding allowed fees and expenses of the professionals employed in the Cases.

**C.** **Pre-Petition Priority Wage Claims.**

As explained above, the Debtors believe that they have paid in full all of their outstanding scheduled pre-petition priority wage claims and post-petition wage claims and that none of the Debtors' former employees are entitled to be paid any further money. Jeffrey Cordes and William Aisenberg ("Cordes and Aisenberg"), two former employees of the Debtors, each filed a priority wage claim in the amount of $12,850. As explained below, the Debtors and the OCEH have entered into the Cordes/Aisenberg Assignment Stipulation (defined below) pursuant to which the Debtors are seeking to assign to the OCEH all rights and standing of the Estates against Cordes and Aisenberg. As further explained below, the OCEH intends to file an objection to the claims filed by Cordes and Aisenberg against the Estates, and the OCEH intends to file an action against Cordes and Aisenberg.

**D.     Pre-Petition Priority Tax Claims.**

The Debtors' scheduled owing the following priority tax claims: $600 to the California Board of Equalization and $2,294 to the California Comptroller of Public Accounts.  The Internal Revenue Service filed claim no. 2 in the Nevada case asserting a priority tax claim in the amount of $2,000, and the Internal Revenue Service filed claim no. 3 in the California case asserting a secured claim in the amount of $30,725.49.

**E.     General Unsecured Claims.**

By paying the Designated Cure Amounts in connection with the Sale Closing, the vast majority of the Debtors' general unsecured debt has already been paid in full.  Attached hereto as Exhibit "1" is a detailed master claims chart (the "Claims Chart"), which shows all known claims in the Cases and their current status.  The Claims Chart contains thirteen columns. The far column to the left is the name of the respective creditor. The next column to the right indicates whether the creditor's claim was filed or scheduled as a claim against ICPW California, ICPW Nevada or both Debtors.  The next four columns to the right pertain to proofs of claim filed by the creditors, including the claim number, the amount of the claim asserted, and the priority of the asserted claim (*i.e.*, secured, priority or general unsecured). The next four columns to the right pertain to the claims that were scheduled by the Debtors, including the amount of the scheduled claim, the priority of the scheduled claim (*i.e.*, secured, priority or general unsecured), and whether the Debtors believe the claim to be contingent, unliquidated or disputed.  The next column to the right indicates the amount of a particular claim that was already paid out of the sale proceeds in accordance with Court order.   The next column to the right indicates the amount that each outstanding claim (or portion thereof) would be allowed at only if the claim is allowed in the amount scheduled by the Debtors (meaning that the Debtors are successful with all of their pending objections to claims and all other claims the Debtors will object to – i.e., the "best case

scenario" for the Estates and the Shareholders.  Finally, the column to the far right indicates the amount that each outstanding claim (or portion thereof) would be allowed at if the claim is allowed in the amount scheduled or asserted (meaning that no objection is ever filed to the claim or an objection is filed but the claimant prevails – i.e., the "worst case scenario" for the Estates and the Shareholders).

As indicated at the bottom of the far-right hand column of the Claims Chart, if every single remaining claim was allowed in the amount asserted by the creditor or scheduled by the Debtors (i.e., the "worst case scenario" for the Estates and the Shareholders), there would be a total of $2,841,864.90 of remaining outstanding claims to be paid (recognizing that the Claims Chart includes the relatively small amount of asserted priority claims described above).  Even if that occurred, that would still leave a total of $13,512,185.92 of Remaining Estate Funds available in the Estates to pay the allowed fees and expenses of the professionals and any other allowed administrative claims, with the balance, after taking into account various reserves described below and in the Trust, available to be distributed to the Trust for ultimate distribution to the Shareholders.  That said, the Debtors, the OCEH and the Trustee intend to object to various claims listed in the Claims Chart. Moreover, the Trustee and the Trust Board may commence adversary proceedings against holders of various claims.  As indicated at the bottom of the second to the far right column of the Claims Chart, if every single remaining claim was allowed in the amount the Debtors contend is owed (i.e., the "best case scenario" for the Estates and the Shareholders), there would be a total of $924,600.64 of remaining outstanding claims to be paid. If that occurred, that would leave a total of $15,429,450.18 of Remaining Estate Funds available in the Estates to pay the allowed fees and expenses of the professionals and any other allowed administrative claims, with the balance, after taking into account various reserves described below and in the Trust, available to be distributed to the Trust for ultimate distribution to the

Shareholders.

Since it is now clear that all creditors will be paid in full, there is no legitimate basis to force creditors whose claims are not disputed by the Debtors or the OCEH to wait until this Plan is confirmed to be paid, which only increases the financial burden on those creditors with absolutely no benefit to the Estates.  Forcing these creditors to wait to be paid is particularly unjust in light of the fact that the vast majority of the Debtors' undisputed unsecured debt (*i.e.*, the Designated Cure Amounts) was paid in full concurrently with the Sale Closing.

As a result, on November 21, 2017, as docket number 241, the Debtors (with the full support of the OCEH) filed a motion with the Court[4] in which the Debtors requested the Court to exercise its broad judicial powers under § 105(a) of the Bankruptcy Code to permit the Debtors (with the support of the OCEH) to implement the "Claims Allowance Protocol" described below (the "Claims Protocol Motion").

CLAIMS ALLOWANCE PROTOCOL

- If the Debtors and the OCEH agree with the amount and priority of a scheduled or filed claim without any modification, the Debtors and the OCEH will file a joint notice with the Court signed by counsel to both the Debtors and the OCEH advising the Court of the same.  Each such notice will identify the name of the creditor, the claim number if it pertains to a proof of claim filed by the creditor, and the amount and priority of the claim that will be deemed allowed.  Once that notice has been filed with the Court, the claim will be deemed permanently allowed in that amount and with that priority, and the Escrow Agent will be deemed authorized to pay the allowed claim out of the Remaining Estate Funds.

---

[4] The hearing on the motion is scheduled to be held on December 12, 2017, at 1:30 p.m.

- If the Debtors and the OCEH are able to reach an agreement with a particular creditor on the amount of a claim which is less than the amount or of a different priority than the scheduled or filed claim, the Debtors and the OCEH will file a joint stipulation signed by the Debtors, the OCEH and the creditor advising the Court of the same. Each such stipulation will identify the name of the creditor, the claim number if it pertains to a proof of claim filed by the creditor, and the amount and priority of the claim that will be deemed allowed. Once that stipulation has been filed with the Court, the claim will be deemed permanently allowed in that amount and with that priority without the need for any Court order, and the Escrow Agent will be deemed authorized to pay the allowed claim out of the Remaining Estate Funds.

## IV.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    What Creditors and Shareholders Will Receive Under this Plan.

As required by the Bankruptcy Code, this Plan classifies claims and interests in various classes according to their right to priority. This Plan states whether each class of claims or interests is impaired or unimpaired. This Plan sets out the treatment each class will receive.

### B.    Unclassified Claims.

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on this Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Plan Proponents have <u>not</u> placed the following claims in a class.

#### 1.    Administrative Expenses.

Administrative expenses are claims for costs or expenses of administering the Cases which are allowed under Bankruptcy Code § 507(a)(2). The Bankruptcy Code requires that all

administrative claims be paid in full on the Effective Date unless a particular claimant agrees to a different treatment.

The following chart lists all of the Debtors' § 507(a)(2) known administrative claims and their treatment under this Plan.[5]

| Name | Amount Owed | Treatment |
|---|---|---|
| Clerk's Office Fees | $0 | Paid in full on the Effective Date out of the Remaining Estate Funds |
| Office of the U.S. Trustee Fees | $0 | Paid in full on the Effective Date out of the Remaining Estate Funds |
| Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), bankruptcy counsel to the Debtors | $_____ (est.), which would be in addition to the post-petition fees and expenses paid to LNBYB by the Debtors | Paid in full out of the Remaining Estate Funds within the later of (i) five days following the Effective Date and (ii) five days following the date of entry of an order of the Court allowing such fees and expenses |
| Stubbs Alderton & Markiles, LLP ("SAM"), special corporate and securities, special trademark, and special litigation counsel for the Debtors | $_____ (est.), which would be in addition to the post-petition fees and expenses paid to SAM by the Debtors | Paid in full out of the Remaining Estate Funds within the later of (i) five days following the Effective Date and (ii) five days following the date of entry of an order of the Court allowing such fees and expenses |
| Dentons US LLP ("Dentons"), counsel to the OCEH | $_____ (est.), which would be in addition to the post-petition fees and expenses paid to Dentons by the Debtors | Paid in full out of the Remaining Estate Funds within the later of (i) five days following the Effective Date and (ii) |

---

[5] For all of the reasons explained above, the Debtors expect that by the time of Plan Confirmation Hearing, all allowed administrative claims other than the remaining outstanding fees and expenses of the professionals employed in the Cases will have been paid in full by the Debtors out of the Debtors' operating funds (assuming that no additional taxes are owing as a result of the asset sale to BBI). Also, this chart does not include any fees or expenses owing to either Craig Hallum Capital Group LLC, financial advisor to the Debtors, or to Province, Inc., financial advisor to the OCUC, because their fees and expenses will be allowed by the Court on a final basis and will have already been paid in full out of the Remaining Estate Funds prior to the Plan Confirmation Hearing. Also, as indicated above, the Debtors are in the process of employing an accountant, and the OCEH will be filing an application to employ Solomon & Cramer LLP as its special litigation counsel.

| | | |
|---|---|---|
| | | five days following the date of entry of an order of the Court allowing such fees and expenses |
| Michael D. Schwarzmann ("MDS"), financial advisor to the OCEH | $_____ (est.), which would be in addition to the post-petition fees and expenses paid to MDS by the Debtors | Paid in full out of the Remaining Estate Funds within the later of (i) five days following the Effective Date and (ii) five days following the date of entry of an order of the Court allowing such fees and expenses |
| Brown Rudnick LLP ("BR"), counsel to the OCUC | $_____ (est.), which would be in addition to the post-petition fees and expenses paid to BR by the Debtors | Paid in full out of the Remaining Estate Funds within the later of (i) five days following the Effective Date and (ii) five days following the date of entry of an order of the Court allowing such fees and expenses |
| BPE&H An Accountancy Corporation as the Debtors' certified public accountant | $_____ (est.), which would be in addition to the post-petition fees and expenses paid to BPE&H by the Debtors | Paid in full out of the Remaining Estate Funds within the later of (i) five days following the Effective Date and (ii) five days following the date of entry of an order of the Court allowing such fees and expenses |
| **TOTAL** | $_____ est. | Paid in the manner described above |

Court Approval of Professional Fees and Expenses Required and Source of Funding

Payment:

The Court must approve all professional fees and expenses listed in the chart above before

they may be paid.  For all professional fees and expenses except fees owing to the Clerk of the

Bankruptcy Court and fees owing to the UST, the professional in question must file and serve a

properly noticed final fee application, and the Court must rule on the final fee application. Only

the amount of fees and expenses allowed by the Court will be paid under this Plan.  The amounts

set forth above simply represent the Plan Proponents' best estimate as to the amounts of the

outstanding fees and expenses projected to be owed to the remaining professionals employed by the Debtors, the UCUC and the OCEH (with input from the various professionals). The actual amounts of the outstanding fees and expenses to be owed to the remaining professionals employed by the Debtors, the UCUC and the OCEH may be higher or lower than the figures set forth above. Much of whether the actual amounts of the outstanding fees and expenses to be owed to the remaining professionals employed by the Debtors, the UCUC and the OCEH will be higher than the figures set forth above will be dependent upon whether the Debtors and/or the OCEH engage in any substantial litigation regarding the confirmation of this Plan, or objecting to claims or any other matter. To the extent the Debtors and/or the OCEH engage in any such substantial litigation, the professionals involved are likely to incur professional fees and expenses in excess (and possibly substantially in excess) of the estimated figures set forth above. By the Plan Proponents including these estimated figures in the above chart, creditors and Shareholders are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and creditors and Shareholders are not waiving any of their rights to object to the allowance of any of these administrative claims. Similarly, professionals who have been employed in the Cases are not being deemed to have agreed that the figures set forth above represent any ceiling on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Court order as such fees and expenses are just estimates provided by the Plan Proponents (with input from the various professionals) at the time of the preparation of this Plan.

2.    **Priority Tax Claims.**

Priority tax claims include certain unsecured income, employment and other taxes described by § 507(a)(8) of the Bankruptcy Code. Section 1129(a)(9)(C) of the Bankruptcy Code requires that each holder of such a § 507(a)(8) priority tax claim receive regular installment

payments of a total value, as of the Effective Date, equal to the allowed amount of such allowed

tax claims, over a period ending not later than five years after the Petition Date.  The limited

number of potential priority tax claims are identified above and are included in the Claims Chart.

The Debtors are continuing with their review of the scheduled and filed priority tax claims.  The

Debtors or the Trustee will file objections to any filed tax claims which the Debtors or the Trustee

believe are not valid.  The Debtors are not agreeing to the allowance of any such filed tax claims,

and the Debtors reserves all rights to file and prosecute objections to any such filed tax claims.

The Debtors will pay all allowed priority tax claims in full out of the Remaining Estate Funds on

the Effective Date unless there is a dispute with any such priority tax claim.  If there is a dispute,

the Escrow Agent will pay any such disputed priority tax claim out of the "Residual Estate

Funds" (defined below) within ten days following the date of entry of an order of the Court

allowing such disputed priority tax claim, inclusive of interest accrued following the Effective

Date at the statutory rate.

**C.**      **Classified Claims and Interests.**

      **1.**      **Classes of Secured Claims.**

      As described above, as result of the fact that Radians was paid in full in connection with

the Sale Closing, there is no remaining secured debt in the Cases.

      **2.**      **Class of Priority Unsecured Claims.**

      Certain priority claims that are referred to in Bankruptcy Code §§ 507(a)(3), (4), (5), (6),

and (7) are required to be placed in classes.  These types of claims are entitled to priority

treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash

on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured

priority claim holders may vote to accept deferred cash payments of a value, as of the Effective

Date, equal to the allowed amount of such claim.  The limited number of potential non-tax

priority claims are identified above and are included in the Claims Chart.  The Debtors are

continuing with their review of the scheduled and filed non-tax priority claims.  The Debtors or

the Trustee will file objections to any filed non-tax priority claims which the Debtors or the

Trustee believe are not valid.  The Debtors are not agreeing to the allowance of any such filed

non-tax priority claims, and the Debtors reserve all rights to file and prosecute objections to any

such filed non-tax priority claims.  The Escrow Agent will pay all allowed non-tax priority claims

in full out of the Remaining Estate Funds on the Effective Date unless there is a dispute with any

such non-tax priority claim.  If there is a dispute, the Escrow Agent will pay any such disputed

non-tax priority claim out of the Residual Estate Funds within ten days following the date of entry

of an order of the Court allowing such disputed non-tax priority claim.

### 3.    Class of General Unsecured Claims – Class 1.

General unsecured claims are pre-petition unsecured claims which are not entitled to

priority under Bankruptcy Code §  507(a).  The following identifies this Plan's treatment of class

1 claims which consists of <u>all</u> of the Debtors' non-priority general unsecured claims which have

not been paid in full by the time of the Plan Confirmation Hearing.  As indicated, the Claims

Chart shows all known claims in the Cases.  The inclusion of a claim in the Claims Chart is not an

acknowledgement by the Debtors or the OCEH of the validity of any class 1 claim.  The Debtors

and the OCEH are continuing with their review of all scheduled and filed class 1 claims that have

not yet been paid in full.  The Debtors, the OCEH or the Trustee will file objections to any class 1

claims that the Debtors, the OCEH and/or the Trustee believe should not be allowed as filed by

the class 1 creditor or as scheduled by the Debtors.  The Debtors, the OCEH and the Trustee are

not agreeing under this Plan to the allowance of any filed class 1 claims, and the Debtors, the

OCEH and the Trustee reserve all rights to file and prosecute objections to any such filed or

scheduled class 1 claims.  As indicated above, the Debtors have filed the Claims Protocol Motion,

which will be considered by the Court at a hearing on December 12, 2017.  If the Claims Protocol Motion is granted by the Court, the Escrow Agent will pay out of the Remaining Estate Funds in accordance with the procedures set forth in the Claims Protocol Motion all class 1 claims that the Debtors and the OCEH agree constitute allowed class 1 claims  ("Allowed Class 1 Claims").  If the Claims Protocol Motion is not granted by the Court, the Escrow Agent will pay out of the Remaining Estate Funds all Allowed Class 1 Claims on the Effective Date.  The Debtors have filed objections to seven filed class 1 claims that the Debtors dispute.  The Debtors expect that all seven of those claims objections will have been resolved, by Court order or settlement, prior to the Effective Date.  The Debtors do not intend to file objections to any other filed or scheduled class 1 claims.  To the extent the OCEH and/or the Trustee dispute any other class 1 claims (whether as filed by the class 1 creditors or as scheduled by the Debtors), the OCEH before the Effective Date and the Trustee after the Effective Date have the full right and standing to file and prosecute objections to any class 1 claims.

Unless the Trustee chooses to have someone other than the Escrow Agent serve as the disbursing agent for class 1 claims, and to the extent that there are any remaining class 1 claims on the Effective Date that the OCEH and/or the Trustee disputes (regardless of whether the OCEH had previously filed an objection to such class 1 claims or not), the Trustee will deliver a letter to the Escrow Agent on the Effective Date identifying all such class 1 claims that the Trustee disputes (the "Disputed Class 1 Claims").  After the Escrow Agent pays the final allowed fees and expenses of the professionals employed in the Cases and before the Escrow Agent delivers to the Trustee the balance of the Remaining Estate Funds, the Escrow Agent will retain in the Trust Account a sum of money equal to the total amount of the Disputed Class 1 Claims inclusive of projected post-petition interest at the "Applicable Interest Rate" (defined below) for six months following the Effective Date (the "Residual Estate Funds").  The Escrow Agent will

35

pay any Disputed Class 1 Claim, together with post-petition interest at the Applicable Interest Rate, only after an order of the Court is entered (whether such order is the result of a settlement reached between the class 1 claimant and the OCEH or the Trustee or following a contested claim objection hearing) that turns the Disputed Class 1 Claim into an Allowed Class 1 Claim and such order becomes a final order of the Court not subject to any pending appeal.  Each time a Disputed Class 1 Claim becomes an Allowed Class 1 Claim and the Escrow Agent pays the Allowed Class 1 Claim, together with post-petition interest at the Applicable Interest Rate, out of the Residual Estate Funds, the Escrow Agent will deliver to the Trustee the difference between the amount of the Disputed Class 1 Claim and the amount of the Allowed Class 1 Claim that is paid, together with post-petition interest at the Applicable Interest Rate.  For example, if a particular class 1 claimant filed a class 1 claim in the amount of $75,000 that the OCEH or the Trustee disputed, and the class 1 claimant ultimately ends up with an Allowed Class 1 Claim in the amount of $25,000 (whether as a result of a settlement reached between the class 1 claimant and the OCEH or the Trustee or following a contested claim objection hearing), the Escrow Agent will pay out of the Residual Estate Funds to the class 1 claimant on account of the class 1 claimant's Allowed Class 1 Claim the sum of $25,000 plus post-petition interest at the Applicable Interest Rate computed through the date of payment, and the Escrow Agent will deliver the balance of the Residual Estate Funds to the Trustee, which would be in the amount of $50,000 less the amount of post-petition interest paid to the holder of the Allowed Class 1 Claim.

Following the Effective Date, the Trustee shall be the sole party with standing to file and prosecute any objections to any remaining class 1 claims, including continuing with the prosecution of any objections filed by the Debtors, the OCEH or any other party prior to the Effective Date which remain unresolved on the Effective Date.  Pursuant to Article 11(a) of this Plan below, the Court will retain jurisdiction over the Trust and the Estates following the

36

Effective Date to adjudicate any and all objections to class 1 claims that the Trustee commences after the Effective Date or that were commenced before the Effective Date by the Debtors, the OCEH or any other party that is taken over by the Trustee following the Effective Date.

Since these are solvent Estates, the Plan Proponents agree that pursuant to the Ninth Circuit case of *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002) and other prevailing law, all general unsecured creditors existing as of the Petition Date that ultimately became, or which ultimately become, Allowed Class 1 Claims, and who have already been paid the amount of their Allowed Class 1 Claim or which will be paid the amount of their Allowed Class 1 Claim, are entitled to be paid post-petition interest from the Petition Date through the date that they were paid or will be paid the full principal amount of their Allowed Class 1 Claim, with the rate of post-petition interest that they are entitled to be paid to be calculated at the federal interest rate for judgments. The Plan Proponents understand that the current interest rate is 1.65% per annum according to the bankruptcy court website: (http://www.cacb.uscourts.gov/post-judgment-interest-rates) (the "Applicable Interest Rate"). On the Effective Date, or as soon thereafter as is practicable, the Escrow Agent will pay to every general unsecured creditor existing as of the Petition Date that ultimately became, or which ultimately becomes, an Allowed Class 1 Claim, interest on their Allowed Claim 1 Claim computed from the Petition Date through the date that they were paid or will be paid the full principal amount of their Allowed Class 1 Claim computed at the Applicable Interest Rate. At such time that a general unsecured creditor who is the holder of a Disputed Class 1 Claim obtains an Allowed Class 1 Claim, the Escrow Agent will pay to such holder of the then Allowed Class 1 Claim out of the Residual Estate Funds the amount of the then Allowed Class 1 Claim plus interest at the Applicable Interest Rate computed from the Petition Date through the date of payment of the then Allowed Class 1 Claim.

When computing the amount of the Residual Estate Funds to be maintained by the Escrow

Agent, the Debtors and the OCEH shall compute a reasonable amount of funds for the Escrow Agent to reserve to take into account the possible payment of post-petition interest to be paid to the Disputed Class 1 Claims at the Applicable Interest Rate, with the Court to include in the Plan Confirmation Order the actual amount of Residual Estate Funds to be maintained by the Escrow Agent. If the total amount of Residual Estate Funds maintained by the Escrow Agent ultimately proves to be insufficient to pay all Disputed Class 1 Claims that ultimately become Allowed Class 1 Claims plus interest at the Applicable Interest Rate from the Petition Date through the date of payment of the then Allowed Class 1 Claims, the Trustee will deliver to the Escrow Agent from the Trust Property the amount of money to make up for the shortfall to insure that all holders of Allowed Class 1 Claims are ultimately paid the full amount of their Allowed Class 1 Claims plus interest at the Applicable Interest Rate from the Petition Date through the date of payment of the then Allowed Class 1 Claims.

Class 1 claims are not impaired by this Plan and therefore do not vote on this Plan because they are conclusively presumed to have accepted this Plan, and solicitation of acceptances to this Plan from class 1 claim holders is not required, pursuant to § 1126(f) of the Bankruptcy Code,.

**4.      Class of Shareholders – Class 2.**

Class 2 consists of the Shareholders, who are the equity holders of ICPW Nevada. After all allowed post-bankruptcy claims have been paid in full, including the final fees and expenses of all professionals employed in the Cases, the balance of the funds in the Estates will be transferred to the Trust (as set forth below) and ultimately distributed, as described below, to the record Shareholders of ICPW Nevada (determined at the end of the date of the Plan Confirmation Hearing – the "Record Date"). The Debtors shall take the required steps necessary to request that the Securities and Exchange Commission ("SEC") and/or the Financial Industry Regulatory Authority ("FINRA") halt trading in ICPW Nevada common stock from the Record Date through

the Effective Date (or for such periods permitted by the SEC and/or FINRA).  Following the

Effective Date, all shares of ICPW Nevada common stock shall be deemed cancelled and all

Record Date interests in ICPW Nevada common stock shall be deemed cancelled and all Record

Date interests in ICPW Nevada common stock shall be deemed camcelled and all Record Date

interests in ICPW Nevada common stock irrevocably shall become beneficial interests in the

Trust.  The Trustee shall maintain the exclusive record of holders of beneficial interests in the

Trust (the "Trust Beneficiaries"), pursuant to the Trust Agreement.

Prior to the date of the Plan Confirmation Hearing, in addition to the notice of Plan

confirmation that the Debtors will provide to the Shareholders, the Debtors also intend to notify

the market, through Current Reports on Form 8-K and concurrently issued press releases, of all of

the foregoing.  The Plan Proponents believe that the foregoing efforts to be made by the Debtors

are critical because it would be untenable to allow unsuspecting traders to purchase securities of

ICPW Nevada that would be worthless following the Effective Date since the Trustee is only

going to make distributions of Trust Property to the Shareholders of ICPW Nevada determined as

of the Record Date.

The Plan Proponents are preliminarily estimating an initial distribution to the Shareholders

of a total of approximately $_____.[6]  This preliminary estimation is based upon

the assumptions that (1) the total amount of Remaining Estate Funds coupled with the Debtors'

funds that will be initially turned over to the Trustee will be in the amount of approximately

$_____; (2) based upon existing law and accumulated Net Operating Losses of the

Debtors, there will be little to no gain subject to taxes owing as a result of the Debtors' asset sale

---

[6] This estimated figure is based on the assumption that no taxes (or no taxes of any meaningful amount) are
owing as a result of the Debtors' asset sale to BBI.  If a meaningful amount of taxes are owing as a result
of the Debtors' asset sale to BBI, then the projected initial distribution to Shareholders will be reduced
accordingly.

to BBI; and (3) the Trustee will elect to retain approximately $_____ in the Trust to fund post-Effective Date litigation by the Trustee against parties not released under this Plan.  These funds will be managed by the Trustee and the Trust Board as set forth in the Trust Agreement.  If any of these assumptions proves to be inaccurate, it will necessarily effect on a dollar-for-dollar basis (higher or lower) the amount of the initial and final distributions that are ultimately made to the Shareholders.

With approximately _____ of record shares, the Plan Proponents are preliminarily estimating an initial distribution of approximately $\_\_\_ per record share.  **However, this is just a very preliminary estimate based upon all of the assumptions above and below and should not be relied upon by any Shareholder in making any decision**.  Many factors which are not yet known could result in an increase or decrease in this estimated figure, including, but not limited to: (1) the ultimate allowed amount of pre-bankruptcy and post-bankruptcy claims, including the additional fees and expenses incurred by the professionals employed in the Cases, (2) the fees and expenses incurred by the professionals employed by the OCEH in prosecuting or defending against litigation, including the current litigation involving Cordes and Aisenberg and the Radians Claim Objection and Lawsuit; (3) the fees and expenses of the Trustee and his/her professionals; (4) any reserve decisions made by the Trustee; (5) whether any taxes are owing as a result of the Debtors' asset sale to BBI; (6) the outcome of the claims objections already filed by the Debtors; (7) the outcome of any claims objections bought by the OCEH or the Trustee or any claim settlements negotiated by the OCEH or the Trustee; and (8) the extent of any net recoveries obtained by the OCEH or the Trustee from the pursuit of any claims or causes of action, all of which will be distributed to the Shareholders.  But even this list is not exhaustive as there are many other factors, some which may not even be known today, that could alter the amount of any initial distribution by the Trust to the Shareholders.    The Plan Proponents believe that

Shareholders are not impaired under this Plan and therefore don't vote on this Plan because they are conclusively presumed to have accepted this Plan, and solicitation of acceptances to this Plan from the Shareholders is not required, pursuant to § 1126(f) of the Bankruptcy Code.  *See In re Acequia, Inc.*, 787 F.2d 1352, 1363 (9th Cir. 1986); *In re Nickels Midway Pier, LLC*, 452 B.R. 156 (D.N.J. 2011).

## V.    MEANS OF EFFECTUATING THIS PLAN AND IMPLEMENTATION OF THIS PLAN.

**A.    Funding for this Plan.**

This Plan will be funded from the following five sources: (i) the Remaining Estate Funds that are turned over to the Trustee; (ii) any funds remaining in the Debtors' operating accounts on the Effective Date; (iii) any refunds or other monies owing to the Debtors which were not sold to BBI; (iv) any net proceeds obtained by the OCEH or the Trust from the pursuit of any claims or causes of action and from "Retained Assets" as defined under the APA; (v) any other monetary recoveries obtained by the Debtors prior to the Effective Date; and (vi) any other monetary recoveries obtained by the OCEH before the Effective Date or the Trust after the Effective Date.

**B.    Effective Date Resignation of the Management and Board of Directors of the Debtors.**

The Debtors currently anticipate that effective as of the close of business on the Effective Date, at the request of the OCEH, Mr. Geoff Greulich will resign from his position as the Debtors' Chief Executive Officer; Mr. Matthew Pliskin will resign from his position as the Debtors' Chief Financial Officer; Mr. Ben Padnos will resign from his position as a Board member; and Mr. Mike DiGregorio will resign from his position as a Board member.  The Trustee shall have the right, but not the obligation, to employ any of these people to assist the Trustee to carry out his/her duties as Trustee if he/she so desires (with the approval of the Trust Board) and is able to reach an agreement with any of these individuals on mutually agreeable terms.

**C.    Dissolution of the OCUC.**

In the event the OCUC is still in existence by the Effective Date, on the Effective Date, the OCUC shall be deemed automatically dissolved without the need for any further order of the Court, and all remaining members of the OCUC shall be automatically deemed discharged of any further duties involving the Estates.

**D.    Dissolution of the OCEH.**

On the Effective Date, the OCEH shall be deemed automatically dissolved without the need for any further order of the Court, and all members of the OCEH shall be automatically deemed discharged of any further duties involving the Estates in their capacity as members of the OCEH.

**E.    Dissolution of the Debtors.**

At such time as the Trustee deems appropriate, the Trustee may cause the Debtors to be dissolved for all purposes under applicable non-bankruptcy law without the necessity for any other or further actions to be taken by or on behalf of the Debtors, or payment of any fees, charges, penalties or other amounts required by applicable non-bankruptcy law. Notwithstanding the foregoing, the Trustee shall be authorized to take any actions, including the filing or recording of any documents and the making of any applicable tax filings, and the payment of any fees, charges or other amounts necessary or appropriate, in the reasonable opinion of the Trustee or as otherwise ordered by the Court or other judicial or administrative body, to dissolve all of the Debtors and to pay any such fees, charges or other amounts from the Trust Property, provided, however, that the Trustee may file on behalf of the Debtors, with the official public office for keeping corporate records in its state or district of organization, a certificate of dissolution or equivalent document.  The Trustee may take all actions on behalf of either or both of the Debtors to effectuate the dissolution of such Debtor or including, without limitation, the execution and

filing or recording of such a certificate of dissolution.

**F.      Creation of the Trust.**

On the Effective Date, a trust (the "Trust") will be created pursuant to the Plan and the Trust Agreement solely for the benefit of the Shareholders.  The Effective Date of the Plan shall also be the effective date of the Trust.  It is currently anticipated that the three current members of the OCEH (Scott Jarus, Ron Chez, and Patrick O'Brien) will serve as the initial members of the Trust Board (the "Trust Board Members").

**G.      Appointment of Disbursing Agent.**

LNBYB (in its capacity as Escrow Agent) will serve as the initial disbursing agent for the Estates at no charge to the Estates for the sole remaining purpose of (1) distributing funds from the Remaining Estate Funds to pay any Allowed Claims existing on the Effective Date; (2) to pay the allowed final fees and expenses of the professionals employed in the Cases (recognizing that the amount of the final fees and expenses of the professionals employed in the  Cases will only become known following the final fee hearing which will occur after the Effective Date); and (3) maintaining in the Trust Account the Residual Estate Funds and paying Allowed Class 1 Claims and any allowed tax claims in the manner described above.[7]

As an accommodation to the Estates, the Escrow Agent will not be paid any disbursing agent's or escrow fee for making any disbursements of any Residual Estate Funds, but the Trustee will be required to pay LNBYB out of the Trust Property the reasonable fees and expenses that

---

[7] The OCEH reserves the right to cause this Plan to be amended not to have the Escrow Agent maintain in the Trust Account the Residual Estate Funds and pay the Allowed Class 1 Claims and any allowed tax claims in the manner described above and, instead, to cause the Escrow Agent to transfer all of the Residual Estate Funds to the Trustee.  The OCEH must make this decision not later than fifteen days prior to the Plan Confirmation Hearing.  If the OCEH makes this election, the Plan Proponents will either file an amended version of this Plan that will address how the role that was to be handled by the Escrow Agent after the Effective Date will be handled, or the Plan Proponents will address this issue as part of the Plan Confirmation Order.

LNBYB incurs after the Effective Date at LNBYB's regular hourly rates related to time spent by LNBYB after the Effective Date in regards to this entire process established for dealing with Disputed Class 1 Claims.  Any dispute which arises or exists between the Trustee and LNBYB over the amount of fees and expenses incurred by LNBYB after the Effective Date in this regard shall be resolved solely by the Court after notice and a hearing.  LNBYB shall be entitled to charge its fees and expenses incurred in regards to any such dispute only if LNBYB is successful at any such contested hearing.

All payments to be made under this Plan by the Escrow Agent from the Remaining Estate Funds or the Residual Estate Funds shall, unless agreed by the Escrow Agent otherwise, be delivered by the Escrow Agent by regular mail, postage prepaid, to the address shown in the Debtors' bankruptcy schedules, as they may from time-to-time be amended in accordance with Bankruptcy Rule 1000, or, if a different address is stated in a proof of claim timely filed with the Bankruptcy Court, to such address.  Checks issued to pay Allowed Claims shall be null and void (and may be voided by the Escrow Agent) if not negotiated by the recipient within sixty (60) days after the date of issuance thereof, with all funds related to such voided checks to be delivered by the Escrow Agent to the Trust.

As soon after the Effective Date as possible, the Escrow Agent will transfer to the Trustee in accordance with the manner as directed by the Trustee and in accordance with this Plan, all of the Remaining Estate Funds after deducting or reserving for each of the following: (1) all disputed tax claims in the amounts asserted by the taxing agencies; (2) all Disputed Class 1 Claims in the amounts asserted by the class 1 claimants; and (3) the full amount of the fees and expenses requested by all of the professionals employed in the Cases (recognizing that these figures will not become known until all such professionals filed their final applications for fees and expenses

incurred through the Effective Date which necessarily will occur at some point after the Effective Date).

Once the Escrow Agent has paid (1) all Allowed Claims existing on the Effective Date; (2) the final fees and expenses of the professionals employed in the Cases the amounts allowed by the Court at a final fee hearing; and (3) all Allowed Class 1 Claims and all allowed priority tax claims, the Escrow Agent will transfer the balance of all of the remaining Residual Estate Funds to the Trustee in accordance with the manner as directed by the Trustee and in accordance with this Plan, and LNBYB shall thereafter be absolved of any further responsibility, obligation or liability to the Estates resulting from serving as the Escrow Agent or the Disbursing Agent.

After the Escrow Agent has paid the final fees and expenses of the professionals employed in the Cases the amounts allowed by the Court at a final fee hearing, or at any time thereafter that the Trustee so desires, subject to the approval of the Trust Board and an order of the Court and payment of any fees and expenses owing to LNBYB for serving as the Disbursing Agent as described above, the Trustee may appoint a different disbursing agent ("Alternative Disbursing Agent") for the purpose of making the distributions under the Plan as described above. The Alternative Disbursing Agent shall be a person or entity satisfactory to the Trust Board and approved by the Court and shall serve without a bond. The Alternative Disbursing Agent shall be entitled to reasonable compensation and reimbursement of all reasonable and actual costs and expenses incurred in performing its duties under the Plan. Following the appointment of any Alternative Disbursing Agent, LNBYB shall thereafter be absolved of any further responsibility, obligation or liability to the Estates resulting from serving as the Escrow Agent or the Disbursing Agent.

**H.  Exemption from Transfer Taxes.**

Pursuant to § 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a

security, or the making or delivery of an instrument of transfer under a plan confirmed under §

1129 of the Bankruptcy Code, may not be taxed under any law imposing a stamp tax or similar

tax. Transfers under this Plan that are exempt from taxes under § 1146(c) of the Bankruptcy

Code include all transfers by the Debtors after the commencement of the Cases in contemplation

of this Plan but prior to the Effective Date, and all transfers to and by the Trustee as contemplated

by this Plan and the Trust, including all payments made to claim holders and Shareholders in

accordance with the terms of this Plan and the Trust. The taxes from which such transfers are

exempt include stamp taxes, recording taxes, sales and use taxes, transfer taxes, and other similar

taxes.

**I.       Executory Contracts and Unexpired Leases.**

As indicated above, pursuant to the Sale Order, all of the Debtors' executory contracts and

unexpired leases that were not assumed and assigned to BBI were deemed rejected as of the Sale

Closing, with the exception of the two supplier agreements with GGS and Grainger whose

rejection can happen only following the entry of an order of the Court approving such rejection.

In accordance with the Sale Order, the Debtors have already provided notice to all counter-parties

to all rejected executory contracts and unexpired leases of their bar date for filing any rejection

damage claims against the Estates. That rejection bar date is December 27, 2017, with one

exception involving an executory contract that the Debtors only recently learned about who has

been served with a separate rejection bar date notice.

**J.       Changes in Rates Subject to Regulatory Commission Approval.**

The Debtors are not subject to any governmental regulatory commission approval of their

rates.

**K.       Administrative Claims Bar Date.**

In connection with the confirmation of this Plan, the Plan Proponents will be requesting the Court to establish the date that is thirty days following the date of entry of the Plan Confirmation Order as the deadline for any creditor to assert an administrative claim against the Estates (the "Administrative Claims Bar Date"). Provided the Court agrees, the Administrative Claims Bar Date and the procedure that creditors will be required to follow in order to assert a timely administrative claim against the Estates will be included in the Plan Confirmation Order. As part of the notice of Plan confirmation that the Debtors will distribute to all creditors and Shareholders, the Debtors will provide notice of the Administrative Claims Bar Date. In order to assert a timely administrative claim, a creditor must file a pleading with the Court by the Administrative Claims Bar Date in which the creditor indicates the amount of its asserted administrative claim and attaches as an exhibit all documentary evidence in support of its asserted administrative claim and serve that pleading on counsel for the Debtors and counsel for the Trustee. The creditor is not required to set the matter for hearing. Any creditor who fails to file a timely administrative claim shall be forever barred from asserting any administrative claim against the Debtors, the Estates, or the Trust. The Trustee shall be required to file with the Court any objection to any asserted administrative claim by the date that is ninety days after the Effective Date and to set the matter for hearing. If the Trustee and the creditor are able to resolve any dispute consensually, the Trustee may file a stipulation and proposed order with the Court without the need to set the matter for hearing, with the stipulation to be signed by the Trustee and the creditor. If the Trustee fails to file a timely objection to any timely filed administrative claim, the timely filed administrative claim shall be deemed permanently allowed and must be paid in full by the Trustee out of the Trust Property. The foregoing deadlines for the filing of administrative claims by the Administrative Claims Bar Date shall not apply to the professionals employed in the Cases by either the Debtors, the OCUC or the OCEH. The deadline for such

professionals to file their final applications for fees and expenses shall be set by the Court in the Plan Confirmation Order.

**L.      Assignment of all Causes of Action, Including Avoidance Actions, to the Trust.**

On the Effective Date, pursuant to § 1123(b)(3) of the Bankruptcy Code, the standing and the exclusive authority to assert, prosecute, defend and/or settle on behalf of the Estates any and all claims and causes of action that belong to the Estates, including the Radians Claim Objection and Lawsuit, will be automatically assigned and transferred to the Trust (the "Transferred Claims and Causes of Action"). Thereafter, the Trustee, with all powers and authority of a debtor in possession or trustee under the Bankruptcy Code, will be the sole representative of the Estates with the standing and authority to assert, prosecute, defend and/or settle the Transferred Claims and Causes of Action.  In the course of any ongoing investigations, the Trustee shall have the right post-confirmation to utilize Bankruptcy Rule 2004 examinations, to be enforced pursuant to Bankruptcy Rule 2005.

On November 21, 2017, as docket number 244, the Debtors and the OCEH filed a joint motion with the Court seeking an order of the Court: (1) granting leave, standing, and exclusive authority to the OCEH to assert, prosecute and/or settle on behalf of the Estates, subject to Court approval, any and all claims, objections and causes of action against Cordes and Aisenberg (the Debtors' former officers), and counter claims and defenses against any of the claims asserted by Cordes and Aisenberg, including those claims asserted in their proofs of claim against the Debtors; and (2) approving that certain *Stipulation Granting Standing To Pursue Certain Estate Based Claims For The Benefit Of The Debtors' Estates* (the "Cordes/Aisenberg Assignment Stipulation") filed concurrently therewith.  The hearing on that motion is scheduled to be held on December 12, 2017.  Assuming that motion is granted by the Court, all rights assigned to the OCEH by the Cordes/Aisenberg Assignment Stipulation will, on the Effective Date, be

automatically assigned and transferred to the Trust and are included within the Transferred Claims and Causes of Action.

Without limiting the foregoing, the Trustee, acting on behalf of the Liquidating Debtor, shall accede to and become the holder of all rights in and to any confidentiality agreements, joint defense agreements, and privilege agreements. Any proceeds received from or on account of the Transferred Claims and Causes of Action shall constitute assets of the Estates and shall vest entirely in the Trust.

Because these are solvent Estates, no preference actions may be pursued because the Estates would not be able to satisfy the condition of § 547(b)(3) or (5) of the Bankruptcy Code. As a result, it is not necessary for the Debtors, the Trustee or any other party to perform any preference analysis.

**M.      Objections to Claims.**

On the Effective Date, the Trustee shall be the sole party with the standing to commence or to continue with the prosecution of any objections to claims in the Cases with respect to any remaining outstanding claims existing on the Effective Date (the "Disputed Claims"). The Trustee shall be required to file objections to all Disputed Claims by no later than ninety days following the Effective Date (unless the Trustee deems the amount in dispute to be insignificant and not warrant further objection), provided that, such date shall not bar later objections. The Trustee shall be required to file with the Court all objections to all Disputed Claims by the date that is ninety days after the Effective Date and to set the matter for hearing. If the Trustee and the creditor holding the Disputed Claim are able to resolve any dispute consensually, the Trustee may file a stipulation and proposed order with the Court without the need to set the matter for hearing, with the stipulation to be signed by the Trustee and the creditor holding the Disputed Claim. If the Trustee fails to file a timely objection to any Disputed Claim, the Disputed Claim shall be

deemed permanently allowed and must be paid in full by the Trustee out of the Trust Property.

The Trustee will continue with the prosecution of any objections to claims (the "Pending Claims Objections") that were commenced by the Debtors, the OCEH or any other party in interest prior to the Effective Date but not yet resolved by the Effective Date. The Trustee will have the authority, in the Trustee's sole discretion and in the reasonable exercise of the Trustee's business judgment (subject to the Trust Board's approval), to withdraw any such pending objections or settle or compromise any Pending Claims Objections following the Effective Date without further notice to creditors or Shareholders or authorization of the Court, in which event such claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of this Plan and paid in full by the Trustee from the Trust Property, provided however, pursuant to Article 11(a) of this Plan, the Court shall retain jurisdiction to hear and adjudicate the allowance or disallowance of all Pending Claims Objections.

As provided by § 502(c) of the Bankruptcy Code, the Court may estimate for purpose of allowance any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the Cases. As more fully set forth below in Article 11(a) of this Plan, the Court shall retain jurisdiction over the Liquidating Debtor, the Trust, the Cases and the Estates to resolve or adjudicate all such objections to claims following the Effective Date regardless of whether such objections to claims were first commenced before or after the Effective Date. Nothing contained in this Plan shall constitute a waiver or release by the Trustee of any rights of setoff or recoupment, or of any defense, the Trustee may have with respect to any claim or interest.

## VI.    THE TRUST

**A.    Transfer of Property to the Trust.**

On the Effective Date, or as soon thereafter as is reasonably practicable, the Escrow Agent will transfer to the Trustee for deposit into the Trust all of the Remaining Estate Funds after deducting or reserving for each of the following: (1) all disputed tax claims in the amounts asserted by the taxing agencies; (2) all Disputed Class 1 Claims in the amounts asserted by the class 1 claimants; and (3) the full amount of the fees and expenses requested by all of the professionals employed in the Cases (recognizing that these figures will not become known until all such professionals filed their final applications for fees and expenses incurred through the Effective Date which necessarily will occur at some point after the Effective Date). If the Trustee chooses a disbursing agent other than the Escrow Agent, the Escrow Agent shall, in accordance with an order of the Court, transfer all of the Residual Estate Funds to the new disbursing agent.

On the Effective Date, except as otherwise provided above, the Debtors will transfer to the Trustee for deposit into or for the benefit of the Trust all (1) funds remaining in the Debtors' operating accounts on the Effective Date (after taking into account any outstanding issued but not yet cleared checks and any normal operating expenses incurred through the Effective Date but not yet paid by the Effective Date), (2) all rights of the Estates to any refunds or other monies owing to the Debtors which were not sold to BBI, and (3) all rights of the Estates to any other monetary recoveries obtained by the Trust after the Effective Date. All of the foregoing property, plus any other assets owned by the Debtors or the Estates, including, without limitation, the "Retained Assets" under the APA, including (i) the equity securities and other interests of ICPW Nevada in ICPW California, (ii) insurance policies and all rights, claims, creditors or causes of action thereunder or in connection with, and (iii) all right, title and interest in all claims and causes of action (including the Transferred Claims and Causes of Action, together with all rights of recovery or set-off, shall constitute property of the Trust (collectively, the "Trust Property").

The Trust Property shall be transferred to the Trust created pursuant to the Trust

Agreement. All payments to Shareholders shall be paid by the Trustee from cash on hand and such payments will be made as and when provided in and in accordance with the Trust Agreement.

**B.      The Trust Agreement.**

An initial draft of the Trust Agreement is attached hereto as Exhibit "2." The Trust Agreement, including the designation of the trustee (the "Trustee") thereunder, shall be approved by the Court, and the designated Trustee shall accept his or her duties thereunder on or before the Plan Confirmation Hearing.  The Trust Agreement shall, among other matters, create the Trust, identify the Trustee as the initial trustee of the Trust, identify the compensation of the Trustee, and specify the authorities and powers of the Trustee and the Trust Board consistent with this Plan.  The Plan Proponents will file the final version of the Trust Agreement with the Court and the proposed initial compensation of the Trustee at least ten days prior to the Plan Confirmation Hearing.

**C.      Funding of the Trust.**

The Trust will be funded with the Trust Property.  It will be the responsibility of the Trustee at all times to maintain a sufficient amount of Trust Property to enable the Trustee to pay from the Trust Property all taxes owing by the Estates, including any taxes owing by the Estates from the Debtors' asset sale to BBI.  That portion of the Remaining Estate Funds transferred by the Escrow Agent to the Trust shortly after the Effective Date will serve as the primary funding of the Trust.

**D.      Management of the Liquidating Debtor by the Trustee and Primary Functions of the Trust.**

On and after the Effective Date, the Trustee shall be responsible for implementation of the Plan, including with respect to the management, control and operation of the Liquidating Debtor.

The appointment, duties and powers of the Trustee are as set forth in Article III of the Trust Agreement. The establishment and role of the Trust Board are as set forth in Article IV of the Trust Agreement. The administration of the Trust, including the rights, powers and privileges of the Trustee, is as set forth in Article V of the Trust Agreement. The distributions from the Trust are as set forth in Article VI of the Trust Agreement. An explanation of the Trust Beneficiaries is as set forth in Article VII of the Trust Agreement. An explanation of the third party rights, limitation of liability and indemnity provisions is as set forth in Article VIII of the Trust Agreement. An explanation of the selection, removal and compensation of the Trustee is as set forth in Article IX of the Trust Agreement.

**E.      Operations of the Trust.**

From and after the Effective Date, the Trust may use and dispose of Trust Property, and take any of the actions consistent with this Plan and/or the Trust Agreement without the approval of the Court and free of the restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, provided that the Trust will be administered so that it qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d). The actions of the Trust and the Trustee shall be subject to the supervision and approval of the Trust Board as provided in this Plan and the Trust Agreement.

In addition to all other powers and authorities provided to the Trustee under the Trust Agreement, under this Plan and subject to the Trust Agreement, the Trustee, with the oversight of the Trust Board, shall have the power and authority to perform the following acts:

(1)      Manage and protect the Trust Property;

(2)      Administer the Stock Incentive Plan;

(3)      Effectuate the wind down and ultimate dissolution of the Debtors as legal entities as set forth above (unless a buyer is obtained to acquire the Debtors' corporate shell);

(4)      Address any outstanding issues with the SEC;

(5)   Analyze the Transferred Claims and Causes of Action, and any other claims, counterclaims and defenses the Trustee deems appropriate, and decide (i) whether to pursue any of the foregoing, and (ii) how to pursue them, all with the goal of maximizing the net recovery for the Trust for the benefit of the Shareholders;

(6)   File and prosecute objections to all Disputed Claims as the Trustee deems appropriate;

(7)   Pursue claims, counterclaims, and causes of action assigned to the Trust or the control of which is assumed by the Trust pursuant to this Plan, as the designated representative of the Estates, and compromise or adjust, by arbitration or otherwise, any claims, disputes or controversies in favor of or against the Trust;

(8)   Institute on behalf of the Trust all claims and causes of action which could be brought by a trustee or debtor-in-possession under the Bankruptcy Code, and prosecute or defend all appeals on behalf of the Debtors, as representative of the Debtors within the meaning of § 1123(b)(3)(B) of the Bankruptcy Code;

(9)   Settle, compromise or adjust, by arbitration or otherwise, any claims, disputes or controversies in favor of or against the Trust;

(10)   Waive or release rights of any kind;

(11)   Deposit Trust Property and make disbursements thereof;

(12)   Employ and have such professionals, including, without limitation, attorneys and accountants, and such other agents, consultants and employees on behalf of the Trust as the Trustee shall deem necessary, provided that the Trustee's authority to pay such professionals shall be governed by the provisions of this Plan and the Trust Agreement.

(13)   Exercise any and all powers granted to the Trustee by any agreements or by common law or any statute which serves to increase the extent of the powers granted to the Trustee hereunder and in the Trust Agreement;

(14)   Take any action required or permitted by this Plan;

(15)   Negotiate, renegotiate and enter into contracts and execute obligations negotiable and non-negotiable;

(16)   Pay post-Effective Date quarterly fees to the U.S. Trustee from Trust Property;

(17)   Prepare and file post-confirmation quarterly reports with the U.S. Trustee and post-confirmation status reports with the Court as required;

(18)   Retain a sufficient amount of Trust Funds equal to the amount of any estimated post-petition tax obligations until such time as the exact amount of such estimated post-petition tax obligations is determined and paid by the Trustee out of the Trust Property; and

(19)   File and obtain final decrees closing the Cases.

**F.**     **Limitation of Liability of the Trustee and the Trust Board.**

The Trustee and the Trust Board Members, and their attorneys, accountants, consultants, employees, agents and assignees, shall have no liability for any error of judgment made in good faith other than as a result of gross negligence or willful misconduct. The Trustee and the Trust Board shall not be liable for any action taken or omitted in good faith and believed to be authorized within the discretion or rights or powers conferred upon them by this Plan and the Trust Agreement.  In performing their duties hereunder and in accordance with the Trust Agreement, the Trustee and the Trust Board Members may consult with counsel selected by them, at the expense of the Trust.  No provisions of this Plan shall require the Trustee or any of the Trust Board Members to expend or risk his/her own funds or otherwise incur personal financial liability in the performance of any of his/her duties under this Plan or in the exercise of any of the Trustee's and the Trustee Board Members' rights and powers.  The Trust shall indemnify and hold the Trustee and Trust Board Members harmless, from and against any damages, costs, claims and other liabilities incurred by any of them in connection with their respective duties and responsibilities hereunder, other than those damages, costs, claims and other liabilities that result from such party's gross negligence or willful misconduct.  The Trustee may purchase errors and omissions insurance to cover potential liabilities that may be incurred in the Cases, and such cost shall be paid for by the Trust.

**G.     Employment of Professionals By the Trustee and Payment of Professional Fees and Expenses By the Trustee Incurred after the Effective Date.**

After the Effective Date, the Trust Board and the Trustee may retain any existing professionals and hire additional professionals they desire and deem appropriate to represent them, including any professionals employed by the OCEH, without the need for any further employment agreements or Court orderst.  The Trustee, under the supervision of the Trust Board, shall have the right to cause the Trust to employ any other professionals that the Trustee deems

appropriate to represent the Trust to assist the Trustee to carry out the Trustee's duties in accordance with the Trust Agreement and to compensate such professionals out of the Trust Property without any further order of or supervision by the Court.    The OCEH currently anticipates that the Trustee and the Trust Board will retain Dentons US LLP as its bankruptcy and general counsel and Solomon & Cramer LLP as its special litigation counsel.

Additionally, after the Effective Date, the Trustee may hire professionals without the requirement that such professionals file employment applications for Court approval of their employment, whether on an hourly, contingency fee or other basis, and without the requirement that such professionals file applications for payment of post-Effective Date fees and expenses on an interim basis; provided, however, that no less frequently than every 180 days, such post-Effective Date professionals and the Trustee shall each file an application with the Court seeking final approval of their respective fees and expenses as previously invoiced or paid on an interim basis, as the case may be.    Such applications shall be served on the UST; provided, however, such applications need not be in the format required by the Local Rules of the Bankruptcy Court or the UST's Guidelines, but shall be sufficiently detailed to identify the hours worked, the rates charged and the work performed.    In the case of fees or expenses paid on a basis which is not by billable hours, the application shall include such other, sufficiently specific information so that the Court can otherwise determine the reasonableness of such fees and expenses.

## VII.    PAYMENTS AND DISTRIBUTIONS IN GENERAL

**A.    Distribution Procedures & Reserve Provisions.**

The Trustee, under the supervision of the Trust Board, will determine the timing and amount of distributions that the Trustee will make to the Shareholders from the Trust Property.

**B.    Delivery of Payments.**

All payments to be made by the Trustee to the Shareholders shall be made to the best known address on the Record Date by checks issued by regular mail, postage prepaid. All checks issued by the Trustee to Shareholders shall be null and void (and may be voided by the Trustee) if not negotiated by the recipient within ninety (90) days after the date of issuance thereof.

**C.    Rounding.**

Whenever any payment of a fraction of a cent would otherwise be called for the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

**D.    Unclaimed Property.**

Shareholders have the obligation to provide the Trustee with written notice of any change to their address, which shall be told to the Shareholders in the Plan confirmation notice. Any Shareholder who fails to negotiate a check sent to them by the Trustee for 90 days after the date of issuance thereof shall forfeit all rights to any distribution under the Plan, and shall not be subject to the unclaimed property or escheat laws of any governmental unit. Upon forfeiture, such cash (including interest thereon) shall be made available for re-distribution to all other Shareholders. The Trustee may but is not required, to undertake reasonable efforts, in the Trustee's business judgment, to locate Shareholders whose distributions are returned or whose checks are not negotiated within 90 days after the date of issuance thereof.

**VIII.    TAX CONSEQUENCES OF THIS PLAN**

CREDITORS AND SHAREHOLDERS CONCERNED WITH HOW THIS PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS (INCLUDING TAX ADVISORS). The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Estates. The Plan Proponents CANNOT and DO NOT represent that the tax consequences contained below are the only tax

consequences of this Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

The Plan Proponents do not anticipate that confirmation of this Plan will have any significant or materially negative effect on any tax liability of the Estates. However, the Plan Proponents do believe that it is possible or even likely that the confirmation of this Plan may serve to reduce or eliminate all or a portion of the Debtors' current net operating loss carry forward (NOL). The Plan Proponents have not performed any detailed analysis of the extent to which, if any, the confirmation of this Plan may have on the retention or loss of NOL or ability of any party to use any such NOL in the future. Any NOL which may be preserved through Plan confirmation shall be preserved under and by this Plan. The Plan Proponents have not performed any analysis of, and make no representations regarding, the potential tax consequences to creditors or Shareholders from the confirmation of or implementation of this Plan. Creditors and Shareholders who wish to understand the potential tax consequences to them from the confirmation of or implementation of this Plan should consult with their own personal accountants, attorneys and/or advisors.

## IX.    CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Plan Proponents CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan. Some of the requirements include that this Plan must be proposed in good faith, acceptance of this Plan (which

does not apply to this Plan), whether this Plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether this Plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

## A.    Who May Vote to Accept/Reject this Plan.

A creditor or interest holder has a right to vote for or against this Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.  As indicated above, all creditors and all Shareholders are not impaired and therefore are not entitled to vote on this Plan because they are conclusively presumed to have accepted this Plan.

## B.    What Is an Allowed Claim/Interest.

Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim or interest.  THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE CASES WAS OCTOBER 20, 2017.  A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtors' schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  A claim is also deemed allowed if (1) it was timely filed, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

## C.    What Is an Impaired Claim/Interest.

A class is impaired if this Plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class comprised of general unsecured claims is impaired if this Plan fails to pay the members of that class 100% of what they are owed.  As indicated above, the Plan Proponents believe that there are no impaired classes under this Plan.  The Plan

Proponents believe that both class 1 (general unsecured creditors) and class 2 (Shareholders) are not impaired.  Parties who dispute the Plan Proponents' characterization of their claim or interest as being impaired or unimpaired may file an objection to this Plan contending that the Plan Proponents have incorrectly characterized the class.

**D.    Who Is <u>Not</u> Entitled to Vote.**

The following four types of claims are <u>not</u> entitled to vote on any plan:  (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under this Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted this Plan.  Claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in classes that do not receive or retain any value under this Plan do not vote because such classes are deemed to have rejected this Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THIS PLAN.

**E.    Treatment of Non-Accepting Classes.**

As noted above, even if <u>all</u> impaired classes do not accept this Plan, the Court may nonetheless confirm this Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code.  The process by which non-accepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows this Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if this Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept this

Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.  The Plan Proponents believe that no "cram down" needs to occur in the Cases because there are no impaired classes under this Plan.

**F.      Request for Confirmation Without Any Voting on this Plan.**

Under this Plan, there will be no impaired class of creditors because the only class of creditors under this Plan is class 1 (general unsecured creditors), and the class 1 claims are not impaired by this Plan and therefore do not vote on this Plan.  Under this Plan, there will be no impaired class of Shareholders because the only class of interests under this Plan is class 2 (the Shareholders), and the class 2 Shareholders are not impaired by this Plan and therefore do not vote on this Plan.  Even if the class 2 Shareholders were impaired by this Plan and were entitled to vote on this Plan, and, as a class, did not vote to accept this Plan (despite the fact that the interests of the class 2 Shareholders are represented by the OCEH; the OCEH is a co-proponent of this Plan; and the OCEH would recommend that all class 2 Shareholders vote to accept this Plan), the Plan Proponents believe that this Plan would nevertheless be confirmable by "cramdown" because the conditions of § 1129(b)(2)(C)(ii) will have been satisfied in that no holder of any interest that junior to the interests of the class 2 Shareholders will receive or retain any property under this Plan on account of any such junior interest.  In fact, there are no interests that are junior to the interests of the class 2 Shareholders.

**G.      Liquidation Analysis.**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept this Plan, then that claimant or interest holder must receive or retain under this Plan property of a value not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the

Bankruptcy Code. The Plan Proponents contend that the "Best Interest Test" does not need to be satisfied in the Cases because there are no claimants or interest holders in an impaired class and there are no impaired classes under this Plan.

In a chapter 7 case, the Debtors' assets would be liquidated by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties subject to their lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, Shareholders would receive the balance that remains after all creditors are paid in full.

The Plan Proponents contend that even if the class 2 Shareholders were impaired by this Plan and the "Best Interest Test" had to be satisfied with respect to the class 2 Shareholders, which would mean that the Plan Proponents would have to demonstrate that each class 2 Shareholder who did not vote to accept this Plan must receive or retain under this Plan property of a value not less than the amount that such class 2 Shareholder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the "Best Interest Test" would clearly be met for at least the following four reasons: One, under this Plan, the Escrow Agent is paying all Allowed Claims out of the Remaining Estate Funds without charging any disbursing agent fee. In contrast, a chapter 7 trustee would be paid the trustee's fee (frequently referred to as the trustee's "handle") in accordance with the percentage formula set forth in § 326 of the Bankruptcy Code. This is significant. For example, if the Escrow Agent pays out a total of $3 million of Allowed Claims, inclusive of the final fees and expenses of the professionals employed in the Cases, the normal chapter 7 trustee for doing so under § 326 of the Bankruptcy Code would be $114,250, and, here, the Escrow Agent is charging no fee at all for making these payments.

Two, the fee structure being charged by the Trustee for making distributions from the Trust will be lower than the percentage formula set forth in § 326 of the Bankruptcy Code. Three, a chapter 7 trustee would hire the trustee's own new professionals, which would create great expense and inefficiency of introducing new professionals into the Cases with no familiarity or background of the Cases, rather than the smooth transition of the use by the Estates of the existing professionals who are already intimately familiar with the Cases. Four, Shareholders will receive their money under this Plan much faster than they would in a chapter 7 bankruptcy simply because of the time it takes for a chapter 7 trustee to close out a chapter 7 bankruptcy estate and distribute funds. Conversely, the Plan Proponents submit that there would be no advantage of any conversion of the Cases to chapter 7. The Plan Proponents therefore believe that it is clear that Shareholders will receive *more* under this Plan than they would receive in any chapter 7 liquidation of the Debtors.

**H.     Feasibility.**

Another requirement for confirmation involves the feasibility of this Plan, which means that confirmation of this Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtors will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on such date. Since the Debtors already have enough cash on hand (through the Remaining Estate Funds) to pay all the claims and expenses which are entitled to be paid on the Effective Date, this first aspect of Plan feasibility has clearly been satisfied. The second aspect considers whether there will be enough cash over the life of this Plan to make the required Plan payments. Since this Plan is a liquidating Plan, where all Remaining Estate Funds and other funds that are in the Estates or will come into the Estates will all be

distributed to holders of allowed claims, with any remaining balance to be paid to Shareholders, this second aspect of Plan feasibility has, by definition, been satisfied.

## X. RISK FACTORS REGARDING THIS PLAN

Since this Plan is a liquidating Plan, where all Remaining Estate Funds and any other recoveries by or funds in the Estates will be distributed to holders of allowed claims in accordance with the terms of this Plan, with the net balance to Shareholders, there is no traditional "risk" to the ability of the Debtors or the Trust to perform under this Plan.

## XI. EFFECT OF CONFIRMATION OF THIS PLAN

A. **Retention of Jurisdiction.**

After confirmation of this Plan and the occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Court will retain such jurisdiction as is legally permissible including for the following purposes:

i. to resolve any and all disputes regarding the operation and interpretation of this Plan and the Plan Confirmation Order;

ii. to determine the allowability, classification, or priority of claims and interests upon objection by the Trustee, and to consider any objection to claims whether such objection is filed before or after the Effective Date;

iii. to determine the extent, validity and priority of any lien asserted against any property of the Debtors, property of the Estates or any Trust Property;

iv. to construe and take any action to enforce this Plan, the Plan Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of this Plan, the Plan Confirmation Order and all matters referred to in this Plan and the Plan Confirmation Order, and to determine

all matters that may be pending before the Court in the Cases on or before the Effective Date with respect to any person or entity related thereto;

v.    to determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

vi.    to determine any request for payment of administrative expenses;

vii.    to determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date and the allowance of any claims resulting therefrom;

viii.    to determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of the Cases whether before, on, or after the Effective Date;

ix.    to determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

x.    to modify this Plan under § 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in this Plan or to reconcile any inconsistency in this Plan so as to carry out its intent and purpose;

xi.    except as otherwise provided in this Plan or the Plan Confirmation Order, to issue injunctions, to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or the Plan Confirmation Order, or the execution or implementation by any person or entity of this Plan or the Plan Confirmation Order;

xii.    to issue such orders in aid of consummation of this Plan and the Plan Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect

to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

xiii.    to enter final decrees closing the Cases.

**B.    Discharge.**

The Debtors will not receive a discharge under this Plan because the requirements of § 1141 of the Bankruptcy Code necessary for the Debtors to receive a discharge are not present.

**C.    Binding Effect of Plan.**

The provisions of the confirmed Plan shall bind the Debtors, the Liquidating Debtor, the Trustee, the Trust Board, the Trust Board Members, and any creditor or Shareholder, whether or not such creditor or Shareholder has filed a proof of claim or proof of interest in the Cases.  With respect to any taxes of the kind specified in Bankruptcy Code § 1146(c), this Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to under this Plan or related to any transaction contemplated under this Plan is to be recorded.

**D.    Revesting of Property Free and Clear.**

Upon the Effective Date, except as otherwise provided in this Plan, title to all assets of the Estates ("Estate Assets") shall vest in the Trust for the purposes contemplated under the Plan and shall no longer constitute property of the Estates.  Except as otherwise provided by this Plan, and to the full extent allowed by §§ 1141(b) and (c) of the Bankruptcy Code, upon the Effective Date, all Estate Assets shall be free and clear of all claims, liens and interests, including unsecured claims.  All unsecured claims against the Debtors or the Estates shall be of no further force or effect except with respect to the rights of holders of Allowed Claims to received payments or distributions as set forth herein.  Following the Effective Date, the Trustee may use, acquire or dispose of any Trust Property free of any restrictions imposed by the Court, the Bankruptcy Code

or the Bankruptcy Rules and without further approval of the Court, except as may otherwise be required under this Plan, the Plan Confirmation Order or the Trust Agreement.   Except as otherwise expressly provided in this Plan,  the Plan Confirmation Order or the Trust Agreement, all rights or causes of action are hereby preserved and retained for enforcement solely and exclusively by and at the discretion of the Trustee.

**E.      Exculpations and Releases.**

To the maximum extent permitted by law, neither the Debtors, the officers and directors of the Debtors, the Liquidating Debtor, the OCUC, the OCEH, the Trustee, the Trust Board Members, nor any of their employees, officers, directors, shareholders, agents, members, representatives, or professionals employed or retained by any of them, shall have or incur liability to any person or entity for any act taken or omission made in good faith in connection with or related to the Cases or the formulation and implementation of this Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of this Plan, or the consummation and implementation of this Plan and the transactions contemplated therein.

**F.      Injunctions.**

The Plan Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released or terminated pursuant to this Plan.  As of the Effective Date, all entities that have held, currently hold or may hold a claim or other debt or liability that is released or terminated or an interest or other right of a creditor or equity security holder that is released, terminated or extinguished pursuant to the terms of this Plan are permanently enjoined from taking any of the following actions against the Debtors, the Liquidating Debtor, the OCUC, the OCEH, the Trustee, the Trust Board Members, and any of their employees, officers, directors,

shareholders, agents, members, representatives, or professionals employed or retained by any of them, or their property on account of any such released, terminated or extinguished claims, debts or liabilities or extinguished interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; and (iv) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of this Plan.  By accepting a distribution made pursuant to this Plan, each holder of an allowed claim and each Shareholder which receives a distribution pursuant to this Plan or the Trust Agreement shall be deemed to have specifically consented to the injunctions set forth in this Section.

## G.    Modification of this Plan.

The Plan Proponents reserve the right to modify this Plan at any time before confirmation and seek confirmation of such modified Plan consistent with the Bankruptcy Code.  The Plan Proponents may also seek to modify this Plan at any time after confirmation of this Plan but before the Effective Date so long as (1) this Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.  Notwithstanding the foregoing, any modification of this Plan, whether before or after confirmation, shall require the consent of both the Debtors or the Liquidating Debtor, as the case may be, and the OCEH or the Trustee, as the case may be.

## H.    Post-Confirmation Status Reports.

Until final decrees closing the Cases are entered, the Trustee shall file quarterly status reports with the Court explaining what progress has been made toward consummation of the confirmed Plan, and the Trustee shall pay the post-confirmation quarterly fees to the UST out of the Trust Property.

**I.    Post-Confirmation Conversion/Dismissal.**

A creditor or any other party in interest may bring a motion to convert or dismiss the Cases under § 1112(b) of the Bankruptcy Code after this Plan is confirmed if there is a default in performing this Plan, with the Trustee (and the Liquidating Debtor if the motion is brought before the Effective Date) reserving all rights to oppose any such motion.  If the Court orders the Cases converted to chapter 7 after this Plan is confirmed, then all property that had been property of the Estates, and that has not been disbursed pursuant to this Plan, will revest in the chapter 7 estates, and the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during the Cases.  The Plan Confirmation Order may also be revoked under very limited circumstances.  The Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the date of entry of the Plan Confirmation Order.

**J.    Final Decrees.**

Once the Estates have been fully administered as referred to in Bankruptcy Rule 3022, the Trustee will file a motion with the Court to obtain final decrees to close the  Cases.  The Trustee shall be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and shall pay all such fees out of the Trust Property.

## XII.    MISCELLANEOUS

**A.    Severability of Plan Provisions.**

In the event that, prior to the Plan Confirmation Hearing, any term or provision of this Plan is held by the Court to be invalid, void or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void

or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Plan Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**B.      Governing Law and Headings.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California.  The headings contained in this Plan are for convenience of reference only and shall not limit or otherwise affect in any way the meaning or interpretation of this Plan.

**C.      Language Interpretation.**

In the interpretation of this Plan, unless the context otherwise requires, references in this Plan to the singular shall be construed to include references to the plural and vice versa; words importing the singular shall be deemed to import the plural and vice versa; words denoting gender shall include all genders; references to sections, schedules, and exhibits shall mean sections, schedules, and exhibits of and to this Plan; references to part includes the whole, except where the context clearly requires otherwise "or" has the inclusive meaning represented by the phrase "and/or," and the words "hereof," "herein," "hereunder," and similar terms in this Plan refer to this Plan as a whole and not to any particular provision of this Plan.

**D.      Exhibits.**

All exhibits attached to this Plan are, by this reference, hereby incorporated into this Plan. The final version of all exhibits to this Plan will be substantially in the forms attached hereto or thereto. The Plan Proponents reserve the right to make non-substantive changes and corrections to such exhibits in advance of the Plan Confirmation Hearing.  If any exhibits are changed or corrected, the replacement exhibits will be filed with the Court prior to the commencement of the Plan Confirmation Hearing.

**E.     Notices.**

All notices required or permitted to be made in accordance with this Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first class mail or via facsimile with electronic confirmation of receipt as follows (but all such notices must also be provided by email as indicated below):

If to the Debtors:
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA  90067
Email:  rb@lnbyb.com
Attention: Ron Bender

If to the Equity Committee:
Dentons US LLP
601 S. Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Email:  tania.moyron@dentons.com
Attention:  Tania Moyron

**F.      Computation of Time Periods.**

In computing any period of time prescribed or allowed by this Plan, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in the Court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

**G.      Defects, Omissions and Amendments.**

The Plan Proponents, with the approval of the Court and without notice to all holders of claims or interests, insofar as it does not materially and adversely affect holders of claims or interests, may correct any defect, omission or inconsistency in this Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of this Plan.  This Plan may be altered or amended before or after the Plan Confirmation Hearing as provided in § 1127 of the Bankruptcy Code.

**H.      Filing of Additional Documents.**

The Plan Proponents shall file with the Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**I.      Successors and Assigns.**

The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors

and/or assigns of such entity.

**J.    Successors and Assigns.**

The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such entity.

**K.    Implementation.**

Upon the confirmation of this Plan and the occurrence of the Effective Date, the Debtors and the OCEH shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in this Plan.

**L.    Certain Actions.**

By reason of entry of the Plan Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under this Plan that would otherwise require approval of the owners, stockholders, shareholders, members, directors, managers, or officers of the Debtors under this Plan, including, without limitation, (i) the distribution of cash pursuant to this Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to this Plan, and (iii) the adoption, execution, and implementation of other matters provided for under this Plan involving the company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to the applicable general corporation, limited liability, or partnership law of the state in which the Debtors or the Liquidating Debtor is chartered, organized or incorporated, without any requirement of further action by the owners, stockholders, shareholders, members, directors, managers, or officers of the Debtors.

**M.      Waiver of Ten (10) Day Stay.**

The Plan Proponents request as part of the Plan Confirmation Order a waiver from the Court of the ten (10) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the ten (10) day stay of Bankruptcy Rule 6004(g).

Dated: December ___, 2017

<u>Presented By:</u>

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

By:____*/s/ Ron Bender*_____
        RON BENDER
        MONICA Y. KIM
        KRIKOR J. MESHEFEJIAN
        Attorneys for Chapter 11 Debtors and Plan Proponents

ICPW Liquidation Corporation, a California corporation, formerly known as Ironclad Performance Wear Corporation, a California corporation, and ICPW Liquidation Corporation, a Nevada corporation, formerly known as Ironclad Performance Wear Corporation, a Nevada corporation

By:_____
        GEOFF GREULICH, Chief Executive Office

<u>Presented By:</u>

DENTONS US LLP

By:____*/s/ Tania Moyron*_____
        SAMUEL R. MAIZEL
        TANIA MOYRON
        Attorneys for Official Committee of Equity Security Holders

Official Committee of Equity Security Holders

By:_____
        SCOTT JARUS, Chairman

74

# EXHIBIT "1"

| Creditor | Case in Which Claim Filed/Scheduled | Claim Nos. | Secured | Priority | General Unsecured | Schedule "D" Secured | Schedule "E" Priority | Schedule "F" Unsecured | C/U/D | PAID AMOUNT | REMAINING CLAIM (best case scenario) | REMAINING CLAIM (worst case scenario) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1920 Hutton Court | NV | | | | | | | $13,257.09 | | $13,257.09 | $0.00 | $0.00 |
| Account Temps | CA | 26 | | | $5,662.28 | | | $5,662.28 | | $0.00 | $5,662.28 | $5,662.28 |
| Advantage Media Services | CA | 4 | $178,522.75 | | | | | $178,522.75 | | $178,522.75 | $0.00 | $0.00 |
| American Alternative Insurance Corporation | CA | 1 | | | $400,000.00 | | | | | $0.00 | $0.00 | $400,000.00 |
| AML United Limited | CA | | | | | | | $28,330.56 | | $28,330.56 | $28,330.56 | $0.00 |
| Amster, Rothstein & Ebenstein, LLP | CA | 11 | | | $11,395.96 | | | $11,395.96 | | $0.00 | $11,395.96 | $11,395.96 |
| Atmos Energy | CA | | | | | | | $51.98 | | $0.00 | $51.98 | $51.98 |
| BDO USA, LLP | CA | | | | | | | $10,000.00 | | $0.00 | $10,000.00 | $10,000.00 |
| Ben Padnos | CA | | | | | | | $1,304.35 | | $0.00 | $1,304.35 | $1,304.35 |
| BIC ALLIANCE | CA | | | | | | | $5,800.00 | | $0.00 | $5,800.00 | $5,800.00 |
| BNSF | CA | 15 | | | $14,788.95 | | | $14,788.95 | | $0.00 | $14,788.95 | $14,788.95 |
| Broadridge | CA | | | | | | | $2,110.51 | | $0.00 | $2,110.51 | $2,110.51 |
| Broussard,Ronald Roy | CA | | | | | | | $40,000.00 | | $40,000.00 | $0.00 | $0.00 |
| Burkhard,Kerri | CA | | | | | | | $2,500.00 | | $2,500.00 | $0.00 | $0.00 |
| Business Systems Integrators, LLC **(Assigned to CRG Financial LLC)** | CA | | | | | | | $695.00 | | $0.00 | $695.00 | $695.00 |
| California Board of Equalization | CA | | | | | | $600.00 | $291.40 | | $0.00 | $891.40 | $891.40 |
| Capital One Bank | CA | | | | | | | $15,471.81 | | $0.00 | $15,471.81 | $15,471.81 |
| Chang Bang Gloves (Hong Kong) Co., Limited | CA/NV | 17,6 | | | $1,410,219.16 | | | $1,228,307.56 | | $1,228,307.56 | $10,818.16 | $181,911.60 |
| Charles Giffen | CA | | | | | | | $4,402.17 | | $0.00 | $4,402.17 | $4,402.17 |
| CIS Custom Information Services | CA | | | | | | | $3,546.45 | | $0.00 | $0.00 | $3,546.45 |
| Commerce Technologies, Inc. | CA | | | | | | | $288.10 | | $0.00 | $0.00 | $288.10 |
| Comptroller of Public Accounts | CA | | | | | | $2,294.00 | | | $0.00 | $2,294.00 | $2,294.00 |
| Custom Information Sevices | NV | 5 | | | $3,546.45 | | | | | $0.00 | $3,546.45 | $3,546.45 |
| David Jacobs | CA | | | | | | | $5,706.52 | | $0.00 | $5,706.52 | $5,706.52 |
| Daylight Transport | CA | | | | | | | $355.09 | | $0.00 | $355.09 | $355.09 |
| DESIGN GALLERY (PVT.) LTD. | CA | | | | | | | $12,801.60 | | $12,801.60 | $0.00 | $0.00 |
| DESUN GARMENTS, LTD. assigned to CRG Financial LLC | CA | 18 | | | $11,135.00 | | | $7,691.75 | | $7,691.75 | $0.00 | $3,443.25 |
| Dival Safety & Supplies | CA | | | | | | | $2,095.00 | | $0.00 | $2,095.00 | $2,095.00 |
| DRG Strategic, LLC - Bob Goldstein | CA | | | | | | | $556.75 | | $0.00 | $556.75 | $556.75 |
| DTM Sales | CA | | | | | | | $3,184.26 | | $0.00 | $3,184.26 | $3,184.26 |
| Emmett Murphy | CA | | | | | | | $1,304.35 | | $0.00 | $1,304.35 | $1,304.35 |
| Emslie, Mike | CA | | | | | | | $35,000.00 | | $35,000.00 | $0.00 | $0.00 |
| Eshleman,Derek G | CA | | | | | | | $20,000.00 | | $20,000.00 | $0.00 | $0.00 |
| Federal Insurance Company | NV | 3 | | | $14,385.50 | | | | | $0.00 | $0.00 | $14,385.50 |
| FedEx | CA | 24 | | | $18,551.03 | | | $14,795.67 | | $0.00 | $18,551.03 | $18,551.03 |
| Feld,Abraham Hagen | CA | | | | | | | $5,000.00 | | $5,000.00 | $0.00 | $0.00 |
| Fowler,Michael J | CA | | | | | | | $40,000.00 | | $40,000.00 | $0.00 | $0.00 |
| Geoff Greulich | CA | | | | | | | $147,500.00 | | $147,500.00 | $0.00 | $0.00 |
| Ginger Collier | CA | | | | | | | $797.81 | | $0.00 | $797.81 | $797.81 |
| GT Graphics of Sheboygan LLC | CA, NV | 10, 4 | | | $759.07 | | | $759.07 | | $0.00 | $759.07 | $759.07 |
| Guo, Xin | CA | | | | | | | $10,000.00 | | $10,000.00 | $0.00 | $0.00 |
| Hewlett Packard | CA | | | | | | | $364.80 | | $0.00 | $364.80 | $364.80 |
| Internal Revenue Service | CA | 6 | $0.00 | $0.00 | $0.00 | | | | | $0.00 | $0.00 | $0.00 |
| Internal Revenue Service | NV | 2 | | $2,000.00 | | | | | | $0.00 | $0.00 | $2,000.00 |
| IPFS Corporation | CA | 3 | $30,725.49 | | | | | | | $0.00 | $12,541.02 | $30,725.49 |
| Jaeger,Eric | CA | | | | | | | $40,000.00 | | $40,000.00 | $0.00 | $0.00 |
| Jeffrey Cordes | CA | 8 | | $12,850.00 | $154,056.75 | | | | | $0.00 | $0.00 | $166,906.75 |
| KA HUNG GLOVE INUSTRIAL CO. LTD. | CA | | | | | | | $49,957.73 | | $38,934.90 | $11,022.83 | $11,022.83 |
| Konica Minolta Business Solutions | CA | | | | | | | $1,152.31 | | $1,152.31 | $0.00 | $0.00 |
| LAB Sales Agency | CA | | | | | | | $54.92 | | $0.00 | $54.92 | $54.92 |
| Laubert,Matthew Palmer | CA | | | | | | | $10,000.00 | | $10,000.00 | $0.00 | $0.00 |
| LF Logistics | CA | | | | | | | $69.10 | | $0.00 | $69.10 | $69.10 |
| Liaison Technologies, Inc. | CA | 23 | | | $945.00 | | | $945.00 | | $0.00 | $945.00 | $945.00 |

| Creditor | Case in Which Claim Filed/Scheduled | | Secured | Priority | Unsecured | Schedule | Priority | Unsecured | |
|---|---|---|---|---|---|---|---|---|---|
| Lien Shun Yang Leather Co., Ltd. | CA | | | | | $34.59 | $0.00 | $34.59 | $34.59 |
| Marshall, Russell | CA | | | | | $5,000.00 | $5,000.00 | $0.00 | $0.00 |
| MARUSAN - MIMASU TSHUSHO CO. LTD. | CA | | | | | $382,811.28 | $382,811.28 | $0.00 | $0.00 |
| Matt Pliskin | CA | | | | | $27,000.00 | $27,000.00 | $0.00 | $0.00 |
| Mediant | CA | | | | | $253.09 | $0.00 | $253.09 | $253.09 |
| MERCINDO GLOBAL MANUFAKTUR | CA | | | | | $453,831.81 | $444,674.64 | $9,157.17 | $9,157.17 |
| Metzler,Stacy Marie | CA | | | | | $7,500.00 | $7,500.00 | $0.00 | $0.00 |
| Michael DiGregorio | CA | | | | | $6,847.83 | $0.00 | $6,847.83 | $6,847.83 |
| Morris,Chartrice Holt | CA | | | | | $7,500.00 | $7,500.00 | $0.00 | $0.00 |
| Nacion,Markham | CA | | | | | $18,000.00 | $18,000.00 | $0.00 | $0.00 |
| National Safety Council | CA | | | | | $395.00 | $0.00 | $395.00 | $395.00 |
| nChannel, Inc. | CA | | | | | $0.00 | $0.00 | $0.00 | $0.00 |
| Net Pack (Assigned to Argo Partners) | CA | | | | | $3,554.60 | $0.00 | $3,554.60 | $3,554.60 |
| Office Depot Acct 31A | CA | | | | | $317.44 | $0.00 | $317.44 | $317.44 |
| Pacific Stock Transfer Company | CA | | | | | $958.00 | $0.00 | $958.00 | $958.00 |
| Perry HVAC | CA | | | | | $1,264.09 | $0.00 | $1,264.09 | $1,264.09 |
| Pestilli & Associates | CA | | | | | $157.46 | $0.00 | $157.46 | $157.46 |
| Pitney Bowes Credit Corp. | CA | | | | | $452.99 | $452.99 | $0.00 | $0.00 |
| Precision Testing Laboratories (Assigned to CRG Financial LLC) | CA | | | | | $1,500.00 | $0.00 | $1,500.00 | $1,500.00 |
| Progroup Incorporated | CA | 22 | | $1,000.00 | | $500.00 | $0.00 | $1,000.00 | $1,000.00 |
| PT JJ GLOVES INDO | CA | | | | | $162,917.76 | $162,917.76 | $0.00 | $0.00 |
| PT SEOK HWA INDONESIA | CA | | | | | $13,174.86 | $13,174.86 | $0.00 | $0.00 |
| PT SPORT GLOVE INDONESIA | CA | | | | | $144,238.66 | $144,238.66 | $0.00 | $0.00 |
| Quill Corporation | CA | | | | | $67.46 | $0.00 | $67.46 | $67.46 |
| Radians Wareham Holding, Inc. | CA, NV | 20, 7 | $3,464,093.28 | | $3,397,406.95 | $5,343,988.19 | $0.00 | $0.00 | |
| RD Pete Bloomer | CA | | | | | $4,350.00 | $0.00 | $4,350.00 | $4,350.00 |
| Republic Services | CA | | | | | $341.10 | $0.00 | $341.10 | $341.10 |
| Resources Global Professionals | NV, CA | 1 | | $80,767.00 | | $80,727.00 | $0.00 | $80,727.00 | $80,727.00 |
| Risk Consulting Partners | CA | | | | | $0.00 | $0.00 | $0.00 | $0.00 |
| Robert Steckler | CA | | | | | $1,304.35 | $0.00 | $0.00 | $1,304.35 |
| Russ McDonald | CA | | | | | $98.65 | $0.00 | $98.65 | $98.65 |
| Safeco Building Maintenance | CA | | | | | $646.35 | $0.00 | $646.35 | $646.35 |
| Shur-Sales & Marketing, Inc. | CA | | | | | $16,125.00 | $0.00 | $16,125.00 | $16,125.00 |
| Skadden Arps Slate Meagher & Flom LLP | CA | 21 | | $342,141.79 | | $231,848.92 | $0.00 | $231,848.92 | $342,141.79 |
| SPS Commerce | CA | | | | | $1,022.55 | $0.00 | $1,022.55 | $1,022.55 |
| Stubbs, Alderton & Markiles, LLP | CA | | | | | $331,893.44 | $0.00 | $331,893.44 | $331,893.44 |
| Superior Printing, Inc. | CA | | | | | $162.23 | $0.00 | $162.23 | $162.23 |
| Synetra | CA | | | | | $37,972.33 | $37,972.33 | $0.00 | $0.00 |
| TAB Sales Soulutions | CA | | | | | $430.52 | $0.00 | $430.52 | $430.52 |
| Tamer Shiha | CA | | | | | $12,500.00 | $12,500.00 | $0.00 | $0.00 |
| Three Part Advisors, LLC | CA | 2 | | $6,900.00 | | $6,900.00 | $0.00 | $6,900.00 | $6,900.00 |
| Three Part Advisors, LLC | CA | 5 | | $6,900.00 | | $0.00 | $0.00 | $0.00 | $0.00 |
| TRI/AUSTIN, INC | CA | | | | | $350.00 | $0.00 | $350.00 | $350.00 |
| TXU Energy | CA | 9 | | $1,752.73 | | $1,430.11 | $0.00 | $1,752.73 | $1,752.73 |
| Tyco Integrated Security, LLC | CA | | | | | $279.06 | $0.00 | $279.06 | $279.06 |
| Uline | CA | | | | | $710.49 | $0.00 | $710.49 | $710.49 |
| University of Milwaukee | CA | | | | | $33,333.00 | $0.00 | $33,333.00 | $33,333.00 |
| UPS Freight | CA | | | | | $504.55 | $0.00 | $504.55 | $504.55 |
| Urena,Daniel | CA | | | | | $7,500.00 | $7,500.00 | $0.00 | $0.00 |
| Vane Clayton | CA | | | | | $7,630.43 | $0.00 | $7,630.43 | $7,630.43 |
| Vonalman,Turner J | CA | | | | | $10,000.00 | $10,000.00 | $0.00 | $0.00 |
| W.W. Grainger, Inc. | CA | 19 | | $963,708.03 | | $180,000.00 | $0.00 | $0.00 | $783,708.03 |
| Washington,Cheryl | CA | 13 | | $10,000.00 | | $10,000.00 | $10,000.00 | $0.00 | $0.00 |
| Weispfenning,Daniel Walton | CA | | | | | $2,500.00 | $2,500.00 | $0.00 | $0.00 |
| Werner Logistics | CA | | | | | $7,375.00 | $0.00 | $7,375.00 | $7,375.00 |
| William M. Aisenberg | CA | 7 | $12,850.00 | $116,556.75 | | $0.00 | $0.00 | $0.00 | $129,406.75 |
| Windstream | CA | 14 | | $1,739.59 | | $1,739.59 | $0.00 | $1,739.59 | $1,739.59 |
| WINSPEED SPORTS SHANGHAI CO., LTD. | CA | 12 | | $152,830.45 | | $144,198.43 | $152,830.45 | $0.00 | $0.00 |

| Creditor | Case in Which Claim Filed/Scheduled | Claim No. | Secured | Priority | General Unsecured | Schedule "D" Secured | Schedule "E/F" Priority | Schedule "E/F" Unsecured | Desc | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WONEEL MIDAS LEATHERS | CA | 16 | | | $896,382.28 | | | $785,358.50 | | $785,358.50 | $24,697.38 | $111,023.78 |
| Yellow and Roadway | CA | | | | | | | $12,391.41 | | $0.00 | $12,391.41 | $12,391.41 |
| California Dept of Tax and Fee Administration | CA | 25 | | $573.60 | | | | | | | $573.60 | $573.60 |
| Comptroller of Public Accounts | NV | 8 | | $1,000.00 | | | | | | | $1,000.00 | $1,000.00 |
| Comptroller of Public Accounts | NV | 9 | | $3,844.52 | $263.72 | | | | | | $4,108.24 | $4,108.24 |
| | | | | | | | | | | | | |
| | | TOTALS: | $3,673,341.52 | $33,118.12 | $4,626,387.49 | $3,397,406.95 | $2,894.00 | $4,966,718.58 | | $9,614,918.18 | $972,657.20 | $2,841,864.90 |

# EXHIBIT "2"

## TRUST AGREEMENT

This Trust Agreement (the "Agreement"), dated as of ⬚⬚⬚⬚⬚⬚ ⬚⬚, 2018, is by and among ICPW Liquidation Corporation, a California corporation, formerly known as Ironclad Performance Wear Corporation, a California corporation ("ICPW California"), and ICPW Liquidation Corporation, a Nevada corporation, formerly known as Ironclad Performance Wear Corporation, a Nevada corporation ("ICPW Nevada" and collectively with ICPW California, the "Debtors"), as settlors, and ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚, as the trustee of the Trust referred to herein (the "Trustee"), and is executed in connection with and pursuant to the terms of the Joint Plan of Liquidation Dated December ⬚⬚, 2017 ("Plan") that was jointly proposed by the Debtors and the Official Committee of Equity Security Holders (the "OCEH"), which provides for, among other things, the establishment of a trust evidenced hereby (the "Trust").

## W I T N E S S E T H

WHEREAS, on September 8, 2017, the Debtors filed voluntary petitions pursuant to Chapter 11 of the Bankruptcy Code with the Bankruptcy Court;

WHEREAS, on ⬚⬚⬚⬚⬚⬚⬚, 2018, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order");

WHEREAS, the Trust is created pursuant to the Plan;

WHEREAS, the Trust is created on behalf, and for the sole benefit, of the shareholders of ICPW Nevada (the "Shareholders" or the "Trust Beneficiaries"), as set forth in the Plan and provided herein;

WHEREAS, the Trust is established for the purpose of collecting, distributing and liquidating all of the funds and property assigned to the Trust and pursuing claims and causes of action assigned to the Trust under the Plan (the "Trust Corpus") for the benefit of the Trust Beneficiaries in accordance with the terms of this Agreement and the Plan;

WHEREAS, the Trust shall have no objective or authority to continue or to engage in the conduct of any trade or business;

WHEREAS, the Plan provides that the Trust Beneficiaries are entitled to their applicable share of the Trust Corpus, all as described generally in the Plan;

WHEREAS, concurrently with the effectiveness of this Agreement, the Effective Date under the Plan has occurred, the Plan has become effective, and the Debtors have been conclusively deemed to have conveyed the assets of the Debtors' estates (the "Trust Property") to the Trust (except as specifically set forth in the Plan), and the Trustee will cause the Debtors to be dissolved pursuant to the terms of the Plan;

WHEREAS, pursuant to the Plan, the Debtors, the Trustee, and the Trust Beneficiaries are required to treat, for all federal income tax purposes, the transfer of the Trust Property to the Trust as a transfer of the Trust Property by the Debtors to the Trust Beneficiaries in satisfaction of their class 2 interests under the Plan, followed by a transfer of the Trust Property by the Trust

1

Beneficiaries to the Trust in exchange for the beneficial interest herein, and to treat the Trust Beneficiaries as the grantors and owners of the Trust for federal income tax purposes;

WHEREAS, the Trust is intended to qualify as a liquidating trust for federal income tax purposes pursuant to Treasury Regulation Section 301.7701-4(d), and to be treated as a grantor trust for federal income tax purposes pursuant to Sections 671 through 679 of the Internal Revenue Code;

WHEREAS, pursuant to the Plan and the Plan Confirmation Order, the Bankruptcy Court has approved _____[1] to serve as the Trustee of the Trust;

WHEREAS, pursuant to the Plan and the Plan Confirmation Order, the Bankruptcy Court has approved Scott Jarus, Ron Chez, and _____ to serve as the members of the Trust Board;

WHEREAS, the Bankruptcy Court shall have jurisdiction over the Trust, the Trustee, the Trust Property, including, without limitation, any claims and causes of action, as provided herein and in the Plan; and

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein and in the Plan, the Debtors and the Trustee agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

1.1     Definitions.

1.1.1     "Agreement" shall have the meaning set forth in the introductory paragraph to this Agreement.

1.1.2     "Bankruptcy Court" shall have the meaning set forth in the introductory paragraph to this Agreement.

1.1.3     "Debtors" shall have the meaning set forth in the introductory paragraph to this Agreement.

1.1.4     "Effective Date" shall have the meaning set forth in the Plan.

1.1.5     "Trust Property" shall mean the Trust Corpus (as defined in the Recitals to this Agreement) and shall include all of the assets assigned to the Trust under the Plan.

1.1.6     "Trust" shall have the meaning set forth in the introductory paragraph to this Agreement.

---

[1] The Debtors, the OCEH and the Trust Board anticipate that Patrick O'Brien will be the Trustee upon Court approval.

       1.1.7    "Trustee" shall mean (x) initially, the person named in the introductory paragraph to this Agreement as the Trustee, and (y) any successors or replacements duly appointed under the terms of this Agreement.

       1.1.8    "Trust Beneficiaries" shall have the meaning set forth in the Recitals to this Agreement, or any successors to such Trust Beneficiaries pursuant to Section 7.6 of this Agreement.

       1.1.9    "Plan" shall have the meaning set forth in the introductory paragraph to this Agreement.

     1.2    <u>Use of Plan Definitions</u>.  All capitalized terms which are used in this Agreement and not otherwise defined herein shall have the same meaning set forth in the Plan.  In the case of any inconsistency between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall govern and control.

     1.3    <u>Certain References</u>.  Reference in this Agreement to any Section or Article is, unless otherwise specified, to such section or article under this Agreement.  The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular section or article of this Agreement.

## ARTICLE II
## ESTABLISHMENT, PURPOSE AND FUNDING OF TRUST

     2.1    <u>Creation and Name</u>.  There is hereby created the Trust, referred to in the Plan. The Trustee may conduct the affairs of the Trust under the name of the "<u>ICPW Nevada Trust</u>."

     2.2    <u>Purpose of the Trust</u>.  The Debtors and the Trustee, pursuant to the Plan and in accordance with Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), hereby create the Trust for the purpose of (i) collecting, distributing, liquidating and otherwise disposing of all of the funds and property in the Trust for the benefit of the Trust Beneficiaries in accordance with the terms of this Agreement and the Plan, (ii) causing all proceeds of Trust Property to be deposited into the Trust in accordance with the Plan and this Agreement, (iii) controlling, defending, prosecuting settling, and/or pursuing the resolution or litigation of all claims, rights, Transferred Claims and Causes of Action included in the Trust Property, in each such case, in accordance with the Plan and this Agreement, (iv) overseeing and, where appropriate, directly initiating actions to resolve any remaining issues regarding the allowance and payment of Disputed Claims or any other claims that require resolution, including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court, and (v) taking such actions permitted hereunder that are necessary or useful to maximize the value of the Trust including, without limitation, the borrowing of funds and the retention of employees. The activities of the Trust shall be limited to those activities set forth herein and as otherwise contemplated by the Plan.  The Trustee understands and agrees that the Trust has no objective to continue or engage in the conduct of any trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.

2.2    Transfer of Trust Property.

2.2.1    The Debtors hereby grant, release, assign, convey, transfer and deliver, for the benefit of the Trust Beneficiaries, pursuant to Sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code and in accordance with the Plan and the Plan Confirmation Order, the Trust Property to the Trust for the uses and purposes as specified in this Agreement and the Plan, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other entities to the maximum extent contemplated by and permissible under Section 1141(c) of the Bankruptcy Code. The Debtors or the Liquidating Debtor shall from time to time as and when reasonably requested by the Trustee execute and deliver or cause to be executed and delivered all such documents (in recordable form where necessary or appropriate), and the Debtors or the Liquidating Debtor shall take or cause to be taken such further action as the Trustee may reasonably deem necessary or appropriate, to vest or perfect in or confirm to the Trustee title to and possession of the Trust Property.

2.2.2    Except as expressly provided herein or as provided in the Plan Confirmation Order, in no event shall any part of the Trust Property revert to or be distributed to any of the Debtors.

2.2.3    For all federal, state and local income tax purposes, the Debtors, the Trust Beneficiaries, and the Trustee shall treat the transfer of the Trust Property to the Trust as a transfer of the Trust Property by the Debtors to the Trust Beneficiaries in satisfaction of their class 2 interests under the Plan, followed by a transfer of the Trust Property by the Trust Beneficiaries to the Trust in exchange for their beneficial interests in the Trust.  Thus, the Trust Beneficiaries shall be treated as the grantors and owners of the Trust.

2.3    Securities Law.  Under Section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Trust to the Trust Beneficiaries under the Plan, to the extent such interests are deemed to be "securities," shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities. If the Trustee determines, with the advice of counsel, that the Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Trustee shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

## ARTICLE III
## APPOINTMENT, DUTIES, AND POWERS OF THE TRUSTEE.

3.1    Appointment.    _____ hereby acknowledges his/her acceptance of his/her appointment as the Trustee, to serve pursuant to the terms of the Plan and this Agreement, until such time as he/she resigns, is removed or discharged, or this Agreement and the Trust terminate as hereinafter set forth.

3.2    Trustee's Duties. The duties, obligations, and responsibilities of the Trustee shall include, but not be limited to, the following: (a) oversee the preservation, holding, management and maximization of all Trust Property and distribute them to the Trust Beneficiaries; (b) take or not take those actions which the Trustee in his/her business discretion believes to be in

4

accordance with the best interests of the Trust Beneficiaries and which actions or inactions are consistent with the Plan.

The Trustee's responsibilities, duties and obligations are solely to the Trust Beneficiaries. The Trustee shall have an independent right and standing to request relief from the Bankruptcy Court which the Trustee believes to be in accordance with the best interests of the Trust Beneficiaries. For purposes of performing his/her duties and fulfilling his/her obligations under the Plan, this Agreement, and the Plan Confirmation Order, the Trustee shall be deemed to be a "party in interest" within the meaning of Section 1109(b) of the Bankruptcy Code and a representative of the Debtors' bankruptcy estates under Bankruptcy Code section 1123(b)(3) and 1129(a)(5).

Within thirty (30) days following the end of each calendar quarter, the Trustee shall provide each member of the Trust Board with the actual Trust expenses paid or incurred during the preceding calendar quarter, from time to time, such other financial information the Trust Board may reasonably request.

The Trustee shall be available from time to time on reasonable notice to report to the Trust Board regarding the status of (i) the administration of the Trust, (ii) the collection and distribution of the Trust Property, and (iii) the status of all litigation. Upon reasonable request by the Trust Board, the Trustee shall promptly prepare, or cause to be prepared, such statistical data and written and oral reports as are reasonably necessary to keep the Trust Board or the Trust Beneficiaries, as the case may be, fully apprised of the condition and status of the Trust Property and any other activities of the Trust hereunder

　　　3.3　　Trustee's Rights, Powers and Privileges and Limitations Thereto.

The Trustee's rights, powers and privileges and the limitations thereto are set forth below in Sections 5.1 and 5.4, respectively.

**ARTICLE IV**
**TRUST BOARD**

　　　4.1　　Trust Board. The initial members of the board of the Trust (the "Trust Board") shall be Scott Jarus, Ron Chez and ＿＿＿＿＿ (the "Trust Board Members"). The Trust Board shall make certain determinations, in accordance with this Agreement and the Plan. Approval of a majority of the Trust Board Members shall be required for the Trust Board to act, provided that the Trust Board may delegate responsibility for discrete issues or decisions to one or more of the Trust Board Members. The Trust Board shall have the rights and powers set forth herein. In the event that a Trust Board shall not continue to exist under this Agreement, all references herein to required approval or other action of such Trust Board shall be of no force or effect. The Trust Board Members, by a majority vote, shall have the right to increase or to decrease the number of the Trust Board Members.

　　　4.2　　Approval of the Trust Board. Notwithstanding anything in this Agreement to the contrary, the Trustee shall submit to the Trust Board for its review and prior approval the matters set forth in Section 5.4 and any other matters that the Trust Board may direct the Trustee to

5

submit for its approval or that expressly require the approval of the Trust Board pursuant to the terms of this Agreement.

4.3    Resignation/Replacement of a Trust Board Member.  In the event that a Trust Board Member resigns, the remaining Trust Board Members, along with the Trustee, shall by majority vote select a replacement to serve on the Trust Board, if they deem it advisable and practicable.

4.4    Reimbursement and Indemnification.  Except for reimbursement of reasonable expenses, and any indemnification by the Trust, the Trust Board Members shall receive no compensation or other payment for the performance of their duties hereunder.

4.5    Confidentiality.  Each of the Trust Board Members shall, while serving as a Trust Board Member under this Agreement and for a period of twelve (12) months following the termination of this Agreement or following his/her removal or resignation from the Trust Board, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Trust Property relate or of which he/she has become aware in his/her capacity as a Trust Board Member.

## ARTICLE V
## ADMINISTRATION OF THE TRUST

5.1    Rights, Powers and Privileges.  The Trustee shall have only the rights, powers and privileges expressly provided in this Agreement and the Plan.  Subject to the Trust Board's right of advice and comment discussed herein, the Trustee shall have the power to take the actions granted in the subsections below and any powers reasonably incidental thereto, which the Trustee, in his/her reasonable discretion, deems necessary or appropriate to fulfill the purpose of the Trust, unless otherwise specifically limited or restricted by the Plan or this Agreement:

5.1.1    make continuing efforts to collect on, sell, or otherwise liquidate or dispose of Trust Property, and take any of the actions set forth in this Agreement without the approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, other than restrictions expressly imposed by the Plan, the Plan Confirmation Order or this Agreement;

5.1.2    file, initiate, analyze, investigate, compromise and settle all causes of action that are Trust Property, including all Transferred Claims and Causes of Action, which could be brought by a trustee or debtor-in-possession under the Bankruptcy Code, and prosecute or defend all appeals on behalf of any of the Debtors, as representative of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code;

5.1.3    commence and/or pursue any and all actions involving Trust Property that could arise or be asserted at any time, unless otherwise waived or relinquished in the Plan, including all Transferred Claims and Causes of Action;

5.1.4    hold legal title to any and all rights of the Debtors and the Trust Beneficiaries in or arising from the Trust Property;

5.1.5    protect and enforce the rights to the Trust Property (including, without limitation, any and all causes of action, including the Transferred Claims and Causes of Action, that are Trust Property) vested in the Trustee by this Agreement and the Plan by any method deemed appropriate including, without limitation, by judicial proceedings or otherwise;

5.1.6    compromise, adjust, arbitrate, sue on or defend, abandon, or otherwise deal with and settle, in accordance with the terms of this Agreement, claims in favor of or against the Trust;

5.1.7    exercise any and all powers granted to the Trustee by any agreements or by common law or any statute which serves to increase the extent of the powers granted to the Trustee hereunder;

5.1.8    manage all litigation instituted by or against the Trust or the Trustee, and administer the Trust expenses related thereto;

5.1.9    determine and satisfy any and all liabilities created or incurred by the Trust;

5.1.10    administer the Stock Incentive Plan;

5.1.11    effectuate the wind down and ultimate dissolution of the Debtors as legal entities (unless a buyer is obtained to acquire the Debtors' corporate shell);

5.1.12    address any outstanding issues with the SEC;

5.1.13    file, if necessary, any and all tax and information returns with respect to the Trust and pay taxes properly payable by the Trust, if any;

5.1.14    request any appropriate tax determination with respect to the Trust;

5.1.15    in reliance upon the official claims register maintained in the Debtors' chapter 11 cases, maintain on the Trustee's books and records a schedule evidencing the beneficial interest herein held by each of the Trust Beneficiaries;

5.1.16    make timely distributions to the Trust Beneficiaries of Trust Property in accordance with this Agreement;

5.1.17    open and maintain bank accounts on behalf of or in the name of the Trust;

5.1.18    make all tax withholdings, file tax information returns, make tax elections by and on behalf of the Trust and file returns for the Trust;

5.1.19    establish such reserves for, among other things, payment of taxes, assessments, Trustee's fees and professional fees and other expenses of administration of the Trust as the Trustee deems to be necessary and appropriate for the proper operation of matters incident to the Trust;

7

5.1.20    pay all expenses and make all other payments relating to the Trust Property;

5.1.21    retain and pay third parties pursuant to Section 5.2 hereof;

5.1.22    obtain insurance coverage or a bond with respect to the liabilities and obligations of the Trustee and the Trust Board Members under this Agreement (in the form of an errors and omissions policy or otherwise) and use Trust Property to obtain and maintain the same;

5.1.23    employ and compensate professionals as the Trustee deems necessary and appropriate;

5.1.24    pay post-Effective Date quarterly fees to the U.S. Trustee;

5.1.25    prepare and file post-confirmation quarterly reports with the U.S. Trustee and post-confirmation status reports with the Bankruptcy Court as required;

5.1.26    all powers provided under the Plan to the Trustee;

5.1.27    invest any moneys held as part of the Trust Property in accordance with the terms of Section 5.3 hereof; and

5.1.28    terminate the Trust consistent with the terms of this Agreement and the Plan and not unduly prolong the duration of the Trust.

5.2    <u>Agents and Professionals</u>.  The Trustee may, but shall not be required to, consult with and retain attorneys, accountants, appraisers, or other parties deemed by the Trustee to have qualifications necessary to assist in the proper administration of the Trust.  The Trustee may pay the reasonable salaries, fees and expenses of such persons (including himself/herself), including contingency fees, out of the Trust Property in the ordinary course to the extent permitted herein.

5.3    <u>Investment and Safekeeping of Trust Property</u>.  All moneys and other Trust Property received by the Trustee shall, until distributed or paid over as herein provided, be held in the Trust for the benefit of the Trust Beneficiaries, but need not be segregated from other Trust Property, unless and to the extent required by law or the Plan.  The Trustee shall be under no liability for interest or producing income on any moneys received by the Trust and held for distribution or payment to the Trust Beneficiaries, except as such interest shall actually be received by the Trustee.  Investments of any moneys held by the Trustee shall be administered in view of the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs. For the removal of doubt, the investment powers of the Trustee, other than those reasonably necessary to maintain the value of the Trust Property and to further the liquidating purpose of the Trust, are limited to powers to invest in demand and time deposits, such as short-term certificates of deposits, in banks or other savings institutions, or other temporary, liquid investments, such as treasury bills.

5.4    <u>Limitations on Trustee and Payment of Fees</u>.  The Trustee shall not at any time, on behalf of the Trust or Trust Beneficiaries: (i) enter into or engage in any trade or business, and

no part of the Trust Property or the proceeds, revenue or income therefrom shall be used or disposed of by the Trust in furtherance of any trade or business, or (ii) except as provided below, reinvest any Trust Property.

In the event of (a) compromises of pending litigation, (b) sales, transfers or abandonment of property with a value of more than $50,000, or (c) claim settlements in which the amount conceded to be due and owing by the Trustee exceeds $100,000, the Trustee shall (i) obtain the approval of the Trust Board of the intended action, and (ii) file with the Bankruptcy Court and serve upon the Office of the United States Trustee and any other party filing a request for special notice after the Plan's Effective Date a notice of intended action describing the Trustee's intended course of action and the justifications therefor, and providing a 10-day period from the date of such notice for the filing of an objection and request for hearing on the same. In the absence of any objection and request for hearing, the Trustee shall be free to take the action described in the notice without further order of the Bankruptcy Court. If an objection and request for hearing is filed, the Trustee will give at least 7 days' notice of the hearing date obtained from the Bankruptcy Court. Additionally, in all such matters the Trustee shall look to the Trust Board for advice and comment prior to filing any notice of intended action.

5.4.1    <u>Trustee's Fees</u>. The Trustee and any of his/her professionals shall prepare monthly an invoice detailing hours, rate, employee and tasks performed and submit a copy of the monthly invoice via email to the Trust Board in order to consult with them and obtain their comments, if any. A majority of the Trust Board shall have ten days from the receipt of the invoice to object in writing to the payment of the Trustee's fees/expenses and the fees/expenses of any professionals retained by the Trustee stating in writing the reason for the objection in detail. If there is no timely objection to any such fees and expenses, the Trustee can pay the monthly invoice immediately out of the Trust Property. If there is a timely objection, the Trustee has five days to consult with the Trust Board and if they cannot resolve the objection, the Trustee can file a notice with the Bankruptcy Court setting a hearing for the Bankruptcy Court to determine whether to allow any such disputed fees/expenses. Any such hearing shall not be on less than seven days' notice.

5.4.2    The Trustee may only invest funds held in the Trust consistent with the requirements of this Agreement, and, provided that the Trustee does so, he/she shall have no liability in the event of insolvency of any institution in which he/she has invested any funds of the Trust, but the Trustee shall be required to make sure that all funds in the Trust are fully collateralized in a manner consistent with the requirements of the United States Trustee for bankruptcy estate funds and are deposited with a financial institution that is on the list of approved depositories by the United States Trustee and designated as bankruptcy estate funds.

5.4.3    The Trustee shall hold, collect, conserve, protect and administer the Trust in accordance with the provisions of this Agreement and the Plan, and pay and distribute amounts as set forth herein for the purposes set forth in this Agreement. Any determination by the Trustee as to what actions are in the best interests of the Trust shall be determinative, except for where the Trustee is required to obtain the prior approval of, or to consult with, the Trust Board as required by this Agreement.

5.5     Bankruptcy Court Approval of Trustee Actions.  Except as provided in the Plan or otherwise specified in this Agreement, the Trustee need not obtain the approval of the Bankruptcy Court in the exercise of any power, rights, or discretion conferred hereunder or account to the Bankruptcy Court.  The Trustee shall exercise his/her business judgment for the benefit of the Trust Beneficiaries in order to maximize the value of the Trust Property and distributions, giving due regard to the cost, risk, and delay of any course of action. Notwithstanding the foregoing, the Trustee shall have the right to submit to the Bankruptcy Court any question or questions regarding which the Trustee may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the Trustee with respect to the Trust Property, the Trust, this Agreement, the Plan, or the Debtors, including the administration and distribution of the Trust Property.  Provided the Bankruptcy Court is willing to do so, the Bankruptcy Court shall retain jurisdiction for such purposes and shall approve or disapprove any such proposed action upon motion by the Trustee.  In addition, the Trustee shall have the authority, but not the obligation, to seek Bankruptcy Court approval to sell any Trust Property free and clear of any and all liens, claims and encumbrances.

5.6     Valuation of Trust Propert.  The Trustee shall make best efforts to understand and apprise the Trust Beneficiaries of the value of the Trust Property.  The valuation shall be used consistently by all parties (including the Trustee and Trust Beneficiaries) for all federal income tax purposes.  Any dispute regarding the valuation of Trust Property shall be resolved by the Bankruptcy Court.

# ARTICLE VI
# DISTRIBUTIONS FROM THE TRUST

6.1     Distributions.    The Trustee shall distribute at least annually to the Trust Beneficiaries all net cash income plus all net cash proceeds from the liquidation of Trust Property; provided, however, that the Trust shall retain such amounts as are reasonably necessary to maintain the value of the Trust Property or to meet claims and contingent liabilities.  The Trustee shall be responsible for all distributions to be made to the Trust Beneficiaries, and shall, at all times, maintain a sufficient reserve to fund all purposes of the Trust.  The Trustee shall consult with the Trust Board as to the amounts of any reserve, with the Bankruptcy Court to be the arbiter to resolve any dispute between the Trustee and the Trust Board.

6.2     Pro Rata Share of Distributions.  Each of the Trust Beneficiaries shall receive its share or pro rata share (as applicable) of any and all distributions made by the Trustee.  The Trustee may withhold from amounts distributable to any Trust Beneficiary any and all amounts, determined in the Trustee's reasonable sole discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

6.3     Delivery of Distributions.  All distributions to be made to the Trust Beneficiaries shall be made by the Trustee to the best known address of the Trust Beneficiaries.

6.4     Undelivered Property.  Any Shareholder which fails to claim any cash within 90 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan, and shall not be subject to the unclaimed property or escheat laws of any governmental unit. Upon forfeiture, such cash (including interest thereon) shall be

made available for re-distribution to other Shareholders. Entities which fail to claim cash shall forfeit their rights thereto and shall have no claim whatsoever against the Liquidating Debtor and/or the Trustee, as applicable, or any holder of an Allowed Claim or interest to whom distributions are made under the Plan, provided, however, that the Trustee may but is not required to undertake reasonable efforts, in its business judgment, to locate Shareholders whose distributions are returned.

6.5    De Minimis Distributions. No distribution shall be required to be made hereunder to any Trust Beneficiary unless such distribution will amount to at least $25.00. Any Trust Beneficiary on account of which the amount of cash to be distributed pursuant to any distribution from the Trust is less than $25.00 shall be deemed to have no claim for such distribution against the Debtors, the Trust, the Trustee or the Trust Property. Subject to Section 6.4 of this Agreement, any cash not distributed pursuant to this Section 6.5 shall be the property of the Trust free of any restrictions thereon.

6.6    Payments Limited to Trust Property.  All payments to be made by the Trustee to or for the benefit of any Trust Beneficiary shall be made only to the extent that the Trustee has sufficient reserves to make such payments in accordance with this Agreement and the Plan. Each Trust Beneficiary shall have recourse only to the Trust Property for distribution under this Agreement and the Plan.

6.7    Fees and Expenses.

6.7.1    Subject to the limitations set forth herein and in the Plan, the Trustee shall pay and/or reserve for the operating and administrative expenses of the Trust before approving distributions to or for the benefit of the Trust Beneficiaries.

6.7.2    The Trustee shall satisfy any fees and expenses of the Trust with Trust Property.

6.8    Priority of Distributions.  Any recovery by the Trust on account of the Trust Property shall be applied in the following order:

(i)    first, to pay and/or reserve for any unpaid or reasonably anticipated costs and expenses of the Trust, including, without limitation, reasonable professional fees and expenses and court costs;

(ii)    second, distributed to the Trust Beneficiaries in accordance with this Agreement and the Plan.

6.9    Compliance with Laws.  Any and all distributions of Trust Property shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

11

## ARTICLE VII
## TRUST BENEFICIARIES

7.1    <u>Identification of the Trust Beneficiaries</u>.  Each of the Trust Beneficiaries shall be recorded and set forth in a schedule (the "<u>Schedule</u>") maintained by the Trustee expressly for such purpose based upon the record holders of stock of ICPW Nevada as of the end of the day on the date of the Plan Confirmation Hearing.  In order to determine the actual names and addresses of the Trust Beneficiaries, the Trustee may either (i) rely upon the Schedule, or (ii) deliver a notice to the Trust Beneficiaries.  Such notice will include a form for each Trust Beneficiary to complete in order to be properly registered as a Trust Beneficiary and be eligible for distributions under the Trust.  As set forth in the Plan, the Debtors are going to attempt to cause a cessation of trading of shares of ICPW Nevada at the end of the day on the date of the Plan Confirmation Hearing.

7.2    <u>Beneficial Interest Only</u>.  The ownership of a beneficial interest in the Trust shall not entitle any Trust Beneficiary or the Debtors to any title in or to the Trust Property or to any right to call for a partition or division of such Trust Property or to require an accounting, except as specifically provided herein.

7.3    <u>Ownership of Beneficial Interests Hereunder</u>.  Each Trust Beneficiary shall own a beneficial interest in the Trust equal in proportion to such Trust Beneficiary's pro rata share of the stock of ICPW Nevada owned by such Trust Beneficiary.

7.4    <u>Evidence of Beneficial Interest</u>.  Ownership of a beneficial interest in the Trust shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Trust by the Trustee, including the Schedule.

7.5    <u>Conflicting Claims</u>.  If any conflicting claims or demands are made or asserted with respect to a beneficial interest, the Trustee shall be entitled, at its sole election, to refuse to comply with any such conflicting claims or demands. In so refusing, the Trustee may elect to make no payment or distribution with respect to the beneficial interest represented by the claims or demands involved, or any part thereof, and the Trustee shall refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands.  In so doing, the Trustee shall not be or become liable to any party for his/her refusal to comply with any of such conflicting claims or demands. The Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a final order or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the Trust and the Trustee (the occurrence of either (a) or (b) being referred to as a "Dispute Resolution" in this Section 7.5). Until a Dispute Resolution is reached with respect to such conflicting claims or demands, the Trustee shall hold in a segregated interest-bearing account with a United States financial institution any payments or distributions from the Trust to be made with respect to the Beneficial Interest at issue.  Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, if any, held in the segregated account, together with any interest and income generated thereon, in accordance with the terms of such Dispute Resolution.

12

7.6    <u>Limitation on Transferability</u>.  It is understood and agreed that the beneficial interests in the Trust shall be assignable during the term of this Agreement only upon compliance with the notice provisions included herein or by operation of law.  A voluntary assignment shall not be effective until appropriate notification and proof thereof is submitted to the Trustee and a fee of $250 is paid to the Trust.  Until then, the Trustee may continue to pay all amounts to or for the benefit of the assigning Trust Beneficiaries to such Trust Beneficiaries.  An assignment (whether voluntary or by operation of law) shall not be effective until appropriate notification and proof thereof is submitted to the Trustee, and the Trustee may continue to pay all amounts to or for the benefit of the assigning Trust Beneficiaries until receipt of proper notification and proof of assignment by operation of law.  The Trustee may rely upon such proof without the requirement of any further investigation.

**ARTICLE VIII**
**THIRD PARTY RIGHTS, LIMITATION OF LIABILITY AND INDEMNITY**

8.1    <u>Parties Dealing With the Trustee</u>.  In the absence of actual knowledge to the contrary, any person dealing with the Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Trust Property.  No person or entity dealing with the Trustee shall have any obligation to inquire into the validity or expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

8.2    <u>Trustee's Liability</u>.  In exercising the rights granted herein, the Trustee shall exercise his/her best judgment to the end that the affairs of the Trust shall be properly managed and the interests of all the Trust Beneficiaries and the Debtors are safeguarded.

8.3    <u>Indemnity</u>. The Trustee, the members of the Trust Board (other than with respect to expenses of counsel for the individual members), and each of their respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives and principals (collectively, the "Indemnified Parties") shall be indemnified and held harmless by the Trust, to the fullest extent permitted by law, solely from the Trust Property for any losses, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees, disbursements and related expenses which the Indemnified Parties may, incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against one or more of the Indemnified Parties on account of the acts or omissions of an Indemnified Party solely in its capacity as such; provided, however, that the Trust shall not be liable to indemnify any Indemnified Party for any act or omission constituting bad faith, fraud or willful misconduct by such Indemnified Party. Notwithstanding any provision herein to the contrary, the Indemnified Parties shall be entitled to obtain advances from the Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such; provided, however that the Indemnified Parties receiving such advances shall repay the amounts so advanced to the Trust upon the entry of a Final Order finding that such Indemnified Parties were not entitled to any indemnity under the provisions of this Section 8.3. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which it is indemnified.

13

## ARTICLE IX
## SELECTION, REMOVAL AND COMPENSATION OF TRUSTEE

9.1    <u>Initial Trustee</u>.  The Trustee shall be _____.

9.2    <u>Term of Service</u>.  The Trustee shall serve until (a) the completion of all the Trustee's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Trustee in accordance with this Agreement; or (c) the Trustee's death, resignation or removal.

9.3    <u>Removal of a Trustee</u>.  Any person serving as the Trustee may be removed, with or without cause, by the Trust Board.  The removal shall be effective on the date specified in such action by the Trust Board, subject to the payment of all amounts owing to the Trustee as of such date.  Additionally, any person serving as Trustee may be removed at any time by an order of the Bankruptcy Court on notice to the Trustee and the Trust Board, and a determination by the Bankruptcy Court that such removal is appropriate upon a showing of good cause.  The removal shall be effective on the date specified in the order.  In the event of any removal, the Trustee shall render to the Trust Board a full and complete accounting of monies and Trust Property received, disbursed, and held during the term of office of that Trustee.

9.4    <u>Resignation of Trustee</u>.  The Trustee may resign at any time by giving the Trust Board at least ninety (90) days written notice of his/her intention to do so.  In the event of a resignation, the resigning Trustee shall render to the Trust Board a full and complete accounting of monies and Trust Property received, disbursed, and held during the term of office of that Trustee.  The resignation shall be effective on the later to occur of:  (i) the date specified in the notice; or (ii) the appointment of a successor Trustee by the Trust Board and the acceptance by such successor of such appointment; _provided_, that if a successor Trustee is not appointed or does not accept his/her appointment within ninety (90) days following delivery of notice of resignation, the resigning Trustee may petition the Bankruptcy Court for the appointment of a successor Trustee.

9.5    <u>Appointment of Successor Trustee</u>.  Upon the resignation, death, incapacity, or removal of the Trustee, the Trust Board shall nominate a successor Trustee to fill the vacancy so created, which successor Trustee appointment shall be subject to the approval by the Bankruptcy Court.  Any successor Trustee so appointed shall consent to and accept in writing the terms of this Agreement and agrees that the provisions of this Agreement and the Plan shall be binding upon and inure to the benefit of the successor Trustee.

9.6    <u>Powers and Duties of Successor Trustee</u>.  A successor Trustee shall have all the rights, privileges, powers, and duties of his/her predecessor under this Agreement and the Plan. Notwithstanding anything to the contrary herein, a removed or resigning Trustee shall, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Trust Agreement all the estates, properties, rights, powers, and trusts of such predecessor Trustee.

9.7    <u>Trust Continuance</u>.  The death, resignation or removal of the Trustee shall not terminate the Trust or revoke any existing agency created pursuant to this Agreement or

14

invalidate any action theretofore taken by the Trustee. In the event that a successor Trustee is not appointed within thirty (30) days of when required under this Agreement, any Trust Beneficiary may apply to the Bankruptcy Court for appointment of a successor Trustee upon notice to the Trust Board.

9.8    Compensation and Costs of Administration. The Trustee shall receive fair and reasonable compensation for his/her services in accordance with his/her customary rates, subject to Section 5.4 of this Agreement.

9.9    Annual Reporting and Filing Requirements.

9.9.1    Within 60 days after the end of each calendar year, the Trustee shall furnish a report to the Trust Board of all Trust Property received by the Trust, all Trust Property disbursed to Trust Beneficiaries, all Trust Property disbursed for professional fees and costs of administering the Trust (including compensation paid to the Trustee), and all Trust Property held by the Trust during the preceding calendar year. The Trustee's report will be available and provided to any Trust Beneficiary upon written request.

9.9.2    The Trustee shall file tax returns for the Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other applicable laws or regulations, and shall furnish information statements to the Trust Beneficiaries setting forth their allocable share of the income, loss, deduction or credit of the Trust and instruct them to report such items on their federal income tax returns. The Trustee may withhold from amounts distributable to any Trust Beneficiary any and all amounts, determined in the Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement. The Trustee shall have the right to employ an accountant and any other professionals needed to assist the Trustee for this purpose.

9.9.3    The tax returns filed by the Trustee shall report all Trust earnings for the taxable year being reported.

9.9.4    All of the Trust's income shall be treated as subject to tax on a current basis. For federal income tax purposes, items of income, gain, loss, and deduction of the Trust will be allocated to the Trust Beneficiaries in a manner, to be determined by the Trustee, that is consistent with applicable Treasury Regulations and that reflects the Trust Beneficiaries' respective contributions and their respective interests in the interim and final distributions to be made by the Trust, and such Trust Beneficiaries shall be responsible for the payment of taxes on a current basis that result from such allocations.

9.10    Confidentiality. The Trustee shall, while serving as Trustee under this Agreement and for a period of twelve (12) months following the termination of this Agreement or following his/her removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Trust Property relate or of which he/she has become aware in his/her capacity as Trustee.

## ARTICLE X
## MAINTENANCE OF RECORDS

10.1    The Trustee shall maintain books and records containing a description of all property from time to time constituting the Trust Property and an accounting of all receipts and disbursements. Upon 60 days' prior written notice delivered to the Trustee, said books and records shall be open to inspection by any Trust Beneficiary at any reasonable time during normal business hours; *provided* that, if so requested, such Trust Beneficiary shall have entered into a confidentiality agreement satisfactory in form and substance to the Trustee. The Trustee shall furnish to any Trust Beneficiary upon written request an annual statement of receipts and disbursements of the Trust. Such books and records may be destroyed without further notice to parties or approval of the Bankruptcy Court five (5) years after the final report to the Bankruptcy Court has been rendered by the Trustee (unless such records and documents are necessary to fulfill the Trustee's obligations pursuant to this Agreement).

## ARTICLE XI
## DURATION OF TRUST

11.1    <u>Duration</u>. The Trust shall become effective upon the Effective Date of the Plan. Thereupon, this Agreement shall remain and continue in full force and effect until the Trust is terminated in accordance with the provisions of this Agreement and the Plan.

11.2    <u>Termination of the Trust.</u>  The Trust (and the duties, responsibilities and powers of the Trustee) shall terminate on the earlier of (a) the date which is 5 years after the Effective Date; and (b) the date when full resolution of all Trust Property transferred to the Trust have occurred, including distribution of the Trust Property and the net proceeds thereof, in accordance with the Plan and this Agreement. The Trustee shall not unduly prolong the duration of the Trust and shall at all times endeavor to resolve, settle, or otherwise dispose of all claims that constitute Trust Property and to effect the distribution of the Trust Property to the Trust Beneficiaries in accordance with the Plan and terminate the Trust as soon as practicable. Upon such termination, except as set forth in Section 11.3 below, the Trustee shall be discharged from his/her position as Trustee and from all further duties, obligations and responsibilities under the Plan.

11.3    <u>Continuance of Trust for Winding Up</u>. After the termination of the Trust and for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until his/her duties have been fully performed, including, without limitation, such post-distribution tasks as necessary to windup the affairs of the Trust. After the termination of the Trust, the Trustee shall retain for a period of five (5) years the books, records, Beneficiary lists, and certificates and other documents and files which shall have been delivered to or created by the Trustee. At the Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after five (5) years from the completion and winding up of the affairs of the Trust. Except as otherwise specifically provided herein, upon the discharge of all liabilities of the Trust and final distribution of the Trust, the Trustee shall have no further duties or obligations hereunder. The Trustee may pay in advance from the Trust Property all costs of document management.

16

## ARTICLE XII
## MISCELLANEOUS

12.1    <u>Preservation of Privilege</u>.  In connection with the rights, claims, and causes of action that constitute the Trust Property, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Trust pursuant to the terms of the Plan or otherwise shall vest in the Trustee and his/her representatives, and the Debtors, the Liquidating Debtor, and the Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, as necessary.

12.2    <u>Notices</u>.  Any notice or other communication which may be or is required to be given, served, or sent to the Trustee or the Trust Board, as applicable, shall be in writing and shall be sent by Federal Express and email, or transmitted by hand delivery, addressed as follows:

If to the Trustee:

_____, Trustee
[Insert Address and Email of Trustee]

With a copy to:

Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:  (213) 623-9300; Facsimile:  (213) 623-9924
Attn:    Samuel R. Maizel/Tania M. Moyron
Email: samuel.maizel@dentons.com; tania.moyron@dentons.com

If to the Trust Board:

Attn: Scott Jarus
938 Duncan Avenue
Manhattan Beach, CA 90266
Email: scott.jarus@verizon.net

With a copy to:

Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:  (213) 623-9300; Facsimile:  (213) 623-9924
Attn:    Samuel R. Maizel/Tania Moyron
Email: samuel.maizel@dentons.com; tania.moyron@dentons.com

12.3    <u>No Bond</u>.  Notwithstanding any state law to the contrary, the Trustee (including any successor) shall be exempt from giving any bond or other security in any jurisdiction.

12.4    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to principles of conflicts of law.

12.5    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

12.6    <u>Headings</u>.  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or understanding of this Agreement or any provision hereof.

12.7    <u>No Execution</u>.  All Trust Property shall be deemed *in custodia legis* until such times as the Trust Property has actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person can execute upon, garnish or attach the Trust Property or the Trust in any manner or compel payment from the Trust except by an order of the Bankruptcy Court that becomes a final order.  Payment will be solely governed by this Agreement and the Plan.

12.8    <u>Intention of Parties to Establish Grantor Trust</u>.  This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a grantor trust.

12.9    <u>Amendment</u>.  This Agreement may be amended at any time by written agreement of the majority of the Trust Board Members, or by order of the Bankruptcy Court after motion by the Trustee.

12.10    <u>Severability</u>.  If any term, provision covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

12.11    <u>Counterparts and Facsimile Signatures</u>.  This Agreement (or any amendment thereto) may be executed in counterparts and a facsimile or other electronic form of signature shall be of the same force and effect as an original.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year written above.

ICPW NEVADA, INC.


By:_____
Name: L. Geoffrey Greulich
Title: President and Chief Executive Officer


TRUSTEE


By:_____
Name: _____

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **NOTICE OF FILING OF INITIAL DRAFT OF DEBTORS' AND OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS' JOINT PLAN OF LIQUIDATION DATED DECEMBER __, 2017**    will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 12, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Shiva D Beck    sbeck@gardere.com, jcharrison@gardere.com**
- **Ron Bender    rb@lnbyb.com**
- **Cathrine M Castaldi    ccastaldi@brownrudnick.com**
- **Russell Clementson    russell.clementson@usdoj.gov**
- **Aaron S Craig    acraig@kslaw.com, lperry@kslaw.com**
- **Matthew A Gold    courts@argopartners.net**
- **Monica Y Kim    myk@lnbrb.com, myk@ecf.inforuptcy.com**
- **Jeffrey A Krieger    jkrieger@ggfirm.com, kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenberggl usker.com**
- **Samuel R Maizel    samuel.maizel@dentons.com, alicia.aguilar@dentons.com;docket.general.lit.LOS@dentons.com;tania.moyron@dentons .com;kathryn.howard@dentons.com**
- **Krikor J Meshefejian    kjm@lnbrb.com**
- **Tania M Moyron    tania.moyron@dentons.com, chris.omeara@dentons.com**
- **S Margaux Ross    margaux.ross@usdoj.gov**
- **United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov**
- **Sharon Z. Weiss    sharon.weiss@bryancave.com, raul.morales@bryancave.com**

**2.  SERVED BY UNITED STATES MAIL**: On **December 12, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 12, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

2

| December 12, 2017 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**