RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; myk@lnbyb.com; kjm@lnbyb.com
Attorneys for Chapter 11 Debtors and Debtors in Possession

SAMUEL R. MAIZEL (SBN 189301)
TANIA M. MOYRON (SBN 235736)
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:  (213) 623-9300; Facsimile:  (213) 623-9924
Email: samuel.maizel@dentons.com; tania.moyron@dentons.com
Attorneys for Official Committee of Equity Security Holders

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>ICPW Liquidation Corporation, a California corporation[1],<br><br>        Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>ICPW Liquidation Corporation, a Nevada corporation[2],<br><br>        Debtor and Debtor in Possession.<br>_____<br><br>☒ Affects both Debtors<br><br>☐ Affects ICPW Liquidation Corporation, a California corporation only<br><br>☐ Affects ICPW Liquidation Corporation, a Nevada corporation only | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with:<br>1:17-bk-12409-MB<br>Chapter 11 Cases<br><br>**MOTION IN SUPPORT OF CONFIRMATION OF DEBTORS' AND OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS' JOINT PLAN OF LIQUIDATION DATED JANUARY 12, 2018; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br><u>Plan Confirmation Hearing</u>:<br>Date:    February 12, 2018<br>Time:    1:30 p.m.<br>Place:   Courtroom "303"<br>        21041 Burbank Blvd.<br>        Woodland Hills, CA |

_____

[1] Formerly known as Ironclad Performance Wear Corporation, a California corporation.
[2] Formerly known as Ironclad Performance Wear Corporation, a Nevada corporation.

# TABLE OF CONTENTS

I. INTRODUCTION...................................................................................................2

II. HISTORY OF THE DEBTORS ...........................................................................4

III. THE DEBTORS' SALE PROCESS ....................................................................5

IV. SUMMARY OF KEY EVENTS OCCURRING SUBSEQUENT TO THE SALE
    CLOSING.............................................................................................................7

V. SUMMARY OF THE PLAN ................................................................................8

    Secured Claims.....................................................................................................8

    Administrative Claims..........................................................................................8

    Pre-Petition Priority Wage Claims. ...................................................................10

    Pre-Petition Priority Tax Claims. ......................................................................10

    General Unsecured Claims – Class 1 under the Plan. ........................................11

    Shareholders – Class 2 under the Plan and Creation of and Role of the Trust and
        the Trustee. ...................................................................................................12

VI. THE ELEMENTS NECESSARY FOR PLAN CONFIRMATION ARE PRESENT AND
    THE COURT SHOULD CONFIRM THE PLAN ............................................16

    A.    The Plan complies with all of the provisions of Section 1129(a) of the
        Bankruptcy Code. ........................................................................................16

        1.    Section 1129(a)(1) of the Bankruptcy Code.................................16

        2.    Section 1129(a)(2) of the Bankruptcy Code.................................20

        3.    Section 1129(a)(3) of the Bankruptcy Code.................................21

        4.    Section 1129(a)(4) of the Bankruptcy Code.................................22

        5.    Section 1129(a)(5) of the Bankruptcy Code.................................23

        6.    Section 1129(a)(6) of the Bankruptcy Code.................................24

        7.    Section 1129(a)(7) of the Bankruptcy Code.................................24

        8.    Section 1129(a)(8) of the Bankruptcy Code.................................25

        9.    Section 1129(a)(9) of the Bankruptcy Code.................................26

10.    Section 1129(a)(10) of the Bankruptcy Code................................................27

12.    Section 1129(a)(12) of the Bankruptcy Code................................................28

13.    Section 1129(a)(13) of the Bankruptcy Code................................................28

VII. CONCLUSION................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

In re Acequia, Inc.,
  787 F.2d 1352 (9th Cir.1986) ............................................................... 29

In re American Solar King Corp.,
  90 B.R. 808 (Bankr. W.D. Tex. 1988) ................................................... 22

In re Apex Oil Co.,
  118 B.R. 683 (Bankr. E.D. Mo. 1990) ................................................... 29

Cane v. Johns-Manville Corp.,
  843 F.2d 636 (2nd Cir. 1988) ............................................................... 17

In re Downtown Inv. Club III,
  89 B.R. 59 (B.A.P. 9th Cir. 1988) ......................................................... 21

In re General Teamsters, Warehousemen & Helpers Union Local 890,
  225 B.R. 719 (Bankr. N.D. Cal. 1998) ................................................... 23

In re Howard Marshall,
  298 B.R. 670 (Bankr. C.D. Cal 2003) .................................................... 23

In re Parks Lumber Co., Inc.,
  19 B.R. 285 (Bankr. W.D. La. 1982) ..................................................... 24

In re Pike's Peak Water Co.,
  779 F.2d 1456 (10th Cir. 1985) ............................................................. 29

In re Produce Hawaii, Inc.,
  41 B.R. 301 (Bankr. D. Hawaii 1984) ................................................... 24

Ryan v. Loui (In re Corey),
  892 F.2d 829 (9th Cir.1989) ................................................................. 23

Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.),
  84 B.R. 167 (9th Cir. B.A.P. 1988) ....................................................... 23

In re Sylmar Plaza, L.P.,
  314 F.3d 1070 (9th Cir. 2002) .............................................................. 23

In re Texaco, Inc.
  84 B.R. 893 (Bankr. S.D. N.Y. 1988) .................................................... 21

In re Warren,
  89 B.R. 87 (9th Cir. B.A.P. 1988) ......................................................... 23

iii

**Federal Statutes**

28 U.S.C.

§ 1930(a)(6) ............................................................................................................. 30

11 U.S.C.

§ 105(a) .................................................................................................................... 8
§ 326 ........................................................................................................................ 26
§§ 507(a)(1), (2) and (8) ......................................................................................... 18
§ 507(a)(2) ............................................................................................................... 28
§ 507(a)(8) ............................................................................................................... 28
§ 1121 ...................................................................................................................... 21
§§ 1121 and 1127 .................................................................................................... 21
§ 1121(c) .................................................................................................................. 21
§ 1122 ...................................................................................................................... 18
§ 1123(a) .................................................................................................................. 18
§ 1123(a)(1) ............................................................................................................. 18
§§ 1122 and 1123 ........................................................................................ 17, 21, 22
§ 1123(a)(2) ............................................................................................................. 18
§ 1123(a)(3) ............................................................................................................. 18
§ 1123(a)(4) ............................................................................................................. 19
§ 1123(a)(5) ............................................................................................................. 19
§ 1123(a)(6) ............................................................................................................. 19
§ 1123(a)(7) ............................................................................................................. 19
§ 1123(b) .................................................................................................................. 19
§ 1123(b)(1) ............................................................................................................. 20
§ 1123(b)(2) ............................................................................................................. 20
§ 1123(b)(3) ............................................................................................................. 20
§ 1123(b)(4) ............................................................................................................. 21
§ 1124(1) .................................................................................................................... 3
§ 1125 ........................................................................................................... 9, 21, 22
§ 1125(b) .................................................................................................................. 22
§ 1126(f) ........................................................................................................... 3, 9, 17
§ 1127 ...................................................................................................................... 22
§ 1127(b) .................................................................................................................. 22
§ 1129(a)(3) ................................................................................................... 22, 23, 24
§ 1129(a)(4) ............................................................................................................. 24
§ 1129(a)(5) ....................................................................................................... 24, 25
§ 1129(a)(5)(A)(i) .................................................................................................... 24
§ 1129(a)(5)(A)(ii) ................................................................................................... 24
§ 1129(a)(5)(B) ........................................................................................................ 25
§ 1129(a)(6) ............................................................................................................. 25
§ 1129(a)(7) ............................................................................................................. 25
§ 1129(a)(7)(A) ........................................................................................................ 25
§ 1129(a)(8) ............................................................................................................. 27
§ 1129(a)(9) ....................................................................................................... 27, 28

§ 1129(a)(10) ................................................................................... 28
§ 1129(a)(11) ................................................................................... 29
§ 1129(a)(12) ................................................................................... 29
§ 1129(a)(13) ................................................................................... 30
§ 1129(a) of the Bankruptcy Code ............................................ 17, 23, 30
§ 1129(a)(1) of the Bankruptcy Code.............................................. 17, 21
§ 1129(a)(2) of the Bankruptcy Code.................................................... 21
§ 1930 ................................................................................................... 29

**Other Authorities**

Bankruptcy Rule 3020(b)(2)....................................................................... 23
7 Collier on Bankruptcy ¶ 1129.02 .......................................................... 18

# I.

# **INTRODUCTION**

ICPW Liquidation Corporation, a California corporation, formerly known as Ironclad Performance Wear Corporation, a California corporation ("ICPW California"), and ICPW Liquidation Corporation, a Nevada corporation, formerly known as Ironclad Performance Wear Corporation, a Nevada corporation ("ICPW Nevada" and collectively with ICPW California, the "Debtors"), and the Official Committee of Equity Security Holders (the "OCEH") hereby file this joint motion (the "Motion") requesting the Court to confirm the "Debtors' and Official Committee of Equity Security Holders' Joint Plan of Liquidation Dated January 12, 2018" (the "Plan"), which the Debtors and the OCEH filed with the Court on January 12, 2018 as Docket Number 383.[3]    The Debtors and the OCEH are collectively referred to herein as the "Plan Proponents".

The Plan Proponents believe that this Plan represents the optimal outcome for these chapter 11 bankruptcy cases (the "Cases").  The Plan Proponents believe that the confirmation of this Plan provides the best vehicle for maximizing the distribution to the Shareholders (defined below); getting a significant distribution made to the Shareholders on the earliest date possible under the circumstances; and getting the Debtors' remaining creditors (holding not yet allowed claims) paid in full with post-petition interest in the fastest and most efficient manner possible. Any pre-petition claims that become allowed prior to Plan confirmation (the "Allowed Claims") in these bankruptcy estates (the "Estates") that are not paid prior to Plan confirmation will be paid in full on the Effective Date, together with post-petition interest.  Any claims that become Allowed Claims after the Effective Date will be paid in full together with post-petition interest.

---

[3] All defined terms used in this Motion which are not defined in this Motion but which are defined in the Plan shall have the same definitions as provided to such terms in the Plan.

Pursuant to § 1124(1) of the Bankruptcy Code,[4] all classes of claims therefore are deemed not to be impaired under the Plan and are not required to vote on the Plan.  As holders of unimpaired claims are conclusively presumed to have accepted the Plan, solicitation of acceptances to the Plan from such claim holders is not required, pursuant to § 1126(f) of the Bankruptcy Code.

After appropriate reserves have been made for all allowed administrative expenses to be paid in full, along with  any remaining disputed claims and expected post-confirmation litigation and other expenses (as further explained below), the balance of the funds in the Estates will be distributed to the record shareholders of ICPW Nevada (the "Shareholders") in the manner described below. The Plan Proponents currently estimate the initial distribution to Shareholders as of the Record Date will be $9,659,669.00 or approximately 11.28 cents per share.

A liquidating trust (the "Trust") is being established under the Plan.  On the Effective Date, the Debtors and the trustee of the Trust (the "Trustee") will enter into a grantor trust agreement (the "Trust Agreement") for the benefit of the Shareholders.  A copy of the Trust Agreement is attached as Exhibit "2" to the Plan.  The Trustee will, among other things, investigate and, if appropriate, pursue all claims and causes of action that belong to the Estates and are assigned to the Trust for the benefit of the Shareholders.  The Plan Proponents believe that Shareholders are not impaired under the Plan.  Therefore, Shareholders are not required to vote on the Plan because they are conclusively presumed to have accepted the Plan, and solicitation of acceptances to the Plan from the Shareholders is not required, pursuant to § 1126(f) of the Bankruptcy Code.

---

[4] All references to "sections" of the Bankruptcy Code are to sections of 11 U.S.C. § 101 et. seq., as amended.

## II.

## HISTORY OF THE DEBTORS

The Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on September 8, 2017 (the "Petition Date").  Until the recently consummated sale of substantially all of its assets, ICPW California was a leading, technology-focused developer and manufacturer of high-performance task-specific gloves and apparel for the "industrial athlete" in a variety of end markets, including construction, manufacturing, oil and gas, automotive, the sporting goods, military, police, fire, and first-responder.  ICPW Nevada is a public company which owns all of the shares of ICPW California (meaning that ICPW California is a wholly-owned subsidiary of ICPW Nevada).  Other than owning all of the shares in ICPW California, ICPW Nevada entity had no business.  All operations of the Debtors effectively functioned through ICPW California.  With the Court's approval, the Cases are being jointly administered.  ICPW Nevada is publicly-traded with its common stock quoted on the OTC Markets under the symbol "ICPW".  As of January 2, 2018, ICPW Nevada had approximately 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.

Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations became insufficient beginning in mid-2013 to support their business operations as well as their continued growth.  There were many reasons for this including heavy competition, loss of a major international distributor, incomplete and/or ineffective expansion and distribution of all of their product lines and development of new customers, and higher than anticipated administrative production, manufacturing and warehousing costs.  In addition, it was discovered in early-2017 that under then management, the Debtors had failed to provide materially complete and accurate financial statements as required under their loan documents to their primary secured lender for the fiscal years ended December 31, 2015 and

2016, and for the fiscal quarters ended March 31, June 30, September 30, 2016 and March 31, 2017. These same financial irregularities were also publicly filed and disclosed through the Company's SEC and other public filings. As a result of this discovery, the Debtors' then chief executive officer and other officers voluntarily resigned, and L. Geoffrey Greulich was employed as the Debtors' new chief executive officer effective July 6, 2017.

The Debtors filed the Cases to consummate a sale of substantially all of their assets (excluding cash, causes of action and other assets) for the most money possible. Just prior to their chapter 11 bankruptcy filings, the Debtors entered into an asset purchase agreement (the "Radians APA") with the Debtors' then pre-petition secured creditor, Radians Wareham Holdings, Inc. ("Radians"), for a cash purchase price of $20 million or $15 million, subject to an overbid process. Radians' agreement to pay a cash purchase price of either $20 million or $15 million was dependent upon whether the Debtors would be able to obtain the consent of a key customer to extending the term of their contract with the Debtors. The Debtors were able to obtain that consent prior to the auction, which resulted in the Radians' purchase price being $20 million. Radians had acquired the Debtors' secured bank debt several months before the Petition Date. The Plan Proponents believe that Radians did this with the goal of acquiring the Debtors' business – either consensually or through a hostile manner.

## III.

## THE DEBTORS' SALE PROCESS

The Debtors' business was actively marketed for sale for a number of months prior to the Debtors' bankruptcy filings by the Debtors' financial advisor/investment banker – Craig Hallum Capital Group LLC ("C-H"). Prospective buyers were provided with the opportunity to purchase assets or equity. While a number of prospective buyers expressed pre-petition interest in possibly purchasing the Debtors' assets or stock, the Debtors ran out of time to continue with their pre-

bankruptcy marketing process because, among other things, Radians (which as described above was also the Debtors' secured creditor having purchased the Debtors' pre-bankruptcy secured bank debt) was sweeping all of the Debtors' cash on a daily basis and was no longer willing to continue to forbear or advance additional needed financing to the Debtors.

Just prior to their bankruptcy filings, the Debtors entered into an asset sale agreement with the Debtors' current secured creditor, Radians Wareham Holdings, Inc. ("Radians") or its affiliate/designee, for a purchase price of $20 million or $15 million, subject to an overbid process.

After the Petition Date, the Debtors filed an emergency motion seeking Court approval of their proposed overbid procedures.  The Court entered an order on September 28, 2017 as Docket Number 71 granting the Debtors' proposed bidding procedures motion (the "Bidding Procedures Order").

Pursuant to the Bidding Procedures Order, an auction sale (the "Auction") was held before the Court on October 30, 2017.  Two prospective overbidders, Brighton-Best International, Inc. ("BBI") and Protective Industrial Products, Inc. ("PIP"), along with Radians (as the stalking horse bidder) were the qualified bidders at the Auction.  After very robust bidding, BBI was determined to be the winning bidder at the Auction with a purchase price of $25,250,000.  The Court entered the sale order on November 3, 2017, as docket number 177 (the "Sale Order").

The sale to BBI closed on November 14, 2017 (the "Sale Closing").  In connection with the Sale Closing, after taking into account various deposits and pro rations, BBI wire transferred a Sale Closing payment of $25,328,919, which is in addition to the $1,000,000 deposit that BBI had provided to the Debtors in advance of the Auction.

**IV.**

**SUMMARY OF KEY EVENTS OCCURRING SUBSEQUENT TO THE SALE CLOSING**

Since these Estates are solvent, on November 21, 2017, as docket number 241, the Debtors (with the full support of the OCEH) filed a motion with the Court in which the Debtors requested the Court to exercise its broad judicial powers under § 105(a) of the Bankruptcy Code to permit the Debtors (with the support of the OCEH) to implement the "Claims Allowance Protocol" described below (the "Claims Protocol Motion").  On December 14, 2017, as docket number 345, the Court granted the Claims Protocol Motion.  Below is a summary of how pre-petition claims that the Debtors and the OCEH agree should be paid as Allowed Claims can be paid in accordance with the Claims Protocol Motion.

CLAIMS ALLOWANCE PROTOCOL

- If the Debtors and the OCEH agree with the amount and priority of a scheduled or filed claim without any modification, the Debtors and the OCEH will file a joint notice with the Court signed by counsel to both the Debtors and the OCEH advising the Court of the same.  Each such notice will identify the name of the creditor, the claim number if it pertains to a proof of claim filed by the creditor, and the amount and priority of the claim that will be deemed allowed.  Once that notice has been filed with the Court, the claim will be deemed permanently allowed in that amount and with that priority, and the Escrow Agent will be deemed authorized to pay the allowed claim out of the Remaining Estate Funds.

- If the Debtors and the OCEH are able to reach an agreement with a particular creditor on the amount of a claim which is less than the amount or of a different priority than the scheduled or filed claim, the Debtors and the OCEH will file a joint stipulation signed by the Debtors, the OCEH and the creditor advising the Court of the same.  Each such stipulation will identify the name of the creditor, the claim number if it pertains to a proof of claim filed by the creditor, and the amount and priority of the claim that will be deemed allowed.  Once that stipulation has been filed with the Court, the claim will be deemed permanently allowed in that amount and with that priority without the need for any Court order, and the Escrow Agent will be deemed authorized to pay the allowed claim out of the Remaining Estate Funds.

Attached as Exhibit "1" to the Plan is a claims chart (the "Claims Chart") indicating all of the claims in these Cases and their status as of January 12, 2018.  As indicated in the Claim Chart, there are only a small number of disputed claims.  After payment of all non-disputed claims with

post-petition interest, there remains a total (as of January 12, 2018) of approximately $13,829,001 from the sale proceeds paid by BBI (the "Remaining Estate Funds").  All of the Remaining Estate Funds are unencumbered.

As part of the Debtors' sale agreement with BBI, the Debtors were required to effectuate a name change following the Sale Closing.  Pursuant to an order entered on November 15, 2017, as docket number 218, the Court authorized the Debtors to effectuate a change of their corporate name to ICPW Liquidation Corporation without further action by the Debtors' Board of Directors or the Shareholders.

On January 10, 2018 as docket number 373, the Court ruled that a disclosure statement is not required under § 1125 of the Bankruptcy Code because, among other things, all creditors and shareholders are not impaired under the Plan.  Consistent with that order, the Debtors and the OCHE served on all creditors and shareholders the notice of hearing on confirmation of the Plan, which contained a comprehensive summary of the Plan.  The Debtors and the OCEH, however, are not soliciting votes or filing a disclosure statement because all creditors are "conclusively presumed" by the Bankruptcy Code to support the Plan pursuant to § 1126(f) of the Bankruptcy Code.

## V.

## SUMMARY OF THE PLAN

**Secured Claims.**

As a result of the fact that Radians was paid in full in connection with the Sale Closing, there is no remaining secured debt in these Cases.

**Administrative Claims.**

Separate and apart from the Remaining Estate Funds, as of the date of the Plan (*i.e.*, January 12, 2018), the Debtors have approximately $470,000 remaining in their debtor-in-

possession accounts which the Debtors use to pay their operating expenses and costs of administering the Estates.  In connection with the sale to BBI, the Debtors retained all of their cash, and the Debtors' used that cash to pay their non-professional fee administrative claims, consisting primarily of trade debt to vendors who extended post-bankruptcy trade debt to the Debtors. As of the date of the Plan, the Debtors are not aware of any outstanding non-professional fee administrative expenses as the Debtors believe they have already paid all such non-professional fee administrative expenses in full other than continuing quarterly fees owing to the UST and any accrued but unpaid income tax claims resulting from the Debtors' sale to BBI.  The Debtors, therefore, believe that the only administrative claims left to be paid in these cases will be the final outstanding allowed fees and expenses of the professionals employed in these cases which will be paid out of the Remaining Estate Funds, their operating expenses and costs of administering these estates, continuing quarterly fees owing to the UST and any tax claims resulting from the Debtors' sale to BBI.  The Debtors project that if the Effective Date of the Plan is February 28, 2018, the Debtors will have approximately $350,000 left in their debtor-in-possession accounts which the Debtors will turn over to the Trust on the Effective Date.

Based upon a preliminary analysis, the Debtors' accountant (BPEH) estimates that the Debtors will owe approximately $130,000 in federal income taxes and approximately $60,000 in state income taxes (divided evenly between California and Texas) resulting from the Debtors' asset sale to BBI.

The Court hearing on the final applications filed by the professionals employed in these cases will be after the Effective Date, since the final fees and expenses being requested by the professionals will include fees and expenses incurred through the Effective Date.  The Plan provides that the final fees and expenses of all of the professionals employed in these Cases are estimated to be between $1,219,558 and $1,419,558.  However, these figures are just estimates.

In connection with the confirmation of the Plan, the Plan Proponents will be requesting the Court to establish the date that is thirty days following the date of entry of the Plan Confirmation Order as the deadline for any creditor to assert an administrative claim against the Estates (the "Administrative Claims Bar Date"). Provided the Court agrees, the Administrative Claims Bar Date and the procedure that creditors will be required to follow in order to assert a timely administrative claim against these Estates will be included in the Plan Confirmation Order. As part of the notice of Plan confirmation that the Debtors will distribute to all creditors and Shareholders, the Debtors will provide notice of the Administrative Claims Bar Date.

**Pre-Petition Priority Wage Claims.**

The Debtors believe that they have paid all of their outstanding scheduled pre-petition priority wage claims and post-petition wage claims in full and that none of the Debtors' former employees are entitled to be paid any further money. Jeffrey Cordes and William Aisenberg ("Cordes and Aisenberg"), two former employees of the Debtors, each filed a priority wage claim in the amount of $12,850. The Debtors and the OCEH have entered into a stipulation which has been approved by the Court pursuant to which the Debtors assigned to the OCEH all the Debtors' rights and standing against Cordes and Aisenberg. The OCEH currently intends to file (i) an objection to the claims filed by Cordes and Aisenberg against the Estates, and (ii) an action against Cordes and Aisenberg seeking damages for pre-petition harm arising from their conduct.

**Pre-Petition Priority Tax Claims.**

The Debtors scheduled the following priority tax claims they owed on the Petition Date: $600 to the California Board of Equalization, and $2,294 to the California Comptroller of Public Accounts. The Internal Revenue Service filed Claim No. 2 in the Nevada case asserting a priority tax claim in the amount of $2,000, and the Internal Revenue Service filed Claim No. 3 in the California case asserting a secured claim in the amount of $30,725.49. Once the Debtors

10

complete their tax returns, the Debtors will either pay these filed priority tax claims or whatever taxes the Debtors actually owe and, if appropriate, the Debtors, the OCEH or the Trustee will file objections to any tax claims the Debtors dispute.  One of the primary purposes for the Debtors' employment of an accounting firm at this time was to provide a preliminary estimate of whether the Debtors owe any pre-petition taxes.  The Debtors' accountant (BPEH) preliminarily estimates that the Debtors will owe approximately $5,000 of pre-petition taxes to the State of Texas.

**General Unsecured Claims – Class 1 under the Plan.**

Class 1 is designated in the Plan as unimpaired.

As a result of the Court granting the Claims Protocol Motion, there are only a small number of remaining disputed claims (collectively, the "Disputed Class 1 Claims").  Unless the Trustee chooses to have someone other than the Escrow Agent serve as the disbursing agent for Disputed Class 1 Claims, after the Escrow Agent pays the final allowed fees and expenses of the professionals employed in these Cases and before the Escrow Agent delivers to the Trustee the balance of the Remaining Estate Funds, the Escrow Agent will retain in the Trust Account a sum of money equal to the total amount of the Disputed Class 1 Claims with post-petition interest through December 31, 2018, which, as indicated in the Claims Chart, totals $379,773.89 (the "Residual Estate Funds").  The Escrow Agent will pay any Disputed Class 1 Claim, together with post-petition interest at the rate of 1.23% per annum (which was the applicable interest on the Petition Date according to the bankruptcy court website: (http://www.cacb.uscourts.gov/post-judgment-interest-rates) (the "Applicable Interest Rate"), only after an order of the Court is entered (whether such order is the result of a settlement reached between the holder of the Disputed Class 1 Claim and the OCEH or the Trustee or following a contested claim objection hearing) that turns the Disputed Class 1 Claim into an allowed class 1 claim and such order becomes a final order of the Court not subject to any pending appeal ("Allowed Class 1 Claim").

Each time a Disputed Class 1 Claim becomes an Allowed Class 1 Claim and the Escrow Agent pays the Allowed Class 1 Claim, together with post-petition interest at the Applicable Interest Rate, out of the Residual Estate Funds, the Escrow Agent will deliver to the Trustee the difference between the amount of the Disputed Class 1 Claim and the amount of the Allowed Class 1 Claim that is paid, together with post-petition interest at the Applicable Interest Rate.  For example, if a particular class 1 claimant filed a class 1 claim in the amount of $75,000 that the OCEH or the Trustee disputed, and the holder of the Disputed Class 1 Claim ultimately ends up with an Allowed Class 1 Claim in the amount of $25,000 (whether as a result of a settlement reached between the class 1 claimant and the OCEH or the Trustee or following a contested claim objection hearing), the Escrow Agent will pay out of the Residual Estate Funds to the class 1 claimant on account of the class 1 claimant's Allowed Class 1 Claim the sum of $25,000 plus post-petition interest at the Applicable Interest Rate computed through the date of payment, and the Escrow Agent will deliver the balance of the Residual Estate Funds to the Trustee, which would be in the amount of $50,000 less the amount of post-petition interest paid to the holder of the Allowed Class 1 Claim.

**Shareholders – Class 2 under the Plan and Creation of and Role of the Trust and the Trustee.**

Class 2 is designated in the Plan as unimpaired.

Class 2 consists of the Shareholders, who are the equity holders of ICPW Nevada as of the Record Date.  After all allowed post-bankruptcy claims have been paid in full, including the final fees and expenses of all professionals employed in the Cases, and a reserve maintained of the Residual Estate Funds to be used to pay the Disputed Class 1 Claims that become Allowed Class 1 Claims, the balance of the funds in the Estates will be transferred to the Trust and ultimately distributed to the record Shareholders of ICPW Nevada.

On the Effective Date, the Trust will be created pursuant to the Plan and the Trust Agreement will be entered into solely for the benefit of the Shareholders. The three members of the OCEH (Scott Jarus, Ron Chez, and Patrick O'Brien) will serve as the initial members of the Trust Board (the "Trust Board Members"). Subject to the approval of the Court and finalization of a Trustee Agreement acceptable to all parties, the Debtors' current Chief Financial Officer (Matthew Pliskin) has been selected by the OCEH to serve as the Trustee of the Trust.

The record date for distributions to Shareholders proposed as part of the Plan will be the later of (i) the date on which the Plan confirmation hearing is held (which is expected to be on February 12, 2018 – the "Plan Confirmation Hearing"), (ii) the date on which the Court enters an order confirming the Plan, and (iii) such other date not less than two days after FINRA has agreed to halt trading in shares of ICPW Nevada (the "Record Date"). It is the intention of the Debtors, with the full support of OECH, to advise FINRA of the proposed Record Date not less than ten (10) days in advance of such date. The period of time between the Plan Confirmation Hearing but prior to the Effective Date is hereafter referred to as the "Gap Period".

Under the Plan, all of the outstanding shares of common stock of ICPW Nevada (the "Common Stock") existing on the Effective Date will be cancelled, and the Record Holders who owned shares of Common Stock on the Record Date will become holders of non-transferable beneficial interests in the Trust in exchange for those shares. The Trust is being established for the exclusive benefit of the Record Holders, net of claims and expenses payable under the express terms of the Trust. All claims and causes of action that belong to the Estates are being assigned under the Plan to the Trust for the exclusive benefit of the Record Holders, and any net proceeds from such claims and causes of action will be for the exclusive benefit of Record Holders.

As indicated above, on not less than ten (10) days advance notice, the Plan Proponents will seek FINRA's approval of a halt in trading of the Common Stock during the Gap Period.

The Plan Proponents believe that a trading halt during the Gap Period is necessary to protect investors and the public interest.  The Plan Proponents believe that the cancellation of the Common Stock as of the Effective Date constitutes an extraordinary event that is likely to have a material effect on the market for the Common Stock, with the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.  Since only Record Holders will receive distributions from the Estates based on the shares of the Common Stock they hold as of the Record Date, the Plan Proponents believe that it would be untenable to allow trading in the Common Stock following the Record Date (since purchasers of such shares will receive no right to receive distributions from the Estates as a result of such purchases).  While the Debtors intend to notify the market, through Current Reports on Form 8-K and concurrently issued press releases, of the process for determining Record Holders, the Record Date, and the estimated initial distribution to Record Holders, the Plan Proponents believe that an extraordinary event trading halt is the most effective method for protecting investors who may seek to trade in the Common Stock from and after the Record Date.  Finally, neither the market, investors nor the Debtors would benefit from trading what would clearly be a worthless security.

In order to effectuate the establishment of a Record Date prior to the Effective Date, the Plan Proponents are therefore in the process of requesting guidance from FINRA regarding implementing an extraordinary event trading halt during the Gap Period, and any additional advance disclosure that FINRA may require in connection with such trading halt.

The Plan Proponents have preliminarily estimated an initial distribution to the Record Holders of approximately 11.28 cents per current outstanding share of Common Stock. Depending upon the results resolution of claim objections and expected pursuit of transferred estate causes of action, it is possible that there may be one or more secondary distributions to the Record Holders of amounts not currently subject to reasonable estimation.  The preliminary

estimate is based upon the following estimates and assumptions: (1) the Remaining Estate Funds are in the amount of $13,829,001 as of December 31, 2017; (2) there will be approximately $350,000 of funds remaining in the Debtors' debtor-in-possession account on February 28, 2018 that will be turned over to the Trust on the Effective Date; (3) the Effective Date will be on or about February 28, 2018; (4) there will be approximately $1,419,558 of final fees and expenses of the professionals employed by the Estates allowed by the Court through February 28, 2017; (5) there will be a reserve of $379,774 maintained by the Disbursing Agent for Disputed Class 1 Claims computed at the amounts asserted by the holders of the Disputed Class 1 Claims with post-petition interest through December 31, 2018; (6) there will be $195,000 of taxes owing from the Debtors' prior asset sale to BBI between federal and state taxes; (7) there will be a total of $25,000 of additional taxes owing by the Debtors; (8) the Trustee will retain an initial reserve of $2,500,000 to fund the Trust and the prosecution of transferred estate claims and causes of action. Although the results of litigation cannot be reasonably estimated at this time, the Trust provides for the possibility of one or more secondary distributions to the Record Holders after the Trustee has completed the prosecution of all claims and causes of action and wound down the affairs of the Trust and dissolved the Debtors.

The Plan Proponents have preliminarily estimated an initial distribution of 11.28 cents per share by the Trustee based upon available funds of $9,659,669 to the Record Holders and cancellation of 85,646,354 Record Shares on the Effective Date. If any of these assumptions proves to be inaccurate, that will necessarily effect on a dollar-for-dollar basis (higher or lower) the amount of the initial distribution to be made to the Record Holders and the availability of one or more secondary distributions.

# VI.

## THE ELEMENTS NECESSARY FOR PLAN CONFIRMATION ARE

## PRESENT AND THE COURT SHOULD CONFIRM THE PLAN

**A.**   **The Plan complies with all of the provisions of Section 1129(a) of the Bankruptcy Code.**

  **1.**   **Section 1129(a)(1) of the Bankruptcy Code.**

Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "the plan complies with the applicable provisions of this title." The phrase "applicable provisions" has been interpreted to mean §§ 1122 and 1123 of the Bankruptcy Code which govern the classification of claims and interests and the contents of a plan of reorganization. Cane v. Johns-Manville Corp., 843 F.2d 636, 648-9 (2nd Cir. 1988); H.R. Rep. No. 95-595, 9th Cong., 1st Sess. 412 (1977); 7 Collier on Bankruptcy ¶ 1129.02 (Richard Levin & Henry J. Sommer eds., 16th ed.).

  1.1   Section 1122 of the Bankruptcy Code.

Section 1122 of the Bankruptcy Code governs the classification of claims and interests. Section 1122(a) requires that a plan "place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class."

The Plan designates one class of claims and one class of interests.

Class 1 - Class 1 is comprised of all still outstanding pre-petition general unsecured claims.

Class 2 - Class 2 is comprised of all Shareholders.

Based on the foregoing, the Plan complies with the provisions of § 1122 of the Bankruptcy Code.

1.2    <u>Section 1123(a) of the Bankruptcy Code</u>.

The Plan complies with the seven (7) mandatory provisions of § 1123(a) of the Bankruptcy Code.

Section 1123(a)(1) of the Bankruptcy Code requires that a plan of reorganization designate classes of claims other than claims of the kind specified in §§ 507(a)(1), (2) and (8) of the Bankruptcy Code.  The Plan satisfies the requirements of § 1123(a)(1) of the Bankruptcy Code by designating all classes of claims other than claims specified in §§ 507(a)(1), (2) and (8) of the Bankruptcy Code.

Section 1123(a)(2) of the Bankruptcy Code requires that a plan of reorganization specify those classes of claims or interests that are not impaired and § 1123(a)(3) of the Bankruptcy Code requires that a plan specify those classes of claims or interests that are impaired.  The Plan satisfies this requirement by indicating whether each class under the Plan is impaired or not impaired.

Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment.  The Plan satisfies this requirement as no claim holder or interest holder is receiving treatment under the Plan different from any other claim holder or interest holder in the same class.

Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide adequate means for the Plan's implementation.  The Plan sets forth the implementation and means of execution of the Plan.

Section 1123(a)(6) of the Bankruptcy Code requires that a plan provide for appropriate distribution of power among all voting equity classes.  This provision of the Plan is not relevant as the Plan is a liquidating plan.

Section 1123(a)(7) of the Bankruptcy Code requires that a plan contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee.  The Plan Proponents have identified the three known Trust Board Members – each of whom served as a member of the OCEH and are therefore very familiar with these Cases, the Plan and the Trust.  Prior to the Plan Confirmation Hearing, the OCEH will identify (and seek Court approval of) the Trustee. The Trust has been formed and will be implemented solely for the benefit of Shareholders.  All creditors (to the extent they are ultimately deemed to have allowed claims) will be paid in full with post-petition interest.  The Plan Proponents believe that the Plan and the Trust are consistent with the interests of creditors and Shareholders.

    1.3    Section 1123(b) of the Bankruptcy Code.

Section 1123(b) of the Bankruptcy Code contains five permissive provisions.

Section 1123(b)(1) of the Bankruptcy Code provides that a plan may impair or leave unimpaired any class of claims, secured or unsecured, or of interests.  Both Classes 1 and 2 under the Plan are not impaired.

Section 1123(b)(2) of the Bankruptcy Code specifies that, subject to § 365 of the Bankruptcy Code, a plan may provide for the assumption, rejection or assignment of any executory contract or unexpired lease not previously rejected.  Pursuant to the Sale Order, all of the Debtors' executory contracts and unexpired leases that were not assumed and assigned to BBI were deemed rejected as of the Sale Closing, with the exception of the two supplier agreements with GGS and Grainger whose rejection can happen only following the entry of an order of the Court approving such rejection.  As a result of the Debtors' frustration with the lack of progress that was being made between BBI, on the one hand, and GGS and Grainger, on the other hand, the Debtors recently filed a motion to reject the two supplier agreements with GGS and Grainger,

but at the request of BBI, the Debtors never submitted a proposed order to the Court providing for the rejection of those two agreements.  BBI has now advised the Debtors that BBI, on the one hand, and GGS and Grainger, on the other hand, have reached agreements on the forms of stipulations providing for the Debtors' assumption of their two supplier agreements with GGS and Grainger and assignment of their two supplier agreements with GGS and Grainger to BBI (as modified by agreement of the parties), with the cure amounts agreed to and funded by BBI.  The Debtors therefore expect to be filing a motion with the Court to be considered concurrently with the Plan Confirmation Hearing providing for the Debtors' assumption of their two supplier agreements with GGS and Grainger and assignment of their two supplier agreements with GGS and Grainger to BBI – in which case the Debtors will withdraw their previously filed rejection motion.

Section 1123(b)(3) of the Bankruptcy Code specifies that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate," and/or "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."  This Section of the Bankruptcy Code is inapplicable to the Plan as the Plan Proponents are not seeking any such settlement or adjustment of any claim or interest under the Plan.

Section 1123(b)(4) of the Bankruptcy Code specifies that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests."  This provision of the Bankruptcy Code is inapplicable to the Plan.

Based upon the foregoing, the Plan complies with all of the provisions of §§ 1122 and 1123 of the Bankruptcy Code and, therefore, complies with § 1129(a)(1) of the Bankruptcy Code.

2.      Section 1129(a)(2) of the Bankruptcy Code.

Section 1129(a)(2) of the Bankruptcy Code provides that a court may confirm a plan only if "[t]the proponent of the plan complies with the applicable provisions of this title."  The "principal purpose of … §1129(a)(2) is to insure that the proponents have complied with the requirements of … §1125 in the solicitation of acceptances to the plan," In re Texaco, Inc. 84 B.R. 893, 906-7 (Bankr. S.D. N.Y. 1988), and with the requirements of §§ 1121 and 1127 of the Bankruptcy Code. In re Downtown Inv. Club III, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988).

2.1      Section 1121 of the Bankruptcy Code.

Section 1121(c) of the Bankruptcy Code provides that "[a]ny party in interest including the debtor ... an equity security holders' committee … may file a plan [.]"  Since the Debtors and the OCEH are the co-proponents of the Plan, and the Debtors and the OCEH are clearly parties in interest, the requirements of § 1121 of the Bankruptcy Code have been satisfied.

2.2      Section 1125 of the Bankruptcy Code.

Section 1125(b) of the Bankruptcy Code provides, in part, that "acceptance or rejection of a plan may not be solicited … from a holder of a claim or interest with respect to such claim or interest, unless, at that time or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and hearing, by the Court as containing adequate information."  This Section of the Bankruptcy Code is inapplicable to these Cases because the Plan Proponents are not soliciting any acceptances to the Plan (see docket number 373 entered by the Court on January 10, 2018).  However, the Debtors did effectuate service of the Notice/Plan Summary as ordered by the Court in the January 10th Order, as  docket number 373.

2.3      Section 1127 of the Bankruptcy Code.

Section 1127 of the Bankruptcy Code sets forth certain requirements that a plan proponent

must satisfy in order to modify a plan. Section 1127(b) of the Bankruptcy Code authorizes a plan proponent to modify the plan at any time before confirmation of the plan provided the plan as modified satisfies the requirements of §§ 1122 and 1123 of the Bankruptcy Code. A modification to a plan does not mandate "the preparation of a new disclosure statement and resolicitation of the plan." In re American Solar King Corp. ("American Solar"), 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988). Additional disclosure to creditors is required "only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties who previously voted for the plan."

While the Plan Proponents reserve all rights in this regard, the Plan Proponents are not at this time requesting the Court to approve any modifications to the Plan.

3.    Section 1129(a)(3) of the Bankruptcy Code.

Section 1129(a)(3) of the Bankruptcy Code provides that a court may confirm a plan only if the plan is proposed "in good faith and not by any means forbidden by law." Section 1129(a)(3) of the Bankruptcy Code does not define good faith in the context of proposing a plan of reorganization. However, the Ninth Circuit defined that standard in the case of In re Sylmar Plaza, L.P., 314 F.3d 1070 (9th Cir. 2002), by holding that "a plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code." Id., at 1074; accord, Ryan v. Loui (In re Corey), 892 F.2d 829, 835 (9th Cir.1989); and Madison Hotel, 749 F.2d at 425. The Ninth Circuit in Sylmar Plaza further held that "the requisite good faith determination is based on the totality of the circumstances." Id., at 1074; accord, Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.), 84 B.R. 167, 172 (9th Cir. B.A.P. 1988).

A Court in this District adopted the same Ninth Circuit standards for good faith in the proposing of a plan of reorganization in the case of In re Howard Marshall, 298 B.R. 670, 675-676 (Bankr. C.D. Cal 2003). In the Marshall case, the Court found that "the good faith evaluation

must be made on a case by case basis". Id., at 676; see Sylmar Plaza, 314 F.3d at 1075; Jorgensen, 66 B.R. at 108-09. The Court further held that "this court must make its own independent evaluation of the debtors' good faith for the purpose of plan confirmation" and that "[p]art of the good faith analysis is that the plan must deal with the creditors in a fundamentally fair manner. Id., at 676;see, e.g., Jorgensen, 66 B.R. at 108-09. However, a debtor need not consider every feasible alternative form of plan, so long as the proposed plan meets the requirements of §1129(a). Id., at 676;see In re General Teamsters, Warehousemen & Helpers Union Local 890, 225 B.R. 719, 729 (Bankr. N.D. Cal. 1998).

Finally, Bankruptcy Rule 3020(b)(2) provides that the Court may determine that a plan proponent proposed a plan in good faith and not by any means forbidden by law, without receiving evidence, if no party in interest has timely objected to the plan proponent's good faith. In re Warren, 89 B.R. 87, 91 (9th Cir. B.A.P. 1988).

The Plan Proponents have proposed the Plan in good faith. The Plan is the result of negotiations between the Debtors and the OCEH – always with the best interests of creditors and Shareholders in mind. No party has objected to the good faith of the Plan Proponents in proposing the Plan; no opposition has been filed to date to confirmation the Plan; and the Plan has no impaired classes. The Plan Proponents therefore submit that the requirements of § 1129(a)(3) of the Bankruptcy Code  have been satisfied.

4.    Section 1129(a)(4) of the Bankruptcy Code.

Section 1129(a)(4) of the Bankruptcy Code provides that a court may confirm a plan only if "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable." None of the professionals

employed in these Cases will be paid any of their outstanding post-petition fees and expenses until such fees and expenses have been approved by the Court.

     5.    <u>Section 1129(a)(5) of the Bankruptcy Code</u>.

Section 1129(a)(5)(A)(i) of the Bankruptcy Code provides that a court may confirm a plan only if the plan proponent discloses 'the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer of voting trustee of the debtor . . . or a successor to the Debtor under the plan."

Section 1129(a)(5)(A)(ii) of the Bankruptcy Code requires that the appointment to, or continuance of a director, officer or voting trustee be "consistent with the best interests of creditors and equity holders and with public policy." <u>In re Produce Hawaii, Inc</u>., 41 B.R. 301, 304 (Bankr. D. Haw. 1984); <u>In re Parks Lumber Co., Inc</u>., 19 B.R. 285, 291 (Bankr. W.D. La. 1982).

Section 1129(a)(5)(B) of the Bankruptcy Code provides that a Court may confirm a plan only if the plan proponent discloses "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."

The identities of the three initial Trust Board Members are set forth above. Prior to the Plan Confirmation Hearing, the OCEH will file with the Court a supplemental pleading which (i) identifies (and seeks Court approval of) the Trustee, which is anticipated to be Matthew Pliskin, the Debtors' current Chief Financial Officers, (ii) identifies the Trust Board Member(s), and (iii) sets forth (and seeks Court approval of) the proposed compensation of the Trustee and the members of the Trust Board. The Plan Proponents believe that the foregoing is consistent with the best interests of creditors, equity holders and public policy.

Based on the foregoing, the Plan satisfies the requirements of § 1129(a)(5) of the Bankruptcy Code.

6.      Section 1129(a)(6) of the Bankruptcy Code.

Section 1129(a)(6) of the Bankruptcy Code requires that after confirmation of a plan, any governmental regulatory commission with jurisdiction "over the rates of the debtor has approved any rate change provided for in the plan ..."  This section of the Bankruptcy Code is inapplicable to these Cases since no governmental regulatory commission has jurisdiction over the rates the Debtors charge, and the Debtors are no longer an operating business in any event.

7.      Section 1129(a)(7) of the Bankruptcy Code.

Section 1129(a)(7)(A) of the Bankruptcy Code (commonly referred to as the "best interest of creditors test") requires that, with respect to each impaired class under the Plan, each member of the class must either accept the Plan or receive under the Plan property having a value, as of the Effective Date, that is not less than the amount that such claim holder would receive if the Debtor's chapter 11 case was converted to a chapter 7 liquidation.

While this section of the Bankruptcy Code is inapplicable because there are no impaired classes under the Plan, the Debtors and the OCEH believe that the only other realistic way for the Cases to end other than confirmation of the Plan would be to convert the Cases to chapter 7. The Plan Proponents believe that converting the Cases to chapter 7 would be a far worse result for Shareholders than confirming the Plan for at least the following three reasons:  One, under the Plan, the Escrow Agent is paying all Allowed Claims out of the Remaining Estate Funds without charging any disbursing agent fee.  In contrast, a chapter 7 trustee would be paid the trustee's fee (frequently referred to as the trustee's "handle") in accordance with the percentage formula set forth in § 326 of the Bankruptcy Code.  This is very significant.  As indicated above, there is currently approximately $13,829,001 of Remaining Estate Funds, and the Debtors project having approximately $350,000 in their debtor-in-possession account at the time of the Plan Confirmation Hearing.  If the Cases were converted to chapter 7 instead of the Plan being

confirmed, and the chapter 7 trustee distributed this total sum of $14,179,001, the chapter 7 trustee's statutory fee under § 326 of the Bankruptcy Code would be approximately $448,620. In contrast, under the Plan, the Escrow Agent is charging no fee at all for making the payments the Escrow Agent will be making, and the fee structure being charged by the Trustee (even after taking into account the expected compensation to be paid to the Trust Board Members) for making distributions from the Trust will be substantially lower than the percentage formula set forth in § 326 of the Bankruptcy Code. Two, a chapter 7 trustee would hire the trustee's own new professionals, which would create great expense and inefficiency of introducing new professionals into the Cases with no familiarity or background of the Cases, rather than the smooth transition of the use by the Estates of the existing professionals who are already intimately familiar with the Cases. Three, Shareholders will receive their money under this Plan much faster than they would in a chapter 7 bankruptcy simply because of the time it takes for a chapter 7 trustee to close out a chapter 7 bankruptcy estate and distribute funds. Conversely, the Plan Proponents submit that there would be no advantage of any conversion of the Cases to chapter 7. The Plan Proponents therefore believe that it is clear that Shareholders will receive *more* under the Plan than they would receive in any chapter 7 liquidation of the Debtors and will receive their distribution much faster under the Plan than they would in any chapter 7 liquidation of the Debtors.

8.      Section 1129(a)(8) of the Bankruptcy Code.

Section 1129(a)(8) of the Bankruptcy Code provides that a court may confirm a plan only if "[w]ith respect to each class of claims or interests:

(A)      such class has accepted the plan; or

(B)      such class is not impaired under the plan."

As described above, both classes under the Plan (class 1 – general unsecured creditors; and class 2 – Shareholders) are not impaired.

9.    <u>Section 1129(a)(9) of the Bankruptcy Code</u>.

Section 1129(a)(9) of the Bankruptcy Code provides that a court may confirm a plan only if the plan complies with the following:

a.    Each holder of a priority claim under §§507(a)(l) or 507(a)(2) of the Bankruptcy Code must receive cash equal to the allowed amount of such claim or agree to a different treatment.

b.    Each holder of a priority claim under §§ 507(a)(3), (4), (5), (6) or (7) of the Bankruptcy Code must receive, on account of such claim:

i.    deferred cash payments of a value, as of the effective date, equal to the allowed amount of such claim, if such class has accepted the plan; or

ii.    cash on the effective date equal to the allowed amount of such claim, if such class has not accepted the plan.

c.    Each holder of a priority claim under § 507(a)(8) of the Bankruptcy Code must receive, on account of such claim, deferred cash payments, over a period not exceeding five years after the Petition Date, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

Under the Plan, each holder of an allowed administrative claim (*i.e.*, claims arising under § 507(a)(2) of the Bankruptcy Code) will be paid in full following the entry of an order of the Court allowing such administrative claim.  As part of the Plan Confirmation Order, the Plan Proponents will be requesting the Court to set an administrative claims bar date and to schedule the date and time for the final fee hearing for the professionals employed in these Cases.

Under the Plan, each holder of an allowed non-tax priority claim (i.e., claims arising under §§ 507(a)(3), (4), (5), (6) or (7) of the Bankruptcy Code) and each holder of an allowed tax claim (i.e., claim arising under § 507(a)(8) of the Bankruptcy Code) will be paid in full.

Based upon the foregoing, the Plan satisfies the requirements of § 1129(a)(9) of the Bankruptcy Code.

10.    Section 1129(a)(10) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code provides that a court may confirm a plan only if "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  This Section of the Bankruptcy Code is inapplicable to the Plan since there are no impaired classes of claims under the Plan.

11.    Section 1129(a)(11) of the Bankruptcy Code.

Section 1129(a)(11) of the Bankruptcy Code provides that a court may confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  In order to meet this feasibility standard, a debtor need only demonstrate that the plan has a "reasonable probability of success." In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir.1986); In re Pike's Peak Water Co., 779 F.2d 1456, 1460 (10th Cir. 1985); In re Apex Oil Co., 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990).

There are two important aspects of a feasibility analysis.  The first aspect considers whether the Debtors will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on such date.  Since the Debtors already have enough cash on hand (through the Remaining Estate Funds) to pay all the claims and expenses which are entitled to be paid on the Effective Date, this first aspect of Plan feasibility has clearly been

satisfied. The second aspect considers whether there will be enough cash over the life of this Plan to make the required Plan payments. Since this Plan is a liquidating Plan, where all Remaining Estate Funds and other funds that are in the Estates or will come into the Estates will all be distributed to holders of allowed claims, with any remaining balance to be paid to Shareholders, this second aspect of Plan feasibility has, by definition, been satisfied.

12. Section 1129(a)(12) of the Bankruptcy Code.

Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan only if "[a]ll fees payable under Section 1930, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." The Debtors are in compliance with all of the fee requirements set forth in § 1930 of the Bankruptcy Code. The Debtors will promptly pay any additional fees or costs owing to the Clerk of the Court or the Office of the United States Trustee. Following the Effective Date, the Trustee will be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and will pay all such fees out of the funds in the Trust.

13. Section 1129(a)(13) of the Bankruptcy Code.

Section 1129(a)(13) of the Bankruptcy Code provides that a court may confirm a plan only if "[t]he plan provides for the continuation after its effective date of payment of all retiree benefits ... for the duration of the period the debtor has obligated itself to provide such benefits." This provision is inapplicable as the Debtors do not have any remaining retiree benefits.

**VII.**

**CONCLUSION**

Based upon all of the foregoing, the Plan Proponents submit that all of the requirements of § 1129(a) of the Bankruptcy Code necessary for confirmation of the Plan have been satisfied. For all of the reasons described above, the Debtors and the OCEH believe that the confirmation of the

28

Plan provides the best possible outcome for Shareholders (and the Debtors' remaining creditors) under the circumstances of these Cases.  The Debtors and the OCEH therefore request the Court to confirm the Plan at the Plan Confirmation Hearing scheduled to be held on February 12, 2018.

Dated: January 22, 2018

Presented By:

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

By:    _/s/ Ron Bender_____
         RON BENDER
         MONICA Y. KIM
         KRIKOR J. MESHEFEJIAN
         Attorneys for Chapter 11 Debtors and Plan Proponents
ICPW Liquidation Corporation, a California corporation, formerly known as Ironclad Performance Wear Corporation, a California corporation, and ICPW Liquidation Corporation, a Nevada corporation, formerly known as Ironclad Performance Wear Corporation, a Nevada corporation


DENTONS US LLP

By:_____
         SAMUEL R. MAIZEL
         TANIA M. MOYRON
         Attorneys for Official Committee of Equity Security Holders

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **MOTION IN SUPPORT OF CONFIRMATION OF DEBTORS' AND OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS' JOINT PLAN OF LIQUIDATION DATED JANUARY 12, 2018; MEMORANDUM OF POINTS AND AUTHORITIES**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 22, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Shiva D Beck**    sbeck@gardere.com, jcharrison@gardere.com
- **Ron Bender**    rb@lnbyb.com
- **Cathrine M Castaldi**    ccastaldi@brownrudnick.com
- **Russell Clementson**    russell.clementson@usdoj.gov
- **Aaron S Craig**    acraig@kslaw.com, lperry@kslaw.com
- **Matthew A Gold**    courts@argopartners.net
- **Monica Y Kim**    myk@lnbrb.com, myk@ecf.inforuptcy.com
- **Jeffrey A Krieger**    jkrieger@ggfirm.com, kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com
- **Samuel R Maizel**    samuel.maizel@dentons.com, alicia.aguilar@dentons.com;docket.general.lit.LOS@dentons.com;tania.moyron@dentons.com;kathryn.howard@dentons.com
- **Krikor J Meshefejian**    kjm@lnbrb.com
- **Tania M Moyron**    tania.moyron@dentons.com, chris.omeara@dentons.com
- **S Margaux Ross**    margaux.ross@usdoj.gov
- **Susan K Seflin**    sseflin@brutzkusgubner.com
- **John M Stern**    john.stern@oag.texas.gov, bk-mbecker@oag.texas.gov
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov
- **Sharon Z. Weiss**    sharon.weiss@bryancave.com, raul.morales@bryancave.com;geri.anderson@bryancave.com
- **Douglas Wolfe**    dwolfe@asmcapital.com

**2.  SERVED BY UNITED STATES MAIL**: On **January 22, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

U.S. Securities and Exchange Commission
Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

Russell Clementson
S Margaux Ross
United States Trustee (SV)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

1

☐ *Service information continued on attached page*

2

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR**

3   **EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **January 22, 2018**, I served the following persons and/or entities by personal delivery, overnight mail

4   service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight

5   mail to, the judge will be completed no later than 24 hours after the document is filed.

6   ***Served via Overnight Mail***
Hon. Martin R. Barash

7   United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342

8   Woodland Hills, CA 91367

9   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

10

| January 22, 2018 | Lourdes Cruz | /s/ Lourdes Cruz |

11  | *Date* | *Type Name* | *Signature* |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**