ANDREW T. SOLOMON (pro hac vice motion pending)
JENNIFER G. CRAMER
asolomon@solomoncramer.com; jcramer@solomoncramer.com
SOLOMON & CRAMER LLP
1441 BROADWAY, SUITE 6026
NEW YORK, NY 10018
Telephone: (212) 884-9102; Facsimile: (516) 368-3896
Special Litigation Counsel to the Official Committee of Equity Security Holders

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY

| | |
|---|---|
| In re:<br><br>ICPW LIQUIDATION CORPORATION, a California corporation,[1]<br><br>_____Debtor and Debtor in Possession._____ | Lead Case No.:  1:17-bk-12408-MB<br>Jointly administered with Case No.: 1:17-bk-12409-MB; Chapter 11 Cases<br><br>Adv. Proc. No.: _____ |
| In re:<br><br>ICPW LIQUIDATION CORPORATION, a Nevada corporation,[2]<br><br>_____Debtor and Debtor in Possession._____<br>Affects:<br><br>☒  Both Debtors<br><br>☐  ICPW Liquidation Corporation, a California corporation<br><br>☐  ICPW Liquidation Corporation, a Nevada corporation. | **OBJECTION TO CLAIM NO. 7.1 AND CLAIM NO. 8.1 PURSUANT TO FRBP 3007 and**<br><br>**COMPLAINT FOR:**<br><br>(1) Breach of Fiduciary Duty;<br><br>(2) Civil RICO;<br><br>(3) Declaratory Judgment;<br><br>(4) Breach of Contract; and<br><br>(5) Faithless Servant. |
| OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS of ICPW LIQUIDATION CORPORATION, a Nevada corporation,<br><br>        Objector and Plaintiff,<br>  - against -<br><br>JEFFREY CORDES and WILLIAM AISENBERG,<br><br>        Claimants and Defendants. | |

The Official Committee of Equity Security Holders (the "Committee", "Objector" or

"Plaintiff") of ICPW Liquidation Corporation (f/k/a Ironclad Performance Wear Corporation), a

---

[1] Formerly known as Ironclad Performance Wear Corporation, a California corporation.
[2] Formerly known as Ironclad Performance Wear Corporation, a Nevada corporation.

Nevada corporation, individually and on behalf of the estates of ICPW NV and ICPW Liquidation

Corporation (f/k/a Ironclad Performance Wear Corporation), a California corporation

(collectively, "Ironclad"), as and for its Objection to the Claims of Jeffrey Cordes ("Cordes") and

William Aisenberg ("Aisenberg") and for its Counterclaims, upon knowledge as to its own

actions and upon information and belief as to the other allegations, alleges as follows:

## I.    INTRODUCTION

1.    Having driven Ironclad to financial catastrophe through mismanagement and

misconduct, Cordes and Aisenberg now demand their reward—six-months' severance.  They

predicate their proofs of claim on recent amendments to their employment agreements, which

they induced through fraud and bad faith just months before they quit while under investigation

for their misconduct.

2.    Cordes and Aisenberg came to Ironclad in 2014 with bold promises to turn the

company around.  Then and throughout their tenure, they assured company shareholders and the

Board of Directors that their initiatives would improve Ironclad's sales and earnings dramatically.

But when their efforts failed, they resorted to cooking the books.  In the end, two employees blew

the whistle.  The company's Audit Committee investigated and, with the help of accountants and

counsel, uncovered numerous accounting irregularities.  When Cordes and Aisenberg were asked

to clarify these transactions, they had no plausible explanation and abruptly resigned.  The

company then determined that it would need to restate its financial statements.  The anticipated

and required restatements triggered defaults under various debt covenants, bringing enormous

pressure from Ironclad's creditors and ultimately compelling this voluntary bankruptcy filing.

3.    In the bankruptcy, Ironclad had no choice but to sell its operating business, which

it did, in what became essentially a salvage operation.  Ironclad's shareholders suffered severe

losses.  They incurred the substantial cost of investigating Cordes and Aisenberg; they incurred

the cost of restating financials; they incurred the vast expenses of a bankruptcy filing and

- 2 -

proceeding. And then they were forced to sell off the company's assets in a distressed scenario, rather than from strength. Total damages are likely to exceed $10 million dollars.

4.    That Cordes and Aisenberg are not entitled to severance is axiomatic. That they must be held responsible for their misdeeds and repay Ironclad for the millions in damages they caused is equally clear and required by justice.

## II.    JURISDICTION AND VENUE

5.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1337. This is a core proceeding under 28 U.S.C. §§ 157(b)(2) (A), (B) (C), and (O). This adversary proceeding is commended pursuant to Rules 3007 and 7001, et seq., of the Federal Rules of Bankruptcy Procedure.

6.    Venue is proper in this Court under 28 U.S.C. §1409.

## III.    PARTIES

7.    Prior to the sale of its operating assets in this bankruptcy proceeding, Ironclad developed, manufactured, and sold high-performance, task-specific work gloves for law enforcement, first-responders, the military, and industries such as oil and gas exploration and automotive. The gloves were sold under the proprietary labels, "Kong" and "Ironclad," and under private-label branding and co-branded labels such as "Built Tough by Ironclad."

8.    Claimant Cordes is a resident of Southlake, Texas. He was the President, Chief Executive Officer and a Director of Ironclad from February 2014 to July 4, 2017, when he resigned while under internal investigation for accounting fraud.

9.    Claimant Aisenberg is a resident of Carrollton, Texas. He was an Executive Vice President and the Chief Financial Officer of Ironclad from April 2014 to July 4, 2017, when he resigned while under internal investigation for accounting fraud.

## IV.    THE CORDES AND AISENBERG CLAIM

10.    On October 3, 2017, Jeffrey Cordes filed Claim No. 8-1 in case 1:17-bk-12408-

MB, the "<u>Cordes Claim</u>").   Cordes demands $12,850.00 in alleged unpaid compensation, $150,000 in "Severance Pay," and $16,906.75 in attorney's fees, which he claims to have incurred pre-petition.

11.   On October 3, 2017, William Aisenberg filed Claim No. 7-1 in case 1:17-bk-12408-MB, the "<u>Aisenberg Claim</u>").   Aisenberg demands $12,850.00 in alleged unpaid compensation, $112,500 in "Severance Pay," and $16,906.75 in attorney's fees, which he claims to have incurred pre-petition.[3]

12.   As explained below, neither Cordes nor Aisenberg is entitled to compensation, severance or attorneys' fees.  The severance claims are based on a January 1, 2017 amendment to their employment agreements.  In seeking this amendment, Cordes and Aisenberg failed to disclose to Ironclad's Board of Directors and its Compensation Committee material information that they had a fiduciary duty to disclose.  These non-disclosures include:

    a.   that Cordes and Aisenberg knowingly and willfully caused Ironclad to record and report revenues that were based on phony sales transactions;

    b.   that Cordes and Aisenberg knowingly and willfully caused Ironclad to recognize sales revenues in violation of GAAP in order to manipulate the timing those revenues were recognized;

    c.   that Cordes and Aisenberg had repeatedly violated numerous federal securities laws by manipulating and fabricating revenues; and

    d.   that Cordes and Aisenberg had engaged in similar misconduct as COO and CFO, respectively, at their prior employer, Walls Holding Company, Inc. ("Walls").

13.   Had Cordes and Aisenberg honestly accounted for their misconduct and illegal

[3] Cordes and Aisenberg are represented by the same counsel and presumably their $16,906.75 attorneys' fee claims, which are submitted severally, constitute a single obligation.

- 4 -

activities, Ironclad's Board of Directors would not have amended their employment contracts to provide for severance.  Indeed, had Cordes and Aisenberg told the truth about their misconduct at Walls, they would have been terminated soon after they were hired.

14.    As detailed below, far from being entitled to severance payments, Cordes and Aisenberg owe the Committee millions of dollars in damages, including:

      a.  Ironclad's costs incurred in investigating, restating and disclosing Ironclad's misreported and fabricated sales and earnings;

      b.  Ironclad's equity holders' loss in value caused by the company's bankruptcy filing and the fire sale of its assets;

      c.  Ironclad's attorneys' fees defending the Cordes Claim and the Aisenberg Claim; and

      d.  Compensation, including stock awards, paid to Cordes and Aisenberg under their employment agreements.

## V.    FACTUAL BACKGROUND

15.    2013 was a disappointing fiscal year for Ironclad.  Net sales were $24,530,853, down 6.3% from 2012, and net income was $560,729, down markedly from 2012's net income of $3,078,808.  Several significant shareholders believed that Ironclad was underperforming and had sued to halt the company from electing new directors.  As part of a settlement, Ironclad agreed to change the composition of the Board and management.  These changes resulted in Ironclad's hiring of Cordes, as its new Chief Executive Officer, and Aisenberg, as its Chief Financial Officer.

16.    Before joining Ironclad, Cordes was President and Chief Operating Officer at Walls, and Aisenberg was its Chief Financial Officer.  In 2013, Williamson-Dickie acquired Walls, which resulted in the termination of Cordes's and Aisenberg's employment.  In late 2013, an executive recruiting firm introduced Cordes to Ironclad, which was searching for a new chief

executive officer.

17.    Cordes joined Ironclad pursuant to a letter agreement dated February 3, 2014.  He received a salary of $300,000, with potential for a performance bonus up to $125,000 based on revenue and operating income targets, and 2.7 million stock options, subject to vesting over four years.  Section 6 of Cordes's letter agreement contained a severance provision, which provided for Cordes to receive 12 months' severance pay in the event of a change of control or 6-months' severance pay if he were terminated.  Both provisions disqualified Cordes from collecting severance if he quit or was terminated for "cause," which is defined to include, *inter alia*, "engaging in dishonest or fraudulent activities which are injurious to the Company" and "breach of fiduciary duty to the Company which involves a material personal profit."

18.    Shortly after joining the company, Cordes persuaded the Board to hire Aisenberg as its new Chief Financial Officer.  Aisenberg joined Ironclad pursuant to a letter agreement dated April 22, 2014.  He received a salary of $225,000, with a potential incentive bonus of up to 30% of his salary based on revenue and operating income targets, and 1 million stock options.  Section 6 of Aisenberg's letter agreement contained a severance provision, which provided for Aisenberg to receive 12 months' severance pay in the event of a change of control or 6-months' severance pay if he were terminated.  Both provisions disqualified Aisenberg from collecting severance if he quit or was terminated for "cause," which is defined to include, *inter alia*, "engaging in dishonest or fraudulent activities which are injurious to the Company" and "breach of fiduciary duty to the Company which involves a material personal profit."[4]

19.    In May 2014, Cordes hired a third Walls alumnus, Tom Felton, to serve as "Senior Vice President Supply Chain," with an annual salary of $190,000 and a potential incentive bonus of up to 25% of his salary based on revenue and operating income targets.  The addition of Felton

---

[4] In early 2017, Cordes and Aisenberg fraudulently induced Ironclad to amend their employment agreements to entitle them to severance regardless of the circumstances of their termination.  As outlined in ¶¶ 89-90 herein, these amendments, which are central to their claims for severance, are unenforceable.

later proved invaluable to Cordes and Aisenberg.  A loyal lieutenant, Felton helped engineer their fraudulent schemes.

20.    Soon after the trio of ex-Walls executives joined Ironclad, the Board received concerning news.  Cordes and Aisenberg had been named as individual defendants in a lawsuit brought by the acquirer of Walls entitled, *Williamson-Dickie Holding Company v. Audax Mezzanine Fund II, L.P.*, dc-14-08309 (Dist. Ct. – Dallas 2014).

21.    In that lawsuit, Walls alleged that Cordes and Aisenberg engaged in fraudulent accounting practices, including booking sham sales on products that never shipped to "artificially inflate[] Walls' earnings … by approximately $800,000" in one transaction and to artificially inflate sales by $700,000 in a second sham transaction.  Cordes and Aisenberg were accused of "selling" goods to a factory, never shipping the goods, then buying the unshipped goods back at inflated prices.  Through these round-trip machinations, according to the complaint, Cordes and Aisenberg were able to boost sales and earnings and inflate the value of the company's inventory.  Cordes and Aisenberg were also accused of shifting costs into later periods to "fraudulently and intentionally inflate[] Walls' earnings" and of "holding the month open" to recognize more sales within a fiscal period.

22.    When the Board interviewed Cordes and Aisenberg, they denied the allegations and claimed that the plaintiff, Williamson-Dickie, had a case of "buyer's remorse."  The Board consulted with its counsel and the company's auditors, and determined that no adverse employment action was warranted because of a lack of evidence.  Months later, Cordes and Aisenberg reported that the case was settling and then later reported the settlement.  By settling the case, Cordes and Aisenberg kept their misconduct secret.

23.    On information and belief, Cordes's and Aisenberg's denial of the allegations in the Williamson-Dickie lawsuit was false.  Had they been honest, the Board would have

1    terminated their employment immediately.

2                            **Revenue Recognition Principles**

3        24.    Ironclad disclosed to investors its revenue recognition policies in its public

4    financial statements filed with the SEC.    Cordes and Aisenberg certified and signed these

5    financial statements attesting to the veracity of these public filings.

6        25.    In the Form 10-K for the Fiscal Year ending December 31, 2013, Ironclad made

7    the following disclosure (repeated in substance in subsequent Form 10-Ks) about its "Revenue

8    Recognition" policy:

> Under our sales model, a customer is obligated to pay us for products sold to it within a specified number of days from the date that title to the products is transferred to the customer. Our standard terms are typically net 30 days from the transfer of title to the products to a customer, however, we have negotiated special terms with certain customers and industries. We typically collect payment from a customer within 30 to 60 days from the transfer of title to the products to a customer. Transfer of title occurs and risk of ownership passes to a customer at the time of shipment or delivery, depending on the terms of our agreement with a particular customer. <u>The sale price of our products is substantially fixed or determinable at the date of sale based on purchase orders generated by a customer and accepted by us. A customer's obligation to pay us for products sold to it is not contingent upon the resale of those products.</u> **<u>We recognize revenue at the time product is shipped or delivered to a customer, based on terms of agreement with a customer.</u>**

19       26.    The emphasized provisions contain the essential elements for the recognition of

20   revenues, as required under Generally Accepted Accounting Principles, and as summarized by the

21   SEC, which synthesized the revenue recognition rule into four basic principles[5]:

22       •   Persuasive evidence of an arrangement exists,

23       •   Delivery has occurred or services have been rendered,

24       •   The seller's price to the buyer is fixed or determinable, and

25       •   Collectability is reasonably assured.

---

[5] https://www.sec.gov/interps/account/sabcodet13.htm

27.     As shown below, Cordes and Aisenberg repeatedly violated these revenue recognition principles to manipulate Ironclad's reported revenues and income.

**Fiscal Year 2014**
**Cordes's and Aisenberg's First Year**

28.     Cordes's and Aisenberg's first year—2014—was a rebuilding year.  Ironclad's results did not improve over the prior year.  Net sales in 2014 of $24,283,552 were slightly lower than 2013's net sales of $24,530,853.  Profitability was also slightly down.  In 2014, Ironclad had net income of $108,701 compared to 2013's $243,471.

**Fiscal Year 2015**
**Cordes's and Aisenberg's Second Year – The Fraud Begins**

29.     Coming off 2014's lackluster performance, Cordes and Aisenberg reassured investors that the company was now in a "position to be more competitive" and that they looked forward to sales growth.[6]

30.     Yet in the first three quarters of 2015, Ironclad's performance failed to improve.  Key shareholders voiced concerns about the company's results and strategic direction.  Cordes countered with promises of a turnaround.  Thus, with the release of Ironclad's third-quarter earnings, Cordes predicted "Q4 2015 net sales to exceed Q4 2014 levels by 20%."  The prediction thus set a sales target of $10,988,598 (as compared to fourth quarter 2014 sales of $9,145,165).

31.     Despite Cordes's optimism, Ironclad's fourth quarter performance looked dismal.  On or about December 18, 2015, Cordes informed the Board that Ironclad had suffered a setback and would not receive expected revenues in the fourth quarter of $2.3 million from a customer named "Wesco."  But Cordes assured that other "opportunities" would offset the Wesco reduction and that management's goal was to finish the quarter 5-10% above the fourth quarter of 2014.  He added, "A Q4-2015 increase of 5% would translate to $9.6 million and end 2015 full year at

---

[6] https://www.sec.gov/Archives/edgar/data/1301712/000072174815000127/icpw8k030515ex99_1.htm

$24.8 million versus $24.2 million in 2012."

32.    By the last days of December 2015, Cordes and Aisenberg recognized that their predictions had been grossly over-optimistic.  Far from exceeding the fourth quarter of 2014 by 20%, sales were trailing.

33.    To mitigate the impending revenue shortfall, Cordes and Aisenberg began their fraudulent scheme to boost sales.  On December 31, 2015, Ironclad recognized four phony sales to three customers—Meridian Global, Pace Distributing, and Summit Work Apparel.

### Fourth Quarter 2015 – Meridian Global

34.    In December 2015, Ironclad engaged in a bogus transaction involving Meridian Global to inflate its revenues falsely by $413,640.

35.    Ironclad contracted with AMS Fulfillment ("AMS") to provide warehousing and fulfillment services.  AMS is headquartered and maintains warehouse facilities in the Santa Clarita Valley of California.

36.    Ironclad provided AMS with a December 30, 2015 purchase order from Meridian Global for 27,576 "Kong Rigger Grip Cut 5 Quanta" gloves for $413,640.  The Purchase Order, dated December 4, 2015, directs shipment to DRG Strategic, LLC, Bob Goldstein, 5656 N. Central Expressway, Dallas, Texas 75206.  The address on the purchase order is a residential building known as the "Highlands Residences."

37.    AMS received the order on December 30, 2015 for shipment the next day.  But the requested shipment method was "Will Call."  Ironclad then generated an invoice with a shipping address of Meridian Global, 28220 Industry Drive, Valencia CA 91355, which is the AMS warehouse's own address (not Meridian's).

38.    Based on this fictitious order, Ironclad recorded the sale of $413,640 on December 31, 2015 and deducted the items from inventory.  This allowed Ironclad to boost falsely its fourth

quarter 2015 sales revenues by $413,640.

39.    AMS never shipped the gloves to Meridian Global, which were picked from the warehouse and then moved to another AMS facility.  In early 2016, Ironclad instructed AMS to remove the "Quanta" label from the gloves and to assign the gloves a new "SKU number."  An SKU or Store Keeping Unit is an alphanumeric code that companies use to track and manage inventory.  By assigning a new SKU number, Ironclad/Meridian "returned" the unsold gloves to inventory and ultimately sold them to other customers.

40.    Meridian Global did not pay Ironclad the invoiced amount of $413,640.  Instead, Ironclad paid Meridian Global $41,364 for the "value add work" performed by AMS—in other words the cost of removing the "Quanta" labels so that the goods could be returned to inventory under a new SKU number.  Ironclad, however, never reversed the $413,640 sale to Meridian Global (rather, in the second quarter of 2016, Ironclad repurchased these same gloves from Meridian Global for a premium).

**Fourth Quarter 2015 – Pace Distributing #1**

41.    In December 2015, Ironclad engaged in two false transactions involving Pace Distributing.

42.    In a letter dated December 7, 2015, Cordes confirmed that Ironclad would sell goods to Pace Distributing to "be held for you in California at a separate warehouse until you can clear your Canada warehouse" and to "help spread the inventory burden," the sale would be "on extended terms."

43.    On December 31, 2015, Ironclad recorded a sale to Pace Distributing of 37,016 gloves for $482,364 (Inv. No. 0206062).  The shipping log posted the sale as "shipped," but the goods were never actually shipped.

44.    From this transaction, Ironclad improperly recognized $482,364 in sales in the

fourth quarter of 2015.

### Fourth Quarter 2015 – Pace Distributing #2

45.　　On December 31, 2015, Ironclad recorded a purchase order from Pace Distributing for 33,080 gloves for $494,126.

46.　　Ironclad posted the order as having shipped on December 31, 2015, but did not actually instruct AMS to pick the goods from inventory until February 19, 2016.　AMS requested an order number, but was told, on information and belief, that this was a "special situation" and no order number would be provided.

47.　　On March 10, 2016, AMS completed picking the inventory, but it was not shipped. In September and October 2016, the goods were returned to inventory.

48.　　From this transaction, Ironclad improperly recognized revenues in the amount of $494,126 in the fourth quarter of 2015.　These goods never shipped and the invoice was never paid.

### Fourth Quarter 2015 – Summit Work Apparel

49.　　On December 31, 2015, Ironclad generated an invoice for the sale of work gloves to Summit Work Apparel in the total amount of $170,867.60.　Unlike the Meridian Global and Pace orders, AMS shipped part of the order and Ironclad shipped another part, and did so before year end.　Based on the invoice and the shipments, Ironclad recognize the revenues from the sale to Summit Work Apparel ("Summit") in the fourth quarter of 2015.

50.　　But the revenues from the Summit transaction were fraudulently created by Cordes and Aisenberg.　The goods should never have shipped and Ironclad had no right to recognize the revenue.　This is all shown by emails involving Cordes and Aisenberg, which are summarized below.

51.　　The origin of the Summit transaction is not yet known, but clearly Summit was not interested in placing an order.　On December 30, 2015, Cordes intervened directly with Summit's

owner, Alan Habash.  In a December 30, 2015 email, Cordes assured Habash that if Summit takes

the proposed order, Ironclad "will get you out of items that are not moving."  Explaining why he

was offering this no risk deal, Cordes stated: "Our year end desire to make numbers is your

winning ticket."  Despite the assurances, Habash did not want the goods because Summit already

had sufficient inventory levels and felt that additional inventory would "outstrip demand."

52.    Despite the absence of an agreement, on December 31, 2015, Ironclad directed

AMS to ship the "ordered" goods to Summit.

53.    On January 5, 2016, a senior accountant at Ironclad informed Aisenberg about the

shipment to Summit and advised of the need to do a Return Goods Adjustment (RGA):

> Bill
>
> Keri just told me that they are going to do an RGA on the Summit
> invoice because it wasn't supposed to ship, although it did ship.  I
> think it was the same situation as the Action Specialties invoice[7]
> from 12/30/15.  The dollar amount for that invoice is $170,867.60.
> However, if they do a return, it will be in 2016.

54.    A few days later, on January 8, 2016, Tom Felton wrote to Aisenberg: "After we

have included all of the invoices that were missed, the Q4 grand total is $8,904[,000].  That puts

us at $24m [$24 million] for the year.  *This includes the $170[,000] for Summit that we are

leaving in Q4.  Will reverse in Q1 2016.*"  Aisenberg forwarded the e-mail to Cordes.

55.    By recognizing false revenues on the last day of the year, Ironclad's fourth quarter

sales in 2015 were $8,421,860 and its year-end sales were $23,582,019.  Compared to 2014, the

company's total revenues declined by 2.89%— not good, but far less than the true decline of

5.8%.

56.    On January 4, 2016, Cordes issued a "year-end update" to the Board.  He wrote,

"at this point, we are expecting revenues for the 4th quarter of 2015 to be approximately 8.3

million, a 9% drop from 2014."   He added that the full year revenues "are $23.5 million and

---

[7] The Action Specialties order, which shipped on 12/30/2015 and was returned early in 2016, was for $102,269.52.

3.2% off 2014." The update contained a detailed explanation for the shortfall and the efforts by Ironclad to replace the lost revenues.

57.    Cordes did not inform the Board that a substantial number of the sales, all occurring on the last day of the year, were fraudulent.

### Fiscal Year - 2016
### First Quarter 2016 – Consolidated Companies of Canada

58.    In 2016, Cordes again assured investors and the Board that Ironclad would increase sales and profitability. Cordes and Aisenberg continued their scheme.

59.    On the last day of the quarter, March 31, 2016, Ironclad recorded a sale in the amount of $264,285 to Consolidated Group of Companies Canada. The items that were supposedly ordered consisted of closeout items. AMS's tracking system indicates that the shipping method was "Will Call." Yet the goods never shipped and the buyer did not pick them up.

60.    The next quarter, in June 2016, both sales were cancelled.

61.    By falsely recognizing this sale, Ironclad's quarterly performance exceeded the prior year's quarter by 10%. Cordes boasted that he was "pleased to report a 10% increase in revenues this quarter."[8]

### Second Quarter 2016 – Meridian Global & Two Waters Trading

62.    Cordes and Aisenberg continued their fraudulent practices in the second quarter of 2016. On the last day of June, Ironclad improperly recognized two quarter-end sales to Meridian Global and Two Waters Trading in the total amount of $395,603.

63.    But before engaging in their typical end of quarter fraudulent sales bolstering, Cordes and Aisenberg had to "clean up" their previous fraudulent Meridian Global order from

---

[8] https://www.sec.gov/Archives/edgar/data/1301712/000072174816001248/icpw8k051116ex99_1.htm

December 30, 2015.  On February 4, 2016, Ironclad issued an invoice to itself whereby DRG Strategic, LLC (Bob Goldstein) supposedly sold 27,576 of the exact Kong Rigger gloves purchased on December 30, 2015 back to Ironclad for a total invoice amount of $455,004.  The shipping date was listed as 2/10/16 and the shipment was to go to "Ironclad Performance Wear."

64.    The difference between the price at which Ironclad sold the gloves to DRG Strategic and the price DRG Strategic sold the gloves back to Ironclad was a premium of $41,364.  As a result of the sale back to Ironclad, Ironclad issued a series of checks to DRG Strategic totaling $41,364 ($17,712 on March 2, 2016, $12,852 on March 17, 2016 and $10,800 on April 18, 2016) and recorded an A/R offset of the full initial sale amount ($413,640) to "reduce A/R bal due per Bill A" [referring to William/Bill Aisenberg].

65.    Then, on June 30, 2016, Ironclad recognized another bogus sale in the amount of $219,597.84 to Meridian Global.  Again, the order never shipped because, as noted above, Meridian Global was not a real customer.  On June 28, 2016, DRG Strategic generated a purchase order for 16,776 of the "Kong Rigger Grip Cut 5 Glove."  The order price was $219,597.84.  The listed shipping service was UPS with a delivery date of 7/31/16.  The purchase order requested delivery to Bob Goldstein at 5656 N. Central Expressway, Dallas, Texas 75206, which is a residential address.

66.    On June 30, 2016, Ironclad recorded a sale to Meridian Global of 16,776 Kong Rigger Quanta gloves, totaling $219,597.84 in sales (Inv. No. 0214692).

67.    As before, the ordered goods never shipped to Meridian and remained in AMS's warehouse, marked as "Will Call."

68.    On August 9, 2016, DRG Strategic, LLC issued a commercial invoice to Ironclad, selling back the 16,776 Kong Rigger Quanta gloves for $248,955.84.  The round-trip sale and return manipulation by Cordes and Aisenberg cost Ironclad another premium, this time for

$29,358.  Ironclad paid DRG Strategic this premium in a check dated September 9, 2016 and issued a credit memo for $219,597.84 described as "AR offset Meridian."

69.     On that last day of the second quarter of 2016, Ironclad also recognized a sale in the amount of $176,005 to Two Water Trading, even though the shipping log indicated that the goods were not available.  The Two Water Trading order did eventually ship, after payments in June, but not until July 8 and July 11, 2016 (*i.e.*, in the third quarter).

70.     These manipulations enabled Cordes to report a "4.3 percent sales increase" in the second quarter of 2016 and to assure investors that the company was "on path to solid growth at Ironclad."

### Fourth Quarter 2016

71.     Coming into the Fourth Quarter, Ironclad was again underperforming.  Yet Cordes expressed great optimism to the Board.  He said that the company would "gain momentum" and forecast a 20% increase in sales (2015's fourth quarter sales were $8.4 million) with "a potential up to $11 million."  [IC 1821].

72.     In fact, the results for the fourth quarter of 2016 were hardly better than 2015, and again they were tarnished by end-of-quarter revenue manipulations.  Two examples are described below.

### Fourth Quarter 2016 – Action Specialties

73.     On December 30, 2016, Ironclad recorded an order from Action Specialties totaling $99,321.12 in sales.

74.     AMS's shipping log indicated that the goods shipped on December 30, 2016.  But the invoice for the sale contains a notation at the bottom: "DID NOT PHYSICALLY SHIP ON 12-30-16."  In fact, the goods did not ship until January 5, 2017, as evidenced by the bill of lading.

75.     Thus, Ironclad improperly recognized revenues from the sale to Action Specialties

in the fourth quarter of 2016 that should have been recognized in the first quarter of 2017.

76.     Cordes, Aisenberg, and Felton were parties to emails showing that the Action Specialties' order had not shipped until after the end of the quarter in which the revenues were recognized.

77.     In addition to the Action Specialties' order, Ironclad improperly recognized revenues on a series of other customer orders that did not ship until the first quarter of 2017.  In total, including Action Specialties, Ironclad prematurely recognized at least $292,147 in sales in 2016 that should have been recognized in 2017.[9]

### Fourth Quarter 2016 – Meridian

78.     In addition to prematurely recognizes revenues, at the end of the fourth quarter of 2016, Ironclad also recognized another completely bogus sale to Meridian Global.

79.     On December 29, 2016, DRG Strategic, LLC issued a purchase order for 95,796 EXO Motor Pro Utility gloves for $332,445.48.  The payment terms were "due upon receipt of invoice."

80.     On December 30, 2016, Ironclad generated an invoice and recorded a sale of 95,796 EXO Motor Pro Utility gloves to Meridian Global for $332,445.48. (Inv. No. 0225936).

---

[9] Each of the following transactions were improperly recorded as sales and revenue at the very end of December 2016, even though the actual ship date confirms that these revenues should not have been recognized until January 2017.

| Customer | Invoice No. | Amount | Actual Ship Date |
|---|---|---|---|
| Mitre 10 Import Ltd | INV0225971 | $ 6,212 | 1/3/2017 |
| Dival Safety Equipment, Inc. | INV0225930 | $10,286 | 1/3/2017 |
| Vallen Distribution | INV0225939 | $ 8,951 | 1/3/2017 |
| Grainger – Roanoke #936 | INV0225915 | $13,342 | 1/3/2017 |
| Gabriel Brothers | INV0225908 | $ 3,360 | 1/3/2017 |
| Project Sales Corporation | INV0225949 | $29,441 | 1/4/2017 |
| Grainger – Minooka #005 | INV0225887 | $14,348 | 1/4/2017 |
| Grainger – Minooka #005 | INV0225910 | $ 7,691 | 1/4/2017 |
| Grainger – Minooka #005 | INV0225907 | $ 9,375 | 1/4/2017 |
| Action Specialties | INV0225931 | $99,321 | 1/5/2017 |
| Al Asayel Health & Safety FZE | INV0225898 | $40,460 | 1/6/2017 |
| PDS International | INV0225970 | $49,360 | 1/19/2017 |

The shipping address was 3515 Brown Street, Suite 122, Dallas TX 75219.

81.    According to AMS's records, the ship date for this order was December 30, 2016 and marked "will call."

82.    On February 20, 2017, DRG Strategic, LLC issued a commercial invoice to Ironclad to sell the same 95,796 gloves back to Ironclad for $339,151.20.

83.    Once again, Meridian was able to profit from the difference in price between the goods it "purchased" and those re-sold back to Ironclad.

84.    As a result of Cordes's and Aisenberg's misconduct, in the fourth quarter of 2016, Ironclad recognized $624,593 in additional revenues.

**2016 Summary**

85.    In 2016, Ironclad's reported sales—falsely enhanced by Cordes's and Aisenberg's illegal manipulations—of $24,986,878, which was a 6% improvement over 2015, but barely 2% higher than 2013 (the year before they joined).  In terms of profitability, 2016 was disastrous. The company lost $962,016.

86.    Capitalizing on their own misconduct, Cordes and Aisenberg authored a self-congratulatory letter to shareholders in March 2017, falsely bragging that "In 2016, the Ironclad team drove a 7% revenue increase."[10]

**The Whistleblowers**

87.    By accelerating and manipulating earnings, Cordes and Aisenberg must have known that their run was about to end.  For one thing, by falsely boosting past results, future improvement became more challenging.  Also, the volume and brazenness of their misconduct increased the likelihood of detection.  As they did at Walls, Cordes and Aisenberg surely understood that their best chance to avoid a reckoning would be to sell the company.  Moreover, the timing to do so was propitious.  Several important shareholders had lost patience with

---

[10] https://www.sec.gov/Archives/edgar/data/1301712/000072174817000185/icpw8k032417ex99_1.htm

management's failure to deliver on promised improvements.

88.    With the Board's consent, Cordes and Aisenberg began to explore the possibility of a strategic transaction, which would result in the sale of the company.  In this process, Cordes and Aisenberg demanded that the Board amend their employment agreements to enhance their upside from a corporate sale.  One significant change was the elimination of the "cause" exception to their 6-month severance right.  With the change, Cordes and Aisenberg obtained the right to collect 6 months' severance after termination of their employment, regardless of the circumstances of their departure.

89.    In negotiating the amendment of their employment agreements in early 2017, at no time did Cordes and Aisenberg advise the Board that Ironclad had improperly recognized more than $2 million in revenues.  Nor did they disclose that they were both aware of and involved in bogus transactions and the improper accounting decisions.  They also failed to disclose to the Board that Ironclad's books and records were inaccurate and that its publicly disclosed financials were erroneous and would require a restatement.  Not knowing any of this, the Board acceded to Cordes's and Aisenberg's requested amendments.

90.    On March 9, 2017, Cordes and Aisenberg publicly disclosed Ironclad's fourth quarter and year-end results for 2016.  The company's reported revenue exceeded the prior year's revenues by 7%.  The number was falsely stated because of the prior year's manipulations, as the public was soon to discover.

91.    The first hint of Cordes's and Aisenberg's misconduct was revealed publicly on April 9, 2017, when Ironclad was forced by its auditors to reverse a sale from the fourth quarter 2016.  The transaction in question was an end-of-quarter sale to Grainger, which Ironclad had recorded in 2016, even though the goods did not ship until January 4, 2017.

92.    On April 13, 2017 and on May 3, 2017, two employees "blew the whistle,"

reporting the improper revenue recognition practices to the Chairman of Ironclad's Audit Committee.   In response, on May 17, 2017, the Audit Committee launched an internal investigation, conducted by its outside counsel, Stubbs Alderton & Markiles, LLP, with forensic accounting assistance from RGP.  Later Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") was retained to supplement the internal investigation.  On June 29, 2017, Skadden interviewed Cordes and Aisenberg.

93.    The investigation uncovered documents evidencing the fraudulent acts, which it categorized as follows:

      a.   Posting a sale of goods for product that never shipped;

      b.   Posting a sale before goods shipped;

      c.   Sending goods to a customer without a valid purchase order;

      d.   Sending goods to a third-party warehouse or freight forwarder to simulate a shipment; and

      e.   Delaying recording of a Return Goods Authorization to manage earnings.

**Resignation**

94.    With the investigation closing in, on July 4, 2017, Cordes and Aisenberg resigned from their respective positions as officers (and in the case of Mr. Cordes, as a director) of Ironclad.

## VI.    OBJECTION TO CLAIM

**Breach of Fiduciary Duty**

95.    Paragraphs 1 to 94 are repeated and realleged as if set forth in full.

96.    Based on the above-described misconduct, the inequitable actions on the part of Cordes and Aisenberg, and the claims and counterclaims described herein, the Committee objects to the Cordes Claim and the Aisenberg Claim, pursuant to Federal Rule of Bankruptcy Procedure 3007 and request that the Claims be disallowed pursuant 11 U.S.C. § 502

97.    As senior executives of Ironclad, Cordes and Aisenberg owed the company a fiduciary duty, which required them to exercise their respective powers in good faith and with a view to the interests of the corporation.  As fiduciaries, Cordes and Aisenberg had an obligation to disclose to Ironclad's Board of Directors material information necessary to enable the Board to make informed decisions.

98.    As fiduciaries, Cordes and Aisenberg owed Ironclad a duty of loyalty and a duty of care, which requires them to put the company's interests above their own personal interests.

99.    Cordes and Aisenberg breached their fiduciary duties by not supplying Ironclad's Board of Directors with material information necessary to enable them to make an informed decision about whether to amend their employment agreements to enable them to receive severance payments even if they voluntarily resigned or were terminated for cause.

100.    The material information that they omitted to disclose included, *inter alia,* (a) that they were actively engaging in illegal acts and manipulations concerning Ironclad's sales and income figures; (b) that Ironclad's financial information was artificially inflated to make it appear that the company was performing better than it was; and (c) that the company's public financial disclosures were materially misstated and would likely require a costly restatement.

101.    Cordes's and Aisenberg's breach of fiduciary duties relating to the amendment of their employment agreements renders those agreements void or voidable, and the Committee elects to void them.

102.    Because the amendments to their employment agreements are void, Cordes and Aisenberg cannot recover severance under those amended provisions.

### Fraudulent Inducement

103.    Paragraphs 1 to 102 are repeated and realleged as if set forth in full.

104.    Cordes and Aisenberg induced Ironclad's Board of Directors to enter into the amendments to their employment agreements by making false statements and omissions

concerning Ironclad's financial performance and their own bad acts as company executives.

105.    The omissions and misstatements were material.

106.    Ironclad's Board of Directors reasonably and justifiably relied on Cordes's and Aisenberg's misrepresentations and omissions in deciding to amend their employment agreements and recast their severance rights.

107.    Ironclad was injured because of Cordes's and Aisenberg's misrepresentations and omissions by entering into the severance agreement, when it would otherwise have terminated their employment.

**Attorneys' Fees**

108.    Paragraphs 1 to 107 are repeated and realleged as if set forth in full.

109.    Cordes's and Aisenberg's claims for attorneys' fees must be denied because their claims are not covered by the Proprietary Inventions Agreement, but under the Indemnification Agreement and Arbitration Agreement, which do not provide for the recovery of legal fees on claims initiated by executives against Ironclad.

**VII.    COUNTERCLAIMS AND CAUSES OF ACTION AGAINST ALL DEFENDANTS**

**First Cause of Action**

**Breach of Fiduciary Duty**

110.    Paragraphs 1 through 109 are incorporated herein by reference in support of each of the other claims and causes of action.

111.    Cordes and Aisenberg were senior executives and officers of Ironclad and, as such, owed a fiduciary duty to the Committee which required them to put the company's interests above their own personal interests.

112.    Cordes and Aisenberg breached their fiduciary duties to Ironclad and the Committee, including the duty of loyalty and duty of care.  Cordes and Aisenberg breached these duties, by *inter alia*, (a) engaging in illegal acts and manipulations concerning Ironclad's sales

and income figures; (b) producing records and public filings that included false financial information, artificially inflated to make it appear that the company was performing better than it was; (c) lying to the Board of Directors and omitting material facts; (d) failing to accurately maintain the company's books and records; and (e) grossly mismanaging, *inter alia*, the sales, inventory, and accounting functions at Ironclad.

113.    Ironclad was injured as a direct and proximate result of Cordes's and Aisenberg's breach of fiduciary duties, and Cordes and Aisenberg benefited by the breach through continued employment and benefits arising under their employment agreements.

114.    The Committee's actual damages have been significant in terms of the costs of investigating, restating, and disclosing Ironclad's misreported and fabricated sales and earnings; the substantial loss in the value of Ironclad's stock; the losses from the selloff of assets; and the enormous costs of the bankruptcy itself—all of which were caused by Cordes's and Aisenberg's actions.

115.    The Committee is entitled to receive actual damages incurred as a result of Cordes's and Aisenberg's breach of fiduciary duties and punitive damages as a result of their willful and egregious misconduct.

**Second Cause of Action**

**Civil RICO (18 U.S.C. § 1962(c))**

116.    Paragraphs 1 through 115 are incorporated herein by reference in support of each of the other claims and causes of action.

117.    Cordes, Aisenberg, and others, including Tom Felton, conducted and participated in an enterprise through a pattern of racketeering activity that caused injury to Ironclad.

118.    The enterprise is an association-in-fact of Cordes, Aisenberg, Felton, and possibly others.  In this enterprise, Cordes, Aisenberg, and Felton infiltrated two companies, established themselves in key positions—Cordes as chief executive or president, Aisenberg in charge of

finance, and Felton in an operational position.  Once established in these position, Cordes, Aisenberg, Felton, and others created bogus transactions and otherwise manipulated the books and records of the target company to misrepresent the value of the company.  At Walls, they were able to the sell the company, based on these false financial records, for artificially inflated values.  At Ironclad, they were unable to sell the company because employees blew the whistle.

119.    The pattern of racketeering activity consists of multiple acts of mail and wire fraud through illegal accounting manipulations that occurred over a period of many years, including an unspecified period while they were employed by Walls and then at Ironclad from at least 2015-2017.

120.    Cordes and Aisenberg used the interstate wires and mails to implement their fraudulent schemes.

121.    Cordes and Aisenberg acted with the requisite *mens rea* in that the accounting manipulations were conducted with their knowledge and, often times, with their direct participation.

122.    Ironclad's business and property were injured directly by Cordes's and Aisenberg's racketeering activity, which caused it to incur professional costs in connection with the investigation, correction, and restatement of its financials, triggered violations of creditor debt covenants, and resulted in the filing of a voluntary bankruptcy proceeding and consequent sale of Ironclad's business.

123.    The Committee is entitled to recover from Cordes and Aisenberg threefold the damages sustained by Ironclad as a result of their violations of 18 U.S.C. § 1962.

**Third Cause of Action**

**Declaratory Judgment**

124.    Paragraphs 1 through 123 are incorporated herein by reference in support of each of the other claims and causes of action.

125.    Cordes and Aisenberg fraudulently induced Ironclad's Board of Directors to amend their employment agreements to provide for severance under circumstances including a voluntary resignation or where cause for termination exists.

126.    Cordes's and Aisenberg's fraudulent statements and omissions are set forth above, but generally relate to their misconduct with respect to Ironclad's books and records and the inaccurate and fraudulent financial statements and reports that resulted.

127.    As fiduciaries, moreover, Cordes and Aisenberg owed Ironclad and its Board of Directors a duty of candor, which they breached with respect to the accounting misconduct and their past misconduct at Walls.

128.    Ironclad's Board of Directors would not have enhanced Cordes's and Aisenberg's severance packages had it known the truth about Ironclad's performance and Cordes's and Aisenberg's misconduct.

129.    As a result of their misconduct, Cordes's and Aisenberg's amended employment agreements are voidable and are voided.

130.    The Committee is therefore entitled to a declaratory judgment stating that the amendments to Cordes's and Aisenberg's employment contracts are void.

**Fourth Cause of Action**

**Breach of Contract**

131.    Paragraphs 1 through 130 are incorporated herein by reference in support of each of the other claims and causes of action.

132.    Cordes and Aisenberg agreed to abide by Ironclad's Code of Ethical Conduct ("Code").

133.    Cordes and Aisenberg violated numerous policies in the Code, including making improper payments to Meridian, engaging in dishonest activities, signing and filing false financial statements (including those submitted to the SEC), committing violations of law, and failing to

report misconduct to the company's Board of Directors or Audit Committee.

134.    Cordes's and Aisenberg's breaches of the Code caused Ironclad to suffer damages, including not only the damage to the company from the investigation, restatement, and forced sale, but also by paying salaries and benefits to Cordes and Aisenberg that the Company otherwise would not have paid.

135.    The Committee is entitled to recover compensatory damages, consequential damages, and restitution of all salary and benefit payments made to Cordes and Aisenberg as a result of their multiple breaches of contract.

**Fifth Cause of Action**

**Faithless Servant**

136.    Paragraphs 1 through 135 are incorporated herein by reference in support of each of the other claims and causes of action.

137.    As officers and, in the case of Cordes, as a director, Cordes and Aisenberg owed Ironclad a duty of loyalty and the utmost good faith.

138.    Cordes and Aisenberg breached their duties of loyalty and good faith by engaging in fraudulent and improper transactions for the purpose of masking their own poor performance, by lying about the company's financial performance, by engaging in fraudulent transactions with third parties to manipulate the company's books and records, and by failing to make an honest account of their prior misconduct at Walls.

139.    As faithless agents, Cordes and Aisenberg were not entitled to receive the wages and stock-based compensation that they received from Ironclad and were unjustly enriched.

140.    Cordes's and Aisenberg's bad faith permeated the performance of their duties and their disloyalty permeated the services they provided in its most substantial and material part.

141.    In equity and good conscience, Cordes and Aisenberg should not be permitted to retain the benefits from their faithless performance of duties.

142.    The Committee is entitled to recover from Cordes and Aisenberg in restitution all amounts paid to them as compensation for their disloyal services.

## VIII.    CONCLUSION AND PRAYER

WHEREFORE, on the basis of the foregoing, Plaintiff respectfully requests a judgment or orders against the Claimant-Defendants as follows:

(a)    an order disallowing the Claim, in whole or in part;

(b)    an order awarding actual damages and punitive damages to Plaintiff against each Defendant;

(c)    an order directing payment to Plaintiff of such amounts by which the Defendants are found to have been unjustly enriched;

(d)    an order awarding treble damages for the financial injuries caused by Defendants' racketeering activities;

(d)    an order awarding the reasonable and necessary costs and attorneys' fees incurred in bringing and prosecuting this objection and counterclaim; and

(e)    such other and further relief as the Court deems appropriate.

Dated: January 26, 2017                Respectfully submitted,

SOLOMON & CRAMER LLP
By _____
        Andrew T. Solomon
        Jennifer G. Cramer

Attorneys for the Official Committee of
Equity Security Holders

- 27 -